No. 23-50201

# In the United States Court of Appeals for the Fifth Circuit

La Union del Pueblo Entero; Friendship-West Baptist Church; South-west Voter Registration education Project; Texas Impact; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velasquez Institute; James Lewin; Fiel Houston, Incorporated,

*Plaintiffs - Appellees*,

*v.*

Gregory W. Abbott, in his Official Capacity as Governor of Texas Et al,

*v.*

Senator Paul Bettencourt; Representative Briscoe Cain,

*Third-Party Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## APPELLANTS' EMERGENCY MOTION FOR A STAY, AN ADMINISTRATIVE STAY, AND IN THE ALTERNATIVE PETITION FOR MANDAMUS

(Counsel Listed on Inside Cover)

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

Benjamin D. Wilson
Deputy Solicitor General
Benjamin.Wilson@oag.texas.gov

Counsel for Appellants

## Certificate of Interested Persons

No. 23-50201

La Union del Pueblo Entero; Friendship-West Baptist Church; Southwest Voter Registration education Project; Texas Impact; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velasquez Institute; James Lewin; Fiel Houston, Incorporated,

*Plaintiffs - Appellees*,

*v.*

Gregory W. Abbott, in his Official Capacity as Governor of Texas Et al,

*v.*

Senator Paul Bettencourt; Representative Briscoe Cain,

*Third-Party Appellants*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ Benjamin D. Wilson
Benjamin D. Wilson
*Counsel of Record for*
*Legislator-Appellants*

# Table of Contents

Page

Certificate of Interested Persons.............................................................ii

Table of Authorities ...............................................................................iv

Introduction and Statement of Emergency ............................................ 1

Statement of Jurisdiction ....................................................................... 3

Statement of the Case ............................................................................ 4

    I.   The S.B. 1 Litigation................................................................ 4

    II.  The *Lulac v. Hughes* Appeal................................................... 5

    III. Plaintiffs' Motion to Compel And The District Court's Order.................. 6

Argument ................................................................................................ 8

    I.   This Court Should Issue a Stay Pending Resolution of *Lulac v. Hughes*. ............................................................................ 8

        A.   The legislative privilege protects legislators from discovery into the subjective motivations for their legislative acts...................... 8

        B.   The remaining factors favor a stay. .....................................13

    II.  In the Alternative, This Court Should Issue A Writ of Mandamus.......................................................................15

        A.   Appellants have a clear and indisputable right to relief.......................16

        B.   Should the Court believe the collateral order doctrine inapplicable, appellants have no other adequate means of obtaining relief. ..................................................................16

        C.   Issuing the writ would be particularly appropriate here. ................... 18

Conclusion ............................................................................................ 18

Certificate of Service............................................................................ 20

Certificate of Compliance .................................................................... 20

Certificate of Conference ..................................................................... 21

# Table of Authorities

Page(s)

**Cases:**

*Almonte v. City of Long Beach*,
    478 F.3d 100 (2d Cir. 2007) ............................................................. 12

*Am. Trucking Ass'ns, Inc. v. Alviti*,
    14 F.4th (1st Cir. 2021) ..................................................... 9, 11, 12

*In re Avantel, S.A.*,
    343 F.3d 311 (5th Cir. 2003) ...........................................................17

*Biblia Abierta v. Banks*,
    129 F.3d 899 (7th Cir. 1997) .............................................................. 9

*Brnovich v. Democratic Nat'l Comm.*,
    141 S. Ct. 2321 (2021) ..................................................................... 14

*Bruce v. Riddle*,
    631 F.2d 272 (4th Cir. 1980) ...........................................................13

*Campaign for S. Equal. v. Bryant*,
    773 F.3d 55 (5th Cir. 2014) .............................................................15

*In re City of N.Y.*,
    607 F.3d 923 (2d Cir. 2010) .............................................................13

*Dombrowski v. Eastland*,
    387 U.S. 82 (1967) (per curiam) ...................................................... 14

*In re E.E.O.C.*,
    207 F. App'x 426 (5th Cir. 2006) (per curiam)............................. 13, 17

*Gravel v. United States*,
    408 U.S. 606 (1972) ........................................................................... 9

*In re Hubbard*,
    803 F.3d 1298 (11th Cir. 2015) .............................................9, 10, 11, 12

*Hunt v. Blackburn*,
    128 U.S. 464 (1888) ..........................................................................17

*In re Itron, Inc.*,
    883 F.3d 553 (5th Cir. 2018)..................................................16, 17, 18

*In re Kellogg Brown & Root, Inc.*,
    756 F.4d 754, 760-61 (D.C. Cir. 2014) ...................................... 16, 17

*Klier v. Elf Atochem N. Am., Inc.*,
    658 F.3d 468 (5th Cir. 2011) ...........................................................16

*Lee v.City of Los Angeles,*
   908 F.3d 1175 (9th Cir. 2018) .................................................. 10, 12, 14

*Leonard v. Martin,*
   38 F.4th 481 (5th Cir. 2022) ......................................................... 3, 4, 15

*Lulac Texas v. Hughes,*
   No. 22-50435 ....................................................................................*passim*

*Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.,*
   559 F.3d 1191 (11th Cir. 2009) ................................................................15

*Mohawk Indus., Inc., v. Carpenter,*
   558 U.S. 100 (2009) ............................................................................... 4

*In re Paxton,*
   60 F.4th 252 (5th Cir. 2023) ....................................................................15

*In re Pros. Direct Ins. Co.,*
   578 F.3d 432 (6th Cir. 2009) ....................................................................13

*S. Pac. Transp. Co. v. San Antonio,*
   748 F.2d 266 (5th Cir. 1984) ....................................................................15

*In re Schlumberger Tech. Corp.,*
   818 F. App'x 304 (5th Cir. 2020) (per curiam) ........................................ 17, 18

*In re Sealed Case,*
   121 F.3d 729 (D.C. Cir. 1997) (per curiam) ...........................................13

*In re: Sealed Case (Med. Records),*
   381 F.3d 1205 (D.C. Cir. 2004) ............................................................. 2

*In re Sealed Case (Med. Records),*
   381 F.3d a 1210 ....................................................................................13

*Tenney v. Brandhove,*
   341 U.S. 367 (1951) ............................................................ 2, 9, 10, 14

*Tex. Democratic Party v. Abbott,*
   961 F.3d 389 (5th Cir. 2020) ................................................................ 8

*Thomas v. Bryant,*
   919 F.3d 298 (5th Cir. 2019) ................................................................ 8

*In re U.S. Dep't of Homeland Sec.,*
   459 F.3d 565 (5th Cir. 2006) ................................................................17

*United States v. Brewster,*
   408 U.S. 501 (1972) .............................................................................9, 12

*United States v. Gillock,*
   445 U.S. 360 (1980) ......................................................................... 11, 12

v

*United States v. Helstoski*,
   442 U.S. 477 (1979) ......................................................................9, 12
*United States v. O'Brien*,
   391 U.S. 367 (1968) ......................................................... 14
*Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*,
   913 F.3d 443 (5th Cir. 2019) ................................... 3
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ....................................................10, 12
*In re Volkswagen of Am., Inc.*,
   545 F.3d 304 (5th Cir. 2008) (en banc) ............................16
*Vote.Org v. Callanen*,
   39 F.4th 297 (5th Cir. 2022) ........................................8, 13
*Whole Woman's Health v. Smith*,
   896 F.3d 362 (5th Cir. 2018) ......................................3, 13

**Constitutional Provisions, Statutes, and Rules:**
U.S. Const.:
   amend. I ................................................................ 4, 10
   amend. XIV ............................................................ 4
28 U.S.C. § 1291 ...................................................... 3
Voting Rights Act:
   Section 2 ................................................................ 4
   Section 208 ............................................................ 4
Fed. R. Civ. P. 45 .................................................... 7

**Other Authorities:**
Appellees' Br., *Lulac v. Hughes*, No. 22-50435 (5th Cir. July 18, 2022) ................. 1
Press Release, Off. of Tex. Gov., *Governor Abbott Delivers 2021 State of the State Address* (Feb. 1, 2021), https://tinyurl.com/abbott2021address ............... 4
Reply Br*., Lulac v. Hughes*, 22-50435 (5th Cir. July 27, 2022) .............................1, 5
S.J. of Tex., 87th Leg., 2d C.S. 188 (2021) ............................... 4
Second Amended Complaint, *LUPE v. Abbott*, No. 5:21-cv-844 (W.D. Tex. Jan. 19, 2022) ........................................ 4

## Introduction and Statement of Emergency

This Court is currently considering whether legislative privilege protects against intrusive discovery into the subjective motivations of members of the Texas Legislature—including in communications with agents of those legislators—and held oral argument on August 2, 2022. *See Lulac Texas v. Hughes*, No. 22-50435. This Court has also stayed discovery in other cases presenting similar issues pending the disposition of the appeal in *Hughes*. *See Lulac v. Patrick*, No. 22-50662 (5th Cir. July 27, 2022) (granting administrative stay pending disposition of *Hughes*). Nonetheless—in this, the same case that gave rise to the *Hughes* appeal—plaintiffs sought and the district court required deposition testimony and document production from Alan Vera, a volunteer for the Harris County Republican Party who communicated with legislators—including appellants Senator Paul Bettencourt and Representative Briscoe Cain—concerning S.B. 1 and its predecessor legislation at their behest.

Unable to obtain the documents they seek from legislators because this Court's decision remains pending, plaintiffs have sought and the district court has blessed a simple workaround—obtain documents subject to this Court's judgment in that appeal by requiring other witnesses turn them over and testify concerning them.[1] This

---

[1] At least some of the same documents and testimony covered by this filing are directly at issue in *Hughes*. Plaintiffs in that appeal contended that legislators' communications with Mr. Vera in particular were not privileged. *See* Appellees' Br. at 44-45, *Lulac v. Hughes*, No. 22-50435 (5th Cir. July 18, 2022) (contending documents shared between lawmakers and third parties like Mr. Vera are not protected by legislative privilege). The legislators in that appeal disagreed. *See* Reply Br. at 20-21, *Lulac v. Hughes*, 22-50435 (5th Cir. July 27, 2022) (contending that privilege is not waived).

Court should not allow plaintiffs to evade its judgment in advance by requiring documents and testimony from Mr. Vera before it has decided the *Hughes* appeal.

As in *Hughes*, plaintiffs again forthrightly admit that they seek testimony and documents to determine "the [legislators'] contemporaneous thoughts and motivations in drafting and enacting S.B. 1." App. D at 17 (Motion to Compel, ECF No. 547). And they do so despite the Supreme Court's admonition that it is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). To make matters worse, the district court repeatedly threatened sanctions, promising: "if Mr. Vera does not produce and talk about" the material at issue here, "heads will roll." App. B at 36-37. Tr. of Mot. Hearing at 36-37, ECF No. 562.

This Court should grant an administrative stay and a stay of the district court's order insofar as it requires Mr. Vera to produce documents covered by legislative privilege or testify about topics covered by legislative privilege pending the resolution of the appeal in *Lulac v. Hughes*. Absent such a stay, the allegedly privileged material "will have been disclosed to third parties" before this Court will be able to address that appeal, "making the issue of privilege effectively moot," at least as to those communications concerning Mr. Vera. *In re: Sealed Case (Med. Records)*, 381 F.3d 1205, 1210 (D.C. Cir. 2004) (citation omitted). In other words, the proverbial "cat [will be] out of the bag." *Id.* In the alternative, appellants request the court construe this motion as a petition for a writ of mandamus and grant the writ to prevent discovery of testimony and documents covered by legislative privilege from being disclosed before this Court has resolved *Lulac v. Hughes*.

Because the district court's order requires Mr. Vera to produce documents that are subject to legislative privilege in response to a subpoena on April 10, this Court should grant relief no later than **April 10.**

## Statement of Jurisdiction

Though 28 U.S.C. § 1291 limits appellate jurisdiction to "final decisions," the "Supreme Court has long given § 1291 a practical rather than a technical construction." *Leonard v. Martin*, 38 F.4th 481, 486 (5th Cir. 2022) (quotation marks omitted). As a result, certain "collateral rulings" are "immediately appealable" if they: "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) [would] be effectively unreviewable on appeal from a final judgment." *Id.* (quoting *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 448 (5th Cir. 2019)).

Each of those criteria are met here. *First*, "the district court's discovery order was conclusive on [appellants], such that failure to comply with it may result in sanctions" if Mr. Vera does not produce documents and testify. *Whole Woman's Health v. Smith*, 896 F.3d 362, 367 (5th Cir. 2018). Indeed, the district court has already promised as much. *Second*, this case presents an "important question[] separate from the merits" of the underlying litigation. *Id.* Appellants are third parties to the litigation, and their privilege assertions are independent of any merits ruling. *Third*, "the consequence of forced discovery here is 'effectively unreviewable' on appeal from the final judgment." *Id.* The privilege assertion "at issue involves an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Leonard*, 38 F.4th at 486 (quotation marks omitted). As this Court has

explained in a related context, "[o]nce information is published, it cannot be made secret again." *Vantage*, 913 F.3d at 449.

Like requiring a nonparty to unseal confidential business documents or allowing discovery against a non-party with important First Amendment implications, this appeal "implicates 'some particular value of a high order' or 'substantial public interest' that would be imperiled or destroyed if review were delayed until after entry of an archetypal final judgment." *Leonard*, 38 F.4th at 487 (quoting *Mohawk Indus., Inc., v. Carpenter*, 558 U.S. 100, 107 (2009)).

## Statement of the Case

### I.   The S.B. 1 Litigation

In his 2021 State of the State address, Governor Abbott announced that "Election Integrity w[ould] be an emergency item" during that year's legislative session. Press Release, Off. of Tex. Gov., *Governor Abbott Delivers 2021 State of the State Address* (Feb. 1, 2021), https://tinyurl.com/abbott2021address. After considerable acrimony and multiple special sessions of the Texas legislature, the final version of S.B. 1 passed both the House and Senate along party lines. S.J. of Tex., 87th Leg., 2d C.S. 188 (2021). Governor Abbott promptly signed the bill into law. *Id.* at 280.

Consistent with the pattern seen throughout the country in 2020, numerous lawsuits challenging S.B. 1 were quickly filed. Nearly three dozen individuals and groups as well as the United States have filed five separate complaints that take aim at S.B. 1. Plaintiffs' operative complaint, filed in January 2022, asserts four claims under the First and Fourteenth Amendments as well as sections 2 and 208 of the Voting Rights

Act. Second Amended Complaint, *LUPE v. Abbott*, No. 5:21-cv-844 (W.D. Tex. Jan. 19, 2022). Discovery has been ongoing since that time.

## II. The *Lulac v. Hughes* Appeal

Disputes related to legislative privilege in this case are currently before this Court. In December 2021, plaintiffs served sweeping third-party subpoenas on several state legislators, including Senator Paul Bettencourt and Representative Briscoe Cain, who are appellants in *Lulac v. Hughes* and this matter. Most relevant to this filing, those third-party subpoenas sought extensive document discovery to probe the legislators' subjective intent in passing S.B. 1—including communications that those legislators had with the Office of the Lieutenant Governor, the Office of the Attorney General, the Texas Legislative Council, and other individuals. After the district court held documents were either not protected by any privilege or that those privileges had been waived, the legislators took an appeal to this Court.

In that appeal, the legislators contended that their communications with individuals who are not members of the legislature—including Alan Vera—remain protected by the legislative privilege because they served as a source of information for legislators in their work in formulating S.B. 1—even if not formally employed by a legislature. *See* Reply Br. at 20-21, *Lulac v. Hughes*, 22-50435 (July 27, 2022).

This Court heard oral argument in that matter on August 2, 2022. The Court has, however, not yet decided that appeal.

### III. Plaintiffs' Motion to Compel And The District Court's Order

On February 27, plaintiffs deposed Alan Vera. *See* Vera Depo. Tr. at 1. Consistent with the arguments they made in *Lulac v. Hughes*, attorneys for the defendants from the Attorney General's Office—which also represents the legislators that are parties to the *Hughes* appeal and this appeal—objected based on legislative privilege to questions that would require Mr. Vera to disclose "the contents of any communications that he made in response to an inquiry from a legislator or legislative staff" where "the scope of the question appeared to potentially encompass [Vera's] communications to the legislators or legislative staff in response to a legislative inquiry." App. C at 79-80. Counsel repeated this objection when necessary, and Mr. Vera was careful not to disclose communications covered by the legislative privilege. *E.g.*, App. C at 117-18.

Counsel for plaintiffs held Mr. Vera's deposition open, App. C at 168, and filed a motion to compel on Saturday, March 4. The district court noticed a hearing on that motion on March 6 and held a hearing on March 7.

At that hearing, the district court explained that it had "already ruled on any number of occasions that the privilege is only applicable to a legislator and that the legislative privilege can be waived by third parties entering into that relationship that only belongs between a legislator and their staff member." App. B at 8-9. Based on its prior rulings, the district court expressed the view that invocation of the legislative privilege was therefore "groundless" and stated that Mr. Vera would be "reposed" and the "[c]ost of the second deposition of Mr. Vera will be borne by the State of Texas Attorney General's Office." App. B at 9. The district court further

expressed that "from here on out, lawyers and individuals will be held in contempt of court for failure to abide by my orders" and "it will go up the food chain, so you can tell that to your office as well." App. B at 23-24. When further addressing legislative privilege, the district court stated that "if Mr. Vera does not produce and not talk about all of this"—including documents that the *Hughes* appeal may determine are protected by legislative privilege—"heads will roll." App. B at 36-37. The State made an oral motion for the district court to stay its ruling on the motion to compel, which the district court denied. App. B at 20.

On Friday March 9, the district court issued an order formalizing what it had expressed orally at the hearing on the motion to compel. App. A. The court explained that it viewed legislative privilege objections concerning Mr. Vera's communications with legislators as "meritless." App. A at 7. It further ordered that costs for the renewed deposition would be "assessed against the Office of the Attorney General of Texas" because "[c]ounsel in the Attorney General's Office was the individual responsible for asserting the meritless objections." *Id.* The Court directed plaintiffs to serve a third-party subpoena on Mr. Vera under Federal Rule of Civil Procedure 45 and further awarded plaintiffs "reasonable attorneys' fees associated with the filing of their motion to compel and their appearance at the hearing held on March 7, 2023." *Id.*

Plaintiffs subsequently served a third-party subpoena on Mr. Vera requiring the production of documents by April 10. Appellants therefore request this Court enter relief no later than **April 10, 2023**.

**ARGUMENT**

## I.   This Court Should Issue a Stay Pending Resolution of *Lulac v. Hughes*.

To determine if a party is entitled to a stay pending appeal, this court considers "(1) whether the applicant has made a strong showing of likelihood to succeed on the merits; (2) whether the movant will be irreparably harmed absent a stay; (3) whether issuance of a stay will substantially injure other interested parties; and (4) where the public interest lies." *Vote.Org v. Callanen*, 39 F.4th 297, 302-03 (5th Cir. 2022) (quoting *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019)). Where the "balance of equities weigh[] *heavily* in favor of granting the stay" then only a "*serious legal question*" is required. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020).

For the reasons already briefed in *Hughes*, appellants are likely to succeed—and have at a bare minimum presented a "substantial case" and shown the equites are heavily in their favor. *Id.* There is little basis to require production of documents and testimony at issue in the *Hughes* appeal immediately, where that case has been submitted for months and a decision may be imminent.

### A.   The legislative privilege protects legislators from discovery into the subjective motivations for their legislative acts.

Legislative privilege protects legislators from discovery into their motives for their legislative acts in private, civil litigation. There is no dispute here that plaintiffs seek testimony and documents to determine "the [legislators'] contemporaneous thoughts and motivations in drafting and enacting S.B. 1." App. D at 7. This Court should not allow plaintiffs to obtain a subset of exactly the same information they

8

would obtain from the legislators themselves merely by demanding it from Mr. Vera—particularly while it is actively considering the legislators' appeal in *Lulac v. Hughes*. Such discovery would vitiate the legislators' privilege and allow a simple end-run around this Court's judgment should the legislators succeed on appeal.

**1.** The legislative privilege generally shields from inquiry acts of legislators and their agents undertaken when "acting in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376. It both "protects 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts'" and "precludes any showing of how [a legislator] acted, voted, or decided." *United States v. Helstoski*, 442 U.S. 477, 489 (1979) (quoting *United States v. Brewster*, 408 U.S. 501, 525, 527 (1972)). The legislative process includes not only "words spoken in debate," but also "[c]ommittee reports, resolutions, and the act of voting" and "things generally done" during a Legislature's session "by one of its members in relation to the business before it." *Gravel v. United States*, 408 U.S. 606, 617 (1972). In essence, "[t]he privilege protects the legislative process itself, and therefore covers . . . legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015); *see also, e.g.*, *Biblia Abierta v. Banks*, 129 F.3d 899, 905 (7th Cir. 1997) ("An inquiry into a legislator's motives for his actions, regardless of whether those reasons are proper or improper, is not an appropriate consideration for the court.")

At least three other circuits have held that the federal-common-law legislative privilege protects state or local legislators from third-party discovery seeking to probe the legislators' motivations for legislative acts in private, civil litigation. *Am.*

*Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th at 88-90 (1st Cir. 2021); *Lee v.City of Los Angeles*, 908 F.3d 1175, 1186-88 (9th Cir. 2018); *Hubbard*, 803 F.3d at 1311-12.

In *Lee*, for example, the Ninth Circuit affirmed a district-court order that prohibited plaintiffs from deposing several city councilmembers and the Mayor of Los Angeles in a racial gerrymandering case on the grounds of legislative privilege. 908 F.3d at 1181, 1186-88. The court observed that the Supreme Court "has repeatedly stressed that 'judicial inquiries into legislative or executive motivation represent a substantial intrusion' such that calling a decision maker as a witness 'is therefore usually to be avoided.'" *Id.* at 1187 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). Even acknowledging that the case involved "serious allegations" of racial gerrymandering during the redistricting process, the Court nevertheless found no justification for "the 'substantial intrusion' into the legislative process" that authorizing the third-party discovery at issue would cause. *Id.* at 1188 (quoting *Vill. of Arlington Heights*, 429 U.S. at 268 n.18). And the court emphatically rejected the plaintiffs' "call for a categorical exception whenever a constitutional claim directly implicates the government's intent" since such an exception "would render the privilege 'of little value.'" *Id.* (quoting *Tenney*, 341 U.S. at 377).

Similarly, in *Hubbard* the Eleventh Circuit held that a district court abused its discretion in failing to quash third-party subpoenas duces tecum that were served on legislators and executive branch officials in a First Amendment retaliation case. 803 F.3d at 1308. The Eleventh Circuit rejected the district court's reliance on a multi-factor balancing test, *id.*, and instead concluded that "[t]he privilege applies

10

with full force against requests for information about the motives for legislative votes and legislative enactments," *id.* at 1310. Because "[t]he subpoenas' only purpose was to support the lawsuit's inquiry into the motivation[s]" of legislators, the court concluded that it "struck at the heart of the legislative privilege." *Id.* at 1311.

The Eleventh Circuit recognized that "a state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests such as 'the enforcement of federal criminal statutes.'" *Id.* at 1311 (quoting *United States v. Gillock*, 445 U.S. 360, 373 (1980)). But it concluded that the privilege is less likely to give way in "civil actions by private plaintiffs" than in "criminal prosecutions by the federal government." *Id.* at 1312. And it was not overcome in the case before it: private, civil litigation challenging an "otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it." *Id.*

Most recently, in *Alviti* the First Circuit applied the legislative privilege to reverse the denial of motions to quash subpoenas that "sought evidence of [Rhode Island] State Officials' legislative acts and underlying motives." 14 F.4th at 87. The court observed that "federal courts will often sustain assertions of legislative privilege by state legislatures except when 'important federal interests are at stake,' such as in a federal criminal prosecution." *Id.* (quoting *Gillock*, 455 U.S. at 373). The question before the court was whether the district court erred in concluding that discovery into "the State Officials' subjective motives outweighed the comity considerations implicated by the subpoenas." *Id.* at 88. The First Circuit held they did not, reasoning that "mere assertion of a federal claim" was not sufficient to overcome the privilege and concluding that if it were "the privilege would be pretty much

11

unavailable largely whenever it is needed." *Id.* The court also held that "proof of the subjective intent of state lawmakers is unlikely to be significant enough in this case to warrant setting aside the privilege" where the claim did not turn on such evidence. *Id.* at 88-89. It also noted that the "Supreme Court has warned against relying too heavily on . . . evidence" of subjective intent, which "is often less reliable and therefore less probative than other forms of evidence bearing on legislative purpose." *Id.* at 90.

These decisions, unlike the district court's decision here, are consistent with where the Supreme Court has "drawn the line" for legislative privilege. *Gillock*, 445 U.S. at 373. Legislative privilege may yield to the federal government's interest in federal criminal prosecutions, but it does not yield in "civil actions" absent extraordinary circumstances. *Id.*; *see Vill. of Arlington Heights*, 429 U.S. at 268 & n.18.

Legislative privilege "protects 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts'" and "precludes any showing of how [a legislator] acted, voted, or decided." *Helstoski*, 442 U.S. at 489 (quoting *Brewster*, 408 U.S. at 525, 527). As in *Lee*, *Hubbard*, and *Alviti*, legislative privilege protects providing documents and information to legislators here, particularly when those documents or information are provided at a legislator's behest.

**2.** Nor have state legislators waived the privilege by having discussions with Mr. Vera to obtain information. The legislative privilege necessarily extends to communications with certain "persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents," when those communications

are in furtherance of legislators' "discharge of their legislative duty." *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007). Indeed, "[m]eeting with 'interest' groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures." *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980); *accord In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (per curiam) (discussing "need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources"). Any alternative rule would deprive legislators of the ability to understand facts on the ground and obtain opinions outside the legislature—encouraging legislatures to act insularly, without the benefit of subject matter experts or opinions from constituents.

## B.  The remaining factors favor a stay.

The legislators will be irreparably harmed by the vitiation of the privilege absent a stay, plaintiffs will not be substantially injured by a stay, and the public interests lies with a stay. *Vote.Org*, 39 F.3th at 302-03.

**1.** Absent a stay, legislative privilege will be vitiated before this Court can rule in *Hughes*. Thus, the "cat [will be] out of the bag" with no opportunity to appeal the district court's legislative privilege determination. *In re Sealed Case (Med. Records)*, 381 F.3d a 1210. As this Court has previously explained, "[a]ssuming privilege exists, there is no adequate remedy on appeal for the revelation of this information." *In re E.E.O.C.*, 207 F. App'x 426, 430 (5th Cir. 2006) (per curiam); *Smith*, 896 F.3d at 367-68 ("a new trial order can hardly avail a third-party witness who," having had a claim of privilege rejected during discovery, "cannot benefit directly from such

relief"); *see also In re City of N.Y.*, 607 F.3d 923, 934 (2d Cir. 2010); *In re Pros. Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009).

And it makes no difference that plaintiffs have sought to obtain documents from Mr. Vera that they cannot obtain from the legislators themselves before this Court decides *Hughes*. The same privileges that are designed to protect the legislative process apply irrespective of the particular source the documents. And allowing them to do so would destroy the legislators' privilege before this Court has a chance to decide its contours and whether to vindicate it. Allowing the plaintiffs to invade legislative privilege—particularly when this Court may be only days away from deciding *Hughes*—will irreparably harm the legislators whose documents will be disclosed.

**2.** On the other hand, plaintiffs will suffer little harm if they are simply obliged to wait until this Court has decided *Hughes* to obtain discovery consistent with this Court's judgment. Indeed, whether at least some legislators' communications with Mr. Vera are covered by the legislative privilege is directly at issue in that appeal. This Court submitted *Hughes* for decision after oral argument in early August last year, so plaintiffs are unlikely to have to wait long to discover the extent of the documents and testimony they can obtain related to Mr. Vera. And whatever information plaintiffs may obtain is of dubious evidentiary value in any event. *E.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349-50 (2021); *United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork.").

**3.** The public interests likewise favor a stay. The harm to legislators from invasive discovery into their legislative acts also harms "the public good." *Tenney*, 341 U.S. at 377; *see Lee*, 908 F.3d at 1187. Our system of government depends on legislators being able to gather facts and legislate without being subject to invasive discovery concerning their legislative actions. *See, e.g.*, *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (per curiam). It would severely undermine the public interest to allow the district court to require production of materials that legislators assert are privileged when this Court is poised to decide that question—as to at least some of the same documents in the same case—shortly. Indeed, as this Court and others have explained, this Court's forthcoming decision in *Hughes* provides ample support for a stay. *See, e.g.*, *Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 58 (5th Cir. 2014) (granting stay pending appeal given that Fifth Circuit would be assessing similar claims in related cases in the next month); *see also Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009) (federal appellate decision that is "likely to have a substantial or controlling effect" is "good" or "excellent" reason for granting stay).

## II.   In the Alternative, This Court Should Issue A Writ of Mandamus.

In the alternative, appellants request this Court construe their motion as a petition for a writ of mandamus and grant the writ. *See Martin*, 38 F.4th at 488 (collecting authority allowing the Court to construe an appeal as a petition for a writ of mandamus) *S. Pac. Transp. Co. v. San Antonio*, 748 F.2d 266, 270 (5th Cir. 1984).

For a writ of mandamus to issue, "(1) the petitioner must show his right to the writ is clear and indisputable; (2) the petitioner must have no other adequate means

of obtaining relief; and (3) the issuing court must be satisfied in its own discretion that the writ is appropriate under the circumstances." *In re Paxton*, 60 F.4th 252, 255 (5th Cir. 2023). Each of these criteria is met here.

### A.  Appellants have a clear and indisputable right to relief.

"The 'right to the issuance of the writ is necessarily clear and indisputable' if 'the district court clearly abused its discretion.'" *In re Itron, Inc.*, 883 F.3d 553, 568 (5th Cir. 2018) (quoting *In re Volkswagen of Am., Inc.,* 545 F.3d 304, 311 (5th Cir. 2008) (en banc)). And "[b]y definition, a district court abuses its discretion when it makes an error of law or applies an incorrect legal standard." *Id.* (quoting *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011).

Appellants right to relief is clear for many of the same reasons they are entitled to a stay on the merits. *Supra* Part I.A. For the reasons explained there, the district court reached the erroneous legal conclusion—relying on its previous reasoning now under review by this Court in *Lulac v. Hughes*—to determine that none of Mr. Vera's communications with legislators are protected by legislative privilege. By applying the wrong law, the district court abused its discretion, giving appellants a clear right to relief.

### B.  Should the Court believe the collateral order doctrine inapplicable, appellants have no other adequate means of obtaining relief.

Second, should this Court conclude that the collateral order doctrine is not applicable, Appellants have no other adequate means of obtaining relief. "This requirement is 'often . . . met in cases where a petitioner claims that a district court erroneously ordered disclosure of attorney-client privileged documents." *In re Itron*, 883

F.3d at 567 (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.4d 754, 760-61 (D.C. Cir. 2014)).[2] Indeed, "[o]ne area where this Court has granted mandamus relief is in the context of privileged documents" where "such an order would not be reviewable on appeal." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 568 (5th Cir. 2006).

There is little to distinguish the legislative privilege from the attorney-client privilege here. Just as in the context of attorney-client privilege, if Mr. Vera is "compelled to produce documents protected by a privilege, that privilege will be lost and the district court's order will then be effectively unreviewable after final judgment." *In re Avantel, S.A.*, 343 F.3d 311, 317 (5th Cir. 2003). As this Court has previously explained, "[a]ssuming privilege exists, there is no adequate remedy on appeal for the revelation of this information." *In re E.E.O.C.*, 207 F. App'x at 430. And, just like the attorney-client privilege, the ability of legislators to communicate fully and frankly with outside experts will "dissipate if [legislators] are not 'free from the consequences or the apprehension' that a court might order" their communications disclosed. *In re Schlumberger Tech. Corp.*, 818 F. App'x 304, 308 (5th Cir. 2020) (per curiam) (quoting *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888)).

---

[2] Appellants maintain that this Court has jurisdiction to consider this appeal for the reasons expressed in the statement of jurisdiction. As third-parties to the underlying proceedings, this is not a case where "interlocutory appeal is not available in attorney-client privilege cases (absent district court certification)." *In re Itron*, 883 F.3d at 567 (quoting *Kellogg*, 756 F.3d at 760-61)).

### C.  Issuing the writ would be particularly appropriate here.

A writ of mandamus would be appropriate under these circumstances. This Court has rested this determination on, for example, an "issue's importance beyond the immediate case," *In re Itron*, 883 F.3d at 568, or the purpose of the underlying privilege. *In re Schlumberger*, 818 F. App'x at 308. The issues presented by both this motion and the *Lulac v. Hughes* appeal are important to the law of this circuit; the district court's determination that documents and testimony like those at issue here are not protected by legislative privilege threatens to chill legislative investigation and factfinding. And the district court's conclusion departs from at least three courts of appeals.

Moreover, mandamus is appropriate because the district court ordered Mr. Vera to produce documents and give testimony covered by legislative privilege even though this Court is considering exactly this issue in *Hughes*—and indeed is considering whether some of the very documents that must be produced under its order are covered by legislative privilege. *Supra* n.1. Though the district court was fully aware of that appeal and that it promises to resolve this issue, it nonetheless insisted that Mr. Vera produce documents and testify before this Court has resolved the scope of appellants' legislative privilege.

### Conclusion

The Court should stay the district court's order compelling Mr. Vera to produce documents and testify concerning topics covered by legislative privilege pending *Hughes*. Appellants likewise requests an administrative stay by **April 10** pending

resolution of this motion. In the alternative, Appellants requests that the court issue a writ of mandamus to protect the legislative privilege.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Judd E. Stone II
Solicitor General

/s/ Benjamin D. Wilson
Benjamin D. Wilson
Deputy Solicitor General
Benjamin.Wilson@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Appellants

## CERTIFICATE OF SERVICE

On March 27, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Benjamin D. Wilson
Benjamin D. Wilson

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d) because it contains 5,043 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Benjamin D. Wilson
Benjamin D. Wilson

## Certificate of Conference

Counsel for legislator-appellants sought to obtain the position of plaintiff-appellees on this motion via email on March 24 and March 27, 2023 and via telephone on March 27, 2023. As of the time of this filing, counsel has been unable to ascertain the position of plaintiff-appellees.

/s/ Benjamin D. Wilson
Benjamin D. Wilson

23-50201

# In the United States Court of Appeals for the Fifth Circuit

La Union del Pueblo Entero; Friendship-West Baptist Church; Southwest Voter Registration education Project; Texas Impact; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velasquez Institute; James Lewin; Fiel Houston, Incorporated,

*Plaintiffs-Appellees*,

*v.*

Gregory W. Abbott, in his Official Capacity as Governor of Texas Et al,

*v.*

Senator Paul Bettencourt; Representative Briscoe Cain,

*Third-Party Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## APPENDIX TO APPELLANTS' MOTION FOR A STAY, AN ADMINISTRATIVE STAY, AND IN THE ALTERNATIVE PETITION FOR MANDAMUS

# TABLE OF CONTENTS

1.  Order on Motion to Compel ................................................... Appendix A
2.  Hearing Transcript on Motion to Compel............................ Appendix B
3.  Transcript of Oral Deposition of Alan Vera .......................... Appendix C
4.  Motion to Compel ............................................................... Appendix D
5.  Response to Motion to Compel ............................................ Appendix E

APPENDIX A

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | Civil Action No. SA-21-CV-00844-XR |
| v. | § | |
| | § | |
| GREGORY W. ABBOTT, IN HIS | § | |
| OFFICIAL CAPACITY AS GOVENOR | § | |
| OF TEXAS *et al.*; | § | |
| *Defendants.* | § | |

## **ORDER**

On this day came on to be considered: (1) Plaintiffs' Motion to Compel Production of Documents and to Compel Testimony of Defendant Intervenor Harris County Republican Party (ECF No. 547) and the responses thereto (ECF Nos. 555, 560), and (2) the parties' Joint Motion for Clarification of the Scheduling Order (ECF No. 542). After careful consideration, the Court issues the following order.

## **BACKGROUND**

In August 2021, the Texas Legislature passed Senate Bill 1 ("SB 1"), which amended various provisions of the Texas Election Code pertaining to voter registration, voting by mail, poll watchers, and more. In the days and weeks after the law was enacted, numerous parties began filing complaints against various Texas state officials (the "State Defendants") and local elections administrators in this district, challenging certain provisions of SB 1 under the United States Constitution and various federal civil rights statutes. In the interest of judicial economy, these were consolidated under the above-captioned case, as it was first filed.[1]

---

[1] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021)

In October 2021, several local and national Republican committees (the "Committees"), including The Harris County Republican Party ("HCRP" or "Defendant-Intervenor"), sought to intervene in this case. ECF No. 57. The Court denied their motion, concluding that the Committees had not established a legally protectable interest at stake in this litigation or that the State Defendants' representation of their purported interests would be inadequate. *See* ECF No. 122 at 2–7. The Fifth Circuit reversed the Court's order denying intervention, concluding that the Committees' interest in SB 1's provisions concerning party-appointed poll watchers—an interest raised for the first time on appeal—warranted intervention. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022).

In May 2022, the Court granted the Committees' renewed motion to intervene and, after giving the parties an opportunity to confer, the parties submitted a proposed Amended Scheduling Order on June 7, 2022, to accommodate the Committees' participation in the case and various delays caused by discovery disputes. *See* Text Orders dated May 13, 2022 and May 18, 2022; ECF No. 436. The next day, the Court entered the Amended Scheduling Order tracking the parties' proposal. ECF No. 437.

The HCRP now seeks to avoid producing certain discovery to the Plaintiffs. *See* ECF No. 560. Specifically, Plaintiffs seek to compel Defendant-Intervenor to comply with Requests for Production Numbers 1[2] and 3[3], which it previously agreed to produce at a hearing on November 14, 2022. The relevant exchange between counsel for the HCRP and the Court was as follows:

---

and *Mi Familia Vota v. Abbott*, No. 5: 21-cv-920 (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex. 2021); *United States v. Texas*, No. 5:21-cv-1085 (W.D. Tex. 2021), ECF No. 13.

[2]  REQUEST FOR PRODUCTION NO. 1. All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Texas Legislature regarding SB 1, SB 7, HB 3, or HB 6.

[3] REQUEST FOR PRODUCTION NO. 3. All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Office of the Texas Governor, the Office of the Texas Attorney General, the Office of the Texas Lieutenant Governor, or the Office of the Texas Secretary of State regarding SB 1, SB 7, HB 3, or HB 6.

> THE COURT: Okay. So then I'm hearing from you that you're going
> to produce all documents responsive to Request for Production
> Number 1 without objection and without any assertion of privileges
> by December 1. Is that what I'm hearing?
>
> MR. GORE: Yes, Your Honor.
>
> ***
>
> [After further discussion regarding the similarities between RFP 1
> and 3, the Court stated:]
>
> THE COURT: So I expect Number 3 is going to be fully complied
> with by December 1.

ECF No. 487, Hr'g Tr. at 13:17–22, 35:3–4. The Court warned counsel that, to the extent that the production was deficient, it would entertain sanctions. *Id.* at 18:2–7. In its written order memorializing its rulings on the parties' discovery disputes, the Court further cautioned that a party found to have "improperly assert[ed] a privilege [during a deposition] may be required to bear the costs of any re-deposition." ECF No. 490 at 20.

On December 1, 2022, Defendant-Intervenor served 61 documents responsive to Plaintiffs' requests. On February 27, 2023, Alan Vera, who served as Chair of the Harris County Republican Party Ballot Security Committee was deposed. Defendant-Intervenor identified Mr. Vera as a relevant custodian and person with knowledge of relevant facts. In his deposition, Mr. Vera testified that he communicated extensively with legislators and legislative staff regarding SB1 from June of 2020 through September 2021. He also met with several of these legislators and staff members in person and gave them documents. He further testified that he had email and phone calls with these individuals, providing legislators with proposed language for SB1 and giving "feedback" to Texas State Senator Paul Bettencourt and State Representatives Jacey Jetton, Valoree Swanson, and Briscoe Cain. He wrote many notes throughout this process. His communications included discussions of mail ballot harvesting, poll watchers, penalties that

3

should be assessed against election officials, drive-through voting, and other matters relevant to this litigation.

On February 28, Defendant-Intervenor produced Cynthia Siegel as its Rule 30(b)(6) representative. Ms. Siegel testified that Mr. Vera represented the HCRP in communicating with the Texas Legislature. She also testified that Mr. Vera used his personal email address when communicating because he did not possess an official HCRP email address.

When Mr. Vera was questioned about whether anyone associated with the HCRP instructed him to search for any responsive documents, he testified that he made no such search of his personal computer or email accounts.

The Court held a hearing on both pending motions on March 7, 2023. As stated in open court and set out more fully below, both motions are **GRANTED**.

## DISCUSSION

### A.    Possession, Custody or Control

Defendant-Intervenor argues that it was under no obligation to produce any of Mr. Vera's documents because the material was not in the possession, custody, or control ("PCC") of the Harris County Republican Party. Defendant-Intervenor otherwise asserts the legislative privilege, an argument this Court has already rejected in this litigation.[4]

PCC is not defined in Federal Rule of Civil Procedure 34 explicitly. Some jurisdictions have stated that a party must produce documents if the party has actual possession, custody or control or has the legal right to obtain the documents on demand. Other jurisdictions have stated that "control" can be found where a party has the practical ability, to acquire the documents. *See*

---

[4] The Court has already noted that the legislative privilege belongs solely to a legislator, and he/she is the only person able to assert that privilege. Neither Mr. Vera nor Defendant-Intervenor can assert the privilege. *See* ECF No. 425 at 4–13. The Court has further concluded that the privilege can be waived if data or documents are shared with anyone outside the legislator/staff relationship. *Id.* That is exactly what occurred here.

*e.g.*, *In re Application of Potanina*, No. 14 MISC. 31 LAP, 2015 WL 4476612, at *1 (S.D.N.Y. June 30, 2015). Despite the fact that many perceive courts in the Fifth Circuit bound to the "legal right" test,[5] many district courts in the Circuit apply a hybrid test—Rule 34 contemplates a party's legal right or practical ability to obtain documents from a non-party to the action. *See, e.g.*, *Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, No. 4:19-CV-1118, 2020 WL 10759435, at *1 (S.D. Tex. Mar. 2, 2020) (citing cases).

This case presents a situation that falls outside the norm of most of these disputes. Here, Mr. Vera acted as the agent for the HCRP but used only using his personal computer and personal email address because the HCRP did not provide him with any equipment. Nonetheless, the Court is satisfied that, under either test, the HCRP is required to search for and produce documents responsive to the requests for production at issue located on Mr. Vera's personal computer and email account. *See id.* at *2 (concluding that the defendant organization had *both* the legal right *and* practical ability to obtain any items responsive to the plaintiffs' discovery requests in the possession of one of its agents).

Defendant-Intervenor failed to conduct a search of Mr. Vera's computer or email account or even to request that he do so personally. Instead, Defendant-Intervenor merely searched its own email servers. At the hearing on March 7, 2023, counsel for Defendant-Intervenor argued that there was no need to search Mr. Vera's personal computer because he would have copied someone with an HCRP email address whenever he was acting as its agent. But counsel failed to conduct any meaningful inquiry into whether Mr. Vera's computer or email account contained relevant communications made on Intervenor-Defendant's behalf in which Mr. Vera failed to copy an

---

[5] *See* The Sedona Conference, *The Sedona Conference Commentary on Rule 34 and Rule 45 "Possession, Custody, or Control"*, 17 SEDONA CONF. J. 467 (2016) (stating the Fifth Circuit is a legal right test jurisdiction, but then citing cases that apply the hybrid approach).

HCRP email address.  Indeed, the legislators could have responded to Mr. Vera's emails without responding to all.  Accordingly, all messages may not be located solely in HCRP's emails.  Without a review of Mr. Vera's computer and email account, counsel for Defendant-Intervenor was unable to accurately represent that Defendant-Intervenor's production was complete under Rule 26(g).  Further, any objection now being lodged at the hearing that a review of Mr. Vera's emails would be unduly burdensome lacks merit.  No such objection was noted at the November 14, 2022 hearing, and no evidence has been put forward supporting any objection.  Counsel's argument is not evidence.  Likewise, any argument now being raised that Mr. Vera represents other individuals in some form of lobbying capacity and a review of his email would be improper is also rejected as untimely.  In addition, the Court is not authorizing any wholesale intrusion into Mr. Vera's computer by the Plaintiffs.  All that is being required is that HCRP and Mr. Vera make a reasonable inquiry into his emails and produce responsive documents.

On a separate note, the Court observes that  the State Defendants were previously required to produce to the Court for an in-camera inspection documents that the State Defendants claimed were privileged. The State Defendants' production to the Court contained fewer than 20 communications between Mr. Vera and various legislators (*see* ECF No. 425 at 48–49, 51–53, 55) while Mr. Vera's own (potentially deficient) production contained 61 documents suggests that the State Defendants' earlier production to the Court may have been incomplete.

**B.     Inappropriate Objections Asserted and Non-Responsive Answers made during the deposition of Mr. Vera**

During Mr. Vera's deposition, counsel for the State Defendants instructed Mr. Vera not to answer various questions based upon the legislative privilege. At other times, Mr. Vera limited his

responses independently citing the privilege. As stated above, and as previously ordered, these objections were meritless.[6]

It is **ORDERED** that Mr. Vera submit to another deposition, with costs assessed against the Office of the Attorney General of Texas. Counsel in the Attorney General's Office was the individual responsible for asserting the meritless objections. Further, that counsel knew at the time he made such objections that he did not represent any of the legislators and that no legislator instructed him to make the objection on their behalf. Further, that counsel knew or should have known of this Court's prior rulings on this matter and that any legislative privilege had been waived because the material was shared outside the legislator/staffer relationship. Plaintiffs are further awarded their reasonable attorneys' fees associated with the filing of their motion to compel and their appearance at the hearing held on March 7, 2023.

Plaintiffs are **DIRECTED** to issue a serve a third-party subpoena under Rule 45 on Mr. Vera in connection with his re-deposition directing him to produce the documents identified in Requests for Production Numbers 1 and 3. This does not relieve HCRP from supplementing its production and producing responsive documents.

It is further **ORDERED** that Mr. Vera and the HCRP produce all documents responsive to the two requests for production at least **fourteen calendar days** prior to the second deposition.

## C.    Motion to Clarify Scheduling Order

The current scheduling order, a proposal submitted and largely agreed to by both parties, was signed on June 8, 2022. ECF No. 437. The parties now dispute the meaning of their own proposal and ask the Court to clarify the scope of discovery. At the hearing, the parties announced

---

[6] At the hearing, counsel for the State Defendants made an oral motion to stay this ruling pending the resolution of the appeal of the Court's previous order on the legislative privilege currently pending before the Fifth Circuit. See ECF No. 426. The Court denied the motion to stay in light of counsel's acknowledgment at the hearing that no legislator actually asserted the privilege during the deposition of Mr. Vera, who is neither a legislator nor a legislative staffer.

that additional discovery is still required to prepare this case for either cross-motions for summary judgment or trial.

The First Amended Scheduling Order is **VACATED**. The parties are **ORDERED** to submit a proposed scheduling order to govern the remainder of this case **no later than March 21, 2023**.

The State Defendants also seek to limit the remaining depositions of Keith Ingram, Director of the Elections Division of the Texas Secretary of State, under Rules 30(b)(1) and 30(b)(6), to a total of nine hours of combined record time. Mr. Ingram has already been deposed for nearly twelve hours—first, as a witness in his individual capacity for over four hours, and then as the sole designee during the first 30(b)(6) deposition of the Texas Secretary of State, which lasted for almost eight hours over the course of two days.

As agreed to by the State Defendants, the additional deposition of Mr. Ingram, whether he is testifying as a fact witness or a 30(b)(6) witness, will be limited to a total of nine hours of combined record time. If Mr. Ingram is unable to answer any questions in his capacity as a 30(b)(6) witness, however, the nine-hour limit will not apply to any additional 30(b)(6) representative that the State Defendants may need to designate in order to answer the questions that Mr. Ingram cannot answer.

## CONCLUSION

The Joint Motion for Clarification of the Scheduling Order (ECF No. 542) is **GRANTED**, and a second amended scheduling order will issue separately. The parties are **ORDERED** to submit a proposed scheduling order to govern the remainder of this case **no later than March 21, 2023**.

Any additional deposition of Mr. Ingram, whether he is testifying as a fact witness or a 30(b)(6) witness, will be limited to a total of nine hours of combined record time.

Plaintiffs' Motion to Compel Production of Documents and to Compel Testimony of Defendant-Intervenor Harris County Republican Party (ECF No. 547) is **GRANTED**.

Plaintiffs are **DIRECTED** to issue a serve a third-party subpoena under Rule 45 on Mr. Vera in connection with his re-deposition directing him to produce the documents identified in Requests for Production Numbers 1 and 3. Mr. Vera must be re-deposed and counsel for Defendant-Intervenor must search Mr. Vera's computer and email for responsive documents. It is further **ORDERED** that Mr. Vera and the HCRP produce all documents responsive to the two requests for production at least **fourteen calendar days** prior to the second deposition.

The Office of the Attorney General of Texas is sanctioned for failing to comply with this Court's previous rulings on the legislative privilege and shall bear the costs of the re-deposition of Mr. Vera. Plaintiffs are further awarded their reasonable attorneys' fees associated with the filing of their motion to compel and their appearance at the hearing held on March 7, 2023.

In failing to search Mr. Vera's computer and email account for responsive documents, the Harris County Republican Party failed to comply with FED. R. CIV. P. 26(g), failed to comply with the Court's Order set forth at the November 14, 2022 hearing, and failed to promptly produce documents in violation of Federal Rule of Civil Procedure 37(c).

The parties have been warned previously in this case about discovery abuse and obfuscation practices that seek to hinder the truth-finding function that should take place in the resolution of this matter. If additional discovery misconduct occurs, the level of sanctions will be increased accordingly and those responsible for the misconduct will be held in contempt of court.

It is so **ORDERED**.

**SIGNED** March 9, 2023.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

Appendix B

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF TEXAS
 2                          SAN ANTONIO DIVISION

 3
     LA UNION DEL PUEBLO ENTERO,      .
 4   ET AL,                           .
                                      .
 5              PLAINTIFFS,            .
          vs.                         . DOCKET NO. 5:21-CV-844-XR
 6                                    .
     GREGORY W. ABBOTT, ET AL,        .
 7                                    .
                DEFENDANTS.           .
 8

 9

10                    TRANSCRIPT OF MOTION PROCEEDINGS
                  BEFORE THE HONORABLE XAVIER RODRIGUEZ
11                     UNITED STATES DISTRICT JUDGE
                            MARCH 7, 2023
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                            FATIMA L. MENENDEZ, ESQUIRE
                              JULIA RENEE LONGORIA, ESQUIRE
18                            KENNETH PARRENO, ESQUIRE
                              MALDEF
19                            100 BROADWAY STREET, #300
                              SAN ANTONIO TX 78205
20

21                            JENNIFER JAESEON YUN, ESQUIRE
                              UNITED STATES DEPARTMENT OF JUSTICE
22                            150 M STREET NE, 8TH FLOOR
                              WASHINGTON DC 20002
23

24

25
```

```
 1

 2                              ZACHARY DOLLING, ESQUIRE
                                TEXAS CIVIL RIGHTS PROJECT
 3                              1405 MONTOPOLIS DRIVE
                                AUSTIN TX 78741
 4

 5   FOR THE DEFENDANTS:        CHRISTOPHER HILTON, ESQUIRE
                                OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 6                              P.O. BOX 12548
                                CAPITAL STATION
 7                              AUSTIN TX 78701

 8

 9                              JOHN M. GORE, ESQUIRE
                                JONES DAY
10                              51 LOUISIANA AVENUE NW
                                WASHINGTON DC 20001
11

12                              MARINA EISNER, ESQUIRE
                                STATES UNITED DEMOCRACY CENTER
13                              1101 17TH STREET NW
                                WASHINGTON DC 20036
14

15                              DAVID LOUK, ESQUIRE
                                COOLEY LLP
16                              3 EMBARCADERO CENTER, 20TH FLOOR
                                SAN FRANCISCO CA 94000
17

18                              BEN L. STOOL, ESQUIRE
                                CRIMINAL DISTRICT ATTORNEY'S OFFICE
19                              OF DALLAS COUNTY, TX
                                500 ELM STREET, SUITE 6300
20                              DALLAS TX 75202

21

22                              ANTHONY J. NELSON, ESQUIRE
                                TRAVIS COUNTY ATTORNEY'S OFFICE
23                              314 WEST 11TH STREET, ROOM 590
                                AUSTIN TX 78701
24

25
```

```
 1

 2                      LEIGH ANN TOGNETTI, ESQUIRE
                        HIDALGO COUNTY CRIMINAL DISTRICT ATTY
 3                      100 E. CANO
                        EDINBURG TX 78539
 4

 5                      LISA V. CUBRIEL, ESQUIRE
                        BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
 6                      CIVIL DIVISION
                        101 W. NUEVA STREET, 7TH FLOOR
 7                      SAN ANTONIO TX 78205

 8

 9                      ERIC J.R. NICHOLS, ESQUIRE
                        BUTLER SNOW LLP
10                      1400 LAVACA STREET, SUITE 1000
                        AUSTIN TX 78701
11

12                      JONATHAN GABRIEL CHAIM FOMBONNE, ESQ
                        SAMEER SINGH BIRRING, ESQUIRE
13                      HARRIS COUNTY ATTORNEY'S OFFICE
                        1019 CONGRESS, 15TH FLOOR
14                      HOUSTON TX 77002

15

16

17

18

19

20  REPORTED BY:        GIGI SIMCOX, RMR, CRR
                        OFFICIAL COURT REPORTER
21                      UNITED STATES DISTRICT COURT
                        SAN ANTONIO, TEXAS
22

23

24

25
```

```
 1        (San Antonio, Texas; March 7, 2023, at 4:00 p.m., in open
 2   court and Zoom videoconference.)
 3            THE COURT:  Let's call La Union del Pueblo Entero
 4   versus Gregg Abbott, 21 civil 844.
 5            Who do we have for the plaintiffs?
 6            MISS PERALES:  For LUPE plaintiffs, Your Honor, Nina
 7   Perales.  And with me today in the courtroom, Samantha Selma
 8   [phonetic], Julia Longoria, Fatima Menendez, and Kenneth
 9   Parreno.
10            THE COURT:  Thank you.
11            Anyone else, appearances?
12            MISS YUN:  Jennifer Yun for the United States.
13            THE COURT:  Anyone else?
14            MR. DOLLING:  Zachary Dolling on behalf of the OCA
15   plaintiffs.
16            THE COURT:  And for the State?
17            MR. HILTON:  Good afternoon, Your Honor, Chris Hilton
18   from the Attorney General's Office for the State defendants.
19   There may be some other AG folks on Zoom, but I'll be the only
20   one speaking today.
21            THE COURT:  Who is representing the Harris County
22   Republican Party?
23            MR. HILTON:  That's John Gore.
24            MR. GORE:  Good afternoon, Your Honor.
25            THE COURT:  Mr. Gore, okay.
```

1          And do we have anyone else on the line representing

2    any of the other defendants?

3          MISS EISNER:  Good afternoon, Your Honor, Marina

4    Eisner representing El Paso County Elections Administrator

5    Lisa Wise from State's United Democracy Center.

6          THE COURT:  Thank you.

7          MR. LOUK:  David Louk from Cooley LLP also

8    representing defendant Wise from El Paso County.

9          THE COURT:  Thank you.

10          MR. STOOL:  Your Honor, this is Ben Stool from Dallas

11    County representing the Dallas County Elections Administrator

12    and the Dallas County District Attorney.

13          THE COURT:  Thank you.

14          So we are here on ─

15          MR. NELSON:  Your Honor ─

16          THE COURT:  Yes.

17          MR. NELSON:  I'm sorry.

18          Tony Nelson, Assistant Travis County Attorney for the

19    Travis County District Attorney and Travis County Clerk.

20          THE COURT:  Thank you.  Sorry, so the way it is being

21    displayed, I can't see that there's more people on the Zoom.

22          MISS TOGNETTI:  Also, Leigh Ann Tognetti from the

23    Hidalgo County District Attorney's Office representing the

24    Hidalgo County Election Administrator Hilda Salinas.

25          THE COURT:  Thank you.

1          Anybody else out there?  No one else.

2          MISS CUBRIEL:  Your Honor, Lisa Cubriel.

3          THE COURT:  Thank you; for Bexar County.

4          MISS CUBRIEL:  I'm here on — yes, Your Honor.  I

5   injured my ankle or I would have been there in person.

6          THE COURT:  Thank you.  You didn't have much of a

7   walk to go.

8          MR. NICHOLS:  Your Honor, Eric Nichols.  We're not

9   involved in the dispute today, but I represent the Harris

10  County District Attorney's Office.

11         THE COURT:  Thank you.  Okay.

12         MR. BIRRING:  Your Honor, Sameer Birring is here for

13  the Harris County Attorney's Office for the Harris County

14  Elections Administrator.  I believe Jonathan Fombonne is also

15  online from the Harris County Attorney's Office.

16         MR. FOMBONNE:  Yes, Your Honor, I'm here.

17         THE COURT:  Okay.  So we have two matters here, a

18  motion to compel regarding documents that Mr. Vera may or may

19  not have, and a deposition that took place, and then a motion

20  to clarify the scheduling order.

21         So first thing, let's take up the Vera deposition.

22         Who served as Mr. Vera's attorney during that

23  deposition?

24         MISS PERALES:  Your Honor, that counsel is named

25  Mr. Andy Taylor.

1            THE COURT:  Mr. Gore, is Mr. Taylor co-counsel with
2   you, or how does that work?
3            MR. GORE:  Mr. Taylor is not co-counsel with us.  I
4   represent the Harris County Republican Party and the other
5   intervenor defendant and Mr. Taylor represents Mr. Vera.
6            THE COURT:  So which attorney from either the
7   intervenor, the State defendants, or Mr. Taylor asserted the
8   legislative privilege?
9            MR. GORE:  The legislative privilege was asserted by
10  the State defendants during Mr. Vera's deposition.
11           THE COURT:  Mr. Hilton, were you the lawyer asserting
12  those privileges?
13           MR. HILTON:  Your Honor, I was not the attorney
14  asserting those privileges.  That was Mr. Will Wassdorf.
15           But just a point of clarification, the — we also
16  represent these legislators for many other purposes and
17  include some of them in this case, so the assertion of this
18  privilege, really more by the attorney than the State
19  defendant themselves.
20           We filed a brief shortly before the hearing today,
21  just to get something on file with —
22           THE COURT:  No, sir.  Wait a minute.  Let's wait
23  here.
24           So at the time of Mr. Vera's deposition, did any of
25  the individual legislators assert the privilege?

1    MR. HILTON:  I don't understand the question.  They
2  weren't at the deposition.
3    THE COURT:  No, sir.  So the question is real simple.
4    The legislative privilege is only to be asserted by a
5  legislator.  The question is which, if any, legislators
6  asserted that privilege during the time that Mr. Vera was
7  being deposed.
8    MR. HILTON:  If I understand your question, which of
9  those legislators had one of their attorneys there, you know,
10  asserting privilege exclusively on their behalf, then the
11  answer would be they did not have an attorney at the
12  deposition.
13    THE COURT:  So the answer is neither the legislator
14  nor any attorney representing a legislator invoked the
15  legislative privilege, is that correct?
16    MR. HILTON:  With the caveat that I provided earlier
17  that we do represent these legislators both in this and other
18  litigation for many purposes, but, yes, Mr. Wassdorf was there
19  as the attorney for the State defendants.
20    THE COURT:  For the State defendants, not the
21  legislators?
22    MR. HILTON:  Yes, Your Honor.
23    THE COURT:  So there was no meritorious invocation of
24  the legislative privilege for a variety of reasons.
25    I've already ruled on any number of occasions that

1  the privilege is only applicable to a legislator and that the

2  legislative privilege can be waived by third parties entering

3  into that relationship that only belongs between a legislator

4  and their staff member.

5         So Mr. Wassdorf, by invoking the legislative

6  privilege, was in violation of my previous orders asserting

7  groundless objections.  So the remedy for all of that is that

8  Mr. Vera will be redeposed.

9         He will be redeposed at the expense -- so now, I was

10 going to impose that upon the Harris Republican Party, but

11 since from what I understand the Harris Republican Party is

12 not responsible for these meritless objections, it was the

13 State defendants.  Cost of the second deposition of Mr. Vera

14 will be borne by the State of Texas Attorney General's Office.

15        In addition, any costs associated by the plaintiffs

16 in filing this motion to compel will be assessed against the

17 State defendants, as well as any cost of reasonable attorneys

18 fees for attendance of today's hearing.

19        Now let's talk about the documents that Mr. Vera or

20 the Harris County Republican Party should have tendered.

21        So, Mr. Gore, did you ever instruct Mr. Vera to

22 search for any documents that were responsive in Requests for

23 Productions 1 or 3?

24        MR. GORE:  Your Honor, we searched our files at the

25 Harris County Republican Party for documents responsive to

1   Request Numbers 1 and 3, including documents that would have

2   come from Mr. Vera.  That included emails that were sent by

3   Mr. Vera to legislators, many of which were produced.

4         On those emails when he reached out to legislators at

5   the initiative of the Harris County Republican Party or on his

6   own initiative, he copied or otherwise included members of the

7   Harris County Republican Party at their official email

8   accounts on those communications.

9         I just want to sharpen what the dispute is about here

10   in this particular motion.  There are two categories of

11   communications involving Mr. Vera, those that Mr. Vera

12   initiated with the legislature on behalf of the Harris County

13   Republican Party, and those that he sent to individual

14   legislators in response to their requests.

15         So we searched and located those emails that he had

16   sent on behalf of the Harris County Republican Party.  We

17   produced those and those were at issue and subject to his

18   testimony in the deposition.  He was asked about them.  He

19   gave answers about them.  We didn't object to him discussing

20   those.

21         And to the extent that those were emails that he

22   initiated and were not initiated by legislators, there was no

23   objection and he went ahead and he testified about those

24   particular documents.  So we've already produced those

25   documents.  We've allowed him to testify about those

1  documents.

2         So we did conduct a search for responsive documents,

3  not only emails but also hard copy documents.  There were no

4  responsive hard copy documents but we did search for those,

5  including those over which Mr. Vera would have been the

6  custodian.

7         THE COURT:  Okay.

8         MR. GORE:  So the dispute here —

9         THE COURT:  So what I was going to say is — so that

10 was helpful background.

11        Now, my understanding of the allegations in the

12 motion to compel are that Mr. Vera was acting as the agent for

13 the Harris County Republican Party in this SB 1 drafting

14 process and fielding questions on behalf of the Harris County

15 Republican Party to the legislators.  So he was acting as your

16 agent, is that true?

17        MR. GORE:  It's true in part.

18        THE COURT:  Okay.  Thank you.

19        (Crosstalk)

20        THE COURT:  This will go a lot faster if we just

21 answers questions that I have.

22        So he's acting as your agent and it's my

23 understanding that he's using his personal email address and

24 his personal computer because he doesn't have or hasn't been

25 given by the Harris County Republican Party one of its

1 computers or a Harris County Republican Party email address,

2 is that correct?

3       MR. GORE:  That is correct in part, yes.

4       THE COURT:  Okay.  "In part."  How can that be in

5 part?

6       MR. GORE:  Well, it is correct to the extent that he

7 is actually acting on behalf of the Harris County Republican

8 Party.  And when he sends emails on behalf of the Harris

9 County Republican Party, he copies the chair or other

10 individuals at their committee email addresses, and those are

11 the emails we searched for, collected, reviewed, and produced

12 to the plaintiffs.

13       THE COURT:  Now —

14       MR. GORE:  When the legislators are reaching out to

15 him separately from that, the Harris County Republican Party

16 is not involved in that.  Those legislators were reaching out

17 to him directly.  Harris County Republican Party was not an

18 intermediary for that, and so in those instances he's not

19 acting on behalf of the Harris County Republican Party when he

20 is fielding those questions and responding to questions to him

21 specifically.

22       THE COURT:  So how can you say, though — so you put

23 him up as your agent, and so there's an agency when he sends

24 material, but you are claiming that there's no agency when the

25 legislators send him questions back?  How do you make this

1  artificial distinction about his role?

2       MR. GORE:  Because the questions back to him were not

3  tied to anything he had said on behalf of the Harris County

4  Republican Party.

5       THE COURT:  But the only reason that they are

6  approaching him is because you-all put him up in the first

7  instance.

8       MR. GORE:  I disagree, Your Honor.

9       Mr. Vera is a known activist and involved in voting

10 issues.  He's involved with other organizations such as the

11 Texas Election Network, which have no connection to the

12 Republican Party, and he advocates on their behalf.  He serves

13 on their board, all of which I understand he does from his

14 personal email.

15      I have to say, I don't represent Mr. Vera, but that's

16 my understanding as well, and so he has other functions and

17 other hats that he wears in this space that aren't necessarily

18 tied to — or are not tied to the Harris County Republican

19 Party and aren't exclusively tied to the Harris County

20 Republican Party.

21      THE COURT:  So when you (inaudible) —

22       (Crosstalk)

23      — the custodian of records, did you make clear that

24 he was a custodian of records only sometimes and otherwise he

25 was not a custodian of records?

1    MR. GORE:  We made clear that we were searching
2  official committee email addresses —

3    THE COURT:  No.  No.  No.  No.  No.  We're talking
4  apples and oranges now, Mr. Gore.

5    What I'm saying is — or what I'm asking is, you
6  represented to the parties in this case in initial disclosures
7  or otherwise that Mr. Vera was an individual with knowledge of
8  relevant facts and that he was a custodian of records on
9  behalf of the Harris County Republican Party, did you not?

10    MR. GORE:  Yes, and all of those records —

11    THE COURT:  And so stop.  Again, it will go a whole
12  lot easier if you just answer the questions that I have.

13    So in that representation, did you say he was only
14  acting in that capacity sometimes?

15    MR. GORE:  No, but we didn't have to say that because
16  when he does other things that aren't tied to the Harris
17  County Republican Party he's not a custodian of records for
18  the Harris County Republican Party.

19    (Crosstalk)

20    THE COURT:  If you insist on playing this game, I'll
21  play it too.

22    So with regard to the official agency capacity that
23  he's doing, my question to you is very direct.  Did you or
24  someone on behalf of the Harris County Republican Party search
25  his personal computer and personal email addresses for any

1  responsive documents to Requests for Production Numbers 1 or

2  3?

3        MR. GORE:  No, we searched official files and

4  committee email addresses, disclosed the scope of that search

5  to the plaintiffs —

6        THE COURT:  So without asking —

7        (Crosstalk)

8        THE COURT:  So without asking him to do that, you

9  made potentially an incomplete production, and so my question

10 to you is, you can't sit here as we talk and verify to the

11 parties and to the Court, pursuant to Rule 26(g), that you

12 made a complete and adequate review for responsive documents

13 because there could be documents that he was in his agency

14 capacity sending to these legislators that he didn't CC some

15 Harris County Republican Party official, and so there could be

16 potentially other documents, isn't that correct?

17       MR. GORE:  No, I don't believe that is correct

18 because we —

19       THE COURT:  How can you say that?

20        (Crosstalk)

21       MR. GORE:  — (inaudible) on behalf of the party.

22       Because when he did send anything on behalf of the

23 party, he copied officials at the Harris County Republican

24 Party and those documents have all been collected, searched,

25 reviewed, and produced and were discussed in his deposition.

1    THE COURT:  So but without a review of his computer

2  and email, you can't represent a full production was made

3  because there could be communications that he did without a CC

4  to somebody at the Harris County Office.  That is a

5  possibility that exists out there, is it not?

6    MR. GORE:  I don't see how that could be.  We have no

7  evidence that that ever happened.  What we have is him copying

8  people and we don't represent him in his personal capacity.

9    He has other associations, including attorney—client

10 relationships with his attorneys in other cases.  He's got an

11 association with an organization, at least one organization

12 that's not affiliated with the Harris County Republican Party.

13    So his personal email account is not within our

14 custody and control, particularly when he's acting as an agent

15 of the legislature and responding to legislative inquiries

16 that are directed at him.

17    Those inquiries were not directed at the Harris

18 County Republican Party.  They weren't directed at the chair.

19 They weren't directed at the party as an organization.  They

20 were directed as to Vera.  And when he acts in that capacity,

21 he's not acting in the capacity of the Harris County

22 Republican Party.  He's acting —

23    THE COURT:  In the 30(b)(6) deposition that was taken

24 of the Harris County Republican Party, your 30(b)(6)

25 representative stated that he was acting as your agent.

1          MR. GORE:  And he did act as our agent in —

2          THE COURT:  So if he was acting as your agent, why

3   didn't you have an obligation under Rule 26(g) to look at his

4   computer to ensure for yourself that all responsive documents,

5   even if you want to parse it the way you do, didn't you have a

6   responsibility to go through his computer to search for

7   responsive emails and other documents because he was your

8   agent?  Why didn't you — even the way you are parsing it, why

9   didn't you do that?

10          MR. GORE:  Because such a search would not have been

11  reasonably calculated to discover discoverable information and

12  would have been unduly burdensome on the parties and on

13  Mr. Vera, because this is Mr. Vera's personal email that he

14  uses for a variety of functions that have nothing to do with

15  the Harris County Republican Party, and it is his practice to

16  share those official communications with members of the Harris

17  County Republican Party.  And in light of those facts, there

18  was no reason to go to Mr. Vera's personal email account and

19  try to find additional communications —

20          THE COURT:  Did you even ask him, can we do this, to

21  even get him to say that this would be intrusive on me?

22          MR. GORE:  We discussed it with Mr. Vera and he did

23  not want us to do it.

24          THE COURT:  And then why didn't you just, even if you

25  weren't going to make the inspection, why didn't you ask him

1  to self-collect?

2       MR. GORE:  Because the facts as we knew them showed

3  that that would be unreasonable and unduly burdensome in the

4  circumstances —

5       THE COURT:  So you produced 61 documents.  How would

6  that be unduly burdensome for him to self-collect whatever he

7  had?  If indeed you're correct and it's only 61 documents, how

8  is that unduly burdensome?

9       MR. GORE:  I don't know how many documents Mr. Vera

10  would have to search.  We produced 61 documents from our

11  files, but in terms of whether and what the search would

12  burden Mr. Vera to do and how he would disentangle email

13  communications that he initiated from those that he sent in

14  response to a legislative initiative, or initiation, which is

15  what the legislative privilege assertion was all about, that

16  was not possible for him necessarily to decouple.

17       Moreover, as I said, he's got mounds of personal

18  email on things that don't have anything to do with the Harris

19  County Republican Party, but that maybe on search terms that

20  are related to the plaintiffs' requests.

21       THE COURT:  The bottom line is no one even tried to

22  do so.  No one tried to do search terms.  No one did any kind

23  of attempt to see how burdensome, if any.  That's the bottom

24  line, isn't that true, Mr. Gore?

25       MR. GORE:  I think the bottom line is that we

1  conducted a reasonable search of our files, produced

2  documents, but didn't hear anything about Mr. Vera's personal

3  email account until February 27th, which was four days before

4  the close of discovery.

5       THE COURT:  But you had an obligation.  You've had an

6  obligation under Rule 26(g) to produce responsive documents

7  and search for those, and if he was acting as your agent, as

8  your 30(b)(6) representative states, then you failed in that

9  obligation.

10      MR. GORE:  Our obligation, Your Honor, was to conduct

11  a reasonable search for responsive documents that was

12  proportionate to the needs of the case and not unduly

13  burdensome.

14      THE COURT:  And the Court finds that you failed under

15  Rule 26(g) to do that reasonable search.

16      Now, with that, we are going to redepose Mr. Vera.

17  He's not going to be able to assert any legislative privilege

18  assertion.  The Court's already ruled I don't know how many

19  times on that.  I'm not going to allow any further meritless

20  objections to be lodged.

21      He's to fully, and frankly, and honestly answer all

22  questions posed to him in that regard between communications

23  between him and the legislators.  Any lawyer and Mr. Vera who

24  does assert that privilege, despite now my clear directions,

25  will be held in contempt of court.

1          Now —

2          MR. HILTON:  Your Honor, may I address one more issue

3    related to that motion before we move on to the other matters?

4          THE COURT:  Yes.

5          MR. HILTON:  Thank you, Your Honor.

6          We'd be happy to do this in writing, if that would be

7    more convenient for the Court, but I thought I would at least

8    say now that we respectfully request that the Court move to

9    stay its ruling that it just made on this motion to compel.

10         THE COURT:  Denied.

11         MR. HILTON:  Thank you, Your Honor.

12         THE COURT:  So now, with that, I want to focus now on

13   what to do with Mr. Vera, in light of this hybrid role that

14   Mr. Gore is alleging he engages in.

15         Now, I will agree with Mr. Gore.  So I don't know who

16   Mr. Vera is, but if he's working for other clients on other

17   matters, then he shouldn't be required to produce something

18   like that, and so what's the plaintiffs' position on that?

19         Are you going to send him a subpoena, pursuant to a

20   third-party subpoena, or are you going to still demand a

21   ruling from this Court on whether or not the Harris County

22   Republican Party has possession, custody, or control regarding

23   his devices?

24         MISS PERALES:  Your Honor, we are happy to double up

25   with a subpoena, but what Mr. Gore is saying is not borne out

1  by Mr. Vera's testimony.  First of all, Mr. Vera doesn't have

2  any other clients; he's not an attorney.  Every time he

3  testified —

4          THE COURT:  Is he a lobbyist?

5          MISS PERALES:  He's a lobbyist for the Harris County

6  Republican Party.

7          THE COURT:  But does he have any other clients that

8  he's a lobbyist for?

9          MISS PERALES:  He did not testify that he did, or

10  given that the questioning was limited as to SB 1, he never

11  testified that he had any other person on whose behalf he was

12  interacting with the legislator.

13          This is a whole new thing that we are hearing today

14  and so I would ask the Court to make clear in its order that

15  unless there's a communication in which Mr. Vera made clear in

16  writing that he was interacting on behalf of somebody other

17  than the Harris County Republican Party that he should have to

18  produce it.

19          Every testimony — every time he testified — and

20  Mr. Gore is right, Mr. Vera testified many times and

21  interacted with the legislature many times on SB 1.  Every

22  time he signed up to register and testify, he did so on behalf

23  of the Harris County Republican Party Ballot Security

24  Committee, whether it was HB 6, SB 1, HB 3, or SB 7.  It was

25  always on behalf of the Harris County Republican Party.

1          Furthermore, Your Honor, I would ask the Court to
2    clarify its order that Mr. Gore and his counsel are not to
3    limit their documents.
4          THE COURT:  You are talking about Mr. Vera?
5          MISS PERALES:  I'm sorry.  That Mr. Vera should not
6    limit his document search to emails with the legislator in
7    which he CC'd party officials.  It is not the case that
8    Mr. Vera testified that he CC'd party officials when he
9    interacted with legislators.
10         In fact, he testified he interacted with legislators
11   many times and all we've received from Mr. Gore and his team
12   were less than seven documents.  That 61 mostly was
13   interaction with the Secretary of State.  With respect to
14   legislators, less than seven documents in the total production
15   in response to Request for Production Number 1, which
16   purported to represent their communications with legislators
17   on SB 1.
18         That's because they only produced what they found in
19   party, official party email addresses, so when the party chair
20   was CC'd.  But given Mr. Vera's testimony that he interacted
21   many times and used his personal email, with the very small
22   handful of documents that we received, we would not want the
23   Court's order to be understood that the search for documents
24   should only be those which Mr. Vera CC'd a party official
25   because we understand from his testimony he had a considerable

1  number of interactions which he did not CC party officials.

2          THE COURT:  Yeah.  No, the Request for Productions 1

3  and 3 doesn't say and limit the email communications or

4  documents were CC'd to anybody.  So the Requests for

5  Productions 1 and 3 are very clear.

6          And so Mr. Vera is ordered, upon penalty of contempt,

7  to produce any documents that he has — and so we can fight

8  about possession, custody, and control, and whether or not

9  this is a legal right jurisdiction, or this is a practical

10  ability jurisdiction, or whether or not this has to be done by

11  a third-party subpoena.

12          When you redepose him, the easiest way to tackle this

13  is just depose him in his individual capacity and require a

14  duces tecum for Requests of Productions 1 and 3.

15          And I expect Mr. Vera to search for documents

16  responsive to 1 and 3, regardless of whether they were CC'd to

17  party officials.  And if there's not a reasonable compliance,

18  pursuant to Rule 26(g) on that subpoena, I will issue sanction

19  orders against anybody and everybody responsible for the

20  failure to responsibly produce those documents.

21          This is my last warning to you-all.  I am tired of

22  this case coming up with these meritless objections, delays,

23  obfuscation.  This is just nonsense.  That's going to stop and

24  it's going to stop today.

25          And from here on out, lawyers and individuals will be

1  held in contempt of court for failure to abide by my orders.

2  I don't know how to make it any more direct than that.  And it

3  will go up the food chain, so you can tell that to your office

4  as well.

5          So that takes care of Vera.

6          The scheduling order.

7          So what I see is still much discovery left to do in

8  this case, and so how do we conduct the remaining discovery

9  and how do we do so in a manner that's as nonintrusive as

10 possible on the poor election officials that have been drug

11 into this thing?

12         Miss Perales.

13         MISS PERALES:  Your Honor, I believe Miss Yun is here

14 to speak on the parties' joint submission regarding the

15 schedule, if it's okay with the court.

16         THE COURT:  So you know, I'm not going to go into

17 this detail again about — because my observations about the

18 scheduling order; you-all agreed to that language.  That was

19 your language in the scheduling order.  And now both of

20 you-all, all of you-all, don't understand what you-all wrote

21 and you want me to rewrite it or clarify it.  I'm having none

22 of it.  I'm having none of it anymore.

23         This is going to be opened up for discovery for the

24 full gamut of relevant proportional discovery, whether it's

25 for primary information, for general election information.

1   I'm not going to play your games anymore.  I'm not going to

2   get drug into these fights anymore.

3            Now, I want to do this, though, in a way that's as

4   nonintrusive as possible on the election offices.

5            So how are we going forward?

6            MISS YUN:  Your Honor, Jennifer Yun, on behalf of the

7   United States.

8            So there are two live issues here, and, one, whether

9   relevant materials that were created or published or disclosed

10  after the primary election discovery period are discoverable

11  during this discovery period.

12           THE COURT:  So I'm telling you it is.  So what I'm

13  asking of you-all is how much more time do you need?  Where do

14  you need this stuff from?  And how are we going to make this

15  as unobtrusive upon the election officials?

16           MISS YUN:  Yes, Your Honor.

17           The parties have been engaging in good faith

18  negotiations to make sure that we are able to complete

19  discovery as expeditiously as possible.

20           And in terms of the county depositions, we have met

21  with the El Paso County counsel as well as the Harris County

22  counsel in order to obviate any need for this Court's

23  intervention.

24           I'm happy to let the counties speak for themselves,

25  but that part of the motion for clarification I believe does

1 | not require the Court's intervention.

2 |         And we have also engaged in extensive meet and

3 | confers with the State defendants in order to complete

4 | depositions of newly disclosed witnesses into April.  That

5 | agreement, I do not believe, is fully agreed upon but we are

6 | negotiating that in order to not involve the Court's — in

7 | order to not ask for the Court's intervention.

8 |         THE COURT:  So all these depositions, especially of

9 | the election officials, I want to focus on them because they

10 | are getting drug into this.

11 |         So how many times have they already been deposed?

12 | What kind of new questions do you have for them that you need

13 | and do they have to take?

14 |         And you-all seem to be fighting over hours and

15 | minutes that people need to be deposed.  Again, I'm here to

16 | tell you-all, I'm sick and tired of this.  I am not going to

17 | be intervening in all this little minutia that good lawyers —

18 | and there are good lawyers in this case — should resolve.

19 |         And so let's backtrack a little bit.  Why do you need

20 | these election officials to be deposed yet again?

21 |         MISS YUN:  Your Honor, just to clarify, are you

22 | asking about the Secretary of State's officials?

23 |         THE COURT:  No, I don't care about them.  I'm worried

24 | about Bexar County, Harris County, El Paso, everybody else on

25 | the Zoom, why are we —

1          MISS EISNER:  Apologies, Your Honor.  I can speak for
2    the El Paso Elections Administrator and the deposition issue.

3          We have reached agreement on that issue, and so we're
4    prepared to file a stipulation.  We were just making sure
5    everybody was going to sign on, but we had a meet and confer
6    and we have agreed to both the breadth and scope of the
7    deposition.  So I think we can take that off the table.

8          THE COURT:  Who else from an elections office thinks
9    they need relief here?

10         MR. FOMBONNE:  Judge, Jonathan Fombonne from the
11   Harris County Attorney's Office for the Harris County
12   Elections Administrator.

13         I don't think we need relief.  I sent an email
14   yesterday to all the counsel in this case asking for
15   confirmation of what I think is our understanding about the
16   Harris County Elections Administrator's 30(b)(6) deposition.

17         I have only received confirmation from one of the
18   plaintiffs' counsel and nobody else.  If folks would be
19   willing to respond to that email, I think we have an agreement
20   and we don't need the Court's intervention.

21         THE COURT:  Is everybody on board now with Harris
22   County or not?  So instead of nods, I want a yes or a no.

23         MISS YUN:  The United States is okay with Harris
24   County, our negotiation with Harris County and agreement with
25   Harris County.

1          MR. DOLLING:  OCA plaintiffs agree with the agreement

2     that Harris County sent out in the email a few days ago.

3          MISS PERALES:  Same for the LUPE plaintiffs, Your

4     Honor.

5          THE COURT:  I think you have relief, Harris County.

6          MR. FOMBONNE:  Thank you.

7          THE COURT:  Anybody else?

8          MR. NELSON:  Yes, Your Honor.

9          With respect to Travis County — and again this is

10    Tony Nelson, Assistant Travis County Attorney — we spoke with

11    counsel for the consolidated plaintiffs who had issued a

12    subpoena for a second 30(b)(6) deposition of the Travis County

13    Clerk's Office and counsel agreed that we would revisit those

14    issues following the outcome of this hearing, that it would

15    make more sense to do so.

16         We have not spoken again on that today but I would

17    presume that we should be able to work something out that

18    would be along the same lines as what has been agreed to with

19    respect to El Paso and Harris County.

20         THE COURT:  Thank you.

21         Any other counties?

22         So with regard to the depositions of any county

23    officials, you know, I expect it just to be relevant,

24    nonredundant, and as unobtrusive as possible.

25         Now, once we get all those depositions finished, how

1  much more do we have?  Who else is left?

2        MISS YUN:  We have two depositions scheduled with the

3  Secretary of State's Office for next week, and then there are

4  also various newly disclosed witnesses that will be deposed

5  but we are in the middle of negotiating those out-of-time

6  depositions with the State, but we do not —

7        THE COURT:  Well, now that I'm vacating the

8  scheduling order they are not out of time.  So then what I'm

9  hearing is there's a lot of work left to do, is what I'm

10  hearing.

11        MISS YUN:  Your Honor, we believe the agreement is

12  not — we have not fully agreed yet but we believe that we can

13  finish all depositions by April 7th.  That is the date that we

14  have been discussing with all the parties thus far.  It is not

15  yet finalized.

16        THE COURT:  And let me stop there.

17        The State, do you have anymore discovery to do, or

18  are you done?

19        MR. HILTON:  We do have some discovery to do.  I

20  think, as Miss Yun mentioned, we are going to work out the

21  issues we have with respect to newly disclosed witnesses and

22  I'm certain that whatever issue arises with anything we need

23  from the counties, we will be able to work that out as well.

24        You know, with the Court's ruling with respect to the

25  scope of the discovery, which was one of the two issues teed

1  up in the joint motion, that's what gives me pause about

2  questioning whether we can actually deal with it in the time

3  frame that we've been discussing.

4      THE COURT:  I'm going to vacate the current

5  scheduling order.

6      So what I'm hearing is I'm going to turn over to you

7  to come up with a new scheduling order, but again, I'm not

8  going to go into the trap of the tiering and the phasing that

9  you-all did that fell apart.  We are just going to have a

10  deadline for completion of discovery.

11      And then we are going to have a deadline for — I'm

12  assuming there's going to be — what we are all aiming for is

13  either cross-motions for summary judgment or trial, are we

14  not?

15      And so I don't know how, with the current scheduling

16  order, which is why I'm vacating it, we are ever going to get

17  to timely cross-motions for summary judgment being filed,

18  responded to, replied, and being ruled upon.  The time lines

19  now are completely untenable, in light of all the discovery

20  fights.

21      So I'm going to put the onus on you.  I'm going to

22  have my clerk, law clerk, send to you-all what I want down as

23  a new scheduling order.  And you-all are going to meet and

24  confer and fill in the blanks for the deadlines.

25      If you can't submit to me an agreed new scheduling

1  order, then you're going to submit to me on a party basis what

2  you think the scheduling order should be, and then I will just

3  be forced to fill in the blanks for you—all if you can't reach

4  resolution on that.

5         Now, where are we headed with this case?  Is it going

6  to be resolved one way or the other on cross-motions for

7  summary judgment?  Does it make sense to even have

8  cross-motions for summary judgment, or do we just, in lieu of

9  the tedium and expense and everything else of cross-motions

10  for summary judgment, have a bench trial?

11         What's the plaintiffs' position on that?

12         MISS YUN:  Your Honor, the United States does not

13  believe any summary judgment deadlines or the trial, pretrial

14  deadlines need to be moved at this time.

15         And we believe that —

16         THE COURT:  Well, I've already said otherwise, so

17  move on to what I was asking.

18         MISS YUN:  We believe that dispositive motions will

19  be helpful and that we hope to resolve at least some of the

20  claims before trial through dispositive motions.

21         MR. HILTON:  I would generally agree with that, Your

22  Honor.  I can't imagine that the entire case will be disposed

23  of before trial, just given the scope of it, but I think that

24  certainly some of the issues could be narrowed on dispositive

25  motion briefing.

1         THE COURT:  So we have cross-motions for summary

2    judgment, one way or the other the issues get disposed of

3    maybe in part and so the remainder is a bench trial?

4         MR. HILTON:  I think that's right, Your Honor, from

5    the State's perspective.

6         MISS YUN:  We agree, Your Honor.

7         THE COURT:  And then in light of some parties have

8    been dropping like flies here, and so I'm assuming does that

9    mean some of the issues have been narrowed, or not, or are we

10   just losing parties?

11        MISS PERALES:  I don't speak for all consolidated

12   plaintiffs but I will say, Your Honor, that from time to time

13   a party finds itself unable to proceed because of the burdens

14   of litigation.  The changes in the parties that are

15   participating have not narrowed the issues before the Court.

16        THE COURT:  And so as I'm thinking out loud on all of

17   this, one thing that will not be included in the new

18   scheduling order is a new amendment of pleadings.  We are

19   staying put on what's been pled to date.  We are not opening

20   up this file anymore.

21        Okay.  With all that said then, what else do we need

22   to talk about today, Miss Perales, or from the U.S.

23   Government?  I don't care who goes first.

24        MISS YUN:  Your Honor, there is one issue in the

25   motion for clarification regarding the two depositions that we

1  noticed with regards to the Secretary of State's Office.

2         We believe that the default federal rule of seven

3  hours per deposition should apply to those two depositions.

4  The State defendants do not agree, so we were hoping to raise

5  that.

6         THE COURT:  And so why should there be preemptive

7  limits?

8         MR. HILTON:  It's two depositions of the same witness

9  who has already been deposed twice before.  They are unwilling

10 to concede that it can be limited to anything less than the

11 full 14 hours for both his individual and 30(b)(6) capacity.

12 We've proposed nine hours spread over those two depositions.

13        I understand the Court's position on relative burdens

14 on the State versus the county defendants, but the fact of the

15 matter is this witness, Mr. Ingram, is incredibly busy helping

16 those counties try to run their elections, and so -- and we

17 think we have proposed a reasonable alternative, but, you

18 know, that's for the Court to decide whether you want to weigh

19 into that or not.

20        THE COURT:  So these other depositions that he's

21 given, has it been in this case or other cases?

22        MR. HILTON:  In this case, Your Honor, in addition to

23 many depositions in many other cases.  He sometimes feels like

24 he gets deposed more than he actually works his job, but

25 that's obviously not the Court's problem, but these would be

1  his third and fourth depositions in this case.

2          THE COURT:  So how is it that nine hours is not

3  enough?

4          MISS YUN:  Your Honor, while Mr. Ingram may be the

5  State's only 30(b)(6) witness, we actually do not know that

6  that is to be the case so we do not want to preemptively limit

7  the amount of time that we have across those two depositions.

8          Of course, we are going to be very respectful of

9  Mr. Ingram's time and want to be as efficient as possible.  We

10  were not saying that we have to take 14 hours.  It is just

11  that we do not know how long it will take and that a

12  preemptive limit is not warranted here.

13          THE COURT:  So with regard to Mr. Ingram, it's

14  limited to nine hours of Mr. Ingram.

15          However, in the event in his 30(b)(6) capacity

16  Mr. Ingram is unable to answer some question, that nine-hour

17  limit will not apply to any additional 30(b)(6) representative

18  that the State may need to proffer to answer questions that

19  Mr. Ingram is unable to answer.

20          MISS YUN:  Thank you.

21          THE COURT:  What else do we need to take up?

22          So you win one today.

23          MR. HILTON:  Thank you, Your Honor.

24          MR. STOOL:  Judge, this is Ben Stool from Dallas

25  County, Texas.

1          THE COURT:  Yes, sir.

2          MR. STOOL:  If I may ask as a point of clarification,

3    in the Court's vacating the current scheduling order, which I

4    take it to be ECF 437, is the Court opening up the county

5    defendants to newly served written discovery from the other

6    parties?  Because it's essentially closed at this point.

7          THE COURT:  So, yeah, thank you for that very good

8    question.

9          When I was talking out loud I was thinking about,

10   with the exception of Mr. Vera, that we have document

11   problems, and I guess we still have document problems from the

12   State that the Fifth Circuit — is the Fifth Circuit ever

13   going to rule?  Have they had a hearing?  They have had a

14   hearing.

15         MR. HILTON:  On the legislative privilege issue, Your

16   Honor, they have had argument.  It's been fully submitted for

17   months, as I understand it.

18         MISS PERALES:  Since August, Your Honor.

19         MR. HILTON:  So we are all waiting eagerly.

20         THE COURT:  They had oral argument in August?

21         MISS PERALES:  Yes, Your Honor.  They held oral

22   argument in August.

23         THE COURT:  Wow.

24         MISS PERALES:  August 2nd.

25         MR. HILTON:  And just to clarify, because they

1 haven't ruled, that's why we have — you know, I previously
2 moved the Court to stay its ruling with respect to the motion
3 to compel.  So we are waiting for the Fifth Circuit.
4          THE COURT:  Again, now the reason I'm cutting it this
5 way is the State has a different argument on the legislative
6 privilege.
7          Their argument, and unless you've argued it
8 differently upstairs, which you have done, and so somehow or
9 another arguments not presented to me get to go to the Fifth
10 Circuit somehow and get ruled on, despite me never having the
11 opportunity in the first instance, but your argument before me
12 was the fact that a document is actually seen, smelled,
13 whiffed by, opened by a legislator, made it subject to the
14 legislative privilege.
15          The reason the legislative privilege does not apply
16 to Mr. Vera is, one, it hasn't been asserted to by any
17 legislator; two, these are broken by waiver because Mr. Vera
18 is not a staffer employed by that legislator and the
19 legislative privilege applies only to the legislator staff
20 relationship.  And so just like any other attorney-client
21 document, once you start showing documents to third parties
22 that's been waived.
23          So the arguments here are completely different than
24 the arguments advanced to me on the legislative privilege.
25          And again, if Mr. Vera does not produce and not talk

1   about all of this, heads will roll.

2           MR. HILTON:  I certainly understand the Court's

3   ruling in that regard, you know, and we'll take whatever

4   appropriate action we think we need to take with respect to

5   that.

6           THE COURT:  It's called more delay in discovery of

7   this case.

8           MR. HILTON:  Well, I would just add that on appeal my

9   understanding is that there are also individual legislators

10  who have consolidated appeals who have, you know, slightly

11  different arguments.  So with respect to legislative

12  privilege, there's a lot that we are waiting on, but

13  regardless, we understand the Court's ruling.

14          THE COURT:  So let's go back to Mr. Stool's excellent

15  question.

16          I was thinking that there was going to be depositions

17  of these individuals but no longer anymore — now, apart from

18  the State, I'm talking about burdens on the county election

19  officials.  I was under the impression that this was just

20  depositions, not placing additional discovery production

21  burdens on any county election officials, or are you thinking

22  otherwise?

23          MISS PERALES:  Your Honor, there is current discovery

24  outstanding.  Because of the Court's current scheduling order,

25  there is discovery that has been served on counties.

1          And in fact, Mr. Stool and I are setting up a meet

2   and confer about document production from Dallas County before

3   the deadline, which is 30 days out from when we served it, and

4   within the Court's now vacated scheduling order.

5          So I would only want to make clear that if Mr. Stool

6   is asking as to newly propounded discovery versus that

7   discovery that we are still waiting to come in from the

8   counties.

9          THE COURT:  So, Mr. Stool, with regard to the request

10  for production that has been currently propounded upon your

11  office or other offices, are you objecting to producing the

12  current request?

13         MR. STOOL:  Not all of it, Your Honor.

14         There's — we — Miss Perales and I do have — we are

15  going to set up a meet and confer about the specifics of it

16  because Dallas County had been relying on the Court's previous

17  amended scheduling order and its limitation on the scope of

18  the discovery to the November 2022 general election that

19  was — your previous order had been very clear that —

20         THE COURT:  Yeah.  Well, that part, Mr. Stool, I'm

21  vacating.

22         MR. STOOL:  I understand that, so I will certainly,

23  we will take that into account when Miss Perales and I meet

24  and confer about that.  So, no, we just — I mostly wanted to

25  make sure we are not going to being subject to anymore written

1  discovery requests from the parties.

2          THE COURT:  I got you.

3          So with regard to the county election officials, any

4  request for production that have been currently propounded and

5  outstanding, the parties are to — well, the plaintiffs and

6  the county officials are to meet and confer about any

7  objections, burdensome, oppressive kind of arguments and try

8  to reach resolution.

9          But in an effort to protect the county election

10  officials from any further discovery, the new scheduling order

11  that will be entered will not permit the additional

12  propounding of discovery on the county election officials

13  unless it's acquiesced to and agreed to by that county office.

14          Does that make sense?

15          MISS YUN:  Yes, Your Honor.

16          MR. STOOL:  Yes, sir.

17          MR. HILTON:  Apologies for being the slowest one in

18  the room.  I just want to clarify, you know, your ruling with

19  respect to the scope of discovery.

20          I understand it with respect to the private-party

21  plaintiffs, the United States, and with the State.  You are

22  removing any scope limitations for the new discovery period?

23          THE COURT:  Well, it still has to be relevant.  It

24  still has to be proportional.  And it's got to be

25  nonprivileged.

1          MR. HILTON:  Of course.  Does that ruling not apply

2   to the county defendants, or does that ruling also apply to

3   the county defendants?

4          And the reason I ask is that the currently, you know,

5   currently propounded discovery we all issued under the

6   assumption that the scope of discovery — you know, the old

7   scope of discovery applied.  I could foresee a situation where

8   the Court has incomplete information if the scope is not the

9   same and we don't have the ability to address that.

10         Maybe I'm getting too hypothetical with it but that

11  was my question.

12         THE COURT:  Well, my understanding of what's been

13  going on with that scope is that there's arguments that — and

14  I'm not saying that they are correct — but the arguments are

15  that the State has not fully complied or it's delayed

16  production, and so it's all still hanging out there.

17         And so I don't want to be dealing with what was in

18  scope, what was out of scope.  Scope is 26(b)(1), relevant,

19  proportional, and nonprivileged.  And so I don't want to deal

20  with your fights.

21         MR. HILTON:  Understood.

22         THE COURT:  Anything else we need to take up today?

23         MISS YUN:  Your Honor, will the Court set a deadline

24  for the joint scheduling proposal that we are supposed to

25  submit?

1    THE COURT:  You will have 14 days.  My law clerk will
2  get it out to you today or tomorrow and you have 14 days from
3  receipt of that email to either get me an agreed to or
4  individual submissions.
5    MISS YUN:  Thank you, Your Honor.
6    THE COURT:  Anything else we need to do today?
7    MISS PERALES:  Not for plaintiffs, Your Honor.
8    MR. HILTON:  Nothing from the State, Your Honor.
9    THE COURT:  So I sure hope we don't have anymore
10  discovery fights because I'll be mad.
11    You know, the last time we were here regarding the
12  Harris County Republican Party, Mr. Vera -- I don't remember
13  who the lawyer was here.  I guess it was Mr. Gore.  My
14  question or comment, "Okay.  So then I'm hearing from you" --
15  this is all back in what?  November '22?  Yeah.  November
16  14th.
17    "Okay.  So then I'm hearing from you that you are
18  going to produce all documents responsive to Request for
19  Production Number 1 without objection and without any
20  assertion of privileges by December 1, is that what I'm
21  hearing?"  "Yes, Your Honor."
22    And then after we had discussions about the
23  similarity between Number 1 and Number 3, I said, "So I expect
24  Number 3 is going to be fully complied with by December 1,"
25  and we didn't get any of this slicing and dicing legislative

1  privilege.

2        And so after 20 years on the bench, I guess you just

3  get a smell test about who is not playing well in the sandbox,

4  and so whoever doesn't play well in the sandbox next time will

5  find themselves in deeper trouble than being deprived recess.

6        We're adjourned.

7     (Concludes proceedings)

8                         -o0o-

9     I certify that the foregoing is a correct transcript from

10  the record of proceedings in the above-entitled matter.  I

11  further certify that the transcript fees and format comply

12  with those prescribed by the Court and the Judicial Conference

13  of the United States.

14

15  Date:  03/10/23          /s/  *Gigi Simcox*
                             United States Court Reporter
16                           262 West Nueve Street
                             San Antonio TX 78207
17                           Telephone:  (210)244-5037

18

19

20

21

22

23

24

25

APPENDIX C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,    )
et al.,    )
    )
       Plaintiffs,    )  Civil Action
    )  No. SA-21-CV-00844-XR
vs.    )
    )
GREGORY W. ABBOTT, et al.,    )
    )
       Defendants.    )
    )

---

ORAL DEPOSITION OF

ALAN VERA

FEBRUARY 27, 2023

---

      ORAL DEPOSITION OF ALAN VERA, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on February 27, 2023, from 10:00 a.m. to 3:37 p.m., Nilda Codina, Notary in and for the State of Texas, recorded by machine shorthand, from Javier N. Maldonado & Associates, P.C., 1415 North Loop W., Suite 600, Houston, Texas, County of Harris pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

## 2

```
1     A-P-P-E-A-R-A-N-C-E-S
2   For the LUPE Plaintiffs:
3     Ms. Nina Perales
      Julia Longoria (Via Zoom)
4     Fatima Menendez (Via Zoom)
      MEXICAN AMERICAN LEGAL DEFENSE
5     AND EDUCATIONAL FUND
      110 Broadway, Suite 300
6     San Antonio, Texas 78205
      Phone:(210)224-5476
7     Fax: (210)224-5382
      nperales@maldef.org
8     jlongoria@maldef.org
      fmenendez@maldef.org
9
      Patrick A. Berry (Via Zoom)
10    Jasleen Singh (Via Zoom)
      Robyn Sanders (Via Zoom)
11    BRENNAN CENTER FOR JUSTICE
      AT NYU SCHOOL OF LAW
12    120 Broadway, Suite 1750
      New York, NY 10271
13    Phone: (646) 292-8310
      Facsimile: (212) 463-7308
14    patrick.berry@nyu.edu
      jasleen.singh@nyu.edu
15    sandersr@brennan.law.nyu.edu
16    Kevin Zhen
      FRIED, FRANK, HARRIS, SHRIVER &amp;
17    JACOBSON LLP
      One New York Plaza
18    New York, New York 10004
      Phone: (212) 859-8000
19    Facsimile: (212) 859-4000
      kevin.zhen@friedfrank.com
20
      FOR Plaintiffs LULAC Texas; Voto Latino; Texas Alliance
21    for Retired Americans; and Texas AFT
      Daniela Lorenzo (Via Zoom)
22    ELIAS LAW GROUP LLP
      10 G Street NE, Suite 600
23    Washington, D.C. 20002
      Phone: (202) 968-4490
24    dlorenzo@elias.law
25
```

## 3

```
1   Attorneys for Plaintiffs Houston Justice; Houston Area
      Urban League; Delta Sigma Theta Sorority, Inc.; The Arc
2   of Texas; and Jeffrey Lamar Clemmons
3     Ms. Jennifer A. Holmes.
      Breanna Williams (Via Zoom)
4     Uruj Sheikh (Via Zoom)
      NAACP LEGAL DEFENSE AND
5     EDUCATIONAL FUND, INC.
      700 14th Street NW, 6th Floor
6     Washington, DC 20005
      Phone:(202) 682-1300
7     Fax: (202) 682-1312
      jholmes@naacpldf.org
8     bwilliams@naacpldf.org
      usheikh@naacpldf.org
9
      Attorneys for Plaintiffs OCA-Greater Houston; League of
10  Women Voters of Texas; REVUP- Texas; Texas Organizing
11    Edgar Saldivar (Via Zoom)
12    ACLU FOUNDATION OF TEXAS, INC.
      5225 Katy Freeway, Suite 350
13    Houston, TX 77007
      Phone: (713) 942-8146
14    Fax: (915) 642-6752
      esaldivar@aclutx.org
15
      Attorneys for Plaintiffs Mi Familia Vota; Marla López;
16
17    Mark Bieter
      STOEL RIVES LLP
18    760 SW Ninth Avenue, Suite 3000
      Portland, OR 97205
19    mark.bieter@stoel.com
20
21
22
23
24
25
```

## 4

```
1   Attorneys for Isabel Longoria
2     Sameer S. Birring
      Jonathan Fombonne (Via Zoom)
3     Heena Kepadia (Via Zoom)
      Neeharika Tumati (Via Zoom)
4     OFFICE OF THE HARRIS COUNTY
      ATTORNEY CHRISTIAN D. MENEFEE
5     1019 Congress
      15th Floor
6     Houston, Texas 77002
      Phone:(713)274-5142
7     sameer.birring@harriscountytx.gov
      jonathan.fombonne@harriscountytx.gov
8     heena.kepadia@harriscountytx.gov
      neeharika.tumati@cao.hctx.net
9
      For Defendant Bexar County Elections Administrator
10    Jacquelyn Callanen
11    Lisa Cubriel (Via Zoom)
      Catherine Wilson (Via Zoom)
12    Assistant District Attorney, Civil Division
      101 W. Nueva, 7th Floor
13    San Antonio, Texas 78205
      Lisa.Cubriel@bexar.org
14    Catherine.wilson@bexar.org
15  Attorney for Defendant Yvonne Ramón
16    Josephine Ramirez-Solis (Via Zoom)
      Jacqueline Villarreal (Via Zoom)
17    Assistant District Attorney
      100 E. Cano, First Floor
18    Hidalgo County Courthouse Annex III
      Edinburg, Texas 78539
19    Phone: (956) 292-7609
      Fax: (956) 318-2301
20    josephine.ramirez@da.co.hidalgo.tx.us
      jacqueline.villarreal@da.co.hidalgo.tx.us
21
      Attorneys for Defendant Dana DeBeauvoir
22
      Anthony Nelson (Via Zoom)
23    tony.nelson@traviscountytx.gov
24
25
```

## 5

```
1   For State Defendants:
2     William G. Wassdorf
      Kathleen Hunker (Via Zoom)
3     Ethan Szumanski (Via Zoom)
      ATTORNEY GENERAL KEN PAXTON
4     P.O. Box 12548
      Austin, Texas 78711-2548
5     Phone:(512)936-1666
      Fax:(512)320-0667
6     will.wassdorf@oag.texas.gov
      kathleen.Hunker@oag.texas.gov
7     ethan.szumanski@oag.texas.gov
8   Intervenor - Defendants Republican National Committee,
      National Republican Senatorial Committee, National
9   Republican Congressional Committee, Harris County GOP,
      Dallas County GOP
10    John M. Gore
11    JONES DAY
      51 Louisiana Ave., N.W.
12    Washington, D.C. 20001-2113
      Phone: (202) 879-3939
13    Fax: (202) 626-1700
      jmgore@jonesday.com
14
15  FOR THE WITNESS:
16    Mr. Andy Taylor, Esq.
      ANDY TAYLOR
17    2628 Highway 36 S. #288
      Brenham, Texas 77833
18    Phone:(713)222-1817
      Fax:(713)222-1815
19    ataylor@andytaylorlaw.com
20  ALSO PRESENT REMOTELY:
21    Benjamin Limric (Via Zoom)
      Michael Stewart (Via Zoom)
22    UNITED STATES DEPARTMENT OF JUSTICE
      benjamin.limric@usdoj.gov
23    michael.stewart3@usdoj.gov
24
25
```

**6**

1                I-N-D-E-X
2                          PAGE
3 Appearances.........................................2
4 ALAN VERA
5 Direct Examination by Ms. Perales...................7
6 Direct Examination by Ms. Holmes..................145
7 Cross-Examination by Mr. Gore.....................160
8 Proceedings concluded.............................166
9 Reporter's certificate............................167
10                E-X-H-I-B-I-T-S
11                          PAGE
12 Exhibit No. 1 Notice of Deposition.................14
13 Exhibit No. 2 Poll Watcher's Guide.................43
14 Exhibit No. 3 Email from Christina Adkins.........123
15 Exhibit No. 4 Texas Poll Watcher Training manual...123
16 Exhibit No. 5 Redacted First Amendment Privilege...127
17 Exhibit No. 6 Email(5/19/2021)....................131
18 Exhibit No. 7 Email(8/10/2021)....................133
19 Exhibit No. 8 Email from Donna Campbell...........133
20 Exhibit No. 9 Email from Paul Bettencourt.........134
21
22
23
24
25

**7**

```
1                P-R-O-C-E-E-D-I-N-G-S
2           THE REPORTER:  Going on the record at
3  9:37 a.m. And today is February 27th, 2023, and we are
4  on the record.  Did you all want to do the federal read
5  on, or were you okay with waiving the Rule 30?
6           MS. PERALES:  We'll waive.
7           THE REPORTER:  Okay.
8           If all counsel and all parties please
9  state their appearances and who they represent for the
10 record.
11          MS. PERALES:  Good morning, my name is
12 Nina Perales and I represent the Lupe Plaintiffs,
13 L-U-P-E.
14          MS. HOLMES:  Good morning, my name is
15 Jennifer Holmes and I represent the Haul Plaintiff's,
16 H-A-U-L.
17          MR. BIRRING:  Good morning, I'm Sameer
18 Birring and I represent the Harris County Election
19 Administrator Clifford Tatum, in his official capacity.
20          MR. WASSDORF:  William Wassdorf for
21 the Attorney General's Office representing State
22 Defendants.
23          MR. GORE:  Good morning, this is John
24 Gore.  I represent the Intervenor Defendants.
25          MR. TAYLOR:  My name is Andy Taylor.
```

**8**

```
1  I do not represent any parties in this litigation, but
2  I do represent the witness, Mr. Alan Vera, and I did
3  have just one confirmation question.  I was told that
4  nobody in this proceeding today is going to audio tape
5  or video tape what's happening, it's just everybody's
6  watching by Zoom but they're not actually taping or
7  tape recording the zoom, other than the court reporter
8  who is -- is Here in the room, is that true?
9           MS. PERALES:  My understanding is that
10 there maybe an audio recording by the court reporter
11 service for the purpose of ensuring and accurate
12 transcription, but we agreed in writing prior to this
13 deposition that we would not video record --
14          MR. TAYLOR:  Okay.
15          MS. PERALES:  -- the deposition.
16          MR. TAYLOR:  And cause I'm the new guy
17 here, it -- does that include all the participants who
18 are watching?
19          MS. PERALES:  Well, I only speak for
20 the Lupe plaintiffs, but perhaps we can get an
21 agreement from counsel on the Zoom that they are not
22 recording the deposition.
23          MR. TAYLOR:  That would be wonderful.
24          MS. PERALES:  If you could just put
25 your agreement in the chat, that would be a big time
```

**9**

```
1  saver.
2           (All Zoom counsel agreed in chat.)
3           MS. PERALES:  Okay.  I think we've got
4  everyone.  I can check the chat on the break too.
5           ALAN VERA,
6  Having been first duly sworn, was examined and
7  testified as follows:
8           MS. PERALES:  And let's get our
9  agreement on the record now, before we get started with
10 me reintroducing myself to you.
11          I will agree that an objection from
12 any one of counsel on the defense side will serve as an
13 objection for all.  Now, under the Federal Rules, it's
14 a form objections largely are the ones that we're are
15 going to be having today.  And I understand that you
16 would like to have an agreement that simply saying form
17 objection is sufficient.
18          MR. WASSDORF:  Correct.
19          MS. PERALES:  And the only thing that
20 I would ask of you is if I don't understand perhaps
21 what the form objection might be, I can ask for
22 clarification.
23          MR. WASSDORF:  Absolutely.
24          MS. PERALES:  And is that the
25 agreement of -- of counsel on the defense side?
```

10

1 MR. GORE: Yes.
2 MR. WASSDORF: Yes.
3 MR. TAYLOR: Yes.
4 MS. PERALES: Thank you.
5 DIRECT EXAMINATION
6 BY MS. PERALES:
7 Q. Good morning, Mr. Vera.
8 A. Good morning.
9 Q. Earlier you heard me introduce myself, I'm
10 Nina Perales and I represent a group of plaintiffs
11 called the Lupe plaintiffs. Everybody else has
12 introduced themselves already, and so I'll just go
13 ahead and start asking you some of the preliminary
14 questions in this deposition.
15 My first question is, have you ever
16 been deposed before?
17 A. No, I have not.
18 Q. All right. So since this is your first
19 voyage into a deposition I'm going to go through some
20 of the ground rules with you.
21 You have just taken an oath to tell
22 the truth and that's subject to federal penalties. So
23 it's important to answer my questions truthfully,
24 accurately, and completely; do you understand?
25 A. I do.

11

1 Q. Now, do you understand that your oath to the
2 tell the truth today is the same as if you were
3 testifying in front of a judge in the courtroom, in the
4 sense that you're oath is to speak the truth?
5 A. I understand.
6 Q. Okay. Is there anything today that would
7 prevent you from giving me your full attention and
8 answering truthfully, such as illness or some other
9 problem?
10 A. I am 74 years old, I will need frequent
11 bathroom breaks.
12 Q. Got it. And that takes me right to the
13 bathroom breaks, which is you are not a hostage here.
14 If you need to take a break at any time, you can ask
15 for a break we will take a break. The only question I
16 have of you, is that if there's a question laying out
17 on the table, if you would answer it before we take the
18 break; is that all right?
19 A. Understood. Understood.
20 Q. Okay. Thank you. Now, counsel will make
21 objections for the record from time to time and you
22 just heard us talking a moment ago about objections,
23 and, generally when there is an objection you still go
24 ahead and answer; however, if counsel instructs you not
25 to answer, please don't answer and we will work it out

12

1 among ourselves, okay?
2 A. Understood.
3 Q. So a few instructions related to the fact
4 that we have a court reporter here. Generally, in
5 conversations sometimes we talk over each other, but
6 because the court reporter can only take down one
7 speaker at a time, will you agree to let me finish my
8 question before you answer, and then I will let you
9 finish your answer before I begin my next question?
10 A. Agreed.
11 Q. Okay. It's also -- you're doing a great job
12 by the way of speaking up but my next instruction is to
13 please make your answers out loud and audible so the
14 court reporter can hear them; is that all right?
15 A. Understood.
16 Q. Okay. Now, the court reporter cannot take
17 down gestures like shrugs or head nods, so will you
18 agree to give your answers verbally?
19 A. Agreed.
20 Q. Now, if you don't understand the question,
21 will you please ask me to rephrase it for you?
22 A. Agreed.
23 Q. Now, I might ask you a question that calls
24 for you to give me your best estimate as to something,
25 and I'm entitled to your best estimate, but I don't

13

1 want you to guess; is that all right?
2 A. Understood.
3 Q. Okay. Thank you. Now, sometimes you might
4 remember more to an answer later in the day. Sometimes
5 the questions percolate a little bit. So if that's the
6 case, and you've remembered something more it's okay to
7 tell me at that point and we'll add it to the record
8 and then we'll go back to whatever else it is that
9 we're discussing; is that all right with you?
10 A. Understood.
11 Q. Okay. I might use some terms interchangeably
12 in today's deposition, I don't know if I will or not,
13 but I want to check now to make sure if we have the
14 same understanding of the terms. If I use the word
15 Hispanic and Latino, will you understand that I mean
16 the same thing by those words?
17 A. Agreed.
18 Q. Okay. I'm going to try not to use jargon,
19 but if I use the word ABBM, will you understand that to
20 be application for ballot by mail?
21 A. Understood.
22 Q. Thank you. Do you have any questions about
23 the deposition process before we begin?
24 A. No, ma'am.
25 Q. Thank you. I understand from the

Alan Vera - 2/27/2023

14

1  introduction this morning that you are being
2  represented by Mr. Andy Taylor; is that correct?
3      A.  That is correct.
4      Q.  Are you also being represented by Mr. John
5  Gore?
6      A.  That is not correct.
7      Q.  And are you being represented by the Attorney
8  General's Office?
9      A.  I am not.
10     Q.  When did your representation -- when did
11 Mr. Taylor's representation of you begin, do you know?
12     A.  The week after I was subpoenaed.
13     Q.  Okay.  Do you have any other lawyers that
14 represent you in this matter?
15     A.  I do not.
16     Q.  Okay.  I'm going to ask you some questions
17 about your preparation for the deposition, but I want
18 to let you know that I do not want to know anything
19 that you said to your lawyer or that your lawyer said
20 to you; okay?
21     A.  Understood.
22     Q.  Can you tell me the steps that you took to
23 prepare for this deposition?
24     A.  I received, through my attorney a very large
25 cachet of document that were in discovery and I read

15

1  those.
2      Q.  Did you bring any of those documents with you
3  today?
4      A.  Did not.
5      Q.  Okay.  Can you generally remember what it was
6  that you reviewed for the deposition?
7      A.  Generally, emails, email attachments, and one
8  or two PowerPoint presentations.
9      Q.  And did you understand this to be discovery
10 that the Harris County Republican Party had produced in
11 this litigation?
12     A.  I did not.  I did not ask questions about the
13 source of the discovery.
14     Q.  Were the documents generally related to
15 Harris County Republican Party?
16     A.  The documents came in two folders, one of
17 which said Harris County, as in the Government.  The
18 other of which said Secretary of State.
19     Q.  Okay.  And when you -- you mentioned a moment
20 ago emails, do you recall generally who the emails were
21 between?
22     A.  That was quite varied, it involved many
23 different people.
24     Q.  And did those people include folks with the
25 Harris County Republican Party?

16

1      A.  They did.
2      Q.  And did some of them include members of the
3  legislature?
4      A.  One or two did.
5      Q.  And did some of them include staff or
6  employees of the Texas Secretary of State?
7      A.  Some of them did.
8      Q.  Did you meet with anybody in advance of this
9  deposition to prepare?
10     A.  I had a Zoom meeting with my attorney for him
11 to brief me on what to expect.
12     Q.  Okay.  And about how long did that Zoom
13 meeting last?
14     A.  There were two sessions, the first one an
15 hour the second one two hours.
16     Q.  Okay.  Was anybody else on the Zoom besides
17 you and Mr. Taylor?
18     A.  Yes, Mr. Jones was.
19     Q.  Okay.  Would that be Mr. Gore --
20     A.  -- I'm sorry John -- John -- Mr. Gore is --
21     Q.  -- (Laughter.)
22     A.  -- Mr. Gore was on the call.
23     Q.  Perhaps some day okay.
24         (Exhibit No. 1 marked.)
25     Q.  (BY MS. PERALES) Mr. Vera, the court reporter

17

1  has handed you what has been marked deposition Exhibit
2  No. 1. And from time to time we will mark certain
3  documents and talk about them and the one that you will
4  look at is always going to be the one with the special
5  orange sticker on it and I'll tell you now don't try to
6  leave with the special orange sticker documents or the
7  court reporter will chase you down and try to get them
8  back; okay?
9      A.  I understand.
10     Q.  Do you recognize this document?
11     A.  I do.
12     Q.  Okay.  Do you recognize it as the notice of
13 deposition seeking your attendance at this deposition
14 today?
15     A.  I recognize it as a predecessor to the notice
16 I received today, this one still says 8:30 a.m. and the
17 one I received says 9:30 a.m.
18         (Laughter.)
19     Q.  (BY MS. PERALES) you're right, that's my
20 fault.
21     A.  Okay.
22     Q.  Thank you for spotting that.  So with the
23 exception of the time though, are you hear testifying
24 today pursuant to this deposition notice?
25     A.  I am.

18

1    Q.  Okay.  Thank you.  I'd like to start with
2  some questions about your background, do you live in
3  Harris County?
4    A.  I do.
5    Q.  How long have you lived in Harris County?
6    A.  Since November of 1980.
7    Q.  Okay.  Are you originally from somewhere not
8  Harris County?
9    A.  Yes.
10    Q.  Tell me where you grew up?
11    A.  El Paso.
12    Q.  Oh, El Paso.  West Texas?
13    A.  Yes, ma'am.
14    Q.  Did you go to high school there?
15    A.  Yes, ma'am.
16    Q.  Did you complete any education following high
17  school?
18    A.  I did.
19    Q.  Okay.  And what was that?
20    A.  I have an undergraduate degree from Loyola
21  University in New Orleans.
22    Q.  Anything after that?
23    A.  U.S. Army.
24    Q.  Okay.  When did you serve?
25    A.  1970 to 1975.

19

1    Q.  Tell me about your current occupation, if you
2  have one?
3    A.  I am semi-retired.
4    Q.  And what are you semi-retired from?
5    A.  Marketing consulting.
6    Q.  Okay.  Can you briefly describe for me your
7  current involvement with the Harris County Republican
8  Party?
9    A.  I am a volunteer.  I serve as chairman of the
10  Harris County Republican Party Ballot Security
11  Committee, that is an unpaid unreimbursed position.
12    Q.  I'm going to circle back to, to more details
13  about the Ballot Security Committee.  So I'm just going
14  to put a pin in that and ask if you hold a membership
15  in other political organizations besides Harris County
16  Republicans?
17    A.  I am on the board of directors of a -- election
18  integrity organization called Texas Election
19  Network.
20    Q.  Any other membership in other political
21  organization?
22    A.  Give me a second.  None that I can recall at
23  this time.
24    Q.  Do you hold membership in any other types of
25  associations besides political organizations; such as a

20

1  fraternal, or I don't know, maybe you serve on your
2  neighborhood, you know, homeowners association or
3  anything like?
4    A.  No, we are members of Freedom Street Rescue.
5  We foster abandon puppies.
6    Q.  I think I would have 20 dogs if I did that.
7    A.  Last Thursday we had 11.
8    Q.  11.  And are the -- any of them fosters at
9  this point or have you just --
10    A.  Seven of those are fosters, they've all
11  arrived at their new homes in New England.
12    Q.  Wonderful.  Any other organizations that you
13  can think of?
14    A.  None that I can think of.
15    Q.  Okay.  Are you a registered voter in Harris
16  County?
17    A.  I am.
18    Q.  Have you ever served as an election judge at
19  the polling place?
20    A.  Yes, ma'am.
21    Q.  Okay.  Tell me about that, how?
22    A.  From 2010 to 2013, I served as the alternate
23  presiding judge at Wesley Elementary School in
24  Congressional District 18.  I think five, seven
25  elections total.

21

1    Q.  Did you serve as a poll worker for any other
2  period of time besides this one?
3    A.  No ma'am.
4    Q.  Have you ever served as a poll watcher?
5    A.  I have.
6    Q.  Tell me about that?
7    A.  I served as a poll watcher in several smaller
8  and local elections, usually on the May Uniform
9  Election Day.  And I was asked to serve as a poll
10  watcher for the 2015, I believe 2015 Cy-Fair ISD bond
11  election.  The first of billion dollar bond election in
12  Texas.
13    Q.  School bond?
14    A.  School bond.
15    Q.  Have you ever been a block walker or
16  sometimes referred to as a canvasser for either a
17  political candidate or for turn out the vote effort?
18    A.  I believe years ago maybe as many as 10 years
19  ago I assisted my precinct chair to block walk our
20  neighborhood and leave flyers hanging on doorknobs.
21    Q.  And do you remember what that was in support
22  of, or against?
23    A.  It was in support of the republican ticket.
24    Q.  Okay.  And did the door hangers then have the
25  names of the candidates that were on the ticket?

Alan Vera - 2/27/2023

22

1    A.  If I remember correctly, they did.
2    Q.  Can you think of any other occasions where
3    you were going door to door from house to house for
4    either a candidate or some kind of campaign?
5    A.  No, I can't.
6    Q.  When you did this effort about 10 years ago
7    did you knock on doors and engage with voters?
8    A.  We knocked on doors, waited for a voter to
9    answer, if the voter didn't answer we simply left the
10   hanger, if a voter answered we introduced ourselves and
11   explained, the candidates for whom we were campaigning.
12   Q.  So you had the chance to have some
13   face-to-face interaction with voters?
14   A.  Some.
15   Q.  Other than the -- so let me just ask you, do
16   you -- is the phrase that you're most comfortable with
17   block walking or canvassing or something else?
18   A.  In my mind those are two different functions
19   block walking is a political activity to gain support
20   for candidate or issue in my mind.  Canvassing is
21   asking questions and getting information.
22   Q.  Okay.
23   A.  So in my mind, which is sometimes strange,
24   those are two slightly different issue.
25   Q.  Have you ever done canvassing?

23

1    A.  I have not personally.
2    Q.  Okay.  So besides that block walking effort
3    that you described, have you ever worked on the
4    campaign of a political candidate or for a political
5    issue?
6    A.  Not since 2014.
7    Q.  And tell me about that, in 2014 in what way
8    did you work on a political campaign --
9    A.  In 2014 before I came chair of the Harris
10   County Republican Party Ballot Security Committee, I
11   handed out campaign literature for Dan Patrick.
12   Q.  And where did you handout the campaign
13   literature?
14   A.  In my neighborhood.
15   Q.  And you went door to door?
16   A.  Yes, ma'am.
17   Q.  Is that different from the --
18   A.  Same thing.
19   Q.  -- same thing?
20   A.  Uh-huh.
21   Q.  Okay.  So besides the handing out of the
22   campaign material in the block walking effort, have you
23   worked on any other campaigns either, maybe making
24   phone calls from a central location to urge voters to
25   turn out or --

24

1    A.  Yes.
2    Q.  -- other types of campaign activity?
3    A.  I can't recall anything beyond what I've
4    already described to you.
5    Q.  Okay.  Do you know if you'll be testifying in
6    this case?
7    A.  I do not know.
8    Q.  Okay.  I'm going to ask you a couple
9    questions now about the Ballot Security Committee.  You
10   mentioned that before you became involved with the
11   Ballot Security Committee you were handing out the
12   campaign material for the republican ticket and you
13   mention that was probably about 10 years ago.
14       So tell me whether your involvement
15   with the Ballot Security Committee then was at the time
16   of the creation of the Ballot Security Committee?
17   A.  No, ma'am.  It was not.  Ballot Security
18   Committee had been created at least 15 years prior to
19   my taking the chairmanship in 2014.
20   Q.  Okay.  If you could for me summarize the --
21   are you still chair of the Ballot Security Committee?
22   A.  I still am.
23   Q.  And as chair you're familiar with the
24   activities of the Ballot Security Committee?
25   A.  Yes.

25

1    Q.  Can you tell me in a sort of summary fashion,
2    the various activities of the Ballot Security
3    Committee?
4    A.  As described in the Republican -- Harris
5    County Republican bylaws, Ballot Security is
6    responsible for promoting election integrity and in all
7    the activities that support that.  So that would
8    include discipline on voter registration, recruiting
9    and training of poll watchers.  In prior years we were
10   also responsible for recruiting election workers, but
11   we have surrendered that in the last two cycles, to the
12   Party staff; supporting good election legislation as
13   guided by the Executive Committee and testifying when
14   possible in support of good election legislation.
15   Q.  I'm just catching up.  You mentioned
16   discipline on voter registration, to you mean the voter
17   registration conducted by the Harris County Republican
18   Party or voter registration in a bigger sense?
19   A.  Thank you for the clarification.  We observe
20   and monitor Harris County's voter registration's roles.
21   Q.  Does the Harris County Republican Party
22   conduct voter registration efforts of they own?
23   A.  I believe they do, but I am not a part of
24   that.
25   Q.  You mentioned in prior years that you used to

26

1  recruit election workers, but you had surrendered that
2  to party staff in the last two election cycles; is that
3  right?
4       A.  That is correct.
5       Q.  And when you say party staff, who -- who is
6  that?
7       A.  These are paid employees who work for the
8  Party.
9       Q.  And so it's their function now to collect
10  names and submit them to the Harris County elections
11  for vetting for poll workers?
12       A.  That is correct.
13       Q.  Okay.  Tell me how you recruit and train poll
14  watchers?
15       A.  The recruiting takes many forms.  I am a
16  frequent speaker at political organizations.  We run
17  notices for poll watchers in the county party news
18  letter and online.  The Ballot Security Committee
19  members are also encouraged to reach out in their
20  neighborhoods and find people in serving as poll
21  watchers.  Training poll watchers I do personally, no
22  one else hands that.  It is a two hour class in person
23  with a test at the end and except for the 2020 COVID
24  year it has never been an online class.  It's always
25  been in person.

27

1       Q.  When was the most recent training that you
2  conducted?
3       A.  Most recent training was October of 2022.
4       Q.  Okay.
5       A.  I did 17 classes that summer into the fall.
6       Q.  When you're doing the training in the two
7  hour class, do you use any kind of materials of any
8  sort?
9       A.  There are two kinds of materials, there is a
10  PowerPoint presentation which technically belongs to
11  the Harris County Republican Party, I created that for
12  them.  And there poll Watcher Guide book which I hand
13  at no charge to every student.
14       Q.  You mention the PowerPoint presentation
15  belongs to Harris County, are you the author of the
16  PowerPoint?
17       A.  I am.
18       Q.  Okay.  And the Poll Watcher Guide book, who
19  is the author of that?
20       A.  The original one?  My wife Colleen.  It's
21  been updated after every legislative session because
22  the code changes.
23       Q.  And who does the updating?
24       A.  I'm -- I do it now, unfortunately.
25       Q.  Where do you do the trainings for the poll

28

1  watchers?
2       A.  All over the county, Whenever possible in
3  county owned buildings.  We have community centers that
4  the Harris County Government has set up.  Whenever
5  possible we conduct the training in those publicly
6  owned centers.
7       Q.  So do you bring with you your laptop with the
8  PowerPoint on it?
9       A.  I do.
10       Q.  Do you have like a little projector?
11       A.  A projector is usually provided by the
12  facility, but there have been times that I brought a
13  spare, thank God.
14       Q.  And you mention that the guidebook that you
15  provide at no cost, does that mean that you personally
16  make the photo copies?
17       A.  In 2022 the County Republican Party paid for
18  the reproduction of the guide books.
19       Q.  Okay.  And are -- are the trainees allowed to
20  take that guidebook home with them after they're done?
21       A.  They take them home with them and encouraged
22  to take them with them to the Polls.
23       Q.  Now you mention a test at the end, is that a
24  written test?
25       A.  It's not a written test, it's an oral.  It's

29

1  a review.
2       Q.  And then is that conducted with the group as
3  a whole?
4       A.  It's conducted with the group as a whole.
5       Q.  So do people just, you call out the questions
6  and people raise their hands and call the answers?
7       A.  Correct, uh-huh.
8       Q.  Do you have the test written down in front of
9  you?
10       A.  It's on the PowerPoint slides?
11       Q.  Okay.  And so you just know at the end which
12  questions to call out for people to make sure?
13       A.  There are 20 questions, they appear in
14  sequence on the slides.
15       Q.  Oh, I see.  So there's something at the very
16  end of the PowerPoint that has the questions?
17       A.  Correct.
18       Q.  Understood.  When you update your PowerPoint
19  for a training, do you save the PowerPoints from
20  before?
21       A.  I don't remember.  I think so, I don't think
22  I delete them from my laptop.
23       Q.  Okay.  So for example if you wanted to
24  compare what your training looked like before SB 1 and
25  after SB 1 would you be able to go --

Alan Vera - 2/27/2023

30

1    A.  I could do so.  Yes, ma'am.
2    Q.  Okay.  Thank you.
3         MR. TAYLOR:  Mr. Vera, let her
4  completely finish her question, you're anticipating it
5  ever so slightly.
6         THE WITNESS:  Thank you.  Thank you.
7    Q.  (BY MS. PERALES) Okay.  Next on my list is
8  supporting legislation related to election integrity
9  and I would like to know what activities fall under
10  that topic?
11    A.  The primary activities that fall under that
12  topic is providing our Harris County republican
13  representatives with lists of items in the election
14  code that need to be addressed, and then testifying in
15  the Senate and house committees that are hearing any
16  bills written to those lists of suggestions.
17    Q.  When you provide the lists, do you generally
18  prepare that in written form?
19    A.  It varies.  There are some meetings in which
20  I have a list typed up and copied, others are simply
21  verbal discussions over a cup of coffee.
22    Q.  You mentioned Harris County legislators?
23    A.  Republican legislators, sorry.
24    Q.  Yes, of course.  Does that include House and
25  Senate?

31

1    A.  Yes, ma'am.
2    Q.  Okay.
3         MS. PERALES:  I'm sorry, should we
4  take a break?
5         MR. TAYLOR:  No, no, no, I was just
6  making a point -- nothing about what you all are doing.
7         MS. PERALES:  Sorry.  Just let me know
8  if you're going to need a break.
9    Q.  (BY MS. PERALES) And we were talking about
10  Harris County Republican, let's start with members of
11  the House.  With whom you met who is currently in
12  the House or with whom have you communicated who's
13  currently in the House about goals for ballot integrity
14  legislation?
15         MR. TAYLOR:  Let me just hop in for a
16  quick second.  My job here is just to protect
17  attorney-client privilege and that's it.  But if you're
18  going to ask questions that might be involved with
19  legislative privilege or something like that, I -- I'm
20  going to defer to the other lawyers who represent other
21  parties, I just want to make that clear.
22         MS. PERALES:  Understood.
23         MR. TAYLOR:  Okay.
24    A.  It -- it varies by session.  In preparation
25  for the current session, the Republican Party of Harris

32

1  County hosted a luncheon and every one or our Harris
2  County Republican State Representatives and Senators
3  attended.
4    Q.  (BY MS. PERALES) Okay.  And at that luncheon
5  did you engage with anybody -- I'm just trying to get a
6  sense of how this works -- did you engage with elected
7  officials, at the luncheon about ballot integrity
8  legislation?
9    A.  At the luncheon I had five minutes to discuss
10  some of the problems that had not been -- the loopholes
11  have not been closed that are causing problems with out
12  election workers with the entire group.
13    Q.  I see, so you were essentially making a
14  presentation to them?
15    A.  Informal presentation, yes.
16    Q.  But you had the floor?
17    A.  For five minutes.
18    Q.  That's good, okay.  And when you say
19  loopholes that weren't closed, does that mean SB 1?
20    A.  No, it means in general.
21    Q.  Okay.
22    A.  What has been reported by our election
23  workers that needs to be addressed.
24    Q.  Okay.  You mentioned the list that -- that
25  can be many written form, aside from the list have you

33

1  ever written something more detailed about a proposal
2  that you wanted a legislator to consider.  So for
3  example, have you ever taken a stab at maybe drafting a
4  provision that you would want to see?
5         MR. WASSDORF:  I'm going to object to
6  the extent that this could get into any responses to
7  legislative inquires on the grounds of legislative
8  privilege.
9    Q.  (BY MS. PERALES) You may answer.
10    A.  Not until this year for the current session.
11  I was asked to join a task force of grass roots
12  activist to examine and work on the concerns about
13  ERIC, E-R-I-C, electronic registration information
14  center.  We studied it, interviewed people across the
15  country for seven months and I was asked to draft a
16  possible bill that would open the ERIC functions put
17  broader range of solutions.  It's the first time I've
18  done that.
19    Q.  Uh-huh.
20    A.  That has been -- I did not submit it, it was
21  submitted by our task force leader and it has become a
22  bill in the current legislature.
23    Q.  In the current Texas Legislature?
24    A.  Current Texas -- the 88th Legislative
25  session.

34

1    Q.   And the task force that you were on was it a
2  Texas only task force?
3    A.   Texas only task force.
4    Q.   Okay.  So prior to working on drafting
5  legislation, this -- for this 88th regular session, in
6  the past if you had a proposal that you wanted to see
7  enacted, how much detail would you put into writing it
8  down?
9    A.   I understand.  Again, with acknowledging the
10  objection, in between the first and second special
11  sessions of the 87th legislature I sent an email with
12  two sentences to the legal counsel of our senator
13  asking that they consider adding these two sentences to
14  Senate bill one for is second special session.  They
15  studied it, liked it, recommended it and it was added
16  to Senate bill one.
17    Q.   And when you say our senator, do you mean
18  Senator Bettencourt?
19    A.   I do.
20    Q.   Okay.  And then do you remember what the two
21  sentences were on?
22    A.   Yes.  The two sentences involved requiring
23  the every county in Texas to reconcile the number of
24  ballots with the number of voters after every election.
25    Q.   Do you remember the name of Senator

35

1  Bettencourt's I guess general council?
2    A.   I do.
3    Q.   Tell me what that is.  That -- by the way,
4  that was very good, whoever prepared you for this
5  deposition is -- did a great job.
6    A.   Sonya Aston.
7    Q.   And did you send the two sentences to
8  Ms. Aston by email?
9    A.   By email.
10    Q.   Okay.  And did she then respond to you?
11    A.   She respond and said I'll see what I can do.
12    Q.   Okay.  Then how did you know -- how did you
13  come to learn that it was well taken and then going to
14  be put in the Bill?
15    A.   Well, as you know in Texas Legislature every
16  special session, every bill has to be re-filed.  So
17  when Senate bill was re-filed for the second special
18  session my two sentences were there.
19    Q.   Do you think you would still have that email
20  to Ms. Aston if your email history somewhere?
21    A.   I don't think so, it's been well over a year.
22    Q.   Okay.  What email service do you use?
23    A.   Outlook.
24    Q.   Outlook.  Do you know if outlook keeps your
25  older emails?

36

1    A.   I don't know.
2    Q.   Okay.  Okay.  Now, I think last on my list is
3  testifying when possible in the legislature, do you
4  recall testifying in the do you recall testifying on SB
5  1 at all?
6    A.   I do.
7    Q.   Okay.  And do you recall testifying on SB 1
8  in the second special?
9    A.   I do.
10    Q.   Okay.  I remember being in a committee
11  hearing and you and I were both there and you were
12  testifying, I can't remember for sure if it was the
13  second special.  But I -- I remember your testimony, do
14  you -- would you, for example in the second special
15  provide both written and verbal testimony?
16    A.   Rarely.
17    Q.   Okay.
18    A.   Rarely.  Occasionally I will bring exhibits
19  to supplement my verbal testimony.  I rarely provide
20  written testimony.
21    Q.   Okay.  Do you recall whether you provided any
22  written testimony on SB 1 or it's predecessor's bills
23  HB 6, SB 7?
24    A.   I don't think I did provide written
25  testimony.  I think it was all verbal.

37

1    Q.   Do you go up with like index cards or a piece
2  of paper?
3    A.   I type up every work I'm going to say and
4  I've timed it out for two minutes in the Senate and
5  three minutes in the House.
6    Q.   And you take those notes back with you?
7    A.   I do.
8    Q.   Okay.  I noticed when I -- I went to the
9  Harris County Republican Party website that there was a
10  link that -- that one could click on to get involved or
11  volunteer with the Party and it allowed me to put my
12  name and my VYD information if I wanted to serve as an
13  election worker; are you aware of that part of the
14  website?
15    A.   I am aware.
16    Q.   Do you know if those pages or the information
17  that's gathered there is used also to recruit poll
18  watchers?
19    A.   I don't deal with that information, but I
20  think it's not impossible that once the party contacts
21  the person who left their name they could add poll
22  watching as an option of volunteer activity.
23    Q.   How do you get the names of potential poll
24  watchers?
25    A.   I get them from the county party.

38

1    Q.   Okay.  So the paid staff?
2    A.   Uh-huh.
3    Q.   All right.  And who is responsible for
4  getting those individuals to a training that you would
5  give?
6    A.   The paid staff.
7    Q.   Okay.  So you don't have to be chasing people
8  down telling them, it's at Saturday at 10 a.m.
9    A.   Not anymore.
10    Q.   Okay.  When I'm quiet I'm crossing off
11  questions, so it's a good thing.  I'm already on page
12  6, we're just zipping right along here.
13    MR. TAYLOR:  You left out a key fact,
14  what's the last page number?
15    (Laughter.)
16    MS. PERALES:  Well, it's not six,
17  but -- but we're actually making really -- I think our
18  conversation, so it touched on several different
19  things, so I'm catching up with myself and crossing off
20  the questions.
21    THE WITNESS:  While you're doing that,
22  can we take a break?
23    MS. PERALES:  Of course.
24    THE WITNESS:  Thank you.
25    MS. PERALES:  Let's take a five minute

39

1  break.
2    THE REPORTER:  Okay.  Going off the
3  record at 10:29 a.m.
4    (Off the record.)
5    THE REPORTER:  Going back on the
6  record at 10:42 a.m.
7    Q.   (BY MS. PERALES:)  Okay.  Mr. Vera, I am going
8  to ask you some more specific questions about poll
9  watchers and your training of the poll watchers
10  comparing the before SB 1 to the after SB 1 period of
11  time, okay?
12    So did your training change at all for
13  poll watchers with respect to what they could do in the
14  polling place while voting is happening?
15    A.   It did not change significantly.  The two
16  greatest changes.
17    MR. GORE:  Let me -- let me just
18  interject here an objection.  We've allowed some
19  latitude on the poll watcher training and I'm fine you
20  confirming there were changes to the training.
21  Anything about the substance of the training, the
22  Harris County Republican Party has asserted a First
23  Amendment right to confidentiality and First Amendment
24  privilege not to disclose the substance of the
25  training.  So I'm going to ask the witness or instruct

40

1  the witness not to answer anything about the substance
2  of the training.
3    Q.   (BY MS. PERALES:)  And Mr. Vera, are you going
4  to follow counsel's advice and not testify about the
5  substance of the poll watcher training?
6    A.   I am.
7    Q.   Okay.  And you did that very elegantly, I --
8  I mentioned previously that so times your Counsel will
9  direct you not to answer and we will then work on that
10  at another time.
11    You mentioned that your poll watcher
12  training did not change significantly, but would it be
13  fair to say that your poll watcher training did change
14  in some respect from the pre-SB 1 period to the post SB
15  1 period?
16    A.   Yes.
17    Q.   Aside from the training that you give poll
18  watchers, do you also receive communications from poll
19  watchers while election day is going on?
20    A.   I do.
21    Q.   Okay.  And generally how do you receive those
22  communications?
23    A.   By text or email.
24    Q.   Have you ever had a poll watcher call you on
25  your cell phone during election day to ask for you

41

1  guidance or advice?
2    A.   Yes.
3    Q.   So then would it be fair to say you
4  communicate with poll watchers by text, email, and
5  telephone?
6    A.   Yes.
7    Q.   And in these communications, would it be fair
8  to say that they're asking for your guidance about what
9  to do in a particular situation?
10    A.   Frequently.
11    Q.   Okay.  And do you then provide that guidance
12  to them based on your understanding of SB 1 and other
13  parts of the election code that deal with poll
14  watchers?
15    A.   That is correct.
16    Q.   You mentioned the training manual that you
17  encouraged, that you've created that you encourage the
18  poll watchers to bring with them to the polling place
19  on election day; is that correct?
20    A.   I mentioned it, yes.
21    Q.   Okay.  Can you tell me approximately how many
22  pages long it is?
23    A.   It is a graded booklet where there are tabs
24  available to you.  I'm going to guess it is a total of
25  18 pages folded and collated and cut very uniquely.

42

1    Q.  Does each page contain approximately 250
2  words?
3    A.  No.  It's a tiered appearance so that there's
4  a tab on what the content is.  So there's a tab that
5  says ID, and they flip it up in that opened is all the
6  informing on ID.
7    Q.  Okay.
8    A.  So -- and on the back are the actual
9  citations from the election code that relate to the
10 issues on the opposite sides of the page.  So 18 pages,
11 but they're not same size.
12   Q.  Okay.  So if I took the words from your
13 manual and I put them in let's say a word processing
14 document, about how many pages long would it be?
15   A.  I don't know.
16   Q.  Would it be more than 18?
17   A.  No --
18   Q.  I'm trying to figure out --
19   A.  What font size?
20        (Laughter.)
21   Q.  (BY MS. PERALES) 12.
22   A.  Yes, then be more than 18 because the font
23 side I have to use for the code is much smaller to fit
24 all the relevant code.
25   Q.  Okay.  Okay.  Would it be fair to say that

43

1  your Poll Watcher Guide is different from the Poll
2  Watcher Guide published by the secretary of state?
3    A.  It is.  It is in format.
4    Q.  Okay.
5    A.  It's much more usable.
6    Q.  Okay.
7    A.  It is a flip chart as opposed to a PDF, you
8  know, like several 100 pages long.
9    Q.  Would you say that there are -- well, so
10 your's is much shorter, so it doesn't contain
11 everything from the secretary of state's guide?
12   A.  Uh-huh.
13   Q.  Would you say that there are substantive
14 differences between your guide and the secretary of
15 state?
16   A.  There's no content difference, mine is more
17 compact.
18   Q.  So for example, do you -- would you maybe be,
19 your guide by different from the secretary state's
20 guide if it offered examples that might be different
21 from those of the secretary of state.  You see what I'm
22 getting at, whether they're --
23   A.  I understand --
24        MR. GORE:  And let me just renew the
25 objection, because again this is an area where the

44

1  Harris County Republican Party has asserted a First
2  Amendment Privilege.  I think you can answer yes or no
3  to the question, but instruct the witness not to
4  provide any discussion of the substance of any such
5  differences.
6    A.  You're supposed to ask me, will I follow
7  counsel, yes.
8        (Laughter.)
9    Q.  (BY MS. PERALES) Are you following your
10 counsel's advice?
11   A.  I am following the counsel's advice.
12   Q.  All right.  So your counsel said don't give
13 substantive, but he's allowed to answer yes or no.
14        So is the answer to then yes or no to
15 my question whether there are substantive differences
16 between your guide and the secretary of state's guide?
17   A.  Let me ask you to clarify for me which
18 secretary of state Poll Watcher Guide you're referring
19 to, because there are many iterations.
20        MR. TAYLOR:  And Nina, just to clarify
21 you already know this, but Mr. Gore is not Alan Vera's
22 personal counsel.  You're saying your lawyer this,
23 "your lawyer that.  That's actually me, Andy Taylor,
24 but Mr. Gore represents Harris County Republican Party,
25 and that's why he rather than me is asserting this

45

1  First Amendment Privilege because I'm not representing
2  the Republican Party in this litigation.  So just that
3  -- just to keep things straight.
4        MS. PERALES:  Thank you for that
5  clarification.
6    Q.  (BY MS. PERALES:) So Mr. Vera when you
7  decline to answer based on Mr. Gore's instruction, you
8  are declining to answer based on the instruction of a
9  lawyer who is not your lawyer, but who is the lawyer
10 for the Harris County Republican Party?
11   A.  That is correct.
12   Q.  Thank you.  And to clarify my question I'm
13 going to mark, although I only have one copy.  A
14 January 2022 publication by the secretary of state's
15 Elections Division titled Poll Watchers Guide.  We will
16 mark that deposition Exhibit No. 2.
17        (Exhibit No. 2 marked.)
18   Q.  (BY MS. PERALES:) Take a moment if you will
19 to take a look at the document?
20   A.  Even they had a change for SB 1.  Thank you
21 for letting me see that.  The combination of the
22 PowerPoint and the Guide that they carry with them, is
23 very similar to this booklet, combined.
24   Q.  Okay.  So let me ask you a few questions,
25 with respect to Exhibit 2, had you ever seen that

Alan Vera - 2/27/2023

46

1  version of the document before I gave it to you today?
2     A.   Online.  I reviewed it online, but not hard
3  copy.
4     Q.   Okay.  So when I make reference to the
5  secretary of state's Poll Watcher Guide, will you
6  understand that I'm referring to the January 2022
7  version?
8     A.   I do, yes.
9     Q.   Okay.  Now, let me go back to my earlier
10 question, which is that the -- your guide, which you've
11 described as 18 pages, would you agree with me that
12 there are substantive differences between your guide
13 and Exhibit 2?
14    A.   That is a difficult question to answer
15 because --
16         MR. GORE:  Again, I'm just going to
17 renew the objection and instruct the witness that he
18 may answer to the extent that doing so does not reveal
19 the substantive content of his guidebook which -- over
20 which Harris County Republican Party has asserted a
21 First Amendment Privilege.
22    A.   The combination of the PowerPoint
23 presentation and the guide is substantively the same as
24 what's in here, combined.
25    Q.   (BY MS. PERALES:)  I understand.  So if

47

1  combined you -- you believe they're substantively the
2  same.  Would it then be correct that your guide by
3  itself is not substantively the same as the secretary
4  of state's guide?
5     A.   My guide is focused on the questions and
6  issues the poll watcher confronts at the polling place
7  itself, not the background of how poll watchers are
8  appointed et cetera, that's in class.
9     Q.   And so would the answer to my question then
10 be yes?
11    A.   The answer is, it is not substantively
12 different in content from those portions of this
13 document that address the activity at the polling
14 place.
15    Q.   Is it your contention then that your guide
16 contains every piece of matter that the secretary of
17 state's guide contains with respect to poll watcher
18 behavior in the, or activities in the poll place?
19    A.   It does.  It does, on the activity at the
20 polling place, yes, they're very consistent.
21    Q.   Did you copy and paste out of the secretary
22 of state guide?
23    A.   I did not.
24    Q.   Okay.
25    A.   I use illustrations.

48

1     Q.   You mean like pictures?
2     A.   Yes.
3     Q.   I see, okay.  Let's talk about the PowerPoint
4  again and the -- and your -- your Poll Watcher Guide.
5  With respect to the guide which your trainees take home
6  with them; is that correct?
7     A.   Uh-huh, that is correct.
8     Q.   Can you estimate how many copies of your
9  guide either in the current version or in past versions
10 are circulating in the world?
11    A.   I know that Harris County Republican Party
12 printed 5,000 of them for our use here in Harris
13 County, so that's the ones I know about.
14    Q.   And you when you say printed 5,000, you mean
15 just for the November 2022 election?
16    A.   For the primary election, primary runoff, and
17 the November election.
18    Q.   Okay.  So since January of 2022?
19    A.   That's correct, because SB 1 went into affect
20 December of 2021.
21    Q.   And were the Poll Watcher Guides printed by
22 the Republican Party only physically distributed by you
23 or were they distributed by other folks as well?
24    A.   Only by me in my classes.
25    Q.   And how many have you distributed?

49

1     A.   Probably 1,000.
2     Q.   Okay.  And do you know where those copies are
3  today?
4     A.   Yes.  Oh, the ones I distributed?
5     Q.   Yes.
6     A.   I do not.  They're -- they're in the
7  possession of the poll Watchers, as far as I know.
8     Q.   Have you ever printed your PowerPoint and
9  given that to anybody?
10    A.   No, ma'am.
11    Q.   Would you say that with respect to the
12 approximately 1,000 Poll Watcher Guides that you
13 prepared, that there is a possibility that at this
14 point some of those guides have made their way to other
15 individuals who maybe weren't the original recipients?
16         MR. TAYLOR:  Objection to form.
17    A.   I have no idea.
18    Q.   (BY MS. PERALES:)  Do you think that it's
19 possible that some of your guides maybe in circulation
20 beyond the original recipients?
21         MR. TAYLOR:  Objection to form.
22    A.   I have no idea.
23    Q.   (BY MS. PERALES:)  If a general member of the
24 public asked you for your guide, let's say a friend of
25 one of your trainees comes at the end of the training

50

1  and says, "I'm here to pick up Susan, Susan's guide
2  looks very interesting," and they would ask for another
3  copy, would you give them another copy?
4      A.   No.
5      Q.   And why is that?
6      A.   Because I only want these in the hands of the
7  people I've trained.
8      Q.   Okay.  What steps do you take to ensure that
9  the guides stay in the hands of the people you trained?
10     A.   All the steps I can take.  The guides are
11 with me personally and I personally hand them to the
12 students and they leave with them, once they leave I
13 have no control.
14     Q.   Okay.  Okay.  I'm going to ask you some
15 questions about your training of poll watchers.  Well,
16 let me ask you an earlier question first, just to nail
17 down something.  Is there anybody else who trains,
18 besides you, who trains poll watchers who will serve on
19 behalf of Harris County Republican Party?
20     A.   No.
21     Q.   I'm going to ask you some questions now about
22 your training with the understanding that they may draw
23 objections, and so I will just embark upon them for the
24 purpose of the record.
25          Can you tell me how your training of

51

1  poll watchers may have changed or didn't change based
2  on the enactment of that part of SB 1 that says "Poll
3  watchers may not be denied free movement where election
4  activity is occurring within the location at which the
5  watcher is serving?
6          MR. GORE:  Objection, First Amendment
7  Privilege, instruct the witness not to answer.
8      Q.   (BY MS. PERALES)  And will you follow the
9  instruction of Mr. Gore not to answer?
10     A.   I will.
11     Q.   Did your training of poll watchers change
12 following enactment of that portion of SB 1 that
13 prohibits an election official from taking any action
14 to obstruct the view of a watcher or distance the
15 watcher from the activity or procedure to be observed
16 in a manner that would make observation not reasonably
17 effective?
18          MR. GORE:  Objection, First Amendment
19 privilege, instruct the witness not to answer.
20     Q.   (BY MS. PERALES:)  Were you -- are you
21 following Mr. Gore's instruction?
22     A.   I am.
23     Q.   Are you aware that -- well, Harris County
24 Republican Party is the appointing authority for its
25 watchers; is that correct?

52

1      A.   That is correct.
2      Q.   Are you aware that SB 1 has now allowed the
3  appointing authority that believes a watcher was
4  unlawfully prevented or obstructed from the performance
5  of the watcher's duties to seek relief in court?
6      A.   I am aware.
7      Q.   Are you aware of any changes in activity of
8  the Harris County Republican Party with respect to
9  being able to take court action when you believe one of
10 your watchers is being unlawfully prevented or
11 obstructed?
12          MR. GORE:  So I'm going to object on
13 First Amendment privilege grounds to the extent the
14 question calls for actions that are not public or
15 communications that are not public and that are
16 internal only to the Harris County Republican Party, to
17 the extent there's anything public out there the
18 witness can testify, but with respect to anything not
19 public, I instruct the witness not to answer.
20     Q.   (BY MS. PERALES:)  Mr. Vera, are you going to
21 follow Mr. Gore's instruction?
22     A.   I am.
23     Q.   Can you answer the question with respect to
24 public information only?
25     A.   I am not aware at this time of any public

53

1  statement or intent from the Harris County Republican
2  Party to seek court action with regard to a poll
3  watcher.
4      Q.   Without telling me any substance, are you
5  aware of any private communication regarding that?
6      A.   No.
7      Q.   Can you tell me what "Free Movement of Poll
8  Watchers," means to you?
9      A.   Free Movement of poll Watchers," means that
10 with the exception of a voter voting by themselves at
11 the voting booth, the poll watcher is free to move
12 around the polling place to observe all other election
13 activity.  The voting booth is off limits if the voter
14 is by himself of herself, or if the voter is being
15 assisted by an assistant the voter brought with them.
16     Q.   How far from the voter should a watcher stand
17 to respect that off-limits area you described?
18     A.   It's not specified in statute, but they
19 should not be close enough to see the ballot or hear
20 the voter's discussion with the assistant.
21     Q.   If the watcher isn't looking at the ballot,
22 how close can the watcher stand?
23     A.   If the voter is being assisted by an election
24 worker who is working that polling location, the poll
25 watcher can be right there at the voting booth, and SB

54

1 1 says can even inspect the ballot.  That's not true
2 when the voter's being assisted by their own chosen
3 assistant.
4     Q.  So how -- you know if a watcher asks you how
5 close can I be in order to perform that function and
6 you say being right there, how close is right there in
7 a numerical sense?
8     A.  We are still referring to a voter being
9 assisted by an election worker, I've told the poll
10 watchers they can be right there at the polling booth
11 to be able to see every action made by the election
12 worker and hear every instruction given by the voter to
13 the election worker, close enough to see and hear.
14     Q.  Okay.  And how far is that in terms of
15 distance?
16     A.  It depends how good the poll watchers vision
17 and hearing is.
18     Q.  Okay.  So let's say it's not great, but the
19 poll watcher still capable of seeing and hearing, if
20 the poll watcher says can I stand one foot from the
21 voter, would you say that's okay?
22     A.  I would tell the vote poll watcher if you
23 need to stand one foot from the voter to see and hear
24 everything, yes.  Do not make contact with the voter or
25 the election worker.

56

1     A.  Executing the instructions.
2     Q.  -- by making the preference selections on the
3 ballot?
4     A.  That is correct.
5     Q.  What actions by an election official would
6 obstruct the view of a watcher that would make the
7 observation not reasonably effective when it came to
8 voting?
9     A.  Are you referring to the actual preparation
10 of the ballots or other examples in the polling place?
11     Q.  The preparation of the ballot.
12     A.  Then the election, one offense the election
13 worker could take would be to constantly move his body
14 to block the poll watcher's vision of the ballot
15 preparation.
16     Q.  Now, with respect to not preparation of the
17 ballot, but other activities -- interacting with voters
18 in the polling place, what action could an election
19 worker take that would make observation not reasonably
20 effective?
21
22     A.  At the voter check-in table, the poll watcher
23 has to be able to hear everything said between the
24 voter and the election worker and to see the
25 information that's coming up on the screen as the voter

55

1     Q.  You mean physical contact?
2     A.  Correct.
3     Q.  And so you mention a moment ago, with respect
4 to a voter being assisted by a poll worker, that the
5 watcher now has the ability to inspect the ballot; do
6 you recall that testimony?
7     A.  Yes.
8     Q.  Okay.  And do you understand that to be
9 inspect the ballot as it's being voted?
10     A.  The language in the code of SB 1 states that
11 the voter, that the poll watcher may observe the
12 preparation of the ballot, does not say anything beyond
13 that.  So what I have told my poll watchers in class
14 is, if you think you need to you can see that the
15 election worker who is assisting the voter is carrying
16 out the voter's instructions in preparing the ballot.
17     Q.  And that means for example being able to see
18 the poll worker make selection of candidate preference?
19     A.  As instructed by the voter, correct.  The key
20 issue counselor is, is the assistant carrying out the
21 expressed instructions of the voter, that's it.
22     Q.  And so the watcher then, you would advise can
23 stand close enough to see and hear not only the voters
24 instructions to the poll worker, but then the poll
25 worker --

57

1 checks in.
2         So if the election worker, by shifting
3 his body to block the screen or making the table so
4 close to the wall the poll watcher can't stand there,
5 those are things that the election workers could do
6 that would prohibit the -- the poll watcher from being
7 able to see and hear all the transactions.
8     Q.  Okay.  Describe for me actions by a poll
9 worker that would distance the watcher from the
10 activity or procedure to be observed in a manner that
11 would make observation not reasonably effective with
12 respect to activities that involve the voter?
13     A.  The most blatant example of that is an
14 election judge, the presiding judge of a polling place
15 telling the voter they cannot move any closer than this
16 distance.
17     Q.  Or telling the watcher?
18     A.  Right, telling the watcher they cannot be any
19 closer than this distance.
20     Q.  Okay.  So for example saying you can't get
21 closer than three feet to the poll worker assisting the
22 voter and casting the ballot?
23     A.  Correct.
24     Q.  Okay.  Is it within the scope of what a poll
25 watcher can do to write down the names of voters as

58

1  they check in to vote?
2      A.  That is not normally within the scope of the
3  poll watcher's activity.
4      Q.  Would you consider it prohibited?
5      A.  It's not specifically prohibited in statute.
6  When I'm asked that question I tell my students --
7          MR. GORE:  -- I'm just going to again
8  interject the objection and instruct the witness not to
9  divulge what he tells his students during training on
10  First Amendment grounds.
11     Q.  (BY MS. PERALES:) And are you going to follow
12  Mr. Gore's instructions?
13     A.  I am.
14     Q.  Uh-huh, let me see if I can find another way
15  to, got this.  If I were to ask you whether you would
16  advise me to refrain from writing down the names of
17  voters as they check in, would you advise me to refrain
18  from doing that?
19     A.  Mr. Gore?
20         MR. GORE:  I understand the question
21  to be a hypothetical about Ms. Perales.
22         MS. PERALES:  And -- and I don't live
23  in Harris County, so.
24     A.  I would advise the poll watcher to refrain
25  from writing down the voter's names.

59

1      Q.  (BY MS. PERALES) Okay.  Have you ever had a
2  poll watcher contact you for guidance on what to do if
3  the voter is communicating with an assistor in a
4  language other than English?
5      A.  I have never had a poll watcher contact me
6  for that reason because the poll watchers are
7  instructed in advance about what to do in that
8  situation.
9      Q.  Okay.  Understanding that the poll watcher is
10  instructed on how they personally should behave, have
11  you ever had a poll watcher contact you to express a
12  concern about an in person assistance in the polling
13  place in a language other than English?
14     A.  No.
15     Q.  Okay.  Are you familiar with organized block
16  walking activities of the Harris County Republican
17  Party?
18     A.  From a distance.
19     Q.  Okay.  Do you know how the Harris County
20  Republican Party recruits block walkers?
21     A.  What I know is that the precinct chairs are
22  encouraged to organize people from the precincts to do
23  block walking.
24     Q.  And when the precinct chairs organize people
25  from their precincts to do block walking, is that

60

1  typically an activity that is in support of multiple
2  Republican candidates at the same time or something
3  different?
4      A.  I think it is a mixture.  If it is a block
5  walking activity before a general election, it's
6  usually multiple candidates.  If it's before a specific
7  school board election it maybe for only one or two
8  candidates.
9      Q.  Do you know generally what block walkers do
10  when they're block walking?
11     A.  Only from what they've told me.
12     Q.  Okay.  Tell me what you know from what
13  they've told you?
14     A.  They work from a list, either in paper or on
15  the phone, they knock on the door, they know the
16  person's name ahead of time, and they follow a script
17  on how to engage the voter with the message being
18  delivered.
19     Q.  Okay.  Do you know the source of the lists of
20  voters?
21     A.  I do not.
22     Q.  Do you know if block walkers know when
23  they're knocking on the door, if the voter is over age
24  65?
25     A.  I do not know that.

61

1      Q.  Do you know if block walkers know when
2  they're knocking on the door if the voter has requested
3  a mail ballot or is eligible to request a mail ballot?
4      A.  I don't know that.
5      Q.  Do you know if the Party gives, I don't know
6  a better word than swag, do you know if the Party gives
7  out like T-shirts or buttons or other things to its
8  block walkers?
9      A.  I do not know for certain, but I have seen
10  candidates give buttons and shirts to block walkers.
11     Q.  And would those be block walkers that were
12  organized by the Harris County Republican Party?
13     A.  I'm not sure.
14     Q.  Have you seen the script that the block
15  walkers use when they interact with the voter?
16     A.  I have not.
17     Q.  Okay.  Do you know if the Harris County
18  Republican Party recruits individuals to be available
19  to provide assistance to voters in person at the
20  polling place?
21     A.  I have never seen that activity by the
22  Republican Party of Harris County.
23     Q.  Okay.  Do you know whether, for example -- do
24  you know whether for example, if Harris County
25  Republican Party has a table set up outside the polling

Alan Vera - 2/27/2023

62

1  place at the appropriate distance, and whether voters
2  have ever asked people at that table to come in and
3  help them, you know, with assistance in casting the
4  ballot?
5      A.  I am not aware that the Harris County
6  Republican Party has ever set up tables outside a
7  polling place.
8      Q.  Okay.  Have you ever worked outside a polling
9  place encouraging voters as they go in?
10     A.  Not for the last 14 years.
11     Q.  And I take -- I take it from that, that your
12 activities which might have been urging voters to vote
13 for a particular candidate, and at the point at which
14 you become the chair of the Ballot Security --
15         MR. TAYLOR:  Committee.
16         MS. PERALES:  Committee.  I wanted to
17 get it right and I wrote it down on the first page.
18     Q.  (BY MS. PERALES:) Is that right?
19     A.  What was the question?
20     Q.  That your activities urging voters to vote
21 for particular candidates, either door to door or
22 outside the polling place, ended when you became the
23 chair of the Ballot Security?
24     A.  That's basically correct.
25     Q.  And can you give me an insight into why?

63

1      A.  I am in charge of election integrity so I
2  don't endorse candidates during primaries.  I don't
3  pick between republican candidates, and for the general
4  election I'm usually too busy with details at the
5  polling places.
6      Q.  That raises a question I had in the back of
7  my mind.  Can you tell me how many people currently are
8  on the Ballot Security Committee for Harris County
9  Republican Party?
10     A.  There are 13 voting members, and there are
11 eight non-voting members.
12     Q.  And from where are the voting members drawn?
13     A.  The voting members are appointed by the SD or
14 Senate District chairs and by the county Party Chair
15 from the SD's, from the Senate District areas.
16     Q.  And -- and from where are the eight
17 non-voting members drawn?
18     A.  They are selected by me.
19     Q.  Okay.  Do they serve a term of a certain
20 length?
21     A.  Two years.
22     Q.  Do the -- does this Ballot Security Committee
23 hold meetings at regular intervals?
24     A.  Monthly.
25     Q.  Who pays for the coffee and donuts?

64

1      A.  There is no coffee and donuts.
2      Q.  It's a very serious meeting then?
3      A.  Very serious.
4      Q.  Okay.  Do you hold these meetings at a party
5  headquarters or at a restaurant?
6      A.  We hold the meetings in the lobby conference
7  room of the Party headquarters building.
8      Q.  Okay.  So no food?
9      A.  No food.
10     Q.  Okay.  Do you have a vote, because you
11 mentioned there are 13 voting members?
12     A.  I have a vote in the committee, yes.
13     Q.  Okay.  Have you personally ever assisted a
14 voter who needed assistance voting in person in the
15 polling place?
16     A.  During the time I was an alternate judge at
17 Wesley elementary school I was asked by voters from
18 that precinct to assist them and yes, I did.
19     Q.  And what types need for assistance did you
20 see at that time?
21     A.  During that time I was asked by a voter to
22 explain why there were no democrat candidates for that
23 office and I had to explain that none had filed to run.
24 The voter was concerned and confused, I explained that.
25     Q.  Okay.

65

1      A.  The -- another voter asked me to explain a
2  bond proposition to them I told them I was not allowed
3  to do anything, but read the language on the ballot and
4  could not answer questions.
5      Q.  Okay.  And so my next question is, what was
6  the -- what was it about the voter that required
7  assistance in voting.  So for example inability to read
8  or write or physical disability or --
9      A.  I had not had any of those instances.  The
10 questions I got were about specific ballot issues.
11     Q.  I see.  Okay.  So would it be fair to say
12 then that you've never assisted in voting in person at
13 the polling place a physically disabled voter who
14 required your assist -- who required assistance to
15 vote?
16     A.  In the places I've worked they always came
17 with their own assistant.
18     Q.  Okay.  Have you ever had occasion to assist a
19 voter who was, who didn't speak English and needed
20 assistance interpreting the ballot at the polling
21 place?
22     A.  Only to the extent of showing them how to
23 turn on the Spanish language ballot and the headphones
24 that read the ballot in Spanish.
25     Q.  Okay.  Have you ever interacted with a voter

66

1  in Spanish while delivering that type of assistance?
2      A.  Yes, but just to give the instructions on how
3  to access the Spanish language ballot and the Spanish
4  language reading of the ballot.
5      Q.  I won't presume, but you are from El Paso,
6  does that mean you speak Spanish?
7      A.  It means I spoke Spanish before I spoke
8  English.
9      Q.  And you still have some ability today?
10      A.  I can order a beer and chips with the best of
11  them.
12          (Laughter.)
13      Q.  (BY MS. PERALES:)  Okay.  Have you ever
14  assisted a family member or friend?
15      A.  I have not.
16          MR. TAYLOR:  Let the question finish
17  before you answer.
18          THE WITNESS:  Thank you, sorry.
19      Q.  (BY MS. PERALES:)  I've been talking up until
20  now about voting in the polling place, but I'll also
21  ask, have you ever assisted a voter who requested your
22  assistance in casting a ballot by mail?
23      A.  I have not.
24      Q.  Have you ever assisted a voter in preparing
25  an application for ballot by mail?

67

1      A.  I have not.
2      Q.  And that includes friends, family members,
3  neighbors, anybody like that?
4      A.  It does.
5      Q.  Okay.  Are you aware of any instances in the
6  polling place in which a voter assistor helped a voter
7  who was not eligible for voter assistance?
8      A.  Repeat the question, please.
9      Q.  Are you aware of any instances in which a
10  voter assistor helped a voter in the polling place who
11  was not eligible for voter assistance?
12      A.  I have not personally seen that.  I have
13  received reports from poll watchers expressing that
14  concern.
15      Q.  Okay.  And what would you do in response to
16  that concern?
17      A.  I would simply have the poll watchers take
18  notes and submit it with the report.
19      Q.  Okay.  And did you ever follow up on any --
20  well, did you ever receive any written concerns like
21  that?
22      A.  Yes.
23      Q.  And what did you do to follow up?
24      A.  We followed up with the Ballot Security
25  Committee looking into the voter assistant, because

68

1  they sign in now.  We've done open records request,
2  received the name of the assistant, and done a little
3  digging.  We haven't found anything extraordinarily
4  evil.
5      Q.  Anything slightly evil?
6      A.  No, just questions about whether the voter
7  really did need an assistant or not.
8      Q.  Okay.
9      A.  But those are judgment calls in many cases.
10      Q.  Have you ever contacted a voter to verify
11  whether the voter needed assistance?
12      A.  I have not.
13      Q.  Now, have you -- are you aware of any
14  instances in which a voter assistor told a voter how to
15  vote in the polling place?
16      A.  We have had those incidents reported to me by
17  poll watchers and by election workers and they were
18  simply instructed to advise the assistor that they're
19  to follow the direction of the voter and not vote in
20  place of the voter.  So, yes we have had those
21  instances reported.
22      Q.  Did you ever receive any reports like that in
23  writing?
24      A.  Yes.
25      Q.  Okay.  And so since you received it in

69

1  writing after the voting has ended, what have you done,
2  if anything in response to receiving something in
3  writing?
4      A.  Two things, the issue is, the issue and the
5  incident is reported on our legislative preparation
6  documents and reported to the Harris County Republican
7  Party's election issue repository.  So there's two
8  records of it.
9      Q.  And would you have access to those records
10  today?
11      A.  I do not have access to the main repository,
12  only my own notes.
13      Q.  Okay.  And do you have notes documenting any
14  instances in which an assistor told a voter how to
15  vote?
16      A.  I do.
17      Q.  Okay.  Where are those notes now?
18      A.  They're at home.
19      Q.  Okay.  And you would be capable of producing
20  them in some form, if needed --
21      A.  I could, but you could not read them probably
22  because they're all handwritten.
23      Q.  Can you recall the date of the most recent
24  time you would have noted an -- a report of an assistor
25  telling a voter how to vote in a polling place?

70

1    A.  I cannot recall, it has been a while.
2    Q.  Okay.  Has it been more than five years?
3    A.  No, but more than two.
4    Q.  Okay.  And that would be a single instance or
5    multiple instances?
6    A.  I can't remember.
7    Q.  Okay.  Okay.  Do you recall the last time you
8    asked an election worker to instruct an assistant to
9    carry out the wishes of the voter?
10    A.  I never do that personally.  I instruct
11    either the poll watcher or one of my workers to bring
12    the issue up with the election judge.
13    Q.  And do you recall the last time you did that?
14    A.  In early voting for the November 2022
15    election?
16    Q.  Do you recall where that polling place was?
17    A.  I don't.
18    Q.  Okay.  And was that a single instance or
19    multiple instances?
20    MR. TAYLOR:  Let me -- let me hop in,
21    I'm the new kid on the block here, but I was told that
22    the November 2020 election cycle was not going to be
23    discussed today and this witness didn't prepare --
24    MS. PERALES:  Okay.
25    MR. TAYLOR:  -- for that subject area.

71

1    Now, I could be wrong, but that's what I was told.
2    MS. PERALES:  Yeah, and I'm sorry we
3    sort of drifted into that because I was asking when
4    something happened and he mentioned --
5    MR. TAYLOR:  Right, right.
6    MS. PERALES:  -- so thank you for that
7    reminder.  I will not ask you about that from the
8    November 2022, because we're going to stick to before
9    that.
10    Q.  (BY MS. PERALES:)  Before November of 2022,
11    can you think of an instance where you instructed poll
12    watcher or poll worker to deal with an issue of an
13    assistor who was suspected of telling a voter how to
14    vote?
15    A.  I believe that in the May uniform election
16    date of 2022, so it was not the November, but the May
17    in an ESD Emergency Services District Election, I did
18    have a poll watcher, I gave a poll watcher guidance to
19    have the presiding judge counsel the assistor not to
20    make decisions for the voter.
21    Q.  And do you know whether the assistor was a
22    private individual or an election worker?
23    A.  It was an election worker.
24    Q.  And how did your watcher know that election
25    worker was telling that particular voter how to vote?

72

1    A.  Because the election worker was the assistant
2    and the poll watcher is now allowed to be at the booth
3    with the election worker assistant, and the poll
4    watcher was and could overhear and see what's going on.
5    Q.  And what did the poll watcher say exactly
6    that -- that communicated their understanding that the
7    election worker was somehow voting for the voter or
8    telling the voter how to vote?
9    A.  The voter was pondering different races and
10    candidates and the election worker was making strong
11    suggestions on whom the voter should choose.
12    Q.  Do you know whether that particular voter was
13    physically disabled or --
14    A.  I do not.
15    Q.  -- okay.  Okay.  Do you know whether -- did
16    the watcher report that the voter -- let me see, how do
17    I ask this question?  Let me start again.  Did the
18    watcher report that the election worker assistor voted
19    for the voter, prepared the ballot in anyway that was
20    different than what the voter wanted?
21    A.  That particular instance, the poll watcher
22    reported that the election worker assistant was
23    strongly suggesting to the voter which choices he
24    should make in casting his ballot.
25    Q.  Okay.  And understanding that, that's not

73

1    okay.  Did the poll watcher communicate how the ballot
2    was ultimately prepared?
3    A.  Poll watcher communicated that he, as he
4    should have, spoke directly to the election worker.
5    Okay.  And then went and saw the presiding judge to
6    also come and reinforce it.
7    Q.  Did the poll watcher say how the ballot was
8    prepared?
9    A.  I did not ask that.
10    Q.  Can you think of any other examples from
11    before the 2022 general election of a poll watcher
12    raising a concern to you or an election official
13    raising a concern to you about an assistor who was
14    voting for the voter or telling the voter how to vote?
15    A.  How far back do you want to go?
16    Q.  Let's go back in five years.
17    A.  Okay.  So in 2018, okay?  Early voting,
18    November election there were people camped in the
19    parking lot outside the Moody gardens -- moody polling
20    place and they were intercepting voters in the lot
21    locking arms with them and walking them into the poll
22    and announcing themselves as the assistant.
23    Q.  Okay.  And do you know whether any of those
24    assistors told voters how to vote?  Did any watcher or
25    election official tell you those assistors told the

74

1  voters how to vote?
2  A.  It was very similar to what I just described
3  to you in the other situation that, yes, the reports
4  then came in that the assister who had attached herself
5  to the voter was strongly suggesting to the voter which
6  candidates they should select at the polling place --
7  the polling booth -- the voting booth.
8  Q.  So was it one assistor at issue?
9  A.  There were four people working the parking
10  lot.
11  Q.  Okay.  But you heard from the watchers or the
12  poll workers that it was this one particular lady?
13  A.  No, it was all four ladies.
14  Q.  Okay.  Four ladies.  And do you know whether
15  the ballot was prepared in accordance with the voter's
16  wishes in those instances?
17  A.  I do not.
18  Q.  Okay.  Okay.  Do you have any other examples
19  within the past five years?
20  A.  Not that I can think of at this time.
21  Q.  Okay.  I am about to change to another topic
22  can we take a five minute break?
23  THE REPORTER:  Okay.  Going off the
24  record at 11:41 a.m.
25  (Off the record.)

75

1  THE REPORTER:  Going back on the
2  record at 11:54 a.m.
3  Q.  (BY MS. PERALES:)  Okay.  Mr. Vera, I'm going
4  to turn to talking about the time leading up to the
5  introduction of the election related bills in the 2021
6  regular session.  So at this point we're not at SB 1 as
7  we've come to know it, but at that time we had HB 6 and
8  SB 7, I believe.
9  So in the lead up to the 2021, Texas
10  Legislative regular session, it's fair to say that you
11  were interested in seeing one or more bills put forward
12  that we're going to deal with election issues?
13  A.  That's correct.
14  Q.  Okay.  So prior to the start of the 2021
15  legislative session, what steps did you take to
16  advocate for election related legislation in the
17  upcoming session?
18  A.  That was the 87th session.  In the early days
19  of the session I visited in person in the capital with
20  the state reps and the senators who represent Harris
21  County and this was a verbal communication of the kinds
22  of issues we think needed to be fixed.  So we visited
23  together and I talked and they took notes.
24  Q.  Okay.  Tell me the names of those people.
25  A.  Briscoe Cain, Valoree Swanson, Mike

76

1  Schofield, Paul Bettencourt.
2  Q.  Any other senators?
3  A.  No.
4  Q.  How about Bryan Hughes?
5  A.  No.
6  Q.  Okay.  Cain, Swanson, and Schofield are
7  members of the House, right?
8  A.  Correct.
9  Q.  Okay.  Tell me about how many times you
10  communicated with Briscoe Cain?
11  A.  Well, it was the initial visit where I
12  visited all of them.  I think twice before the
13  committees began hearing, maybe two times the most.
14  Q.  So this would have been after the -- Legg
15  started?
16  A.  After the opening day of the Legg But before
17  the committees began hearing bills.
18  Q.  Okay.  Did you do any work prior -- sorry.
19  Did you do any work prior to the start of the session?
20  A.  I work all the time.  Can you be more
21  specific.
22  Q.  So bill filing usually opens in November of
23  the year preceding, so just taking you from --
24  following the November 2020 election, knowing that
25  there's an upcoming legislative session?

77

1  A.  Right.
2  Q.  Just in that period before the legislative
3  session starts, did you do work -- and I'm sure you
4  must have, so maybe the better question is, what work
5  did you do to prepare for a accomplishing your goals
6  with respect to your legislation --
7  A.  -- I understand -- I understand your question
8  now, thank you.  Again, just to be clear I -- in that
9  year was mostly phone calls in advance and those start
10  in June.  I began calling Swanson and Cain and
11  Schofield in June of 2020 discussing issues that were
12  of concern to the Ballot Security Committee, not bills
13  just issues that needed to be addressed.
14  Q.  Uh-huh.
15  A.  And then that continued in January of 2021,
16  when I visited their offices and followed up on those
17  issues.
18  Q.  Okay.  Understood.  You met with them one on
19  one?
20  A.  Well, in June it was phone calls in January
21  it was visits one on one, uh-huh.
22  Q.  Did you meet with the members personally or
23  did you meet with their staff?
24  A.  Probably a mix, I can't remember exactly, but
25  I'm sure the -- the members were there on one of the

Alan Vera - 2/27/2023

78

1   visits and staff on others.
2       Q.  Okay.  What do you remember advocating on
3   that were related to SB 1, meaning either ended up
4   in -- in SB 1 or one of its predecessor's bills?
5       A.  Oh, I see, I see, I see --
6           MR. WASSDORF:  I'm going to object
7   again on the basis of Legislative Privilege to the
8   extent that any of the contents of these communications
9   were in response to a legislative inquiry and instruct
10  you not to answer in that regard.
11          MS. PERALES:  I don't think you can
12  instruct him not to answer.
13          MR. WASSDORF:  Well, I mean --
14          MS. PERALES:  But let's -- let's take
15  a minute to think about it.
16          MR. TAYLOR:  Doesn't the state --
17  doesn't the state own that privilege though.  I mean
18  it's not a privilege that --
19          MS. PERALES:  Well, it's -- it's maybe
20  the privilege of a legislator, but it's -- they're
21  third parties.  They're not parties to the action here.
22          MR. WASSDORF:  I don't know.
23          MS. PERALES:  Let me think about this.
24  Let me think about this.  I'm -- I'm not going to
25  trying to steamroll you.  I do want to stay on the

79

1   record.
2           MR. WASSDORF:  I -- I was asserting
3   the privilege of instructing him not to answer based on
4   Mr. Taylor's representation that he was going to defer
5   to us with respect to our respective privilege
6   objections.
7           MR. TAYLOR:  Yeah, and I can make it
8   easier perhaps.  I don't want my client a witness to be
9   put in a position where somebody has asserted a
10  privilege and then said that he improperly waived that
11  privilege.  So I don't think we have, he and I don't
12  have any choice, but if somebody's going to raise a
13  privilege today, we're just going to have to, you know,
14  not answer that question.  But I'm not saying that the
15  privilege is valid or invalid, I have no idea because
16  I'm not involved in this case.  So that's -- but that's
17  the practical reality, is I am instructing him not to
18  answer questions that these other lawyers are
19  asserting, but not because they're valid, but because
20  they're asserted.
21          MS. PERALES:  Uh-huh.  So can you tell
22  me if you're going to assert the Legislative Privilege
23  and instruct the, Mr. Vera not to answer with respect
24  to all communications with legislators and staff?
25          MR. WASSDORF:  No, it's just any --

80

1   the contents of any communications that he made in
2   response to an inquiry from a legislator or legislative
3   staff.
4           MS. PERALES:  So can you tell me what
5   it was about my question to Mr. Vera that may have
6   raised that issue for you?
7           MR. WASSDORF:  I'm having difficulty
8   in remembering what exactly the wording of the question
9   was, but as it was read the scope of the question
10  appeared to potentially encompass his communications to
11  the legislators or legislative staff in response to a
12  legislative inquiry.
13          MS. PERALES:  One second.
14          Let me see if I can divide his
15  testimony in such a way that we are able to segregate
16  those questions on the record and deal with them
17  separately, perhaps down the line a little bit in the
18  deposition.
19          MR. WASSDORF:  Sure.
20      Q.  (BY MS. PERALES:)  So Mr. Vera, would it be
21  fair to say that you had communications with
22  legislators and staff in which you were bringing forth
23  information or requests at your initiative; that's a
24  yes or no question.
25      A.  Yes.

81

1       Q.  Okay.  Were there ever times when you were
2   communicating with legislators and staff in response to
3   a question from them?
4       A.  Yes.
5       Q.  Okay.  So I'm going to try to divide your
6   testimony into what I believe is non-objectionable, you
7   bringing forth information to legislators and staff at
8   your initiative and then we will try to deal separately
9   with your communications with legislators and staff
10  where they're requesting something from you?
11      A.  This is going to be difficult.
12      Q.  Okay.
13      A.  Because the interaction and the dynamics of
14  the exchanges and discussions, those things overlap
15  continually.
16      Q.  Yeah, okay.
17      A.  It's going to be difficult.
18      Q.  Okay.  Well, with without discussing the
19  substance of what they may have been asking you and
20  what you may have been, let me try get a sense of how
21  that would have unfolded.
22          Would it be fair to say that you
23  communicated with legislators and their staff in
24  person, by phone, and by email?
25      A.  That would be an accurate statement.

82

1    Q.   Okay.  Did you ever have any Zoom meetings
2   with legislators or staff?
3    A.   Did not.
4    Q.   Okay.  And so is it your testimony that when
5   you were communicating with legislators and their
6   staff, that it was a -- a combination of you bringing
7   forth information at your initiative or requests at
8   your initiative and then getting inquiries from them
9   and then you're responding to those inquires?
10    A.   If I understand the question, yes, it was
11   both those issues and frequently in the same meetings.
12    Q.   Okay.  Is it fair to say then to summarize
13   your earlier testimony that you started calling House,
14   Members and staff and Senator Bettencourt and staff in
15   the summer prior to the January 2021 session, and that
16   your communications with them continued both either
17   through email, calls, or in person meetings until the
18   enactment of SB 1?
19    A.   Well, if an enactment means final passage,
20   yes, because SB 1 did not become effective till
21   December of 2021, so, yes to the enactment.
22    Q.   Okay.  When you responded to inquires from
23   legislators or staff, would it be fair to say that you
24   were giving them information as well as suggestions on
25   crafting SB 1, or what ultimately became SB 1?

83

1    A.   It would be more -- it would most accurate to
2   say that when I was responding to questions it was
3   providing specific information on problems we had
4   faced.
5    Q.   Uh-huh.
6    A.   Not craft -- not how to craft SB 1.
7    Q.   But suggestions certainly about where, where
8   you wanted to see language to solve certain problems
9   that you had seen?
10    A.   I think you've gone a little too far on the
11   specificity.  It wasn't the language, it was we've got
12   to find how to fix this.  I wasn't suggesting the
13   language and how to fix it.
14    Q.   Okay.  Certainly not bill language, let met
15   -- let ask my question in a better way then.
16    A.   Okay.
17    Q.   When you're communicating in response to
18   inquiries from legislators, you were giving them both
19   factual information as well as telling them from your
20   perspective that either certain holes needed to be
21   plugged in the statute or certain issues needed to be
22   addressed by the statute?
23    A.   That is correct, but what I did not do was
24   provide language for the statute.
25    Q.   Okay.  You mention that prior to the start of

84

1   the 2021 regular session you started calling
2   legislators and their staff on certain issues as far
3   as -- as the summer before so summer of 2021 -- I'm
4   sorry, summer of 2020 --
5    A.   2020.
6    Q.   -- And I had asked you a question about what,
7   of those communications were relevant to SB 1, or what
8   ended up in SB 1. So just focusing on your outreach to
9   legislators, starting before the start of the 2021
10   regular session, can you tell me what issues you were
11   reaching out on that were relevant to SB 1?  So for
12   example there's lots of issues in the election code and
13   I know that you work on lots of different things?
14    A.   Uh-huh.
15    Q.   But just specific to what was addressed in SB
16   1, can you remember starting the summer of 2020 what
17   you were advocating on to the members?
18    A.   At that time I know I mentioned growth in
19   mail ballot harvesting in Harris County.  I know I
20   mentioned problems with election judges preventing poll
21   watchers from being close enough to see and hear
22   activity, and that was partly due to COVID, okay?
23   Those are the two major issues in the summer, was the
24   mail ballot harvesting problem and the carryover poll
25   watcher obstruction problem.

85

1    Q.   So prior to SB -- actually, SB 7 and HB 6 --
2    A.   Uh-huh.
3    Q.   Getting filed --
4    A.   Uh-huh.
5    Q.   In the regular session, did you advocate for
6   example on -- and I'm just going to go through the
7   provisions, requiring a registrar to report ineligible
8   registrants or voters to law enforcement officials?
9    A.   No, I did not.
10    Q.   Did you --
11    A.   But I -- to be clear, I want to be -- I do
12   remember also repeating a prior concern about people
13   registering to vote using a commercial post office box
14   as a residence address.  And that was in addition to
15   the poll watcher and the mail ballot harvesting.
16    Q.   Uh-huh.
17    A.   Sorry, I forgot that.
18    Q.   Well, that's what I'm going to go through the
19   list because who could remember all of it, it's a long
20   list?
21    A.   Okay.
22    Q.   Do you remember raising before SB 1 was
23   filed, concerns to legislators or advocating that
24   legislators address voter registration list maintenance
25   issues, other than this residential address issue?

Alan Vera - 2/27/2023

---

86

1    A.  At that time, no.  The PO Box registration
2  was the issue I raised.
3    Q.  And so you mentioned at that time, no.  So
4  I'm going to make a note to ask you about it later on
5  as well.  Do you remember advocating that SB 1 have any
6  provisions regarding the secretary or state receiving
7  the names of voters excused from jury duty for
8  nonresidence?
9    A.  No.
10    Q.  Do you remember advocating before SB 1 was
11  filed on requiring the secretary of state to refer
12  information around potential criminal conduct to the
13  AG?
14    A.  No.
15    Q.  Now, this is leading up to before SB 1 gets
16  filed, how about recommending that legislators require
17  polling place to be inside a building?
18    A.  That wasn't -- that wasn't on my list.
19    Q.  Okay.  How about recommending to legislators
20  that they're not be 24 hour voting?
21    A.  That wasn't on my list.
22    Q.  Okay.  Do you recall before SB 1 was filed
23  recommending to legislators that the election code
24  contain a specific provision that voting machines not
25  allow straight ticket voting?

---

87

1    A.  Not on my list.
2    Q.  Okay.  Do you recall recommending to
3  legislators that SB 1 limit the presiding judge from
4  removing a watcher unless the watcher committed certain
5  infractions, whether those be of the Election Code or
6  the Penal Code?
7    A.  Not that specific thought, but in the summer
8  I raised the concerns about poll watchers not being
9  allowed to observe what they're entitled to observe.
10  So I raised the general topic, not that specific topic.
11    Q.  Do you know how that specific topic -- how
12  that specificity about prohibiting election judges from
13  removing watchers unless the watcher committed certain
14  infractions; do you know where that language came from?
15    A.  I do not.
16    Q.  Okay.  And of course I should have asked you
17  about the ones above as well, do you know where the
18  language came from in SB 1 about having to have the
19  polling place be in a permanent structure?
20    A.  Not that specific thought, no.  That didn't
21  come from my discussions.
22    Q.  All right.  And then do you know where the
23  language in SB 1 came from about not having 24 hour
24  voting?
25    A.  No, I do not.

---

88

1    Q.  Okay.  Do you -- do you recall whether you
2  were advocating before SB 1 was filed on making it
3  Class A Misdemeanor to refuse to accept a watcher?
4    A.  Not specifically that, no.
5    Q.  Do you know the source of where that came
6  from in SB 1?
7    A.  I do not.
8    Q.  Okay.  Now, there's a provision in SB 1 which
9  I believe you said that you did advocate with respect
10  to, which is that the watcher may not be denied free
11  movement where election activity is occurring and the
12  watcher is entitled to sit or stand near enough to see
13  or hear?
14    A.  Yes.
15    Q.  You advocated on that?
16    A.  Yes.
17    Q.  Okay.  And did you advocate with respect to
18  it being a Class A Misdemeanor to take action to
19  obstruct the view of a watcher or distance the watcher?
20    A.  It was already a Class A Misdemeanor.
21    Q.  Okay.  Do you recall advocating that there be
22  either different or increased penalties to -- for an
23  election judge to either distance the watcher or impede
24  the view of the watcher?
25    A.  Not specifically.  I did in my summer phone

---

89

1  calls, advocate for their being a stronger penalty for
2  election judges who prevent poll watchers from
3  performing their duties.
4    Q.  Before SB 1 was introduced, did you advocate
5  on prohibiting mail ballot drop boxes?
6    A.  I did not.
7    Q.  Do you know where that language -- what was
8  the source of that language for SB 1?
9    A.  I don't know.
10    Q.  Okay.  Before SB 1 was introduced, did you
11  advocate for either applications for ballot by mail or
12  mail ballots to have increased requirements for
13  presenting ID numbers, and then having -- those ID
14  numbers need to be verified in order to count either
15  the application, process the application, or count the
16  mail ballot?
17    A.  Not specifically, but I did tell you
18  previously that in the summer phone calls I was raising
19  concerns about mail ballot harvesting in Harris County.
20    Q.  Okay.  You didn't have that specific proposal
21  "though, let's add an ID requirement to the paperwork
22  and have those things required to be checked"?
23    A.  I did not have that specific proposal.  I may
24  have pointed out in one or two phone calls, that the
25  states of Wyoming and Alabama required a photocopy of

---

90

1  the driver's license of the voter to be included with
2  the ballot.
3      Q.  Do you know the -- the source of specific
4  language in SB 1 requiring the ID numbers for ABBMs and
5  mail ballots?
6      A.  I do not.
7      Q.  Okay.  Before SB 1 was introduced, did you
8  advocate at all with legislators for additional
9  information to be asked from individuals who transport
10  curb side voters?
11     A.  Did not.
12     Q.  Do you know where the source of that
13  language --
14     A.  No, ma'am.
15     Q.  -- okay.  Prior to the introduction of SB 1,
16  did you advocate with legislators to increase
17  requirements on polling place assistors; namely, that
18  the assistor oath include additional statements?
19     A.  That was not on my list, no.
20     Q.  Okay.  And what about whether the assistor
21  would have to say whether they were being compensated
22  by a campaign or a PAC?
23     A.  That wasn't me.
24     Q.  How about with respect to mail assistors,
25  mail, not male like y'all --

91

1      A.  M-A-I-L.
2      Q.  -- M-A-I-L, assistance with voting by mail,
3  did you advocate at all prior to the introduction of SB
4  1 that persons who assist voters who are voting by mail
5  are requesting a mail ballot provide additional
6  information about their relationship and compensation?
7      A.  Not that specifically.
8      Q.  Okay.  Do you know the source of that?
9      A.  I do not.
10     Q.  Do you know the source of -- or where it came
11  from in SB 1 that the assistor oath be lengthened and
12  that --
13     A.  I do not know the source.
14     Q.  -- okay.  Now, there's a -- a provision in SB
15  1 that makes it an offense to compensate or offer to
16  compensate another person to assist voters in voting by
17  mail, did you advocate on that issue prior to SB 1's?
18     A.  I did not.
19     Q.  Okay.  Do you know how that language got into
20  the Bill?
21     A.  I do not.
22     Q.  All right.  So there is a part of SB 1 that
23  talks about vote harvesting and so I understand that
24  you had raised a concern related to that.  And so did
25  you advocate with legislators that it should be

92

1  prohibited to have an in person interaction with a
2  voter in the presence of the ballot where the -- the
3  person is advocating for a particular candidate or a
4  measure?
5      A.  That was not from me.
6      Q.  Okay.  So what did you advocate for -- well,
7  let me -- let me close that.  Do you know where that
8  language came from in SB 1 or its predecessors related
9  to prohibited vote harvesting services as an in person
10  interaction with one or more voters in the physical
11  presence of an official ballot intended to deliver
12  votes for a specific candidate or measure?
13     A.  I do not know where it came from.
14     Q.  Okay.  So what were you advocating for with
15  protect to the vote harvesting?
16     A.  Okay.  So we got to be careful about stepping
17  on the objections, okay?
18     Q.  Yeah, I'm just asking what you were
19  advocating for?
20     A.  In my calls I was describing a problem we
21  were, at that time, investigating.  In January and
22  February of 2020, a flood of ABBM was received by the
23  Harris County Clerk with significant issues.
24         So I'm reporting problems.  106 ABBMs
25  delivered in a single envelope with no assistant

93

1  signature to correspond with the act of mailing.
2  Witness signatures on ABBMs requested by people that
3  died in 1990 and 2000 and as recently as 2015 asking
4  for an ABBM in 2020, that's a problem.
5         ABBM signed with a witness by voters
6  whose name was spelled wrong in the signature, that was
7  our concern of ballot harvesting, okay?  And it was
8  significant and there were a number of them.  So that,
9  I was advocating for solutions to prevent or toughen
10  the penalties for that kind of conduct.
11     Q.  Okay.  Now, I -- and what you're saying is
12  triggering memory in my part that there's at least one
13  document produced where you were sending an email
14  saying that the voter wasn't even necessarily involved
15  in that process and that you felt that vote harvesting
16  related to the in person interaction may have been not
17  all of what you would like to see with respect to vote
18  harvesting?
19     A.  You're remembering correctly, but that was an
20  inquiry from a state legislator, so I won't comment,
21  your -- your memory was correct.
22     Q.  Okay.  I -- okay.  It was produced and it
23  seemed to me that it was you saying to them -- or at
24  least what I saw you saying to them something along
25  those lines.  So then, would bit fair to say that prior

94

1  to the introduction of SB 1 you had a concern about
2  vote harvesting that may have been related to
3  falsification of information outside the presence of
4  the voter as opposed to anything that might be
5  happening between the voter and someone who's asking
6  them to vote a certain way?
7      A.  The concerns I was raising in the summer of
8  2020, were about ballot harvesting in a definition that
9  did not include direct interaction with the voter,
10  where the voter was totally unaware that they were
11  requesting a mail in ballot.
12      Q.  Okay.  So I want to stay in the time period
13  prior to the introduction of SB 1, and shift slightly
14  to your communications with people who are not
15  legislators?
16      A.  Uh-huh.
17      Q.  Namely, first, the secretary of state's
18  office, did you communicate at all with the secretary
19  of state's office about what you would want to see in
20  voter integrity legislation in the 2021 session?
21      A.  I did not, no.
22      Q.  Next I'll go to the -- the office of the
23  governor.  Did you communicate with anybody in the
24  office of the governor related to what he would want to
25  see in voter integrity legislation for the 2021

95

1  session?
2      A.  No, I did not.
3      Q.  And then finally with the respect to the
4  office of Texas Attorney General, did you communicate
5  with anybody in the office of the Texas Attorney
6  General about anything you would have wanted to see in
7  the 2021 session related to voter integrity
8  legislation?
9      A.  No, I did not.
10      Q.  Now, I'm going to bring you up to the time
11  period of the regular session, the bills are now
12  introduced, you mentioned that you probably had two
13  meetings with legislators or legislative staff after
14  the opening day?
15      A.  One or two, uh-huh.
16      Q.  Uh-huh.  So in addition to personal meetings
17  -- well, let me ask you this, do you know how many
18  times you went up to Austin during the regular session?
19      A.  Well, before the committee hearings began
20  with bills, only twice.  So January, February, two
21  times.
22      Q.  Uh-huh.
23      A.  Once the committee hearings began for hearing
24  election bills it was almost weekly.
25      Q.  And in the almost weekly visits that you were

96

1  making after HB 6 and SB 7 are introduced?
2      A.  We filed.
3      Q.  Were filed, were introduced and the
4  committees started doing their meetings, were you
5  meeting also almost weekly with legislators or
6  legislative staff?
7      A.  No, once that -- once the committee meetings
8  began my time was spent in the committee meetings.
9  They drag out forever.  So, yeah, I might see staff or
10  members in the hallway or in the Capital Grill, the
11  meetings were few and far between after that.
12      Q.  So what might, what do they call it,
13  buttonhole people in the halls or in the Capital Grill
14  and talk to them about the election integrity bills?
15      A.  If that means I tripped over them, then yes.
16  I may have tripped over them and made a comment.
17      Q.  Okay.  So at this point, what is the means by
18  which you are communicating with legislators or
19  legislative staff?  At this point has it shifted to
20  emails, phone calls?
21      A.  At that point it begins to shift to emails
22  initiated by the legislators or their staff.
23      Q.  Uh-huh.
24      A.  I am the boots on the ground and I frequently
25  get an email asking me to look for unintended

97

1  consequences in the language of this bill and I respond
2  with my best evaluation of what might be the unintended
3  consequences.  The email you referenced earlier on the
4  issue of ballot harvesting being an in person
5  definition was inquiry from a legislator, and that was
6  my response.
7      Q.  Okay.  So would it be fair to say then that,
8  once the committee hearings start your interactions
9  with legislative staff and legislators are in the form
10  of providing feedback on specific bill language that
11  they want to vet with you?
12      A.  In general, yes.  In general, yes.  There
13  have been -- there were two occasions in that first
14  regular session when in testimony I mentioned
15  suggestions that might make the Bill better, and in
16  those two cases -- only two -- I was contacted while I
17  was still waiting to testify on later bills and spent
18  time explaining to the staff, this is what I was
19  referring to.
20      Q.  And generally that -- would that be by phone
21  or --
22      A.  Well, it's in person.
23      Q.  In person?
24      A.  While I'm still there in Austin.
25      Q.  I see.  So you might -- a legislator --

98

1  legislative staff might track you down while you're
2  still in the building and ask you to respond as they're
3  vetting bill language?
4      A.  Asking me to explain specifically what I was
5  suggesting in my testimony that might make the Bill
6  better.
7      Q.  Okay.  Did you ever have an exchange like
8  that that resulted in bill changing in some way?
9      A.  I assume there -- yes, but I can't remember
10  which bill.  It was not one of these, except for the
11  reconciliation of votes and voters.
12      Q.  Okay.  So just specific to HB 6, SB 7, SB 1,
13  it's predecessor's bills, do you ever recall advocating
14  during the regular session for something to either be
15  added or changed about those bills that you saw come to
16  fruition?
17      A.  Not in the regular session.
18      Q.  Okay.  And you've testified in favor of the
19  bills during the regular session HB 6 and SB 7, is that
20  correct?
21      A.  Correct.
22      Q.  Did you advocate for any bills that were not
23  HB 6 or SB 7 to kind of reach out and incorporate maybe
24  a -- a smaller bill that was also moving through the
25  Legg?

99

1      A.  Please state the question again so I'm clear,
2  did I ever advocate for bringing another bill into SB
3  7?
4      Q.  Yeah.
5      A.  There was one point -- not in regular session
6  I don't think -- but, I advocated bringing Senate bill
7  1589 into Senate bill one or 7, whatever the number was
8  at the time.
9      Q.  And did that happen?
10     A.  Nope.
11     Q.  Was 1589 one of the Bettencourt bills?
12     A.  It was.  Show you how much influence I have.
13     Q.  Well, and Senator Bettencourt he had filed
14  some -- so smaller stand alone bills; is that correct?
15     A.  Yes.
16     Q.  Did you ever communicate by text with either
17  legislators or legislative staff?
18     A.  No, I think Briscoe Cain may have texted me
19  once to ask me to stop testifying on all the bills,
20  swear to God.
21         (Everyone Laughing.)
22     Q.  (BY MS. PERALES:) Did he offer a reason why,
23  or did you understand why he was asking?
24     A.  This meeting is running too long.  The
25  committee hearing is running too long, stop testifying.

100

1  That was the only one I can recall.
2      Q.  Okay.  You mentioned that you typically
3  didn't submit written testimony when you testified, but
4  did you submit anything in writing to either
5  legislators or legislative staff that showed your
6  thoughts or perspectives on either SB 7, or HB 6 -- and
7  it could be anything, a memo, an email, a mark up of
8  the Bill with your concerns?
9      A.  At that time I'm sure that I don't leave
10  copies of my testimony, but I sometimes give Exhibits.
11  Yes, I did give out Exhibits showing the examples of
12  the dead voters who requested mail ballots, okay, in
13  January, February 2020.  So those were handed out to
14  the committees, that was it.
15     Q.  And then specific to the bills themselves,
16  did you ever give them any writings that gave your
17  thoughts or reactions to what was in the Bill or what
18  wasn't in the Bill or how the Bill was written?
19     A.  Only when -- when asked, I -- I didn't
20  proactively.
21     Q.  Uh-huh.
22     A.  But if they -- when they asked me say, take a
23  look at this, see what are the unintended consequences
24  I replied.
25     Q.  And unintended consequences, when you say

101

1  that you mean how the Bill language would play out in
2  real life?
3      A.  Yes.
4      Q.  And whether it would accomplish the goals of
5  the Bill?
6      A.  That's correct.
7      Q.  Okay.  And when you would be asked -- and I
8  won't ask you for the specifics of that just yet -- you
9  could have potentially have responded in writing with
10  respect to that?
11     A.  By email, potentially, yes.
12     Q.  Okay.
13     A.  Usually those were either emails or telephone
14  calls.
15     Q.  Do you recall ever advocating for something
16  to be taken out of either SB 7 or HB 6?
17     A.  I think the language defining ballot
18  harvesting as requiring personal contact with the voter
19  qualify as that, but again that was in response to a
20  question from a legislator.
21     Q.  Okay.  Now, as SB 7 and HB 6 are moving
22  through the regular session, what communications are
23  you having with the secretary of state regarding those
24  bills, where Keith Ingram, Christina Adkins, or anybody
25  else in the secretary of state's office?

102

1    A. I don't think I'm having any communications
2    with them about the bills. I can't recall any
3    communications with them about HB 6 or SB 7.
4    Q. You weren't for example saying, hey, when you
5    testify don't forget, this issue has come up in Harris
6    County, anything in which you're encouraging them to
7    either include information or have a certain
8    perspective?
9    A. I can't recall ever communicating with the
10   SOS office or anyone there about those bills while the
11   session was in progress.
12   Q. Okay. Were there other bills for example
13   that you sent information to Keith Ingram on that had
14   to do with elections?
15   A. No, no. You should know that Keith Ingram
16   doesn't really like me a whole lot, okay? So I send
17   formal complaints when I uncovered some wrongdoing, and
18   that's normally when I communicate with him. We don't
19   communicate directly a whole lot.
20   Q. So if Keith Ingram said, for example, you had
21   provided him bill language on something or another,
22   would that be false?
23   A. I wouldn't know where it came from.
24   Q. Okay.
25   A. I wouldn't know where they came from.

103

1    Q. Okay. Same question with respect to the
2    attorney general's office, as the HB 6, SB 7 are moving
3    through the regular session were you having any
4    communications with the office of the attorney general
5    related to these bills?
6    A. No, during that time my communications with
7    the office of attorney general were complaining about
8    lack of action on complaints I had already filed.
9    Q. Okay. And then with respect to
10   communications with office of the governor, were you
11   having any with the officer of the governor -- office
12   of the governor on HB 6, SB 7 during the regular
13   session?
14   A. I cannot remember any communications with the
15   governor's office.
16          MR. TAYLOR: Nina, at what point --
17   I'm not suggesting right now -- do you want to break
18   for lunch?
19          MS. PERALES: Whenever the witness --
20   as I mentioned, you're not a hostage here -- whenever
21   the witness feels like he's comfortable and ready to
22   take that break.
23          MR. TAYLOR: Do you feel like you're
24   making quicker progress than anticipated where it makes
25   sense to just try to get this over with, or is that

104

1    unrealistic?
2          MS. PERALES: So a lot of the rest of
3    this is -- hold on a second, let me just check and see.
4    So I pretty much -- you've sensed I sort of reached the
5    end of my questions with respect to regular session.
6    So this would be a natural stopping point because you
7    know my next set of questions -- not about the
8    pre-pre-session or the regular, but my next set of
9    questions are going to be about the specials and
10   then --
11          MR. TAYLOR: You think that would be
12   at least an hour?
13          MS. PERALES: Very similar --
14          MR. TAYLOR: I'm just trying to figure
15   out if we should break for lunch.
16          MS. PERALES: -- yes, I think we
17   should break for lunch, if the witness is, you know --
18          THE WITNESS: I never had such power.
19          THE REPORTER: Going off the record at
20   12:44 p.m.
21          (Off the record.)
22          THE REPORTER: Going back on the
23   record at 1:42 p.m.
24   Q. (BY MS. PERALES:) Okay. We're back on the
25   record, Mr. Vera, and I'm going to update our

105

1    conversation to the time period of the first and second
2    special sessions in 2021. If you recall the 2021
3    regular session ended over the Memorial Day weekend
4    without passage of SB 7, HB 6, and then we had the two
5    special sessions culminating with the legislature's
6    passage of what then came to be known as SB 1.
7          So during the -- now, you had
8    mentioned earlier in your testimony that you did some
9    advocacy during the first special session. Do you
10   remember at this point, I think bills were introduced,
11   I'm not sure whether we got to the committee hearings
12   during the first special, but can you generally give me
13   a sense of what you were doing during the first special
14   on the election integrity bill?
15   A. Well, I testified before the state -- Senate
16   State Affairs Committee on a Saturday. And I testified
17   in the House for Mr. Murrell's Bill that same day and
18   then things kind of ended because everyone had fled to
19   Washington, there was no quorums so they couldn't
20   conduct business.
21   Q. Okay. Do you remember at that point what you
22   were focused on in terms of provisions in the Bill, had
23   your focus remained the same as it was before these
24   bills were filed in the regular or had your advocacy
25   expanded to additional portions of the Bill?

106

1      A.   Nothing changed during the first special
2    session, but while that was going on we were doing our
3    analysis of Harris County's elections again and found
4    once, again, that we had many precincts, many vote
5    centers, where there were many ballots than voters.  So
6    between the first and second special sessions is when I
7    advocated for the addition of two sentences to what was
8    then SB 1 that would require every county to reconcile
9    the number of ballots and number of voters.
10     Q.   Okay.  So in -- I'm going to go over with you
11   again some of the provisions of SB 1 and my question
12   will be, with respect to the time leading up to the
13   legislature's passage of SB 1, whether you did any
14   advocacy on these provisions?
15     A.   Now, we're including the summer of 2021?
16     Q.   Yeah, all the way through.
17     A.   Okay.
18     Q.   From pre-filing all the way through -- well
19   you've told me in pre-filing period what you were
20   focused on?
21     A.   Uh-huh.
22     Q.   But now through you know end of September
23   2021, did you advocate at all with legislatures or
24   any -- any other officials to have registration
25   provisions in SB 1?

107

1      A.   No, I did not.
2      Q.   Did you advocate to require the secretary of
3    state to refer information about criminal conduct to
4    the attorney general?
5      A.   Did not.
6      Q.   Did you advocate with respect to sending
7    lists of voters who were excused from jury duty for
8    nonresidence to the secretary of state?
9      A.   Did not.
10     Q.   Did you advocate for -- with any legislators
11   or other officials for language in the Bill that would
12   only inside the physical building?
13     A.   Did not.
14     Q.   Did you advocate with legislators or other
15   officials about containing the hours of voting so that
16   there wouldn't be voting between 10 p.m. and 6 a.m.
17     A.   Did not.
18     Q.   Did you advocate with legislators or other
19   officials regarding voting machines not allowing
20   straight ticket voting?
21     A.   Did not.
22     Q.   Now, you were advocating on poll watchers?
23     A.   I was.
24     Q.   And so is there a point at which you began to
25   advocate on the specific provisions in SB 1 related to

108

1    poll watchers, such as prohibiting election judges from
2    removing unruly watchers unless the watcher's behavior
3    violates the Penal Code or was personally observed by
4    the election judge?
5      A.   I was not advocating for that.  I will tell
6    you that during that time period I advocated for
7    removing some of the original language of SB 1 which
8    allowed poll watchers to carry cameras and take photos
9    and record inside the polling place.  I was opposed to
10   that.
11     Q.   Okay.  Now, the provisions related to -- okay
12   did you advocate in the legislature with other
13   officials during this time period up to passage of SB 1
14   that it be made a Class A Misdemeanor to refuse to
15   accept a watcher?
16     A.   I did not.
17     Q.   Did you advocate during this time period with
18   either legislators or other officials that SB 1 include
19   language saying that a watcher may not be denied free
20   movement where election activity is occurring --
21   occurring and is entitled to sit or stand near enough
22   to see and hear the conduct of the observed activity?
23     A.   Only in my testimony to the committee.
24     Q.   And with respect to the time period that
25   we've defined leading the passage of SB 1, did you

109

1    advocate with legislators or other officials to make it
2    a Class A Misdemeanor to take any -- for an election
3    official to take any action to obstruct the view of a
4    watcher or distance the watcher from the activity or
5    procedure being observed?
6      A.   Only in my testimony to the committee.
7      Q.   Did you advocate, leading up to the passage
8    of SB 1, on prohibiting mail ballot drop boxes?
9      A.   I did not personally advocate in that.
10     Q.   Okay.  Did you advocate leading up to the
11   passage of SB 1 for language in the Bill that would
12   require voters to put ID numbers on ABBMs or mail
13   ballots as part of the process of verifying voter
14   identity?
15     A.   I did not advocate.
16     Q.   Okay.  Did you advocate leading up to the
17   passage of SB 1 for new information to be gathered from
18   individuals transporting curbside voters?
19     A.   I did not advocate for that provision.
20     Q.   Did you advocate leading up to the passage of
21   SB 1 with legislators or other officials on adding
22   language to assistor oath?
23     A.   I did not.
24     Q.   Did you advocate leading up to the passage of
25   SB 1 with legislators or other officials for

Alan Vera - 2/27/2023

110

1  requirement that individuals assisting with mail ballot
2  preparation provide their relationship and whether they
3  were compensated?
4      A.  I did not advocate in that specific issue.
5      Q.  Did you advocate leading up to the passage of
6  SB 1 for -- either with legislators or others that
7  there be a state jail felony when a person compensates
8  or offers to compensate another person to assist
9  voters?
10     A.  I did not advocate for that provision.
11     Q.  Okay.  And did you advocate leading down the
12 passage of SB 1 with legislators or others that SB 1
13 prohibit what it terms vote harvesting services that
14 would be an in person interaction with a voter in the
15 presence of a ballot intended to advocate for certain
16 ballot positions?
17     A.  I did not advocate for that provision.
18     Q.  Leading up to the passage of SB 1 did you
19 advocate with legislators or other officials on
20 imposing a civil penalty on election officials who
21 violate the election code?
22     A.  I did not advocate for that provision.
23     Q.  So you mentioned earlier -- okay.  Well,
24 here's -- here's a question for you, some of these
25 provisions seem related to things that Harris County

111

1  was doing in the general election of 2020?
2      A.  Uh-huh.
3      Q.  For example, expanding the hours of voting to
4  24 hours, having voting occur kind of in areas where
5  it's not a permanent structure, but more of a tent set
6  up or nonpermanent structure, but you did -- you're
7  saying that your advocacy in the legislature with
8  legislators did not touch on those things that Harris
9  County had done, in particular?
10     A.  Immediately after the 2020 election, okay?  I
11 did my own local analysis for our legislators on what
12 had happened in that election.  And one of the issues
13 that I addressed was the incredible problems and the
14 almost disenfranchisement of 2,000 voters in drive-thru
15 voting because of the poor -- poor way it was handled.
16 So talked about that locally and I'm -- I'm sure many
17 of our legislators heard my comment on that topic.
18     Q.  Did you ever speak to legislators and urge
19 them to do something about what you had found with
20 respect to the drive-thru voting?
21     A.  I did not do that.  I was questioned at
22 length on drive-thru voting by Senator Royce West
23 during the Senate State Affairs Committee hearing on SB
24 1 in the first special session.  And that's why, for
25 half an hour got into all the details and problems of

112

1  drive-thru voting.
2      Q.  Okay.  So we've covered these specific
3  provisions, so let me sort of change somewhat to ask
4  you, on what provisions were you communicating with
5  legislatures or legislative staff during the period
6  leading up to the enactment of SB 1?
7      A.  During that period of time I was not doing
8  any individual advocacy with legislators or their
9  staffs accept between the first and special session
10 when I asked Senator Bettencourt's staff to carry those
11 two sentences and put them into SB 1 for me, everything
12 else was in public testimony.
13     Q.  What about answering questions from
14 legislators --
15     A.  Yes.
16     Q.  -- as we had discussed earlier, were you
17 answering questions from legislators during the period
18 of the -- either the regular or the first or the second
19 special session?
20     A.  Yes, I would get questions from legislators
21 asking me to review this document and this language and
22 see if there are any unintended consequences, that's
23 normal.
24     Q.  And then you provide your feedback?
25     A.  Correct.

113

1      Q.  Okay.  And so about how often, how many times
2  per week during the first or second special were you
3  providing that kind of feedback to legislators or
4  staff?
5      A.  Well, during the first special session it was
6  no more than twice a week.  The second special session
7  it was only once a week at max, that anybody asked.
8      Q.  Okay.
9      A.  Things were pretty settled by then.
10     Q.  Okay.  And then with respect to who was
11 asking, can you give me the names of the people who
12 were seeking your input on the Bill language or for the
13 -- you know, for your reaction to this?
14     A.  I would get emails from State Rep Jacey
15 Jetton, State Rep Valoree Swanson, Senator Bettencourt
16 and his staff, and I think 90 percent of the emails I
17 got requesting my point of view were those three people
18 or their staffs.
19     Q.  Did you ever have a request for your feedback
20 from Briscoe Cain or his staff?
21     A.  In the regular session I did get a -- a
22 request from that on HB 6.
23     Q.  Okay.  And with respect to Mike Schofield,
24 did you ever get a request from him for feedback or
25 reaction either him or his staff?

114

1    A.  Did not.
2    Q.  Okay.  How about Representative Clardy, did
3  you have any communications with either him or his
4  staff related to bill language?
5    A.  No.
6    Q.  Okay.  Jacey Jetton, would it be fair to say
7  it was not somebody that you had met with at the early
8  part of the session?
9    A.  That's correct.  He's a representative from
10  Fort Bend County, so he would not have attended the
11  Harris County's events where we discussed the election
12  legislation --
13    Q.  I'm sorry, I stepped on your answer.  And so
14  tell me how you begin to start communicating with
15  Representative Jetton about SB 1?
16    A.  Very simple.  I got an email from his staff
17  asking me to comment on these sections of the Bill, and
18  I gave them my comments.
19    Q.  Would it be fair to say that during the time
20  that you were providing your comments on bill language
21  in the regular session, the first and second special
22  session, that what you were being asked to comment on
23  was broader than poll watchers or harvesting?
24    A.  Yes, it would be a correct statement, because
25  the email usually simply asked, please take a look at

115

1  these sections and tell us if there are any unintended
2  consequences from that language.
3    Q.  And then you would provide your concerns or
4  your thoughts about how the Bill language would play
5  out in real life?
6    A.  I would provide my feedback on that --
7  those -- those exact words, the current language might
8  be misinterpreted, misconstrued, or abused for a -- a
9  result I didn't want.
10    Q.  Or also might fail to address a problem that
11  you perceived?
12    A.  Correct, yes.
13    Q.  Okay.  And would it be fair to say then those
14  types of legislator requests covered most provisions in
15  SB 1?
16    A.  I can't answer that because I won't remember.
17  I know that most of the request I get for that feedback
18  specify sections of the language they want me to look
19  at.  I don't know if it covered all -- SB 1 is a pretty
20  long bill.
21    Q.  Maybe I'll -- I'll be slightly more specific,
22  were you asked to respond to language related to poll
23  watchers, for example?
24    A.  Yes.
25    Q.  Okay.  Were you asked to respond to language

116

1  related to vote harvesting?
2    A.  Yes.
3    Q.  Were you asked to respond to language related
4  to voter assistance?
5    A.  No, I was not.
6    Q.  Okay.  Were you asked to respond to language
7  related to 24 hour voting?
8    A.  No, I was not.
9    Q.  Were you asked to responds to language
10  related to temporary polling places or moveable polling
11  places, given that you had raised some concerns about
12  that in your testimony?
13    A.  I was not because they thought they already
14  had the solution.
15    Q.  Okay.  So they weren't asking for your help
16  on that one?
17    A.  Correct.
18    Q.  Were you asked to provide your thoughts on
19  the Bill language related to voters providing ID
20  numbers on either ABBMs or mail ballots?
21    A.  I was and I was -- my -- I was and I was
22  ignored.
23    Q.  Okay.  Is there anything else that you can
24  think of in your mind that were parts of SB 1 that you
25  were asked to provide your feedback on that I haven't

117

1  touched in just the moment or two?
2    A.  I can't remember, we covered so much.  If I
3  think of it I'll -- I'll mention it, but right now I
4  can't think of thinking else.
5    Q.  Now with protect to feedback you provided on
6  poll watchers, tell me the feedback that you provided
7  on poll watchers.
8      MR. WASSDORF:  I'm going to object on
9  the grounds of legislative privilege and ask the
10  witness not to testify.
11      MS. PERALES:  Okay.
12    Q.  (BY MS. PERALES) And Mr. Vera, are you going
13  to follow the instruction of Mr. Wassdorf not to
14  testify on the feedback that you provided legislators
15  related to poll watchers?
16      THE WITNESS:  I am.
17    Q.  (BY MS. PERALES:) Okay.  Now what feedback
18  did you provide to legislators with respect to vote
19  harvesting?
20      MR. WASSDORF:  Same objection.
21    Q.  (BY MS. PERALES) Are you going to follow the
22  advice of Mr. Wassdorf and decline to testify on the
23  feedback that you provided to legislators or staff
24  about vote harvesting?
25    A.  I am.

Alan Vera - 2/27/2023

118

```
1    Q.  Next I'll ask you what feedback you provided
2  to legislators or staff related to the requirement that
3  voters provide an ID number on either their ABBM or
4  their mail ballot?
5         MR. WASSDORF:  Same objection.
6    Q.  (BY MS. PERALES) Are you going to follow the
7  instruction of Mr. Wassdorf and decline to testify on
8  the feedback you provided to the legislators about the
9  voter ID on mail voting?
10   A.  I am.
11   Q.  (BY MS. PERALES:) Okay.  What feedback did
12 you provide to legislators or staff related to what we
13 call drive-thru voting?
14        MR. WASSDORF:  Same objection.
15   Q.  (BY MS. PERALES) Are you going to follow the
16 instruction of Mr. Wassdorf and not -- and decline to
17 testify regarding the feedback that you provided
18 legislators about drive-thru voting?
19   A.  I am.
20   Q.  (BY MS. PERALES:) Were you asked to provide
21 feedback on any of the voter registration provisions of
22 SB 1, including the requirement that the
23 registrar report an ineligible registrant or voter to
24 law enforcement?
25   A.  I was not.
```

119

```
1    Q.  Were you asked to provide any feedback by
2  legislators on the provisions of SB 1 requiring the
3  secretary of state to refer any information about
4  criminal conduct to the attorney general?
5    A.  I was not.
6    Q.  Were you asked to provide any feedback by
7  legislators about the provision of SB 1 that requires
8  the secretary of state to receive lists of voters
9  excused from jury duty for nonresidence?
10   A.  I was not.
11   Q.  Were you asked to provide any feedback by
12 legislators on the provisions of SB 1 having to do with
13 24 hour voting?
14   A.  I was not.
15   Q.  Were you asked to provide any feedback by
16 legislators or staff on the provision of SB 1 having to
17 do with mail ballot drop boxes?
18   A.  I was not.
19   Q.  Were you asked to provide any feedback by
20 legislators or staff on bill language addressing
21 individuals who bring people to the polls for curbside
22 voting?
23   A.  I was not.
24   Q.  So if we take the time period leading up to
25 passage of SB 1 at the end of the second special, based
```

120

```
1  on all of your experiences in those sessions, what is
2  your understanding of the source of the language in SB
3  1 about voter assistance in the polling place?
4    A.  Yeah, I don't know.  I have no idea where it
5  came from, it was not one of my areas of focus.
6    Q.  Okay.  Same question with respect to the
7  provisions on 24 -- and I'm just going name certain
8  practices that occurred in Harris County.  24 hour
9  voting, mail ballot drop boxes, and drive-thru voting,
10 do you know the source of where those ideas came from
11 in the Bill?
12   A.  No, I don't.
13   Q.  Okay.
14   A.  The language in the Bill on the drive-thru
15 voting, because the language addressed the kind of
16 facility, was almost taken from the Federal Court in
17 downtown Houston.
18   Q.  Okay.
19   A.  There was a -- there was a civil action and a
20 judge -- the Federal Judge ruled that the language in
21 the early voting portions of the code was different
22 from the language in the election day portions of the
23 code, and what I observed is that SB 1 simply took the
24 languages from election day and applied them to early
25 voting.  So I wasn't part of that process, but
```

121

```
1  that's -- that's what I observed.
2    Q.  Okay.  Thank you.  Based on your experience
3  through passage of SB 1, do you know where the -- what
4  the source or the idea or the language was related to
5  voters providing an ID number when sending in either an
6  ABBM or a mail ballot?
7    A.  I do not know the source of that language.
8    Q.  Now you had raised a concern yourself that
9  there was essentially non-voters submitting
10 applications for ballot by mail?
11   A.  Uh-huh.
12   Q.  In the names of others?
13   A.  Uh-huh.
14   Q.  Do you have any sense of how the Bill ends up
15 saying somebody who submits an ABBM or mail ballot
16 ought to provide additional information, like an ID
17 number?
18   A.  Senate Bill 1 did not affect those sections
19 of the code that dealt with falsifying or forging ABBMs
20 for people that are unaware that their names are being
21 used.  That was not changed by SB 1.
22   Q.  So do you have any sense of where the new ID
23 requirements came from in -- in terms of who might have
24 proposed it or?
25   A.  I don't know.  I don't know.
```

122

1    Q.   Okay.  What is your sense of the source of
2  the language on vote harvesting that's in SB 1?  Based
3  on your knowledge through the passing of SB 1, do you
4  know where that language came from about vote
5  harvesting, which is advocating in person with a voter
6  in the presence of the ballot in favor of a particular
7  candidate or measure?
8    A.   No, I don't know where that came from.
9    Q.   How about that portion of SB 1, do you know
10  for example who suggested or what the source of the
11  provision is that it's a state jail felony when a
12  person compensates or offers to compensate another
13  person to assist voters?
14    A.   I don't know the source of that.
15    Q.   Okay.  Earlier I had asked you about whether
16  you communicated with the secretary of state's office?
17    A.   Uh-huh.
18    Q.   Either Keith Ingram or Christina Adkins
19  during either the first or the special session?
20    A.   Uh-huh.
21    Q.   Although, I'm not sure if I asked about the
22  first or the special session, so let me just ask you.
23  Do you remember communicating with anybody from the
24  secretary states office Keith Ingram, Christina Adkins
25  about SB 1 or related issues during either the first or

123

1  second special?
2    A.   I clearly remember not communicating with
3  anyone in the SOS office about SB 1 during the regular
4  session or the two special sessions.
5    Q.   Okay.  What about for example your poll
6  watcher trainings, do you recall sharing your poll
7  watcher training PowerPoint with Keith Ingram --
8    A.   Yes, that was different.
9    Q.   -- and/or Christina Adkins?
10    A.   In a -- in a Senate State Affairs Committee
11  hearing they were both present, I was there to testify,
12  and at that point SB 1 was passing, was going to pass,
13  and required a secretary of state to provide poll
14  watcher training as part of new requirements of Senate
15  Bill 1.  I said to Keith, by the way I've got a
16  presentation I've been use for years that updates,
17  would you like to see it?  So this was back in you
18  know, 2021, and they said I'd love to see it, so I'll
19  just email it to you.  Christina said, yeah, copy me
20  too.  So I sent them my PowerPoint, the old PowerPoint,
21  pre-SB 1, and sent it by email to both of them.
22    Q.   Okay.  And so would you agree with me that
23  that was related to SB 1 with respect to the provision
24  that would require the secretary state to state to
25  start training poll watchers?

124

1    A.   I would agree that it's relevant to that, but
2  it was not an advocacy for that.  I wasn't advocating,
3  it was -- it was a done deal, SOS was going to have to
4  train poll watchers and I offered them some -- a head
5  start in the training materials.
6    Q.   Okay.  Were there any other communications
7  that you had with either the secretary of state, the
8  AG, or the governor's office during this period of time
9  that you might not classify as advocacy, but was
10  communication related or touching on SB one's
11  provisions?
12    A.   Let me think.  No, that was long after that
13  I -- I can't remember any.  I cannot remember any other
14  communications.
15    Q.   Okay.  So would it then be fair to say that
16  you sent a copy of your poll worker training
17  PowerPoint?
18    A.   Poll watcher.
19    Q.   I'm sorry, thank you for that.  Your -- let
20  me ask the question again, would it be fair to say that
21  you sent a copy of your poll watcher training
22  PowerPoint to Mr. Ingram and Ms. Adkins of the
23  secretary of state's office in early September, 2021?
24    A.   I think that's probably correct.
25    Q.   Okay.  Would you mark this as the next

125

1  exhibit please?
2        The court reporter has handed you what
3  has been marked deposition Exhibit No. 3. Do you
4  recognize this as at least partly an email from you on
5  September 2, 2021, to Keith Ingram and Christina Atkins
6  attaching your poll watcher PowerPoint?
7        (Exhibit No. 3 marked.)
8    A.   Yeah, I specifically attached the 2020 poll
9  watcher version, that's correct.
10    Q.   (BY MS. PERALES:) The court reporter has
11  handed you what has been marked Deposition Exhibit No.
12  4. Can you identify this document?
13        (Exhibit No. 4 marked.)
14    A.   It appears to be a photocopy of my 2020 poll
15  watcher training class.
16    Q.   (BY MS. PERALES) Is Exhibit No. 4 what would
17  have been the attachment to Exhibit No. 3, the email?
18    A.   That's correct.
19    Q.   How do I know this is your 2020 training,
20  where can I tell on here?
21    A.   I don't know if you can tell from the
22  document or not, hang on.
23        You can tell because there's nothing
24  in here about having to take the secretary of state's
25  poll watcher training which was changed in 2021, so on

126

1 a slide that says before election day, if you look up
2 I'll show you. That slide, the new one would say have
3 to take the secretary of state poll watcher training
4 also.
5      Q. So you recall making that change to your
6 training after SB 1 passed?
7      A. Yes.
8      Q. Okay. Okay. If Mr. Ingram or Ms. Adkins
9 asked you for your 2022 poll watcher training as follow
10 up, would you send it to them?
11      A. Not without checking with Charis Eagle.
12      Q. Did you check with Charis Eagle about 2021 --
13      A. I let her know that I was sending this, yes.
14      Q. Okay.
15          MS. PERALES: So counsel, based on the
16 fact that Mr. Vera shared this document outside the
17 bounds of the Harris County Republican Party, we would
18 respectfully request that counsel produce the 2022 poll
19 worker training prepared by Mr. Vera?
20      A. Poll watcher.
21          MS. PERALES: Poll watcher training.
22 Poll watcher training prepared by Mr. Vera.
23          MR. GORE: Okay. We have asserted our
24 First Amendment Privilege with respect to that
25 document. It's contained on the log as well, I

127

1 believe. Mr. Vera has made clear there were changes to
2 that document, from the 2020 version. So those -- that
3 new version remains subject to privilege. It hasn't
4 been shared outside the Harris County Republican Party.
5      Mr. Vera has testified that he has not
6 done so, would not do so without permission of the
7 Chair of the Harris County Republican Party. So we're
8 -- we're maintaining that it is still subject to
9 privilege, including because it contains new content
10 that hasn't been disclosed outside of the Harris County
11 Republican Party.
12          MS. PERALES: Now the fact that it
13 hasn't been disclosed doesn't necessarily mean that
14 it's privileged are you -- so -- and -- and thus we
15 would assert that the privilege claim has been waived
16 with respect to Mr. Vera's poll watcher training from
17 2022 because he has shared externally his 2020 poll
18 watcher training.
19          Is it your contention that the
20 differences between the two documents is subject to the
21 First Amendment Privilege?
22          MR. GORE: It's our contention that
23 the 2020 document was also subject to First Amendment
24 Privilege, and that privilege was waived only with
25 respect to the 2020 document. The 2022 document is a

128

1 separate document and that document remains subject to
2 the First Amendment privilege that has been asserted
3 over that document.
4          MS. PERALES: Okay.
5      Q. (BY MS. PERALES) Mr. Vera earlier in your
6 deposition you testified that you weren't sure if your
7 email, Microsoft outlook, kept your emails from more
8 than a year ago?
9      A. Uh-huh.
10      Q. And you've testified earlier in the
11 deposition that you did have back and forth exchanges
12 with either legislators or legislative staff by email,
13 in which you were providing feedback on provisions of
14 SB 1; is that right?
15      A. Yes.
16      Q. As part of the process of being involved in
17 this case, did you search for those emails in which you
18 were providing feedback to legislators or initiating
19 conversations with them relevant to provisions of SB 1?
20      A. I did not search for any documents in my own
21 files.
22      Q. Okay.
23      A. Are you -- I was given by the attorneys a
24 whole set of documents that were produced, one of which
25 included a feedback to State Rep Jetton's question to

129

1 me about SB 1 and the language about harvesting.
2      Q. Okay. Did you turn over your computer to
3 anybody to have them search your emails as part of your
4 involvement in this case?
5      A. I did not.
6      Q. Okay. If your Microsoft Outlook did in fact
7 save emails that are older than a year old or two years
8 old, would your emails going back and forth with the
9 legislator be there and -- and providing feedback
10 and having your communications?
11      A. I don't know, there -- they should be.
12      Q. Okay. Mr. Vera, the court reporter has
13 handed you what has been marked Deposition Exhibit No.
14 5.
15          Is this the email that you were
16 referencing a moment ago in which you had an exchange
17 with Representative Jetton regarding in person activity
18 with a voter and vote harvesting?
19          (Exhibit No. 5 marked.)
20      A. Yes, it does. This looks like the document
21 that I mentioned in that previous testimony.
22      Q. (BY MS. PERALES:) And what is the date of
23 your email to Representative Jetton?
24      A. August 20th, 2021.
25      Q. So this is some time before the passage of SB

---

130

1 1?

2 A. Some time during -- it looks like the second

3 special session.

4 Q. Okay. Do you know who Tori McFarland is?

5 A. I think at that time Tori McFarland was on

6 the staff of Jacey Jetton.

7 Q. And Coleen, I believe you mentioned earlier

8 in the deposition is your wife?

9 A. Correct, uh-huh.

10 Q. Okay. And so in this -- in this email

11 subpoena is it -- is it fair to say that you're

12 alerting Representative Jetton to something that you've

13 characterized as an unintended consequence in the

14 version of SB 1 that was going to be heard in committee

15 the following day; is that right?

16 A. Yes, ma'am?

17 Q. And then Representative Jetton responds

18 "thank you for sharing and good catch, we will work

19 with chairman Murrell on an amendment", closed quote?

20 A. Uh-huh.

21 Q. Okay. Now, I know earlier you had suggested

22 that maybe this exchange was -- as part of

23 representative Jetton asking for your feedback; is that

24 right?

25 A. Yes.

---

131

1 Q. Okay. Do you -- where is the email below

2 that, where he asks for your feedback?

3 A. Well, there's no -- I don't think's an email

4 below that, I think it was a phone call from Ms. Tori

5 asking me -- saying State Rep Jetton would like you to

6 comment on that aspect SB 1.

7 Q. And the aspect being that vote harvesting was

8 defined as an in person interaction?

9 A. Yes.

10 Q. And then you provided your feedback in this

11 email; is that right?

12 A. That's correct.

13 Q. And then Representative Jetton responds to

14 you?

15 A. Uh-huh.

16 Q. And then, it sort of cut off at the top, but

17 it looks like you may have taken that exchange and then

18 forwarded it to Chair Siegel and some others?

19 A. It looks like that.

20 Q. Okay.

21 A. Just keeping her posted.

22 Q. Okay. All right.

23 A. Yeah, looks like those are all HCRP employees

24 or officers.

25 Q. I wanted to ask, did anybody besides you with

---

132

1 Harris County Republican Party talk to legislators or

2 legislative staff about issues or provisions that ended

3 up in SB 1?

4 A. It's certainly possible. I don't know -- I

5 can't name people who did nor can I say they didn't.

6 The Ballot Security Committee -- let me back up.

7 During the Harris County Republican

8 Party Executive Committee Meeting at the beginning of

9 each legislative session, the Executive Committee

10 passes a resolution that gives guidance to Ballot

11 Security Committee on which changes in general to the

12 election code to support and which changes to oppose as

13 we interact with the state legislators.

14 So we all receive those same marching

15 orders, and so I'm up there a lot, but others can be up

16 there as well as long as they stay in line with the

17 Executive Committee directed at us, we're all right.

18 Q. Okay. And do you know if -- so you say --

19 let me ask you this. Did -- did Chair Siegel have

20 interactions with members of the legislature or staff

21 on some of these issues or provisions that end up in SB

22 1?

23 A. I am not aware. I know that Chair Siegel and

24 Senator Bettencourt communicate regularly, okay? But I

25 cannot tell you whether or not they discussed Senate

---

133

1 Bill 1.

2 The court reporter is not catching

3 that. Ask them to speak louder, and more slowly.

4 (Discussions in hallway, laughter.)

5 Q. (BY MS. PERALES:) The court reporter has

6 handed you what has been marked Deposition Exhibit No.

7 6. Do you recognize this as an email from May 19th,

8 2021, from you?

9 (Exhibit No. 6 marked.)

10 A. Uh-huh.

11 Q. (BY MS. PERALES:) To --

12 A. Senate or Bryan Hughes.

13 Q. Senator Hughes and it looks like some more

14 senators --

15 A. Don Buckingham, Paul Bettencourt, Louis Culp,

16 these are members of the Senate Committee on State

17 Affairs that hears election bills.

18 Q. And then you CC some staffers, would that be

19 right, as well as some folks with the Harris County

20 Republican Party?

21 A. That's correct.

22 Q. Okay. And I see Sonya Aston is there?

23 A. Yes.

24 Q. And she was staffing with?

25 A. Senator Bettencourt.

---

134

```
1     Q.  And then can you sort of generally help me
2  understand what is it that you are sending to these
3  legislators and staff?
4     A.  On this date, May 19th, we're coming to the
5  end of the regular session Senator Bettencourt's bill,
6  Senate Bill 1589, had passed the Senate earlier, but
7  had not been heard in the Committee in the House at
8  all, so this note asked him to consider adding that
9  portion of SB 1589 to the Article 4 Provision of Senate
10 Bill 7, which was still in process.
11    Q.  Okay.  And were these Election Marshals under
12 the Bill themselves law enforcement officers?
13    A.  Yes.
14    Q.  And did 1589 position them inside the polling
15 place?
16    A.  No.
17    Q.  And where would it have positioned them?
18    A.  It simply made them available to be called,
19 to respond to reports of criminal election activity.
20    Q.  How would that be different than just calling
21 the regular police?
22    A.  These people will actually respond.
23    Q.  That's what happens when you ask an open
24 ended question in a deposition.
25    A.  Uh-huh.
```

135

```
1     Q.  Okay.  Thank you one more question about
2  Exhibit No. 6, sorry?
3        (Exhibit No. 6 marked.)
4     A.  Uh-huh.
5     Q.  (BY MS. PERALES) You say here, quote, "please
6  see the attached record of our invited testimony to the
7  senate committee on state affairs" closed quote, do you
8  see that line there?
9     A.  Yes.
10    Q.  And would that be an example of a time when
11 you did provide something in writing to the Senate?
12    A.  No, I was just attaching my notes.  The notes
13 I spoke from when I testified in support of SB 1, 1589.
14    Q.  Do you remember if those note are typed or
15 handwritten?
16    A.  They're typed, I can't read my handwritten
17 notes.
18        (Laughter.)
19    Q.  (BY MS. PERALES) I have three emails and I'm
20 going to mark each of them.  Okay.  Can you identify I
21 believe it's No. 7 for me?
22        (Exhibit No. 7 marked.)
23    A.  Exhibit No. 7 looks like an automated reply
24 from the office of Senator Bob Hall to the Chair of
25 Harris County Republican Party.
```

136

```
1     Q.  (BY MS. PERALES) Okay.  Identify No. 8 for
2  me.
3        (Exhibit No. 8 marked.)
4     A.  Exhibit No. 8 appears to be automated reply
5  From office of Senator Donna Campbell to the Chair of
6  the Harris County Republican Party.
7     Q.  And can you identify 9 for me?
8        (Exhibit No. 9 marked.)
9     A.  Exhibit No. 9 appears to be automated reply
10 office of Senator Bettencourt to the Chair of the
11 Harris County Republican Party.
12    Q.  (BY MS. PERALES) And is the date on all three
13 exhibits August 10th of 2021?
14    A.  It is.
15    Q.  And they're all at about 4:30 in the morning,
16 yes?
17    A.  Yeah, between 4:30 and 4:45, yup.
18    Q.  Okay.  Do you know what email these exhibits
19 were responding to?
20    A.  I have no idea.
21    Q.  Okay.  Does the date August 10th, 2021 in
22 anyway refresh your recollection about whether this
23 might have been related to communications on SB 1?
24    A.  It does not.  I -- that was in the end of
25 second special session, but no, I can't tell.
```

137

```
1     Q.  Okay.  Thank you.  Did you have any
2  communications with Senator Hall that related in any
3  way to SB 1?
4     A.  Oh, goodness.  I don't remember.
5     Q.  Okay.  Same question with Senator Donna
6  Campbell, did you have any communications with Donna
7  Campbell about SB 1?
8     A.  I don't remember.  The only reason I -- I
9  hedged on Senator Hall he was very good when I did
10 public testimony before the senate committee on state
11 affairs of have asking me many follow up questions.  So
12 I don't know if I may have sent him an email or not.
13    Q.  SB 1 was heard in Senate State Affairs on
14 August 9th, 2021?
15    A.  Okay.
16    Q.  And since these auto replies are coming from
17 the wee hours of August 10th?
18    A.  Uh-huh.
19    Q.  Is -- is it possible that you remember
20 sending some kind of follow up communication to various
21 senators following your testimony?
22    A.  I don't remember doing that.  And if I'd had
23 it would have come from my email address, not the party
24 chairs.
25    Q.  Okay.  Okay.  Is there any part of SB 1 as it
```

138

1 was passed by the legislature that you believe
2 responded to your concern about the vote harvesting
3 being defined as an in person interaction?
4    A.  I don't remember for certain because it's a
5 long bill, but I do know that they did not affect the
6 sections of the code already established for dealing
7 with the concerns I had of people stealing others
8 identities to vote by mail, they did -- they left that
9 alone.
10    Q.  Is there any part of SB 1 as it was passed
11 that you think tracks very closely with communications
12 that you made with legislators?
13    A.  Oh, goodness --
14    Q.  Either something that you initiated or
15 something that was the product of the back and forth
16 where you're providing feedback?
17    A.  Well, I've already told you that I was --
18 after the previous election I was very concerned about
19 the way poll watchers were obstructed.  So some of the
20 poll watcher improvements certainly tracked with my
21 concerns, okay?  I told you that I had -- I had after
22 the 2020 November election, that had gone public with many
23 serious concerns about drive-thru voting and so that
24 was reflected.  So I think, you know, at least poll
25 watcher -- poll watchers were better protected, the

139

1 issue of voting as it was with the aberration in
2 drive-thru was addressed.  And they did not mess with
3 the clear language of mail ballot harvesting that was
4 not involving personal interaction.  So those three
5 things for sure.
6    Q.  Do you recall having conversations with
7 legislators around making it a -- an offense to have a
8 paid person assist a voter in voting by mail?
9    A.  I didn't have any such discussion with
10 legislators.
11    Q.  Do you have an understanding of what need was
12 meant to be addressed by that?
13    A.  I have an understanding from what I've been
14 told, having -- sitting around the committee hearing
15 rooms talking to others, but I did not initiate that.
16    Q.  Okay.  And you don't have a first hand
17 acknowledgment of the reasons for that?
18    A.  I do not, nope.
19    Q.  Do you have any first hand knowledge about
20 the reasons for prohibiting in person interaction with
21 a voter in the presence of the mail ballot with --
22 while advocating for a particular candidate or outcome?
23    A.  No, I was not, I was not privy to those
24 discussions or this original complaints.
25    Q.  And -- and no staff or legislator said, oh

140

1 that's there because so and so really felt?
2    A.  No, no.
3    Q.  Okay.  Okay.  With respect to any or the
4 other provisions of SB 1, do you have any knowledge
5 about what the source or origin was, whether it was
6 a particular colleague in the Republican Party maybe
7 from another County or a particular legislator who was
8 the reason that that provision is there in the Bill?
9    A.  No, I don't.  Not directly, I -- I do know
10 that -- I'm sorry, I don't know, I understand that
11 prior to that session beginning there were a number of
12 election attorneys that were writing legislative
13 language and submitting it.
14    Q.  Uh-huh.
15    A.  But I can't track any one item to any one
16 attorney.
17    Q.  Can you tell me the names of those attorneys?
18    A.  I can't tell you the names of all -- I know
19 Eric Opiela was one of them, and he's the only one I
20 can remember.
21    Q.  Okay.
22    A.  Because he's kind of up front about it.
23        (Laughter).
24    Q.  (BY MS. PERALES) Did you have -- you know, we
25 talked about Senator Bettencourt, he's your local

141

1 senator.  We haven't talked that much about Brian
2 Hughes who was this author/main sponsor.
3        Did you ever have any exchange of
4 communication with either Brian Hughes or his staff
5 from let's say the beginning of the regular session
6 through the end of the second special?
7    A.  No, I did not.  But let me just double check.
8 No, the only communication was in committee with --
9 either it was with the Senator or his staff.
10    Q.  Do you have any interaction with republican
11 candidates running for office and advising them about
12 what's in SB 1?
13    A.  No, I don't get involved with candidates much
14 at all.  I answer questions, but I don't interact with
15 them, I don't take part in their campaigns.
16    Q.  And do you recall, for example in 2022, since
17 SB 1 is a fairly new piece of legislation, do you
18 recall answering any questioning of any candidate or
19 their campaign staffers about the meaning of SB 1?
20    A.  The only questions I remember answering from
21 candidates at that time was about whether the candidate
22 could still appoint a poll watcher, and secondly are
23 there any new requirements of poll watchers in which I
24 have to -- had to reply about the SOS training now
25 being mandatory.  Because of course the candidate can

Alan Vera - 2/27/2023

142

1  appoint poll watchers, but Harris County -- our Party
2  would only appoint poll watchers that I trained, so.
3      Q.  So aside from poll watchers can you think of
4  any other --
5      A.  I can't think of anything else, hang on.  No.
6          However, because of SB 1 I was asked
7  to take a look at the mail ballot application mailers
8  that Harris County Republican Party was going to send
9  out to the republicans over 65 and I had to completely
10 rewrite them.
11     Q.  I was just going to ask about outreach by the
12 Party to potential mail voters?
13     A.  Uh-huh.
14     Q.  So did you work on revising the outreach
15 materials for the Harris County Republican Party --
16     A.  I did.
17     Q.  To the voters over 65?
18     A.  Correct.  I had to redo it completely.
19     Q.  All right.  And so you made those changes to
20 the, what are they like, mailers?
21     A.  Yes, they were -- they were mailers into the
22 layout stage, not quite what was called the mechanical
23 stage, but I had to change those.
24     Q.  Okay.  Around the time of the 2022 primary
25 election?

143

1      A.  Uh-huh.
2      Q.  Were you offering any guidance or advice to
3  deal with any requests from voters coming in about how
4  to apply for their mail ballots?
5      A.  I was giving -- I was the Party staff, the --
6  the paid staff advice on how to answer questions about
7  the new mail ballot requirements.
8      Q.  Do you recall the nature of the questions
9  that you were getting in the 2022 primary period from
10 voters about either applying for ballot by mail or
11 returning that mail ballot related to SB 1 --
12     A.  The questions weren't coming to me, they were
13 coming to staff, but they were calling me to get the
14 information; but it was just the general stuff, now
15 which number do I have to put?  Can I just put my whole
16 driver's license number, et cetera?  Basic fundamental
17 questions.
18     Q.  What would your advice -- what was your
19 advice during the primary period about which number the
20 voters should put?
21     A.  Well, I had the staff tell the voters, put
22 both numbers, okay?  Because the issue was the number
23 the voter put on the ABBM or the carrier envelope had
24 to match a number in the voters registration record.
25 And many of these -- the voters were not old enough to

144

1  vote by mail, they don't remember which -- which number
2  they used when they first registered, put them both.
3      Q.  Were there also voters who hadn't put a
4  number when they registered?
5      A.  It's possible.  I -- I don't know that -- I
6  don't know that, it could be possible.  I don't know
7  that.
8      Q.  If a voter had lived at the same address for
9  example since pre-HAVA, Help America Vote Act?
10     A.  Uh-huh.
11     Q.  It's possible that their registration, which
12 would have occurred pre-200 wasn't accompanied by an ID
13 number at all; isn't that right?
14     A.  It's possible.
15     Q.  And they would be over 65, and just have
16 stayed put the whole time?
17     A.  Uh-huh.
18     Q.  Do you recall hearing from paid staff of the
19 Party that there were voters in that situation that
20 they hadn't provide any number -- had not provided any
21 number at all with their original registration because
22 it had been a long time ago?
23     A.  I had not heard that specifically.
24     Q.  Okay.  But you did hear about voters putting
25 one number and Harris County having a different number,

145

1  and so the -- the Harris County couldn't match it?
2      A.  I heard that from the people on our signature
3  verification committee.
4      Q.  Did you hear that from any of the Party staff
5  that were getting questions from voters?
6      A.  Yes, yes.
7          MS. PERALES:  Can we have a five
8  minute break?
9          THE REPORTER:  Okay.  Going off the
10 record at 2:49 p.m.
11         (Off the record.)
12         THE REPORTER:  Back on the record at
13 3:01 p.m.
14     Q.  (BY MS. PERALES:) Mr. Vera, are there any
15 topics or is there any information that you know about
16 relevant to SB 1 that you discussed with Mr. Gore that
17 you haven't talked about today in the deposition,
18 either because I didn't ask you or for any other
19 reason?
20     A.  I can't think of anything, give me a second.
21 Nope, nope.
22     Q.  Okay.
23         MS. PERALES:  So I'm going to pass the
24 witness, but I'm not going to conclude the deposition
25 or conclude my questioning of the witness.  We're going

146

1  to leave the deposition open at the end in order to
2  allow for us to be able to resolve some of the issues
3  that have come up with respect to invocation of either
4  First Amendment Privilege or Legislative Privilege that
5  are not resolved, so with that caveat I'm going to pass
6  the witness.
7         MR. GORE:  If I can just say on the
8  record, we appreciate where you're coming from.  We
9  obviously object to holding the deposition open.  We
10 think all the privilege assertions have been
11 appropriate.  We understand that you are reserving the
12 right to keep the deposition only -- open only with
13 respect to those privilege issues, is that -- is that
14 correct?
15        MS. PERALES:  Yes.  That's right, and
16 when you say those privilege issues then we can go back
17 and forth all day.  When you say those privilege issues
18 it's specifically the -- the places today where the
19 witness has declined to testify because of either
20 Legislative Privilege or because of First Amendment
21 Privilege.
22        MR. GORE:  Thank you for
23 clarification.  We stand on our objection, but we
24 appreciate the clarification.
25        MS. PERALES:  Okay.  Would you like to

147

1  switch seats?
2         MS. HOLMES:  Sure.
3             EXAMINATION
4  BY MS. HOLMES:
5     Q.  Good afternoon, Mr. Vera, we met earlier, but
6  my name's Jennifer Holmes, I represent the Haul
7  plaintiffs.  And I have just a handful of kind of
8  clarifying questions for you.  It shouldn't take too
9  long.  You testified that you're the chair of the
10 Ballot Security Committee for the Harris County
11 Republican Party, correct?
12    A.  Correct.
13    Q.  And who else is on the Ballot Security
14 Committee?
15    A.  The Ballot Security Committee is made up of
16 members that are appointed by the Senate District
17 Chairs of each Senate District in Harris County.  And
18 based on the bylaws of the Party, senate districts can
19 appoint one or two members to ballot security,
20 depending upon the size of the district.  There are
21 three appointees by the Party Chair and I am one and
22 she's allowed to appointment two others.
23    Q.  And so that was Cindy Siegel who appointed
24 you and two others to the committee?
25    A.  Yes, for this current term, uh-huh.

148

1     Q.  And what are the names of the two other
2  members?
3     A.  Dan Alan, and Steve Carlton -- or Carlin,
4  C-A-R-L-I-N.  Steve Carlin.
5     Q.  And what are Mr. Alan and Mr. Carlin's
6  duties -- actually, sorry, let me ask you a question
7  before that.  What are Mr. Alan and Mr. Carlin's
8  titles?
9     A.  They're just members, but they're also
10 precinct chairs.
11    Q.  And what are their duties with the Ballot
12 Security Committee?
13    A.  We recently organized into work group, and
14 Mr. Alan has responsibility for digital poll watching
15 and Mr. Carlin is taking charge of mail ballot
16 observation or BBM observation.
17    Q.  And were Mr. Alan and Mr. Carlin on the
18 Ballot Security Committee during the 2020 election
19 cycle?
20    A.  They were not.
21    Q.  Who was on the committee during that cycle?
22    A.  I don't have all the names memorized, there
23 13 members -- voting members, and about eight or nine
24 nonvoting members, and they change every two years.  So
25 neither one of them were on at the 2020 cycle, other

149

1  people appointed by their Senate district chairs of
2  course in those seat.
3     Q.  And how about the 2022 primary, who was on
4  the committee?
5     A.  Those people were on the committee.
6     Q.  Sorry, these people meaning the 13?
7     A.  Steve -- Steve Carlin and -- and Dan Alan
8  were on the committee along the 11 others.  I don't
9  have all the names memorized.
10    Q.  Did Mr. Alan, Mr. Carlin, or any of the other
11 current or former members of the Ballot Security
12 Committee join you in your conversations or emails to
13 legislators about the legislative bills that eventually
14 became SB 1?
15    A.  I'm not aware that they did, and they are
16 done independently.  They're allowed to do so as long
17 as they're following the guidelines of the Executive
18 Committee resolution, okay?  So they could
19 independently communicate.
20        Former members of the committee have
21 traveled with me to Austin to testify on the days that
22 I go to testify.
23    Q.  And can you tell me the names of the member
24 of the committee who testified during the 2021
25 legislative session on -- on SB 1 or any of the

150

1 predecessors --
2    A.  Yes.  Ken Moore M-O-O-R-E was the most
3 frequent person to accompany to me to testify.
4    Q.  Anyone else?
5    A.  Nope, it's a lonely road.
6    Q.  Did Mr. Moore submit written testimony?
7    A.  I don't believe he did, I believe I was only
8 verbal testimony.
9    Q.  Do you know if he used written notes when he
10 testified?
11    A.  Handwritten about half hour before he
12 testified.
13    Q.  I'd like to ask you about the training you
14 provide to poll watchers?
15    A.  Uh-huh.
16    Q.  We -- you testified earlier about the
17 training materials and that include -- included a
18 PowerPoint and a guidebook, correct?
19    A.  Uh-huh.
20    Q.  When you give the guidebook to the poll
21 watchers do you instruct them to keep it confidential?
22    A.  I tell them to keep it with them at all times
23 and that they should hang onto it for 22 months after
24 the election.
25    Q.  Do you tell them to not share it with anyone

151

1 else?
2    A.  I don't know if I tell them not to share, I
3 just tell them to keep it in their possession.
4    Q.  Do poll watchers sign anything saying they
5 will keep the guidebook confidential?
6    A.  They do not.
7    Q.  Concerning the poll watcher PowerPoint
8 training that you create?
9    A.  Uh-huh.
10    Q.  Does anyone review that PowerPoint to offer
11 suggestions or edits?
12    A.  The general council for the Party reviews it.
13    Q.  And is that the general council for Harris
14 County Republican Party?
15    A.  Harris County Republican Party.
16    Q.  And what is that persons name?
17    A.  Ed Hubbard.
18    Q.  Does anyone else review the PowerPoint
19 training?
20    A.  The power -- the County Chair does.
21    Q.  Anyone else?
22    A.  Nope.
23    Q.  And when the County Chair has reviewed your
24 PowerPoint training, has she made any edits,
25 corrections, or suggestions.

152

1    A.  Not this year.
2    Q.  And are you referring to the 2022 training?
3    A.  Uh-huh.
4    Q.  How about for the 2020 training?
5    A.  We didn't have a party chair to speak of in
6 2020, so it was cursory review.  The party chair at the
7 time was Keith Nielsen and he did not review the
8 presentation.
9    Q.  Can you explain what you mean that you did
10 not have a Party Chair, but the Party Chair was Keith
11 Nielsen?
12    A.  We did, there was -- that was the COVID year
13 and it was kind of a mess.  The state convention was
14 delayed months, okay?  And so everything was behind
15 schedule, the organizing of the Party, so the chair --
16 the County Party Chair who should have stepped down in
17 May of 2020 was still in office in August of 2020, they
18 hadn't elected a new chair yet.  And when the new chair
19 came in, I know the bills hadn't been paid for a while,
20 and we just had a lot of catching up to do.  COVID had
21 a significant impact on that.
22    Q.  It was a chaotic time.
23    A.  It was.  It was.
24    Q.  Okay.  How about the guidebook poll watchers,
25 does anyone review that to offer suggestions or edits?

153

1    A.  Same two people, the Party Chair and the
2 general council.
3    Q.  And have you received corrections, edits, or
4 comments?
5    A.  No.
6    Q.  Is that true for both the 2022 guidebook?
7    A.  And the?
8    Q.  And the 2020 guidebook?
9    A.  That's correct.
10    Q.  Do you have Exhibit 3 before you or can you
11 pull it out of that stack, please?  Do I have it?  And
12 do you recall that Exhibit 3 is an email that you sent
13 to Keith Ingram and Christina Adkins --
14    A.  Correct.
15    Q.  On September 2, 2021?
16    A.  Correct.
17    Q.  And it attached the 2020 poll watcher
18 PowerPoint training?
19    A.  Correct.
20    Q.  Okay.  In the email at the bottom you write
21 in the second paragraph, you're talking about the --
22 the PowerPoint deck.  You said there's -- I think it
23 should say there's a version, but it says "there's
24 aversion with the audio available, but it's hosted on
25 the TrueTheVote website and requires checking in and

154

1  creating an account, free;" did I read that correctly?
2      A.   Correct.
3      Q.   Was the 2020 poll watcher PowerPoint training
4  accessible on the TrueTheVote website?
5      A.   The 2021 was.
6      Q.   The 2021 --
7      A.   Uh-huh.
8      Q.   Okay.  Oh, sorry.  I misheard you, the 2020
9  version was?
10     A.   Was.
11     Q.   Okay.  And how would someone -- first, can
12 you explain, what is true to vote?
13     A.   True the vote is a nonprofit nonpartisan
14 organization started in 2010 to promote election
15 integrity nationally.
16     Q.   Is it part of the Harris County Republican
17 Party?
18     A.   It is not.
19     Q.   And during what time period was the poll
20 watcher training available on the true to vote website?
21     A.   From approximately the first of August until
22 the end of October.
23     Q.   Of 2020?
24     A.   Of 2020, yeah.
25     Q.   And if anyone wanted to go to the true to

155

1  vote website and see the -- the PowerPoint, what would
2  they have to do?
3      A.   They'd have to sign in, create an account,
4  okay?  And be passed by the truth, the vote gate keeper
5  who was kind of helping me get the training out there.
6      Q.   Were there any restrictions on who could sign
7  in and create an account?
8      A.   They would have to -- yes, but it was --
9  remember this was COVID, also, so I couldn't have in
10 person training because groups of 50 or more were
11 forbidden.  And so they would submit their names,
12 TrueTheVote would send names to me, I would vet their
13 voting history, and give a thumbs up or thumbs down as
14 far as access to the back to the class.
15     Q.   And what did you base the thumbs up or thumbs
16 down on?
17     A.   On, primary voting history.
18     Q.   What about the primary voting history?
19     A.   Republican voting primary voting in at least
20 three primary elections.
21     Q.   Any other requirements for someone to access
22 the training?
23     A.   They had -- no, they had to be a registered
24 voter three and have three successive republican
25 primary votes, elections.

156

1      Q.   Would that have to be in Harris County or
2  anywhere within Texas?
3      A.   No, it was all within Harris County.
4      Q.   Is the 2022 poll watcher training available
5  anywhere online?
6      A.   No, it's not available online.  You have --
7  now that we're out of COVID you have to take the course
8  in person.  We do have a video because we had poll
9  watchers who took the class in May and now it's October
10 and they'd like a refresher.  The party had a private
11 YouTube channel, password protected, that the poll
12 watchers who had already completed the in person class
13 could request to see again, and that access was managed
14 by the paid party staff.
15     Q.   Okay.  And in terms of the 2020 poll watcher
16 training?
17     A.   Uh-huh.
18     Q.   The PowerPoint, did you ever share it outside
19 of the Harris County Republican Party other than
20 sending it to Keith Ingram, and Christina Adkins, and
21 putting it on the TrueTheVote website?
22     A.   That was it.
23     Q.   So you've testified about your duties to
24 recruit and train poll watchers?
25     A.   Uh-huh.

157

1      Q.   Is it also part of your responsibilities to
2  assign poll watchers to particular polling locations?
3      A.   I don't make the assignments, the Party in
4  the 2022 general election, the executive director of
5  the Party made the assignments.
6      Q.   How about in the 2022 primary?
7      A.   Those were all made by the executive director
8  of the Party.
9      Q.   And who is the executive director?
10     A.   Well, he was Casey Voeks, V-O-E-K-S he
11 certainly resigned.
12     Q.   And how about the 2020 election cycle, who
13 made the decision to assign poll watchers to various
14 polling locations?
15     A.   In 2020 I made those decisions because there
16 was no party staff.
17     Q.   And in 2020 when you were deciding the
18 assignments, did you place a poll watcher in every
19 polling location in the county?
20     A.   All right.  The poll watchers first of all, I
21 never place a poll watcher alone there's always two.
22 Next is, I make sure we have poll watchers at the
23 critical ballot handling areas of early voting ballot
24 board, signature verification committee, and central
25 count.  Then the rest of the polling locations for poll

Alan Vera - 2/27/2023

158

1   watchers are selected based on history of data
2   discrepancies with the election judges.  The judges
3   that need the most help get the poll watchers.
4       Q.   And what kind of data discrepancies would you
5   consider --
6       A.   Data discrepancies number one would be more
7   ballots than votes.  Precincts or polling places that
8   had more ballots turned in than voters who signed in.
9   Discrepancy number 2 would be provisional ballot
10  affidavits without ballots.  And those are the two
11  major issues that we measure by.
12      Q.   Did you -- in considering these -- these two
13  categories of data discrepancies?
14      A.   Uh-huh.
15      Q.   Did you review any information or data to
16  figure out where these discrepancies were happening?
17      A.   We get -- we download the -- that data after
18  every election.  And so we know at what polling
19  location the discrepancy happened and we know who the
20  election judge was at that polling location.  And so
21  the next election we look to see where's that judge
22  been appointed and they get the poll watcher help.
23      Q.   So the decision is made more based on where a
24  particular judge posted rather than the polling place
25  location that had the -- the data discrepancies?

159

1       A.   That's generally to -- true.  It's the
2   association of data discrepancies with an election
3   judge, and the poll watchers are sent to support that
4   election judge and to help them out.
5       Q.   So during the 2020 general election, what
6   were your, I guess, priority polling locations based on
7   your review of data discrepancies?
8       A.   I don't remember the exact locations because
9   the judges move, but I had 80 polling locations on
10  election day that receive poll watchers.  I had
11  probably 10 during early voting that receive poll
12  watchers.
13      Q.   Earlier today you mentioned Moody Gardens was
14  that --
15      A.   Yeah, I met --
16      Q.   -- okay.  Let me finish my question though.
17  Earlier today you mentioned -- now you've corrected you
18  -- you were talking about Moody Park, was that a -- a
19  location, a polling location where you prioritize
20  sending poll watchers during the 2020 election?
21      A.   Moody Park was not a priority for the 2020
22  election for poll watchers.
23      Q.   Had it -- was it a priority for the 2022
24  primary election?
25      A.   It was not.

160

1       Q.   Okay.  Can you recall any of the polling
2   place that were priorities during the 2020 general
3   election for sending poll watchers?
4       A.   The 2020 general election?
5       Of the West Gray Multi Service Center, I think
6   Hiram Clark, and I'm not -- I'm not remembering we've
7   changed polling places so many times now, I don't
8   remember.
9       Q.   How about during the 2022 primary election,
10  do you recall any polling locations that were
11  priorities in your opinion to send poll watchers?
12      A.   During the 2022 primary election republican
13  poll watchers could only watch in republican polls.  So
14  that was a practice section for the poll watcher
15  candidates for the fall.  And they were simply sent
16  based on convenience to them to get experience with the
17  election process.
18      Q.   When you're deciding where to assign poll
19  watchers, do you consider anything about partisan
20  affiliation of voters in that certain area?
21      A.   No, because Harris County has county wide
22  polling.  So any voter of any party can vote anywhere,
23  our main concern is the judges and their track record.
24      Q.   Do you consider anything about population
25  density in a certain area?  This area, more people live

161

1   here, more people are voting here, we should send a
2   poll watcher here, is that part of the consideration?
3       A.   It is not part of our consideration.  That
4   should be part of the consideration for the county's
5   placement of polls based on voter density, but that's
6   not part of our consideration.
7       Q.   If you give me one minute I may be done here?
8       A.   Yes, ma'am.
9       Q.   Okay.
10          MS. HOLMES:  I am likewise going to
11  pass the witness, but I will reiterate what Ms. Perales
12  said on the record about holding the deposition open
13  for resolution of disputes over the invocation of
14  legislative purpose and First Amendment Privilege.
15          MR. GORE:  Subject to that statement
16  I'll just reiterate our prior objection.
17          MR. BIRRING:  We don't have any
18  questions today.  We will reserve the questions for
19  trial if you're a witness there.
20          MS. PERALES:  Shall we ask the people
21  on the Zoom call?
22          (Getting situated for Zoom
23  examination.)
24          MR. TAYLOR:  Look a poll watcher.
25          (Laughter.)

162

1    MS. PERALES: Does anybody have any
2    questions? Zoom people, speak now or forever hold your
3    piece or at least until -- unless we reopen? Anything
4    folk? No. Okay. I don't hear anything from Zoom.
5    MR. GORE: MR. GORE: Okay. I have a
6    few questions for you Mr. Vera, thank you for your
7    patience today.
8    THE WITNESS: Yes, sir.
9    CROSS-EXAMINATION
10   BY MR. GORE:
11   Q. I want to pick up on where Ms. Holmes ended
12   and -- and where you deploy poll watchers. Do you
13   consider anything about voter demographics in where you
14   would send poll watchers or assign as priority
15   locations for poll watchers?
16   A. We do not.
17   Q. Mr. Vera, do you have to Exhibit 5 handy?
18   A. I have it.
19   Q. And Mr. Vera, you see that this is an email
20   chain that includes emails between you and
21   representative Jetton, and then a forward from you to
22   members of the Harris County Republican Party; is that
23   right?
24   A. Correct.
25   Q. So I want to focus on this top email here

163

1    where there's box that says "redacted for First
2    Amendment Privilege," and that's an email you sent
3    internally to the Harris County Republican Party; is
4    that right?
5    A. Correct.
6    Q. So is it fair to say that you sometimes send
7    internal emails regarding your legislative advocacy --
8    activities?
9    A. Correct.
10   Q. Do you also send emails regarding -- internal
11   email regarding poll watcher activities?
12   A. Correct.
13   Q. Do you also send internal emails regarding
14   election integrity issues?
15   A. Correct.
16   Q. When you send those emails, do you expect
17   them to remain confidential within the Harris County
18   Republican Party?
19   A. I do.
20   Q. Does that expectation of confidentiality
21   allow you to be full and frank in those internal
22   communications when you have them?
23   A. It does.
24   Q. If -- if you believe that those
25   communications might become public, would you be less

164

1    likely to engage them?
2    A. I'd be less likely.
3    Q. Would you be less likely to be full and frank
4    in those conversations if you believed they might
5    become public?
6    A. I'd be less likely.
7    MS. PERALES: I just want to object to
8    the leading nature of the questions?
9    MR. GORE: Well, I -- I'm not sure how
10   they're leading, I think they're yes or no questions,
11   aren't they?
12   MS. PERALES: Yes, but they're also
13   leading. I don't mean to stop your roll, so if you
14   have more.
15   MR. GORE: Okay. Thank you.
16   Q. (BY MR. GORE) Okay. I just have one more
17   question. So Mr. Vera, if you believe that these
18   communications might become public, would that chill
19   your expression in these emails?
20   A. It would.
21   Q. And if these emails became public in this
22   litigation or otherwise turned over to plaintiffs,
23   would you be less likely to engage in that full and
24   frank communication in the future?
25   A. In that format, yes.

165

1    Q. And if you were subject to questioning about
2    internal conversations you had about the Harris County
3    Republican Party, would that also make you less likely
4    to engage in those kinds of conversations in the
5    future?
6    A. It would.
7    Q. Would that be true for communications that
8    are not reduced to email or writing?
9    A. Yes.
10   Q. Thank you, Mr. Vera.
11   MR. GORE: I have no further
12   questions.
13   MS. PERALES: Before we go off the
14   record I have just one more thing, which is to ask
15   counsel for Mr. Vera or for the defendant interveners
16   if you plan to conduct a search for responsive
17   documents of Mr. Vera's email and his computer, because
18   I believe he's testified that he does have relevant and
19   responsive documents, but hasn't searched and hasn't
20   given over his computer to be searched. And I'd just
21   like to know if you're -- if you -- if counsel would
22   agree to do that prior to the deadline, or how we
23   should proceed?
24   MR. GORE: Well, I -- I can speak only
25   for the intervener defendants and Harris Country

166

1  Republican party, and I'll Mr. Taylor speak for
2  Mr. Vera. I think we've been really up front
3  throughout our in discovery correspondence that we only
4  have custody and control over Harris County Republican
5  Party email addresses and documents, those were the
6  email addresses and documents we searched to respond to
7  the discovery requests that were propounded on the
8  Harris County Republican Party, and we have made
9  productions and created a privilege log off of that
10 production and that collection.
11       We didn't receive any objection to
12 that scope of collection or production. So that's --
13 that's how we've proceeded in the case, and we think
14 that that's a fulsome and -- and complete collection
15 and production consistent with the Harris County
16 Republican Party's obligations under the rules.
17       MS. PERALES: I believe that Mr. Vera
18 was designated as a custodian though for records for
19 Harris County in this case, and so after having
20 designated him as a custodian, it -- it would be
21 plaintiff's position that it is incumbent then on GOP
22 Defendant Interveners to search what he has, and it
23 appears that it hasn't extended to what he has.
24       It's not even clear Mr. Vera has a
25 Harris County GOP email address since his -- most of

167

1  his emails were coming from his business address that
2  -- that we have today. So if we have to kind of leave
3  the dispute where it is, then we'll -- we'll follow up
4  more on that, but I just wanted to know if -- if there
5  was anything more to our positions to -- to present
6  today.
7        MR. GORE: I'll just put one more
8  thing on the record, we certainly did identify Mr. Vera
9  as a document custodian. In the same correspondence we
10 said we would look -- search official files of the
11 Committee and the Official committee email addresses.
12 We do have within the files at least some documents
13 related to the Ballot Security Committee and others, so
14 we did search through those, but we've never
15 represented that we would search through Mr. Vera's
16 personal email, and that's outside of the custody and
17 control of the committee. I just put that on there to
18 complete the record and I think probably wanted to
19 engage on this separately unless Mr. Taylor has
20 something he'd like to add.
21       MR. TAYLOR: I mean, like I've said
22 before I -- I don't represent a party, I just represent
23 a non-party witness. Correct me if I'm wrong, but I
24 was not aware and don't believe currently that there's
25 any subpoena that's been issued on Mr. Vera in his

168

1  individual capacity to produce any documents. So I
2  have not searched documents that Mr. Vera might have
3  access to individually.
4        Obviously, if there's a subpoena and
5  it's appropriate and, you know, we'll -- we'll comply
6  with our obligations, but you're catching me flat
7  footed because this is the -- the first I've heard
8  about it.
9        MS. PERALES: Okay. Thank you. All
10 right. We're going to hold the deposition open, but I
11 believe the questioning for today and the conversation
12 for today has concluded.
13       THE REPORTER: I just need to get on
14 the record, if there's any further stipulations you
15 want to put on the record, which I believe we passed
16 that, maybe, and if there's any copies anybody would
17 like to order?
18       MS. PERALES: I need to order, and
19 I'll talk with you off the record about the need for
20 expedite and transcript.
21       THE REPORTER: Okay.
22       MS. HOLMES: I'd also like a rough.
23       THE REPORTER: Okay. With that we're
24 going off the record at 3:37 p.m.
25       (Proceedings concluded.)

169

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION
3  LA UNION DEL PUEBLO ENTERO,  )
   et al.,                      )
4                               )
       Plaintiffs,              ) Civil Action
5                               ) No. SA-21-CV-00844-XR
       vs.                      )
6                               )
   GREGORY W. ABBOTT, et al.,   )
7                               )
       Defendants.              )
8                               )
9         REPORTER'S CERTIFICATE
          DEPOSITION OF ALAN VERA
10          FEBRUARY 27, 2023
11      I, Nilda Codina, Notary in and for the State
12 of Texas, hereby certify to the following:
13      That the witness, ALAN VERA, was duly sworn
14 by the officer and that the transcript of the oral
15 deposition is a true record of the testimony given by
16 the witness;
17      I further certify that pursuant to FRCP Rule
18 30(f)(1) that the signature of the deponent:
19      _____ was requested by the deponent or a
20 party before the completion of the deposition and
21 returned within 30 days from date of receipt of the
22 transcript. If returned, the attached Changes and
23 Signature Page contains any changes and the reasons
24 therefor;
25      __X___ was not requested by the deponent or a

170

1   party before the completion of the deposition.
2        I further certify that I am neither attorney
3   nor counsel for, related to, nor employed by any of the
4   parties to the action in which this testimony was
5   taken.
6        Further, I am not a relative or employee of
7   any attorney of record in this cause, nor do I have a
8   financial interest in the action.
9        Subscribed and sworn to on this the 8th day
10  of March, 2023.
11       _____
         NILDA CODINA
12       Notary Public in and
          For the State of Texas
13       My Commission No. 12878135-3
         Expires:  10/24/2023
14
         INTEGRITY LEGAL SUPPORT
15       Firm Registration No. 528
         9901 Brodie Lane
16       Suite 160-400
         Austin, TX 78748
17       Phone:(512)320-8690
18
19
20
21
22
23
24
25

**Numbers**

**100** 43:8
**1,000** 49:1,12
**106** 92:24
**10:29** 39:3
**10:42** 39:6
**10th** 136:13,21
  137:17
**11:41** 74:24
**11:54** 75:2
**12:44** 104:20
**1589** 99:7,11 134:6,9,
  14 135:13
**1970** 18:25
**1975** 18:25
**1980** 18:6
**1990** 93:3
**19th** 133:7 134:4
**1:42** 104:23
**1's** 91:17
**2000** 93:3
**2,000** 111:14
**2010** 20:22 154:14
**2013** 20:22
**2014** 23:6,7,9 24:19
**2015** 21:10 21:10
  93:3
**2018** 73:17
**2020** 26:23 70:22
  76:24 77:11 84:4,5,
  16 92:22 93:4 94:8
  100:13 111:1,10
  125:8,14,19 127:2,
  17,23,25 138:22
  148:18,25 152:4,6,
  17,17 153:8,17
  154:3,8,23,24
  156:15 157:12,15,
  17 159:5,20,21
  160:2,4
**2021** 48:20 75:5,9,14
  77:15 82:15,21
  84:1,3,9 94:20,25
  95:7 105:2 105:2
  106:15,23 123:18
  124:23 125:5,25
  126:12 129:24
  133:8 136:13,21

  137:14 149:24
  153:15 154:5,6
**2022** 27:3 28:17
  45:14 46:6 48:15,
  18 70:14 71:8,10,
  16 73:11 126:9,18
  127:17,25 141:16
  142:24 143:9 149:3
  152:2 153:6 156:4
  157:4,6 159:23
  160:9,12
**2023** 7:3
**20th** 129:24
**250** 42:1
**27th** 7:3
**2:49** 145:10
**3:01** 145:13
**3:37** 168:24
**4:30** 136:15,17
**4:45** 136:17
**5,000** 48:12,14
**87th** 34:11 75:18
**88th** 33:24 34:5
**8:30** 17:16
**9:30** 17:17
**9:37** 7:3
**9th** 137:14

**A**

**a.m** 7:3 17:16,17
  38:8 39:3,6 74:24
  75:2 107:16
**abandon** 20:5
**ABBMs** 90:4 92:24
  93:2 109:12 116:20
  121:19
**aberration** 139:1
**ability** 55:5 66:9
**able** 29:25 52:9
  54:11 55:17 56:23
  57:7 80:15 146:2
**above** 87:17
**Absolutely** 9:23
**abused** 115:8
**accept** 88:3 108:15
  112:9
**access** 66:3 69:9,11
  155:14,21 156:13
  168:3

**accessible** 154:4
**accompanied** 144:12
**accompany** 150:3
**accomplish** 101:4
**accomplishing** 77:5
**accordance** 74:15
**account** 154:1 155:3,
  7
**accurate** 8:11 81:25
  83:1
**accurately** 10:24
**acknowledging** 34:9
**acknowledgment**
  139:17
**across** 33:14
**act** 93:1 144:9
**action** 51:13 52:9
  53:2 54:11 56:18
  78:21 88:18 103:8
  109:3 120:19 169:4
**actions** 52:14 56:5
  57:8
**activist** 33:12
**activities** 24:24
  25:2,7 30:9,11
  47:18 56:17 57:12
  59:16 62:12,20
  163:8,11
**activity** 22:19 24:2
  37:22 47:13,19
  51:4,15 52:7 53:13
  57:10 58:3 60:1,5
  61:21 84:22 88:11
  108:20,22 109:4
  129:17 134:19
**actual** 42:8 56:9
**actually** 8:6 38:17
  44:23 85:1 134:22
  148:6
**add** 13:7 37:21 89:21
  167:20
**added** 34:15 98:15
**adding** 34:13 109:21
  134:8
**addition** 85:14 95:16
  106:7
**additional** 90:8,18
  91:5 105:25 121:16
**address** 47:13 85:14,
  24,25 115:10

137:23 144:8
166:25 167:1
**addressed** 30:14
32:23 77:13 83:22
84:15 111:13
120:15 139:2,12
**addresses** 166:5,6
167:11
**addressing** 119:20
**Adkins** 101:24 122:18,
24 123:9 124:22
126:8 153:13
156:20
**Administrator** 7:19
**advance** 16:8 59:7
77:9
**advice** 40:4 41:1
44:10,11 117:22
143:2,6,18,19
**advise** 55:22 58:16,
17,24 68:18
**advising** 141:11
**advocacy** 105:9,24
106:14 111:7 112:8
124:2,9 163:7
**advocate** 75:16 85:5
88:9,17 89:1,4,11
90:8,16 91:3,17,25
92:6 98:22 99:2
106:23 107:2,6,10,
14,18,25 108:12,17
109:1,7,9,10,15,16,
19,20,24 110:4,5,
10,11,15,17,19,22
**advocated** 88:15 99:6
106:7 108:6
**advocating** 78:2
84:17 85:23 86:5,
10 88:2,21 92:3,14,
19 93:9 98:13
101:15 107:22
108:5 122:5 124:2
139:22
**Affairs** 105:16
111:23 123:10
133:17 135:7
137:11,13
**affect** 48:19 121:18
138:5
**affidavits** 158:10

**affiliation** 160:20
**after** 14:12 18:22
27:21 28:20 29:25
34:24 39:10 69:1
76:14,16 95:13
96:1,11 111:10
124:12 126:6
138:18,21 150:23
158:17 166:19
**afternoon** 147:5
**Again** 34:9 43:25
46:16 48:4 58:7
72:17 77:8 78:7
99:1 101:19 106:3,
4,11 124:20 156:13
**against** 21:22
**age** 60:23
**ago** 11:22 15:20
21:18,19 22:6
24:13 55:3 128:8
129:16 144:22
**agree** 9:11 12:7,18
46:11 123:22 124:1
165:22
**agreed** 8:12 9:2
12:10,19,22 13:17
**agreement** 8:21,25
9:9,16,25
**ahead** 10:13 11:24
60:16
**Alabama** 89:25
**Alan** 8:2 44:21 148:3,
5,7,14,17 149:7,10
**alerting** 130:12
**allow** 86:25 146:2
163:21
**allowed** 28:19 37:11
39:18 44:13 52:2
65:2 72:2 87:9
108:8 147:22
149:16
**allowing** 107:19
**almost** 95:24,25 96:5
111:14 120:16
**alone** 99:14 138:9
157:21
**along** 38:12 93:24
149:8
**already** 10:12 24:4
38:11 44:21 88:20

103:8 116:13 138:6,
17 156:12
**also** 12:11 14:4
25:10 26:19 37:17
40:18 66:20 73:6
85:12 96:5 98:24
115:10 126:4
127:23 144:3 148:9
155:9 157:1 163:10,
13 164:12 165:3
168:22
**alternate** 20:22
64:16
**although** 45:13
122:21
**always** 17:4 26:24
65:16 157:21
**Amendment** 39:23
39:23 44:2 45:1
46:21 51:6,18
52:13 58:10 126:24
127:21,23 128:2
130:19 146:4,20
161:14 163:2
**America** 144:9
**among** 12:1
**analysis** 106:3
111:11
**and/or** 123:9
**Andy** 7:25 14:2 44:23
**announcing** 73:22
**another** 40:10 50:2,3
58:14 65:1 74:21
91:16 99:2 102:21
110:8 122:12 140:7
**answer** 10:23 11:17,
24,25,25 12:8,9
13:4 22:9 22:9
33:9 40:1,9 44:2,
13,14 45:7,8 46:14,
18 47:9,11 51:7,9,
19 52:19,23 65:4
66:17 78:10,12
79:3,14,18,23
114:13 115:16
141:14 143:6
**answered** 22:10
**answering** 11:8
112:13,17 141:18,
20

answers 12:13,18
  29:6
anticipated 103:24
anticipating 30:4
anybody 16:8,16 32:5
  49:9 50:17 67:3
  94:23 95:5 101:24
  113:7 122:23 129:3
  131:25 162:1
  168:16
anymore 38:9
anyone 102:10 123:3
  150:4,25 151:10,18,
  21 152:25 154:25
anything 11:6 14:18
  18:22 20:3 24:3
  39:21 40:1 52:17,
  18 55:12 65:3 68:3,
  5 69:2 94:4 95:6
  100:4,7 102:6
  116:23 142:5
  145:20 151:4
  160:19,24 162:3,4,
  13 167:5
anyway 72:19 136:22
anywhere 156:2,5
  160:22
appear 29:13
appearance 42:3
appearances 7:9
appeared 80:10
appears 125:14 136:4,
  9 166:23
application 13:20
  66:25 89:15 89:15
  142:7
applications 89:11
  121:10
applied 120:24
apply 143:4
applying 143:10
appoint 141:22 142:1,
  2 147:19
appointed 47:8 63:13
  147:16,23 149:1
  158:22
appointees 147:21
appointing 51:24
  52:3
appointment 147:22

appreciate 146:8,24
appropriate 62:1
  146:11 168:5
approximately 41:21
  42:1 49:12 154:21
area 43:25 53:17
  70:25 160:20,25,25
areas 63:15 111:4
  120:5 157:23
aren't 164:11
arms 73:21
Army 18:23
around 53:12 86:12
  139:7,14 142:24
arrived 20:11
Article 134:9
aside 32:25 40:17
  142:3
ask 9:20,21 11:14
  12:21,23 14:16
  15:12 19:14 22:15
  24:8 31:18 39:8,25
  40:25 44:6,17
  45:24 50:2,14,16,
  21 58:15 66:21
  71:7 72:17 73:9
  83:15 86:4 95:17
  98:2 99:19 101:8
  112:3 117:9 118:1
  122:22 124:20
  131:25 132:19
  133:3 134:23
  142:11 145:18
  148:6 150:13
  161:20 165:14
asked 21:9 33:11,15
  49:24 58:6 62:2
  64:17,21 65:1 70:8
  84:6 87:16 90:9
  100:19,22 101:7
  112:10 113:7
  114:22,25 115:22,
  25 116:3,6,9,18,25
  118:20 119:1,6,11,
  15,19 122:15,21
  126:9 134:8 142:6
asking 10:13 22:21
  34:13 41:8 71:3
  81:19 92:18 93:3
  94:5 96:25 98:4

99:23 112:21
  113:11 114:17
  116:15 130:23
  131:5 137:11
asks 54:4 131:2
aspect 131:6,7
assert 79:22 127:15
asserted 39:22 44:1
  46:20 79:9,20
  126:23 128:2
asserting 44:25 79:2,
  19
assertions 146:10
assign 157:2,13
  160:18 162:14
assignments 157:3,5,
  18
assist 64:18 65:14,
  18 91:4,16 110:8
  122:13 139:8
assistance 59:12
  61:19 62:3 64:14,
  19 65:7,14,20 66:1,
  22 67:7,11 68:11
  91:2 116:4 120:3
assistant 53:15,20
  54:3 55:20 65:17
  67:25 68:2,7 70:8
  72:1,3,22 73:22
  92:25
assisted 21:19 53:15,
  23 54:2,9 55:4
  64:13 65:12 66:14,
  21,24
assister 74:4
assisting 55:15
  57:21 110:1
assistor 59:3 67:6,
  10 68:14,18 69:14,
  24 71:13,19,21
  72:18 73:13 74:8
  90:18,20 91:11
  109:22
assistors 73:24,25
  90:17,24
association 20:2
  159:2
associations 19:25
assume 98:9
Aston 35:6,8,20

133:22
**Atkins** 125:5
**attached** 74:4 125:8
135:6 153:17
**attaching** 125:6
135:12
**attachment** 125:17
**attachments** 15:7
**attendance** 17:13
**attended** 32:3 114:10
**attention** 11:7
**Attorney** 7:21 14:7,
24 16:10 95:4,5
103:2,4,7 107:4
119:4 140:16
**attorney-client**
31:17
**attorneys** 128:23
140:12,17
**audible** 12:13
**audio** 8:4,10 153:24
**August** 129:24 136:13,
21 137:14,17
152:17 154:21
**Austin** 95:18 97:24
149:21
**author** 27:15,19
**author/main** 141:2
**authority** 51:24 52:3
**auto** 137:16
**automated** 135:23
136:4,9
**available** 41:24
61:18 134:18
153:24 154:20
156:4,6
**aversion** 153:24
**aware** 37:13,15 51:23
52:2,6,7,25 53:5
62:5 67:5,9 68:13
132:23 149:15
167:24

---

**B**

---

**back** 13:8 17:8 19:12
37:6 39:5 42:8
46:9 63:6 73:15,16
75:1 104:22,24
123:17 128:11

129:8 132:6 138:15
145:12 146:16
155:14
**background** 18:2 47:7
**ballot** 13:20 19:10,
13 23:10 24:9,11,
15,16,17,21,24
25:2,5 26:18 31:13
32:7 53:19,21 54:1
55:5,9,12,16 56:3,
11,14,17 57:22
61:3 61:3 62:4,14,
23 63:8,22 65:3,10,
20,23,24 66:3,4,22,
25 67:24 72:19,24
73:1,7 74:15 77:12
84:19,24 85:15
89:5,11,16,19 90:2
91:5 92:2,11 93:7
94:8,11 97:4
101:17 109:8 110:1,
15,16 118:4 119:17
120:9 121:6,10,15
122:6 132:6,10
139:3,21 142:7
143:7,10,11 147:10,
13,15,19 148:11,15,
18 149:11 157:23
157:23 158:9
167:13
**ballots** 34:24 56:10
89:12 90:5 100:12
106:5,9 109:13
116:20 143:4 158:7,
8,10
**base** 155:15
**based** 41:12 45:7,8
51:1 79:3 119:25
121:2 122:2 126:15
147:18 158:1,23
159:6 160:16 161:5
**Basic** 143:16
**basically** 62:24
**basis** 78:7
**bathroom** 11:11,13
**became** 24:10 62:22
82:25 149:14
164:21
**become** 33:21 62:14
82:20 163:25 164:5,

18
**beer** 66:10
**before** 9:9 10:16
11:17 12:8,9 13:23
23:9 24:10 29:20,
24 39:10 46:1 60:5,
6 66:7,17 71:8,10
73:11 76:12,16
77:2 84:3,9 85:22
86:10,15,22 88:2
89:4,10 90:7 95:19
105:15,23 126:1
129:25 137:10
148:7 150:11
153:10 165:13
167:22
**began** 76:13,17 77:10
95:19,23 96:8
107:24
**begin** 12:9 13:23
14:11 114:14
**beginning** 132:8
140:11 141:5
**begins** 96:21
**behalf** 50:19
**behave** 59:10
**behavior** 47:18 108:2
**behind** 152:14
**being** 14:1,4,7 36:10
52:9,10 53:14,23
54:2,6,8 55:4,9,17
57:6 60:17 84:21
87:8 88:18 89:1
90:21 97:4 109:5
114:22 121:20
128:16 131:7 138:3
141:25
**believe** 21:10,18
25:23 47:1 52:9
71:15 75:8 81:6
88:9 127:1 130:7
135:21 138:1 150:7
150:7 163:24
164:17 165:18
166:17 167:24
168:11,15
**believed** 164:4
**believes** 52:3
**belongs** 27:10,15
**below** 131:1,4

Bend 114:10
besides 16:16 19:15,
    25 21:2 23:2,21
    50:18 131:25
best 12:24,25 66:10
    97:2
Bettencourt 34:18
    76:1 82:14 99:11,
    13 113:15 132:24
    133:15,25 136:10
    140:25
Bettencourt's 35:1
    112:10 134:5
better 61:6 77:4
    83:15 97:15 98:6
    138:25
between 15:21 34:10
    43:14 44:16 46:12
    56:23 63:3 94:5
    96:11 106:6 107:16
    112:9 127:20
    136:17 162:20
beyond 24:3 49:20
    55:12
big 8:25
bigger 25:18
bill 33:16,22 34:14,
    16 35:14,16,17
    76:22 83:14 91:20
    97:1,10,15 98:3,5,
    8,10,24 99:2,6,7
    100:8,17,18,18
    101:1,5 102:21
    105:14,17,22,25
    109:11 113:12
    114:4,17,20 115:4,
    20 116:19 119:20
    120:11,14 121:14,
    18 123:15 133:1
    134:5,6,10,12
    138:5 140:8
billion 21:11
bills 30:16 36:22
    75:5,11 76:17
    77:12 78:4 95:11,
    20,24 96:14 97:17
    98:13,15,19,22
    99:11,14,19 100:15
    101:24 102:2,10,12
    103:5 105:10,24

133:17 149:13
    152:19
Birring 7:18
bit 13:5 80:17 93:25
blatant 57:13
block 21:15,19 22:17,
    19 23:2,22 56:14
    57:3 59:15,20,23,
    25 60:4,9,10,22
    61:1,8,10,11,14
    70:21
board 19:17 60:7
    157:24
Bob 135:24
body 56:13 57:3
bond 21:10,11,13,14
    65:2
book 27:12,18
booklet 41:23 45:23
books 28:18
booth 53:11,13,25
    54:10 72:2 74:7
    74:7
boots 96:24
both 36:11,15 82:11,
    16 83:18 123:11,21
    143:22 144:2 153:6
bottom 153:20
bounds 126:17
box 85:13 86:1 163:1
boxes 89:5 109:8
    119:17 120:9
break 9:4 11:14,15,
    15,18 31:4,8 38:22
    39:1 74:22 103:17,
    22 104:15,17 145:8
breaks 11:11,13
Brian 141:1,4
brief 16:11
briefly 19:6
bring 15:2 28:7
    36:18 41:18 70:11
    95:10 119:21
bringing 80:22 81:7
    82:6 99:2,6
Briscoe 75:25 76:10
    99:18 113:20
broader 33:17 114:23
brought 28:12 53:15
Bryan 76:4 133:12

Buckingham 133:15
building 64:7 86:17
    98:2 107:12
buildings 28:3
business 105:20
    167:1
busy 63:4
buttonhole 96:13
buttons 61:7,10
bylaws 25:5 147:18

C

cachet 14:25
Cain 75:25 76:6,10
    77:10 99:18 113:20
call 16:22 29:5,6,12
    40:24 96:12 118:13
    131:4 161:21
called 10:11 19:18
    134:18 142:22
calling 77:10 82:13
    84:1 134:20 143:13
calls 12:23 23:24
    52:14 68:9 77:9,20
    82:17 89:1,18,24
    92:20 96:20 101:14
came 15:16 23:9 56:7
    65:16 74:4 87:14,
    18,23 88:5 91:10
    92:8,13 102:23,25
    105:6 120:5,10
    121:23 122:4,8
    152:19
cameras 108:8
campaign 22:4 23:4,8,
    11,12,22 24:2,12
    90:22 141:19
campaigning 22:11
campaigns 23:23
    141:15
Campbell 136:5 137:6,
    7
camped 73:18
can 8:20 9:4,21
    11:14 12:6,14
    14:22 15:5 19:6,22
    20:13,14 22:2 25:1
    32:25 35:11 38:22
    41:21 44:2 48:8

50:10,25 52:18,23
53:7,22,25 54:1,5,
10,20 55:14,22
57:25 58:14 62:25
63:7 66:10 69:23
71:11 73:10 74:20,
22 76:20 78:11
79:7,21 80:4,14
84:10,16 100:1
105:12 113:11
116:23 125:12,20,
21,23 132:5,15
134:1 135:20 136:7
140:17,20 141:25
142:3 143:15 145:7
146:7,16 147:18
149:23 152:9
153:10 154:11
160:1,22 165:24
**candidate** 21:17 22:4,
20 23:4 55:18
62:13 92:3,12
122:7 139:22
141:18,21,25
**candidates** 21:25
22:11 60:2,6,8
61:10 62:21 63:2,3
64:22 72:10 74:6
141:11,13,21
160:15
**cannot** 12:16 57:15,
18 70:1 103:14
124:13 132:25
**can't** 22:5 24:3
36:12 57:4,20 70:6
77:24 98:9 102:2,9
115:16 117:2,4
124:13 132:5
135:16 136:25
140:15,18 142:5
145:20
**canvasser** 21:16
**canvassing** 22:17,20,
25
**capable** 54:19 69:19
**capacity** 7:19 168:1
**capital** 75:19 96:10,
13
**cards** 37:1
**careful** 92:16

**Carlin** 148:3,4,15,17
149:7,10
**Carlin's** 148:5,7
**Carlton** 148:3
**carrier** 143:23
**carry** 45:22 70:9
108:8 112:10
**carrying** 55:15,20
**carryover** 84:24
**case** 13:6 24:6 79:16
128:17 129:4
166:13,19
**cases** 68:9 97:16
**Casey** 157:10
**casting** 57:22 62:3
66:22 72:24
**catch** 130:18
**catching** 25:15 38:19
133:2 152:20 168:6
**categories** 158:13
**cause** 8:16
**causing** 32:11
**caveat** 146:5
**cell** 40:25
**center** 33:14 160:5
**centers** 28:3,6 106:5
**central** 23:24 157:24
**certain** 17:2 61:9
63:19 83:8,20,21
84:2 87:4,13 94:6
102:7 110:15 120:7
138:4 160:20,25
**certainly** 83:7,14
132:4 138:20
157:11 167:8
**cetera** 47:8 143:16
**chain** 162:20
**chair** 21:19 23:9
24:21,23 62:14,23
63:14 127:7 131:18
132:19,23 135:24
136:5,10 147:9,21
151:20,23 152:5,6,
10,10,15,16,18,18
153:1
**chairman** 19:9 130:19
**chairmanship** 24:19
**chairs** 59:21,24
63:14 137:24
147:17 148:10

149:1
**chance** 22:12
**change** 39:12,15
40:12,13 45:20
51:1,11 74:21
112:3 126:5 142:23
148:24
**changed** 51:1 98:15
106:1 121:21
125:25 160:7
**changes** 27:22 39:16,
20 52:7 127:1
132:11,12 142:19
**changing** 98:8
**channel** 156:11
**chaotic** 152:22
**characterized**
130:13
**charge** 27:13 63:1
148:15
**Charis** 126:11,12
**chart** 43:7
**chase** 17:7
**chasing** 38:7
**chat** 8:25 9:2,4
**check** 9:4 13:13 58:1,
17 104:3 126:12
141:7
**checked** 89:22
**check-in** 56:22
**checking** 126:11
153:25
**checks** 57:1
**chill** 164:18
**chips** 66:10
**choice** 79:12
**choices** 72:23
**choose** 72:11
**chosen** 54:2
**Christina** 101:24
122:18,24 123:9,19
125:5 153:13
156:20
**Cindy** 147:23
**circle** 19:12
**circulating** 48:10
**circulation** 49:19
**citations** 42:9
**civil** 110:20 120:19
169:4

claim 127:15
Clardy 114:2
clarification 9:22
    25:19 45:5 146:23,
    24
clarify 44:17,20
    45:12
clarifying 147:8
Clark 160:6
class 26:22,24 27:7
    47:8 55:13 88:3,18,
    20 108:14 109:2
    125:15 155:14
    156:9,12
classes 27:5 48:24
classify 124:9
clear 31:21 77:8
    85:11 99:1 127:1
    139:3 166:24
clearly 123:2
Clerk 92:23
click 37:10
client 79:8
Clifford 7:19
close 53:19,22 54:5,
    6,13 55:23 57:4
    84:21 92:7
closed 32:11,19
    130:19 135:7
closely 138:11
closer 57:15,19,21
code 27:22 30:14
    41:13 42:9,23,24
    55:10 84:12 86:23
    87:5,6 108:3
    110:21 120:21,23
    121:19 132:12
    138:6
coffee 30:21 63:25
    64:1
Coleen 130:7
collated 41:25
colleague 140:6
collect 26:9
collection 166:10,12,
    14
Colleen 27:20
combination 45:21
    46:22 82:6
combined 45:23 46:24

47:1
come 35:13 62:2 73:6
    75:7 87:21 98:15
    102:5 137:23 146:3
comes 49:25
comfortable 22:16
    103:21
coming 56:25 134:4
    137:16 143:3,12,13
    146:8 167:1
comment 93:20 96:16
    111:17 114:17,22
    131:6
comments 114:18,20
    153:4
commercial 85:13
committed 87:4,13
Committee 19:11,13
    23:10 24:9,11,15,
    16,18,21,24 25:3,
    13 26:18 36:10
    62:15,16 63:8,22
    64:12 67:25 77:12
    95:19,23 96:7,8
    97:8 99:25 105:11,
    16 108:23 109:6
    111:23 123:10
    130:14 132:6,8,9,
    11,17 133:16 134:7
    135:7 137:10
    139:14 141:8 145:3
    147:10,14,15,24
    148:12,18,21 149:4,
    5,8,12,18,20,24
    157:24 167:11
    167:11,13,17
committees 30:15
    76:13,17 96:4
    100:14
communicate 41:4
    73:1 94:18,23 95:4
    99:16 102:18,19
    132:24 149:19
communicated 31:12
    72:6 73:3 76:10
    81:23 122:16
communicating 59:3
    81:2 82:5 83:17
    96:18 102:9 112:4
    114:14 122:23

123:2
communication 53:5
    75:21 124:10
    137:20 141:4,8
    164:24
communications
    40:18,22 41:7
    52:15 78:8 79:24
    80:1,10,21 81:9
    82:16 84:7 94:14
    101:22 102:1,3
    103:4,6,10,14
    114:3 124:6,14
    129:10 136:23
    137:2,6 138:11
    163:22,25 164:18
    165:7
community 28:3
compact 43:17
compare 29:24
comparing 39:10
compensate 91:15,16
    110:8 122:12
compensated 90:21
    110:3
compensates 110:7
    122:12
compensation 91:6
complaining 103:7
complaints 102:17
    103:8 139:24
complete 18:16
    166:14 167:18
completed 156:12
completely 10:24
    30:4 142:9,18
comply 168:5
computer 129:2
    165:17,20
concern 59:12 67:14,
    16 73:12,13 77:12
    85:12 91:24 93:7
    94:1 121:8 138:2
    160:23
concerned 64:24
    138:18
Concerning 151:7
concerns 33:12 67:20
    85:23 87:8 89:19
    94:7 100:8 115:3

116:11 138:7,21,23
**conclude** 145:24,25
**concluded** 168:12,25
**conduct** 25:22 28:5
86:12 93:10 105:20
107:3 108:22 119:4
165:16
**conducted** 25:17 27:2
29:2,4
**conference** 64:6
**confidential** 150:21
151:5 163:17
**confidentiality**
39:23 163:20
**confirmation** 8:3
**confirming** 39:20
**confronts** 47:6
**confused** 64:24
**Congressional** 20:24
**consequence** 130:13
**consequences** 97:1,3
100:23,25 112:22
115:2
**consider** 33:2 34:13
58:4 134:8 158:5
160:19,24 162:13
**consideration** 161:2,
3,4,6
**considering** 158:12
**consistent** 47:20
166:15
**constantly** 56:13
**consulting** 19:5
**contact** 54:24 55:1
59:2,5,11 101:18
**contacted** 68:10
97:16
**contacts** 37:20
**contain** 42:1 43:10
86:24
**contained** 126:25
**containing** 107:15
**contains** 47:16,17
127:9
**content** 42:4 43:16
46:19 47:12 127:9
**contention** 47:15
127:19,22
**contents** 78:8 80:1
**continually** 81:15

**continued** 77:15
82:16
**control** 50:13 166:4
167:17
**convenience** 160:16
**convention** 152:13
**conversation** 38:18
105:1 168:11
**conversations** 12:5
128:19 139:6
149:12 164:4 165:2,
4
**copied** 30:20
**copies** 28:16 48:8
49:2 100:10 168:16
**copy** 45:13 46:3
47:21 50:3 50:3
123:19 124:16,21
**Correct** 9:18 14:2,3,
6 26:4,12 29:7,17
41:15,19 45:11
47:2 48:6,7,19
51:25 52:1 55:2,19
56:4 57:23 62:24
75:13 76:8 83:23
93:21 98:20,21
99:14 101:6 112:25
114:9,24 115:12
116:17 124:24
125:9,18 130:9
131:12 133:21
142:18 146:14
147:11,12 150:18
153:9,14,16,19
154:2 162:24 163:5,
9,12,15 167:23
**corrected** 159:17
**corrections** 151:25
153:3
**correctly** 22:1 93:19
154:1
**correspond** 93:1
**correspondence**
166:3 167:9
**cost** 28:15
**could** 8:24 24:20
30:1 33:6 37:10,21
39:13 56:13,18
57:5 65:4 69:21
69:21 71:1 72:4

85:19 100:7 101:9
141:22 144:6
149:18 155:6
156:13 160:13
**couldn't** 105:19
145:1 155:9
**council** 35:1 151:12,
13 153:2
**counsel** 7:8 8:21 9:2,
12,25 11:20,24
34:12 40:8 44:7,12,
22 71:19 126:15,18
165:15,21
**counselor** 55:20
**counsel's** 40:4 44:10,
11
**count** 89:14,15
157:25
**country** 33:15 165:25
**County** 7:18 15:10,15,
17,25 18:13,3,8
19:7,10,15 20:16
23:10 25:5,17,21
26:10,17 27:11,15
28:2,3,4,17 30:12,
22 31:10 32:1,2
34:23 37:9,25
39:22 44:1,24
45:10 46:20 48:11,
13 50:19 51:23
52:8,16 53:1 58:23
59:16,19 61:12,17,
22,24 62:5 63:8,14
69:6 75:21 84:19
89:19 92:23 102:6
106:8 110:25 111:9
114:10 120:8
126:17 127:4,7,10
132:1,7 133:19
135:25 136:6,11
140:7 142:1,8,15
144:25 145:1
147:10,17 151:14,
15,20,23 152:16
154:16 156:1,3,19
157:19 160:21
160:21 162:22
163:3,17 165:2
166:4,8,15,19,25
**County's** 25:20 106:3

114:11 161:4
couple 24:8
course 30:24 38:23
  87:16 141:25 149:2
  156:7
court 8:7,10 12:4,6,
  14,16 16:25 17:7
  52:5,9 53:2 120:16
  125:2,10 129:12
  133:2,5
courtroom 11:3
covered 112:2 115:14,
  19 117:2
craft 83:6 83:6
crafting 82:25
create 151:8 155:3,7
created 24:18 27:11
  41:17 166:9
creating 154:1
creation 24:16
criminal 86:12 107:3
  119:4 134:19
critical 157:23
crossing 38:10,19
culminating 105:5
Culp 133:15
cup 30:21
curb 90:10
curbside 109:18
  119:21
current 19:1,7 31:25
  33:10,22,23,24
  48:9 115:7 147:25
  149:11
currently 31:11,13
  63:7 167:24
cursory 152:6
custodian 166:18,20
  167:9
custody 166:4 167:16
cut 41:25 131:16
cycle 70:22 148:19,
  21,25 157:12
cycles 25:11 26:2
Cy-Fair 21:10

                D

Dan 23:11 148:3
  149:7

data 158:1,4,6,13,15,
  17,25 159:2,7
date 69:23 71:16
  129:22 134:4
  136:12,21
day 13:4 16:23 21:9
  40:19,25 41:19
  76:16 95:14 105:3,
  17 120:22,24 126:1
  130:15 146:17
  159:10
days 75:18 149:21
dead 100:12
deadline 165:22
deal 37:19 41:13
  71:12 75:12 80:16
  81:8 124:3 143:3
dealing 138:6
dealt 121:19
December 48:20 82:21
deciding 157:17
  160:18
decision 157:13
  158:23
decisions 71:20
  157:15
deck 153:22
decline 45:7 117:22
  118:7,16
declined 146:19
declining 45:8
defendant 165:15
  166:22
Defendants 7:22,24
  165:25 169:7
defense 9:12,25
defer 31:20 79:4
defined 108:25 131:8
  138:3
defining 101:17
definition 94:8 97:5
degree 18:20
delayed 152:14
delete 29:22
deliver 92:11
delivered 60:18
  92:25
delivering 66:1
democrat 64:22
demographics 162:13

denied 51:3 88:10
  108:19
density 160:25 161:5
depending 147:20
depends 54:16
deploy 162:12
deposed 10:16
deposition 8:13,15,
  22 10:14,19 13:12,
  23 14:17,23 15:6
  16:9 17:1,13,13,24
  35:5 45:16 80:18
  125:3,11 128:6,11
  129:13 130:8 133:6
  134:24 145:17,24
  146:1,9,12 161:12
  168:10
describe 19:6 57:8
described 23:3 24:4
  25:4 46:11 53:17
  74:2
describing 92:20
designated 166:18,20
detail 34:7
detailed 33:1
details 19:12 63:4
  111:25
died 93:3
difference 43:16
differences 43:14
  44:5,15 46:12
  127:20
different 15:23
  22:18,24 23:17
  38:18 43:1,19,20
  47:12 60:3 72:9,20
  84:13 88:22 120:21
  123:8 134:20
  144:25
difficult 46:14
  81:11,17
difficulty 80:7
digging 68:3
digital 148:14
direct 40:9 94:9
directed 132:17
direction 68:19
directly 73:4 102:19
  140:9
director 157:4,7,9

**directors** 19:17
**disability** 65:8
**disabled** 65:13 72:13
**discipline** 25:8,16
**disclose** 39:24
**disclosed** 127:10,13
**discovery** 14:25 15:9,
    13 166:3,7
**discrepancies** 158:2,
    4,6,13,16,25 159:2,
    7
**Discrepancy** 158:9,19
**discuss** 32:9
**discussed** 70:23
    112:16 114:11
    132:25 145:16
**discussing** 13:9
    77:11 81:18
**discussion** 44:4
    53:20 139:9
**discussions** 30:21
    81:14 87:21 133:4
    139:24
**disenfranchisement**
    111:14
**dispute** 167:3
**disputes** 161:13
**distance** 51:14 54:15
    57:9,16,19 59:18
    62:1 88:19,23
    109:4
**distributed** 48:22,23,
    25 49:4
**District** 20:24 63:14,
    15 71:17 147:16,17,
    20 149:1
**districts** 147:18
**divide** 80:14 81:5
**Division** 45:15
**divulge** 58:9
**document** 14:25 17:10
    42:14 45:19 46:1
    47:13 93:13 112:21
    125:12,22 126:16,
    25 127:2,23,25,25
    128:1 128:1,3
    129:20 167:9
**documenting** 69:13
**documents** 15:2,14,16
    17:3,6 69:6 127:20

128:20,24 165:17,
    19 166:5,6 167:12
    168:1,2
**does** 8:17 25:21
    27:23 28:15 30:24
    32:19 42:1 46:18
    47:19 47:19 55:12
    63:22 66:6 67:4
    129:20 136:21,24
    151:10,18,20
    152:25 162:1
    163:20,23 165:18
**doesn't** 43:10 78:16,
    17 102:16 127:13
**dogs** 20:6
**doing** 12:11 27:6
    31:6 38:21 46:18
    58:18 96:4 105:13
    106:2 111:1 112:7
    137:22
**dollar** 21:11
**Don** 133:15
**done** 22:25 28:20
    33:18 68:1,2 69:1
    111:9 124:3 127:6
    149:16 161:7
**Donna** 136:5 137:5,6
**donuts** 63:25 64:1
**door** 21:24 22:3 22:3
    23:15 23:15 60:15,
    23 61:2 62:21
    62:21
**doorknobs** 21:20
**doors** 22:7,8
**double** 141:7
**down** 12:6,17 17:7
    29:8 34:8 38:8
    50:17 57:25 58:16,
    25 62:17 80:17
    98:1 110:11 152:16
    155:13,16
**download** 158:17
**downtown** 120:17
**draft** 33:15
**drafting** 33:3 34:4
**drag** 96:9
**draw** 50:22
**drawn** 63:12,17
**drifted** 71:3
**driver's** 90:1 143:16

**drive-thru** 111:14,20,
    22 112:1 118:13,18
    120:9,14 138:23
    139:2
**drop** 89:5 109:8
    119:17 120:9
**due** 84:22
**duly** 9:6
**during** 40:25 58:9
    63:2 64:16,21
    95:18 98:14,19
    103:6,12 105:7,9,
    12,13 106:1 108:6,
    13,17 111:23 112:5,
    7,17 113:2,5
    114:19 122:19,25
    123:3 124:8 130:2
    132:7 143:19
    148:18,21 149:24
    154:19 159:5,11,20
    160:2,9,12
**duties** 52:5 89:3
    148:6,11 156:23
**duty** 86:7 107:7
    119:9
**dynamics** 81:13

**E**

**each** 12:5 42:1 132:9
    135:20 147:17
**Eagle** 126:11,12
**Earlier** 10:9 46:9
    50:16 82:13 97:3
    105:8 110:23
    112:16 122:15
    128:5,10 130:7,21
    134:6 147:5 150:16
    159:13,17
**early** 70:14 73:17
    75:18 114:7 120:21,
    24 124:23 157:23
    159:11
**easier** 79:8
**edits** 151:11,24
    152:25 153:3
**education** 18:16
**effective** 51:17 56:7,
    21 57:11 82:20
**effort** 21:17 22:6

23:2,22
**efforts** 25:22
**eight** 63:11,16
  148:23
**either** 21:16 22:4
  23:23 48:9 60:14
  62:21 70:11 78:3
  82:16 83:20 88:22,
  23 89:11,14 98:14
  99:16 100:4,6
  101:13,16 102:7
  108:18 110:6
  112:18 113:25
  114:3 116:20 118:3
  121:5 122:18,19,25
  124:7 128:12
  138:14 141:4,9
  143:10 145:18
  146:3,19
**elected** 32:6 152:18
**Election** 7:18 19:18
  19:18 20:18 21:9,
  11,11 25:6,10,12,
  14 26:1,2 30:8,13
  32:12,22 34:24
  37:13 40:19,25
  41:13,19 42:9
  48:15,16,17 51:3,
  13 53:12,23 54:9,
  11,13,25 55:15
  56:5,12,12,18,24
  57:2,5,14 60:5,7
  63:1,4 68:17 69:7
  70:8,12,15,22
  71:15,17,22,23,24
  72:1,3,7,10,18,22
  73:4,11,12,18,25
  75:5,12,16 76:24
  84:12,20 86:23
  87:5,12 88:11,23
  89:2 95:24 96:14
  105:14 108:1,4,20
  109:2 110:20,21
  111:1,10,12 114:11
  120:22,24 126:1
  132:12 133:17
  134:11,19 138:18,
  22 140:12 142:25
  148:18 150:24
  154:14 157:4,12

158:2,18,20,21
  159:2,4,5,10,20,22,
  24 160:3,4,9,12,17
  163:14
**elections** 20:25 21:8
  26:10 45:15 102:14
  106:3 155:20,25
**electronic** 33:13
**elegantly** 40:7
**Elementary** 20:23
  64:17
**eligible** 61:3 67:7,
  11
**else** 10:11 13:8
  16:16 22:17 26:22
  50:17 101:25
  112:12 116:23
  117:4 142:5 147:13
  150:4 151:1,18,21
**email** 15:7 34:11
  35:8,9,19,20,22
  40:23 41:4 81:24
  82:17 93:13 96:25
  97:3 100:7 101:11
  114:16,25 123:19,
  21 125:4,17 128:7,
  12 129:15,23
  130:10 131:1,3,11
  133:7 136:18
  137:12,23 153:12,
  20 162:19,25 163:2,
  11 165:8,17 166:5,
  6,25 167:11,16
**emails** 15:7,20,20
  35:25 96:20,21
  101:13 113:14,16
  128:7,17 129:3,7,8
  135:19 149:12
  162:20 163:7,10,13,
  16 164:19,21 167:1
**embark** 50:23
**Emergency** 71:17
**employees** 16:6 26:7
  131:23
**enacted** 34:7
**enactment** 51:2,12
  82:18,19,21 112:6
**encompass** 80:10
**encourage** 41:17
**encouraged** 26:19

28:21 41:17 59:22
**encouraging** 62:9
  102:6
**end** 26:23 28:23
  29:11,16 49:25
  104:5 106:22
  119:25 132:21
  134:5 136:24 141:6
  146:1 154:22
**ended** 62:22 69:1
  78:3 84:8 105:3,18
  132:2 134:24
  162:11
**endorse** 63:2
**ends** 121:14
**enforcement** 85:8
  118:24 134:12
**engage** 22:7 32:5,6
  60:17 164:1,23
  165:4 167:19
**England** 20:11
**English** 59:4,13
  65:19 66:8
**enough** 53:19 54:13
  55:23 84:21 88:12
  108:21 143:25
**ensure** 50:8
**ensuring** 8:11
**entire** 32:12
**entitled** 12:25 87:9
  88:12 108:21
**envelope** 92:25
  143:23
**Eric** 140:19
**essentially** 32:13
  121:9
**established** 138:6
**estimate** 12:24,25
  48:8
**evaluation** 97:2
**Even** 45:20 54:1
  93:14 166:24
**events** 114:11
**eventually** 149:13
**ever** 10:15 20:18
  21:4,15 22:25 23:3
  30:5 33:1,3 40:24
  45:25 49:8 59:1,11
  62:2,6,8 64:13
  65:18,25 66:13,21,

24 67:19,20 68:10, 22 81:1 82:1 98:7, 13 99:2,16 100:16 101:15 102:9 111:18 113:19,24 141:3 156:18

**every** 27:13,21 32:1 34:23,24 35:15,16 37:3 47:16 54:11, 12 106:8 148:24 157:18 158:18

**Everybody** 10:11

**everybody's** 8:5

**everyone** 9:4 99:21 105:18

**everything** 43:11 54:24 56:23 112:11 152:14

**evil** 68:4,5

**exact** 115:7 159:8

**exactly** 72:5 77:24 80:8

**examination** 161:23

**examine** 33:12

**examined** 9:6

**example** 29:23 33:3 36:14 43:18 55:17 57:13,20 61:23,24 65:7 84:12 85:6 102:4,12,20 111:3 115:23 118:22 122:10 123:5 135:10 141:16 144:9

**examples** 43:20 56:10 73:10 74:18 100:11

**except** 26:23 98:10

**exception** 17:23 53:10

**exchange** 98:7 129:16 130:22 131:17 141:3

**exchanges** 81:14 128:11

**excused** 86:7 107:7 119:9

**Executing** 56:1

**Executive** 25:13 132:8,9,17 149:17 157:4,7,9

**Exhibit** 16:24 17:1 45:16,17,25 46:13 125:1,3,7,11,13,16, 17 129:13,19 133:6, 9 135:2,3,22,23 136:3,4,8,9 153:10, 12 162:17

**exhibits** 36:18 100:10,11 136:13, 18

**expanded** 105:25

**expanding** 111:3

**expect** 16:11 163:16

**expectation** 163:20

**expedite** 168:20

**experience** 121:2 160:16

**experiences** 120:1

**explain** 64:22,23 65:1 98:4 152:9 154:12

**explained** 22:11 64:24

**explaining** 97:18

**express** 59:11

**expressed** 55:21

**expressing** 67:13

**expression** 164:19

**extended** 166:23

**extent** 33:6 46:18 52:13,17 65:22 78:8

**externally** 127:17

**extraordinarily** 68:3

## F

**faced** 83:4

**face-to-face** 22:13

**facility** 28:12 120:16

**fact** 12:3 38:13 126:16 127:12 129:6

**factual** 83:19

**fail** 115:10

**fair** 40:13 41:3,7 42:25 65:11 75:10 80:21 81:22 82:12,

23 93:25 97:7 114:6,19 115:13 124:15,20 130:11 163:6

**fairly** 141:17

**fall** 27:5 30:9,11 160:15

**false** 102:22

**falsification** 94:3

**falsifying** 121:19

**familiar** 24:23 59:15

**family** 66:14 67:2

**far** 49:7 53:16 54:14 73:15 83:10 84:2 96:11 155:14

**fashion** 25:1

**fault** 17:20

**favor** 98:18 122:6

**February** 7:3 92:22 95:20 100:13

**federal** 7:4 9:13 10:22 120:16,20

**feedback** 97:10 112:24 113:3,19,24 115:6,17 116:25 117:5,6,14,17,23 118:1,8,11,17,21 119:1,6,11,15,19 128:13,18,25 129:9 130:23 131:2,10 138:16

**feel** 103:23

**feels** 103:21

**feet** 57:21

**felony** 110:7 122:11

**felt** 93:15 140:1

**few** 12:3 45:24 96:11 162:6

**figure** 42:18 104:14 158:16

**filed** 64:23 85:3,23 86:11,16,22 88:2 96:2,3 99:13 103:8 105:24

**files** 128:21 167:10, 12

**filing** 76:22

**final** 82:19

**finally** 95:3

**find** 26:20 58:14

83:12
**fine** 39:19
**finish** 12:7,9 30:4
66:16 159:16
**first** 9:6 10:15,18
16:14 21:11 33:17
34:10 39:22,23
44:1 45:1 46:21
50:16 51:6,18
52:13 58:10 62:17
94:17 97:13 105:1,
9,12,13 106:1,6
111:24 112:9,18
113:2,5 114:21
122:19,22,25
126:24 127:21,23
128:2 139:16,19
144:2 146:4,20
154:11,21 157:20
161:14 163:1 168:7
**fit** 42:23
**five** 20:24 32:9,17
38:25 70:2 73:16
74:19,22 145:7
**fix** 83:12,13
**fixed** 75:22
**flat** 168:6
**fled** 105:18
**flip** 42:5 43:7
**flood** 92:22
**floor** 32:16
**flyers** 21:20
**focus** 105:23 120:5
162:25
**focused** 47:5 105:22
106:20
**focusing** 84:8
**folded** 41:25
**folders** 15:16
**folk** 162:4
**folks** 15:24 48:23
133:19
**follow** 40:4 44:6
51:8 52:21 58:11
60:16 67:19,23
68:19 117:13,21
118:6,15 126:9
137:11,20 167:3
**followed** 67:24 77:16
**following** 18:16 44:9,

11 51:12,21 76:24
130:15 137:21
149:17
**follows** 9:7
**font** 42:19,22
**food** 64:8,9
**foot** 54:20,23
**footed** 168:7
**forbidden** 155:11
**force** 33:11,21 34:1,
2,3
**forever** 96:9 162:2
**forget** 102:5
**forging** 121:19
**forgot** 85:17
**form** 9:14,16,21
30:18 32:25 49:16,
21 69:20 97:9
**formal** 102:17
**format** 43:3 164:25
**former** 149:11,20
**forms** 26:15
**Fort** 114:10
**forth** 80:22 81:7
82:7 128:11 129:8
138:15 146:17
**forward** 75:11 162:21
**forwarded** 131:18
**foster** 20:5
**fosters** 20:8,10
**found** 68:3 106:3
111:19
**four** 74:9,13,14
**frank** 163:21 164:3,
24
**fraternal** 20:1
**free** 51:3 53:7,9,11
88:10 108:19 154:1
**Freedom** 20:4
**frequent** 11:10 26:16
150:3
**Frequently** 41:10
82:11 96:24
**friend** 49:24 66:14
**friends** 67:2
**from** 8:21 9:11 11:7,
21 13:25 17:2 18:7,
20 19:4 20:22 22:3
23:17,24 29:19,22
32:25 37:25 40:14,

17,18 42:9,12 43:1,
11,19,21 47:12
51:13,15 52:4 53:1,
16 54:20,23 57:6,9
58:16,18,25 59:18,
22,25 60:11,12,14
62:11 63:12,15,15,
16 64:17 66:5
67:13 71:7 73:10
74:11 76:23 80:2
81:3,10 82:8,22
83:18,19 84:21
86:7 87:3,12,14,18,
21,23 88:6 89:2
90:9 91:11 92:5,8,
13 93:20 97:5
101:20 102:23,25
106:18 107:7 108:1
109:4,17 112:13,17,
20 113:14,20,22,24
114:9,16 115:2
119:9 120:5,10,16,
22,24 121:23 122:4,
8,23 125:4,21
127:2,16 128:7
131:4 133:7,8
135:13,24 136:5
137:16,23 139:13
140:7 141:5,20
142:3 143:3,9
144:18 145:2,4,5
146:8 154:21 162:4,
21 167:1
**front** 11:3 29:8
140:22 166:2
**fruition** 98:16
**full** 11:7 163:21
164:3,23
**fulsome** 166:14
**function** 26:9 54:5
**functions** 22:18
33:16
**fundamental** 143:16
**further** 165:11
168:14
**future** 164:24 165:5

---

### G

**gain** 22:19

gardens 73:19 159:13
gate 155:4
gathered 37:17
    109:17
gave 46:1 71:18
    100:16 114:18
general 32:20 35:1
    49:23 60:5 63:3
    73:11 87:10 95:4,6
    97:12 97:12 103:4,
    7 107:4 111:1
    119:4 132:11
    143:14 151:12,13
    153:2 157:4 159:5
    160:2,4
generally 11:23 12:4
    15:5,7,14,20 30:17
    40:21 60:9 97:20
    105:12 134:1 159:1
General's 7:21 14:8
    103:2
gestures 12:17
get 8:20 9:8,9 17:7
    32:5 33:6 37:10,23,
    25 57:20 62:17
    81:20 96:25 103:25
    112:20 113:14,21,
    24 115:17 141:13
    143:13 155:5 158:3,
    17,22 160:16
    168:13
gets 86:15
getting 22:21 38:4
    43:22 82:8 85:3
    143:9 145:5 161:22
give 12:18,24 19:22
    38:5 40:17 44:12
    50:3 61:10 62:25
    66:2 100:10,11,16
    105:12 113:11
    145:20 150:20
    155:13 161:7
given 49:9 54:12
    116:11 128:23
    165:20
gives 61:5,6 132:10
giving 11:7 82:24
    83:18 143:5
goals 31:13 77:5
    101:4

God 28:13 99:20
Going 7:2 8:4 9:15
    10:19 13:18 14:16
    17:4 19:12,13 22:3
    24:8 31:8,18,20
    33:5 35:13 37:3
    39:2,5,7,25 40:3,
    19 41:24 45:13
    46:16 50:14,21
    52:12,20 58:7,11
    70:22 71:8 72:4
    74:23 75:1,3,12
    78:6,24 79:4,12,13,
    22 81:5,11,17 85:6,
    18 86:4 95:10
    104:9,19,22,25
    106:2,10 117:8,12,
    21 118:6,15 120:7
    123:12 124:3 129:8
    130:14 135:20
    142:8,11 145:9,23,
    24,25 146:5 161:10
    168:10,24
gone 83:10 138:22
Good 7:11,14,17,23
    10:7,8 25:12,14
    32:18 35:4 38:11
    54:16 130:18 137:9
    147:5
goodness 137:4
    138:13
Gore 7:24 14:5 16:19,
    20,22 44:21,24
    51:9 58:19 145:16
Gore's 45:7 51:21
    52:21 58:12
got 9:3 11:12 58:15
    65:10 83:11 91:19
    92:16 105:11
    111:25 113:17
    114:16 123:15
Government 15:17
    28:4
governor 94:23,24
    103:10,11,12
governor's 103:15
    124:8
graded 41:23
grass 33:11
Gray 160:5

great 12:11 35:5
    54:18
greatest 39:16
grew 18:10
Grill 96:10,13
ground 10:20 96:24
grounds 33:7 52:13
    58:10 117:9
group 10:10 29:2,4
    32:12 148:13
groups 155:10
growth 84:18
guess 13:1 35:1
    41:24 159:6
guidance 41:1,8,11
    59:2 71:18 132:10
    143:2
Guide 27:12,18 28:18
    43:1,2,11,14,19,20
    44:16 44:16,18
    45:15,22 46:5,10,
    12,23 47:2,4,5,15,
    17,22 48:4,5,9
    49:24 50:1
guidebook 28:14,20
    46:19 150:18,20
    151:5 152:24 153:6,
    8
guided 25:13
guidelines 149:17
Guides 48:21 49:12,
    14,19 50:9,10
guy 8:16

## H

hadn't 144:3,20
    152:18,19
half 111:25 150:11
Hall 135:24 137:2,9
halls 96:13
hallway 96:10 133:4
hand 27:12 50:11
    139:16,19
handed 17:1 23:11
    100:13 125:2,11
    129:13 133:6
handful 147:7
handing 23:21 24:11
handled 111:15

handling 157:23
handout 23:12
hands 26:22 29:6
  50:6,9
handwritten 69:22
  135:15,16 150:11
handy 162:17
hang 125:22 142:5
  150:23
hanger 22:10
hangers 21:24
hanging 21:20
happen 99:9
happened 71:4 111:12
  158:19
happening 8:5 39:14
  94:5 158:16
happens 134:23
hard 46:2
Harris 7:18 15:10,15,
  17,25 18:3,5,8
  19:7,10,15 20:15
  23:9 25:4,17,20,21
  26:10 27:11,15
  28:4 30:12,22
  31:10,25 32:1 37:9
  39:22 44:1,24
  45:10 46:20 48:11,
  12 50:19 51:23
  52:8,16 53:1 58:23
  59:16,19 61:12,17,
  22,24 62:5 63:8
  69:6 75:20 84:19
  89:19 92:23 102:5
  106:3 110:25 111:8
  114:11 120:8
  126:17 127:4,7,10
  132:1,7 133:19
  135:25 136:6,11
  142:1,8,15 144:25
  145:1 147:10,17
  151:13,15 154:16
  156:1,3,19 160:21
  162:22 163:3,17
  165:2,25 166:4,8,
  15,19,25
harvesting 84:19,24
  85:15 89:19 91:23
  92:9,15 93:7,15,18
  94:2,8 97:4 101:18

110:13 114:23
116:1 117:19,24
122:2,5 129:1,18
131:7 138:2 139:3
has 10:11 17:1 17:1
  26:24 28:4 29:16
  32:22 33:20,21
  35:16 39:22 44:1
  46:20 52:2 55:5
  56:23 61:2,25 62:6
  69:1 70:1,2 79:9
  96:19 102:5 125:2,
  3,10,11 127:1,5,5,
  15,17 128:2 129:12,
  13 133:5,6 146:19
  148:14 151:23,24
  160:21 166:22,23,
  24 167:19 168:12
hasn't 127:3,10,13
  165:19 165:19
  166:23
Haul 7:15 147:6
haven't 68:3 116:25
  141:1 145:17
Having 9:6,15 80:7
  87:18,23 89:13
  101:23 102:1 103:3,
  11 111:4 119:12,16
  125:24 129:10
  139:6,14 144:25
  166:19
head 12:17 124:4
headphones 65:23
headquarters 64:5,7
hear 12:14 17:23
  53:19 54:12,13,23
  55:23 56:23 57:7
  84:21 88:13 108:22
  144:24 145:4 162:4
heard 10:9 11:22
  74:11 111:17
  130:14 134:7
  137:13 144:23
  145:2 168:7
hearing 30:15 36:11
  54:17,19 76:13,17
  95:23 99:25 111:23
  123:11 139:14
  144:18
hearings 95:19,23

97:8 105:11
hears 133:17
he'd 167:20
hedged 137:9
help 62:3 116:15
  134:1 144:9 158:3,
  22 159:4
helped 67:6,10
helping 155:5
Here 8:8,17 11:13
  12:4 31:16 38:12
  39:18 46:24 48:12
  50:1 70:21 78:21
  103:20 125:20,24
  135:5 161:1 161:1,
  2,7 162:25
here's 110:24 110:24
herself 53:14 74:4
he's 44:13 103:21
  114:9 140:19,22,25
  165:18
hey 102:4
high 18:14,16
himself 53:14
Hiram 160:6
Hispanic 13:15
history 35:20 155:13,
  17,18 158:1
hold 19:14,24 63:23
  64:4,6 104:3 162:2
  168:10
holding 146:9 161:12
holes 83:20
Holmes 7:15 147:6
  162:11
home 28:20,21 48:5
  69:18
homeowners 20:2
homes 20:11
hop 31:15 70:20
hostage 11:13 103:20
hosted 32:1 153:24
hour 16:15 26:22
  27:7 86:20 87:23
  104:12 111:25
  116:7 119:13 120:8
  150:11
hours 16:15 107:15
  111:3,4 137:17
house 22:3 22:3

30:15,24 31:11,12,
  13 37:5 76:7 82:13
  105:17 134:7
Houston 120:17
however 11:24 142:6
Hubbard 151:17
Hughes 76:4 133:12,
  13 141:2,4
hypothetical 58:21

### I

I'd 18:1 123:18
  137:22 150:13
  164:2,6 165:20
  168:22
idea 49:17,22 79:15
  120:4 121:4 136:20
ideas 120:10
identify 125:12
  135:20 136:1,7
  167:8
identities 138:8
identity 109:14
ignored 116:22
I'll 10:12 17:5
  35:11 66:20 94:22
  115:21 115:21
  117:3 117:3 118:1
  123:18 126:2
  161:16 166:1 167:7
  168:19
illness 11:8
illustrations 47:25
I'm 7:17 8:16 10:9,
  19 12:25 13:18
  14:16 16:20 19:12,
  13 24:8 25:15
  27:24 31:3,19 32:5
  33:5 37:3 38:10
  38:10,11,19 39:19,
  25 41:24 42:18
  43:21 45:1,12 46:6,
  16 50:1,14,21
  52:12 58:6,7 61:13
  63:4 70:21 71:2
  75:3 77:3,25 78:6,
  24,24 79:14,16
  80:7 81:5 84:3
  85:6,18 86:4 92:18,

24 95:10 97:24
  99:1 100:9 102:1
  103:17 104:14,25
  105:11 106:10
  111:16 111:16
  114:13 117:8 120:7
  122:21 124:19
  132:15 135:19
  140:10 145:23,24
  146:5 149:15 160:6
  160:6 164:9 167:23
Immediately 111:10
impact 152:21
impede 88:23
important 10:23
imposing 110:20
impossible 37:20
improperly 79:10
improvements 138:20
inability 65:7
incident 69:5
incidents 68:16
include 8:17 15:24
  16:2,5 25:8 30:24
  90:18 94:9 102:7
  108:18 150:17
included 90:1 128:25
  150:17
includes 67:2 162:20
including 106:15
  118:22 127:9
incorporate 98:23
increase 90:16
increased 88:22
  89:12
incredible 111:13
incumbent 166:21
independently
  149:16,19
index 37:1
individual 71:22
  112:8 168:1
individually 168:3
individuals 38:4
  49:15 61:18 90:9
  109:18 110:1
  119:21
ineligible 85:7
  118:23
influence 99:12

Informal 32:15
information 22:21
  33:13 37:12,16,19
  52:24 56:25 80:23
  81:7 82:7,24 83:3,
  19 86:12 90:9 91:6
  94:3 102:7,13
  107:3 109:17 119:3
  121:16 143:14
  145:15 158:15
informing 42:6
infractions 87:5,14
Ingram 101:24 102:13,
  15,20 122:18,24
  123:7 124:22 125:5
  126:8 153:13
  156:20
initial 76:11
initiate 139:15
initiated 96:22
  138:14
initiating 128:18
initiative 80:23
  81:8 82:7,8
input 113:12
inquires 33:7 82:9,
  22
inquiries 82:8 83:18
inquiry 78:9 80:2,12
  93:20 97:5
inside 86:17 107:12
  108:9 134:14
insight 62:25
inspect 54:1 55:5,9
instance 70:4,18
  71:11 72:21
instances 65:9 67:5,
  9 68:14,21 69:14
  70:5,19 74:16
instruct 39:25 44:3
  46:17 51:7,19
  52:19 58:8 70:8,10
  78:9,12 79:23
  150:21
instructed 55:19
  59:7,10 68:18
  71:11
instructing 79:3,17
instruction 12:12
  45:7,8 51:9,21

52:21 54:12 117:13
118:7,16
**instructions** 12:3
55:16,21,24 56:1
58:12 66:2
**instructs** 11:24
**integrity** 19:18 25:6
30:8 31:13 32:7
63:1 94:20,25 95:7
96:14 105:14
154:15 163:14
**intended** 92:11
110:15
**intent** 53:1
**interact** 61:15
132:13 141:14
**interacted** 65:25
**interacting** 56:17
**interaction** 22:13
81:13 92:1,10
93:16 94:9 110:14
131:8 138:3 139:4,
20 141:10
**interactions** 97:8
132:20
**intercepting** 73:20
**interchangeably**
13:11
**interested** 75:11
**interesting** 50:2
**interject** 39:18 58:8
**internal** 52:16 163:7,
10,13,21 165:2
**internally** 163:3
**interpreting** 65:20
**intervals** 63:23
**intervener** 165:25
**interveners** 165:15
166:22
**Intervenor** 7:24
**interviewed** 33:14
**into** 10:19 27:5 33:6
34:7 48:19 62:25
67:25 71:3 73:21
81:6 91:19 99:2,7
111:25 112:11
142:21 148:13
**introduce** 10:9
**introduced** 10:12
22:10 89:4,10 90:7

95:12 96:1,3
105:10
**introduction** 14:1
75:5 90:15 91:3
94:1,13
**invalid** 79:15
**investigating** 92:21
**invited** 135:6
**invocation** 146:3
161:13
**involve** 57:12
**involved** 15:22 24:10
31:18 34:22 37:10
79:16 93:14 128:16
141:13
**involvement** 19:7
24:14 129:4
**involving** 139:4
**isn't** 53:21 144:13
**issue** 22:20,24 23:5
55:20 69:4 69:4,7
70:12 71:12 74:8
80:6 85:25 86:2
91:17 97:4 102:5
110:4 139:1 143:22
**issued** 167:25
**issues** 42:10 47:6
65:10 75:12,22
77:11,13,17 82:11
83:21 84:2,10,12,
23 85:25 92:23
111:12 122:25
132:2,21 146:2,13,
16,17 158:11
163:14
**item** 140:15
**items** 30:13
**iterations** 44:19
**it's** 8:5 9:13 10:23
12:11 13:6 26:9,24
27:20 28:25 28:25
28:25 29:4,10
33:17 35:21 36:22
37:20 38:8,11,16
42:3 43:5 49:18
53:18 54:18 55:9
58:5 60:5,6 64:2
75:10 78:18,19,19,
20 79:25 81:17
85:19 97:22 98:13

111:5 122:11 124:1
126:25 127:14,22
132:4 135:21 138:4
144:5,11,14 146:18
150:5 153:24 156:6,
9 159:1 166:24
168:5
**its** 51:24 61:7 78:4
92:8
**itself** 47:3,7
**I've** 24:3 33:17 37:4
50:7 54:9 65:16
66:19 123:15,16
138:17 139:13
167:21 168:7

---

**J**

---

**Jacey** 113:14 114:6
130:6
**jail** 110:7 122:11
**January** 45:14 46:6
48:18 77:15,20
82:15 92:21 95:20
100:13
**jargon** 13:18
**Jennifer** 7:15 147:6
**Jetton** 113:15 114:6,
15 129:17,23 130:6,
12,17,23 131:5,13
162:21
**Jetton's** 128:25
**job** 12:11 31:16 35:5
**John** 7:23 14:4 16:20
16:20
**join** 33:11 149:12
**Jones** 16:18
**judge** 11:3 20:18,23
57:14 57:14 64:16
70:12 71:19 73:5
87:3 88:23 108:4
120:20 120:20
158:20,21,24 159:3,
4
**judges** 84:20 87:12
89:2 108:1 158:2
158:2 159:9 160:23
**judgment** 68:9
**June** 77:10,11,20
**jury** 86:7 107:7

119:9
**just** 8:3,5,24 10:12,
21 11:22 19:13
20:9 22:15 25:15
29:5,11 31:5,7,15,
16,21 32:5 38:12
39:17 43:24 44:20
45:2,3 46:16 48:15
50:16,23 58:7 66:2
68:6 74:2 76:23
77:2,8,13 79:13,25
84:8,15 85:6 92:18
98:12 101:8 103:25
104:3,14 117:1
120:7 122:22
123:19 131:21
134:20 135:12
141:7 142:11
143:14,15 144:15
146:7 147:7 148:9
151:3 152:20
161:16 164:7,16
165:14,20 167:4,7,
17,22 168:13

**K**

**keep** 45:3 146:12
150:21,22 151:3,5
**keeper** 155:4
**keeping** 131:21
**keeps** 35:24
**Keith** 101:24 102:13,
15,20 122:18,24
123:7,15 125:5
152:7,10 153:13
156:20
**Ken** 150:2
**kept** 128:7
**key** 38:13 55:19
**kid** 70:21
**kind** 22:4 27:7 93:10
98:23 105:18 111:4
113:3 120:15
137:20 140:22
147:7 152:13 155:5
158:4 167:2
**kinds** 27:9 75:21
165:4
**knock** 22:7 60:15

**knocked** 22:8
**knocking** 60:23 61:2
**know** 13:12 14:11,18,
18 20:1,2 24:5,7
29:11 30:9 31:7
35:12,15,24 36:1
37:16 42:15 43:8
44:21 48:11,13
49:2,7 54:4 59:19,
21 60:9,12,15,19,
22,22,25 61:1 61:1,
4,5,5,6,9,17,23,24
62:3 71:21,24
72:12,15 73:23
74:14 75:7 78:22
79:13 84:13,18,19
87:11,14,17,22
88:5 89:7,9 90:3,
12 91:8,10,13,19
92:7,13 95:17
102:15,23,25 104:7,
17 106:22 113:13
115:17,19 120:4,10
121:3,7,25,25
122:4,8,9,14
123:18 125:19,21
126:13 129:11
130:4,21 132:4,18,
23 136:18 137:12
138:5,24 140:9,10,
18,24 144:5,6,6
145:15 150:9 151:2
152:19 158:18,19
165:21 167:4 168:5
**knowing** 76:24
**knowledge** 122:3
139:19 140:4
**known** 105:6

**L**

**lack** 103:8
**ladies** 74:13,14
**lady** 74:12
**language** 55:10 59:4,
13 65:3,23 66:3,4
83:8,11,13,14,24
87:14,18,23 89:7,8
90:4,13 91:19 92:8
97:1,10 98:3 101:1,

17 102:21 108:7,19
109:11,22 112:21
113:12 114:4,20
115:2,4,7,18,22,25
116:3,6,9,19
119:20 120:2,14,15,
20,22 121:4,7
122:2,4 129:1
139:3 140:13
**languages** 120:24
**laptop** 28:7 29:22
**large** 14:24
**largely** 9:14
**last** 16:13 20:7
25:11 26:2 36:2
38:14 62:10 70:7,
13
**later** 13:4 86:4
97:17
**Latino** 13:15
**latitude** 39:19
**Laughing** 99:21
**Laughter** 16:21 17:18
38:15 42:20 44:8
66:12 133:4 135:18
140:23 161:25
**law** 85:8 118:24
134:12
**lawyer** 14:19 14:19
44:22,23 45:9 45:9
45:9
**lawyers** 14:13 31:20
79:18
**laying** 11:16
**layout** 142:22
**lead** 75:9
**leader** 33:21
**leading** 75:4 86:15
106:12 108:25
109:7,10,16,20,24
110:5,11,18 112:6
119:24 164:8,10,13
**learn** 35:13
**least** 24:18 93:12,24
104:12 125:4
138:24 155:19
162:3 167:12
**leave** 17:6 21:20
50:12 50:12 100:9
146:1 167:2

**left** 22:9 37:21
  38:13 138:8
**legal** 34:12
**Legg** 76:14,16 98:25
**legislation** 25:12,14
  30:8 31:14 32:8
  34:5 75:16 77:6
  94:20,25 95:8
  114:12 141:17
**legislative** 27:21
  31:19 33:7 33:7,24
  69:5 75:10,15
  76:25 77:2 78:7,9
  79:22 80:2,11,12
  95:13 96:6,19 97:9
  98:1 99:17 100:5
  112:5 117:9 128:12
  132:2,9 140:12
  146:4,20 149:13,25
  161:14 163:7
**legislator** 33:2
  78:20 80:2 93:20
  97:5,25 101:20
  115:14 129:9
  139:25 140:7
**legislators** 30:22,23
  79:24 80:11,22
  81:2,7,9,23 82:2,5,
  23 83:18 84:2,9
  85:23,24 86:16,19,
  23 87:3 90:8,16
  91:25 94:15 95:13
  96:5,18,22 97:9
  99:17 100:5 107:10,
  14,18 108:18 109:1,
  21,25 110:6,12,19
  111:8,11,17,18
  112:8,14,17,20
  113:3 117:14,18,23
  118:2,8,12,18
  119:2,7,12,16,20
  128:12,18 132:1,13
  134:3 138:12 139:7,
  10 149:13
**legislature** 16:3
  33:22,23 34:11
  35:15 36:3 108:12
  111:7 132:20 138:1
**legislature's** 105:5
  106:13

**legislatures** 106:23
  112:5
**length** 63:20 111:22
**lengthened** 91:11
**less** 163:25 164:2,3,
  6,23 165:3
**let** 12:7,8 14:18
  22:15 30:3 31:7,15
  39:17 39:17 43:24
  44:17 45:24 46:9
  50:16 58:14 66:16
  70:20 70:20 72:16,
  17 78:23,24 80:14
  81:20 83:14,15
  92:7 92:7 95:17
  104:3 112:3 122:22
  124:12,19 126:13
  132:6,19 141:7
  148:6 159:16
**let's** 9:8 31:10
  38:25 42:13 48:3
  49:24 54:18 73:16
  78:14 78:14 89:21
  141:5
**letter** 26:18
**letting** 45:21
**license** 90:1 143:16
**life** 101:2 115:5
**like** 9:16 12:17 18:1
  20:3 28:10 29:24
  30:9 31:19 37:1
  43:8 48:1 61:7
  67:3,20 68:22
  90:25 93:17 98:7
  102:16 103:21,23
  121:16 123:17
  129:20 130:2 131:5,
  17,19,23 133:13
  135:23 142:20
  146:25 150:13
  156:10 165:21
  167:20,21 168:17,
  22
**liked** 34:15
**likely** 164:1,2,3,6,
  23 165:3
**likewise** 161:10
**limit** 87:3
**limits** 53:13
**line** 80:17 132:16

  135:8
**lines** 93:25
**link** 37:10
**list** 30:7,20 32:24,
  25 36:2 60:14
  85:19,20,24 86:18,
  21 87:1 90:19
**lists** 30:13,16,17
  60:19 107:7 119:8
**literature** 23:11,13
**litigation** 8:1 15:11
  45:2 164:22
**little** 13:5 28:10
  68:2 80:17 83:10
**live** 18:2 58:22
  160:25
**lived** 18:5 144:8
**lobby** 64:6
**local** 21:8 111:11
  140:25
**locally** 111:16
**located** 107:11
**location** 23:24 51:4
  53:24 157:19
  158:19,20,25
  159:19 159:19
**locations** 157:2,14,
  25 159:6,8,9
  160:10 162:15
**locking** 73:21
**log** 126:25 166:9
**lonely** 150:5
**long** 16:12 18:5
  41:22 42:14 43:8
  85:19 99:24,25
  115:20 124:12
  132:16 138:5
  144:22 147:9
  149:16
**look** 17:4 45:19
  96:25 100:23
  114:25 115:18
  126:1 142:7 158:21
  161:24 167:10
**looked** 29:24
**looking** 53:21 67:25
**looks** 50:2 129:20
  130:2 131:17,19,23
  133:13 135:23
**loopholes** 32:10,19

**lot** 73:19,20 74:10
102:16,19 104:2
132:15 152:20
**lots** 84:12,13
**loud** 12:13
**louder** 133:3
**Louis** 133:15
**love** 123:18
**Loyola** 18:20
**lunch** 103:18 104:15,
17
**luncheon** 32:1,4,7,9
**Lupe** 7:12 8:20 10:11

**M**

**ma'am** 13:24 18:13,15
20:20 21:3 23:16
24:17 30:1 31:1
49:10 90:14 130:16
161:8
**machines** 86:24
107:19
**made** 49:14 54:11
80:1 96:16 108:14
127:1 134:18
138:12 142:19
147:15 151:24
157:5,7,13,15
158:23 166:8
**mail** 13:20 61:3 61:3
66:22,25 84:19,24
85:15 89:5,11,12,
16,19 90:5,24,25
91:2,4,5,17 94:11
100:12 109:8,12
110:1 116:20 118:4,
9 119:17 120:9
121:6,10,15 138:8
139:3,8,21 142:7,
12 143:4,7,10,11
144:1 148:15
**mailers** 142:7,20,21
**mailing** 93:1
**main** 69:11 160:23
**maintaining** 127:8
**maintenance** 85:24
**major** 84:23 158:11
**make** 11:20 12:13
13:13 28:16 29:12

31:21 46:4 51:16
54:24 55:18 56:6,
20 57:11 71:20
72:24 79:7 86:4
97:15 98:5 109:1
157:3,22 165:3
**makes** 91:15 103:24
**making** 23:23 31:6
32:13 38:17 56:2
57:3 72:10 88:2
96:1 103:24 126:5
139:7
**male** 90:25
**managed** 156:13
**mandatory** 141:25
**manner** 51:16 56:20
57:10
**manual** 41:16 42:13
**many** 15:22 21:18
26:15 32:25 41:21
42:14 44:19 48:8,
25 63:7 68:9 76:9
95:17 106:4 106:4,
5 111:16 113:1
137:11 138:22
143:25 160:7
**marching** 132:14
**mark** 17:2 45:13,16
100:7 124:25
135:20
**marked** 16:24 17:1
45:17 125:3,7,11,
13 129:13,19 133:6,
9 135:3,22 136:3,8
**Marketing** 19:5
**Marshals** 134:11
**match** 143:24 145:1
**material** 23:22 24:12
**materials** 27:7,9
124:5 142:15
150:17
**matter** 14:14 47:16
**max** 113:7
**May** 21:8 33:9 46:18
50:22 51:1,3 55:11
71:15,16 80:5
81:19,20 88:10
89:23 93:16 94:2
96:16 99:18 108:19
131:17 133:7 134:4

137:12 152:17
156:9 161:7
**maybe** 8:10 20:1
21:18 23:23 33:3
43:18 49:15,19
60:7 76:13 77:4
78:19 98:23 115:21
130:22 140:6
168:16
**McFarland** 130:4,5
**mean** 13:15 25:16
28:15 32:19 34:17
48:1,14 55:1 66:6
78:13,17 101:1
127:13 152:9
164:13 167:21
**meaning** 78:3 141:19
149:6
**means** 32:20 53:8,9
55:17 66:7 82:19
96:15,17
**meant** 139:12
**measure** 92:4,12
122:7 158:11
**mechanical** 142:22
**meet** 16:8 77:22,23
**meeting** 16:10,13
64:2 96:5 99:24
132:8
**meetings** 30:19 63:23
64:4,6 82:1,11,17
95:13,16 96:4,7,8,
11
**member** 49:23 66:14
149:23
**members** 16:2 20:4
26:19 31:10 63:10,
11,12,13,17 64:11
67:2 76:7 77:22,25
82:14 84:17 96:10
132:20 133:16
147:16,19 148:2,9,
23,23,24 149:11,20
162:22
**membership** 19:14,20,
24
**memo** 100:7
**Memorial** 105:3
**memorized** 148:22
149:9

memory 93:12,21
mention 24:13 27:14
   28:14,23 55:3
   83:25 117:3
mentioned 15:19
   24:10 25:15,25
   30:22 32:24 40:8,
   11 41:16,20 64:11
   71:4 84:18,20 86:3
   95:12 97:14 100:2
   103:20 105:8
   110:23 129:21
   130:7 159:13,17
mess 139:2 152:13
message 60:17
met 31:11 77:18
   83:14 114:7 147:5
   159:15
Microsoft 128:7
   129:6
might 9:21 12:23
   13:3,11 31:18
   43:20 62:12 94:4
   96:9,12 97:2,15,25
   98:1,5 115:7,10
   121:23 124:9
   136:23 163:25
   164:4,18 168:2
Mike 75:25 113:23
mind 22:18,20,23
   63:7 116:24
mine 43:16
minute 38:25 74:22
   78:15 145:8 161:7
minutes 32:9,17 37:4,
   5
misconstrued 115:8
Misdemeanor 88:3,18,
   20 108:14 109:2
misheard 154:8
misinterpreted
   115:8
mix 77:24
mixture 60:4
moment 11:22 15:19
   45:18 55:3 117:1
   129:16
monitor 25:20
Monthly 63:24
months 33:15 150:23

152:14
Moody 73:19 73:19
   159:13,18,21
Moore 150:2,6
more 13:4,6 19:12
   33:1 39:8 42:16,22
   43:5,16 70:2,3
   75:11 76:20 83:1
   92:10 111:5 113:6
   115:21 128:7 133:3,
   13 135:1 155:10
   158:6,8,23 160:25
   161:1 164:14,16
   165:14 167:4,5,7
morning 7:11,14,17,
   23 10:7,8 14:1
   136:15
most 22:16 27:1,3
   57:13 69:23 76:13
   83:1 115:14,17
   150:2 158:3 166:25
mostly 77:9
move 53:11 56:13
   57:15 159:9
moveable 116:10
movement 51:3 53:7,9
   88:11 108:20
moving 98:24 101:21
   103:2
much 34:7 42:23 43:5,
   10 99:12 104:4
   117:2 141:1,13
Multi 160:5
multiple 60:1,6 70:5,
   19
Murrell 130:19
Murrell's 105:17
must 77:4
myself 9:10 10:9
   38:19

**N**

nail 50:16
name 7:11,14,25
   34:25 37:12,21
   60:16 68:2 93:6
   120:7 132:5 151:16
namely 90:17 94:17
names 21:25 26:10

37:23 57:25 58:16,
   25 75:24 86:7
   113:11 121:12,20
   140:17,18 148:1,22
   149:9,23 155:11,12
name's 147:6
nationally 154:15
natural 104:6
nature 143:8 164:8
near 88:12 108:21
necessarily 93:14
   127:13
need 11:10,14 30:14
   31:8 54:23 55:14
   64:19 68:7 89:14
   139:11 158:3
   168:13,18,19
needed 64:14 65:19
   68:11 69:20 75:22
   77:13 83:20,21
needs 32:23
neighborhood 20:2
   21:20 23:14
neighborhoods 26:20
neighbors 67:3
neither 148:25
Network 19:19
never 26:24 59:5
   61:21 65:12 70:10
   104:18 157:21
   167:14
new 8:16 18:21 20:11
   20:11 70:21 109:17
   121:22 123:14
   126:2 127:3,9
   141:17,23 143:7
   152:18 152:18
news 26:17
next 12:9,12 30:7
   65:5 94:22 104:7,8
   118:1 124:25
   157:22 158:21
Nielsen 152:7,11
Nina 7:12 10:10
   44:20 103:16
nine 148:23
nobody 8:4
nods 12:17
None 19:22 20:14
   64:23

non-objectionable
    81:6
nonpartisan 154:13
non-party 167:23
nonpermanent 111:6
nonprofit 154:13
nonresidence 86:8
    107:8 119:9
non-voters 121:9
non-voting 63:11,17
nonvoting 148:24
Nope 99:10 139:18
    145:21 145:21
    150:5 151:22
nor 132:5
normal 112:23
normally 58:2 102:18
note 86:4 134:8
    135:14
noted 69:24
notes 37:6 67:18
    69:12,13,17 75:23
    135:12 135:12,17
    150:9
nothing 31:6 106:1
    125:23
notice 17:12,15,24
noticed 37:8
notices 26:17
November 18:6 48:15,
    17 70:14,22 71:8,
    10,16 73:18 76:22,
    24 138:22
now 9:9,13 11:1,20
    12:16,20,23 13:3,
    13 17:5 24:9 26:9
    27:24 28:23 36:2
    46:9 50:21 52:2
    55:5 56:16 66:20
    68:1,13 69:17 71:1
    72:2 77:8 86:15
    88:8 91:14 93:11
    95:10,11 101:21
    103:17 105:7
    106:15,22 107:22
    108:11 117:3,5,17
    121:8 127:12
    130:21 141:24
    143:14 156:7,9
    159:17 160:7 162:2

number 34:23,24
    38:14 93:8 99:7
    106:9 106:9 118:3
    121:5,17 140:11
    143:15,16,19,22,24
    144:1,4,13,20,21,
    25,25 158:6,9
numbers 89:13,14
    90:4 109:12 116:20
    143:22
numerical 54:7

O

oath 10:21 11:1,4
    90:18 91:11 109:22
object 33:5 52:12
    78:6 117:8 146:9
    164:7
objection 9:11,13,17,
    21 11:23 34:10
    39:18 43:25 46:17
    49:16,21 51:6,18
    58:8 117:20 118:5,
    14 146:23 161:16
    166:11
objections 9:14
    11:21,22 50:23
    79:6 92:17
obligations 166:16
    168:6
observation 51:16
    56:7,20 57:11
    148:16 148:16
observe 25:19 53:12
    55:11 87:9 87:9
observed 51:15 57:10
    108:3,22 109:5
    120:23 121:1
obstruct 51:14 56:6,
    19 88:19 109:3
obstructed 52:4,11
    138:19
obstruction 84:25
obviously 146:9
    168:4
occasion 65:18
Occasionally 36:18
occasions 22:2 97:13
occupation 19:1

occur 111:4
occurred 120:8
    144:12
occurring 51:4 88:11
    108:20,21
October 27:3 154:22
    156:9
off 38:10,19 39:2,4
    53:13 74:23,25
    104:19,21 131:16
    145:9,11 165:13
    166:9 168:19,24
offense 56:12 91:15
    139:7
offer 91:15 99:22
    151:10 152:25
offered 43:20 124:4
offering 143:2
offers 110:8 122:12
Office 7:21 14:8
    64:23 85:13 94:18,
    19,22,24 95:4,5
    101:25 102:10
    103:2,4,7,10,11,15
    122:16,24 123:3
    124:8,23 135:24
    136:5,10 141:11
    152:17
officer 103:11
officers 131:24
    134:12
offices 77:16
official 7:19 51:13
    56:5 73:12,25
    92:11 109:3 167:10,
    11
officials 32:7 85:8
    106:24 107:11,15,
    19 108:13,18 109:1,
    21,25 110:19,20
off-limits 53:17
often 113:1
old 11:10 123:20
    129:7,8 143:25
older 35:25 129:7
once 37:20 50:12
    95:23 96:7 96:7
    97:8 99:19 106:4
    113:7
one 8:3 9:12 12:6

15:7,16 16:4,14,15
17:3,4,16,17 19:2
21:2 26:22 27:20
32:1 34:14,16
37:10 45:13 49:25
52:9 54:20,23
56:12 60:7 70:11
74:8,12 75:11
77:18,19,21,21,25
78:4 80:13 89:24
92:10 93:12 95:15
98:10 99:5,7,11
100:1 111:12
116:16 120:5 126:2
128:24 135:1
140:15 140:15,19,
19 144:25 147:19,
21 148:25 158:6
161:7 164:16
165:14 167:7
**ones** 9:14 48:13 49:4
87:17
**one's** 124:10
**online** 26:18,24 46:2
46:2 156:5,6
**only** 8:19 9:19 11:15
12:6 34:2,3 45:13
48:22,24 50:6
52:16,24 55:23
60:7,11 65:22
69:12 95:20 97:16
100:1,19 107:12
108:23 109:6 113:7
127:24 137:8
140:19 141:8,20
142:2 146:12
146:12 150:7
160:13 165:24
166:3
**onto** 150:23
**open** 33:16 68:1
134:23 146:1,9,12
161:12 168:10
**opened** 42:5
**opening** 76:16 95:14
**opens** 76:22
**Opiela** 140:19
**opinion** 160:11
**oppose** 132:12
**opposed** 43:7 94:4

108:9
**opposite** 42:10
**option** 37:22
**oral** 28:25
**orange** 17:5,6
**order** 54:5 66:10
89:14 146:1 168:17,
18
**orders** 132:15
**organization** 19:18,
21 154:14
**organizations** 19:15,
25 20:12 26:16
**organize** 59:22,24
**organized** 59:15
61:12 148:13
**organizing** 152:15
**origin** 140:5
**original** 27:20 49:15,
20 108:7 139:24
144:21
**originally** 18:7
**Orleans** 18:21
**other** 8:7 11:8 12:5
14:13 15:18 19:15,
20,20,24 20:12
21:1 22:2,15 23:23
24:2 31:20 31:20
41:12 48:23 49:14
53:12 56:10,17
59:4,13 61:7 73:10
74:3,18 76:2 79:18
85:25 102:12
106:24 107:11,14,
18 108:12,18 109:1,
21,25 110:19 124:6,
13 140:4 142:4
145:18 148:1,25
149:10 155:21
156:19
**others** 30:20 78:1
110:6,12 121:12
131:18 132:15
138:7 139:15
147:22,24 149:8
167:13
**otherwise** 164:22
**ought** 121:16
**ourselves** 12:1 22:10
**out** 11:16,25 12:13

21:17 23:11,21,25
24:11 26:19 29:5,
12 32:11 37:4
38:13 42:18 47:21
52:17 55:16,20
61:7 70:9 84:11
89:24 96:9 98:23
100:11,13 101:1,16
104:15 115:5 142:9
153:11 155:5 156:7
158:16 159:4
**outcome** 139:22
**Outlook** 35:23,24,24
128:7 129:6
**outreach** 84:8 142:11,
14
**outside** 61:25 62:6,8,
22 73:19 94:3
126:16 127:4,10
156:18 167:16
**over** 12:5 28:2 30:21
35:21 46:19 60:23
96:15,16 103:25
105:3 106:10 128:3
129:2 142:9,17
144:15 161:13
164:22 165:20
166:4
**overhear** 72:4
**overlap** 81:14
**own** 25:22 54:2 65:17
69:12 78:17 111:11
128:20
**owned** 28:3,6

**P**

**p.m** 104:20,23 107:16
145:10,13 168:24
**page** 38:11,14 42:1,
10 62:17
**pages** 37:16 41:22,25
42:10,14 43:8
46:11
**paid** 26:7 28:17 38:1,
6 139:8 143:6
144:18 152:19
156:14
**paper** 37:2 60:14
**paperwork** 89:21

**paragraph** 153:21
**Park** 159:18,21
**parking** 73:19 74:9
**part** 25:23 37:13
    51:2 91:22 93:12
    109:13 114:8
    120:25 123:14
    128:16 129:3
    130:22 137:25
    138:10 141:15
    154:16 157:1 161:2,
    3,4,6
**participants** 8:17
**particular** 41:9
    62:13,21 71:25
    72:12,21 74:12
    92:3 111:9 122:6
    139:22 140:6,7
    157:2 158:24
**parties** 7:8 8:1
    31:21 78:21 78:21
**partisan** 160:19
**partly** 84:22 125:4
**parts** 41:13 116:24
**Party** 15:10,15,25
    19:8,10 23:10
    25:12,18,21 26:2,5,
    8,17 27:11 28:17
    31:25 37:9,11,20,
    25 39:22 44:1,24
    45:2,10 46:20
    48:11,22 50:19
    51:24 52:8,16 53:2
    59:17,20 61:5,6,12,
    18,22,25 62:6 63:9,
    14 64:4,7 126:17
    127:4,7,11 132:1,8
    133:20 135:25
    136:6,11 137:23
    140:6 142:1,8,12,
    15 143:5 144:19
    145:4 147:11,18,21
    151:12,14,15 152:5,
    6,10,10,15,16
    153:1 154:17
    156:10,14,19 157:3,
    5,8,16 160:22
    162:22 163:3,18
    165:3 166:1,5,8
    167:22
**Party's** 69:7 166:16
**Paso** 18:11,12 66:5
**pass** 123:12 145:23
    146:5 161:11
**passage** 82:19 105:4,
    6 106:13 108:13,25
    109:7,11,17,20,24
    110:5,12,18 119:25
    121:3 129:25
**passed** 126:6 134:6
    138:1,10 155:4
    168:15
**passes** 132:10
**passing** 122:3 123:12
**password** 156:11
**past** 34:6 48:9 74:19
**paste** 47:21
**patience** 162:7
**Patrick** 23:11
**Paul** 76:1 133:15
**pays** 63:25
**Penal** 87:6 108:3
**penalties** 10:22
    88:22 93:10
**penalty** 89:1 110:20
**people** 15:23,24
    26:20 29:5,6,12
    33:14 38:7 50:7,9
    59:22,24 62:2 63:7
    73:18 74:9 75:24
    85:12 93:2 94:14
    96:13 113:11,17
    119:21 121:20
    132:5 134:22 138:7
    145:2 149:1,5,6
    153:1 160:25 161:1,
    20 162:2
**per** 113:2
**Perales** 7:12 10:10
    58:21 161:11
**perceived** 115:11
**percent** 113:16
**percolate** 13:5
**perform** 54:5
**performance** 52:4
**performing** 89:3
**perhaps** 8:20 9:20
    16:23 79:8 80:17
**period** 21:2 39:10
    40:14,15 77:2
**94**:12 95:11 105:1
    106:19 108:6,13,17,
    24 112:5,7,17
    119:24 124:8 143:9,
    19 154:19
**permanent** 87:19
    111:5
**permission** 127:6
**person** 26:22,25
    37:21 59:12 61:19
    64:14 65:12 75:19
    81:24 82:17 91:16
    92:1,3,9 93:16
    97:4,22,23 110:7,8,
    14 122:5,12,13
    129:17 131:8 138:3
    139:8,20 150:3
    155:10 156:8,12
**personal** 44:22 95:16
    101:18 139:4
    167:16
**personally** 23:1
    26:21 28:15 50:11
    50:11 59:10 64:13
    67:12 70:10 77:22
    108:3 109:9
**person's** 60:16
**persons** 91:4 151:16
**perspective** 83:20
    102:8
**perspectives** 100:6
**phone** 23:24 40:25
    60:15 77:9,20
    81:24 88:25 89:18,
    24 96:20 97:20
    131:4
**photo** 28:16
**photocopy** 89:25
    125:14
**photos** 108:8
**phrase** 22:16
**physical** 55:1 65:8
    92:10 107:12
**physically** 48:22
    65:13 72:13
**pick** 50:1 63:3
    162:11
**pictures** 48:1
**piece** 37:1 47:16
    141:17 162:3

pin 19:14
place 20:19 39:14
    41:18 47:6,14,18,
    20 53:12 56:10,18
    57:14 59:13 61:20
    62:1,7,9,22 64:15
    65:13,21 66:20
    67:6,10 68:15,20
    69:25 70:16 73:20
    74:6 86:17 87:19
    90:17 108:9 120:3
    134:15 157:18,21
    158:24 160:2
placement 161:5
places 63:5 65:16
    107:11 116:10,11
    146:18 158:7 160:7
Plaintiffs 7:12 8:20
    10:10,11 147:7
    164:22 169:4
Plaintiff's 7:15
    166:21
plan 165:16
play 101:1 115:4
please 7:8 11:25
    12:13,21 67:8 99:1
    114:25 125:1 135:5
    153:11
plugged 83:21
point 13:7 20:9 31:6
    49:14 62:13 75:6
    96:17,19,21 99:5
    103:16 104:6
    105:10,21 107:24
    113:17 123:12
pointed 89:24
police 134:21
political 19:15,20,
    25 21:17 22:19
    23:4 23:4,8 26:16
poll 21:1,4,7,9 25:9
    26:11,13,17,20,21
    27:12,18,25 37:17,
    21,23 39:8,9,13,19
    40:5,11,13,17,18,
    24 41:4,13,18 43:1
    43:1 44:18 45:15
    46:5 47:6,7,17,18
    48:4,21 49:7,12
    50:15,18 51:1,2,11

53:2,7,9,11,24
54:9,16,19,20,22
55:4,11,13,18,24,
24 56:14,22 57:4,6,
8,21,24 58:3,24
59:2,5,6,9,11
67:13,17 68:17
70:11 71:11,12,18,
18 72:2,3,5,21
73:1,3,7,11,21
74:12 84:20,24
85:15 87:8 89:2
107:22 108:1,8
114:23 115:22
117:6,7,15 123:5,6,
13,25 124:4,16,18,
21 125:6,8,14,25
126:3,9,18,20,21,
22 127:16,17
138:19,20,24,25
141:22,23 142:1,2,
3 148:14 150:14,20
151:4,7 152:24
153:17 154:3,19
156:4,8,11,15,24
157:2,13,18,20,21,
22,25 158:3,22
159:3,10,11,20,22
160:3,11,13,14,18
161:2,24 162:12,14,
15 163:11
polling 20:19 39:14
41:18 47:6,13,20
53:12,24 54:10
56:10,18 57:14
59:12 61:20,25
62:7,8,22 63:5
64:15 65:13,20
66:20 67:6,10
68:15 69:25 70:16
73:19 74:6,7 86:17
87:19 90:17 107:11
108:9 116:10
116:10 120:3
134:14 157:2,14,19,
25 158:7,18,20,24
159:6,9,19 160:1,7,
10,22
Polls 28:22 119:21
160:13 161:5

pondering 72:9
poor 111:15 111:15
population 160:24
portion 51:12 122:9
    134:9
portions 47:12
    105:25 120:21,22
position 19:11 79:9
    134:14 166:21
positioned 134:17
positions 110:16
    167:5
possession 49:7
    151:3
possibility 49:13
possible 25:14 28:2,
    5 33:16 36:3 49:19
    132:4 137:19 144:5,
    6,11,14
post 40:14 85:13
posted 131:21 158:24
potential 37:23
    86:12 142:12
potentially 80:10
    101:9,11
power 104:18 151:20
PowerPoint 15:8
    27:10,14,16 28:8
    29:10,16,18 45:22
    46:22 48:3 49:8
    123:7,20,20 124:17,
    22 125:6 150:18
    151:7,10,18,24
    153:18,22 154:3
    155:1 156:18
PowerPoints 29:19
practical 79:17
practice 160:14
practices 120:8
pre-200 144:12
preceding 76:23
precinct 21:19 59:21,
    24 64:18 148:10
precincts 59:22,25
    106:4 158:7
predecessor 17:15
predecessor's 36:22
    78:4 98:13
predecessors 92:8
    150:1

**preference** 55:18
  56:2
**pre-filing** 106:18,19
**pre-HAVA** 144:9
**preliminary** 10:13
**preparation** 14:17
  31:24 55:12 56:9,
  11,15,16 69:5
  110:2
**prepare** 14:23 16:9
  30:18 70:23 77:5
**prepared** 35:4 49:13
  72:19 73:2,8 74:15
  126:19,22
**preparing** 55:16
  66:24
**pre-pre-session**
  104:8
**pre-SB** 40:14 123:21
**presence** 92:2,11
  94:3 110:15 122:6
  139:21
**present** 123:11 167:5
**presentation** 27:10,
  14 32:14,15 46:23
  123:16 152:8
**presentations** 15:8
**presenting** 89:13
**presiding** 20:23
  57:14 71:19 73:5
  87:3
**presume** 66:5
**pretty** 104:4 113:9
  115:19
**prevent** 11:7 89:2
  93:9
**prevented** 52:4,10
**preventing** 84:20
**previous** 129:21
  138:18
**previously** 40:8
  89:18
**primaries** 63:2
**primary** 30:11 48:16
  48:16 142:24 143:9,
  19 149:3 155:17,18,
  19,20,25 157:6
  159:24 160:9,12
**printed** 48:12,14,21
  49:8

**prior** 8:12 24:18
  25:9,25 34:4 75:14
  76:18,19 82:15
  83:25 85:1,12
  90:15 91:3,17
  93:25 94:13 140:11
  161:16 165:22
**priorities** 160:2,11
**prioritize** 159:19
**priority** 159:6,21,23
  162:14
**private** 53:5 71:22
  156:10
**privilege** 31:17,19
  33:8 39:24 44:2
  45:1 46:21 51:7,19
  52:13 78:7,17,18,
  20 79:3,5,10,11,13,
  15,22 117:9 126:24
  127:3,9,15,21,24,
  24 128:2 146:4
  146:4,10,13,16,17,
  20,21 161:14 163:2
  166:9
**privileged** 127:14
**privy** 139:23
**proactively** 100:20
**probably** 24:13 49:1
  69:21 77:24 95:12
  124:24 159:11
  167:18
**problem** 11:9 84:24,
  25 92:20 93:4
  115:10
**problems** 32:10,11
  83:3,8 84:20 92:24
  111:13,25
**procedure** 51:15
  57:10 109:5
**proceed** 165:23
**proceeded** 166:13
**proceeding** 8:4
**Proceedings** 168:25
**process** 13:23 89:15
  93:15 109:13
  120:25 128:16
  134:10 160:17
**processing** 42:13
**produce** 126:18 168:1
**produced** 15:10 93:13,

  22 128:24
**producing** 69:19
**product** 138:15
**production** 166:10,12,
  15
**productions** 166:9
**progress** 102:11
  103:24
**prohibit** 57:6 110:13
**prohibited** 58:4,5
  92:1,9
**prohibiting** 87:12
  89:5 108:1 109:8
  139:20
**prohibits** 51:13
**projector** 28:10,11
**promote** 154:14
**promoting** 25:6
**proposal** 33:1 34:6
  89:20,23
**proposed** 121:24
**proposition** 65:2
**propounded** 166:7
**protect** 31:16 92:15
  117:5
**protected** 138:25
  156:11
**provide** 28:15 30:17
  36:15,19,24 41:11
  44:4 61:19 83:24
  91:5 110:2 112:24
  115:3,6 116:18,25
  117:18 118:3,12,20
  119:1,6,11,15,19
  121:16 123:13
  135:11 144:20
  150:14
**provided** 28:11 36:21
  102:21 117:5,6,14,
  23 118:1,8,17
  131:10 144:20
**providing** 30:12 83:3
  97:10 113:3 114:20
  116:19 121:5
  128:13,18 129:9
  138:16
**provision** 33:4 86:24
  88:8 91:14 109:19
  110:10,17,22 119:7,
  16 122:11 123:23

134:9 140:8
**provisional** 158:9
**provisions** 85:7 86:6
  105:22 106:11,14,
  25 107:25 108:11
  110:25 112:3,4
  115:14 118:21
  119:2,12 120:7
  124:11 128:13,19
  132:2,21 140:4
**public** 49:24 52:14,
  15,17,19,24,25
  112:12 137:10
  138:22 163:25
  164:5,18,21
**publication** 45:14
**publicly** 28:5
**published** 43:2
**pull** 153:11
**puppies** 20:5
**purpose** 8:11 50:24
  161:14
**pursuant** 17:24
**put** 8:24 19:14 33:16
  34:7 35:14 37:11
  42:13 75:11 79:9
  109:12 112:11
  143:15 143:15,20,
  21,23 144:2,3,16
  167:7,17 168:15
**putting** 144:24
  156:21

---

**Q**

**qualify** 101:19
**question** 8:3 10:15
  11:15,16 12:8,9,20,
  23 30:4 44:3,15
  45:12 46:10,14
  47:9 50:16 52:14,
  23 58:6,20 62:19
  63:6 65:5 66:16
  67:8 72:17 77:4,7
  79:14 80:5,8,9,24
  81:3 82:10 83:15
  84:6 99:1 101:20
  103:1 106:11
  110:24 120:6
  124:20 128:25

---

134:24 135:1 137:5
  148:6 159:16
  164:17
**questioned** 111:21
**questioning** 141:18
  145:25 165:1
  168:11
**questions** 10:14,23
  13:5,22 14:16
  15:12 18:2 22:21
  24:9 29:5,12,13,16
  31:18 38:11,20
  39:8 45:24 47:5
  50:15,21 65:4,10
  68:6 79:18 80:16
  83:2 104:5,7,9
  112:13,17,20
  137:11 141:14,20
  143:6,8,12,17
  145:5 147:8 161:18
  161:18 162:2,6
  164:8,10 165:12
**quick** 31:16
**quicker** 103:24
**quiet** 38:10
**quite** 15:22 142:22
**quorums** 105:19
**quote** 130:19 135:5,7

---

**R**

**races** 72:9
**raise** 29:6 79:12
**raised** 80:6 86:2
  87:8,10 91:24
  116:11 121:8
**raises** 63:6
**raising** 73:12,13
  85:22 89:18 94:7
**range** 33:17
**Rarely** 36:16,18,19
**rather** 44:25 158:24
**reach** 26:19 98:23
**reached** 104:4
**reaching** 84:11
**reaction** 113:13,25
**reactions** 100:17
**read** 7:4 14:25 65:3,
  7,24 69:21 80:9
  135:16 154:1

---

**reading** 66:4
**ready** 103:21
**real** 101:2 115:5
**reality** 79:17
**really** 38:17 68:7
  102:16 140:1 166:2
**reason** 59:6 99:22
  137:8 140:8 145:19
**reasonably** 51:16
  56:7,20 57:11
**reasons** 139:17,20
**recall** 15:20 19:22
  24:3 36:4 36:4,7,
  21 55:6 69:23 70:1,
  7,13,16 86:22 87:2
  88:1,21 98:13
  100:1 101:15 102:2,
  9 105:2 123:6
  126:5 139:6 141:16,
  18 143:8 144:18
  153:12 160:1,10
**receive** 40:18,21
  67:20 68:22 119:8
  132:14 159:10,11
  166:11
**received** 14:24 17:16,
  17 67:13 68:2,25
  92:22 153:3
**receiving** 69:2 86:6
**recent** 27:1,3 69:23
**recently** 93:3 148:13
**recipients** 49:15,20
**recognize** 17:10,12,
  15 125:4 133:7
**recollection** 136:22
**recommended** 34:15
**recommending** 86:16,
  19,23 87:2
**reconcile** 34:23
  106:8
**reconciliation**
  98:11
**record** 7:2,4,10 8:13
  9:9 11:21 13:7
  39:3,4,6 50:24
  74:24,25 75:2 79:1
  80:16 104:19,21,23,
  25 108:9 135:6
  143:24 145:10,11,
  12 146:8 160:23

161:12 165:14
167:8,18 168:14,15,
19,24
**recording** 8:7,10,22
**records** 68:1 69:8,9
166:18
**recruit** 26:1,13
37:17 156:24
**recruiting** 25:8,10
26:15
**recruits** 59:20 61:18
**redacted** 163:1
**redo** 142:18
**reduced** 165:8
**refer** 86:11 107:3
119:3
**reference** 46:4
**referenced** 97:3
**referencing** 129:16
**referred** 21:16
**referring** 44:18 46:6
54:8 56:9 97:19
152:2
**re-filed** 35:16,17
**reflected** 138:24
**refrain** 58:16,17,24
**refresh** 136:22
**refresher** 156:10
**refuse** 88:3 108:14
**regard** 53:2 78:10
**regarding** 53:5 86:6
101:23 107:19
118:17 129:17
163:7,10,11,13
**registered** 20:15
144:2,4 155:23
**registering** 85:13
**registrant** 118:23
**registrants** 85:8
**registrar** 85:7
118:23
**registration** 25:8,16,
17,18,22 33:13
85:24 86:1 106:24
118:21 143:24
144:11,21
**registration's**
25:20
**regular** 34:5 63:23
75:6,10 84:1,10

85:5 95:11,18
97:14 98:14,17,19
99:5 101:22 103:3,
12 104:5,8 105:3,
24 112:18 113:21
114:21 123:3 134:5,
21 141:5
**regularly** 132:24
**reinforce** 73:6
**reintroducing** 9:10
**reiterate** 161:11,16
**relate** 42:9
**related** 12:3 15:14
30:8 75:5,16 78:3
91:24 92:8 93:16
94:2,24 95:7 103:5
107:25 108:11
110:25 114:4
115:22 116:1,3,7,
10,19 117:15 118:2,
12 121:4 122:25
123:23 124:10
136:23 137:2
143:11 167:13
**relationship** 91:6
110:2
**relevant** 42:24 84:7,
11 124:1 128:19
145:16 165:18
**relief** 52:5
**remain** 163:17
**remained** 105:23
**remains** 127:3 128:1
**remember** 13:4 15:5
21:21 22:1 29:21
34:20,25 36:10,12,
13 70:6 77:24 78:2
84:16 85:12,19,22
86:5,10 98:9
103:14 105:10,21
115:16 117:2
122:23 123:2
124:13 124:13
135:14 137:4,8,19,
22 138:4 140:20
141:20 144:1 155:9
159:8 160:8
**remembered** 13:6
**remembering** 80:8
93:19 160:6

**reminder** 71:7
**removing** 87:4,13
108:2,7
**renew** 43:24 46:17
**reopen** 162:3
**Rep** 113:14,15 128:25
131:5
**Repeat** 67:8
**repeating** 85:12
**rephrase** 12:21
**replied** 100:24
**replies** 137:16
**reply** 135:23 136:4,9
141:24
**report** 67:18 69:24
72:16,18 85:7
118:23
**reported** 32:22 68:16,
21 69:5,6 72:22
**reporter** 8:7,10 12:4,
6,14,16 16:25 17:7
125:2,10 129:12
133:2,5
**reporting** 92:24
**reports** 67:13 68:22
74:3 134:19
**repository** 69:7,11
**represent** 7:9,12,15,
18,24 8:1,2 10:10
14:14 31:20 75:20
147:6 167:22
167:22
**representation**
14:10,11 79:4
**Representative**
114:2,9,15 129:17,
23 130:12,17,23
131:13 162:21
**representatives**
30:13 32:2
**represented** 14:2,4,7
167:15
**representing** 7:21
45:1
**represents** 44:24
**reproduction** 28:18
**reps** 75:20
**Republican** 15:10,15,
25 19:7,10 21:23
23:10 24:12 25:4,5,

17,21 27:11 28:17
30:12,23 31:10,25
32:2 37:9 39:22
44:1,24 45:2,10
46:20 48:11,22
50:19 51:24 52:8,
16 53:1 59:16,20
60:2 61:12,18,22,
25 62:6 63:3,9
69:6 126:17 127:4,
7,11 132:1,7
133:20 135:25
136:6,11 140:6
141:10 142:8,15
147:11 151:14,15
154:16 155:19,24
156:19 160:12,13
162:22 163:3,18
165:3 166:1,4,8,16
**Republicans** 19:16
142:9
**request** 61:3 68:1
113:19,22,24
115:17 126:18
156:13
**requested** 61:2 66:21
93:2 100:12
**requesting** 81:10
91:5 94:11 113:17
**requests** 80:23 82:7
115:14 143:3 166:7
**require** 86:16 106:8
107:2 109:12
123:24
**required** 65:6,14,14
89:22,25 123:13
**requirement** 89:21
110:1 118:2,22
**requirements** 89:12
90:17 121:23
123:14 141:23
143:7 155:21
**requires** 119:7
153:25
**requiring** 34:22 85:7
86:11 90:4 101:18
119:2
**Rescue** 20:4
**reserve** 161:18
**reserving** 146:11

**residence** 85:14
**residential** 85:25
**resigned** 157:11
**resolution** 132:10
149:18 161:13
**resolve** 146:2
**resolved** 146:5
**respect** 39:13 40:14
45:25 47:17 48:5
49:11 52:8,18,23
53:17 55:3 56:16
57:12 77:6 79:5,23
88:9,17 90:24
93:17 95:3 101:10
103:1,9 104:5
106:12 107:6
108:24 111:20
113:10,23 117:18
120:6 123:23
126:24 127:16,25
140:3 146:3,13
**respectfully** 126:18
**respective** 79:5
**respond** 35:10,11
97:1 98:2 115:22,
25 116:3,6 134:19,
22 166:6
**responded** 82:22
101:9 138:2
**responding** 82:9 83:2
136:19
**responds** 116:9
130:17 131:13
**response** 67:15 69:2
78:9 80:2,11 81:2
83:17 97:6 101:19
**responses** 33:6
**responsibilities**
157:1
**responsibility**
148:14
**responsible** 25:6,10
38:3
**responsive** 165:16,19
**rest** 104:2 157:25
**restaurant** 64:5
**restrictions** 155:6
**result** 115:9
**resulted** 98:8
**returning** 143:11

**reveal** 46:18
**review** 29:1 112:21
151:10,18 152:6,7,
25 158:15 159:7
**reviewed** 15:6 46:2
151:23
**reviews** 151:12
**revising** 142:14
**rewrite** 142:10
**right** 10:18 11:12,18
12:14 13:1,9 17:19
26:3 38:3,12 39:23
44:12 53:25 54:6
54:6,10 57:18
62:17,18 71:5 71:5
76:7 77:1 87:22
91:22 103:17 117:3
128:14 130:15,24
131:11,22 132:17
133:19 142:19
144:13 146:12,15
157:20 162:23
163:4 168:10
**road** 150:5
**roles** 25:20
**roll** 164:13
**room** 8:8 64:7
**rooms** 139:15
**roots** 33:11
**rough** 168:22
**Royce** 111:22
**Rule** 7:5
**ruled** 120:20
**Rules** 9:13 10:20
166:16
**run** 26:16 64:23
**running** 99:24,25
141:11
**runoff** 48:16

---

**S**

---

**SA-21-CV-00844-XR**
169:5
**said** 14:19 14:19
15:17,18 35:11
44:12 56:23 79:10
88:9 102:20 123:15,
18,19 139:25
153:22 161:12

167:10,21

**same** 11:2 13:14,16 23:18,19 42:11 46:23 47:2,3 60:2 82:11 103:1 105:17, 23 117:20 118:5,14 120:6 132:14 137:5 144:8 153:1 167:9

**Sameer** 7:17

**Saturday** 38:8 105:16

**save** 29:19 129:7

**saver** 9:1

**saw** 73:5 93:24 98:15

**say** 26:5 32:18 34:17 37:3 40:13 41:3,8 42:13,25 43:9,13 48:14 49:11,24 54:6,18,21 55:12 65:11 72:5 73:7 75:10 80:21 81:22 82:12,23 83:2 90:21 93:25 97:7 100:22,25 114:6,19 115:13 124:15,20 126:2 130:11 132:5, 18 135:5 141:5 146:7,16,17 153:23 163:6

**saying** 9:16 44:22 57:20 79:14 93:11, 14,23,24 102:4 108:19 111:7 121:15 131:5 151:4

**says** 17:16,17 42:5 50:1 51:2 54:1,20 126:1 153:23 163:1

**schedule** 152:15

**Schofield** 76:1,6 77:11 113:23

**school** 18:14,17 20:23 21:13,14 60:7 64:17

**scope** 57:24 58:2 80:9 166:12

**screen** 56:25 57:3

**script** 60:16 61:14

**SD's** 63:15

**search** 128:17,20 129:3 165:16 166:22 167:10,14,

15

**searched** 165:19,20 166:6 168:2

**seat** 149:2

**seats** 147:1

**second** 16:15 19:22 31:16 34:10,14 35:17 36:8,13,14 80:13 104:3 105:1 106:6 112:18 113:2, 6 114:21 119:25 123:1 130:2 136:25 141:6 145:20 153:21

**secondly** 141:22

**Secretary** 15:18 16:6 43:2,11,14,19,21 44:16,18 45:14 46:5 47:3,16,21 86:6,11 94:17,18 101:23,25 107:2,8 119:3,8 122:16,24 123:13,24 124:7,23 125:24 126:3

**section** 160:14

**sections** 114:17 115:1,18 121:18 138:6

**Security** 19:10,13 23:10 24:9,11,15, 16,17,21,24 25:2,5 26:18 62:14,23 63:8,22 67:24 77:12 132:6,11 147:10,13,15,19 148:12,18 149:11 167:13

**see** 29:15 32:13 33:4 34:6 35:11 43:21 45:21 48:3 53:19 54:11,13,23 55:14, 17,23 56:24 57:7 58:14 64:20 65:11 72:4,16 78:5 78:5 78:5 80:14 83:8 84:21 88:12 93:17 94:19,25 95:6 96:9 97:25 100:23 104:3 108:22 112:22 123:17,18 133:22

135:6,8 155:1 156:13 158:21 162:19

**seeing** 54:19 75:11

**seek** 52:5 53:2

**seeking** 17:13 113:12

**seem** 110:25

**seemed** 93:23

**seen** 45:25 61:9,14, 21 67:12 83:9

**segregate** 80:15

**select** 74:6

**selected** 63:18 158:1

**selection** 55:18

**selections** 56:2

**semi-retired** 19:3,4

**Senate** 30:15,25 34:14,16 35:17 37:4 63:14,15 99:6, 7 105:15 111:23 121:18 123:10,14 132:25 133:12,16 134:6 134:6,9 135:7,11 137:10,13 147:16,17,18 149:1

**senator** 34:12,17,18, 25 82:14 99:13 111:22 112:10 113:15 132:24 133:13,25 134:5 135:24 136:5,10 137:2,5,9 140:25 141:1,9

**Senators** 32:2 75:20 76:2 133:14 137:21

**send** 35:7 102:16 126:10 142:8 155:12 160:11 161:1 162:14 163:6, 10,13,16

**sending** 93:13 107:6 121:5 126:13 134:2 137:20 156:20 159:20 160:3

**sense** 11:4 25:18 32:6 54:7 81:20 103:25 105:13 121:14,22 122:1

**sensed** 104:4

**sent** 34:11 102:13

123:20,21 124:16,
21 137:12 153:12
159:3 160:15 163:2
**sentences** 34:12,13,
21,22 35:7,18
106:7 112:11
**separate** 128:1
**separately** 80:17
81:8 167:19
**September** 106:22
124:23 125:5
153:15
**sequence** 29:14
**serious** 64:2,3
138:23
**serve** 9:12 18:24
19:9 20:1 21:1,9
37:12 50:18 63:19
**served** 20:18,22 21:4,
7
**service** 8:11 35:22
160:5
**Services** 71:17 92:9
110:13
**serving** 26:20 51:5
**session** 27:21 31:24,
25 33:10,25 34:5,
14 35:16,18 75:6,
10,15,17,18,19
76:19,25 77:3
82:15 84:1,10 85:5
94:20 95:1,7,11,18
97:14 98:14,17,19
99:5 101:22 102:11
103:3,13 104:5
105:3,9 106:2
111:24 112:9,19
113:5,6,21 114:8,
21,22 122:19,22
123:4 130:3 132:9
134:5 136:25
140:11 141:5
149:25
**sessions** 16:14 34:11
105:2,5 106:6
120:1 123:4
**set** 28:4 61:25 62:6
104:7,8 111:5
128:24
**settled** 113:9

**Seven** 20:10,24 33:15
**several** 21:7 38:18
43:8
**Shall** 161:20
**share** 150:25 151:2
156:18
**shared** 126:16 127:4,
17
**sharing** 123:6 130:18
**she's** 147:22
**shift** 94:13 96:21
**shifted** 96:19
**shifting** 57:2
**shirts** 61:10
**shorter** 43:10
**should** 31:3 53:16,19
59:10 72:11,24
73:4 74:6 87:16
91:25 102:15
104:15,17 129:11
143:20 150:23
152:16 153:23
161:1,4 165:23
**shouldn't** 147:8
**Show** 99:12 126:2
**showed** 100:5
**showing** 65:22 100:11
**shrugs** 12:17
**side** 9:12,25 42:23
90:10
**sides** 42:10
**Siegel** 131:18 132:19,
23 147:23
**sign** 68:1 151:4
155:3,6
**signature** 93:1,6
145:2 157:24
**signatures** 93:2
**signed** 93:5 158:8
**significant** 92:23
93:8 152:21
**significantly** 39:15
40:12
**similar** 45:23 74:2
104:13
**simple** 114:16
**simply** 9:16 22:9
30:20 67:17 68:18
114:25 120:23
134:18 160:15

**since** 10:18 18:6
23:6 48:18 68:25
137:16 141:16
144:9 166:25
**single** 70:4,18 92:25
**sir** 162:8
**sit** 88:12 108:21
**sitting** 139:14
**situated** 161:22
**situation** 41:9 59:8
74:3 144:19
**six** 38:16
**size** 42:11,19 147:20
**slide** 126:1,2
**slides** 29:10,14
**slightly** 22:24 30:5
68:5 94:13 115:21
**slowly** 133:3
**smaller** 21:7 42:23
98:24 99:14
**solution** 116:14
**solutions** 33:17 93:9
**solve** 83:8
**some** 10:13,19 11:8
13:11 14:16 16:2,5,
7,23 18:2 22:4,12,
14 30:19 32:10
39:8,18 40:14
49:14,19 50:14,21
66:9 69:20 98:8
99:14 102:17 105:8
106:11 108:7
110:24 116:11
124:4 129:25 130:2
131:18 132:21
133:13,18,19
137:20 138:19
146:2 167:12
**somebody** 79:9 114:7
121:15
**somebody's** 79:12
**somehow** 72:7
**someone** 94:5 154:11
155:21
**something** 12:24 13:6
22:17 29:15 31:19
33:1 50:17 60:2
69:2 71:4 81:10
93:24 98:14 101:15
102:21 111:19

130:12 135:11 138:14,15 167:20

**sometimes** 12:5 13:3, 4 21:16 22:23 100:10 163:6

**somewhat** 112:3

**somewhere** 18:7 35:20

**Sonya** 35:6 133:22

**sorry** 16:20 30:23 31:3,7 66:18 71:2 76:18 84:4 85:17 114:13 124:19 135:2 140:10 148:6 149:6 154:8

**sort** 25:1 27:8 71:3 104:4 112:3 131:16 134:1

**source** 15:13 60:19 88:5 89:8 90:3,12 91:8,10,13 120:2, 10 121:4,7 122:1, 10,14 140:5

**Spanish** 65:23,24 66:1,3,3,6,7

**spare** 28:13

**speak** 8:19 11:4 65:19 66:6 111:18 133:3 152:5 162:2 165:24 166:1

**speaker** 12:7 26:16

**speaking** 12:12

**special** 17:4,6 34:10, 14 35:16,17 36:8, 13,14 105:2,5,9,12, 13 106:1,6 111:24 112:9,19 113:2,5,6 114:21 119:25 122:19,22 123:1,4 130:3 136:25 141:6

**specials** 104:9

**specific** 39:8 60:6 65:10 76:21 83:3 84:15 86:24 87:7, 10,11,20 89:20,23 90:3 92:12 97:10 98:12 100:15 107:25 110:4 112:2 115:21

**specifically** 58:5 88:4,25 89:17 91:7

98:4 125:8 144:23 146:18

**specificity** 83:11 87:12

**specifics** 101:8

**specified** 53:18

**specify** 115:18

**spelled** 93:6

**spent** 96:8 97:17

**spoke** 66:7 66:7 73:4 135:13

**sponsor** 141:2

**spotting** 17:22

**stab** 33:3

**stack** 153:11

**staff** 16:5 25:12 26:2,5 38:1,6 77:23 78:1 79:24 80:3,11,22 81:2,7, 9,23 82:2,6,14,14, 23 84:2 95:13 96:6, 9,19,22 97:9,18 98:1 99:17 100:5 112:5,10 113:4,16, 20,25 114:4,16 117:23 118:2,12 119:16,20 128:12 130:6 132:2,20 134:3 139:25 141:4, 9 143:5,6,13,21 144:18 145:4 156:14 157:16

**staffers** 133:18 141:19

**staffing** 133:24

**staffs** 112:9 113:18

**stage** 142:22,23

**stand** 53:16,22 54:20, 23 55:23 57:4 88:12 99:14 108:21 146:23

**start** 10:13 18:1 31:10 72:17 75:14 76:19 77:9 83:25 84:9 97:8 114:14 123:25 124:5

**started** 9:9 76:15 82:13 84:1 96:4 154:14

**starting** 84:9,16

**starts** 77:3

**state** 7:9,21 15:18 16:6 32:2 43:2,15, 21 44:18 47:22 75:20 78:16,17 86:6,11 93:20 99:1 101:23 105:15,16 107:3,8 110:7 111:23 113:14,15 119:3,8 122:11 123:10,13,24,24 124:7 126:3 128:25 131:5 132:13 133:16 135:7 137:10,13 152:13

**statement** 53:1 81:25 114:24 161:15

**statements** 90:18

**state's** 43:11,19 44:16 45:14 46:5 47:4,17 94:17,19 101:25 122:16 124:23 125:24

**states** 55:10 89:25 122:24

**statute** 53:18 58:5 83:21,22,24

**stay** 50:9 78:25 94:12 132:16

**stayed** 144:16

**stealing** 138:7

**steamroll** 78:25

**stepped** 114:13 152:16

**stepping** 92:16

**steps** 14:22 50:8,10 75:15

**Steve** 148:3,4 149:7 149:7

**stick** 71:8

**sticker** 17:5,6

**still** 11:23 17:16 24:21,22 35:19 54:8,19 66:9 97:17, 24 98:2 127:8 134:10 141:22 152:17

**stipulations** 168:14

**stop** 99:19,25 164:13

**stopping** 104:6

straight 45:3 86:25
   107:20
strange 22:23
Street 20:4
strong 72:10
stronger 89:1
strongly 72:23 74:5
structure 87:19
   111:5,6
student 27:13
students 50:12 58:6,
   9
studied 33:14 34:15
stuff 143:14
subject 10:22 70:25
   127:3,8,20,23
   128:1 161:15 165:1
submit 26:10 33:20
   67:18 100:3,4
   150:6 155:11
submits 121:15
submitted 33:21
submitting 121:9
   140:1
subpoena 130:11
   167:25 168:4
subpoenaed 14:12
substance 39:21,24
   40:1,5 44:4 53:4
   81:19
substantive 43:13
   44:13,15 46:12,19
substantively 46:23
   47:1,3,11
successive 155:24
such 11:8 19:25 44:4
   80:15 104:18 108:1
   139:9
sufficient 9:17
suggested 122:10
   130:21
suggesting 72:23
   74:5 83:12 98:5
   103:17
suggestions 30:16
   72:11 82:24 83:7
   97:15 151:11,25
   152:25
summarize 24:20
   82:12

summary 25:1
summer 27:5 82:15
   84:3 84:3,4,16,23
   87:7 88:25 89:18
   94:7 106:15
supplement 36:19
support 21:21,23
   22:19 25:7,14 60:1
   132:12 135:13
   159:3
supporting 25:12
   30:8
supposed 44:6
sure 13:13 29:12
   36:12 61:13 77:3,
   25 80:19 100:9
   105:11 111:16
   122:21 128:6 139:5
   147:2 157:22 164:9
surrendered 25:11
   26:1
Susan 50:1
Susan's 50:1
suspected 71:13
swag 61:6
Swanson 75:25 76:6
   77:10 113:15
swear 99:20
switch 147:1
sworn 9:6

**T**

tab 42:4 42:4
table 11:17 56:22
   57:3 61:25 62:2
tables 62:6
tabs 41:23
take 11:14,15,17
   12:6,16 28:20,21,
   22 31:4 37:6 38:22,
   25 45:18,19 48:5
   50:8,10 52:9 56:13,
   19 62:11 62:11
   67:17 74:22 75:15
   78:14 88:18 100:22
   103:22 108:8 109:2,
   3 114:25 119:24
   125:24 126:3
   141:15 142:7 147:8

   156:7
taken 10:21 33:3
   35:13 101:16
   120:16 131:17
takes 11:12 26:15
taking 24:19 51:13
   76:23 148:15
talk 12:5 17:3 48:3
   96:14 132:1 168:19
talked 75:23 111:16
   140:25 141:1
   145:17
talking 11:22 31:9
   66:19 75:4 139:15
   153:21 159:18
talks 91:23
tape 8:4,5,7
taping 8:6
task 33:11,21 34:1,2,
   3
Tatum 7:19
Taylor 7:25 14:2
   16:17 44:23 166:1
   167:19
Taylor's 14:11 79:4
technically 27:10
telephone 41:5
   101:13
tell 10:21 11:2 13:7
   14:22 17:5 18:10
   19:1 20:21 21:6
   23:7 24:14 25:1
   26:13 35:3 41:21
   50:25 53:7 54:22
   58:6 60:12 63:7
   73:25 75:24 76:9
   79:21 80:4 84:10
   89:17 108:5 114:14
   115:1 117:6 125:20,
   21,23 132:25
   136:25 140:17,18
   143:21 149:23
   150:22,25 151:2,3
telling 38:8 53:4
   57:15,17,18 69:25
   71:13,25 72:8
   73:14 83:19
tells 58:9
temporary 116:10
tent 111:5

**term** 63:19 147:25
**terms** 13:11,14 54:14
   105:22 110:13
   121:23 156:15
**test** 26:23 28:23,24,
   25 29:8
**testified** 9:7 98:18
   100:3 105:15,16
   127:5 128:6,10
   135:13 147:9
   149:24 150:10,12,
   16 156:23 165:18
**testify** 40:4 52:18
   97:17 102:5 117:10,
   14,22 118:7,17
   123:11 146:19
   149:21,22 150:3
**testifying** 11:3
   17:23 24:5 25:13
   30:14 36:3,4,4,7,
   12 99:19,25
**testimony** 36:13,15,
   19,20,22,25 55:6
   80:15 81:6 82:4,13
   97:14 98:5 100:3,
   10 105:8 108:23
   109:6 112:12
   116:12 129:21
   135:6 137:10,21
   150:6,8
**Texas** 16:6 18:12
   19:18 21:12 33:23,
   24 34:2,3,23 35:15
   75:9 95:4,5 156:2
**text** 40:23 41:4
   99:16
**texted** 99:18
**than** 8:7 22:15 42:16,
   22 44:25 57:15,19,
   21 59:4,13 61:6
   70:2,3 72:20 85:25
   103:24 106:5 113:6
   114:23 128:8 129:7
   134:20 156:19
   158:7,8,24
**Thank** 10:4 11:20
   13:3,22,25 17:22
   18:1 25:19 28:13
   30:2,6,6 38:24
   45:4,12,20 66:18

71:6 77:8 121:2
   124:19 130:18
   135:1 137:1 146:22
   162:6 164:15
   165:10 168:9
**that's** 10:22 13:5
   17:19 31:17 32:18
   37:17 44:23,25
   47:8 48:13,19 54:1,
   21 55:21 56:25
   62:24 71:1 72:25
   75:13 79:16 79:16
   80:23 85:18 93:4
   101:6 102:18
   111:24 112:22
   114:9 121:1 121:1
   122:2 124:24 125:9,
   18 131:12 133:21
   134:23 140:1
   146:15 153:9 159:1
   161:5 163:2 166:12,
   13,14 167:16,25
**their** 7:9 20:11 26:9,
   19 29:6 37:21
   49:14 54:2 59:25
   65:17 72:6 77:16,
   23 81:23 82:5 84:2
   89:1,3 91:6 96:4,
   22 110:2 112:8
   113:18 118:3,4
   121:20 141:15,19
   143:4 144:11,21
   148:11 149:1 151:3
   155:11,12 160:23
**themselves** 10:12
   53:10 73:22 100:15
   134:12
**then** 12:8 13:8 21:24
   24:15 29:2 30:14
   34:20 35:10,12,13
   40:9 41:3,11 42:22
   44:14 47:2,9,15
   55:22,24 56:12
   64:2 65:12 73:5
   74:4 77:15 79:10
   81:8 82:8,9,12
   83:15 87:22 89:13
   93:25 95:3 96:15
   97:7 100:15 103:9
   104:10 105:4,6,18

106:8 112:24 113:9,
   10 115:3,13 124:15
   130:17 131:10,13,
   16,17 133:18 134:1
   146:16 157:25
   162:21 166:21
   167:3
**there** 8:10 11:6,23
   16:14 18:14 27:9
   27:9,12 28:12
   29:13 30:19 35:18
   36:11 37:9,17
   39:20 41:23 43:9,
   13 44:15,19 46:12
   49:13 50:17 52:17
   53:25 54:6 54:6,10
   57:4 63:10 63:10
   64:1,11,22 73:18
   74:9 77:25 81:1
   88:21 91:22 93:8
   97:12,13,24 98:9
   99:5 102:10,12
   105:19 106:5
   107:16,24 110:7
   112:22 115:1
   116:23 120:19
   120:19 121:9
   123:11 124:6 127:1
   129:9,11 132:15,16
   133:22 135:8
   137:25 138:10
   140:1,8,11 141:23
   144:3,19 145:14,15
   147:20 148:22
   152:12 155:5,6
   157:15 161:19
   167:4,17
**there's** 11:16 29:15
   42:3,4 43:16 52:17
   69:7 76:25 84:12
   88:8 91:14 93:12
   125:23 131:3
   153:22,23,23
   157:21 163:1
   167:24 168:4,14,16
**These** 26:7 34:13
   41:7 50:6 64:4
   78:8 79:18 98:10
   103:5 105:23
   106:14 110:24

112:2 114:17 115:1
132:21 133:16
134:2,11,22 136:18
137:16 143:25
149:6 158:12
158:12,16 164:17,
19,21
**They'd** 155:3 156:10
**they're** 8:6 28:20
41:8 42:11 43:22
47:1,20 49:6 49:6
60:10,23 61:2
68:18 69:18,22
78:20,21 79:19,20
81:10 86:20 87:9
98:2 135:16 136:15
148:9 148:9 149:16,
17 164:10 164:10,
12
**they've** 20:10 60:11,
13
**thing** 9:19 13:16
23:18,19 38:11
165:14 167:8
**things** 38:19 45:3
57:5 61:7 69:4
81:14 84:13 89:22
105:18 110:25
111:8 113:9 139:5
**think** 9:3 20:6,13,14,
24 22:2 29:21
29:21 35:19,21
36:2,24,25 37:20
38:17 44:2 49:18
55:14 60:4 71:11
73:10 74:20 75:22
76:12 78:11,15,23,
24 79:11 83:10
99:6,18 101:17
102:1 104:11,16
105:10 113:16
116:24 117:3,4
124:12,24 130:5
131:4 138:11,24
142:3,5 145:20
146:10 153:22
160:5 164:10 166:2,
13 167:18
**thinking** 117:4
**think's** 131:3

**third** 78:21
**those** 13:16 15:1,2,
24 20:10 22:18,24
28:5 30:16 37:6,16
38:4 40:21 43:21
47:12 49:2,14 57:5
61:11 65:9 68:9,16,
20 69:9,17 73:23,
25 74:16 75:24
77:9,16 80:16
81:14 82:9,11 84:7,
23 87:5 89:13,22
93:25 97:16 98:15
100:13 101:13,23
102:10 111:8
112:10 113:17
115:7 115:7,13
120:1,10 121:18
127:2 128:17
131:23 132:14
135:14 139:4,23
140:17 142:19,23
146:13,16,17 149:2,
5 157:7,15 158:10
163:16,21,24 164:4
165:4 166:5 167:14
**though** 17:23 78:17
89:21 159:16
166:18
**thought** 87:7,20
116:13
**thoughts** 100:6,17
115:4 116:18
**three** 37:5 57:21
113:17 135:19
136:12 139:4
147:21 155:20,24,
24
**through** 10:19 14:24
82:17 85:6,18
98:24 101:22 103:3
106:16,18,22 121:3
122:3 141:6 167:14,
15
**throughout** 166:3
**thumbs** 155:13 155:13,
15,15
**Thursday** 20:7
**thus** 127:14
**ticket** 21:23,25

24:12 86:25 107:20
**tiered** 42:3
**till** 82:20
**time** 8:25 11:14,21,
21 12:7 17:2 17:2,
23 19:23 21:2
24:15 33:17 39:11
40:10 52:25 60:2,
16 64:16,20,21
69:24 70:7,13
74:20 75:4,7 76:20
84:18 86:1,3 92:21
94:12 95:10 96:8
97:18 99:8 100:9
103:6 105:1 106:12
108:6,13,17,24
112:7 114:19
119:24 124:8
129:25 130:2,5
135:10 141:21
142:24 144:16,22
152:7,22 154:19
**timed** 37:4
**times** 28:12 40:8
76:9,13 81:1 95:18,
21 113:1 150:22
160:7
**titled** 45:15
**titles** 148:8
**today** 7:3 8:4 9:15
11:2,6 15:3 17:14,
16,24 46:1 49:3
66:9 69:10 70:23
79:13 145:17
146:18 159:13,17
161:18 162:7 167:2,
6 168:11,12
**today's** 13:12
**together** 75:23
**told** 8:3 54:9 55:13
60:11,13 65:2
68:14 69:14 70:21
71:1 73:24,25
106:19 138:17,21
139:14
**too** 9:4 63:4 83:10
99:24,25 123:20
147:8
**took** 14:22 42:12
75:23 120:23 156:9

**top** 131:16 162:25
**topic** 30:10,12 74:21
  87:10 87:10,11
  111:17
**topics** 145:15
**Tori** 130:4,5 131:4
**total** 20:25 41:24
**totally** 94:10
**touch** 111:8
**touched** 38:18 117:1
**touching** 124:10
**toughen** 93:9
**track** 98:1 140:15
  160:23
**tracked** 138:20
**tracks** 138:11
**train** 26:13 124:4
  156:24
**trained** 50:7,9 142:2
**trainees** 28:19 48:5
  49:25
**training** 25:9 26:21
  27:1,3,6 28:5
  29:19,24 38:4 39:9,
  12,19,20,21,25
  40:2,5,12,13,17
  41:16 49:25 50:15,
  22,25 51:11 58:9
  123:7,14,25 124:5,
  16,21 125:15,19,25
  126:3,6,9,19,21,22
  127:16,18 141:24
  150:13,17 151:8,19,
  24 152:2,4 153:18
  154:3,20 155:5,10,
  22 156:4,16
**trainings** 27:25
  123:6
**trains** 50:17,18
**transactions** 57:7
**transcript** 168:20
**transcription** 8:12
**transport** 90:9
**transporting** 109:18
**traveled** 149:21
**trial** 161:19
**triggering** 93:12
**tripped** 96:15,16
**true** 8:8 54:1 153:6
  154:12,13,20,25

159:1 165:7
**TrueTheVote** 153:25
  154:4 155:12
  156:21
**truth** 10:22 11:2,4
  155:4
**truthfully** 10:23
  11:8
**try** 13:18 17:5,7
  81:5,8,20 103:25
**trying** 32:5 42:18
  78:25 104:14
**T-shirts** 61:7
**turn** 21:17 23:25
  65:23 75:4 129:2
**turned** 158:8 164:22
**twice** 76:12 95:20
  113:6
**two** 15:8,16 16:4,14,
  15 22:18,24 25:11
  26:2,22 27:6,9
  34:12,13,20,22
  35:7,18 37:4 39:15
  60:7 63:21 69:4,7
  70:3 76:13 84:23
  89:24 95:12,15,20
  97:13,16,16 105:4
  106:7 112:11 117:1
  123:4 127:20 129:7
  147:19,22,24 148:1,
  24 153:1 157:21
  158:10,12
**type** 37:3 66:1
**typed** 30:20 135:14,
  16
**types** 19:24 24:2
  64:19 115:14
**typically** 60:1 100:2

---

**U**

**Uh-huh** 23:20 29:7
  33:19 38:2 43:12
  48:7 58:14 77:14,
  21 79:21 83:5
  84:14 85:2,4,16
  94:16 95:15,16,22
  96:23 100:21
  106:21 111:2
  121:11,13 122:17,

20 128:9 130:9,20
  131:15 133:10
  134:25 135:4
  137:18 140:14
  142:13 143:1
  144:10,17 147:25
  150:15,19 151:9
  152:3 154:7 156:17,
  25 158:14
**ultimately** 73:2
  82:25
**unaware** 94:10 121:20
**uncovered** 102:17
**under** 9:13 30:9,11
  134:11 166:16
**undergraduate** 18:20
**understand** 9:15,20
  10:24 11:1,5 12:20
  13:15,19,25 15:9
  17:9 34:9 43:23
  46:6,25 55:8 58:20
  77:7 77:7 82:10
  91:23 99:23 134:2
  140:10 146:11
**understanding** 8:9
  13:14 41:12 50:22
  59:9 72:6,25 120:2
  139:11,13
**Understood** 11:19
  11:19 12:2,15 13:2,
  10,21 14:21 29:18
  31:22 77:18
**unfolded** 81:21
**unfortunately** 27:24
**Uniform** 21:8 71:15
**unintended** 96:25
  97:2 100:23,25
  112:22 115:1
  130:13
**uniquely** 41:25
**University** 18:21
**unlawfully** 52:4,10
**unless** 87:4,13 108:2
  162:3 167:19
**unpaid** 19:11
**unrealistic** 104:1
**unreimbursed** 19:11
**unruly** 108:2
**until** 33:10 66:19
  82:17 154:21 162:3

**upcoming** 75:17 76:25
**update** 29:18 104:25
**updated** 27:21
**updates** 123:16
**updating** 27:23
**upon** 50:23 147:20
**urge** 23:24 111:18
**urging** 62:12,20
**usable** 43:5
**use** 13:11,14,18,19
    27:7 35:22 42:23
    47:25 48:12 61:15
    123:16
**used** 25:25 37:17
    121:21 144:2 150:9
**using** 85:13
**usually** 21:8 28:11
    60:6 63:4 76:22
    101:13 114:25

**V**

**valid** 79:15,19
**Valoree** 75:25 113:15
**varied** 15:22
**varies** 30:19 31:24
**various** 25:2 137:20
    157:13
**Vera** 8:2 10:7 16:25
    30:3 39:7 40:3
    45:6 52:20 75:3
    79:23 80:5,20
    104:25 117:12
    126:16,19,22 127:1,
    5 128:5 129:12
    145:14 147:5 162:6,
    17,19 164:17
    165:10,15 166:2,17,
    24 167:8,25 168:2
**Vera's** 44:21 127:16
    165:17 167:15
**verbal** 30:21 36:15,
    19,25 75:21 150:8
**verbally** 12:18
**verification** 145:3
    157:24
**verified** 89:14
**verify** 68:10
**verifying** 109:13
**version** 46:1,7 48:9

125:9 127:2,3
    130:14 153:23
    154:9
**versions** 48:9
**very** 14:24 29:15
    35:4 40:7 41:25
    45:23 47:20 50:2
    64:2,3 74:2 104:13
    114:16 137:9
    138:11,18
**vet** 97:11 155:12
**vetting** 26:11 98:3
**video** 8:5,13 156:8
**view** 51:14 56:6,19
    88:19,24 109:3
    113:17
**violate** 110:21
**violates** 108:3
**vision** 54:16 56:14
**visit** 76:11
**visited** 75:19,22
    76:12 77:16
**visits** 77:21 78:1
    95:25
**Voeks** 157:10
**volunteer** 19:9 37:11,
    22
**vote** 21:17 54:22
    58:1 62:12,20
    64:10,12 65:15
    68:15,19 69:15,25
    71:14,25 72:8
    73:14,24 74:1
    85:13 91:23 92:9,
    15 93:15,17 94:2,6
    106:4 110:13 116:1
    117:18,24 122:2,4
    129:18 131:7 138:2,
    8 144:1,9 154:12,
    13,20 155:1,4
    160:22
**voted** 55:9 72:18
**voter** 20:15 22:8,9,
    10 25:8,16,16,18,
    20,22 53:10,13,14,
    15,16,23 54:8,12,
    21,23,24 55:4,11,
    15,19,21 56:22,24,
    25 57:12,15,22
    59:3 60:17,23 61:2,

15 64:14,21,24
    65:1,6,13,19,25
    66:21,24 67:6 67:6,
    7,10,10,11,25 68:6,
    10,11,14,14,19,20
    69:14,25 70:9
    71:13,20,25 72:7,8,
    9,11,12,16,19,20,
    23 73:14 73:14
    74:5 74:5 85:24
    90:1 92:2 93:14
    94:4,5,9,10,20,25
    95:7 101:18 109:13
    110:14 116:4 118:9,
    21,23 120:3 122:5
    129:18 139:8,21
    143:23 144:8
    155:24 160:22
    161:5 162:13
**voters** 22:7,13 23:24
    34:24 55:23 56:17
    57:25 58:17 60:20
    61:19 62:1,9,12,20
    64:17 73:20,24
    74:1 85:8 86:7
    90:10 91:4,16
    92:10 93:5 98:11
    100:12 106:5,9
    107:7 109:12,18
    110:9 111:14
    116:19 118:3 119:8
    121:5 122:13
    142:12,17 143:3,10,
    20,21,24,25 144:3,
    19,24 145:5 158:8
    160:20
**voter's** 53:20 54:2
    55:16 58:25 74:15
**votes** 92:12 98:11
    155:25 158:7
**voting** 39:14 53:10,
    11,13,25 56:8
    63:10,12,13 64:11,
    14 65:7,12 66:20
    69:1 70:14 72:7
    73:14,17 74:7
    86:20,24,25 87:24
    91:2,4,16 107:15,
    16,19,20 111:3,4,
    15,20,22 112:1

116:7 118:9,13,18
119:13,22 120:9
120:9,15,21,25
138:23 139:1,8
148:23 155:13,17,
18,19,19 157:23
159:11 161:1
**voyage** 10:19

**W**

**waited** 22:8
**waiting** 97:17
**waive** 7:6
**waived** 79:10 127:15,
24
**waiving** 7:5
**walk** 21:19
**walker** 21:15
**walkers** 59:20 60:9,
22 61:1,8,10,11,15
**walking** 22:17,19
23:2,22 59:16,23,
25 60:5,10 73:21
**wall** 57:4
**want** 7:4 13:1,13
14:17,18 31:21
33:4 50:6 73:15
78:25 79:8 85:11
94:12,19,24 97:11
103:17 115:9,18
162:11,25 164:7
168:15
**wanted** 29:23 33:2
34:6 37:12 62:16
72:20 83:8 95:6
131:25 154:25
167:4,18
**Washington** 105:19
**wasn't** 83:11,12
86:18 86:18,21
90:23 93:14 100:18
120:25 124:2
144:12
**Wassdorf** 7:20 117:13,
22 118:7,16
**watch** 160:13
**watcher** 21:4,7,10
27:12,18 39:19
40:5,11,13,24 43:1,

2 44:18 46:5 47:6,
17 48:4,21 49:12
51:5,14,15 52:3
53:3,11,16,21,22,
25 54:4,19,20,22
55:5,11,22 56:6,19,
22 57:4,6,9,17,18,
25 58:24 59:2,5,9,
11 70:11 71:12,18,
18,24 72:2,4,5,16,
18,21 73:1,3,7,11,
24 84:25 85:15
87:4 87:4,13 88:3,
10,12,19,19,23,24
108:15,19 109:4
109:4 123:6,7,14
124:18,21 125:6,9,
15,25 126:3,9,20,
21,22 127:16,18
138:20,25 141:22
151:7 153:17 154:3,
20 156:4,15 157:18,
21 158:22 160:14
161:2,24 163:11
**watchers** 25:9 26:14,
17,21,21 28:1
37:18,24 39:9 39:9,
13 40:18,19 41:4,
14,18 45:15 47:7
49:7 50:15,18 51:1,
3,11,25 52:10 53:8,
9 54:10,16 55:13
59:6 67:13,17
68:17 74:11 84:21
87:8,13 89:2
107:22 108:1,2,8
114:23 115:23
117:6,7,15 123:25
124:4 138:19,25
141:23 142:1,2,3
150:14,21 151:4
152:24 156:9,12,24
157:2,13,20,22
158:1,3 159:3,10,
12,20,22 160:3,11,
13,19 162:12,14,15
**watcher's** 52:5 56:14
58:3 108:2
**watching** 8:6,18
37:22 148:14

**way** 12:12 23:7 35:3
49:14 58:14 80:15
83:15 94:6 98:8
106:16,18 111:15
123:15 137:3
138:19
**website** 37:9,14
153:25 154:4,20
155:1 156:21
**wee** 137:17
**week** 14:12 113:2,6,7
**weekend** 105:3
**weekly** 95:24,25 96:5
**We'll** 7:6 13:7,8
167:3 167:3 168:5
168:5
**Well** 8:19 35:13,15,
21 38:16 43:9
48:23 50:15 51:23
67:20 76:11 77:20
78:13,19 81:18
82:19,24 83:19
85:18 86:5 87:17
92:6 95:17,19
97:22 99:13 105:15
106:18 110:23
113:5 126:25 131:3
132:16 133:19
138:17 143:21
157:10 164:9
165:24
**went** 23:15 37:8
48:19 73:5 95:18
**we're** 9:14 13:9
38:12,17 71:8 75:6,
12 79:13 104:24
106:15 127:7,8
132:17 134:4
145:25 156:7
168:10,23
**weren't** 32:19 49:15
102:4 116:15 128:6
143:12
**Wesley** 20:23 64:17
**West** 18:12 111:22
160:5
**we've** 9:3 39:18 68:1
75:7 83:11 108:25
112:2 160:6 166:2,
13 167:14

whatever 13:8 99:7
what's 8:5 38:14
    46:24 72:4 141:12
Whenever 28:2,4
    103:19,20
where's 158:21
whether 24:14 36:21
    43:22 44:15 58:15
    61:23,24 62:1 68:6,
    11 71:21 72:12,15
    73:23 74:14 87:5
    88:1 90:20,21
    101:4 105:11
    106:13 110:2
    122:15 132:25
    136:22 140:5
    141:21
which 11:13 15:17,18
    22:23 27:10,12
    29:11 30:19 44:17
    46:10 46:10,19,20
    48:5 51:4 62:12,13
    67:6,9 68:14 69:14
    72:23 74:5 80:22
    88:8,10 96:18
    98:10 102:6 107:24
    108:7 122:5 125:25
    128:13,17,24
    129:16 132:11,12
    134:10 141:23
    143:15,19 144:1
    144:1,11 165:14
    168:15
While 38:21 39:14
    40:19 66:1 70:1
    97:16,24 98:1
    102:10 106:2
    139:22 152:19
who 7:9 8:8,17 15:20
    26:5 26:5,7 27:18,
    23 31:11,20 37:21
    38:3 45:9 45:9
    49:15 50:17,18,18
    53:24 55:15 63:25
    64:14 65:13,14,19,
    19 66:21 67:7,10
    71:13 73:13 74:4
    75:20 85:19 89:2
    90:9 91:4 91:4
    94:14 100:12 107:7

110:20 113:10,11
119:21 121:15,23
122:10 130:4 132:5
140:7 141:2 144:3
147:13,23 148:21
149:3,24 152:16
155:5,6 156:9,12
157:9,12 158:8,19
whoever 35:4
whole 29:3,4 102:16,
    19 128:24 143:15
    144:16
whom 22:11 31:11,12
    72:11
who's 31:12 94:5
whose 93:6
why 44:25 50:5 62:25
    64:22 99:22,23
    111:24
wide 160:21
wife 27:20 130:8
will 9:11,12 11:10,
    15,20,25 12:7,8,17,
    21 13:12,15,19
    17:2,3,7 36:18
    40:8,9 44:6 45:15,
    18 46:5 50:18,23
    51:8,10 71:7 81:8
    106:12 108:5
    130:18 134:22
    151:5 161:11,18
William 7:20
wishes 70:9 74:16
within 51:4 57:24
    58:2 74:19 156:2,3
    163:17 167:12
Without 53:4 81:18
    105:4 126:11 127:6
    158:10
witness 8:2 39:25
    40:1 44:3 46:17
    51:7,19 52:18,19
    58:8 70:23 79:8
    93:2,5 103:19,21
    104:17 117:10
    145:24,25 146:6,19
    161:11,19 167:23
wonderful 8:23 20:12
won't 66:5 93:20
    101:8 115:16

word 13:14,19 42:13
    61:6
wording 80:8
words 13:16 42:2,12
    115:7
work 11:25 23:8 26:7
    33:12 37:3 40:9
    60:14 76:18,19,20
    77:3,4 84:13
    130:18 142:14
    148:13
worked 23:3,23 62:8
    65:16
worker 21:1 37:13
    53:24 54:9,12,13,
    25 55:4,15,18,24,
    25 56:13,19,24
    57:2,9,21 70:8
    71:12,22,23,25
    72:1,3,7,10,18,22
    73:4 124:16 126:19
workers 25:10 26:1,
    11 32:12,23 57:5
    68:17 70:11 74:12
working 34:4 53:24
    74:9
works 32:6
world 48:10
wouldn't 102:23,25
    107:16
write 57:25 65:8
    153:20
writing 8:12 34:7
    58:16,25 68:23
    69:1,3 100:4 101:9
    135:11 140:12
    165:8
writings 100:16
written 28:24,25
    29:8 30:16,18
    32:25 33:1 36:15,
    20,22,24 67:20
    100:3,18 150:6,9
wrong 71:1 93:6
    167:23
wrongdoing 102:17
wrote 62:17
Wyoming 89:25

Y

**y'all** 90:25
**year** 26:24 33:10
  35:21 76:23 77:9
  128:8 129:7 152:1,
  12
**years** 11:10 21:18
  21:18 22:6 24:13,
  18 25:9,25 62:10
  63:21 70:2 73:16
  74:19 123:16 129:7
  148:24
**yet** 101:8 152:18
**you'll** 24:5
**you're** 11:4 12:11
  17:19 22:16 24:23
  27:6 30:4 31:8,17
  38:21 44:6,18,22
  79:22 82:9 83:17
  93:11,19 98:1
  102:6 103:20,23
  111:6 130:11
  138:16 146:8 147:9
  153:21 160:18
  161:19 165:21
  168:6
**your's** 43:10
**yourself** 121:8
**YouTube** 156:11
**you've** 13:6 41:17
  46:10 65:12 83:10
  98:18 104:4 106:19
  128:10 130:12
  156:23 159:17
**yup** 136:17

**Z**

**zipping** 38:12
**Zoom** 8:6,7,21 9:2
  16:10,12,16 82:1
  161:21,22 162:2,4

APPENDIX D

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | |
| | § | |
| STATE OF TEXAS, *et al.*, | § | Case No. 5:21-cv-00844-XR |
| | § | [Lead Case] |
| *Defendants.* | § | |
| | § | |
| HARRIS COUNTY REPUBLICAN PARTY, *et al.*, | § | |
| | § | |
| | § | |
| *Intervenor-Defendants.* | | |

<u>**LUPE PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND
TO COMPEL TESTIMONY OF DEFENDANT INTERVENOR HARRIS COUNTY
REPUBLICAN PARTY**</u>

Plaintiffs La Union del Pueblo Entero, *et al.* ("Plaintiffs")[1] file this motion to compel and

request that the Court order Defendant Intervenor Harris County Republican Party to (1) respond

to Plaintiffs' Requests for Production of Documents 1 and 3 and (2) provide deposition testimony

related to the Party's communications regarding Senate Bill 1 ("SB1") with Texas legislators,

legislative staff and certain executive branch agencies.  Plaintiffs' counsel hereby certify that they

have conferred in a good faith attempt to resolve the matter by agreement and have been unable to

secure compliance by Defendant Intervenor.

## I.     <u>INTRODUCTION</u>

This case involves a challenge by Plaintiff organizations and voters to SB1, a 2021 law that

---

[1] Plaintiffs are La Union del Pueblo Entero, Friendship-West Baptist Church, Southwest Voter Registration Education Project, Texas Impact, Mexican American Bar Association of Texas, Anti-Defamation League Austin, Southwest, and Texoma, Texas Hispanics Organized for Political Education, Jolt Action, William C. Velasquez Institute, FIEL Houston Inc., and James Lewin.

makes significant changes to how Texas voters cast ballots in elections. Defendant Intervenor Harris County Republican Party, as well as other local and national Republican Party entities, intervened on May 13, 2022.[2]

Although Defendant Intervenor promised the Court in November 2022 that it would produce documents reflecting its communications about SB1 with Texas legislators and certain executive branch agencies, Defendant Intervenor did not conduct a search for responsive documents in the custody of Mr. Alan Vera, the Chair of the Harris County Republican Party Ballot Security Committee and the person who conducted most of Defendant Intervenor's lobbying activities on SB1. Earlier this week, Mr. Vera testified in deposition that although he exchanged emails and gave documents to Texas legislators and executive branch officials related to SB1, he was never asked to search for or turn over emails or other documents in this case.

Furthermore, in his deposition, Mr. Vera followed the instructions of counsel for State Defendants not to answer questions regarding certain communications with Texas legislators and legislative staff on the grounds of legislative immunity.

Plaintiffs asked Defendant Intervenor on January 12, 2023 to search for responsive documents beyond those contained in Harris County Republican Party email accounts. On February 27, following Mr. Vera's testimony that he used his personal email account to communicate with legislators and executive branch staff, Plaintiffs asked Defendant Intervenor to conduct a search for responsive documents in Mr. Vera's email and his computer. Defendant Intervenor maintained that it only has custody or control over Harris County Republican Party

---

[2] Text Order of 5/13/2022.

email addresses and documents.

Defendant Intervenor also maintained that the legislative privilege objections are appropriate.  This motion follows.

## II.    BACKGROUND

Private Plaintiffs served Defendant Intervenors with their First Set of Requests for Production on July 7, 2022.  On October 24, 2022, following several meet and confer exchanges, Plaintiffs filed an Opposed Motion to Compel Production of Documents.[3]  In the November 14, 2022 hearing on that discovery motion, Defendant Intervenors advised the Court that they would produce all documents responsive to Plaintiffs' requests for production ("RFPs") 1[4] and 3[5] without objection and without any assertion of privileges, by December 1, 2022.[6]

In their December 1, 2022 production in response to RFPs 1 and  3, Defendant Intervenors produced 61 documents, only seven of which were responsive to RFP 1.   Ex. K.   Many of the remaining documents, which purported to be responsive to RFPs 1 and 3, were simply notices sent by the Texas Secretary of State to local election officials, as opposed to direct communication with executive branch agencies or officials.

---

[3] *See* ECF 469.

[4] REQUEST FOR PRODUCTION NO. 1. All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Texas Legislature regarding SB 1, SB 7, HB 3, or HB 6.

[5] REQUEST FOR PRODUCTION NO. 3. All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Office of the Texas Governor, the Office of the Texas Attorney General, the Office of the Texas Lieutenant Governor, or the Office of the Texas Secretary of State regarding SB 1, SB 7, HB 3, or HB 6.

[6] *See* ECF 490 at 5; Hr'g Tr. at 13:17–22, 35:3–4.

On January 12, 2023, Plaintiffs sent a deficiency letter to Defendant Intervenors. Ex. H. In that letter, Plaintiffs requested that Defendant Intervenors include in their search individuals associated with Defendant Intervenors whose email accounts may contain documents "sent to or exchanged with the Texas Legislature [and several other state agencies] regarding SB 1, SB 7, HB 3, or HB 6" and expand their search beyond official committee email addresses if necessary to include "[a]ll documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Texas Legislature [and several other state agencies] regarding SB 1, SB 7, HB 3, or HB 6." *Id.* at 2.

On February 23, 2023 and February 24, 2023, according to the agreement of the parties, Plaintiffs served Defendant Intervenors with notices to depose: (1) Mr. Alan Vera, a named document custodian of Defendant Intervenor and Chairman of the Harris County Republican Party Ballot Security Committee, pursuant to Fed. R. C. P. 30(b)(1); (2) the Harris County Republican Party pursuant to Fed. R. C. P. 30(b)(6); and (3) Ms. Cindy Siegel, Harris County Republican Party Chairman, pursuant to Fed. R. C. P. 30(b)(1). Exs. B, C, D, E and J.

On February 27, 2023, Defendant Intervenor Harris County Republican Party produced Mr. Alan Vera for deposition. Mr. Vera testified that in his role as the Chairman of the Harris County Republican Party Ballot Security Committee, he communicated extensively with legislators and legislative staff regarding SB1, beginning in June of 2020 and through final passage of SB1 by the Texas Legislature in September 2021. Ex. L. at 19:22-20:10, 25:3-21, 27:20-29:20; 71:15-72:6. Mr. Vera testified that he met in person with legislators and legislative staff, gave them "exhibits" to his public testimony, and also communicated with them by email and phone calls. Ex. L. at 70:7-19; 77:4-13; 76:11-17; 91:5-92:18; 94:14-95:1.

Mr. Vera testified that he both initiated communications with legislators about SB1 and responded to legislator requests for information about SB1. Ex. L. at 76:21-77:3. When he responded to inquiries from legislators, he gave them factual information and told them from his perspective that either certain holes needed to be plugged in the statute or certain issues needed to be addressed by the statute. Ex. L. at 78:9-16; 91:5-92:18; 108:24-109:23. Mr. Vera further testified that on at least one occasion, he provided legislators with proposed bill language that was included in the enacted SB1. Ex. L. at 30:3-14. Mr. Vera testified that he usually responded to legislator inquiries by email or phone. Ex. L. at 95:2-96:1.

During the two special legislative sessions immediately preceding SB1's passage, Mr. Vera provided feedback on SB1 to legislators once or twice a week. Ex. L. at 107:12-20. Mr. Vera testified that he provided feedback on SB1 to Texas Senator Paul Bettencourt, State Representative Jacey Jetton, State Representative Valoree Swanson and State Representative Briscoe Cain. Ex. L. at 107:21-108:8; 108:24-109:23. Senator Bettencourt served on the Senate State Affairs Committee and the SB1 conference committee in the Second Special Session[7], Representative Cain was the Chair of the House Elections Committee in 2021[8], and Representatives Swanson[9] and Jetton[10] served on the House Elections Committee in 2021.

Mr. Vera testified that he communicated with legislators about including language in SB1 related to mail ballot "harvesting," free movement of poll watchers, penalties for poll workers who

[7] https://capitol.texas.gov/Members/MemberInfo.aspx?Leg=87&Chamber=S&Code=A1055

[8] https://capitol.texas.gov/Members/MemberInfo.aspx?Leg=87&Chamber=H&Code=A3265

[9] https://capitol.texas.gov/Members/MemberInfo.aspx?Leg=87&Chamber=H&Code=A3425

[10] https://capitol.texas.gov/Members/MemberInfo.aspx?Leg=87&Chamber=H&Code=A3980

obstruct poll watchers, perceived problems with drive-thru voting, and voters registered at illegal addresses--provisions of SB1 challenged by Plaintiffs in this case. Ex. L. at 78:23-80:9; 81:19-82:2; 82:25-83:8; 83:13-20; 84:2-19; 105:8-106:3; 110:7-13. Mr. Vera further testified that in his opinion, SB1's language on poll watcher interference, drive-thru voting and mail ballot "harvesting" tracked closely to his communications with legislators. Ex. L. at 132:11-133:6.

Mr. Vera used his personal email address to send communications to, and receive communications from, legislators and their staff regarding SB1, including sending proposed bill language. Ex. L. at 30:3-14; 30:15-22; 131:20-25. Also, when testifying in the Legislature on SB1, Mr. Vera would write out what he would say and retain those notes after testifying. Ex. L. at 31:3-32:3. Mr. Vera also used his personal email address to communicate with executive branch agencies about SB1. Ex. L. at 116:25-118:15; 119:10-18.

Despite the fact that Mr. Vera was deeply involved in lobbying on SB1 on behalf of the Harris County Republican Party, Mr. Vera testified that he did not search for emails in which he was providing feedback to legislators or initiating conversations with legislators relevant to SB1. Ex. L. at 122:17-123:3. Mr. Vera further testified that he did not turn over his computer to anybody to have them search his emails as part of his involvement in the case, although his emails would be there if Microsoft Outlook saved emails that are older than one year. Ex. L. at 123:9-18.

Without documents from Mr. Vera's files, Plaintiffs were unable to question Mr. Vera adequately about his communications with legislators and legislator staff. The similar lack of document production related to Mr. Vera's communications with various executive branch agencies made it impossible for Plaintiffs to obtain information regarding Defendant Intervenor's communications with those agencies. For example, Mr. Vera testified that he "clearly

remember[ed] not communicating with anyone in the SOS office about SB1 during the regular session or the two special sessions" until counsel showed him an email from the Party Chairman's account and then he recalled that he communicated with staff in the office of the Secretary of State regarding poll watcher training and SB1.  Ex. L. at 116:25-118:15; 119:10-18.

Mr. Vera further refused to answer specific questions about his responses to legislator inquiries for feedback on SB1 because counsel for State Defendants objected and instructed him not to answer on the grounds of legislative privilege.  Ex. L. at 72:20-75:5. Based on those instructions from counsel for State Defendants, Mr. Vera refused to answer questions such as what feedback he provided to legislators related to SB1's provisions on poll watchers, vote "harvesting," and drive-thru voting, and the requirement that voters provide identification numbers on their applications for ballot by mail and their mail ballots.  Ex. L. at 111:16-113:4

Counsel for State Defendants stated that they asserted legislative privilege as to Defendant Intervenor's "communications to the legislators or legislative staff in response to a legislative inquiry" Ex. L. at 74:14-75:5.  Mr. Vera testified that it was difficult to separate responsive communications from communications he initiated with legislators or legislative staff because "the interaction and the dynamics of the exchanges and discussions, those things overlap continually." Ex. L. at 75:6-76:10.  Mr. Vera further testified that when he communicated with legislators and their staff about SB1, it was frequently a combination of him offering information on his own initiative, receiving inquiries from legislators and their staff, and responding to the inquiries from legislators and their staff.  Ex. L. at 76:21-77:3.

In addition to following the instructions of counsel for State Defendants not to answer certain questions because of legislative privilege, Mr. Vera censored his answers to other questions

calling for communications with legislators regarding SB1, even when counsel for State Defendants did not object. Ex. L. at 28:25-29:12; 87:6-9 ("Q. Okay. So what were you advocating for with protect [sic] to the vote harvesting? A. Okay. So we got to be careful about stepping on the objections, okay?"); 88:2-12. Mr. Vera also omitted from his answers information related to his responding to legislator inquiries, and then admitted to these communications when asked directly. Ex. L. at 106:13-107:11.

At the end of Mr. Vera's questioning, counsel for Plaintiffs stated that they would hold open the deposition in order to resolve the issues that had arisen with respect to assertion of the legislative privilege. Ex. L. at 139:22. Counsel for Defendant Intervenor responded that "We think all the privilege assertions have been appropriate." *Id.* Counsel for Plaintiffs also requested that Defendant Intervenor agree to conduct a search for responsive documents in Mr. Vera's email and his computer because he had been designated by Defendant Intervenor as a document custodian, had testified that he had relevant and responsive documents, and testified that he had not searched and had not given over his computer to be searched. Ex. L. at 159:2-161:23. Counsel for Defendant Intervenor responded that although they had designated Mr. Vera as a document custodian, "we only have custody and control over Harris county republican party email addresses and document[s.]" *Id.*

On February 28, 2023, Ms. Cynthia Siegel testified on behalf of the Harris County Republican Party. Ms. Siegel confirmed that Mr. Vera represented the Harris County Republican Party in communicating with the Texas Legislature with respect to SB1 and its predecessor bills. Ex. M (Forthcoming Excerpts of Transcript of Cindy Siegel (February 28, 2023) Rough Transcript.) Ms. Siegel also testified that Mr. Vera conducted Harris County Republican Party

business through his personal email account because Mr. Vera did not have a Harris County Republican Party email address.  *Id.*

## I.  LEGAL STANDARD

### A.  Motion to Compel

"A party seeking discovery may move for an order compelling an answer, designation, production, or inspection" if the other party "fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34."  Fed. R. Civ. P. 37(a)(3)(B)(iv).  Rule 34 permits parties to serve upon each other "a request within the scope of Rule 26(b)" to produce certain items "in the responding party's possession, custody, or control."  Fed. R. Civ. P. 34(a)(1).  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).

Rule 26 requires a party that asserts a privilege to "describe the nature of the documents, communications, or tangible things not produced or disclosed—and to do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A)(ii).  "It is well settled that the party asserting the privilege has the burden of establishing its applicability."  *Perez v. Perry*, No. SA-11-CV-360-OLG-JES-XR, 2014 WL 3495414, at *2 (W.D. Tex. July 11, 2014) (citing *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985)).  Conclusory assertions are "insufficient to carry out the proponent's burden of establishing" privilege.  *E.E.O.C. v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017).

Under the Federal Rules of Civil Procedure, "[a] party seeking discovery may move for an order compelling an answer . . . if a deponent fails to answer a question."  Fed. R. Civ. P.

37(a)(3)(B)(i).  Where counsel instructs a deponent not to answer a question on privilege grounds, the Court may "more accurately assess the privilege dispute on an appropriate [later] motion." *League of United Latin Am. Citizens v. Abbott*, 3:21-cv-00259-DCG-JES-JVB, 2022 WL 3656395, at *3 (W.D. Tex. Aug. 23, 2022).  Of note, "[i]n a deposition, whether a query implicates privileged communications depends on the question being asked."  *Id.* at *2 (internal quotation omitted).

When a motion to compel "is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  Fed. R. Civ. P. 37(a)(5)(A).

### B.  Legislative Privilege

"Legislative privilege is an evidentiary privilege, 'governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence.'"  *La Union Del Pueblo Entero v. Abbott ("LUPE I")*, No. SA-21-CV-00844-XR, 2022 WL 1667687, at *2 (W.D. Tex. May 25, 2022), *appeal docketed sub nom. LULAC v. Hughes*, No. 22-50435 (5th Cir. May 27, 2022) (quoting *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 624 (5th Cir. 2017)).  "The privilege 'is, at best, one which is qualified.'"  *League of United Latin Am. Citizens v. Guillen*, No. 22-50407, 2022 WL 2713263, at *1 (5th Cir. May 20, 2022) (quoting *Jefferson Cmty.*, 849 F.3d at 624).   To that end, "[t]he privilege 'must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."  *LUPE I*, 2022 WL 1667687, at *2 (quoting *Jefferson*

10

*Cmty.*, 849 F.3d at 624); *see also League of United Latin Am. Citizens v. Abbott (LULAC I)*, No. 3:21-cv-00259-DCG-JES-JVB, 2022 WL 1570858, at *1 (W.D. Tex. May 18, 2022).

II.    **ARGUMENT**

**A.  Defendant Intervenor has control of documents related to Mr. Vera's communications with Texas legislators and legislative staff, and executive branch agencies, and must produce any responsive documents from Mr. Vera's email account and computer.**

Mr. Vera was Defendant Intervenor Harris County Republican Party's primary agent for purposes of communicating with the Legislature regarding SB1. He used his personal computer and personal email address to conduct business for the Harris County Republican Party. Defendant Intervenor does not dispute that Mr. Vera's communications with the Legislature regarding SB1 are relevant and responsive to Plaintiffs' discovery requests. Yet it argues that it is under no obligation to produce relevant documents from Mr. Vera's personal computer and personal email address because it claims that those documents are not within its possession, custody, or control. On the contrary, case law from this Circuit makes clear that those documents and communications made on behalf of Defendant Intervenor are plainly within its possession, custody, and control.

Courts in this Circuit have emphasized that "[p]ossession, custody, or control are broad terms." *League of United Latin Am. Citizens v. Abbott ("LULAC II")*, No. 3:21-cv-00259-DCG-JES-JVB, 2022 WL 3233406, at *7 (W.D. Tex. Aug. 10, 2022). Indeed, those terms "include more than actual possession or control of the materials; the terms also contemplate a party's legal right or *practical ability to obtain* the materials from a nonparty to the action." *Id.* (cleaned up); *see also Perez v. Perry*, No. SA-11-CV-360-OLG-JES, 2014 WL 1796661, at *1 (W.D. Tex. May 6, 2014). As such "a party can 'control' documents that are within the possession or custody of a non-party," and "[d]ocuments are considered to be within a party's control when that party has the

11

right, authority, or practical ability to obtain the documents from a nonparty." *Perez*, 2014 WL 1796661, at *1 (quoting Fed. R. Civ. P. 34(a)(1)(A)).

Because Mr. Vera used his personal computer and personal email address to conduct official business of the Harris County Republican Party, documents in both are under the "control" of Defendant Intervenor. *Ultravision Technologies, LLC v. Govision, LLC* is instructive. No. 2:18-cv-00100-JRG-RSP, 2020 WL 10692709 (E.D. Tex. Aug. 28, 2020). In that case, the requesting party sought documents from individuals identified as custodians and who had conducted business for the responding party on their personal email accounts. *Id.* at *2. Despite the responding party's objections, the court in *Ultravision* concluded that the personal email accounts of those individuals were "under [the responding party's] control" and compelled production from those email accounts. *Id.*

As in *Ultravision*, the challenged documents here are under the control of Defendant Intervenor. Mr. Vera is the Chairman of the Harris County Republican Party Ballot Security Committee. Ex. L. at 14:2-7. In that role, his duties include advocating on election legislation in the Texas Legislature, including providing members of the Legislature with the Party's priority items, proposing bill language, and testifying in Senate and House committees in support of election legislation. Ex. L. at 19:22-20:10, 25:3-21, 27:20-29:20. Mr. Vera and the designated representative of the Harris County Republican Party both testified that Mr. Vera conducted Harris County Republican Party business through his personal email account and his personal computer. Ex. L. at 30:3-14; 30:15-22; 131:20-25 (Vera) and Ex. <u>M</u> (Forthcoming Excerpts of Transcript of Cindy Siegel (February 28, 2023) Rough Transcript.). Defendant Intervenor also identified Mr. Vera as a document custodian for the Harris County Republican Party. Ex. F.

Thus, Defendant Intervenor plainly has "the right, authority, or practical ability to obtain the documents from" Mr. Vera—but failed to search for or produce any such document. *See Perez*, 2014 WL 1796661, at *1; *see also LULAC II*, 2022 WL 3233406, at *7. Accordingly, any responsive documents in Mr. Vera's personal email address and on his personal computer are under the "control" of Defendant Intervenor—and must be produced. *Ultravision*, 2020 WL 10692709, at *2.

### B. Defendant Intervenor, Mr. Vera, and State Defendants Improperly Invoke the Legislative Privilege.

> *1. Neither Defendant Intervenor, Mr. Vera, nor State Defendants Can Assert the Legislative Privilege.*

As an initial matter, Defendant Intervenor and Mr. Vera cannot assert the legislative privilege because they are not *legislators*.

Courts in this Circuit—including this Court—have consistently held that the legislative "privilege is personal, and it may be waived or asserted" only "by the individual legislator." *La Union Del Pueblo Entero v. Abbott ("LUPE I")*, No. SA-21-CV-00844-XR, 2022 WL 1667687, at *2 (W.D. Tex. May 25, 2022), *appeal docketed sub nom. LULAC v. Hughes*, No. 22-50435 (5th Cir. May 27, 2022); *see also Perez v. Perry*, No. SA-11-cv-360, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014); *LULAC II*, 2022 WL 3233406, at *1; *Gilby v. Hughes*, 471 F. Supp. 3d 763, 768 (W.D. Tex. 2020); *TitleMax of Tex., Inc. v. City of Dallas*, No. 3:21-cv-1040, 2022 WL326566, at *6 (N.D. Tex. Feb. 3, 2022). Neither Mr. Vera nor Defendant Intervenor is a state legislator. Accordingly, they may not assert the legislative privilege here over the challenged testimony.

And because State Defendants are also not legislators, the legislative privilege may not be invoked by, or on behalf of, State Defendants. During Mr. Vera's deposition, counsel for State

Defendants—from the Office of the Attorney General—invoked the legislative privilege to object

to several of Plaintiffs' questions, (Ex. L. at 72:20-75:5; 74:14-75:5) and even instructed Mr. Vera

to invoke the privilege and refuse to testify (Ex. L. at 111:16-113:4).  Following State Defendants'

instructions, Mr. Vera declined to answer based on the legislative privilege.  *Id.*

As already discussed, neither Defendant Intervenor nor Mr. Vera could invoke the

legislative privilege.  And as other courts in this Circuit have uniformly held, "neither the

Governor, nor the Secretary of State or the State of Texas has standing to assert the legislative

privilege on behalf of any legislator or staff member."  *Perez*, 2014 WL 106927, at *1; *see also*

*LULAC II*, 2022 WL 3233406, at *1; *Gilby*, 471 F. Supp. 3d at 768; *TitleMax*, 2022 WL 326566,

at *6.  Counsel from the Office of the Attorney General made clear during the deposition that he

represented only State Defendants, (Ex. L. at 2:15-17) and thus could "not invoke the privilege on

behalf of [a] legislator, legislative aide, or staff member," *LUPE I*, 2022 WL 1667687, at *2

(quoting *Gilby*, 471 F. Supp. 2d at 767).  Accordingly, State Defendants' assertions of the

legislative privilege—as well as any assertion by Defendant Intervenor or Mr. Vera on behalf of

State Defendants (or  anyone else)—were improper, and Defendant Intervenor should be

compelled to provide the deposition testimony regarding any communications between Mr. Vera

and legislators or legislative staff.[11]

> ### 2. *Legislators Waived the Legislative Privilege for any Communication with Defendant Intervenor.*

Even if Defendant Intervenor, Mr. Vera, or State Defendants could invoke the legislative

privilege on behalf of a legislator or legislative staff, the privilege has been waived as to any

communications with Mr. Vera.  As the Court previously emphasized, "the legislative privilege

---

[11] For the same reasons, State Defendants lack standing to assert the legislative privilege over any documents in Mr. Vera's computer or from Mr. Vera's personal email address.

[is] waived when [] State Legislators communicate[] with parties outside the legislature, such as party leaders and lobbyists." *LUPE I*, 2022 WL 1667687, at *2; *see also Perez*, 2014 WL 106927, at *2 ("To the extent that legislators or legislative staff communicated with any outsider (*e.g.* party representatives, non-legislators, or non-legislative staff), any privilege is waived as to the contents of those specific communications."); *LULAC II*, 2022 WL 3233406, at *1 n.3; *Gilby*, 471 F. Supp. 3d at 767; *Favors v. Cuomo*, 285 F.R.D. 187, 212 (S.D.N.Y. 2012) (noting that "communications with 'knowledgeable outsiders' . . . fall outside the privilege"). That is so even where communications with third parties are purportedly "made as part of the legislative process of gathering facts for and considering . . . legislation." *See LUPE I*, 2022 WL 1667687, at *3.[12] So, for example, "lobbying communications between the Defendant Intervenors and members of the Texas legislature" "must be produced." *La Union Del Pueblo Entero v. Abbott (LUPE II)*, No. SA-21-CV-00844-XR, 2022 WL 17574079, at *7 (W.D. Tex. Dec. 9, 2022).

Because Mr. Vera is a third party to the Texas Legislature, legislators with whom he communicated have waived the legislative privilege as to any information about which Mr. Vera may testify. Similarly, any documents in the possession, custody, or control of Defendant Intervenor—including those in Mr. Vera's personal computer and email account—necessarily have been shared with outsiders of the Legislature. Accordingly, Mr. Vera's testimony should be compelled, as should the production of any documents in the possession, custody, or control of Defendant Intervenor over which the legislative privilege is asserted.

---

[12] During Mr. Vera's deposition, counsel for State Defendants invoked the legislative privilege specifically over the "content of any communications that [Mr. Vera] made in response to an inquiry from a legislator of legislative staff," Ex. L. at 74:14-75:5, and instructed Mr. Vera not to testify as to any such information. Ex. L. at 111:16-113:4. Mr. Vera in turn declined to answer some of Plaintiffs' questions based on those instructions. *Id.* The Court has already rejected that overly broad view of the legislative privilege—an understanding based on inapposite case law regarding legislative *immunity*, not the legislative *privilege*— and the Court should do the same here. *LUPE I*, 2022 WL 1667687, at *3; *LULAC I*, 2022 WL 1570858, at *1.

### 3. Defendant Intervenor, Mr. Vera, and State Defendants Cannot Assert the Legislative Privilege over Fact-based Information.

Mr. Vera improperly declined to testify about fact-based information not subject to the legislative privilege.  The Court has previously emphasized that the legislative privilege "does not apply . . . to 'documents containing factually based information used in the decision-making process or disseminated to legislators or committees, such as committee reports and minutes of meetings,' or 'the materials and information available [to lawmakers] at the time a decision was made.'"  *LUPE I*, 2022 WL 1667687, at *2 (quoting *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *9 (N.D. Ill. Oct. 11, 2011)); *see also League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-00259-DCG-JES-JVB, 2022 WL 2921793, at *2 (W.D. Tex. July 25, 2022), *appeal docketed sub nom. LULAC v. Patrick*, No. 22-50435 (5th Cir. July 26, 2022).

Plaintiffs sought testimony from Mr. Vera regarding communications in which he provided information to legislators or legislative staff at those individuals' request, Ex. L at 78:9-16.  Based on the legislative privilege, State Defendants objected to—and at times Mr. Vera declined to answer—Plaintiffs' questions seeking such testimony.  Ex. L. at 72:20-75:5; 74:14-75:5; 111:16-113:4.  However, that testimony constitutes merely "materials and information available [to lawmakers] at the time a decision was made," and is therefore distinct from documents or testimony that could fall within the scope of the privilege—that is, it is not evidence "that contains or involves opinions, motives, recommendations or advice about legislative decisions."  *LUPE I*, 2022 WL 1667687, at *2 (quotation omitted).  Likewise, documents on Mr. Vera's personal computer and in his personal email account contain fact-based information not subject to the privilege.  Accordingly, that evidence must be disclosed.

### 4. Even if Applicable, the Legislative Privilege Should Yield.

Even if applicable, the legislative privilege should yield to the need for discovery here. To determine whether the privilege should yield, courts in this Circuit and elsewhere have consistently considered the following five factors: "(1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *See Perez*, 2014 WL 106927, at *2; *see also LUPE I*, 2022 WL 1667687, at *6. Further, as the Court previously emphasized, the legislative "privilege 'must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'" *LUPE I*, 2022 WL 1667687, at *2 (quoting *Jefferson Cmty.*, 849 F.3d at 624); *LULAC I*, 2022 WL 1570858, at *1; *Perez*, 2014 WL 106927, at *2.

All five factors weigh in favor of disclosure. First, the evidence sought is both relevant and vital to Plaintiffs' claims under the Voting Rights Act and the U.S. Constitution, as "[t]he evidence that [Plaintiffs] seek to compel is highly relevant in proving" those claims, as communications between Mr. Vera and legislators may "reflect the [legislators'] contemporaneous thoughts and motivations in drafting and enacting S.B. 1." *LUPE I*, 2022 WL 1667687, at *6. The second factor—the availability of other evidence—also weighs in favor of disclosure. Of note, this factor "weighs in favor of disclosure 'given the practical reality that officials "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."'" *LUPE I*, 2022 WL 1667687, at *6 (quoting *Veasey*, 2014 WL 1340077, at *3). Plaintiffs have alleged that the Legislature enacted SB1 with an intent

to discriminate against racial minorities and that those plans had a discriminatory effect, and Plaintiffs are therefore entitled to examine the most probative evidence regarding that legislation.

The third and fourth factors—the seriousness of the litigation and issues involved, and the role of the government in the litigation—also weigh in favor of disclosure. Plaintiffs "raise serious questions whether S.B. 1 complies with the Voting Rights Act and the First and Fourteenth Amendments." *LUPE I*, 2022 WL 1667687, at *6; *see also Harding v. Cnty. of Dallas*, No. 3:15-CV-1031-D, 2016 WL 7426127, at *6 (N.D. Tex. Dec. 23, 2016); *Veasey v. Perry*, No. 2:13-CV-193, 2014 WL 1340077, at *2 (S.D. Tex. Apr. 3, 2014) ("[T]he importance of eliminating racial discrimination in voting—the bedrock of this country's democratic system of government—cannot be overstated."). "As [Plaintiffs] have alleged that the Texas legislature intentionally discriminated against minority voters, the decisionmaking process . . . *is* the case[.]" *LUPE I*, 2022 WL 1667687, at *6 (quotation omitted).

Finally, there is no possible chilling effect on governmental employees. Texas legislators and executive officials have participated in the discovery process—including through document production, depositions, and trial appearances—associated with litigation challenging discriminatory voting laws in Texas. *See, e.g., Perez* 2014 WL 106927, at *1; *Texas v. Holder*, 888 F. Supp. 2d 113, 120-21 (D.D.C. 2012). And yet, even after courts have previously concluded that the legislative privilege should yield, no chilling effect has occurred. *See Veasey v. Perry*, No. 2:13-CV-193, 2014 WL 1340077, at *3 (S.D. Tex. Apr. 3, 2014). In any event, even if this factor weighed against disclosure, courts have repeatedly found—particularly in the voting rights context—"that the need for accurate fact finding outweighs any chill to the legislature's deliberations." *LUPE I*, 2022 WL 1667687, at *7; *see also Veasey*, 2014 WL 1340077, at *3; *Baldus v. Brennan*, No. 11-CV-562, 11-CV-1011, 2011 WL 6122542, at *2 (E.D. Wis. Dec. 8,

2011) (concluding that the potential "chilling effect" on the state legislature "is outweighed by the highly relevant and potentially unique nature of the evidence").

Accordingly, the *Perez* factors strongly weigh in favor of disclosure of testimony and production of documents Plaintiffs seek to compel.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the instant motion, direct Defendant Intervenor to conduct a search for and produce all relevant documents in response to Plaintiffs' Requests for Production 1 and 3, including documents in Mr. Vera's personal email address and personal computer, and compel Defendant Intervenor to provide deposition testimony in response to Plaintiffs' questions regarding Defendant Intervenor's communications with legislators and legislative staff.


Dated: March 3, 2023                              Respectfully submitted,


*/s/ Nina Perales*                                     */s/ Sean Morales-Doyle*
Nina Perales (TX Bar No. 24005046)          Sean Morales-Doyle (NY Bar No. 5646641)
Julia R. Longoria (TX Bar No. 24070166)     Patrick A. Berry (NY Bar No. 5723135)
Fatima L. Menendez (TX Bar No. 24090260)    Jasleen K. Singh (CA. Bar No. 316596)
MEXICAN AMERICAN LEGAL                        Eliza Sweren-Becker (NY Bar No. 5424403)
DEFENSE AND EDUCATIONAL FUND                  Andrew B. Garber (NY Bar No. 5684147)
110 Broadway, Suite 300                       BRENNAN CENTER FOR JUSTICE AT
San Antonio, TX 78205                         NYU SCHOOL OF LAW
Telephone: (210) 224-5476                     120 Broadway, Suite 1750
Facsimile: (210) 224-5382                     New York, NY 10271
nperales@maldef.org                           Telephone: (646) 292-8310
jlongoria@maldef.org                          Facsimile: (212) 463-7308
fmenendez@maldef.org                          sean.morales-doyle@nyu.edu
                                              patrick.berry@nyu.edu
Michael C. Keats*                             jasleen.singh@nyu.edu
Rebecca L. Martin*                            eliza.sweren-becker@nyu.edu
Jason S. Kanterman*                           andrew.garber@nyu.edu
Kevin Zhen*
                                              Paul R. Genender (TX Bar No. 00790758)

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza

New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

*Attorneys for Plaintiffs*
**LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER
REGISTRATION EDUCATION
PROJECT, MEXICAN AMERICAN
BAR ASSOCIATION OF TEXAS,
TEXAS HISPANICS ORGANIZED FOR
POLITICAL EDUCATION, JOLT
ACTION, WILLIAM C. VELASQUEZ
INSTITUTE, FIEL HOUSTON INC**

*Admitted pro hac vice*

Elizabeth Y. Ryan (TX Bar No. 24067758)
Matthew Berde (TX Bar No. 24094379)
Megan Cloud (TX Bar No. 24116207_
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
paul.genender@weil.com
liz.ryan@weil.com
matt.berde@weil.com
megan.cloud@weil.com

**COUNSEL FOR
FRIENDSHIP-WEST BAPTIST
CHURCH, ANTI-DEFAMATION
LEAGUE AUSTIN, SOUTHWEST, AND
TEXOMA, TEXAS IMPACT, JAMES
LEWIN**

*Admitted pro hac vice*

<u>**CERTIFICATE OF CONFERENCE**</u>

I hereby certify that, on January 12, 2023 and February 27, 2023, counsel for LUPE Plaintiffs conferred with counsel for Harris County Republican Party Defendant Intervenor concerning the relief requested in the instant motion. As described in the body of this motion, Harris County Republican Party Defendant Intervenor did not agree to produce the requested testimony and documents. I hereby further certify that, on March 3, 2023, counsel for LUPE Plaintiffs conferred with counsel for all parties concerning the subject of the instant motion. Counsel for State Defendants and Defendant Intervenor stated that they oppose the motion. Counsel for the United States stated that they took no position on the motion.

/s/ Nina Perales
Nina Perales

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 3rd day of March 2023.

/s/ Nina Perales
Nina Perales

Appendix E

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | Case No. 5:21-cv-844-XR |
| v. | § | [Consolidated Cases] |
| | § | |
| GREGORY W. ABBOTT, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

### STATE DEFENDANTS' RESPONSE TO LUPE PLAINTIFFS' MOTION TO COMPEL

Plaintiffs' Motion to Compel seeks privileged information and imposes burdens that are disproportionate to the needs of the case. Despite deposing three members of the Texas Legislature, receiving thousands of pages of documents from individual legislators, and obtaining over 100,000 documents from State Defendants, Plaintiffs seek to impose more costs, burdens, and inefficiencies by compelling agents of individual legislators to release privileged information. This, despite a pending appeal involving the very same legal issue. Deciding legislative privilege absent further guidance from the Fifth Circuit is premature, and Mr. Vera should not be compelled to discuss information that is protected by a privilege that he cannot waive. Plaintiffs' motion should thus be denied.

### BACKGROUND

Throughout the discovery in this case, individual legislators and State Defendants have diligently invoked legislative privilege. On May 3, 2022, Plaintiffs filed a motion to compel the production of nearly 300 privileged documents on multiple grounds. *See* ECF 391. This Court determined that the legislative privilege did not apply and granted Plaintiffs' initial motion, *see* ECF 425, which State Defendants then appealed. *See* Appellants' Brief, *LULAC v. Hughes*, No. 22-50435 (5th Cir. May 26, 2022). The parties and the Court still await guidance from the Fifth Circuit.

**ARGUMENT**

## I. Legislative Privilege Protects the Information Plaintiffs Seek.

For centuries, the legislative privilege has "protect[ed] 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts'" and "preclude[d] any showing of how [a legislator] acted, voted, or decided." *United States v. Helstoski*, 442 U.S. 477, 489 (1979). In addition, "[t]he privilege protects the legislative process itself, and therefore covers . . . legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015). This legislative process not only includes "words spoken in debate," but also "[c]ommittee reports, resolutions, and the act of voting," as well as the "things generally done" during a Legislature's session "by one of its members in relation to the business before it." *Gravel v. United States*, 408 U.S. 606, 617 (1972). This privilege necessarily includes "[m]eeting[s] with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation . . . [and] assist legislators in the discharge of their legislative duty." *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007).

Here, the information Plaintiffs seek falls within the scope of legislative privilege. Plaintiffs attempt to obtain evidence of legislators' "contemporaneous thoughts and motivations in drafting and enacting S.B. 1." *See* ECF 547 at 17. Plaintiffs concede that Mr. Vera communicated with legislators extensively and "responded to legislator requests for information about SB1." *See* ECF 547 at 4–5. When responding to such legislative inquiries, Mr. Vera was necessarily engaged in the "proposal, formulation, and passage of legislation." *See Hubbard*, 803 F.3d at 1308. Indeed, Plaintiffs concede that Mr. Vera provided "proposed bill language" and gave legislators information relating to "certain holes [that] needed to be plugged in the statute or certain issues [that] needed to be addressed by the statute." ECF 547 at 5. For example, "Mr. Vera communicated with legislators about including language related to mail ballot 'harvesting,' free movement of poll watchers, penalties for poll workers who obstruct

2

poll watchers, perceived problems with drive-thru voting, and voters registered at illegal addresses," all of which implicate provisions of SB1 being challenged in this litigation. *See* ECF 547 at 5–6. These are but a few examples of the types of privileged information that Plaintiffs seek. For purposes of analyzing legislative privilege, Mr. Vera was thus acting as an "agent" of these legislators by fulfilling their requests "to discuss issues that bear on potential legislation" and to "assist legislators in the discharge of their legislative duty." *See Almonte*, 478 F.3d at 107.

All of these communications—and the other substantively similarly communications at issue—fall within the definition and scope of legislative privilege. Plaintiffs should not be allowed to obtain from Mr. Vera what they would not be allowed to obtain directly from the legislators themselves. Accordingly, such communications should not be compelled.

## II.   Legislative Privilege was Properly Asserted Here.

Plaintiffs argue that legislative privilege has not been properly invoked. That argument is wrong for several reasons. First, any objection lodged by counsel representing those acting as legislative agents is proper. Second, the Office of the Texas Attorney General represents not only State Defendants, but individual legislators, and thus objections made on behalf of those legislators are also proper. Third, absent a specific waiver of legislative privilege by the legislator that holds the privilege, the State of Texas is entitled to lodge the objection.

Given the "complexities of the modern legislative process," the Supreme Court has reasoned that "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants." *Gravel*, 408 U.S. at 616. In line with this reasoning, circuit courts have likewise determined that the legislative privilege extends to non-legislators. *See, e.g.*, *Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995) (finding that "the prophylaxis of the [Speech and Debate] Clause also extends to legislative acts performed by non-legislators"). Rather than adopt an "unacceptably narrow view" that legislative privilege is confined to legislators themselves, the Supreme

Court has instead described the privilege as having the "fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." *Id.* at 618. Thus, the privilege still applies here to the extent that it was invoked on behalf of non-legislators that were fulfilling a legislative role at the behest of members of the legislature.

Additionally, as Plaintiffs are aware, the Office of the Texas Attorney General represents specific legislators in this case. Those legislators have scrupulously invoked legislative privilege during their own depositions as well as in response to Rule 45 subpoenas for documents. Attempts to force their attendance at any deposition that might conceivably reveal legislatively privileged information would be both impractical and disproportionate to the needs of the case. Legislators have instead requested that counsel use its best legal judgment to vigorously defend the privileges to which they are entitled.

Finally, State Defendants themselves have a sufficient interest in preserving legislative privilege on behalf of legislators unless a waiver of that privilege has been effectuated. Legislative privilege applies "whether or not the legislators themselves have been sued." *E.E.O.C. v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011); *see also Hubbard*, 803 F.3d at 1308; *S.C. State Conference of NAACP v. McMaster*, 584 F. Supp. 3d 152, 160 (D.S.C. 2022); *Benisek v. Lamone*, 241 F. Supp. 3d 566, 573 (D. Md. 2017). This is because "state and local officials undoubtedly share an interest in minimizing the 'distraction' of 'divert[ing]' their time, energy, and attention from their legislative tasks to defend the litigation.'" *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018) (quoting *Eastland*, 421 U.S. at 503). Because members of the Texas Legislature presumably wish to keep their privileged documents and communications private absent any indication to the contrary, State Defendants' invocation of the privilege was also proper.

For this reason, Plaintiffs' argument for waiver also fails. *See* ECF 547 at 14–15. As the Supreme Court has observed, "waiver can be found only after explicit and unequivocal renunciation

of the protection." *Helstoski*, 442 U.S. at 490. But Plaintiffs have not established even one instance where a legislator explicitly and unequivocally renounced legislative privilege in relation to SB1. Plaintiffs' argument also conflicts with the Supreme Court's central justifications for extending the legislative privilege beyond just the legislators themselves. If legislators are not able to have free and open conversations with their agents about the problems in the relevant communities, a legislator's actions would be uninformed and unsuccessful—a demise that would effectively divide the voice of the people from the ears of the representatives. Accordingly, legislative privilege has not been waived.

## III. Any Marginal Benefit of the Requested Discovery is Insufficient to Overcome Legislative Privilege.

Plaintiffs use a five-factor balancing test to assert that the "legislative privilege should yield to the need for discovery here." *See* ECF 547 at 16–17. But the legitimacy and applicability of that argument is the subject of a currently pending appeal and awaiting decision from the Fifth Circuit. In addition, other circuit courts have rejected such a factor-based test. *See, e.g.*, *Hubbard*, 803 F.3d at 1308. Reliance on that test here would thus be premature.

Plaintiffs would not be entitled to the requested information even if that balancing test were applied. Proving discriminatory intent using the kind of information Plaintiffs hope to find is subject to "the inherent challenges of using evidence of individual lawmakers' motives to establish that the legislature as a whole enacted [the challenged legislation] with any particular purpose." *Am. Trucking Associations, Inc. v. Alviti*, 14 F.4th 76, 90 (1st Cir. 2021) (citing *United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."). While such "evidence of individual legislators' motives is [not] always irrelevant per se," it is undoubtedly "often less reliable and therefore less probative than other forms of evidence bearing on legislative purpose." *Id.* Balanced against this negligible benefit, imposing any discovery burden on

non-parties would be improper and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

Allowing plaintiffs to bootstrap greater access to discovery by bringing particular claims is also bad policy. Indeed, "[w]ere [this Court] to find the mere assertion of a federal claim sufficient, even one that addresses a central concern of the Framers, the privilege would be pretty much unavailable largely whenever it is needed." *Id.* at 88. Plaintiffs' efforts should not be rewarded, and the privileged information should remain protected.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motion to Compel.

Date: March 7, 2023

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

Respectfully submitted.

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Tex. State Bar No. 24087727

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

J. AARON BARNES
Special Counsel
Tex. State Bar No. 24099014

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
christopher.hilton@oag.texas.gov
kathleen.hunker@oag.texas.gov
aaron.barnes@oag.texas.gov

COUNSEL FOR STATE DEFENDANTS

**CERTIFICATE OF SERVICE**

 I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on March 7, 2023, and that all counsel of record were served by CM/ECF.

          */s/ Kathleen T. Hunker*
          KATHLEEN T. HUNKER