No. 23-50201

# In the United States Court of Appeals
# for the Fifth Circuit

---

LA UNION DEL PUEBLO ENTERO; FRIENDSHIP-WEST BAPTIST CHURCH; SOUTH-WEST VOTER REGISTRATION EDUCATION PROJECT; TEXAS IMPACT; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION; WILLIAM C. VELASQUEZ INSTITUTE; JAMES LEWIN; FIEL HOUSTON, INCORPORATED,

*Plaintiffs-Appellees,*

v.

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS, ET AL,

v.

SENATOR PAUL BETTENCOURT; REPRESENTATIVE BRISCOE CAIN,

*Third-Party Appellants.*

---

Appeal from the United States District Court for the
Western District of Texas, San Antonio Division

---

## APPELLEES' RESPONSE TO APPELLANTS' EMERGENCY MOTION FOR A STAY, AN ADMINISTRATIVE STAY, AND IN THE ALTERNATIVE PETITION FOR MANDAMUS

---

(Counsel Listed Inside Cover)

Nina Perales
Kenneth Parreno
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
nperales@maldef.org

Michael C. Keats
Jason S. Kanterman
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, NY 10004
(212) 589-8000

*Counsel for La Union del Pueblo
Entero; Southwest Voter
Registration Education Project;
Mexican American Bar Association
of Texas; Texas Hispanics
Organized for Political Action;
JOLT Action; William C.
Velasquez Institute; Fiel Houston,
Incorporated*

Zachary D. Tripp
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7220
zack.tripp@weil.com

Elizabeth Y. Ryan
Megan Cloud
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
(214) 746-8158

Aaron J. Curtis
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8901

Sean Morales-Doyle
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(212) 463-7308

*Counsel for Friendship-West Baptist Church; Texas Impact; James
Lewin*

# CERTIFICATE OF INTERESTED PERSONS

Appellees certify that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1)    Plaintiffs-Appellees:

La Union del Pueblo Entero

Friendship-West Baptist Church

Southwest Voter Registration Education Project

Texas Impact

Mexican American Bar Association of Texas

Texas Hispanics Organized for Political Action

JOLT Action

William C. Velasquez Institute

James Lewin

Fiel Houston, Inc.


2)    Third-Party-Appellants:

Senator Paul Bettencourt

Representative Briscoe Cain

3)     Counsel for Plaintiffs-Appellees La Union del Pueblo Entero; Southwest Voter Registration Education Project; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Action; JOLT Action; William C. Velasquez Institute; and Fiel Houston, Inc.:

Nina Perales

Fatima L. Menendez

Julia R. Longoria

Kenneth Parreno

Mexican American Legal Defense & Educational Fund


Michael C. Keats

Rebecca L. Martin

Jason S. Katerman

Kevin Zhen

Fried Frank, Harris, Shriver & Jacobson LLP

4)    Counsel for Plaintiffs-Appellees Friendship-West Baptist Church; Texas Impact; and James Lewin:

Sean Morales-Doyle

Andrew B. Garber

Eliza Sweren-Becker

Jasleen K. Singh

Patrick A. Berry

Robyn Sanders

Brennan Center for Justice at NYU Law School


Zachary D. Tripp

Paul R. Genender

Elizabeth Y. Ryan

Aaron J. Curtis

Alexander P. Cohen

Megan Cloud

Weil, Gotshal & Manges LLP

5)    Counsel for Third-Party-Appellants:

Ken Paxton

Judd E. Stone II

Brent Webster

Benjamin D. Wilson

Kathleen Hunker

Office of the Attorney General of Texas

*/s/ Zachary D. Tripp*
Zachary D. Tripp
*Counsel for Appellees*

# TABLE OF CONTENTS

Introduction ................................................................................ 1

Jurisdiction ................................................................................. 3

Statement of the Case ................................................................ 3

    A.  The *LULAC Texas v. Hughes* Appeal ............................. 3

    B.  The Harris County Republican Party Intervenes ...................... 4

    C.  Vera's Deposition ........................................................ 4

    D.  Plaintiffs' Motion to Compel ........................................ 5

Argument .................................................................................. 7

    I.  The Court Lacks Jurisdiction Over the Legislators' Appeal ........... 7

        A.  The Legislators Cannot Appeal Because They Are Not Parties ............................................................ 7

        B.  The District Court's Interlocutory Discovery Order Is Not a Final Order ................................................ 8

    II.  The Legislators Are Not Entitled to a Stay Pending Appeal ......... 12

        A.  The Legislators Are Unlikely to Succeed on the Merits ........... 13

        B.  The Legislators Fail to Establish that They Will Suffer Any Irreparable Harm Without a Stay ............................. 18

        C.  The Remaining Factors Favor Plaintiffs ................................. 19

    III. Mandamus Is Unwarranted ............................................. 20

Conclusion................................................................................ 23

Certificate of Compliance ......................................................... 25

Certificate of Service................................................................. 26

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*A-Mark Auction Galleries, Inc. v. Am. Numismatic Ass'n*,
  233 F.3d 895 (5th Cir. 2000) ................................................................... 9

*ACORN v. Cnty. of Nassau*,
  2007 WL 2815810 (E.D.N.Y. Sept. 25, 2007) ....................................... 14

*Almonte v. City of Long Beach*,
  478 F.3d 100 (2d Cir. 2007) ................................................................... 17

*Am. Trucking Ass'ns v. Alviti*,
  14 F.4th 76 (1st Cir. 2021) ................................................... 9, 16, 17, 22

*In re Beazley Ins. Co.*,
  2009 WL 7361370 (5th Cir. May 4, 2009) ............................................ 22

*In re Boeing Co.*,
  2021 WL 3233504 (5th Cir. July 29, 2021) .......................................... 21

*Bruce v. Riddle*,
  631 F.2d 272 (4th Cir. 1980) ................................................................. 17

*Edwards v. City of Houston*,
  78 F.3d 983 (5th Cir. 1996) (en banc) ..................................................... 7

*EEOC v. La. Off. of Cmmty. Servs.*,
  47 F.3d 1438 (5th Cir. 1995) ................................................................... 8

*Gilby v. Hughes*,
  471 F. Supp. 3d 763 (W.D. Tex. 2020) .................................... 14, 15, 16

*Henry v. Lake Charles Am. Press, L.L.C.*,
  566 F.3d 164 (5th Cir. 2009) ................................................................... 9

*In re Hubbard*,
  803 F.3d 1298 (11th Cir. 2015) ............................................................. 17

*Jackson Mun. Airport Auth. v. Bryant*,
  2017 WL 6520967 (S.D. Miss. Dec. 19, 2017) ...................................... 16

*Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish
Gov't*,
  849 F.3d 615 (5th Cir. 2017) ........................................................ 15, 17

*In re JPMorgan Chase & Co.*,
  916 F.3d 494 (5th Cir. 2019) ................................................................ 21

*League of United Latin Am. Citizens (LULAC) v. Abbott*,
  2022 WL 3233406 (W.D. Tex. Aug. 10, 2022) ................................ 14, 16

*League of United Latin Am. Citizens v. Guillen*,
  2022 WL 2713263 (5th Cir. May 20, 2022)..................................... 15, 16

*Lee v. City of Los Angeles*,
  908 F.3d 1175 (9th Cir. 2018) ......................................................... 16, 17

*Leonard v. Martin*,
  38 F.4th 481 (5th Cir. 2022)................................................ 11, 20, 21, 22

*Marino v. Ortiz*,
  484 U.S. 301 (1988) ................................................................................ 7

*Marylanders for Fair Representation, Inc. v. Schaefer*,
  144 F.R.D. 292 (D. Md. 1992) ............................................................. 14

*Mohawk Indus., Inc. v. Carpenter*,
  558 U.S. 100 (2009) ........................................................................ *passim*

*Munaf v. Geren*,
  553 U.S. 674 (2008) .............................................................................. 13

*Nichols v. Alcatel USA, Inc.*,
  532 F.3d 364 (5th Cir. 2008) ............................................................... 18

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................... 13, 19

*Perez v. Perry*,
  2014 WL 106927 (W.D. Tex. Jan. 8, 2014) ................................ 14, 15, 16

*Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*,
  464 F. Supp. 3d 915 (S.D. Ohio 2020) ................................................. 16

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  734 F.3d 406 (5th Cir. 2013) ............................................................... 12

*Rollins v. Home Depot USA*,
  8 F.4th 393 (5th Cir. 2021).................................................................. 20

*Sharyland Water Supply Corp. v. Block*,
  755 F.2d 397 (5th Cir. 1985) ............................................................... 16

*Texas v. United States,*
   679 F. App'x 320 (5th Cir. 2017) (per curiam).....................................7, 8

*Thomas v. Bryant,*
   919 F.3d 298 (5th Cir. 2019) ...................................................................13

*TitleMax of Tex., Inc. v. City of Dallas,*
   2022 WL 326566 (N.D. Tex. Feb. 3, 2022)................................14, 15, 16

*Turtle Mountain Band of Chippewa Indians v. N.D. Legis.*
   *Assembly,*
   No. 23-1597 (8th Cir.) ...............................................................................10

*United States v. Gillock,*
   445 U.S. 360 (1980)..................................................................................15

**Rules**

Fed. R. App. P. 8...........................................................................................12


**Statutes**

28 U.S.C. § 1291 ....................................................................................3, 7, 9

28 U.S.C. § 1292(b)...............................................................................11, 22

52 U.S.C. § 10301 ..........................................................................................3


**Other Authority**

Plaintiffs-Appellees' Mot. to Dismiss Appeal of Dr. Rachel
Tudor, *Texas v. United States,*
   679 F. App'x 320 (No. 16-11534) (5th Cir. Jan. 30, 2017).......................8

# INTRODUCTION

Texas State Senator Paul Bettencourt and Representative Briscoe Cain ask this Court to stay the district court's discovery order based on objections they never lodged and privileges they never invoked. These Legislators had notice and numerous opportunities to intervene in the proceedings below. But they did not object to Plaintiffs' request for documents or attend the deposition of Alan Vera, a private citizen. Likewise, the Legislators did not respond to or even appear at the two hearings on Plaintiffs' motions to compel. But now, after taking no action in the district court, the Legislators ask this Court to intercede on their behalf in the first instance and either stay the district court's decision pending appeal or issue a writ of mandamus. The Court should deny the Legislators' extraordinary requests.

The main thrust of the Legislators' arguments is that Plaintiffs are attempting to make an "end-run" around another appeal—*LULAC Texas v. Hughes*—which raises various legislative privilege issues and has been submitted since August 2022. That assertion has no merit. Plaintiffs are working diligently to move this case forward to trial in a timely and efficient manner. After the Harris County Republican Party chose to intervene in this case but then refused to produce relevant documents and testimony, Plaintiffs moved to compel as parties normally do. And because

the Legislators never appeared or objected to the document discovery or Vera's testimony, the district court held that the legislative privilege was not properly invoked and granted the motion to compel. It's as simple as that.

The Legislators had ample opportunity to assert the legislative privilege in the district court here, just as they asserted it in *Hughes*. They could have objected to Plaintiffs' document requests, responded to the motions to compel, attended and objected at Vera's deposition, attended the hearings, or moved the district court for reconsideration, stay, or certification of interlocutory appeal. But the Legislators did none of those things. Instead, they seek appellate relief in the first instance. Because the Legislators were not parties to the proceedings below, they lack standing to bring this appeal. And even if the Legislators have standing, the district court correctly held that they waived the privilege for communications with an outsider like Vera, consistent with every district court in this Circuit to have addressed the issue and this Circuit's repeated emphasis that the legislative privilege is qualified.

The Legislators therefore cannot show they are entitled to a stay or mandamus relief, and the Court should deny their motion.

## JURISDICTION

For the reasons stated below in Part I.A, the Court lacks jurisdiction under 28 U.S.C. § 1291 over the Legislators' appeal and their motion to stay.

## STATEMENT OF THE CASE

This case involves a challenge to Senate Bill 1 ("SB1"), an omnibus voting law enacted in 2021 that substantially altered how Texans vote. Among other things, Plaintiffs contend that SB1 violates the U.S. Constitution and the Voting Rights Act, 52 U.S.C. § 10301.

### A.  The *LULAC Texas v. Hughes* Appeal

In December 2021, consolidated plaintiffs in this suit served third-party document subpoenas on several state legislators, including Senator Bettencourt and Representative Cain ("Legislators"), who withheld documents based on assertions of the legislative privilege. The plaintiffs moved to compel, and the Texas Office of the Attorney General appeared on the state legislators' behalf, objecting and asserting the legislative privilege. The district court granted the motion, the state legislators appealed, *LULAC Texas v. Hughes*, No. 22-50435, and the district court granted the legislators' unopposed motion to stay the order pending resolution of that appeal. *Hughes* was submitted on August 2, 2022, and remains pending.

3

## B.  The Harris County Republican Party Intervenes

Separately, on May 13, 2022, the district court granted a renewed motion to intervene from the Harris County Republican Party (the "Party"). App. A at 2. Two months later, Plaintiffs served the Party with document requests and eventually moved to compel the production of those documents. *Id.* at 3-4. On November 14, 2022, the Party advised the district court that it would produce all documents responsive to Plaintiffs' request for documents exchanged with the Texas Legislature regarding SB1 without objection and without any assertion of privileges. *Id.* at 5. The Legislators did not object, respond to the motion to compel, or appear at the November 2022 hearing.

## C.  Vera's Deposition

On February 27, 2023, Plaintiffs deposed Alan Vera, a witness the Party had identified as a document custodian. App. B at 1; App. C at 4. Vera is a volunteer for the Party who serves as chairman of the Party's Ballot Security Committee. App. B 19:1-11. He is neither a legislator nor an employee of the Legislature. The Office of the Attorney General appeared at the deposition on behalf of the Texas Governor and other state officials ("State Defendants"). App. B 7:20-22. Although the Office of the Attorney General also represents the same Legislators in this appeal and *Hughes*, those same attorneys did not appear on the Legislators' behalf. App. B 5:1-7.

Vera testified that, on behalf of the Party, he communicated extensively with legislators and legislative staff regarding SB1 from June 2020 through September 2021. *See* App. B 19:6-11, 30:7-37:5, 75:3-84:25, 95:10-101:20, 104:24-106:9, 112:2-116:22. Those individuals included the Legislators as well as Representatives Jacey Jetton and Valoree Swanson. *Id.* at 75:18-76:8, 113:10-114:18. Vera testified that he met in person with legislators and legislative staff, provided them with "exhibits," and communicated with them by phone and email. *Id.* at 36:18-20, 75:9-78:1, 81:1-82:21, 100:2-24. Despite the Party's knowledge that Vera did not have a Party email account, the Party failed to search Vera's personal email address or computer for responsive documents. App. H at 5.

During Vera's deposition, no legislator appeared or invoked the legislative privilege. Instead, the State Defendants objected based on the privilege (even though they are not legislators) and instructed Vera not to answer questions regarding his response to legislator inquiries for feedback on SB1. App. B 33:3-34:10, 78:2-80:12; 117:5-118:19. Vera also self-censored his answers to questions calling for his communications with legislators regarding SB1. *Id.* at 34:9-16, 92:16-17, 117:5-118:19.

### D. Plaintiffs' Motion to Compel

On March 4, 2023, Plaintiffs moved to compel the Party to search for and produce documents in Vera's personal email and computer and to

compel Vera to fully answer questions regarding communications he had with legislators or their staff. App. C at 1-3. Plaintiffs served the motion on the Office of the Attorney General, which already represented the Legislators in *Hughes*. The Office of the Attorney General—on behalf of the State Defendants but *not* the Legislators—filed a response brief on March 7, 2023. App. D at 1, 6.

That same day, the district court held a hearing on Plaintiffs' motion. App. E. Counsel from the Office of the Attorney General appeared only on behalf of the State Defendants, *id.* at 4:16-20, and conceded that the Legislators did not have an attorney at Vera's deposition, *id.* at 8:8-12. The district court accordingly concluded that "there was no meritorious invocation of the legislative privilege" and ordered that Vera be re-deposed. *Id.* at 8:23-9:18. The State Defendants made an oral motion to stay, which the court denied. *Id.* at 20:6-10; App. H at 7. The Legislators acknowledge they were not parties to that motion. *See* App. H at 7 n.6.

The district court ordered the Party to search for responsive documents in Vera's personal email and computer. App. E 23:2-20. And the court instructed Plaintiffs to serve a subpoena on Vera directing him to produce the identified documents and to appear at a second deposition. *Id.* On March 9, 2023, the district court entered a written order memorializing its rulings. App. H at 8-10.

The Legislators appealed. This motion followed.

## ARGUMENT

## I.  The Court Lacks Jurisdiction Over the Legislators' Appeal

As a threshold matter, this Court should deny the Legislators' motion because this Court lacks jurisdiction under 28 U.S.C. § 1291 to hear their appeal.

### A.  The Legislators Cannot Appeal Because They Are Not Parties

"It is well-settled that one who is not a party to a lawsuit, or has not properly become a party, has no right to appeal a judgment entered in that suit." *Edwards v. City of Houston*, 78 F.3d 983, 993 (5th Cir. 1996) (en banc); *Texas v. United States*, 679 F. App'x 320, 323 (5th Cir. 2017) (per curiam); *accord Marino v. Ortiz*, 484 U.S. 301, 304 (1988). That rule is fatal to the Legislators' appeal.

The Legislators are not parties. They did not intervene or ask to intervene. And they took no action below. They did not lodge any objection to the Party's document production or Vera's testimony or document production, did not oppose Plaintiffs' motions to compel, and did not appear at the hearings on the motions.

The Legislators have also forfeited any argument that this case fits within any exception to the rule that non-parties cannot appeal. Relying on *Marino* and its progeny, the Office of the Attorney General recently

argued to this Court that an individual who is not party cannot appeal. Plaintiffs-Appellees' Mot. to Dismiss Appeal of Dr. Rachel Tudor, at 3-6, 8, *Texas v. United States*, No. 16-11534 (5th Cir. Jan. 30, 2017), at App. F. The Office emphasized that this Court lacked jurisdiction because the individual "did not participate in the proceedings" below. *Id.* at 6. Here, the Legislators did not participate below, and thus this Court lacks jurisdiction for the reasons the Office itself articulated.

Even worse, in *Texas* this Court dismissed for lack of jurisdiction for the simpler reason that the appellant had not even referenced in her brief any exception for a non-party who had "actually participated in the proceedings below." 679 F. App'x at 323-24 (quoting *EEOC v. La. Off. of Cmmty. Servs.*, 47 F.3d 1438, 1442-43 (5th Cir. 1995)). The Legislators have similarly forfeited any such argument. This Court thus lacks jurisdiction for multiple reasons: The Legislators are non-parties. They forfeited any argument that they can nonetheless appeal. And as the Office itself argued in *Texas*, the narrow exception would not even apply because they did not actually participate below.

## B. The District Court's Interlocutory Discovery Order Is Not a Final Order

The Legislators never mention their failure to participate in the district court proceedings. Instead, they focus on the collateral order doctrine.

Mot. at 3-4. But even if they could invoke that doctrine as a non-party, this Court would still lack jurisdiction.

Under 28 U.S.C. § 1291, an appellate court's jurisdiction is limited to appeals from "final decisions of the district courts." Discovery orders are ordinarily non-final, and thus appealable only after entry of a final judgment. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009); *A-Mark Auction Galleries, Inc. v. Am. Numismatic Ass'n*, 233 F.3d 895, 897-98 (5th Cir. 2000).

Courts have recognized a "'small' class of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.'" *Mohawk*, 558 U.S. at 106. To be an appealable collateral order, an order must "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 171 (5th Cir. 2009) (citation omitted). In *Mohawk*, the Supreme Court held that interlocutory discovery orders requiring the production of attorney-client privileged materials do not qualify as collateral orders and cannot be immediately appealed. 558 U.S. at 114. The district court's discovery order similarly is not immediately appealable. *See Am. Trucking Ass'ns v. Alviti*, 14 F.4th 76, 84, 90-91 (1st Cir. 2021) (no appellate jurisdiction over interlocutory review of legislative

privilege assertions by state officials); Judgment, *Turtle Mountain Band of Chippewa Indians v. N.D. Legis. Assembly*, No. 23-1597 (8th Cir. Apr. 3, 2023) (dismissing similar appeal for lack of jurisdiction), at App. G.

First, under *Mohawk*, the particular question here is not a sufficiently "*important*" issue to warrant an immediate appeal because "deferring review until final judgment" would not "so imperil[] the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." 558 U.S. at 108 (emphasis added). *Mohawk* establishes that orders requiring the production of privileged materials do not satisfy that demanding test. *Id.* at 109. Yet the Legislators do not even argue, as they must to overcome *Mohawk*, that the legislative privilege should be treated differently from the attorney-client privilege in this respect—particularly where, as here, the communications are between a legislator *and a member of the public,* obtained from the member of the public himself. *See infra* Part II.A. And this case involves the particular class of orders where the Legislators failed to assert the privilege or to otherwise raise any objection in the district court, despite having the opportunity to do so. Opening the door to such non-party interlocutory appeals would cause exactly the kind of problems the final-judgment rule is designed to prevent: It would "disrupt the orderly progress of the litigation, swamp the courts of appeals,

and substantially reduce the district court's ability to control the discovery process." *Mohawk*, 558 U.S. at 112-13 (citation omitted).

Second, as in *Mohawk*, the district court's decision is not "effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* at 110 (citation omitted). "[T]his court and every other circuit court hold that the collateral order doctrine does not provide jurisdiction over a non-party's appeal from a discovery order because nonparties have alternative avenues for appellate review." *Leonard v. Martin*, 38 F.4th 481, 487 (5th Cir. 2022). The Legislators could have intervened, objected, and "request[ed] that the district court certify a § 1292(b) appeal." *Id.* at 488; *see also Mohawk*, 558 U.S. at 110. Even after entry of final judgment, the appellate court could "remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Mohawk*, 558 U.S. at 109; *accord Leonard*, 38 F.4th at 487-88 (denying appellate review of order denying third party's discovery motion).

The Legislators argue that the district court's order is "effectively unreviewable" because once the "information is published, it cannot be made secret again." Mot. at 3-4 (citations omitted). But the Supreme Court rejected that same argument in *Mohawk* and concluded that "postjudgment

appeals generally suffice to protect the rights of litigants and ensure the vitality of the attorney-client privilege." 558 U.S. at 109. There is no sound basis to treat the legislative privilege differently. As a result, the collateral order doctrine does not apply, and this Court lacks jurisdiction over this appeal.

## II.    The Legislators Are Not Entitled to a Stay Pending Appeal

Even if this Court determines it has jurisdiction to review the district court's order, a stay would be unwarranted. First, under Federal Rule of Appellate Procedure 8, "[a] party must ordinarily move first in the district court for … a stay of the … order of a district court" unless "moving first in the district court would be impracticable." The Legislators failed to do so. The Court should deny the Legislators' motion solely on that basis. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013) (a party "would ordinarily be required" "seek a stay in the district court"). Indeed, the State Defendants moved for a stay below, which the district court denied in part because "no legislator actually asserted the privilege during the deposition of Mr. Vera." App. H at 7 n.6. Yet the Legislators *still* did not come forward to raise an objection and to ask for a stay on their behalf. The Legislators thus slept on their rights and have forfeited any argument that their failure to move should be excused.

12

Second, a stay would be unwarranted even if the Legislators had sought one below. A stay is an "extraordinary remedy" that is never available by right. *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019). Courts consider "1) whether the applicant has made a strong showing of likelihood to succeed on the merits; 2) whether the movant will be irreparably harmed absent a stay; 3) whether issuance of a stay will substantially injure other interested parties; and 4) where the public interest lies." *Id.*; *see Nken v. Holder*, 556 U.S. 418, 434 (2009). The Legislators fail to satisfy any of those requirements.

### A. The Legislators Are Unlikely to Succeed on the Merits

1. At the outset, the Legislators are unlikely to succeed on the merits because this Court lacks jurisdiction to hear this appeal. *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (a "difficult question as to jurisdiction" "mak[es] … success more *unlikely* due to potential impediments to even reaching the merits"); *see supra* Section I.

2. The Legislators are further unlikely to succeed because they failed to invoke the privilege below. As the district court explained, "the legislative privilege belongs solely to a legislator, and he/she is the only person able to assert that privilege." App. H at 4 n.4. Because no legislator (or even legislative staff) did so, the district court held that the Legislators had forfeited any objection. *Id.* at 4 n.4, 7 n.6; App. E 7:24-9:4. Similarly,

13

the Legislators never asserted the legislative privilege in response to Plaintiffs' document requests or either motion to compel and remained silent even when the Party agreed to produce the requested documents without objection. App. H at 5.

District courts in this Circuit have uniformly held that "[t]he legislative privilege is a personal one and may be waived or asserted" only "by each individual legislator." *See Perez v. Perry*, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014) ("[N]either the Governor, nor the Secretary of State or the State of Texas has standing to assert the legislative privilege on behalf of any legislator or staff member that may be deposed."); *League of United Latin Am. Citizens (LULAC) v. Abbott*, 2022 WL 3233406, at *1 (W.D. Tex. Aug. 10, 2022); *Gilby v. Hughes*, 471 F. Supp. 3d 763, 767 (W.D. Tex. 2020); *TitleMax of Tex., Inc. v. City of Dallas*, 2022 WL 326566, at *6 (N.D. Tex. Feb. 3, 2022).[1] The Legislators cite no authority to the contrary. The Legislators' forfeiture of the privilege below precludes them from establishing a likelihood of success.

3.   In a similar vein, the Legislators cannot assert the privilege over communications in which they did not participate, as "[a] legislator cannot

---

[1]   Courts in other circuits have reached the same conclusion. *See, e.g.*, *ACORN v. Cnty. of Nassau*, 2007 WL 2815810, at *4 (E.D.N.Y. Sept. 25, 2007); *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992).

assert or waive the privilege on behalf of another legislator." *Perez*, 2014 WL 106927, at *1; *Gilby*, 471 F. Supp. 3d at 767; *TitleMax*, 2022 WL 326566, at *6. Vera communicated not only with the Legislators, but also with Representatives Jetton and Swanson (or their respective staff) regarding potential bill language. App. B 75:18-76:8; 113:14-16. Neither was a party below or is one here. This Court should reject any attempt to invoke the privilege or stay the district court's order with respect to exchanges in which the Legislators did not participate.

4.    The Legislators are even less likely to succeed on the merits because the legislative privilege does not bar members of the public from disclosing or testifying about their communications with legislators. "Both this court and the Supreme Court have confirmed that the state legislative privilege is not absolute." *League of United Latin Am. Citizens v. Guillen*, 2022 WL 2713263, at *1 (5th Cir. May 20, 2022). Rather, "the legislative privilege for state lawmakers is, at best, one which is qualified." *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 624 (5th Cir. 2017) (citation omitted).

The legislative privilege protects "candor in … *internal* exchanges." *United States v. Gillock*, 445 U.S. 360, 373 (1980) (emphasis added). District courts in this Circuit have thus unanimously concluded that legislators waive the legislative privilege for any exchanges where they or their

staff "communicate[] with any outsider (*e.g.* party representatives, non-legislators, or non-legislative staff)." *Perez*, 2014 WL 106927, at *2; *accord LULAC*, 2022 WL 3233406, at *1 n.3; *TitleMax*, 2022 WL 326566, at *6; *Gilby*, 471 F. Supp. at 767; *Jackson Mun. Airport Auth. v. Bryant*, 2017 WL 6520967, at *7 (S.D. Miss. Dec. 19, 2017); *see also Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*, 464 F. Supp. 3d 915, 921-22 (S.D. Ohio 2020) (collecting cases). That conclusion is consistent with the general rule that "virtually every privilege is waived by disclosure to a third party." *Sharyland Water Supply Corp. v. Block*, 755 F.2d 397, 399 & n.13 (5th Cir. 1985) (collecting cases).

The Legislators acknowledge that Vera is not a legislator or legislative staffer. Mot. at 12-13. Thus, the district court correctly concluded that the Legislators waived the legislative privilege in any communications with him. App. H at 4 n.4.

5.    Without any support from this Circuit, the Legislators turn to out-of-circuit cases to assert that the privilege protects lawmakers from discovery in civil litigation seeking to probe legislators' motivations. Mot. at 12-13. But none supports the Legislators. As an initial matter, those circuits "all recognize that the legislative privilege is qualified," consistent with this Circuit. *See Guillen*, 2022 WL 2713263, at *1 n.2 (citing *Alviti*, 14 F.4th at 88; *Lee v. City of Los Angeles*, 908 F.3d 1175, 1188 (9th Cir.

2018); and *In re Hubbard*, 803 F.3d 1298, 1311 (11th Cir. 2015)). Further, *Alviti* indicates that the privilege does not apply when "the information has already been given to a private third party." 14 F.4th at 85-86. And the other cases merely involve state legislators asserting the privilege to avoid being deposed themselves, *Lee*, 908 F.3d at 1186-88, or to avoid producing documents themselves, *In re Hubbard*, 803 F.3d at 1302, 1308. Neither decision accepts that the privilege shields a legislator's communications with a third party or blocks a member of the public from being compelled to testify or produce documents about his communications with a legislator.

The Legislators assert that the privilege "extends to communications with certain persons outside the legislature," but they rely on out-of-circuit cases regarding federal legislative *immunity*, not state legislative *privilege*. Mot. at 12-13 (citing *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007); *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980)). Here, Plaintiffs are not seeking to hold the Legislators personally liable. Plaintiffs are asking a member of the public to testify and produce documents about communications with state legislators. Although the federal legislative immunity is absolute, the state legislative privilege is, at best, qualified. *Jefferson*, 849 F.3d at 624. This Court therefore has rejected any conflation of those two principles. *See id*. And *In re Sealed Case* is inapposite

because it concerns the presidential communications privilege—not the legislative privilege—and does not prevent the type of discovery from members of the public that is at issue here. 121 F.3d 729, 746-47 (D.C. Cir. 1997) (per curiam).

The Legislators thus have identified no case that has extended the legislative privilege to the kind of discovery here. They are therefore unlikely to succeed on the merits.

## B. The Legislators Fail to Establish that They Will Suffer Any Irreparable Harm Without a Stay

The Legislators fail to identify any irreparable harm that they will suffer absent a stay. Indeed, they have failed to introduce any affidavits or other evidence of harm that they would actually suffer. That failure of proof is sufficient to deny a stay. *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 378-79 (5th Cir. 2008) (emphasizing failure to carry burden when "no evidence was offered that suggests" irreparable harm).

The Legislators instead assert abstract harms that arise from letting the "cat … out of the bag" while awaiting a decision in *Hughes*. Mot. at 13. But denying the Legislators' stay motion would not moot appellate review in *Hughes* because that case involves a larger set of documents. *See* Mot. at 8-9. Moreover, the Supreme Court has already explained that disclosure of privileged documents is insufficiently harmful to justify even interlocutory review, much less a stay in the interim. *See Mohawk*, 558 U.S. at 110.

Indeed, "[a]ppellate courts can remedy the improper disclosure of privileged material … by vacating an adverse judgment and remanding for a … trial in which the protected material and its fruits are excluded from evidence." *Id.* at 109. The Legislators fail to show that such a ruling would not adequately remedy any alleged chilling effect.

More fundamentally, the proverbial "cat is out of the bag" not because of a lack of interlocutory appeal, but because the Legislators failed to protect their privilege by (1) communicating with a member of the public, and thus waiving the privilege; and then (2) failing to assert the privilege in the district court, and thus forfeiting any objection that they might have had. There is accordingly no warrant for a stay.

### C.  The Remaining Factors Favor Plaintiffs

The remaining stay factors—"whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies"—also weigh heavily against a stay. *See Nken*, 556 U.S. at 426 (citation omitted). Public policy strongly favors avoiding piecemeal appeals, which threaten to halt litigation as trial approaches. *See Mohawk*, 558 U.S. at 106. Those concerns loom large. Discovery closes in less than a month, and trial is set to begin on September 11, 2023. App. I at 1, 3. Delaying discovery would seriously interfere with the parties' ability to litigate this case. The public interest concerns are further magnified

because this is a voting rights case, which has already extended through one election cycle, and delays threaten to push resolution past yet another General Election.

## III. Mandamus Is Unwarranted

"A writ of mandamus is a drastic and extraordinary remedy reserved for really extraordinary causes." *Leonard*, 38 F.4th at 488-89 (citation omitted). "Mandamus is appropriate only where: (1) the petitioner shows a clear and indisputable right to the writ; (2) the petitioner has no other adequate means to attain the relief he desires; and (3) the court is satisfied that the writ is appropriate under the circumstances." *Id.* at 489 (citation omitted). The Legislators cannot satisfy any of these requirements, much less all of them.

1.    First, the Legislators "must show not only that the district court erred, but that it *clearly and indisputably* erred." *Id.* (citation omitted). They cannot do so because the district court (1) correctly held that the Legislators forfeited the privilege and (2) correctly resolved the underlying privilege issues, consistent with every other ruling in this Circuit.

The lack of a timely objection in the district court is a sufficient basis to deny mandamus relief. *See Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021) (appellate courts "do not ordinarily consider issues that

are forfeited because they are raised for the first time on appeal"). Moreover, as discussed above, the legislator must invoke the privilege himself, and state legislators waive the legislative privilege when they communicate with third parties like Vera. *See supra* Section II.A. Because its ruling was consistent with "[e]very decision from district courts in this circuit," the district court did not clearly and indisputably err. *See In re JPMorgan Chase & Co.*, 916 F.3d 494, 504 (5th Cir. 2019).

The Legislators suggest that review is de novo, contending that mandamus is warranted because the district court purportedly applied "the wrong law." Mot. at 16. As discussed, the district court correctly applied the law of the Circuit. In any event, "[d]emonstrating a clear and indisputable right to a writ of mandamus require[s] more than showing that the district court misinterpreted the law, misapplied it to the facts, or otherwise engaged in an abuse of discretion." *Leonard*, 38 F.4th at 489 (citation omitted). The Legislators must "show a clear abuse[] of discretion that produce[s] patently erroneous results," or "exceptional circumstances amounting to a judicial usurpation of power." *Id.* (citations omitted). For all the reasons set forth above, they cannot satisfy that demanding standard. *See Leonard*, 38 F.4th at 490 (denying writ of mandamus where petitioner failed to "show a clear and indisputable right to the writ"); *In re*

*Boeing Co.*, 2021 WL 3233504, at \*2 (5th Cir. July 29, 2021) (similar); *accord Alviti*, 14 F.4th at 86 (denying writ of mandamus for state officials who asserted legislative privilege over documents in possession of private third party).

2.    The Legislators also had other adequate means to obtain relief. *See Leonard*, 38 F.4th at 489. The Legislators could have sought to intervene, objected to Vera's testimony and the Party's document production in the district court, opposed Plaintiffs' motions to compel, and asked the district court for a stay of its order. *See supra* Section I.B. They also could have sought certification under 28 U.S.C. § 1292(b). But the Legislators did none of those things. *See id.* Unlike the petitioner in *In re Itron*, who "exhausted every other opportunity for interlocutory review" of the lower court's decision, 883 F.3d 553, 568 (5th Cir. 2018), the Legislators exhausted *none* of the available opportunities to obtain relief.

3.    Finally, the writ is not appropriate under the circumstances. *See Leonard*, 38 F.4th at 489. Among other things, the issues presented "would be of minimal importance beyond this case" because the district court conducted a "fact-intensive" analysis that was "distinct" from the analysis in *Hughes. See In re Beazley Ins. Co.*, 2009 WL 7361370, at \*6 (5th Cir. May 4, 2009) (citation omitted). Unlike the legislators in *Hughes* who personally invoked the privilege in the district court, here, the district court

granted the first motion to compel after no party objected and granted the second motion to compel because "no legislator actually asserted the privilege during the deposition of Mr. Vera." App. H at 4 n.4, 7 n.6. Therefore, this appeal involves an unusual fact pattern that the Legislators themselves can avoid in the future simply by appearing and levying an objection in the district court.

## CONCLUSION

For the foregoing reasons, this Court should deny the Legislators' emergency motion for a stay or administrative stay and deny their petition for mandamus.

Respectfully submitted,

Nina Perales
Kenneth Parreno
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
nperales@maldef.org

Michael C. Keats
Jason S. Kanterman
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
One New York Plaza
New York, NY 10004
(212) 589-8000
*Counsel for La Union del Pueblo
Entero; Southwest Voter
Registration Education Project;
Mexican American Bar
Association of Texas; Texas
Hispanics Organized for
Political Action; JOLT Action;
William C. Velasquez Institute;
Fiel Houston, Incorporated*

April 6, 2023

*/s/ Zachary D. Tripp*

Zachary D. Tripp
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7220
zack.tripp@weil.com

Elizabeth Y. Ryan
Megan Cloud
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
(214) 746-8158

Aaron J. Curtis
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8901

Sean Morales-Doyle
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(212) 463-7308

*Counsel for Friendship-West
Baptist Church; Texas Impact;
James Lewin*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 5,064 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

/s/ Zachary D. Tripp
Zachary D. Tripp
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7220
zack.tripp@weil.com

April 6, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2023, I electronically filed the forego-
ing with the Clerk of the Court using the ECF system, which will send
notification of such filing to all ECF participants.

/s/ Zachary D. Tripp

Zachary D. Tripp
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7220
zack.tripp@weil.com

April 6, 2023

No. 23-50201

# In the United States Court of Appeals
# for the Fifth Circuit

---

LA UNION DEL PUEBLO ENTERO; FRIENDSHIP-WEST BAPTIST CHURCH;
SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; TEXAS IMPACT;
MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS
ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION; WILLIAM C.
VELASQUEZ INSTITUTE; JAMES LEWIN; FIEL HOUSTON, INCORPORATED,

*Plaintiffs-Appellees,*

v.

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR

OF TEXAS, ET AL,

v.

SENATOR PAUL BETTENCOURT; REPRESENTATIVE BRISCOE CAIN,

*Third-Party Appellants.*

---

Appeal from the United States District Court for the
Western District of Texas, San Antonio Division

---

**APPENDIX TO APPELLEES' RESPONSE TO APPELLANTS'
EMERGENCY MOTION FOR A STAY, AN ADMINISTRATIVE
STAY, AND IN THE ALTERNATIVE PETITION FOR
MANDAMUS**

---

# TABLE OF CONTENTS

1. December 9, 2022 Order on Motion to Compel ................ Appendix A

2. Transcript of Deposition of Alan Vera ............................. Appendix B

3. LUPE Plaintiffs' Motion to Compel................................... Appendix C

4. State Defendants' Resonse to LUPE Plaintiffs' Motion to
   Compel ............................................................................. Appendix D

5. Transcript of March 7, 2023 Hearing on Motion to
   Compel ............................................................................. Appendix E

6. Plaintiffs-Appellees' Motion to Dismiss Appeal of Dr.
   Rachel Tudor, *Texas v. United States* ................................ Appendix F

7. Judgment, *Turtle Mountain Band of Chippewa Indians v.
   North Dakota Legislative Assembly* ................................. Appendix G

8. March 9, 2023 Order on Motion to Compel ...................... Appendix H

9. Amended Scheduling Order................................................ Appendix I



# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO *et al.*,  §
    *Plaintiffs*  §
          §
-vs-  §        SA-21-CV-00844-XR
          §
GREGORY W. ABBOTT, IN HIS  §    *CONSOLIDATED CASES*
OFFICIAL CAPACITY AS GOVENOR  §
OF TEXAS *et al.*;  §
    *Defendants*  §

## ORDER

On this date, the Court considered Plaintiffs' motion to compel discovery responses from Defendant Intervenors Harris County Republican Party, the Dallas County Republican Party, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee (collectively, the "Committees" or the "Defendant Intervenors") and to amend the scheduling order (ECF No. 469); Defendant Intervenors' motion for a protective order (ECF No. 471); the parties' arguments at the hearing on November 14, 2022; and the supplemental briefing that followed (ECF Nos. 483, 484, 486).

## BACKGROUND

These consolidated cases arise out of Texas's enactment of an omnibus voting bill, Senate Bill 1 ("SB 1"). In the days and weeks after the law was passed on August 31, 2021, numerous parties began filing complaints against various Texas state officials (the "State Defendants") and local elections administrators in this district, challenging certain provisions of SB 1 under the United States Constitution and various federal civil rights statutes. In the interest of judicial economy, these were consolidated under the above-captioned case, as it was first filed.[1]

---

[1] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D.

Plaintiffs generally allege (1) that the Texas Legislature enacted SB 1 with the intent to discriminate and unduly burden the right to vote of Black and Latino voters and voters with disabilities rather than to protect election integrity or prevent fraud and (2) that SB 1 does in fact unlawfully burden the right to vote. *See* ECF No. 199 ("HAUL Compl."), ECF No. 207 ("LULAC Compl."), ECF No. 208 ("LUPE Compl."). In their operative complaints, Plaintiffs allege violations of the Voting Rights Act of 1965, the Americans with Disabilities Act, and the United States Constitution. *See id.*

The Committees first sought to intervene in this action in October 2021. ECF No. 57. The Court denied their motion, concluding that the Committees had not established a legally protectable interest at stake in this litigation or that the State Defendants' representation of their purported interests would be inadequate. *See* ECF No. 122 at 2–7. The Fifth Circuit reversed the Court's order denying intervention, concluding that the Committees' interest in SB 1's provisions concerning party-appointed poll watchers—an interest raised for the first time on appeal— warranted intervention. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022).

In May 2022, the Court granted the Committees' renewed motion to intervene and, after giving the parties an opportunity to confer, entered an Amended Scheduling Order on June 8, 2022, to accommodate the Defendant Intervenors' participation in the case and various delays caused by discovery disputes. *See* Text Orders dated May 13, 2022 and May 18, 2022; ECF No. 437. Under that Order, primary election discovery "as to Plaintiffs" closed on August 12; such discovery "as to Intervenors" closed October 24. ECF No. 437. The Amended Scheduling Order also established a discovery period for the general election and limited general election discovery to "no more than 10 depositions per side[.]" *Id.* at 2.

---

Tex. 2021) and *Mi Familia Vota v. Abbott*, No. 5: 21-cv-920 (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex. 2021); *United States v. Texas*, No. 5:21-cv-1085 (W.D. Tex. 2021), ECF No. 13.

After the Court granted the Committees' motion to intervene at the direction of the Fifth Circuit on May 13, the LUPE Plaintiffs, the HAUL Plaintiffs, and the LULAC Plaintiffs (hereinafter, "Private Plaintiffs") served their first set of requests for production ("RFPs") on the Defendant Intervenors on July 7, *see* ECF No. 469-1, and their first interrogatories ("ROGs") on July 13, *see* ECF No. 469-2. Private Plaintiffs sought discovery concerning (i) SB 1, its predecessor bills and the purported justifications for the voting restrictions therein, including allegedly promoting "election integrity" and combatting alleged voter fraud (ROGs 1–3, 5; RFPs 1–7, 11–13); (ii) the recruitment and training of election judges, election clerks, poll workers, and poll watchers as well as instances of violence, discrimination, harassment, or inappropriate behavior by any of the above (ROGs 8–9; RFPs 8–10); and (iii) the impact or potential impact of SB 1 and its predecessor bills on the demographic groups at issue in the consolidated actions (ROGs 7,10; RFPs 14–20).

On August 5, 2022, the Defendant Intervenors responded to Private Plaintiffs' RFPs with various boilerplate objections, including that the requests were "overbroad and unduly burdensome," and sweeping assertions of First Amendment privilege, unsupported by a privilege log. *See* ECF No. 469-3. On August 12, 2022, they responded with substantially similar objections to the interrogatories. *See* ECF No. 469-4. Private Plaintiffs allege that the Defendant Intervenors have been stringing them along, representing on three separate occasions between August and October 2022 that they were in the process of identifying search terms and custodians to collect documents responsive to the RFPs. ECF No. 469 at 4.

On October 5, 2022, without having received any responsive documents or interrogatory answers, Private Plaintiffs wrote the Defendant Intervenors to set depositions. *See* ECF No. 469-5. Then, on October 21, Private Plaintiffs served eight deposition notices, noticing the depositions

of three corporate representatives and five individuals associated with Defendant Intervenors. *See* ECF No. 471-9; ECF Nos. 471-10, 471-11, 483-4, 483-6, 483-7, 483-8. The list of "Deposition Topics" in the deposition notices closely tracks Private Plaintiffs' RFPs. *See* ECF Nos. 471-9, 471-10, 471-11. To date, the Defendant Intervenors have agreed to accept deposition subpoenas for only one of their current or former employees and maintain that Private Plaintiffs' "request for depositions related to the primary election is untimely," because, under the Amended Scheduling Order, the deadline to conclude primary discovery "as to Plaintiffs" was August 12, 2022. ECF No. 471-7 at 5.

After engaging in informal correspondence and two meet-and-confer meetings, Private Plaintiffs filed a motion asking the Court to (1) compel document production in response to their RFPs and substantive responses to their interrogatories and (2) amend the scheduling order to permit completion of discovery on the Defendant Intervenors on matters related to the 2022 primary election. ECF No. 469. On October 31, 2022, the Defendant Intervenors responded to Private Plaintiffs' motion to compel and moved for a protective order, arguing that compelled disclosure would chill their associational rights under the First Amendment and that discovery was untimely under the Amended Scheduling Order. ECF No. 471.

Private Plaintiffs, State Defendants, and the Defendant Intervenors dispute whether the noticed depositions constitute discovery "as to Plaintiffs" or "as to Intervenors," as well as numerous issues related to the scope of discovery and privilege claims. *See* ECF No. 469; ECF No. 471; ECF No. 472. Under their reading, Private Plaintiffs believe that they served discovery "as to the Intervenors" on time—before the October 24 discovery deadline. ECF No. 469 at 8–10. The Defendant Intervenors and State Defendants suggest that depositions noticed by Plaintiffs after August 12 but before the October 24 close of primary election discovery "as to Intervenors"

4

are out of time and thus must "count toward the ten-deposition-limit" for the United States and Private Plaintiffs during the general election discovery period. ECF No. 471 at 13, 30; ECF No. 472 at 2–3, 6. The United States, also a plaintiff in this action, asks the Court to modify the scheduling order to "clarify[]" that the eight depositions Plaintiffs have noticed should "not count against the ten general election depositions collectively allotted to the United States and Private Plaintiffs." ECF No. 474 at 1.

The Court held a hearing on the pending discovery motions on November 14, 2022. As of the date of the hearing, the Defendant Intervenors had not produced a single document in response to Private Plaintiffs' twenty outstanding RFPs or substantively answered a single interrogatory.

The Court addressed each of the RFPs individually. The Defendant Intervenors agreed to produce responsive documents to RFPs 1 and 3 by no later than December 1, 2022. Hr'g Tr. at 13:17–22, 35:3–4.[2] The Court agreed with the Defendant Intervenors that RFPs 2, 4, and 5 were overly broad and ordered the parties to meet and confer over potential search terms.[3] *Id.* at 17:21–18:10, 35:5–6. The Court further sustained the Defendant Intervenors' objections to the relevance

---

[2] RFP #1: All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Texas Legislature regarding SB 1, SB 7, HB 3, or HB 6.

RFP #3: All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Office of the Texas Governor, the Office of the Texas Attorney General, the Office of the Texas Lieutenant Governor, or the Office of the Texas Secretary of State regarding SB 1, SB 7, HB 3, or HB 6.

[3] RFP #2: All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Texas Legislature relating to election administration, voting, election integrity, or the conduct of elections from January 1, 2020, to present.

RFP # 4: All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Office of the Texas Governor, the Office of the Texas Attorney General, the Office of the Texas Lieutenant Governor, or the Office of the Texas Secretary of State relating to election administration, voting, election integrity, or the conduct of elections from January 1, 2020, to present.

RFP # 5: All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Office of the Elections Administrator of Harris County or the Office of the Elections Administrator of Dallas County relating to election administration, voting, election integrity, or the conduct of elections from January 1, 2020 to the present.

of RFP 8's requests for documents and communications regarding the recruitment, retention, and training of election judges before SB 1 was enacted. *Id.* at 50:4–6.[4]

After hearing the parties' arguments, the Court took the remainder of the RFPs and the question of whether the Defendant Intervenors would be required to produce a privilege log in support of their assertions of First Amendment privilege under advisement. Recognizing that any order requiring a privilege log would not resolve the question of how to resolve assertions of the privilege raised during depositions of the Defendant Intervenors' 30(b)(6) witnesses, the Court invited the parties to file supplemental briefing on the application of the First Amendment privilege to the Defendant Intervenors' deposition testimony. Both parties have submitted additional briefing. *See* ECF No. 483 (Defendant Intervenor's Brief); ECF No. 484 (Plaintiff's Brief); ECF No. 486; (Defendant Intervenor's Response).

## DISCUSSION

### I.      Discovery Deadlines and Limits

The parties dispute the timeliness of discovery against the Defendant Intervenors and whether the noticed depositions count against the ten-per-side deposition limit for discovery during the general election discovery period. *See* ECF Nos. 469, 471, 472, 474.

To begin, in light of the Court's authority to control its own docket, the parties are *encouraged* to address any future confusion or disagreement about the scheduling order by filing a joint motion for clarification rather than spilling dozens of pages of ink on textualist arguments about the proper interpretation of an order that can be amended *sua sponte*.

---

[4] RFP #8: All documents, including but not limited to communications, regarding the recruitment, retention, and training of election judges, election clerks, and other poll workers in Texas from January 1, 2018, to present, including any training materials or presentations created or provided by You.

To clarify the meaning of the Amended Scheduling Order for the purposes of the scheduling dispute now before the Court, the Court confirms that the written discovery requests served on Defendant Intervenors on July 7 and July 13, and the deposition notices served on October 21 were timely under the Amended Scheduling Order, which permitted discovery on matters related to the primary election "as to Intervenors" until October 24, 2022. ECF No. 437 at 1. Both the Defendant Intervenors' months-long delay in document production and the parties' apparent confusion about the meaning of the Amended Scheduling Order constitute good cause to extend the deadline for primary discovery by and upon the Defendant Intervenors, which will not prejudice any party, nor delay the proceedings.

The deadline for discovery *by or upon* Defendant Intervenors on matters related to the primary election is hereby extended to **January 27, 2023**. Given that this extension overlaps with the general election discovery period, the Court clarifies that any deposition of Defendant Intervenors' representatives or members conducted during the general election discovery period shall *not* count against the deposition limit set forth in the Amended Scheduling Order *unless* the deposition explicitly addresses matters specific to the general election.

Having addressed the parties' case management concerns, the Court proceeds to the Defendant Intervenors' substantive objections to Private Plaintiffs' discovery requests as irrelevant, unduly burdensome, and impairing their right to associate under the First Amendment.

## II.    Relevance of Requested Documents and Burden of Production

Many of Defendant Intervenors' boilerplate objections misconstrue the nature of the claims and defenses at issue in this case, and, as a result, overlook the relevance of many of the Private Plaintiffs' discovery requests. In addition, "boilerplate, and unsupported objections to discovery requests that fail to state their grounds with specificity are improper and result in waiver of

those objections." *T.S. by & through P.O. v. Burke Found.*, No. 1:19-CV-809-RP, 2021 WL 3924796, at *3 (W.D. Tex. June 29, 2021).

Defendant Intervenors repeatedly emphasize the claims premised on the Texas legislature's discriminatory *intent* in enacting SB 1, objecting to "the relevance and proportionality of discovery requests seeking documents that were not before the Texas Legislature." ECF No. 471 at 17–18, 28. But Private Plaintiffs have also asserted claims based on SB 1's *effects*. For example, the LUPE Plaintiffs allege that SB 1 unconstitutionally burdens the right to vote and has a discriminatory impact on voters based on their race and disability in violation of Sections 2 and 208 of the Voting Rights Act. *See, e.g.*, LUPE Complaint (Counts I, IV, V). These claims do not require proof of discriminatory intent, but instead look to a challenged law's impact. *See Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)) (directing courts to conduct a balancing test weighing the asserted burden on the right to vote against the precise justifications for the burden imposed); *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 741 (5th Cir. 1993) ("Congress specifically intended to make clear that proof of discriminatory intent is not required to establish a violation of Section 2."); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 718 (S.D. Tex. 2017) ("[E]vidence of a discriminatory impact may prove a violation of the Voting Rights Act.").

The Defendant Intervenors' answers to the Private Plaintiffs' operative complaints clearly demonstrate an awareness that the legal challenges to SB 1 are not limited to the Texas legislature's discriminatory intent. *See* ECF No. 412 (Answer to LUPE Compl.); ECF No. 412-1 (Answer to LULAC Compl.); ECF No. 412-2 (Answer to HAUL Compl.). The answers explicitly state the Defendant Intervenors' position on SB 1's *effects* in response to the allegations in the Private Plaintiffs' complaints. *See, e.g.*, ECF No. 412 at 2 ("The Republican Committees deny . . . that

claims of threats to election integrity are 'baseless,' that it is hard to vote in Texas elections, or that SB 1 makes it 'harder' to vote."); *id.* at 30 ("The Republican Committees deny that SB 1 permits poll watchers to intimidate voters."); *id.* at 31 ("The Republican Committees deny that SB 1 will deter anyone from serving as an assistor" or "reduce the number of people available to assist voters, reduce turnout of voters who rely on assistance, or subject anyone to felony prosecution for assisting voters in accordance with the law."); *id.* at 36 ("The Republican Committees deny that SB 1 imposes burdens on mail voting."); *id.* at 39 ("The Republican Committees deny that SB 1 'suppress[es] Latino voters,' 'depress[es] Latino turnout,' or decreases the interest in or convenience of voting."). In their motion to intervene, the Committees asserted that they would "raise defenses that share many common questions with the parties' claims and defenses," *e.g.*, ECF No. 57 at 10, 12. Private Plaintiffs are plainly entitled to discovery as to the Defendant Intervenors' defenses.

Defendant Intervenors' objections that the discovery requests are overly burdensome are also unavailing because they have failed to present evidence of the burden that each request will impose on each Committee. Objections to discovery must be made with specificity, and the responding party has the obligation to explain and support its objections. FED. R. CIV. P. 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest."); FED. R. CIV. P. 33(b)(4) ("The grounds for objecting to an interrogatory must be stated with specificity."). "In the absence of some evidentiary showing that a discovery request would be burdensome, it is appropriate for a court to reject a request for a protective order on the ground that the undue burden claim is conclusory." *See, e.g.*, *Robroy Industries - Texas, LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 WL 319064, at *3 (E.D. Tex. Jan. 23, 2017)

(citing *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990));
*McLeod*, 894 F.2d at 1484–86 (holding that merely objecting to requests as "overly broad,
burdensome, oppressive and irrelevant" without showing "specifically how each [request] is not
relevant or how each question is overly broad, burdensome or oppressive" is inadequate to "voice
a successful objection").

In support of their argument that *all* of the discovery requests are unduly burdensome,
Defendant Intervenors have offered a single data point—that their initial search terms had yielded
over 24,000 documents in the review universe for Harris County Republican Party custodians
alone. *See* ECF No. 471 at 18. Clearly, the search results of a single search by a single Committee
is insufficient evidence that the discovery requests on all of the Committees are overly
burdensome. Moreover, because Defendant Intervenors appear to have aggregated all possible
search terms drawn from the discovery requests into a single search, it is impossible to discern
which individual RFPs are overly burdensome. Indeed, as the Court pointed out on several
occasions at the hearing, Defendant Intervenors cannot establish an undue burden as to RFPs for
which the responsive documents had already been identified, ECF No. 487, Hr'g Tr. at 10:17–
11:17, or did not exist in great numbers, if at all, *id.* at 35:21–36:4.

Without specific evidence supporting the alleged burden, Defendant Intervenors'
objections amount to generalized complaints that participating in this litigation is costly and time
consuming and may require them to "divert resources away from election campaigns." ECF No.
471 at 18. As Private Plaintiffs point out, these complaints are hardly persuasive considering that
Defendant Intervenors "affirmatively inserted themselves into this action and agreed to comply
with the discovery schedule set by the court and never sought a modification or extension based
on the [general] elections." ECF No. 475 at 8; *see also* ECF No. 469 at 6–7 (citing *BankDirect*

*Cap. Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 6694904, at *6 (N.D. Ill. 2018) ("The excuse [of] a busy and demanding schedule rings even more hollow when those making it filed the case . . . .")). Having elected to enter this case as parties, rather than as amici, Defendant Intervenors cannot avoid their discovery obligations merely because participating in this litigation is inconvenient.

## III.    First Amendment Privilege

### A.    Applicable Law

Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.'' *NAACP v. Alabama*, 357 U.S. 449, 460 (1958). Thus, "[t]he First Amendment protects political association as well as political expression," *Buckley v. Valeo*, 424 U.S. 1, 15 (1976), and the "freedom to associate with others for the common advancement of political beliefs and ideas is . . . protected by the First and Fourteenth Amendments.'' *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973).

In *Perry v. Schwarzenegger*, the Ninth Circuit noted that "[a] party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment privilege." 591 F.3d 1147, 1160 (9th Cir. 2009); *see also Whole Woman's Health v. Smith,* 896 F.3d 362, 372 (5th Cir. 2018); *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2022 WL 2901007, at *2 (E.D. Tex. Jan. 11, 2022). That privilege protects against a forced "[d]isclosure[ ] of political affiliations and activities" that would have a deterrent effect on the exercise of free speech or freedom of association rights. *Perry*, 591 F.3d at 1160.

The privilege arising out of the First Amendment is not absolute, however, as it only protects a party from compelled disclosure that would chill the associational rights at issue.

*NAACP*, 357 U.S. at 462–63. Courts evaluate claims of First Amendment privilege using to a two-part test. First, the party asserting the qualified privilege must make a prima facie showing of arguable First Amendment infringement. This prima facie showing requires the party to prove that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights. *Perry*, 591 F.3d at 1160.

Second, if the litigant can make the necessary prima facie showing, the evidentiary burden then shifts to the requesting party to establish that its interest in the information sought through the discovery is sufficient to justify the deterrer effect on the free exercise of the constitutionally protected right of association. *See id.* at 1161. "More specifically, the second step of the analysis is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but not necessarily to preclude it." *Id.*

Information that may be privileged on the basis of associational rights includes identities of rank and file members and similarly situated individuals, mailing lists, and lists of conferences attendees. *See id.* at 462 ("[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association"); *Perry,* 591 F.3d at 1153, 1155. If the prerequisites for its application are established, the associational privilege also protects internal policy or campaign communications concerning contested political issues. *See Smith,* 896 F.3d at 372; *Perry,* 591 F.3d at 1162.

### A.    Analysis

Defendant Intervenors argue that disclosure of the documents and information requested in RFPs 6–20 (and related ROGs and deposition topics) would burden their right to free association and is protected from disclosure under the First Amendment. In support of this assertion,

Defendant Intervenors offer declarations from individual members of each Committee describing how compelled disclosure of the requested communications would impair the ability to associate freely under the First Amendment.[5] These burdens appear to fall into four general categories:

(1)    Harm to the efficacy of the Committee's political activities through publication revelation of its confidential strategies and tactics, campaign and advocacy activities, and the allocation of resources for campaign and get-out-the-vote activities.[6]

(2)    Harm to the free flow of information among each Committee's officers, staff, consultants, candidates, and volunteers based on the chilling effect that disclosure would have on their willingness to offer candid views on advocacy strategy and messaging.[7]

(3)    Harm to "outside organizations" with "shared political goals" who would be "more likely to decline to offer candid views on sensitive topics if they believed that their views would be disclosed."[8]

(4)    Harm to the Committees' efforts to attract and retain active members and volunteers, because such individuals would fear that their identities and confidential communications would be disclosed in future litigation over which they have no control.[9]

The Court will address these burdens more fully below as they specifically pertain to Plaintiffs' discovery requests, but begins with two preliminary comments concerning the scope of the requested discovery and any responsive production.

---

[5] *See* ECF No. 483-12, Decl. of Casey Voeks (Executive Director of the Harris County Republican Party); ECF No. 483-13, Decl. of Susan Fountain (Executive Director of the Dallas County Republican Party); ECF No. 483-14, Decl. of Andrew Sexton (Regional Political Director of the Republican National Committee); ECF No. 483-15, Decl. of Jackson Carter Gross (Deputy Political Director of the National Republican Senatorial Committee); ECF No. 483-16, Decl. of David Johnston (Regional Political Director of the Republican Congressional Committee).

[6] ECF No. 483-12, Voeks Decl. ¶ 13; ECF No. 483-13, Fountain Decl. ¶ 13; ECF No. 483-14, Sexton Decl. ¶ 11; ECF No. 483-13, Gross Decl. ¶ 13; ECF No. 483-16, Johnston Decl. ¶ 13.

[7] ECF No. 483-12, Voeks Decl. ¶ 11; ECF No. 483-13, Fountain Decl. ¶ 11; ECF No. 483-14, Sexton Decl. ¶ 11; ECF No. 483-15, Gross Decl. ¶ 11; ECF No. 483-16, Johnston Decl. ¶ 11.

[8] *Id.*

[9] ECF No. 483-12, Voeks Decl. ¶ 12; ECF No. 483-13, Fountain Decl. ¶ 12; ECF No. 483-14, Sexton Decl. ¶ 12; ECF No. 483-15, Gross Decl. ¶ 12; ECF No. 483-16, Johnston Decl. ¶ 12.

First, Defendant Intervenors will be permitted to redact the names of any individual Committee members or volunteers from all discovery they are required to produce in this litigation. This should obviate any concerns that the Defendant Intervenors' compliance with their discovery obligations in this matter will disclose the identity of the Committees' members or volunteers, resulting in harassment, membership withdrawal, or discouragement of new members.

Second and relatedly, the Court observes that the identity of any individual Committee member or volunteer appears to be wholly irrelevant to the claims and defenses at issue in this action. *See* Fed. R. Civ. P. 26(b) (limiting scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case"). Outside of lobbying communications between the Defendant Intervenors and members of the Texas legislature, which must be produced in any event,[10] there is no reason to expect that the identity of any individual Committee member would have any bearing on the Texas legislature's *intent* in enacting SB 1. And to the extent that Private Plaintiffs' discovery requests are aimed at the *effects* of SB 1 on voting rights and election integrity, that evidence exists independent of the identity of any Committee member associated with that information.

## B.     Defendant Intervenors' Communications with Third Parties (RFPs 6 & 7) [11]

Plaintiffs have requested from Defendant Intervenors documents and communications sent to or exchanged with twelve enumerated third-party organizations. ECF No. 469-1 at 11, 12.

---

[10] *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, No. A-15-CV-134-RP, 2016 WL 5922315, at *7 (W.D. Tex. Oct. 11, 2016) ("[W]hile citizens plainly have a right to 'communicate with [public] officials on a matter of public concern,' that does not mean they have a right to protect these communications from public view.") (quoting *Sol v. Whiting*, No. SA–11–CV–360–OLG, 2013 WL 12098752 (D. Ariz. Dec. 11, 2013)); *Perez v. Perry*, No. SA–11–CV–360–OLG, 2014 WL 106927 *2 (W.D. Tex. Jan. 8, 2014) (communications between "any legislator, legislative aide, or staff member" and "any outsider" were not privileged and were discoverable).

[11] RFP #6: All documents, including but not limited to communications, sent to or exchanged with [twelve enumerated] third-party organizations (the "Third-Party Organizations"), including any of their affiliates or subsidiaries, and the current and former employees, officers, attorneys, agents, trustees, investigators, representatives,

Defendant Intervenors object that these documents and communications are not relevant to the claims and defenses at issue in this action and are subject to the First Amendment associational privilege. *See* ECF No. 471 at 9, 12

*Perry* and its progeny have all dealt with the disclosure of either the identity of association members or internal communications—not communications with third parties. *See, e.g.*, *Perry*, 591 F.3d at 1160 ("Disclosure of political affiliations and activities that have a deterrent effect on the on the exercise of First Amendment rights are therefore subject to this same exacting scrutiny." (emphasis added) (internal quotation marks omitted)); *In re Anonymous Online Speakers*, 661 F.3d 1168, 1174 (9th Cir. 2011) (stating that the holding in *Perry* "was limited to private internal campaign communications concerning the formulation of campaign strategies and messages" (internal quotation marks omitted)); *Dunnet Bay Constr. Co. v. Hannig*, No. 10-CV-3051, 2011 WL 5417123, at *3 (C.D. Ill. Nov. 9, 2011) (interpreting *Perry*'s holding as "protect[ing] against the disclosure of the identity of members and the content of internal communications between members, employees, and agents of political campaigns").

The Defendant Intervenors' communications with third-party organizations are not protected by the First Amendment privilege of association. The Court will not presume that a protected associational relationship exists between a party and every other person or entity with whom they share common beliefs or goals. Indeed, such an expansive view of the associational privilege would swallow the discovery process altogether.

---

contractors, consultants thereof, or other persons or entities acting on their behalf or subject to their control, regarding SB 1, SB 7, HB 3, or HB 6.

RFP #7: All documents, including but not limited to communications, sent to or exchanged with the Third-Party Organizations, including any of their affiliates or subsidiaries, and the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, consultants thereof, or other persons or entities acting on their behalf or subject to their control, relating to election administration, voting, election integrity, or the conduct of elections from January 1, 2020 to present.

## C.    Defendant Intervenors' Internal Communications (RFPs 9–20)[12]

Despite their assertions to the contrary, Defendant Intervenors are not entitled to a blanket

privilege by virtue of their status as associations. *See United States v. El Paso Co.*, 682 F.2d 530,

---

[12] RFP #9: All documents, including but not limited to communications, regarding the recruitment and training of poll watchers in Texas from January 1, 2018, to present, including any training materials or presentations created or provided by You.

RFP #10: All documents, including but not limited to communications, regarding instances of violence, discrimination, harassment, intimidation, or any inappropriate behavior from poll watchers, election judges, election clerks, or other poll workers in Texas from January 1, 2018, to present.

RFP #11: All documents, including but not limited to communications, sent to or exchanged with candidates or potential candidates for elected office in Texas regarding the effects or potential effects of SB 1, SB 7, HB 3, or HB 6.

RFP #12: All documents, including but not limited to communications, sent to or exchanged with candidates or potential candidates for elected office in Texas regarding election administration, voting, election integrity, or the conduct of elections during the period from January 1, 2020, to present.

RFP #13: All documents, including but not limited to communications, regarding allegations, investigations, and discussions of illegal voting, election fraud, or any kind of criminal conduct in connection with [nine enumerated] methods of voting during the period from January 1, 2018, to the present.

RFP #14: All documents, including but not limited to communications, the impact or potential impact of SB 1, SB 7, HB 3, or HB 6 on demographic groups, including but not limited to, racial or ethnic minorities, persons with disabilities, persons with limited English proficiency, or partisan affiliation.

RFP #15: All documents, including but not limited to communications, regarding usage of [nine enumerated] methods of voting in Texas by demographic groups, including but not limited to, racial or ethnic minorities, persons with limited English proficiency, persons with disabilities, or partisan affiliation, during the period from January 1, 2020, to present.

RFP #16: All documents, including but not limited to communications, regarding the impact or potential impact of SB 1, SB 7, HB 3, or HB 6 on residents of [Bexar, Dallas, Harris, El Paso, Hidalgo, or Travis] counties.

RFP #17: All documents, including but not limited to communications, regarding the number or proportion of Texas residents, Texas citizens of voting age, or Texas registered voters who have, or lack, a Texas Driver's License, a Texas Election Identification Certificate, a Texas Personal Identification Card, or a Social Security Number, including patterns by race, ethnicity, disability status, or party affiliation from January 1, 2020, to present.

RFP #18: All documents, including but not limited to communications, regarding questions or complaints received from voters about SB 1's requirements to provide an identification number on Applications for Ballot By Mail and to provide an identification number on the carrier envelope of a mail ballot.

RFP #19: All documents, including but not limited to communications, regarding voter assistance, including transportation assistance for curbside voters, and "vote harvesting services" as defined by SB1, and patterns of requests for voter assistance by race, ethnicity, disability status, or party affiliation during the period from January 1, 2020, to present.

539 (5th Cir. 1982) (noting that privilege "may not be tossed as a blanket over an undifferentiated group of documents"). Conclusory assertions of privilege are "insufficient to carry out the proponent's burden of establishing" the relevant privilege. *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017).

Defendant Intervenors point to several cases for the proposition that a privilege log is not required where the parties are able to "assess a claim of privilege" adequately without one. *See* ECF No. 477 at 18–19. These cases, however, generally involved discovery requests seeking the names of specific members of the relevant association or the application of different form of privilege altogether. *See, e.g.*, *Am. C. R. Union v. Martinez-Rivera*, No. 2:14-CV026-AM-CW, 2015 WL 13650010, at *4–5 (W.D. Tex. Sept. 10, 2015) (asking "ACRU to identify, by name, title, function, and contact information, all of the individuals, employees, and agents of ACRU, including all staff members, who have served since 2006"); *Jordan v. Comm'r, Miss. Dep't of Corrections*, 947 F.3d 1322, 1328 n.3 (11th Cir. 2020) ("Here, it is apparent from the face of the subpoena that the information sought therein falls within the plain language of the Lethal Injection Secrecy Act."). Here, it is not readily apparent from the face of Private Plaintiffs' discovery requests that all responsive documents will be subject to the First Amendment privilege.

Unlike cases involving the disclosure of membership lists, the Defendant Intervenors are not entitled to assert a blanket privilege by virtue of their status as associations. To begin, the associational privilege is limited. When privilege "has the effect of withholding relevant information from the fact-finder, it is interpreted narrowly so as to apply only where necessary to

---

RFP #20: All documents, including but not limited to communications, analyses, reports, studies, or commentary, relating to the changing demographics of Texas voters; voter turnout by particular demographic groups, including but not limited to, racial or ethnic minorities, persons with limited English proficiency, persons with disabilities, or partisan affiliation; or particular voting practices in Texas.

achieve its purpose." *Taylor Lohmeyer Law Firm P.L.L.C. v. United States*, 957 F.3d 505, 510 (5th Cir. 2020). Thus, assertions of privilege must "be specifically asserted" on a document-by-document basis. *Id.*; *see Perry*, 591 F.3d at 1153 n.1 (concluding "that some form of a privilege log is required and reject[ing] Proponents' contention that producing any privilege log would impose an unconstitutional burden."); *Smith*, 896 F.3d at 366 (noting that the third-party witness asserting First Amendment privilege provided a privilege log).

Plaintiffs accurately observe that, as a practical matter, it is impossible to define the limits of this privilege in the abstract. Even assuming the seriousness of the chilling effects on Defendant Intervenors' First Amendment rights, the Court must determine whether Private Plaintiffs have borne their burden under *Perry*. Private Plaintiffs must establish a substantial need for the withheld documents that outweighs the intrusion into the Defendant Intervenors' constitutional rights. *See Perry*, 591 F.3d at 1161 ("[T]he second step of the analysis is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but *not necessarily to preclude it*.") (emphasis added). Evaluating whether this burden has been met requires a document-by-document approach because the relevance and need for the document clearly depend on the contents of the document itself.

Accordingly, to the extent that Defendant Intervenors withhold purportedly privileged information, they must produce a privilege log. The privilege log must: "(i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." FED. R. CIV. P. 26(b)(5).

**D. Application of First Amendment Privilege to Deposition Testimony**

In their supplemental brief addressing depositions, Plaintiffs urge the Court to "defer ruling on the application of the First Amendment privilege" until after written discovery has taken place. ECF No. 484 at 5. Plaintiffs further propose a "limited protective order that would allow for any deposition answer for which the First Amendment privilege is claimed to be held under seal for two weeks" and would require Defendant Intervenors "to file a motion to keep the seal in place." *Id.* at 1. The Defendant Intervenors oppose Plaintiffs' proposal and ask the Court to quash the noticed depositions. *See* ECF No. 486 at 4–5.

The Federal Rules expressly authorize counsel to instruct a witness not to answer a question "when necessary to preserve a privilege." FED. R. CIV. P. 30(c)(2). Thus, the Rules allow a party to preserve the privilege while any disputes over the application of the privilege are resolved through a motion to compel. *Dean v. Shell Pipeline Co., LP*, No. CV 19-137-BAJ-RLB, 2020 WL 5899428, at *3 (M.D. La. Oct. 5, 2020) ("A party may move to compel an answer if 'a deponent fails to answer a question asked under Rule 30.'") (quoting FED. R. CIV. P. 37(a)(3)(B)(i)). Moreover, protective orders limiting dissemination of information protected by the First Amendment privilege "cannot eliminate" the First Amendment injury resulting from compelled disclosure. *Perry*, 591 F.3d at 1164. This is especially true where, as here, the compelled testimony is made directly to "public policy opponent[s]," who obviously will learn of the sensitive information regardless of the protective order. *Smith*, 896 F.3d at 373.

Accordingly, counsel for Defendant Intervenors may instruct their witnesses not to answer a question asked at their depositions when necessary to assert their associational privilege. In the event of the assertion of a privilege and instruction not to answer, the parties may raise the issue

19

to the Court for resolution. Should the Court conclude that a privilege was improperly asserted, the party improperly asserting a privilege may be required to bear the costs of any re-deposition.

## CONCLUSION

For the foregoing reasons and as stated in open court, Plaintiffs' motion to compel discovery responses from the Defendant Intervenors and to amend the scheduling order (ECF No. 469) and Defendant Intervenors' cross-motion for a protective order (ECF No. 471) are **GRANTED IN PART** and **DENIED IN PART**.

The deadline for discovery *by or upon* Defendant Intervenors on matters related to the primary election is hereby extended to **January 27, 2023**.

Any deposition of Defendant Intervenors' representatives or members conducted during the general election discovery period shall *not* count against the deposition limit set forth in the Amended Scheduling Order (ECF No. 437) *unless* the deposition explicitly addresses matters specific to the general election.

The Defendant Intervenors must (1) produce documents responsive to Plaintiffs' requests for production, subject to the objections sustained at the hearing held on November 14, 2022, and the Defendant Intervenors' assertions of privilege, and (2) supplement their responses to Plaintiffs' interrogatories as needed based on the documents produced during discovery. The Defendant Intervenors may redact the names of any of their members included in such documents. The Defendant Intervenors must provide a privilege log that satisfies the requirements of FED. R. CIV. P. 26(b)(5).

It is so **ORDERED**.

SIGNED this 9th of December, 2022.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
        Plaintiffs,              )   Civil Action
                                 )   No. SA-21-CV-00844-XR
vs.                              )
                                 )
GREGORY W. ABBOTT, et al.,       )
                                 )
        Defendants.              )
                                 )

_____

ORAL DEPOSITION OF

ALAN VERA

FEBRUARY 27, 2023

_____


        ORAL DEPOSITION OF ALAN VERA, produced as a

witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on February 27, 2023, from 10:00 a.m. to 3:37 p.m.,

Nilda Codina, Notary in and for the State of Texas,

recorded by machine shorthand, from Javier N. Maldonado

& Associates, P.C., 1415 North Loop W., Suite 600,

Houston, Texas, County of Harris pursuant to the

Federal Rules of Civil Procedure, and the provisions

stated on the record or attached hereto.

Alan Vera - 2/27/2023

2

```
 1              A-P-P-E-A-R-A-N-C-E-S

 2   For the LUPE Plaintiffs:

 3        Ms. Nina Perales
          Julia Longoria (Via Zoom)
 4        Fatima Menendez (Via Zoom)
          MEXICAN AMERICAN LEGAL DEFENSE
 5        AND EDUCATIONAL FUND
          110 Broadway, Suite 300
 6        San Antonio, Texas 78205
          Phone:(210)224-5476
 7        Fax: (210)224-5382
          nperales@maldef.org
 8        jlongoria@maldef.org
          fmenendez@maldef.org
 9
          Patrick A. Berry (Via Zoom)
10        Jasleen Singh (Via Zoom)
          Robyn Sanders (Via Zoom)
11        BRENNAN CENTER FOR JUSTICE
          AT NYU SCHOOL OF LAW
12        120 Broadway, Suite 1750
          New York, NY 10271
13        Phone: (646) 292-8310
          Facsimile: (212) 463-7308
14        patrick.berry@nyu.edu
          jasleen.singh@nyu.edu
15        sandersr@brennan.law.nyu.edu

16        Kevin Zhen
          FRIED, FRANK, HARRIS, SHRIVER &amp;
17        JACOBSON LLP
          One New York Plaza
18        New York, New York 10004
          Phone: (212) 859-8000
19        Facsimile: (212) 859-4000
          kevin.zhen@friedfrank.com
20
     FOR Plaintiffs LULAC Texas; Voto Latino; Texas Alliance
21   for Retired Americans; and Texas AFT

22        Daniela Lorenzo (Via Zoom)
          ELIAS LAW GROUP LLP
23        10 G Street NE, Suite 600
          Washington, D.C. 20002
24        Phone: (202) 968-4490
          dlorenzo@elias.law

25
```

<pre>
 1   Attorneys for Plaintiffs Houston Justice; Houston Area
     Urban League; Delta Sigma Theta Sorority, Inc.; The Arc
 2   of Texas; and Jeffrey Lamar Clemmons

 3        Ms. Jennifer A. Holmes.
          Breanna Williams (Via Zoom)
 4        Uruj Sheikh (Via Zoom)
          NAACP LEGAL DEFENSE AND
 5        EDUCATIONAL FUND, INC.
          700 14th Street NW, 6th Floor
 6        Washington, DC 20005
          Phone:(202) 682-1300
 7        Fax: (202) 682-1312
          jholmes@naacpldf.org
 8        bwilliams@naacpldf.org
          usheikh@naacpldf.org
 9
     Attorneys for Plaintiffs OCA-Greater Houston; League of
10   Women Voters of Texas; REVUP- Texas; Texas Organizing

11
          Edgar Saldivar (Via Zoom)
12        ACLU FOUNDATION OF TEXAS, INC.
          5225 Katy Freeway, Suite 350
13        Houston, TX 77007
          Phone: (713) 942-8146
14        Fax: (915) 642-6752
          esaldivar@aclutx.org
15
     Attorneys for Plaintiffs Mi Familia Vota; Marla López;
16

17        Mark Bieter
          STOEL RIVES LLP
18        760 SW Ninth Avenue, Suite 3000
          Portland, OR 97205
19        mark.bieter@stoel.com

20

21

22

23

24

25
</pre>

Alan Vera - 2/27/2023

4

```
1   Attorneys for Isabel Longoria

2        Sameer S. Birring
         Jonathan Fombonne (Via Zoom)
3        Heena Kepadia (Via Zoom)
         Neeharika Tumati (Via Zoom)
4        OFFICE OF THE HARRIS COUNTY
         ATTORNEY CHRISTIAN D. MENEFEE
5        1019 Congress
         15th Floor
6        Houston, Texas 77002
         Phone:(713)274-5142
7        sameer.birring@harriscountytx.gov
         jonathan.fombonne@harriscountytx.gov
8        heena.kepadia@harriscountytx.gov
         neeharika.tumati@cao.hctx.net
9
    For Defendant Bexar County Elections Administrator
10  Jacquelyn Callanen

11       Lisa Cubriel (Via Zoom)
         Catherine Wilson (Via Zoom)
12       Assistant District Attorney, Civil Division
         101 W. Nueva, 7th Floor
13       San Antonio, Texas 78205
         Lisa.Cubriel@bexar.org
14       Catherine.wilson@bexar.org

15  Attorney for Defendant Yvonne Ramón

16       Josephine Ramirez-Solis (Via Zoom)
         Jacqueline Villarreal (Via Zoom)
17       Assistant District Attorney
         100 E. Cano, First Floor
18       Hidalgo County Courthouse Annex III
         Edinburg, Texas 78539
19       Phone: (956) 292-7609
         Fax: (956) 318-2301
20       josephine.ramirez@da.co.hidalgo.tx.us
         jacqueline.villarreal@da.co.hidalgo.tx.us
21
    Attorneys for Defendant Dana DeBeauvoir
22
         Anthony Nelson (Via Zoom)
23       tony.nelson@traviscountytx.gov

24

25
```

1  For State Defendants:

2         William G. Wassdorf
          Kathleen Hunker (Via Zoom)
3         Ethan Szumanski (Via Zoom)
          ATTORNEY GENERAL KEN PAXTON
4         P.O. Box 12548
          Austin, Texas 78711-2548
5         Phone:(512)936-1666
          Fax:(512)320-0667
6         will.wassdorf@oag.texas.gov
          kathleen.Hunker@oag.texas.gov
7         ethan.szumanski@oag.texas.gov

8  Intervenor - Defendants Republican National Committee,
   National Republican Senatorial Committee, National
9  Republican Congressional Committee, Harris County GOP,
   Dallas County GOP

10
          John M. Gore
11        JONES DAY
          51 Louisiana Ave., N.W.
12        Washington, D.C. 20001-2113
          Phone: (202) 879-3939
13        Fax: (202) 626-1700
          jmgore@jonesday.com

14

15 FOR THE WITNESS:

16        Mr. Andy Taylor, Esq.
          ANDY TAYLOR
17        2628 Highway 36 S. #288
          Brenham, Texas 77833
18        Phone:(713)222-1817
          Fax:(713)222-1815
19        ataylor@andytaylorlaw.com

20 ALSO PRESENT REMOTELY:

21        Benjamin Limric (Via Zoom)
          Michael Stewart (Via Zoom)
22        UNITED STATES DEPARTMENT OF JUSTICE
          benjamin.limric@usdoj.gov
23        michael.stewart3@usdoj.gov

24

25

1                           I-N-D-E-X

2                                                        PAGE

3   Appearances.........................................2

4   ALAN VERA

5   Direct Examination by Ms. Perales...................7

6   Direct Examination by Ms. Holmes.................145

7   Cross-Examination by Mr. Gore....................160

8   Proceedings concluded............................166

9   Reporter's certificate...........................167

10                     E-X-H-I-B-I-T-S

11                                                       PAGE

12  Exhibit No. 1 Notice of Deposition................14

13  Exhibit No. 2 Poll Watcher's Guide................43

14  Exhibit No. 3 Email from Christina Adkins.........123

15  Exhibit No. 4 Texas Poll Watcher Training manual...123

16  Exhibit No. 5 Redacted First Amendment Privilege...127

17  Exhibit No. 6 Email(5/19/2021)....................131

18  Exhibit No. 7 Email(8/10/2021)....................133

19  Exhibit No. 8 Email from Donna Campbell...........133

20  Exhibit No. 9 Email from Paul Bettencourt.........134

21

22

23

24

25

Alan Vera - 2/27/2023

7

1                    P-R-O-C-E-E-D-I-N-G-S

2                    THE REPORTER:  Going on the record at

3  9:37 a.m. And today is February 27th, 2023, and we are

4  on the record.  Did you all want to do the federal read

5  on, or were you okay with waiving the Rule 30?

6                    MS. PERALES:  We'll waive.

7                    THE REPORTER:  Okay.

8                    If all counsel and all parties please

9  state their appearances and who they represent for the

10 record.

11                   MS. PERALES:  Good morning, my name is

12 Nina Perales and I represent the Lupe Plaintiffs,

13 L-U-P-E.

14                   MS. HOLMES:  Good morning, my name is

15 Jennifer Holmes and I represent the Haul Plaintiff's,

16 H-A-U-L.

17                   MR. BIRRING:  Good morning, I'm Sameer

18 Birring and I represent the Harris County Election

19 Administrator Clifford Tatum, in his official capacity.

20                   MR. WASSDORF:  William Wassdorf for

21 the Attorney General's Office representing State

22 Defendants.

23                   MR. GORE:  Good morning, this is John

24 Gore.  I represent the Intervenor Defendants.

25                   MR. TAYLOR:  My name is Andy Taylor.

1  I do not represent any parties in this litigation, but

2  I do represent the witness, Mr. Alan Vera, and I did

3  have just one confirmation question.  I was told that

4  nobody in this proceeding today is going to audio tape

5  or video tape what's happening, it's just everybody's

6  watching by Zoom but they're not actually taping or

7  tape recording the zoom, other than the court reporter

8  who is -- is Here in the room, is that true?

9                MS. PERALES:  My understanding is that

10  there maybe an audio recording by the court reporter

11  service for the purpose of ensuring and accurate

12  transcription, but we agreed in writing prior to this

13  deposition that we would not video record --

14                MR. TAYLOR:  Okay.

15                MS. PERALES:  -- the deposition.

16                MR. TAYLOR:  And cause I'm the new guy

17  here, it -- does that include all the participants who

18  are watching?

19                MS. PERALES:  Well, I only speak for

20  the Lupe plaintiffs, but perhaps we can get an

21  agreement from counsel on the Zoom that they are not

22  recording the deposition.

23                MR. TAYLOR:  That would be wonderful.

24                MS. PERALES:  If you could just put

25  your agreement in the chat, that would be a big time

 1  saver.

 2              (All Zoom counsel agreed in chat.)

 3              MS. PERALES:  Okay.  I think we've got

 4  everyone.  I can check the chat on the break too.

 5                   ALAN VERA,

 6  Having been first duly sworn, was examined and

 7  testified as follows:

 8              MS. PERALES:  And let's get our

 9  agreement on the record now, before we get started with

10  me reintroducing myself to you.

11              I will agree that an objection from

12  any one of counsel on the defense side will serve as an

13  objection for all.  Now, under the Federal Rules, it's

14  a form objections largely are the ones that we're are

15  going to be having today.  And I understand that you

16  would like to have an agreement that simply saying form

17  objection is sufficient.

18              MR. WASSDORF:  Correct.

19              MS. PERALES:  And the only thing that

20  I would ask of you is if I don't understand perhaps

21  what the form objection might be, I can ask for

22  clarification.

23              MR. WASSDORF:  Absolutely.

24              MS. PERALES:  And is that the

25  agreement of -- of counsel on the defense side?

1          MR. GORE:  Yes.

2          MR. WASSDORF:  Yes.

3          MR. TAYLOR:  Yes.

4          MS. PERALES:  Thank you.

5                 DIRECT EXAMINATION

6  BY MS. PERALES:

7      Q.   Good morning, Mr. Vera.

8      A.   Good morning.

9      Q.   Earlier you heard me introduce myself, I'm

10 Nina Perales and I represent a group of plaintiffs

11 called the Lupe plaintiffs.  Everybody else has

12 introduced themselves already, and so I'll just go

13 ahead and start asking you some of the preliminary

14 questions in this deposition.

15            My first question is, have you ever

16 been deposed before?

17      A.   No, I have not.

18      Q.   All right.  So since this is your first

19 voyage into a deposition I'm going to go through some

20 of the ground rules with you.

21            You have just taken an oath to tell

22 the truth and that's subject to federal penalties.  So

23 it's important to answer my questions truthfully,

24 accurately, and completely; do you understand?

25      A.   I do.

1    Q.   Now, do you understand that your oath to the

2  tell the truth today is the same as if you were

3  testifying in front of a judge in the courtroom, in the

4  sense that you're oath is to speak the truth?

5    A.   I understand.

6    Q.   Okay.  Is there anything today that would

7  prevent you from giving me your full attention and

8  answering truthfully, such as illness or some other

9  problem?

10    A.   I am 74 years old, I will need frequent

11  bathroom breaks.

12    Q.   Got it.  And that takes me right to the

13  bathroom breaks, which is you are not a hostage here.

14  If you need to take a break at any time, you can ask

15  for a break we will take a break.  The only question I

16  have of you, is that if there's a question laying out

17  on the table, if you would answer it before we take the

18  break; is that all right?

19    A.   Understood.  Understood.

20    Q.   Okay.  Thank you.  Now, counsel will make

21  objections for the record from time to time and you

22  just heard us talking a moment ago about objections,

23  and, generally when there is an objection you still go

24  ahead and answer; however, if counsel instructs you not

25  to answer, please don't answer and we will work it out

Alan Vera - 2/27/2023

12

1    among ourselves, okay?

2        A.    Understood.

3        Q.    So a few instructions related to the fact

4    that we have a court reporter here.  Generally, in

5    conversations sometimes we talk over each other, but

6    because the court reporter can only take down one

7    speaker at a time, will you agree to let me finish my

8    question before you answer, and then I will let you

9    finish your answer before I begin my next question?

10       A.    Agreed.

11       Q.    Okay.  It's also -- you're doing a great job

12   by the way of speaking up but my next instruction is to

13   please make your answers out loud and audible so the

14   court reporter can hear them; is that all right?

15       A.    Understood.

16       Q.    Okay.  Now, the court reporter cannot take

17   down gestures like shrugs or head nods, so will you

18   agree to give your answers verbally?

19       A.    Agreed.

20       Q.    Now, if you don't understand the question,

21   will you please ask me to rephrase it for you?

22       A.    Agreed.

23       Q.    Now, I might ask you a question that calls

24   for you to give me your best estimate as to something,

25   and I'm entitled to your best estimate, but I don't

Alan Vera -

13

 1    want you to guess; is that all right?

 2         A.    Understood.

 3         Q.    Okay.  Thank you.  Now, sometimes you might

 4    remember more to an answer later in the day.  Sometimes

 5    the questions percolate a little bit.  So if that's the

 6    case, and you've remembered something more it's okay to

 7    tell me at that point and we'll add it to the record

 8    and then we'll go back to whatever else it is that

 9    we're discussing; is that all right with you?

10         A.    Understood.

11         Q.    Okay.  I might use some terms interchangeably

12    in today's deposition, I don't know if I will or not,

13    but I want to check now to make sure if we have the

14    same understanding of the terms.  If I use the word

15    Hispanic and Latino, will you understand that I mean

16    the same thing by those words?

17         A.    Agreed.

18         Q.    Okay.  I'm going to try not to use jargon,

19    but if I use the word ABBM, will you understand that to

20    be application for ballot by mail?

21         A.    Understood.

22         Q.    Thank you.  Do you have any questions about

23    the deposition process before we begin?

24         A.    No, ma'am.

25         Q.    Thank you.  I understand from the

1  introduction this morning that you are being

2  represented by Mr. Andy Taylor; is that correct?

3       A.   That is correct.

4       Q.   Are you also being represented by Mr. John

5  Gore?

6       A.   That is not correct.

7       Q.   And are you being represented by the Attorney

8  General's Office?

9       A.   I am not.

10      Q.   When did your representation -- when did

11  Mr. Taylor's representation of you begin, do you know?

12      A.   The week after I was subpoenaed.

13      Q.   Okay.  Do you have any other lawyers that

14  represent you in this matter?

15      A.   I do not.

16      Q.   Okay.  I'm going to ask you some questions

17  about your preparation for the deposition, but I want

18  to let you know that I do not want to know anything

19  that you said to your lawyer or that your lawyer said

20  to you; okay?

21      A.   Understood.

22      Q.   Can you tell me the steps that you took to

23  prepare for this deposition?

24      A.   I received, through my attorney a very large

25  cachet of document that were in discovery and I read

15

1  those.

2      Q.   Did you bring any of those documents with you

3  today?

4      A.   Did not.

5      Q.   Okay.  Can you generally remember what it was

6  that you reviewed for the deposition?

7      A.   Generally, emails, email attachments, and one

8  or two PowerPoint presentations.

9      Q.   And did you understand this to be discovery

10 that the Harris County Republican Party had produced in

11 this litigation?

12     A.   I did not.  I did not ask questions about the

13 source of the discovery.

14     Q.   Were the documents generally related to

15 Harris County Republican Party?

16     A.   The documents came in two folders, one of

17 which said Harris County, as in the Government.  The

18 other of which said Secretary of State.

19     Q.   Okay.  And when you -- you mentioned a moment

20 ago emails, do you recall generally who the emails were

21 between?

22     A.   That was quite varied, it involved many

23 different people.

24     Q.   And did those people include folks with the

25 Harris County Republican Party?

1    A.    They did.

2    **Q.    And did some of them include members of the**

3  **legislature?**

4    A.    One or two did.

5    **Q.    And did some of them include staff or**

6  **employees of the Texas Secretary of State?**

7    A.    Some of them did.

8    **Q.    Did you meet with anybody in advance of this**

9  **deposition to prepare?**

10   A.    I had a Zoom meeting with my attorney for him

11  to brief me on what to expect.

12   **Q.    Okay.  And about how long did that Zoom**

13  **meeting last?**

14   A.    There were two sessions, the first one an

15  hour the second one two hours.

16   **Q.    Okay.  Was anybody else on the Zoom besides**

17  **you and Mr. Taylor?**

18   A.    Yes, Mr. Jones was.

19   **Q.    Okay.  Would that be Mr. Gore --**

20   A.    -- I'm sorry John -- John -- Mr. Gore is --

21   Q.    -- (Laughter.)

22   A.    -- Mr. Gore was on the call.

23   **Q.    Perhaps some day okay.**

24            (Exhibit No. 1 marked.)

25   **Q.    (BY MS. PERALES) Mr. Vera, the court reporter**

1  has handed you what has been marked deposition Exhibit

2  No. 1. And from time to time we will mark certain

3  documents and talk about them and the one that you will

4  look at is always going to be the one with the special

5  orange sticker on it and I'll tell you now don't try to

6  leave with the special orange sticker documents or the

7  court reporter will chase you down and try to get them

8  back; okay?

9       A.   I understand.

10      Q.   Do you recognize this document?

11      A.   I do.

12      Q.   Okay.  Do you recognize it as the notice of

13  deposition seeking your attendance at this deposition

14  today?

15      A.   I recognize it as a predecessor to the notice

16  I received today, this one still says 8:30 a.m. and the

17  one I received says 9:30 a.m.

18                (Laughter.)

19      Q.   (BY MS. PERALES) you're right, that's my

20  fault.

21      A.   Okay.

22      Q.   Thank you for spotting that.  So with the

23  exception of the time though, are you hear testifying

24  today pursuant to this deposition notice?

25      A.   I am.

```
 1        Q.   Okay.  Thank you.  I'd like to start with

 2   some questions about your background, do you live in

 3   Harris County?

 4        A.   I do.

 5        Q.   How long have you lived in Harris County?

 6        A.   Since November of 1980.

 7        Q.   Okay.  Are you originally from somewhere not

 8   Harris County?

 9        A.   Yes.

10        Q.   Tell me where you grew up?

11        A.   El Paso.

12        Q.   Oh, El Paso.  West Texas?

13        A.   Yes, ma'am.

14        Q.   Did you go to high school there?

15        A.   Yes, ma'am.

16        Q.   Did you complete any education following high

17   school?

18        A.   I did.

19        Q.   Okay.  And what was that?

20        A.   I have an undergraduate degree from Loyola

21   University in New Orleans.

22        Q.   Anything after that?

23        A.   U.S. Army.

24        Q.   Okay.  When did you serve?

25        A.   1970 to 1975.
```

Alan Vera - 2/27/2023

19

```
 1      Q.   Tell me about your current occupation, if you

 2 have one?

 3      A.   I am semi-retired.

 4      Q.   And what are you semi-retired from?

 5      A.   Marketing consulting.

 6      Q.   Okay.  Can you briefly describe for me your

 7 current involvement with the Harris County Republican

 8 Party?

 9      A.   I am a volunteer.  I serve as chairman of the

10 Harris County Republican Party Ballot Security

11 Committee, that is an unpaid unreimbursed position.

12      Q.   I'm going to circle back to, to more details

13 about the Ballot Security Committee.  So I'm just going

14 to put a pin in that and ask if you hold a membership

15 in other political organizations besides Harris County

16 Republicans?

17      A.   I am on the board of directors of a -- an

18 election integrity organization called Texas Election

19 Network.

20      Q.   Any other membership in other political

21 organization?

22      A.   Give me a second.  None that I can recall at

23 this time.

24      Q.   Do you hold membership in any other types of

25 associations besides political organizations; such as a
```

1  **fraternal, or I don't know, maybe you serve on your**

2  **neighborhood, you know, homeowners association or**

3  **anything like?**

4      A.   No, we are members of Freedom Street Rescue.

5  We foster abandon puppies.

6      **Q.   I think I would have 20 dogs if I did that.**

7      A.   Last Thursday we had 11.

8      **Q.   11.  And are the -- any of them fosters at**

9  **this point or have you just --**

10     A.   Seven of those are fosters, they've all

11  arrived at their new homes in New England.

12     **Q.   Wonderful.  Any other organizations that you**

13  **can think of?**

14     A.   None that I can think of.

15     **Q.   Okay.  Are you a registered voter in Harris**

16  **County?**

17     A.   I am.

18     **Q.   Have you ever served as an election judge at**

19  **the polling place?**

20     A.   Yes, ma'am.

21     **Q.   Okay.  Tell me about that, how?**

22     A.   From 2010 to 2013, I served as the alternate

23  presiding judge at Wesley Elementary School in

24  Congressional District 18.  I think five, seven

25  elections total.

1   **Q.   Did you serve as a poll worker for any other**

2   **period of time besides this one?**

3        A.   No ma'am.

4        **Q.   Have you ever served as a poll watcher?**

5        A.   I have.

6        **Q.   Tell me about that?**

7        A.   I served as a poll watcher in several smaller

8   and local elections, usually on the May Uniform

9   Election Day.  And I was asked to serve as a poll

10  watcher for the 2015, I believe 2015 Cy-Fair ISD bond

11  election.  The first of billion dollar bond election in

12  Texas.

13       **Q.   School bond?**

14       A.   School bond.

15       **Q.   Have you ever been a block walker or**

16  **sometimes referred to as a canvasser for either a**

17  **political candidate or for turn out the vote effort?**

18       A.   I believe years ago maybe as many as 10 years

19  ago I assisted my precinct chair to block walk our

20  neighborhood and leave flyers hanging on doorknobs.

21       **Q.   And do you remember what that was in support**

22  **of, or against?**

23       A.   It was in support of the republican ticket.

24       **Q.   Okay.  And did the door hangers then have the**

25  **names of the candidates that were on the ticket?**

1    A.    If I remember correctly, they did.

2    **Q.    Can you think of any other occasions where**

3    **you were going door to door from house to house for**

4    **either a candidate or some kind of campaign?**

5    A.    No, I can't.

6    **Q.    When you did this effort about 10 years ago**

7    **did you knock on doors and engage with voters?**

8    A.    We knocked on doors, waited for a voter to

9    answer, if the voter didn't answer we simply left the

10   hanger, if a voter answered we introduced ourselves and

11   explained, the candidates for whom we were campaigning.

12   **Q.    So you had the chance to have some**

13   **face-to-face interaction with voters?**

14   A.    Some.

15   **Q.    Other than the -- so let me just ask you, do**

16   **you -- is the phrase that you're most comfortable with**

17   **block walking or canvassing or something else?**

18   A.    In my mind those are two different functions

19   block walking is a political activity to gain support

20   for candidate or issue in my mind.  Canvassing is

21   asking questions and getting information.

22   **Q.    Okay.**

23   A.    So in my mind, which is sometimes strange,

24   those are two slightly different issue.

25   **Q.    Have you ever done canvassing?**

1    A.    I have not personally.

2    Q.    **Okay.  So besides that block walking effort**

3  **that you described, have you ever worked on the**

4  **campaign of a political candidate or for a political**

5  **issue?**

6    A.    Not since 2014.

7    Q.    **And tell me about that, in 2014 in what way**

8  **did you work on a political campaign --**

9    A.    In 2014 before I came chair of the Harris

10  County Republican Party Ballot Security Committee, I

11  handed out campaign literature for Dan Patrick.

12    Q.    **And where did you handout the campaign**

13  **literature?**

14    A.    In my neighborhood.

15    Q.    **And you went door to door?**

16    A.    Yes, ma'am.

17    Q.    **Is that different from the --**

18    A.    Same thing.

19    Q.    **-- same thing?**

20    A.    Uh-huh.

21    Q.    **Okay.  So besides the handing out of the**

22  **campaign material in the block walking effort, have you**

23  **worked on any other campaigns either, maybe making**

24  **phone calls from a central location to urge voters to**

25  **turn out or --**

1    A.   Yes.

2        Q.   -- other types of campaign activity?

3    A.   I can't recall anything beyond what I've

4    already described to you.

5        Q.   Okay.  Do you know if you'll be testifying in

6    this case?

7    A.   I do not know.

8        Q.   Okay.  I'm going to ask you a couple

9    questions now about the Ballot Security Committee.  You

10   mentioned that before you became involved with the

11   Ballot Security Committee you were handing out the

12   campaign material for the republican ticket and you

13   mention that was probably about 10 years ago.

14               So tell me whether your involvement

15   with the Ballot Security Committee then was at the time

16   of the creation of the Ballot Security Committee?

17   A.   No, ma'am.  It was not.  Ballot Security

18   Committee had been created at least 15 years prior to

19   my taking the chairmanship in 2014.

20       Q.   Okay.  If you could for me summarize the --

21   are you still chair of the Ballot Security Committee?

22   A.   I still am.

23       Q.   And as chair you're familiar with the

24   activities of the Ballot Security Committee?

25   A.   Yes.

Alan Vera -  2/27/2023

1    **Q.  Can you tell me in a sort of summary fashion,**

2    **the various activities of the Ballot Security**

3    **Committee?**

4        A.   As described in the Republican -- Harris

5    County Republican bylaws, Ballot Security is

6    responsible for promoting election integrity and in all

7    the activities that support that.  So that would

8    include discipline on voter registration, recruiting

9    and training of poll watchers.  In prior years we were

10   also responsible for recruiting election workers, but

11   we have surrendered that in the last two cycles, to the

12   Party staff; supporting good election legislation as

13   guided by the Executive Committee and testifying when

14   possible in support of good election legislation.

15       **Q.  I'm just catching up.  You mentioned**

16   **discipline on voter registration, to you mean the voter**

17   **registration conducted by the Harris County Republican**

18   **Party or voter registration in a bigger sense?**

19       A.   Thank you for the clarification.  We observe

20   and monitor Harris County's voter registration's roles.

21       **Q.  Does the Harris County Republican Party**

22   **conduct voter registration efforts of they own?**

23       A.   I believe they do, but I am not a part of

24   that.

25       **Q.  You mentioned in prior years that you used to**

1  recruit election workers, but you had surrendered that

2  to party staff in the last two election cycles; is that

3  right?

4       A.   That is correct.

5       Q.   And when you say party staff, who -- who is

6  that?

7       A.   These are paid employees who work for the

8  Party.

9       Q.   And so it's their function now to collect

10 names and submit them to the Harris County elections

11 for vetting for poll workers?

12      A.   That is correct.

13      Q.   Okay.  Tell me how you recruit and train poll

14 watchers?

15      A.   The recruiting takes many forms.  I am a

16 frequent speaker at political organizations.  We run

17 notices for poll watchers in the county party news

18 letter and online.  The Ballot Security Committee

19 members are also encouraged to reach out in their

20 neighborhoods and find people in serving as poll

21 watchers.  Training poll watchers I do personally, no

22 one else hands that.  It is a two hour class in person

23 with a test at the end and except for the 2020 COVID

24 year it has never been an online class.  It's always

25 been in person.

1    Q.   When was the most recent training that you

2  conducted?

3    A.   Most recent training was October of 2022.

4    Q.   Okay.

5    A.   I did 17 classes that summer into the fall.

6    Q.   When you're doing the training in the two

7  hour class, do you use any kind of materials of any

8  sort?

9    A.   There are two kinds of materials, there is a

10 PowerPoint presentation which technically belongs to

11 the Harris County Republican Party, I created that for

12 them.  And there poll Watcher Guide book which I hand

13 at no charge to every student.

14   Q.   You mention the PowerPoint presentation

15 belongs to Harris County, are you the author of the

16 PowerPoint?

17   A.   I am.

18   Q.   Okay.  And the Poll Watcher Guide book, who

19 is the author of that?

20   A.   The original one?  My wife Colleen.  It's

21 been updated after every legislative session because

22 the code changes.

23   Q.   And who does the updating?

24   A.   I'm -- I do it now, unfortunately.

25   Q.   Where do you do the trainings for the poll

1  watchers?

2     A.   All over the county, Whenever possible in

3  county owned buildings.  We have community centers that

4  the Harris County Government has set up.  Whenever

5  possible we conduct the training in those publicly

6  owned centers.

7     **Q.   So do you bring with you your laptop with the**

8  **PowerPoint on it?**

9     A.   I do.

10    **Q.   Do you have like a little projector?**

11    A.   A projector is usually provided by the

12  facility, but there have been times that I brought a

13  spare, thank God.

14    **Q.   And you mention that the guidebook that you**

15  **provide at no cost, does that mean that you personally**

16  **make the photo copies?**

17    A.   In 2022 the County Republican Party paid for

18  the reproduction of the guide books.

19    **Q.   Okay.  And are -- are the trainees allowed to**

20  **take that guidebook home with them after they're done?**

21    A.   They take them home with them and encouraged

22  to take them with them to the Polls.

23    **Q.   Now you mention a test at the end, is that a**

24  **written test?**

25    A.   It's not a written test, it's an oral.  It's

1    a review.

2        Q.   And then is that conducted with the group as

3    a whole?

4        A.   It's conducted with the group as a whole.

5        Q.   So do people just, you call out the questions

6    and people raise their hands and call the answers?

7        A.   Correct, uh-huh.

8        Q.   Do you have the test written down in front of

9    you?

10       A.   It's on the PowerPoint slides?

11       Q.   Okay.  And so you just know at the end which

12   questions to call out for people to make sure?

13       A.   There are 20 questions, they appear in

14   sequence on the slides.

15       Q.   Oh, I see.  So there's something at the very

16   end of the PowerPoint that has the questions?

17       A.   Correct.

18       Q.   Understood.  When you update your PowerPoint

19   for a training, do you save the PowerPoints from

20   before?

21       A.   I don't remember.  I think so, I don't think

22   I delete them from my laptop.

23       Q.   Okay.  So for example if you wanted to

24   compare what your training looked like before SB 1 and

25   after SB 1 would you be able to go --

1    A.   I could do so.  Yes, ma'am.

2    **Q.   Okay.  Thank you.**

3              MR. TAYLOR:  Mr. Vera, let her

4    completely finish her question, you're anticipating it

5    ever so slightly.

6              THE WITNESS:  Thank you.  Thank you.

7    **Q.   (BY MS. PERALES) Okay.  Next on my list is**

8    **supporting legislation related to election integrity**

9    **and I would like to know what activities fall under**

10   **that topic?**

11   A.   The primary activities that fall under that

12   topic is providing our Harris County republican

13   representatives with lists of items in the election

14   code that need to be addressed, and then testifying in

15   the Senate and house committees that are hearing any

16   bills written to those lists of suggestions.

17   **Q.   When you provide the lists, do you generally**

18   **prepare that in written form?**

19   A.   It varies.  There are some meetings in which

20   I have a list typed up and copied, others are simply

21   verbal discussions over a cup of coffee.

22   **Q.   You mentioned Harris County legislators?**

23   A.   Republican legislators, sorry.

24   **Q.   Yes, of course.  Does that include House and**

25   **Senate?**

1      A.   Yes, ma'am.

2      **Q.   Okay.**

3                MS. PERALES:  I'm sorry, should we

4    take a break?

5                MR. TAYLOR:  No, no, no, I was just

6    making a point -- nothing about what you all are doing.

7                MS. PERALES:  Sorry.  Just let me know

8    if you're going to need a break.

9      **Q.   (BY MS. PERALES) And we were talking about**

10   **Harris County Republican, let's start with members of**

11   **the House.  With whom have you met who is currently in**

12   **the House or with whom have you communicated who's**

13   **currently in the House about goals for ballot integrity**

14   **legislation?**

15               MR. TAYLOR:  Let me just hop in for a

16   quick second.  My job here is just to protect

17   attorney-client privilege and that's it.  But if you're

18   going to ask questions that might be involved with

19   legislative privilege or something like that, I -- I'm

20   going to defer to the other lawyers who represent other

21   parties, I just want to make that clear.

22               MS. PERALES:  Understood.

23               MR. TAYLOR:  Okay.

24     A.   It -- it varies by session.  In preparation

25   for the current session, the Republican Party of Harris

Alan Vera - 2/27/2023

32

1   County hosted a luncheon and every one or our Harris

2   County Republican State Representatives and Senators

3   attended.

4       **Q.   (BY MS. PERALES) Okay.  And at that luncheon**

5   **did you engage with anybody -- I'm just trying to get a**

6   **sense of how this works -- did you engage with elected**

7   **officials, at the luncheon about ballot integrity**

8   **legislation?**

9       A.   At the luncheon I had five minutes to discuss

10  some of the problems that had not been -- the loopholes

11  have not been closed that are causing problems with out

12  election workers with the entire group.

13      **Q.   I see, so you were essentially making a**

14  **presentation to them?**

15      A.   Informal presentation, yes.

16      **Q.   But you had the floor?**

17      A.   For five minutes.

18      **Q.   That's good, okay.  And when you say**

19  **loopholes that weren't closed, does that mean SB 1?**

20      A.   No, it means in general.

21      **Q.   Okay.**

22      A.   What has been reported by our election

23  workers that needs to be addressed.

24      **Q.   Okay.  You mentioned the list that -- that**

25  **can be many written form, aside from the list have you**

1  **ever written something more detailed about a proposal**

2  **that you wanted a legislator to consider.  So for**

3  **example, have you ever taken a stab at maybe drafting a**

4  **provision that you would want to see?**

5           MR. WASSDORF:  I'm going to object to

6  the extent that this could get into any responses to

7  legislative inquires on the grounds of legislative

8  privilege.

9       **Q.   (BY MS. PERALES) You may answer.**

10      A.   Not until this year for the current session.

11 I was asked to join a task force of grass roots

12 activist to examine and work on the concerns about

13 ERIC, E-R-I-C, electronic registration information

14 center.  We studied it, interviewed people across the

15 country for seven months and I was asked to draft a

16 possible bill that would open the ERIC functions put

17 broader range of solutions.  It's the first time I've

18 done that.

19      **Q.   Uh-huh.**

20      A.   That has been -- I did not submit it, it was

21 submitted by our task force leader and it has become a

22 bill in the current legislature.

23      **Q.   In the current Texas Legislature?**

24      A.   Current Texas -- the 88th Legislative

25 session.

1      Q.   And the task force that you were on was it a

2   Texas only task force?

3      A.   Texas only task force.

4      Q.   Okay.  So prior to working on drafting

5   legislation, this -- for this 88th regular session, in

6   the past if you had a proposal that you wanted to see

7   enacted, how much detail would you put into writing it

8   down?

9      A.   I understand.  Again, with acknowledging the

10   objection, in between the first and second special

11   sessions of the 87th legislature I sent an email with

12   two sentences to the legal counsel of our senator

13   asking that they consider adding these two sentences to

14   Senate bill one for is second special session.  They

15   studied it, liked it, recommended it and it was added

16   to Senate bill one.

17      Q.   And when you say our senator, do you mean

18   Senator Bettencourt?

19      A.   I do.

20      Q.   Okay.  And then do you remember what the two

21   sentences were on?

22      A.   Yes.  The two sentences involved requiring

23   the every county in Texas to reconcile the number of

24   ballots with the number of voters after every election.

25      Q.   Do you remember the name of Senator

1  Bettencourt's I guess general council?

2      A.   I do.

3      Q.   Tell me what that is.  That -- by the way,

4  that was very good, whoever prepared you for this

5  deposition is -- did a great job.

6      A.   Sonya Aston.

7      Q.   And did you send the two sentences to

8  Ms. Aston by email?

9      A.   By email.

10     Q.   Okay.  And did she then respond to you?

11     A.   She respond and said I'll see what I can do.

12     Q.   Okay.  Then how did you know -- how did you

13  come to learn that it was well taken and then going to

14  be put in the Bill?

15     A.   Well, as you know in Texas Legislature every

16  special session, every bill has to be re-filed.  So

17  when Senate bill was re-filed for the second special

18  session my two sentences were there.

19     Q.   Do you think you would still have that email

20  to Ms. Aston if your email history somewhere?

21     A.   I don't think so, it's been well over a year.

22     Q.   Okay.  What email service do you use?

23     A.   Outlook.

24     Q.   Outlook.  Do you know if outlook keeps your

25  older emails?

1      A.   I don't know.

2      Q.   Okay.  Okay.  Now, I think last on my list is

3  testifying when possible in the legislature, do you

4  recall testifying in the do you recall testifying on SB

5  1 at all?

6      A.   I do.

7      Q.   Okay.  And do you recall testifying on SB 1

8  in the second special?

9      A.   I do.

10     Q.   Okay.  I remember being in a committee

11  hearing and you and I were both there and you were

12  testifying, I can't remember for sure if it was the

13  second special.  But I -- I remember your testimony, do

14  you -- would you, for example in the second special

15  provide both written and verbal testimony?

16     A.   Rarely.

17     Q.   Okay.

18     A.   Rarely.  Occasionally I will bring exhibits

19  to supplement my verbal testimony.  I rarely provide

20  written testimony.

21     Q.   Okay.  Do you recall whether you provided any

22  written testimony on SB 1 or it's predecessor's bills

23  HB 6, SB 7?

24     A.   I don't think I did provide written

25  testimony.  I think it was all verbal.

1    Q.    Do you go up with like index cards or a piece

2    of paper?

3    A.    I type up every work I'm going to say and

4    I've timed it out for two minutes in the Senate and

5    three minutes in the House.

6    Q.    And you take those notes back with you?

7    A.    I do.

8    Q.    Okay.  I noticed when I -- I went to the

9    Harris County Republican Party website that there was a

10   link that -- that one could click on to get involved or

11   volunteer with the Party and it allowed me to put my

12   name and my VYD information if I wanted to serve as an

13   election worker; are you aware of that part of the

14   website?

15   A.    I am aware.

16   Q.    Do you know if those pages or the information

17   that's gathered there is used also to recruit poll

18   watchers?

19   A.    I don't deal with that information, but I

20   think it's not impossible that once the party contacts

21   the person who left their name they could add poll

22   watching as an option of volunteer activity.

23   Q.    How do you get the names of potential poll

24   watchers?

25   A.    I get them from the county party.

1      Q.    Okay.  So the paid staff?

2      A.    Uh-huh.

3      Q.    All right.  And who is responsible for

4   getting those individuals to a training that you would

5   give?

6      A.    The paid staff.

7      Q.    Okay.  So you don't have to be chasing people

8   down telling them, it's at Saturday at 10 a.m.

9      A.    Not anymore.

10      Q.    Okay.  Okay.  When I'm quiet I'm crossing off

11   questions, so it's a good thing.  I'm already on page

12   6, we're just zipping right along here.

13            MR. TAYLOR:  You left out a key fact,

14   what's the last page number?

15            (Laughter.)

16            MS. PERALES:  Well, it's not six,

17   but -- but we're actually making really -- I think our

18   conversation, so it touched on several different

19   things, so I'm catching up with myself and crossing off

20   the questions.

21            THE WITNESS:  While you're doing that,

22   can we take a break?

23            MS. PERALES:  Of course.

24            THE WITNESS:  Thank you.

25            MS. PERALES:  Let's take a five minute

1  break.

2                    THE REPORTER:  Okay.  Going off the

3  record at 10:29 a.m.

4                         (Off the record.)

5                    THE REPORTER:  Going back on the

6  record at 10:42 a.m.

7      Q.   (BY MS. PERALES:) Okay.  Mr. Vera, I am going

8  to ask you some more specific questions about poll

9  watchers and your training of the poll watchers

10 comparing the before SB 1 to the after SB 1 period of

11 time, okay?

12                    So did your training change at all for

13 poll watchers with respect to what they could do in the

14 polling place while voting is happening?

15     A.   It did not change significantly.  The two

16 greatest changes.

17                    MR. GORE:  Let me -- let me just

18 interject here an objection.  We've allowed some

19 latitude on the poll watcher training and I'm fine you

20 confirming there were changes to the training.

21 Anything about the substance of the training, the

22 Harris County Republican Party has asserted a First

23 Amendment right to confidentiality and First Amendment

24 privilege not to disclose the substance of the

25 training.  So I'm going to ask the witness or instruct

1    the witness not to answer anything about the substance

2    of the training.

3         Q.   (BY MS. PERALES:) And Mr. Vera, are you going

4    to follow counsel's advice and not testify about the

5    substance of the poll watcher training?

6         A.   I am.

7         Q.   Okay.  And you did that very elegantly, I --

8    I mentioned previously that so times your Counsel will

9    direct you not to answer and we will then work on that

10   at another time.

11             You mentioned that your poll watcher

12   training did not change significantly, but would it be

13   fair to say that your poll watcher training did change

14   in some respect from the pre-SB 1 period to the post SB

15   1 period?

16        A.   Yes.

17        Q.   Aside from the training that you give poll

18   watchers, do you also receive communications from poll

19   watchers while election day is going on?

20        A.   I do.

21        Q.   Okay.  And generally how do you receive those

22   communications?

23        A.   By text or email.

24        Q.   Have you ever had a poll watcher call you on

25   your cell phone during election day to ask for you

Alan Vera - 2/27/2023

41

1   guidance or advice?

2       A.   Yes.

3       Q.   So then would it be fair to say you

4   communicate with poll watchers by text, email, and

5   telephone?

6       A.   Yes.

7       Q.   And in these communications, would it be fair

8   to say that they're asking for your guidance about what

9   to do in a particular situation?

10      A.   Frequently.

11      Q.   Okay.  And do you then provide that guidance

12  to them based on your understanding of SB 1 and other

13  parts of the election code that deal with poll

14  watchers?

15      A.   That is correct.

16      Q.   You mentioned the training manual that you

17  encouraged, that you've created that you encourage the

18  poll watchers to bring with them to the polling place

19  on election day; is that correct?

20      A.   I mentioned it, yes.

21      Q.   Okay.  Can you tell me approximately how many

22  pages long it is?

23      A.   It is a graded booklet where there are tabs

24  available to you.  I'm going to guess it is a total of

25  18 pages folded and collated and cut very uniquely.

Alan Vera - 2/27/2023

42

1      Q.   Does each page contain approximately 250

2  words?

3      A.   No.  It's a tiered appearance so that there's

4  a tab on what the content is.  So there's a tab that

5  says ID, and they flip it up in that opened is all the

6  informing on ID.

7      Q.   Okay.

8      A.   So -- and on the back are the actual

9  citations from the election code that relate to the

10  issues on the opposite sides of the page.  So 18 pages,

11  but they're not same size.

12      Q.   Okay.  So if I took the words from your

13  manual and I put them in let's say a word processing

14  document, about how many pages long would it be?

15      A.   I don't know.

16      Q.   Would it be more than 18?

17      A.   No --

18      Q.   I'm trying to figure out --

19      A.   What font size?

20                    (Laughter.)

21      Q.   (BY MS. PERALES) 12.

22      A.   Yes, then be more than 18 because the font

23  side I have to use for the code is much smaller to fit

24  all the relevant code.

25      Q.   Okay.  Okay.  Would it be fair to say that

1  your Poll Watcher Guide is different from the Poll

2  Watcher Guide published by the secretary of state?

3      A.    It is.  It is in format.

4      Q.    Okay.

5      A.    It's much more usable.

6      Q.    Okay.

7      A.    It is a flip chart as opposed to a PDF, you

8  know, like several 100 pages long.

9      Q.    Would you say that there are -- well, so

10  your's is much shorter, so it doesn't contain

11  everything from the secretary of state's guide?

12      A.    Uh-huh.

13      Q.    Would you say that there are substantive

14  differences between your guide and the secretary of

15  state?

16      A.    There's no content difference, mine is more

17  compact.

18      Q.    So for example, do you -- would you maybe be,

19  your guide by different from the secretary state's

20  guide if it offered examples that might be different

21  from those of the secretary of state.  You see what I'm

22  getting at, whether they're --

23      A.    I understand --

24              MR. GORE:  And let me just renew the

25  objection, because again this is an area where the

1   Harris County Republican Party has asserted a First

2   Amendment Privilege.  I think you can answer yes or no

3   to the question, but instruct the witness not to

4   provide any discussion of the substance of any such

5   differences.

6        A.   You're supposed to ask me, will I follow

7   counsel, yes.

8                  (Laughter.)

9        **Q.   (BY MS. PERALES) Are you following your**

10  **counsel's advice?**

11       A.   I am following the counsel's advice.

12       **Q.   All right.  So your counsel said don't give**

13  **substantive, but he's allowed you to answer yes or no.**

14                  **So is the answer to then yes or no to**

15  **my question whether there are substantive differences**

16  **between your guide and the secretary of state's guide?**

17       A.   Let me ask you to clarify for me which

18  secretary of state Poll Watcher Guide you're referring

19  to, because there are many iterations.

20                  MR. TAYLOR:  And Nina, just to clarify

21  you already know this, but Mr. Gore is not Alan Vera's

22  personal counsel.  You're saying your lawyer this,

23  "your lawyer that.  That's actually me, Andy Taylor,

24  but Mr. Gore represents Harris County Republican Party,

25  and that's why he rather than me is asserting this

1    First Amendment Privilege because I'm not representing

2    the Republican Party in this litigation.  So just that

3    -- just to keep things straight.

4                    MS. PERALES:  Thank you for that

5    clarification.

6        **Q.    (BY MS. PERALES:) So Mr. Vera when you**

7    **decline to answer based on Mr. Gore's instruction, you**

8    **are declining to answer based on the instruction of a**

9    **lawyer who is not your lawyer, but who is the lawyer**

10   **for the Harris County Republican Party?**

11       A.    That is correct.

12       **Q.    Thank you.  And to clarify my question I'm**

13   **going to mark, although I only have one copy.  A**

14   **January 2022 publication by the secretary of state's**

15   **Elections Division titled Poll Watchers Guide.  We will**

16   **mark that deposition Exhibit No. 2.**

17                    (Exhibit No. 2 marked.)

18       **Q.    (BY MS. PERALES:) Take a moment if you will**

19   **to take a look at the document?**

20       A.    Even they had a change for SB 1. Thank you

21   for letting me see that.  The combination of the

22   PowerPoint and the Guide that they carry with them, is

23   very similar to this booklet, combined.

24       **Q.    Okay.  So let me ask you a few questions,**

25   **with respect to Exhibit 2, had you ever seen that**

1    version of the document before I gave it to you today?

2        A.    Online.  I reviewed it online, but not hard

3    copy.

4        Q.    Okay.  So when I make reference to the

5    secretary of state's Poll Watcher Guide, will you

6    understand that I'm referring to the January 2022

7    version?

8        A.    I do, yes.

9        Q.    Okay.  Now, let me go back to my earlier

10   question, which is that the -- your guide, which you've

11   described as 18 pages, would you agree with me that

12   there are substantive differences between your guide

13   and Exhibit 2?

14       A.    That is a difficult question to answer

15   because --

16                MR. GORE:  Again, I'm just going to

17   renew the objection and instruct the witness that he

18   may answer to the extent that doing so does not reveal

19   the substantive content of his guidebook which -- over

20   which Harris County Republican Party has asserted a

21   First Amendment Privilege.

22       A.    The combination of the PowerPoint

23   presentation and the guide is substantively the same as

24   what's in here, combined.

25       Q.    (BY MS. PERALES:) I understand.  So if

1  **combined you -- you believe they're substantively the**

2  **same.  Would it then be correct that your guide by**

3  **itself is not substantively the same as the secretary**

4  **of state's guide?**

5      A.   My guide is focused on the questions and

6  issues the poll watcher confronts at the polling place

7  itself, not the background of how poll watchers are

8  appointed et cetera, that's in class.

9      **Q.   And so would the answer to my question then**

10  **be yes?**

11      A.   The answer is, it is not substantively

12  different in content from those portions of this

13  document that address the activity at the polling

14  place.

15      **Q.   Is it your contention then that your guide**

16  **contains every piece of matter that the secretary of**

17  **state's guide contains with respect to poll watcher**

18  **behavior in the, or activities in the poll place --**

19      A.   It does.  It does, on the activity at the

20  polling place, yes, they're very consistent.

21      **Q.   Did you copy and paste out of the secretary**

22  **of state guide?**

23      A.   I did not.

24      **Q.   Okay.**

25      A.   I use illustrations.

1    Q.    You mean like pictures?

2    A.    Yes.

3    Q.    I see, okay.  Let's talk about the PowerPoint

4  again and the -- and your -- your Poll Watcher Guide.

5  With respect to the guide which your trainees take home

6  with them; is that correct?

7    A.    Uh-huh, that is correct.

8    Q.    Can you estimate how many copies of your

9  guide either in the current version or in past versions

10  are circulating in the world?

11    A.    I know that Harris County Republican Party

12  printed 5,000 of them for our use here in Harris

13  County, so that's the ones I know about.

14    Q.    And you when you say printed 5,000, you mean

15  just for the November 2022 election?

16    A.    For the primary election, primary runoff, and

17  the November election.

18    Q.    Okay.  So since January of 2022?

19    A.    That's correct, because SB 1 went into affect

20  December of 2021.

21    Q.    And were the Poll Watcher Guides printed by

22  the Republican Party only physically distributed by you

23  or were they distributed by other folks as well?

24    A.    Only by me in my classes.

25    Q.    And how many have you distributed?

1     A.    Probably 1,000.

2     **Q.    Okay.  And do you know where those copies are**

3  **today?**

4     A.    Yes.  Oh, the ones I distributed?

5     **Q.    Yes.**

6     A.    I do not.  They're -- they're in the

7  possession of the poll Watchers, as far as I know.

8     **Q.    Have you ever printed your PowerPoint and**

9  **given that to anybody?**

10     A.    No, ma'am.

11     **Q.    Would you say that with respect to the**

12  **approximately 1,000 Poll Watcher Guides that you**

13  **prepared, that there is a possibility that at this**

14  **point some of those guides have made their way to other**

15  **individuals who maybe weren't the original recipients?**

16                    MR. TAYLOR:  Objection to form.

17     A.    I have no idea.

18     **Q.    (BY MS. PERALES:) Do you think that it's**

19  **possible that some of your guides maybe in circulation**

20  **beyond the original recipients?**

21                    MR. TAYLOR:  Objection to form.

22     A.    I have no idea.

23     **Q.    (BY MS. PERALES.) If a general member of the**

24  **public asked you for your guide, let's say a friend of**

25  **one of your trainees comes at the end of the training**

Alan Vera - 2/27/2023

50

1  and says, "I'm here to pick up Susan, Susan's guide

2  looks very interesting," and they would ask for another

3  copy, would you give them another copy?

4       A.   No.

5       Q.   And why is that?

6       A.   Because I only want these in the hands of the

7  people I've trained.

8       Q.   Okay.  What steps do you take to ensure that

9  the guides stay in the hands of the people you trained?

10      A.   All the steps I can take.  The guides are

11  with me personally and I personally hand them to the

12  students and they leave with them, once they leave I

13  have no control.

14      Q.   Okay.  Okay.  I'm going to ask you some

15  questions about your training of poll watchers.  Well,

16  let me ask you an earlier question first, just to nail

17  down something.  Is there anybody else who trains,

18  besides you, who trains poll watchers who will serve on

19  behalf of Harris County Republican Party?

20      A.   No.

21      Q.   I'm going to ask you some questions now about

22  your training with the understanding that they may draw

23  objections, and so I will just embark upon them for the

24  purpose of the record.

25                Can you tell me how your training of

Alan Vera - 2/27/2023

51

1  poll watchers may have changed or didn't change based

2  on the enactment of that part of SB 1 that says "Poll

3  watchers may not be denied free movement where election

4  activity is occurring within the location at which the

5  watcher is serving?

6              MR. GORE:  Objection, First Amendment

7  Privilege, instruct the witness not to answer.

8       Q.  (BY MS. PERALES) And will you follow the

9  instruction of Mr. Gore not to answer?

10      A.  I will.

11      Q.  Did your training of poll watchers change

12 following enactment of that portion of SB 1 that

13 prohibits an election official from taking any action

14 to obstruct the view of a watcher or distance the

15 watcher from the activity or procedure to be observed

16 in a manner that would make observation not reasonably

17 effective?

18             MR. GORE:  Objection, First Amendment

19 privilege, instruct the witness not to answer.

20      Q.  (BY MS. PERALES:) Were you -- are you

21 following Mr. Gore's instruction?

22      A.  I am.

23      Q.  Are you aware that -- well, Harris County

24 Republican Party is the appointing authority for its

25 watchers; is that correct?

Alan Vera - 2/27/2023

52

1     A.    That is correct.

2     Q.    **Are you aware that SB 1 has now allowed the**

3  **appointing authority that believes a watcher was**

4  **unlawfully prevented or obstructed from the performance**

5  **of the watcher's duties to seek relief in court?**

6     A.    I am aware.

7     Q.    **Are you aware of any changes in activity of**

8  **the Harris County Republican Party with respect to**

9  **being able to take court action when you believe one of**

10  **your watchers is being unlawfully prevented or**

11  **obstructed?**

12                    MR. GORE:  So I'm going to object on

13  First Amendment privilege grounds to the extent the

14  question calls for actions that are not public or

15  communications that are not public and that are

16  internal only to the Harris County Republican Party, to

17  the extent there's anything public out there the

18  witness can testify, but with respect to anything not

19  public, I instruct the witness not to answer.

20     Q.    **(BY MS. PERALES:) Mr. Vera, are you going to**

21  **follow Mr. Gore's instruction?**

22     A.    I am.

23     Q.    **Can you answer the question with respect to**

24  **public information only?**

25     A.    I am not aware at this time of any public

1 statement or intent from the Harris County Republican

2 Party to seek court action with regard to a poll

3 watcher.

4    **Q.   Without telling me any substance, are you**

5 **aware of any private communication regarding that?**

6    A.   No.

7    **Q.   Can you tell me what "Free Movement of Poll**

8 **Watchers," means to you?**

9    A.   Free Movement of poll Watchers," means that

10 with the exception of a voter voting by themselves at

11 the voting booth, the poll watcher is free to move

12 around the polling place to observe all other election

13 activity.  The voting booth is off limits if the voter

14 is by himself of herself, or if the voter is being

15 assisted by an assistant the voter brought with them.

16    **Q.   How far from the voter should a watcher stand**

17 **to respect that off-limits area you described?**

18    A.   It's not specified in statute, but they

19 should not be close enough to see the ballot or hear

20 the voter's discussion with the assistant.

21    **Q.   If the watcher isn't looking at the ballot,**

22 **how close can the watcher stand?**

23    A.   If the voter is being assisted by an election

24 worker who is working that polling location, the poll

25 watcher can be right there at the voting booth, and SB

Alan Vera - 2/27/2023

54

1  says can even inspect the ballot.  That's not true

2  when the voter's being assisted by their own chosen

3  assistant.

4      **Q.   So how -- you know if a watcher asks you how**

5  **close can I be in order to perform that function and**

6  **you say being right there, how close is right there in**

7  **a numerical sense?**

8      A.   We are still referring to a voter being

9  assisted by an election worker, I've told the poll

10  watchers they can be right there at the polling booth

11  to be able to see every action made by the election

12  worker and hear every instruction given by the voter to

13  the election worker, close enough to see and hear.

14      **Q.   Okay.  And how far is that in terms of**

15  **distance?**

16      A.   It depends how good the poll watchers vision

17  and hearing is.

18      **Q.   Okay.  So let's say it's not great, but the**

19  **poll watcher still capable of seeing and hearing, if**

20  **the poll watcher says can I stand one foot from the**

21  **voter, would you say that's okay?**

22      A.   I would tell the vote poll watcher if you

23  need to stand one foot from the voter to see and hear

24  everything, yes.  Do not make contact with the voter or

25  the election worker.

1       Q.    You mean physical contact?

2       A.    Correct.

3       Q.    And so you mention a moment ago, with respect

4    to a voter being assisted by a poll worker, that the

5    watcher now has the ability to inspect the ballot; do

6    you recall that testimony?

7       A.    Yes.

8       Q.    Okay.  And do you understand that to be

9    inspect the ballot as it's being voted?

10      A.    The language in the code of SB 1 states that

11   the voter, that the poll watcher may observe the

12   preparation of the ballot, does not say anything beyond

13   that.  So what I have told my poll watchers in class

14   is, if you think you need to you can see that the

15   election worker who is assisting the voter is carrying

16   out the voter's instructions in preparing the ballot.

17      Q.    And that means for example being able to see

18   the poll worker make selection of candidate preference?

19      A.    As instructed by the voter, correct.  The key

20   issue counselor is, is the assistant carrying out the

21   expressed instructions of the voter, that's it.

22      Q.    And so the watcher then, you would advise can

23   stand close enough to see and hear not only the voters

24   instructions to the poll worker, but then the poll

25   worker --

1    A.    Executing the instructions.

2    **Q.    -- by making the preference selections on the**

3    **ballot?**

4    A.    That is correct.

5    **Q.    What actions by an election official would**

6    **obstruct the view of a watcher that would make the**

7    **observation not reasonably effective when it came to**

8    **voting?**

9    A.    Are you referring to the actual preparation

10   of the ballots or other examples in the polling place?

11   **Q.    The preparation of the ballot.**

12   A.    Then the election, one offense the election

13   worker could take would be to constantly move his body

14   to block the poll watcher's vision of the ballot

15   preparation.

16   **Q.    Now, with respect to not preparation of the**

17   **ballot, but other activities -- interacting with voters**

18   **in the polling place, what action could an election**

19   **worker take that would obstruct the view of a watcher**

20   **in a manner that would make observation not reasonably**

21   **effective?**

22   A.    At the voter check-in table, the poll watcher

23   has to be able to hear everything said between the

24   voter and the election worker and to see the

25   information that's coming up on the screen as the voter

1  checks in.

2              So if the election worker, by shifting

3  his body to block the screen or making the table so

4  close to the wall the poll watcher can't stand there,

5  those are things that the election workers could do

6  that would prohibit the -- the poll watcher from being

7  able to see and hear all the transactions.

8      Q.   Okay.  Describe for me actions by a poll

9  worker that would distance the watcher from the

10 activity or procedure to be observed in a manner that

11 would make observation not reasonably effective with

12 respect to activities that involve the voter?

13     A.   The most blatant example of that is an

14 election judge, the presiding judge of a polling place

15 telling the voter they cannot move any closer than this

16 distance.

17     Q.   Or telling the watcher?

18     A.   Right, telling the watcher they cannot be any

19 closer than this distance.

20     Q.   Okay.  So for example saying you can't get

21 closer than three feet to the poll worker assisting the

22 voter and casting the ballot?

23     A.   Correct.

24     Q.   Okay.  Is it within the scope of what a poll

25 watcher can do to write down the names of voters as

Alan Vera - 2/27/2023

58

1  they check in to vote?

2      A.   That is not normally within the scope of the

3  poll watcher's activity.

4      **Q.   Would you consider it prohibited?**

5      A.   It's not specifically prohibited in statute.

6  When I'm asked that question I tell my students --

7              MR. GORE:  -- I'm just going to again

8  interject the objection and instruct the witness not to

9  divulge what he tells his students during training on

10  First Amendment grounds.

11     **Q.   (BY MS. PERALES:) And are you going to follow**

12  **Mr. Gore's instructions?**

13     A.   I am.

14     **Q.   Uh-huh, let me see if I can find another way**

15  **to, got this.  If I were to ask you whether you would**

16  **advise me to refrain from writing down the names of**

17  **voters as they check in, would you advise me to refrain**

18  **from doing that?**

19     A.   Mr. Gore?

20              MR. GORE:  I understand the question

21  to be a hypothetical about Ms. Perales.

22              MS. PERALES:  And -- and I don't live

23  in Harris County, so.

24     A.   I would advise the poll watcher to refrain

25  from writing down the voter's names.

1    Q.   (BY MS. PERALES) Okay.  Have you ever had a

2  poll watcher contact you for guidance on what to do if

3  the voter is communicating with an assistor in a

4  language other than English?

5    A.   I have never had a poll watcher contact me

6  for that reason because the poll watchers are

7  instructed in advance about what to do in that

8  situation.

9    Q.   Okay.  Understanding that the poll watcher is

10  instructed on how they personally should behave, have

11  you ever had a poll watcher contact you to express a

12  concern about an in person assistance in the polling

13  place in a language other than English?

14    A.   No.

15    Q.   Okay.  Are you familiar with organized block

16  walking activities of the Harris County Republican

17  Party?

18    A.   From a distance.

19    Q.   Okay.  Do you know how the Harris County

20  Republican Party recruits block walkers?

21    A.   What I know is that the precinct chairs are

22  encouraged to organize people from the precincts to do

23  block walking.

24    Q.   And when the precinct chairs organize people

25  from their precincts to do block walking, is that

Alan Vera -

60

1  **typically an activity that is in support of multiple**

2  **Republican candidates at the same time or something**

3  **different?**

4      A.   I think it is a mixture.  If it is a block

5  walking activity before a general election, it's

6  usually multiple candidates.  If it's before a specific

7  school board election it maybe for only one or two

8  candidates.

9      **Q.   Do you know generally what block walkers do**

10  **when they're block walking?**

11      A.   Only from what they've told me.

12      **Q.   Okay.  Tell me what you know from what**

13  **they've told you?**

14      A.   They work from a list, either in paper or on

15  the phone, they knock on the door, they know the

16  person's name ahead of time, and they follow a script

17  on how to engage the voter with the message being

18  delivered.

19      **Q.   Okay.  Do you know the source of the lists of**

20  **voters?**

21      A.   I do not.

22      **Q.   Do you know if block walkers know when**

23  **they're knocking on the door, if the voter is over age**

24  **65?**

25      A.   I do not know that.

Alan Vera - 2/27/2023

61

1      Q.    Do you know if block walkers know when

2  they're knocking on the door if the voter has requested

3  a mail ballot or is eligible to request a mail ballot?

4      A.    I don't know that.

5      Q.    Do you know if the Party gives, I don't know

6  a better word than swag, do you know if the Party gives

7  out like T-shirts or buttons or other things to its

8  block walkers?

9      A.    I do not know for certain, but I have seen

10  candidates give buttons and shirts to block walkers.

11      Q.    And would those be block walkers that were

12  organized by the Harris County Republican Party?

13      A.    I'm not sure.

14      Q.    Have you seen the script that the block

15  walkers use when they interact with the voter?

16      A.    I have not.

17      Q.    Okay.  Do you know if the Harris County

18  Republican Party recruits individuals to be available

19  to provide assistance to voters in person at the

20  polling place?

21      A.    I have never seen that activity by the

22  Republican Party of Harris County.

23      Q.    Okay.  Do you know whether, for example -- do

24  you know whether for example, if Harris County

25  Republican Party has a table set up outside the polling

1   place at the appropriate distance, and whether voters

2   have ever asked people at that table to come in and

3   help them, you know, with assistance in casting the

4   ballot?

5       A.   I am not aware that the Harris County

6   Republican Party has ever set up tables outside a

7   polling place.

8       Q.   Okay.  Have you ever worked outside a polling

9   place encouraging voters as they go in?

10      A.   Not for the last 14 years.

11      Q.   And I take -- I take it from that, that your

12  activities which might have been urging voters to vote

13  for a particular candidate, and at the point at which

14  you become the chair of the Ballot Security --

15              MR. TAYLOR:  Committee.

16              MS. PERALES:  Committee.  I wanted to

17  get it right and I wrote it down on the first page.

18      Q.   (BY MS. PERALES:) Is that right?

19      A.   What was the question?

20      Q.   That your activities urging voters to vote

21  for particular candidates, either door to door or

22  outside the polling place, ended when you became the

23  chair of the Ballot Security?

24      A.   That's basically correct.

25      Q.   And can you give me an insight into why?

Alan Vera - 2/27/2023

63

1  A.   I am in charge of election integrity so I

2  don't endorse candidates during primaries.  I don't

3  pick between republican candidates, and for the general

4  election I'm usually too busy with details at the

5  polling places.

6  **Q.   That raises a question I had in the back of**

7  **my mind.  Can you tell me how many people currently are**

8  **on the Ballot Security Committee for Harris County**

9  **Republican Party?**

10  A.   There are 13 voting members, and there are

11  eight non-voting members.

12  **Q.   And from where are the voting members drawn?**

13  A.   The voting members are appointed by the SD or

14  Senate District chairs and by the county Party Chair

15  from the SD's, from the Senate District areas.

16  **Q.   And -- and from where are the eight**

17  **non-voting members drawn?**

18  A.   They are selected by me.

19  **Q.   Okay.  Do they serve a term of a certain**

20  **length?**

21  A.   Two years.

22  **Q.   Do the -- does this Ballot Security Committee**

23  **hold meetings at regular intervals?**

24  A.   Monthly.

25  **Q.   Who pays for the coffee and donuts?**

Alan Vera - 2/27/2023

64

1    A.    There is no coffee and donuts.

2    Q.    It's a very serious meeting then?

3    A.    Very serious.

4    Q.    Okay.  Do you hold these meetings at a party

5    headquarters or at a restaurant?

6    A.    We hold the meetings in the lobby conference

7    room of the Party headquarters building.

8    Q.    Okay.  So no food?

9    A.    No food.

10   Q.    Okay.  Do you have a vote, because you

11   mentioned there are 13 voting members?

12   A.    I have a vote in the committee, yes.

13   Q.    Okay.  Have you personally ever assisted a

14   voter who needed assistance voting in person in the

15   polling place?

16   A.    During the time I was an alternate judge at

17   Wesley elementary school I was asked by voters from

18   that precinct to assist them and yes, I did.

19   Q.    And what types need for assistance did you

20   see at that time?

21   A.    During that time I was asked by a voter to

22   explain why there were no democrat candidates for that

23   office and I had to explain that none had filed to run.

24   The voter was concerned and confused, I explained that.

25   Q.    Okay.

Alan Vera - 2/27/2023

65

1    A.   The -- another voter asked me to explain a

2    bond proposition to them I told them I was not allowed

3    to do anything, but read the language on the ballot and

4    could not answer questions.

5    **Q.   Okay.  And so my next question is, what was**

6    **the -- what was it about the voter that required**

7    **assistance in voting.  So for example inability to read**

8    **or write or physical disability or --**

9    A.   I had not had any of those instances.  The

10   questions I got were about specific ballot issues.

11   **Q.   I see.  Okay.  So would it be fair to say**

12   **then that you've never assisted in voting in person at**

13   **the polling place a physically disabled voter who**

14   **required your assist -- who required assistance to**

15   **vote?**

16   A.   In the places I've worked they always came

17   with their own assistant.

18   **Q.   Okay.  Have you ever had occasion to assist a**

19   **voter who was, who didn't speak English and needed**

20   **assistance interpreting the ballot at the polling**

21   **place?**

22   A.   Only to the extent of showing them how to

23   turn on the Spanish language ballot and the headphones

24   that read the ballot in Spanish.

25   **Q.   Okay.  Have you ever interacted with a voter**

Alan Vera - 2/27/2023

66

```
1  in Spanish while delivering that type of assistance?

2       A.   Yes, but just to give the instructions on how

3  to access the Spanish language ballot and the Spanish

4  language reading of the ballot.

5       Q.   I won't presume, but you are from El Paso,

6  does that mean you speak Spanish?

7       A.   It means I spoke Spanish before I spoke

8  English.

9       Q.   And you still have some ability today?

10      A.   I can order a beer and chips with the best of

11  them.

12           (Laughter.)

13      Q.   (BY MS. PERALES) Okay.  Have you ever

14  assisted a family member or friend?

15      A.   I have not.

16           MR. TAYLOR:  Let the question finish

17  before you answer.

18           THE WITNESS:  Thank you, sorry.

19      Q.   (BY MS. PERALES) I've been talking up until

20  now about voting in the polling place, but I'll also

21  ask, have you ever assisted a voter who requested your

22  assistance in casting a ballot by mail?

23      A.   I have not.

24      Q.   Have you ever assisted a voter in preparing

25  an application for ballot by mail?
```

Alan Vera - 2/27/2023

67

1    A.   I have not.

2    **Q.   And that includes friends, family members,**

3    **neighbors, anybody like that?**

4    A.   It does.

5    **Q.   Okay.  Are you aware of any instances in the**

6    **polling place in which a voter assistor helped a voter**

7    **who was not eligible for voter assistance?**

8    A.   Repeat the question, please.

9    **Q.   Are you aware of any instances in which a**

10   **voter assistor helped a voter in the polling place who**

11   **was not eligible for voter assistance?**

12   A.   I have not personally seen that.  I have

13   received reports from poll watchers expressing that

14   concern.

15   **Q.   Okay.  And what would you do in response to**

16   **that concern?**

17   A.   I would simply have the poll watchers take

18   notes and submit it with the report.

19   **Q.   Okay.  And did you ever follow up on any --**

20   **well, did you ever receive any written concerns like**

21   **that?**

22   A.   Yes.

23   **Q.   And what did you do to follow up?**

24   A.   We followed up with the Ballot Security

25   Committee looking into the voter assistant, because

Alan Vera - 2/27/2023

68

1  they sign in now.  We've done open records request,

2  received the name of the assistant, and done a little

3  digging.  We haven't found anything extraordinarily

4  evil.

5      **Q.   Anything slightly evil?**

6      A.   No, just questions about whether the voter

7  really did need an assistant or not.

8      **Q.   Okay.**

9      A.   But those are judgment calls in many cases.

10     **Q.   Have you ever contacted a voter to verify**

11 **whether the voter needed assistance?**

12     A.   I have not.

13     **Q.   Okay.  Now, have you -- are you aware of any**

14 **instances in which a voter assistor told a voter how to**

15 **vote in the polling place?**

16     A.   We have had those incidents reported to me by

17 poll watchers and by election workers and they were

18 simply instructed to advise the assistor that they're

19 to follow the direction of the voter and not vote in

20 place of the voter.  So, yes we have had those

21 instances reported.

22     **Q.   Did you ever receive any reports like that in**

23 **writing?**

24     A.   Yes.

25     **Q.   Okay.  And so since you received it in**

Alan Vera - 2/27/2023

69

1   **writing after the voting has ended, what have you done,**

2   **if anything in response to receiving something in**

3   **writing?**

4       A.   Two things, the issue is, the issue and the

5   incident is reported on our legislative preparation

6   documents and reported to the Harris County Republican

7   Party's election issue repository.  So there's two

8   records of it.

9       **Q.   And would you have access to those records**

10  **today?**

11      A.   I do not have access to the main repository,

12  only my own notes.

13      **Q.   Okay.  And do you have notes documenting any**

14  **instances in which an assistor told a voter how to**

15  **vote?**

16      A.   I do.

17      **Q.   Okay.  Where are those notes now?**

18      A.   They're at home.

19      **Q.   Okay.  And you would be capable of producing**

20  **them in some form, if needed --**

21      A.   I could, but you could not read them probably

22  because they're all handwritten.

23      **Q.   Can you recall the date of the most recent**

24  **time you would have noted an -- a report of an assistor**

25  **telling a voter how to vote in a polling place?**

Alan Vera - 2/27/2023

70

1    A.   I cannot recall, it has been a while.

2    **Q.   Okay.  Has it been more than five years?**

3    A.   No, but more than two.

4    **Q.   Okay.  And that would be a single instance or**

5    **multiple instances?**

6    A.   I can't remember.

7    **Q.   Okay.  Okay.  Do you recall the last time you**

8    **asked an election worker to instruct an assistant to**

9    **carry out the wishes of the voter?**

10   A.   I never do that personally.  I instruct

11   either the poll watcher or one of my workers to bring

12   the issue up with the election judge.

13   **Q.   And do you recall the last time you did that?**

14   A.   In early voting for the November 2022

15   election?

16   **Q.   Do you recall where that polling place was?**

17   A.   I don't.

18   **Q.   Okay.  And was that a single instance or**

19   **multiple instances?**

20              MR. TAYLOR:  Let me -- let me hop in,

21   I'm the new kid on the block here, but I was told that

22   the November 2020 election cycle was not going to be

23   discussed today and this witness didn't prepare --

24              MS. PERALES:  Okay.

25              MR. TAYLOR:  -- for that subject area.

Alan Vera - 2/27/2023

71

1  Now, I could be wrong, but that's what I was told.

2            MS. PERALES:  Yeah, and I'm sorry we

3  sort of drifted into that because I was asking when

4  something happened and he mentioned --

5            MR. TAYLOR:  Right, right.

6            MS. PERALES:  -- so thank you for that

7  reminder.  I will not ask you about that from the

8  November 2022, because we're going to stick to before

9  that.

10       **Q.   (BY MS. PERALES:) Before November of 2022,**

11  **can you think of an instance where you instructed poll**

12  **watcher or poll worker to deal with an issue of an**

13  **assistor who was suspected of telling a voter how to**

14  **vote?**

15       A.   I believe that in the May uniform election

16  date of 2022, so it was not the November, but the May

17  in an ESD Emergency Services District Election, I did

18  have a poll watcher, I gave a poll watcher guidance to

19  have the presiding judge counsel the assistor not to

20  make decisions for the voter.

21       **Q.   And do you know whether the assistor was a**

22  **private individual or an election worker?**

23       A.   It was an election worker.

24       **Q.   And how did your watcher know that election**

25  **worker was telling that particular voter how to vote?**

Alan Vera - 2/27/2023

72

1    A.   Because the election worker was the assistant
2  and the poll watcher is now allowed to be at the booth
3  with the election worker assistant, and the poll
4  watcher was and could overhear and see what's going on.
5    **Q.   And what did the poll watcher say exactly**
6  **that -- that communicated their understanding that the**
7  **election worker was somehow voting for the voter or**
8  **telling the voter how to vote?**
9    A.   The voter was pondering different races and
10  candidates and the election worker was making strong
11  suggestions on whom the voter should choose.
12    **Q.   Do you know whether that particular voter was**
13  **physically disabled or --**
14    A.   I do not.
15    **Q.   -- okay.  Okay.  Do you know whether -- did**
16  **the watcher report that the voter -- let me see, how do**
17  **I ask this question?  Let me start again.  Did the**
18  **watcher report that the election worker assistor voted**
19  **for the voter, prepared the ballot in anyway that was**
20  **different than what the voter wanted?**
21    A.   That particular instance, the poll watcher
22  reported that the election worker assistant was
23  strongly suggesting to the voter which choices he
24  should make in casting his ballot.
25    **Q.   Okay.  And understanding that, that's not**

Alan Vera - 2/27/2023

73

1   **okay.  Did the poll watcher communicate how the ballot**

2   **was ultimately prepared?**

3       A.   Poll watcher communicated that he, as he

4   should have, spoke directly to the election worker.

5   Okay.  And then went and saw the presiding judge to

6   also come and reinforce it.

7       **Q.   Did the poll watcher say how the ballot was**

8   **prepared?**

9       A.   I did not ask that.

10      **Q.   Can you think of any other examples from**

11  **before the 2022 general election of a poll watcher**

12  **raising a concern to you or an election official**

13  **raising a concern to you about an assistor who was**

14  **voting for the voter or telling the voter how to vote?**

15      A.   How far back do you want to go?

16      **Q.   Let's go back in five years.**

17      A.   Okay.  So in 2018, okay?  Early voting,

18  November election there were people camped in the

19  parking lot outside the Moody gardens -- moody polling

20  place and they were intercepting voters in the lot

21  locking arms with them and walking them into the poll

22  and announcing themselves as the assistant.

23      **Q.   Okay.  And do you know whether any of those**

24  **assistors told voters how to vote?  Did any watcher or**

25  **election official tell you those assistors told the**

1  voters how to vote?

2      A.   It was very similar to what I just described

3  to you in the other situation that, yes, the reports

4  then came in that the assister who had attached herself

5  to the voter was strongly suggesting to the voter which

6  candidates they should select at the polling place --

7  the polling booth -- the voting booth.

8      Q.   So was it one assistor at issue?

9      A.   There were four people working the parking

10 lot.

11     Q.   Okay.  But you heard from the watchers or the

12 poll workers that it was this one particular lady?

13     A.   No, it was all four ladies.

14     Q.   Okay.  Four ladies.  And do you know whether

15 the ballot was prepared in accordance with the voter's

16 wishes in those instances?

17     A.   I do not.

18     Q.   Okay.  Okay.  Do you have any other examples

19 within the past five years?

20     A.   Not that I can think of at this time.

21     Q.   Okay.  I am about to change to another topic

22 can we take a five minute break?

23               THE REPORTER:  Okay.  Going off the

24 record at 11:41 a.m.

25               (Off the record.)

1                    THE REPORTER:  Going back on the

2    record at 11:54 a.m.

3         **Q.   (BY MS. PERALES:) Okay.  Mr. Vera, I'm going**

4    **to turn to talking about the time leading up to the**

5    **introduction of the election related bills in the 2021**

6    **regular session.  So at this point we're not at SB 1 as**

7    **we've come to know it, but at that time we had HB 6 and**

8    **SB 7, I believe.**

9                    **So in the lead up to the 2021, Texas**

10   **Legislative regular session, it's fair to say that you**

11   **were interested in seeing one or more bills put forward**

12   **that we're going to deal with election issues?**

13        A.   That's correct.

14        **Q.   Okay.  So prior to the start of the 2021**

15   **legislative session, what steps did you take to**

16   **advocate for election related legislation in the**

17   **upcoming session?**

18        A.   That was the 87th session.  In the early days

19   of the session I visited in person in the capital with

20   the state reps and the senators who represent Harris

21   County and this was a verbal communication of the kinds

22   of issues we think needed to be fixed.  So we visited

23   together and I talked and they took notes.

24        **Q.   Okay.  Tell me the names of those people.**

25        A.   Briscoe Cain, Valoree Swanson, Mike

1  Schofield, Paul Bettencourt.

2       **Q.   Any other senators?**

3       A.   No.

4       **Q.   How about Bryan Hughes?**

5       A.   No.

6       **Q.   Okay.  Cain, Swanson, and Schofield are**

7  **members of the House, right?**

8       A.   Correct.

9       **Q.   Okay.  Tell me about how many times you**

10 **communicated with Briscoe Cain?**

11      A.   Well, it was the initial visit where I

12 visited all of them.  I think twice before the

13 committees began hearing, maybe two times the most.

14      **Q.   So this would have been after the -- the Legg**

15 **started?**

16      A.   After the opening day of the Legg But before

17 the committees began hearing bills.

18      **Q.   Okay.  Did you do any work prior -- sorry.**

19 **Did you do any work prior to the start of the session?**

20      A.   I work all the time.  Can you be more

21 specific.

22      **Q.   So bill filing usually opens in November of**

23 **the year preceding, so just taking you from --**

24 **following the November 2020 election, knowing that**

25 **there's an upcoming legislative session?**

Alan Vera - 2/27/2023

77

1      A.   Right.

2      Q.   **Just in that period before the legislative**

3   **session starts, did you do work -- and I'm sure you**

4   **must have, so maybe the better question is, what work**

5   **did do you to prepare for a accomplishing your goals**

6   **with respect to your legislation --**

7      A.   -- I understand -- I understand your question

8   now, thank you.  Again, just to be clear I -- in that

9   year was mostly phone calls in advance and those start

10  in June.  I began calling Swanson and Cain and

11  Schofield in June of 2020 discussing issues that were

12  of concern to the Ballot Security Committee, not bills

13  just issues that needed to be addressed.

14     Q.   **Uh-huh.**

15     A.   And then that continued in January of 2021,

16  when I visited their offices and followed up on those

17  issues.

18     Q.   **Okay.  Understood.  You met with them one on**

19  **one?**

20     A.   Well, in June it was phone calls in January

21  it was visits one on one, uh-huh.

22     Q.   **Did you meet with the members personally or**

23  **did you meet with their staff?**

24     A.   Probably a mix, I can't remember exactly, but

25  I'm sure the -- the members were there on one of the

1  visits and staff on others.

2      Q.   Okay.  What do you remember advocating on

3  that were related to SB 1, meaning either ended up

4  in -- in SB 1 or one of its predecessor's bills?

5      A.   Oh, I see, I see, I see --

6              MR. WASSDORF:  I'm going to object

7  again on the basis of Legislative Privilege to the

8  extent that any of the contents of these communications

9  were in response to a legislative inquiry and instruct

10 you not to answer in that regard.

11             MS. PERALES:  I don't think you can

12 instruct him not to answer.

13             MR. WASSDORF:  Well, I mean --

14             MS. PERALES:  But let's -- let's take

15 a minute to think about it.

16             MR. TAYLOR:  Doesn't the state --

17 doesn't the state own that privilege though.  I mean

18 it's not a privilege that --

19             MS. PERALES:  Well, it's -- it's maybe

20 the privilege of a legislator, but it's -- they're

21 third parties.  They're not parties to the action here.

22             MR. WASSDORF:  I don't know.

23             MS. PERALES:  Let me think about this.

24 Let me think about this.  I'm -- I'm not going to

25 trying to steamroll you.  I do want to stay on the

Alan Vera - 2/27/2023

79

1  record.

2                    MR. WASSDORF:  I -- I was asserting

3  the privilege of instructing him not to answer based on

4  Mr. Taylor's representation that he was going to defer

5  to us with respect to our respective privilege

6  objections.

7                    MR. TAYLOR:  Yeah, and I can make it

8  easier perhaps.  I don't want my client a witness to be

9  put in a position where somebody has asserted a

10  privilege and then said that he improperly waived that

11  privilege.  So I don't think we have, he and I don't

12  have any choice, but if somebody's going to raise a

13  privilege today, we're just going to have to, you know,

14  not answer that question.  But I'm not saying that the

15  privilege is valid or invalid, I have no idea because

16  I'm not involved in this case.  So that's -- but that's

17  the practical reality, is I am instructing him not to

18  answer questions that these other lawyers are

19  asserting, but not because they're valid, but because

20  they're asserted.

21                    MS. PERALES:  Uh-huh.  So can you tell

22  me if you're going to assert the Legislative Privilege

23  and instruct the, Mr. Vera not to answer with respect

24  to all communications with legislators and staff?

25                    MR. WASSDORF:  No, it's just any --

Alan Vera - 2/27/2023

80

1  the contents of any communications that he made in

2  response to an inquiry from a legislator or legislative

3  staff.

4              MS. PERALES:  So can you tell me what

5  it was about my question to Mr. Vera that may have

6  raised that issue for you?

7              MR. WASSDORF:  I'm having difficulty

8  in remembering what exactly the wording of the question

9  was, but as it was read the scope of the question

10 appeared to potentially encompass his communications to

11 the legislators or legislative staff in response to a

12 legislative inquiry.

13             MS. PERALES:  One second.

14             Let me see if I can divide his

15 testimony in such a way that we are able to segregate

16 those questions on the record and deal with them

17 separately, perhaps down the line a little bit in the

18 deposition.

19             MR. WASSDORF:  Sure.

20     Q.   (BY MS. PERALES:) So Mr. Vera, would it be

21 fair to say that you had communications with

22 legislators and staff in which you were bringing forth

23 information or requests at your initiative; that's a

24 yes or no question.

25     A.   Yes.

Alan Vera - 2/27/2023

1      Q.   Okay.  Were there ever times when you were

2  communicating with legislators and staff in response to

3  a question from them?

4      A.   Yes.

5      Q.   Okay.  So I'm going to try to divide your

6  testimony into what I believe is non-objectionable, you

7  bringing forth information to legislators and staff at

8  your initiative and then we will try to deal separately

9  with your communications with legislators and staff

10  where they're requesting something from you?

11      A.   This is going to be difficult.

12      Q.   Okay.

13      A.   Because the interaction and the dynamics of

14  the exchanges and discussions, those things overlap

15  continually.

16      Q.   Yeah, okay.

17      A.   It's going to be difficult.

18      Q.   Okay.  Well, with without discussing the

19  substance of what they may have been asking you and

20  what you may have been, let me try get a sense of how

21  that would have unfolded.

22              Would it be fair to say that you

23  communicated with legislators and their staff in

24  person, by phone, and by email?

25      A.   That would be an accurate statement.

Alan Vera - 2/27/2023

82

1    Q.    Okay.  Did you ever have any Zoom meetings
2    with legislators or staff?

3    A.    Did not.

4    Q.    Okay.  And so is it your testimony that when
5    you were communicating with legislators and their
6    staff, that it was a -- a combination of you bringing
7    forth information at your initiative or requests at
8    your initiative and then getting inquiries from them
9    and then you're responding to those inquires?

10    A.    If I understand the question, yes, it was
11    both those issues and frequently in the same meetings.

12    Q.    Okay.  Is it fair to say then to summarize
13    your earlier testimony that you started calling House,
14    Members and staff and Senator Bettencourt and staff in
15    the summer prior to the January 2021 session, and that
16    your communications with them continued both either
17    through email, calls, or in person meetings until the
18    enactment of SB 1?

19    A.    Well, if an enactment means final passage,
20    yes, because SB 1 did not become effective till
21    December of 2021, so, yes to the enactment.

22    Q.    Okay.  When you responded to inquires from
23    legislators or staff, would it be fair to say that you
24    were giving them information as well as suggestions on
25    crafting SB 1, or what ultimately became SB 1?

1    A.    It would be more -- it would most accurate to

2  say that when I was responding to questions it was

3  providing specific information on problems we had

4  faced.

5    Q.    Uh-huh.

6    A.    Not craft -- not how to craft SB 1.

7    **Q.    But suggestions certainly about where, where**

8  **you wanted to see language to solve certain problems**

9  **that you had seen?**

10    A.    I think you've gone a little too far on the

11  specificity.  It wasn't the language, it was we've got

12  to find how to fix this.  I wasn't suggesting the

13  language and how to fix it.

14    **Q.    Okay.  Certainly not bill language, let met**

15  **-- let ask my question in a better way then.**

16    A.    Okay.

17    **Q.    When you're communicating in response to**

18  **inquiries from legislators, you were giving them both**

19  **factual information as well as telling them from your**

20  **perspective that either certain holes needed to be**

21  **plugged in the statute or certain issues needed to be**

22  **addressed by the statute?**

23    A.    That is correct, but what I did not do was

24  provide language for the statute.

25    **Q.    Okay.  You mention that prior to the start of**

Alan Vera - 2/27/2023

84

1  the 2021 regular session you started calling

2  legislators and their staff on certain issues as far

3  as -- as the summer before so summer of 2021 -- I'm

4  sorry, summer of 2020 --

5      A.   2020.

6      Q.   -- And I had asked you a question about what,

7  of those communications were relevant to SB 1, or what

8  ended up in SB 1. So just focusing on your outreach to

9  legislators, starting before the start of the 2021

10 regular session, can you tell me what issues you were

11 reaching out on that were relevant to SB 1?  So for

12 example there's lots of issues in the election code and

13 I know that you work on lots of different things?

14     A.   Uh-huh.

15     Q.   But just specific to what was addressed in SB

16 1, can you remember starting the summer of 2020 what

17 you were advocating on to the members?

18     A.    At that time I know I mentioned growth in

19 mail ballot harvesting in Harris County.  I know I

20 mentioned problems with election judges preventing poll

21 watchers from being close enough to see and hear

22 activity, and that was partly due to COVID, okay?

23 Those are the two major issues in the summer, was the

24 mail ballot harvesting problem and the carryover poll

25 watcher obstruction problem.

1    Q.    So prior to SB -- actually, SB 7 and HB 6 --

2    A.    Uh-huh.

3    Q.    Getting filed --

4    A.    Uh-huh.

5    Q.    In the regular session, did you advocate for

6    example on -- and I'm just going to go through the

7    provisions, requiring a registrar to report ineligible

8    registrants or voters to law enforcement officials?

9    A.    No, I did not.

10    Q.    Did you --

11    A.    But I -- to be clear, I want to be -- I do

12    remember also repeating a prior concern about people

13    registering to vote using a commercial post office box

14    as a residence address.  And that was in addition to

15    the poll watcher and the mail ballot harvesting.

16    Q.    Uh-huh.

17    A.    Sorry, I forgot that.

18    Q.    Well, that's what I'm going to go through the

19    list because who could remember all of it, it's a long

20    list?

21    A.    Okay.

22    Q.    Do you remember raising before SB 1 was

23    filed, concerns to legislators or advocating that

24    legislators address voter registration list maintenance

25    issues, other than this residential address issue?

1    A.    At that time, no.  The PO Box registration

2  was the issue I raised.

3    Q.    And so you mentioned at that time, no.  So

4  I'm going to make a note to ask you about it later on

5  as well.  Do you remember advocating that SB 1 have any

6  provisions regarding the secretary or state receiving

7  the names of voters excused from jury duty for

8  nonresidence?

9    A.    No.

10    Q.    Do you remember advocating before SB 1 was

11  filed on requiring the secretary of state to refer

12  information around potential criminal conduct to the

13  AG?

14    A.    No.

15    Q.    Now, this is leading up to before SB 1 gets

16  filed, how about recommending that legislators require

17  polling place to be inside a building?

18    A.    That wasn't -- that wasn't on my list.

19    Q.    Okay.  How about recommending to legislators

20  that they're not be 24 hour voting?

21    A.    That wasn't on my list.

22    Q.    Okay.  Do you recall before SB 1 was filed

23  recommending to legislators that the election code

24  contain a specific provision that voting machines not

25  allow straight ticket voting?

Alan Vera - 2/27/2023

87

1    A.   Not on my list.

2    **Q.   Okay.  Do you recall recommending to**

3    **legislators that SB 1 limit the presiding judge from**

4    **removing a watcher unless the watcher committed certain**

5    **infractions, whether those be of the Election Code or**

6    **the Penal Code?**

7    A.   Not that specific thought, but in the summer

8    I raised the concerns about poll watchers not being

9    allowed to observe what they're entitled to observe.

10   So I raised the general topic, not that specific topic.

11   **Q.   Do you know how that specific topic -- how**

12   **that specificity about prohibiting election judges from**

13   **removing watchers unless the watcher committed certain**

14   **infractions; do you know where that language came from?**

15   A.   I do not.

16   **Q.   Okay.  And of course I should have asked you**

17   **about the ones above as well, do you know where the**

18   **language came from in SB 1 about having to have the**

19   **polling place be in a permanent structure?**

20   A.   Not that specific thought, no.  That didn't

21   come from my discussions.

22   **Q.   All right.  And then do you know where the**

23   **language in SB 1 came from about not having 24 hour**

24   **voting?**

25   A.   No, I do not.

1    Q.   Okay.  Do you -- do you recall whether you
2    were advocating before SB 1 was filed on making it
3    Class A Misdemeanor to refuse to accept a watcher?

4    A.   Not specifically that, no.

5    Q.   Do you know the source of where that came
6    from in SB 1?

7    A.   I do not.

8    Q.   Okay.  Now, there's a provision in SB 1 which
9    I believe you said that you did advocate with respect
10   to, which is that the watcher may not be denied free
11   movement where election activity is occurring and the
12   watcher is entitled to sit or stand near enough to see
13   or hear?

14   A.   Yes.

15   Q.   You advocated on that?

16   A.   Yes.

17   Q.   Okay.  And did you advocate with respect to
18   it being a Class A Misdemeanor to take action to
19   obstruct the view of a watcher or distance the watcher?

20   A.   It was already a Class A Misdemeanor.

21   Q.   Okay.  Do you recall advocating that there be
22   either different or increased penalties to -- for an
23   election judge to either distance the watcher or impede
24   the view of the watcher?

25   A.   Not specifically.  I did in my summer phone

Alan Vera - 2/27/2023

89

1  calls, advocate for their being a stronger penalty for

2  election judges who prevent poll watchers from

3  performing their duties.

4      **Q.    Before SB 1 was introduced, did you advocate**

5  **on prohibiting mail ballot drop boxes?**

6      A.    I did not.

7      **Q.    Do you know where that language -- what was**

8  **the source of that language for SB 1?**

9      A.    I don't know.

10     **Q.    Okay.  Before SB 1 was introduced, did you**

11 **advocate for either applications for ballot by mail or**

12 **mail ballots to have increased requirements for**

13 **presenting ID numbers, and then having -- those ID**

14 **numbers need to be verified in order to count either**

15 **the application, process the application, or count the**

16 **mail ballot?**

17     A.    Not specifically, but I did tell you

18 previously that in the summer phone calls I was raising

19 concerns about mail ballot harvesting in Harris County.

20     **Q.    Okay.  You didn't have that specific proposal**

21 **"though, let's add an ID requirement to the paperwork**

22 **and have those things required to be checked"?**

23     A.    I did not have that specific proposal.  I may

24 have pointed out in one or two phone calls, that the

25 states of Wyoming and Alabama required a photocopy of

1  the driver's license of the voter to be included with

2  the ballot.

3      Q.   Do you know the -- the source of specific

4  language in SB 1 requiring the ID numbers for ABBMs and

5  mail ballots?

6      A.   I do not.

7      Q.   Okay.  Before SB 1 was introduced, did you

8  advocate at all with legislators for additional

9  information to be asked from individuals who transport

10 curb side voters?

11     A.   Did not.

12     Q.   Do you know where the source of that

13 language --

14     A.   No, ma'am.

15     Q.   -- okay.  Prior to the introduction of SB 1,

16 did you advocate with legislators to increase

17 requirements on polling place assistors; namely, that

18 the assistor oath include additional statements?

19     A.   That was not on my list, no.

20     Q.   Okay.  And what about whether the assistor

21 would have to say whether they were being compensated

22 by a campaign or a PAC?

23     A.   That wasn't me.

24     Q.   How about with respect to mail assistors,

25 mail, not male like y'all --

1        A.    M-A-I-L.

2        Q.    -- M-A-I-L, assistance with voting by mail,

3   did you advocate at all prior to the introduction of SB

4   1 that persons who assist voters who are voting by mail

5   are requesting a mail ballot provide additional

6   information about their relationship and compensation?

7        A.    Not that specifically.

8        Q.    Okay.  Do you know the source of that?

9        A.    I do not.

10       Q.    Do you know the source of -- or where it came

11  from in SB 1 that the assistor oath be lengthened and

12  that --

13       A.    I do not know the source.

14       Q.    -- okay.  Now, there's a -- a provision in SB

15  1 that makes it an offense to compensate or offer to

16  compensate another person to assist voters in voting by

17  mail, did you advocate on that issue prior to SB 1's?

18       A.    I did not.

19       Q.    Okay.  Do you know how that language got into

20  the Bill?

21       A.    I do not.

22       Q.    All right.  So there is a part of SB 1 that

23  talks about vote harvesting and so I understand that

24  you had raised a concern related to that.  And so did

25  you advocate with legislators that it should be

1  prohibited to have an in person interaction with a

2  voter in the presence of the ballot where the -- the

3  person is advocating for a particular candidate or a

4  measure?

5      A.   That was not from me.

6      Q.   Okay.  So what did you advocate for -- well,

7  let me -- let me close that.  Do you know where that

8  language came from in SB 1 or its predecessors related

9  to prohibited vote harvesting services as an in person

10 interaction with one or more voters in the physical

11 presence of an official ballot intended to deliver

12 votes for a specific candidate or measure?

13     A.   I do not know where it came from.

14     Q.   Okay.  So what were you advocating for with

15 protect to the vote harvesting?

16     A.   Okay.  So we got to be careful about stepping

17 on the objections, okay?

18     Q.   Yeah, I'm just asking what you were

19 advocating for?

20     A.   In my calls I was describing a problem we

21 were, at that time, investigating.  In January and

22 February of 2020, a flood of ABBM was received by the

23 Harris County Clerk with significant issues.

24              So I'm reporting problems.  106 ABBMs

25 delivered in a single envelope with no assistant

1  signature to correspond with the act of mailing.

2  Witness signatures on ABBMs requested by people that

3  died in 1990 and 2000 and as recently of 2015 asking

4  for an ABBM in 2020, that's a problem.

5            ABBM signed with a witness by voters

6  whose name was spelled wrong in the signature, that was

7  our concern of ballot harvesting, okay?  And it was

8  significant and there were a number of them.  So that,

9  I was advocating for solutions to prevent or toughen

10  the penalties for that kind of conduct.

11      Q.   Okay.  Now, I -- and what you're saying is

12  triggering memory in my part that there's at least one

13  document produced where you were sending an email

14  saying that the voter wasn't even necessarily involved

15  in that process and that you felt that vote harvesting

16  related to the in person interaction may have been not

17  all of what you would like to see with respect to vote

18  harvesting?

19      A.   You're remembering correctly, but that was an

20  inquiry from a state legislator, so I won't comment,

21  your -- your memory was correct.

22      Q.   Okay.  I -- okay.  It was produced and it

23  seemed to me that it was you saying to them -- or at

24  least what I saw you saying to them something along

25  those lines.  So then, would bit fair to say that prior

1   to the introduction of SB 1 you had a concern about

2   vote harvesting that may have been related to

3   falsification of information outside the presence of

4   the voter as opposed to anything that might be

5   happening between the voter and someone who's asking

6   them to vote a certain way?

7       A.   The concerns I was raising in the summer of

8   2020, were about ballot harvesting in a definition that

9   did not include direct interaction with the voter,

10  where the voter was totally unaware that they were

11  requesting a mail in ballot.

12      Q.   Okay.  So I want to stay in the time period

13  prior to the introduction of SB 1, and shift slightly

14  to your communications with people who are not

15  legislators?

16      A.   Uh-huh.

17      Q.   Namely, first, the secretary of state's

18  office, did you communicate at all with the secretary

19  of state's office about what you would want to see in

20  voter integrity legislation in the 2021 session?

21      A.   I did not, no.

22      Q.   Next I'll go to the -- the office of the

23  governor.  Did you communicate with anybody in the

24  office of the governor related to what he would want to

25  see in voter integrity legislation for the 2021

1    session?

2        A.   No, I did not.

3        Q.   And then finally with the respect to the

4    office of Texas Attorney General, did you communicate

5    with anybody in the office of the Texas Attorney

6    General about anything you would have wanted to see in

7    the 2021 session related to voter integrity

8    legislation?

9        A.   No, I did not.

10       Q.   Now, I'm going to bring you up to the time

11   period of the regular session, the bills are now

12   introduced, you mentioned that you probably had two

13   meetings with legislators or legislative staff after

14   the opening day?

15       A.   One or two, uh-huh.

16       Q.   Uh-huh.  So in addition to personal meetings

17   -- well, let me ask you this, do you know how many

18   times you went up to Austin during the regular session?

19       A.   Well, before the committee hearings began

20   with bills, only twice.  So January, February, two

21   times.

22       Q.   Uh-huh.

23       A.   Once the committee hearings began for hearing

24   election bills it was almost weekly.

25       Q.   And in the almost weekly visits that you were

1  making after HB 6 and SB 7 are introduced?

2       A.    We filed.

3       Q.    Were filed, were introduced and the

4  committees started doing their meetings, were you

5  meeting also almost weekly with legislators or

6  legislative staff?

7       A.    No, once that -- once the committee meetings

8  began my time was spent in the committee meetings.

9  They drag out forever.  So, yeah, I might see staff or

10 members in the hallway or in the Capital Grill, the

11 meetings were few and far between after that.

12      Q.    So what might, what do they call it,

13 buttonhole people in the halls or in the Capital Grill

14 and talk to them about the election integrity bills?

15      A.    If that means I tripped over them, then yes.

16 I may have tripped over them and made a comment.

17      Q.    Okay.  So at this point, what is the means by

18 which you are communicating with legislators or

19 legislative staff?  At this point has it shifted to

20 emails, phone calls?

21      A.    At that point it begins to shift to emails

22 initiated by the legislators or their staff.

23      Q.    Uh-huh.

24      A.    I am the boots on the ground and I frequently

25 get an email asking me to look for unintended

1   consequences in the language of this bill and I respond

2   with my best evaluation of what might be the unintended

3   consequences.  The email you referenced earlier on the

4   issue of ballot harvesting being an in person

5   definition was inquiry from a legislator, and that was

6   my response.

7       Q.   Okay.  So would it be fair to say then that,

8   once the committee hearings start your interactions

9   with legislative staff and legislators are in the form

10  of providing feedback on specific bill language that

11  they want to vet with you?

12      A.   In general, yes.  In general, yes.  There

13  have been -- there were two occasions in that first

14  regular session when in testimony I mentioned

15  suggestions that might make the Bill better, and in

16  those two cases -- only two -- I was contacted while I

17  was still waiting to testify on later bills and spent

18  time explaining to the staff, this is what I was

19  referring to.

20      Q.   And generally that -- would that be by phone

21  or --

22      A.   Well, it's in person.

23      Q.   In person?

24      A.   While I'm still there in Austin.

25      Q.   I see.  So you might -- a legislator --

1  **legislative staff might track you down while you're**

2  **still in the building and ask you to respond as they're**

3  **vetting bill language?**

4      A.   Asking me to explain specifically what I was

5  suggesting in my testimony that might make the Bill

6  better.

7      **Q.   Okay.  Did you ever have an exchange like**

8  **that that resulted in bill changing in some way?**

9      A.   I assume there -- yes, but I can't remember

10  which bill.  It was not one of these, except for the

11  reconciliation of votes and voters.

12      **Q.   Okay.  So just specific to HB 6, SB 7, SB 1,**

13  **it's predecessor's bills, do you ever recall advocating**

14  **during the regular session for something to either be**

15  **added or changed about those bills that you saw come to**

16  **fruition?**

17      A.   Not in the regular session.

18      **Q.   Okay.  And you've testified in favor of the**

19  **bills during the regular session HB 6 and SB 7, is that**

20  **correct?**

21      A.   Correct.

22      **Q.   Did you advocate for any bills that were not**

23  **HB 6 or SB 7 to kind of reach out and incorporate maybe**

24  **a -- a smaller bill that was also moving through the**

25  **Legg?**

Alan Vera - 2/27/2023

99

1    A.   Please state the question again so I'm clear,

2  did I ever advocate for bringing another bill into SB

3  7?

4    **Q.   Yeah.**

5    A.   There was one point -- not in regular session

6  I don't think -- but, I advocated bringing Senate bill

7  1589 into Senate bill one or 7, whatever the number was

8  at the time.

9    **Q.   And did that happen?**

10   A.   Nope.

11   **Q.   Was 1589 one of the Bettencourt bills?**

12   A.   It was.  Show you how much influence I have.

13   **Q.   Well, and Senator Bettencourt he had filed**

14  **some -- so smaller stand alone bills; is that correct?**

15   A.   Yes.

16   **Q.   Did you ever communicate by text with either**

17  **legislators or legislative staff?**

18   A.   No, I think Briscoe Cain may have texted me

19  once to ask me to stop testifying on all the bills,

20  swear to God.

21               (Everyone Laughing.)

22   **Q.   (BY MS. PERALES:) Did he offer a reason why,**

23  **or did you understand why he was asking?**

24   A.   This meeting is running too long.  The

25  committee hearing is running too long, stop testifying.

1  That was the only one I can recall.

2      Q.   Okay.  You mentioned that you typically

3  didn't submit written testimony when you testified, but

4  did you submit anything in writing to either

5  legislators or legislative staff that showed your

6  thoughts or perspectives on either SB 7, or HB 6 -- and

7  it could be anything, a memo, an email, a mark up of

8  the Bill with your concerns?

9      A.   At that time I'm sure that I don't leave

10 copies of my testimony, but I sometimes give Exhibits.

11 Yes, I did give out Exhibits showing the examples of

12 the dead voters who requested mail ballots, okay, in

13 January, February 2020.  So those were handed out to

14 the committees, that was it.

15     Q.   And then specific to the bills themselves,

16 did you ever give them any writings that gave your

17 thoughts or reactions to what was in the Bill or what

18 wasn't in the Bill or how the Bill was written?

19     A.   Only when -- when asked, I -- I didn't

20 proactively.

21     Q.   Uh-huh.

22     A.   But if they -- when they asked me say, take a

23 look at this, see what are the unintended consequences

24 I replied.

25     Q.   And unintended consequences, when you say

1  that you mean how the Bill language would play out in

2  real life?

3       A.   Yes.

4       Q.   And whether it would accomplish the goals of

5  the Bill?

6       A.   That's correct.

7       Q.   Okay.  And when you would be asked -- and I

8  won't ask you for the specifics of that just yet -- you

9  could have potentially have responded in writing with

10  respect to that?

11       A.   By email, potentially, yes.

12       Q.   Okay.

13       A.   Usually those were either emails or telephone

14  calls.

15       Q.   Do you recall ever advocating for something

16  to be taken out of either SB 7 or HB 6?

17       A.   I think the language defining ballot

18  harvesting as requiring personal contact with the voter

19  qualify as that, but again that was in response to a

20  question from a legislator.

21       Q.   Okay.  Now, as SB 7 and HB 6 are moving

22  through the regular session, what communications are

23  you having with the secretary of state regarding those

24  bills, where Keith Ingram, Christina Adkins, or anybody

25  else in the secretary of state's office?

1    A.    I don't think I'm having any communications

2  with them about the bills.  I can't recall any

3  communications with them about HB 6 or SB 7.

4    **Q.    You weren't for example saying, hey, when you**

5  **testify don't forget, this issue has come up in Harris**

6  **County, anything in which you're encouraging them to**

7  **either include information or have a certain**

8  **perspective?**

9    A.    I can't recall ever communicating with the

10  SOS office or anyone there about those bills while the

11  session was in progress.

12    **Q.    Okay.  Were there other bills for example**

13  **that you sent information to Keith Ingram on that had**

14  **to do with elections?**

15    A.    No, no.  You should know that Keith Ingram

16  doesn't really like me a whole lot, okay?  So I send

17  formal complaints when I uncovered some wrongdoing, and

18  that's normally when I communicate with him.  We don't

19  communicate directly a whole lot.

20    **Q.    So if Keith Ingram said, for example, you had**

21  **provided him bill language on something or another,**

22  **would that be false?**

23    A.    I wouldn't know where it came from.

24    **Q.    Okay.**

25    A.    I wouldn't know where they came from.

1        **Q.   Okay.  Same question with respect to the**

2    **attorney general's office, as the HB 6, SB 7 are moving**

3    **through the regular session were you having any**

4    **communications with the office of the attorney general**

5    **related to these bills?**

6        A.   No, during that time my communications with

7    the office of attorney general were complaining about

8    lack of action on complaints I had already filed.

9        **Q.   Okay.  And then with respect to**

10   **communications with office of the governor, were you**

11   **having any with the officer of the governor -- office**

12   **of the governor on HB 6, SB 7 during the regular**

13   **session?**

14       A.   I cannot remember any communications with the

15   governor's office.

16              MR. TAYLOR:  Nina, at what point --

17   I'm not suggesting right now -- do you want to break

18   for lunch?

19              MS. PERALES:  Whenever the witness --

20   as I mentioned, you're not a hostage here -- whenever

21   the witness feels like he's comfortable and ready to

22   take that break.

23              MR. TAYLOR:  Do you feel like you're

24   making quicker progress than anticipated where it makes

25   sense to just try to get this over with, or is that

1  unrealistic?

2              MS. PERALES:  So a lot of the rest of

3  this is -- hold on a second, let me just check and see.

4  So I pretty much -- you've sensed I sort of reached the

5  end of my questions with respect to regular session.

6  So this would be a natural stopping point because you

7  know my next set of questions -- not about the

8  pre-pre-session or the regular, but my next set of

9  questions are going to be about the specials and

10 then --

11             MR. TAYLOR:  You think that would be

12 at least an hour?

13             MS. PERALES:  Very similar --

14             MR. TAYLOR:  I'm just trying to figure

15 out if we should break for lunch.

16             MS. PERALES:  -- yes, I think we

17 should break for lunch, if the witness is, you know --

18             THE WITNESS:  I never had such power.

19             THE REPORTER:  Going off the record at

20 12:44 p.m.

21             (Off the record.)

22             THE REPORTER:  Going back on the

23 record at 1:42 p.m.

24    Q.   (BY MS. PERALES:) Okay.  We're back on the

25 record, Mr. Vera, and I'm going to update our

1  conversation to the time period of the first and second

2  special sessions in 2021.  If you recall the 2021

3  regular session ended over the Memorial Day weekend

4  without passage of SB 7, HB 6, and then we had the two

5  special sessions culminating with the legislature's

6  passage of what then came to be known as SB 1.

7              So during the -- now, you had

8  mentioned earlier in your testimony that you did some

9  advocacy during the first special session.  Do you

10 remember at this point, I think bills were introduced,

11 I'm not sure whether we got to the committee hearings

12 during the first special, but can you generally give me

13 a sense of what you were doing during the first special

14 on the election integrity bill?

15     A.   Well, I testified before the state -- Senate

16 State Affairs Committee on a Saturday.  And I testified

17 in the House for Mr. Murrell's Bill that same day and

18 then things kind of ended because everyone had fled to

19 Washington, there was no quorums so they couldn't

20 conduct business.

21     Q.   Okay.  Do you remember at that point what you

22 were focused on in terms of provisions in the Bill, had

23 your focus remained the same as it was before these

24 bills were filed in the regular or had your advocacy

25 expanded to additional portions of the Bill?

1     A.    Nothing changed during the first special

2  session, but while that was going on we were doing our

3  analysis of Harris County's elections again and found

4  once, again, that we had many precincts, many vote

5  centers, where there were many ballots than voters.  So

6  between the first and second special sessions is when I

7  advocated for the addition of two sentences to what was

8  then SB 1 that would require every county to reconcile

9  the number of ballots and number of voters.

10     **Q.    Okay.  So in -- I'm going to go over with you**

11  **again some of the provisions of SB 1 and my question**

12  **will be, with respect to the time leading up to the**

13  **legislature's passage of SB 1, whether you did any**

14  **advocacy on these provisions?**

15     A.    Now, we're including the summer of 2021?

16     **Q.    Yeah, all the way through.**

17     A.    Okay.

18     **Q.    From pre-filing all the way through -- well**

19  **you've told me in pre-filing period what you were**

20  **focused on?**

21     A.    Uh-huh.

22     **Q.    But now through you know end of September**

23  **2021, did you advocate at all with legislatures or**

24  **any -- any other officials to have registration**

25  **provisions in SB 1?**

Alan Vera - 2/27/2023

107

1    A.    No, I did not.

2    Q.    Did you advocate to require the secretary of

3  state to refer information about criminal conduct to

4  the attorney general?

5    A.    Did not.

6    Q.    Did you advocate with respect to sending

7  lists of voters who were excused from jury duty for

8  nonresidence to the secretary of state?

9    A.    Did not.

10    Q.    Did you advocate for -- with any legislators

11  or other officials for polling places to be located

12  only inside the physical building?

13    A.    Did not.

14    Q.    Did you advocate with legislators or other

15  officials about containing the hours of voting so that

16  there wouldn't be voting between 10 p.m. and 6 a.m.

17    A.    Did not.

18    Q.    Did you advocate with legislators or other

19  officials regarding voting machines not allowing

20  straight ticket voting?

21    A.    Did not.

22    Q.    Now, you were advocating on poll watchers?

23    A.    I was.

24    Q.    And so is there a point at which you began to

25  advocate on the specific provisions in SB 1 related to

1   poll watchers, such as prohibiting election judges from

2   removing unruly watchers unless the watcher's behavior

3   violates the Penal Code or was personally observed by

4   the election judge?

5        A.   I was not advocating for that.  I will tell

6   you that during that time period I advocated for

7   removing some of the original language of SB 1 which

8   allowed poll watchers to carry cameras and take photos

9   and record inside the polling place.  I was opposed to

10  that.

11       Q.   Okay.  Now, the provisions related to -- okay

12  did you advocate in the legislature with other

13  officials during this time period up to passage of SB 1

14  that it be made a Class A Misdemeanor to refuse to

15  accept a watcher?

16       A.   I did not.

17       Q.   Did you advocate during this time period with

18  either legislators or other officials that SB 1 include

19  language saying that a watcher may not be denied free

20  movement where election activity is occurring --

21  occurring and is entitled to sit or stand near enough

22  to see and hear the conduct of the observed activity?

23       A.   Only in my testimony to the committee.

24       Q.   And with respect to the time period that

25  we've defined leading the passage of SB 1, did you

1  advocate with legislators or other officials to make it

2  a Class A Misdemeanor to take any -- for an election

3  official to take any action to obstruct the view of a

4  watcher or distance the watcher from the activity or

5  procedure being observed?

6      A.   Only in my testimony to the committee.

7      Q.   Did you advocate, leading up to the passage

8  of SB 1, on prohibiting mail ballot drop boxes?

9      A.   I did not personally advocate in that.

10     Q.   Okay.  Did you advocate leading up to the

11 passage of SB 1 for language in the Bill that would

12 require voters to put ID numbers on ABBMs or mail

13 ballots as part of the process of verifying voter

14 identity?

15     A.   I did not advocate.

16     Q.   Okay.  Did you advocate leading up to the

17 passage of SB 1 for new information to be gathered from

18 individuals transporting curbside voters?

19     A.   I did not advocate for that provision.

20     Q.   Did you advocate leading up to the passage of

21 SB 1 with legislators or other officials on adding

22 language to assistor oath?

23     A.   I did not.

24     Q.   Did you advocate leading up to the passage of

25 SB 1 with legislators or other officials for

1  requirement that individuals assisting with mail ballot

2  preparation provide their relationship and whether they

3  were compensated?

4      A.   I did not advocate in that specific issue.

5      Q.   Did you advocate leading up to the passage of

6  SB 1 for -- either with legislators or others that

7  there be a state jail felony when a person compensates

8  or offers to compensate another person to assist

9  voters?

10     A.   I did not advocate for that provision.

11     Q.   Okay.  And did you advocate leading down the

12  passage of SB 1 with legislators or others that SB 1

13  prohibit what it terms vote harvesting services that

14  would be an in person interaction with a voter in the

15  presence of a ballot intended to advocate for certain

16  ballot positions?

17     A.   I did not advocate for that provision.

18     Q.   Leading up to the passage of SB 1 did you

19  advocate with legislators or other officials on

20  imposing a civil penalty on election officials who

21  violate the election code?

22     A.   I did not advocate for that provision.

23     Q.   So you mentioned earlier -- okay.  Well,

24  here's -- here's a question for you, some of these

25  provisions seem related to things that Harris County

1    was doing in the general election of 2020?

2        A.    Uh-huh.

3        Q.    For example, expanding the hours of voting to

4    24 hours, having voting occur kind of in areas where

5    it's not a permanent structure, but more of a tent set

6    up or nonpermanent structure, but you did -- you're

7    saying that your advocacy in the legislature with

8    legislators did not touch on those things that Harris

9    County had done, in particular?

10        A.    Immediately after the 2020 election, okay?  I

11    did my own local analysis for our legislators on what

12    had happened in that election.  And one of the issues

13    that I addressed was the incredible problems and the

14    almost disenfranchisement of 2,000 voters in drive-thru

15    voting because of the poor -- poor way it was handled.

16    So talked about that locally and I'm -- I'm sure many

17    of our legislators heard my comment on that topic.

18        Q.    Did you ever speak to legislators and urge

19    them to do something about what you had found with

20    respect to the drive-thru voting?

21        A.    I did not do that.  I was questioned at

22    length on drive-thru voting by Senator Royce West

23    during the Senate State Affairs Committee hearing on SB

24    1 in the first special session.  And that's why, for

25    half an hour got into all the details and problems of

1 drive-thru voting.

2     **Q.   Okay.  So we've covered these specific**

3 **provisions, so let me sort of change somewhat to ask**

4 **you, on what provisions were you communicating with**

5 **legislatures or legislative staff during the period**

6 **leading up to the enactment of SB 1?**

7     A.   During that period of time I was not doing

8 any individual advocacy with legislators or their

9 staffs accept between the first and special session

10 when I asked Senator Bettencourt's staff to carry those

11 two sentences and put them into SB 1 for me, everything

12 else was in public testimony.

13     **Q.   What about answering questions from**

14 **legislators --**

15     A.   Yes.

16     **Q.   -- as we had discussed earlier, were you**

17 **answering questions from legislators during the period**

18 **of the -- either the regular or the first or the second**

19 **special session?**

20     A.   Yes, I would get questions from legislators

21 asking me to review this document and this language and

22 see if there are any unintended consequences, that's

23 normal.

24     **Q.   And then you provide your feedback?**

25     A.   Correct.

1    Q.   Okay.  And so about how often, how many times

2    per week during the first or second special were you

3    providing that kind of feedback to legislators or

4    staff?

5    A.   Well, during the first special session it was

6    no more than twice a week.  The second special session

7    it was only once a week at max, that anybody asked.

8    Q.   Okay.

9    A.   Things were pretty settled by then.

10   Q.   Okay.  And then with respect to who was

11   asking, can you give me the names of the people who

12   were seeking your input on the Bill language or for the

13   -- you know, for your reaction to this?

14   A.   I would get emails from State Rep Jacey

15   Jetton, State Rep Valoree Swanson, Senator Bettencourt

16   and his staff, and I think 90 percent of the emails I

17   got requesting my point of view were those three people

18   or their staffs.

19   Q.   Did you ever have a request for your feedback

20   from Briscoe Cain or his staff?

21   A.   In the regular session I did get a -- a

22   request from that on HB 6.

23   Q.   Okay.  And with respect to Mike Schofield,

24   did you ever get a request from him for feedback or

25   reaction either him or his staff?

Alan Vera - 2/27/2023

114

 1    A.   Did not.

 2    Q.   Okay.  How about Representative Clardy, did

 3 you have any communications with either him or his

 4 staff related to bill language?

 5    A.   No.

 6    Q.   Okay.  Jacey Jetton, would it be fair to say

 7 it was not somebody that you had met with at the early

 8 part of the session?

 9    A.   That's correct.  He's a representative from

10 Fort Bend County, so he would not have attended the

11 Harris County's events where we discussed the election

12 legislation --

13    Q.   I'm sorry, I stepped on your answer.  And so

14 tell me how you begin to start communicating with

15 Representative Jetton about SB 1?

16    A.   Very simple.  I got an email from his staff

17 asking me to comment on these sections of the Bill, and

18 I gave them my comments.

19    Q.   Would it be fair to say that during the time

20 that you were providing your comments on bill language

21 in the regular session, the first and second special

22 session, that what you were being asked to comment on

23 was broader than poll watchers or harvesting?

24    A.   Yes, it would be a correct statement, because

25 the email usually simply asked, please take a look at

Alan Vera - 2/27/2023

1  these sections and tell us if there are any unintended

2  consequences from that language.

3  **Q.  And then you would provide your concerns or**

4  **your thoughts about how the Bill language would play**

5  **out in real life?**

6  A.  I would provide my feedback on that --

7  those -- those exact words, the current language might

8  be misinterpreted, misconstrued, or abused for a -- a

9  result I didn't want.

10  **Q.  Or also might fail to address a problem that**

11  **you perceived?**

12  A.  Correct, yes.

13  **Q.  Okay.  And would it be fair to say then those**

14  **types of legislator requests covered most provisions in**

15  **SB 1?**

16  A.  I can't answer that because I won't remember.

17  I know that most of the request I get for that feedback

18  specify sections of the language they want me to look

19  at.  I don't know if it covered all -- SB 1 is a pretty

20  long bill.

21  **Q.  Maybe I'll -- I'll be slightly more specific,**

22  **were you asked to respond to language related to poll**

23  **watchers, for example?**

24  A.  Yes.

25  **Q.  Okay.  Were you asked to respond to language**

1  related to vote harvesting?

2      A.   Yes.

3      Q.   Were you asked to respond to language related

4  to voter assistance?

5      A.   No, I was not.

6      Q.   Okay.  Were you asked to respond to language

7  related to 24 hour voting?

8      A.   No, I was not.

9      Q.   Were you asked to responds to language

10 related to temporary polling places or moveable polling

11 places, given that you had raised some concerns about

12 that in your testimony?

13     A.   I was not because they thought they already

14 had the solution.

15     Q.   Okay.  So they weren't asking for your help

16 on that one?

17     A.   Correct.

18     Q.   Were you asked to provide your thoughts on

19 the Bill language related to voters providing ID

20 numbers on either ABBMs or mail ballots?

21     A.   I was and I was -- my -- I was and I was

22 ignored.

23     Q.   Okay.  Is there anything else that you can

24 think of in your mind that were parts of SB 1 that you

25 were asked to provide your feedback on that I haven't

1  touched in just the moment or two?

2      A.   I can't remember, we covered so much.  If I

3  think of it I'll -- I'll mention it, but right now I

4  can't think of thinking else.

5      Q.   Now with protect to feedback you provided on

6  poll watchers, tell me the feedback that you provided

7  on poll watchers.

8                  MR. WASSDORF:  I'm going to object on

9  the grounds of legislative privilege and ask the

10  witness not to testify.

11                 MS. PERALES:  Okay.

12     Q.   (BY MS. PERALES) And Mr. Vera, are you going

13  to follow the instruction of Mr. Wassdorf not to

14  testify on the feedback that you provided legislators

15  related to poll watchers?

16                 THE WITNESS:  I am.

17     Q.   (BY MS. PERALES:) Okay.  Now what feedback

18  did you provide to legislators with respect to vote

19  harvesting?

20                 MR. WASSDORF:  Same objection.

21     Q.   (BY MS. PERALES) Are you going to follow the

22  advice of Mr. Wassdorf and decline to testify on the

23  feedback that you provided to legislators or staff

24  about vote harvesting?

25     A.   I am.

1    Q.   Next I'll ask you what feedback you provided

2  to legislators or staff related to the requirement that

3  voters provide an ID number on either their ABBM or

4  their mail ballot?

5                 MR. WASSDORF:  Same objection.

6    Q.   (BY MS. PERALES) Are you going to follow the

7  instruction of Mr. Wassdorf and decline to testify on

8  the feedback you provided to the legislators about the

9  voter ID on mail voting?

10    A.   I am.

11    Q.   (BY MS. PERALES:) Okay.  What feedback did

12  you provide to legislators or staff related to what we

13  call drive-thru voting?

14                 MR. WASSDORF:  Same objection.

15    Q.   (BY MS. PERALES) Are you going to follow the

16  instruction of Mr. Wassdorf and not -- and decline to

17  testify regarding the feedback that you provided

18  legislators about drive-thru voting?

19    A.   I am.

20    Q.   (BY MS. PERALES:) Were you asked to provide

21  feedback on any of the voter registration provisions of

22  SB 1, including for example the requirement that the

23  registrar report an ineligible registrant or voter to

24  law enforcement?

25    A.   I was not.

Alan Vera - 2/27/2023

119

Q.   Were you asked to provide any feedback by
legislators on the provisions of SB 1 requiring the
secretary of state to refer any information about
criminal conduct to the attorney general?

A.   I was not.

Q.   Were you asked to provide any feedback by
legislators about the provision of SB 1 that requires
the secretary of state to receive lists of voters
excused from jury duty for nonresidence?

A.   I was not.

Q.   Were you asked to provide any feedback by
legislators on the provisions of SB 1 having to do with
24 hour voting?

A.   I was not.

Q.   Were you asked to provide any feedback by
legislators or staff on the provision of SB 1 having to
do with mail ballot drop boxes?

A.   I was not.

Q.   Were you asked to provide any feedback by
legislators or staff on bill language addressing
individuals who bring people to the polls for curbside
voting?

A.   I was not.

Q.   So if we take the time period leading up to
passage of SB 1 at the end of the second special, based

1    on all of your experiences in those sessions, what is

2    your understanding of the source of the language in SB

3    1 about voter assistance in the polling place?

4        A.    Yeah, I don't know.  I have no idea where it

5    came from, it was not one of my areas of focus.

6        Q.    Okay.  Same question with respect to the

7    provisions on 24 -- and I'm just going name certain

8    practices that occurred in Harris County.  24 hour

9    voting, mail ballot drop boxes, and drive-thru voting,

10    do you know the source of where those ideas came from

11    in the Bill?

12        A.    No, I don't.

13        Q.    Okay.

14        A.    The language in the Bill on the drive-thru

15    voting, because the language addressed the kind of

16    facility, was almost taken from the Federal Court in

17    downtown Houston.

18        Q.    Okay.

19        A.    There was a -- there was a civil action and a

20    judge -- the Federal Judge ruled that the language in

21    the early voting portions of the code was different

22    from the language in the election day portions of the

23    code, and what I observed is that SB 1 simply took the

24    languages from election day and applied them to early

25    voting.  So I wasn't part of that process, but

1  that's -- that's what I observed.

2    **Q.   Okay.   Thank you.   Based on your experience**

3  **through passage of SB 1, do you know where the -- what**

4  **the source or the idea or the language was related to**

5  **voters providing an ID number when sending in either an**

6  **ABBM or a mail ballot?**

7    A.   I do not know the source of that language.

8    **Q.   Now you had raised a concern yourself that**

9  **there was essentially non-voters submitting**

10 **applications for ballot by mail?**

11   A.   Uh-huh.

12   **Q.   In the names of others?**

13   A.   Uh-huh.

14   **Q.   Do you have any sense of how the Bill ends up**

15 **saying somebody who submits an ABBM or mail ballot**

16 **ought to provide additional information, like an ID**

17 **number?**

18   A.   Senate Bill 1 did not affect those sections

19 of the code that dealt with falsifying or forging ABBMs

20 for people that are unaware that their names are being

21 used.   That was not changed by SB 1.

22   **Q.   So do you have any sense of where the new ID**

23 **requirements came from in -- in terms of who might have**

24 **proposed it or?**

25   A.   I don't know.   I don't know.

1    Q.   Okay.  What is your sense of the source of

2  the language on vote harvesting that's in SB 1?  Based

3  on your knowledge through the passing of SB 1, do you

4  know where that language came from about vote

5  harvesting, which is advocating in person with a voter

6  in the presence of the ballot in favor of a particular

7  candidate or measure?

8    A.   No, I don't know where that came from.

9    Q.   How about that portion of SB 1, do you know

10  for example who suggested or what the source of the

11  provision is that it's a state jail felony when a

12  person compensates or offers to compensate another

13  person to assist voters?

14    A.   I don't know the source of that.

15    Q.   Okay.  Earlier I had asked you about whether

16  you communicated with the secretary of state's office?

17    A.   Uh-huh.

18    Q.   Either Keith Ingram or Christina Adkins

19  during either the first or the special session?

20    A.   Uh-huh.

21    Q.   Although, I'm not sure if I asked about the

22  first or the special session, so let me just ask you.

23  Do you remember communicating with anybody from the

24  secretary states office Keith Ingram, Christina Adkins

25  about SB 1 or related issues during either the first or

Alan Vera - 2/27/2023

123

1  second special?

2     A.   I clearly remember not communicating with

3  anyone in the SOS office about SB 1 during the regular

4  session or the two special sessions.

5     Q.   Okay.  What about for example your poll

6  watcher trainings, do you recall sharing your poll

7  watcher training PowerPoint with Keith Ingram --

8     A.   Yes, that was different.

9     Q.   -- and/or Christina Adkins?

10    A.   In a -- in a Senate State Affairs Committee

11 hearing they were both present, I was there to testify,

12 and at that point SB 1 was passing, was going to pass,

13 and required a secretary of state to provide poll

14 watcher training as part of new requirements of Senate

15 Bill 1. I said to Keith, by the way I've got a

16 presentation I've been use for years that updates,

17 would you like to see it?  So this was back in you

18 know, 2021, and they said I'd love to see it, so I'll

19 just email it to you.  Christina said, yeah, copy me

20 too.  So I sent them my PowerPoint, the old PowerPoint,

21 pre-SB 1, and sent it by email to both of them.

22    Q.   Okay.  And so would you agree with me that

23 that was related to SB 1 with respect to the provision

24 that would require the secretary state to state to

25 start training poll watchers?

1      A.   I would agree that it's relevant to that, but

2  it was not an advocacy for that.  I wasn't advocating,

3  it was -- it was a done deal, SOS was going to have to

4  train poll watchers and I offered them some -- a head

5  start in the training materials.

6      **Q.   Okay.  Were there any other communications**

7  **that you had with either the secretary of state, the**

8  **AG, or the governor's office during this period of time**

9  **that you might not classify as advocacy, but was**

10  **communication related or touching on SB one's**

11  **provisions?**

12      A.   Let me think.  No, that was long after that

13  I -- I can't remember any.  I cannot remember any other

14  communications.

15      **Q.   Okay.  So would it then be fair to say that**

16  **you sent a copy of your poll worker training**

17  **PowerPoint?**

18      A.   Poll watcher.

19      **Q.   I'm sorry, thank you for that.  Your -- let**

20  **me ask the question again, would it be fair to say that**

21  **you sent a copy of your poll watcher training**

22  **PowerPoint to Mr. Ingram and Ms. Adkins of the**

23  **secretary of state's office in early September, 2021?**

24      A.   I think that's probably correct.

25      **Q.   Okay.  Would you mark this as the next**

1  exhibit please?

2            The court reporter has handed you what

3  has been marked deposition Exhibit No. 3. Do you

4  recognize this as at least partly an email from you on

5  September 2, 2021, to Keith Ingram and Christina Atkins

6  attaching your poll watcher PowerPoint?

7                 (Exhibit No. 3 marked.)

8       A.   Yeah, I specifically attached the 2020 poll

9  watcher version, that's correct.

10      Q.   (BY MS. PERALES:) The court reporter has

11  handed you what has been marked Deposition Exhibit No.

12  4. Can you identify this document?

13                 (Exhibit No. 4 marked.)

14      A.   It appears to be a photocopy of my 2020 poll

15  watcher training class.

16      Q.   (BY MS. PERALES) Is Exhibit No. 4 what would

17  have been the attachment to Exhibit No. 3, the email?

18      A.   That's correct.

19      Q.   How do I know this is your 2020 training,

20  where can I tell on here?

21      A.   I don't know if you can tell from the

22  document or not, hang on.

23                 You can tell because there's nothing

24  in here about having to take the secretary of state's

25  poll watcher training which was changed in 2021, so on

1  a slide that says before election day, if you look up

2  I'll show you.  That slide, the new one would say have

3  to take the secretary of state poll watcher training

4  also.

5      **Q.   So you recall making that change to your**

6  **training after SB 1 passed?**

7      A.   Yes.

8      **Q.   Okay.  Okay.  If Mr. Ingram or Ms. Adkins**

9  **asked you for your 2022 poll watcher training as follow**

10 **up, would you send it to them?**

11     A.   Not without checking with Charis Eagle.

12     **Q.   Did you check with Charis Eagle about 2021 --**

13     A.   I let her know that I was sending this, yes.

14     **Q.   Okay.**

15          MS. PERALES:  So counsel, based on the

16 fact that Mr. Vera shared this document outside the

17 bounds of the Harris County Republican Party, we would

18 respectfully request that counsel produce the 2022 poll

19 worker training prepared by Mr. Vera?

20     A.   Poll watcher.

21          MS. PERALES:  Poll watcher training.

22 Poll watcher training prepared by Mr. Vera.

23          MR. GORE:  Okay.  We have asserted our

24 First Amendment Privilege with respect to that

25 document.  It's contained on the log as well, I

Alan Vera - 2/27/2023

127

1 believe. Mr. Vera has made clear there were changes to

2 that document, from the 2020 version. So those -- that

3 new version remains subject to privilege. It hasn't

4 been shared outside the Harris County Republican Party.

5             Mr. Vera has testified that he has not

6 done so, would not do so without permission of the

7 Chair of the Harris County Republican Party. So we're

8 -- we're maintaining that it is still subject to

9 privilege, including because it contains new content

10 that hasn't been disclosed outside of the Harris County

11 Republican Party.

12             MS. PERALES: Now the fact that it

13 hasn't been disclosed doesn't necessarily mean that

14 it's privileged are you -- so -- and -- and thus we

15 would assert that the privilege claim has been waived

16 with respect to Mr. Vera's poll watcher training from

17 2022 because he has shared externally his 2020 poll

18 watcher training.

19             Is it your contention that the

20 differences between the two documents is subject to the

21 First Amendment Privilege?

22             MR. GORE: It's our contention that

23 the 2020 document was also subject to First Amendment

24 Privilege, and that privilege was waived only with

25 respect to the 2020 document. The 2022 document is a

1  separate document and that document remains subject to

2  the First Amendment privilege that has been asserted

3  over that document.

4                    MS. PERALES:  Okay.

5      **Q.   (BY MS. PERALES) Mr. Vera earlier in your**

6  **deposition you testified that you weren't sure if your**

7  **email, Microsoft outlook, kept your emails from more**

8  **than a year ago?**

9      A.   Uh-huh.

10      **Q.   And you've testified earlier in the**

11  **deposition that you did have back and forth exchanges**

12  **with either legislators or legislative staff by email,**

13  **in which you were providing feedback on provisions of**

14  **SB 1; is that right?**

15      A.   Yes.

16      **Q.   As part of the process of being involved in**

17  **this case, did you search for those emails in which you**

18  **were providing feedback to legislators or initiating**

19  **conversations with them relevant to provisions of SB 1?**

20      A.   I did not search for any documents in my own

21  files.

22      **Q.   Okay.**

23      A.   Are you -- I was given by the attorneys a

24  whole set of documents that were produced, one of which

25  included a feedback to State Rep Jetton's question to

1  me about SB 1 and the language about harvesting.

2       Q.   Okay.  Did you turn over your computer to

3  anybody to have them search your emails as part of your

4  involvement in this case?

5       A.   I did not.

6       Q.   Okay.  If your Microsoft Outlook did in fact

7  save emails that are older than a year old or two years

8  old, would your emails going back and forth with the

9  legislator be there and -- and your providing feedback

10 and having your communications?

11      A.   I don't know, there -- they should be.

12      Q.   Okay.  Mr. Vera, the court reporter has

13 handed you what has been marked Deposition Exhibit No.

14 5.

15           Is this the email that you were

16 referencing a moment ago in which you had an exchange

17 with Representative Jetton regarding in person activity

18 with a voter and vote harvesting?

19                (Exhibit No. 5 marked.)

20      A.   Yes, it does.  This looks like the document

21 that I mentioned in that previous testimony.

22      Q.   (BY MS. PERALES:) And what is the date of

23 your email to Representative Jetton?

24      A.   August 20th, 2021.

25      Q.   So this is some time before the passage of SB

1    1?

2        A.    Some time during -- it looks like the second

3    special session.

4        Q.    Okay.  Do you know who Tori McFarland is?

5        A.    I think at that time Tori McFarland was on

6    the staff of Jacey Jetton.

7        Q.    And Coleen, I believe you mentioned earlier

8    in the deposition is your wife?

9        A.    Correct, uh-huh.

10        Q.    Okay.  And so in this -- in this email

11    subpoena is it -- is it fair to say that you're

12    alerting Representative Jetton to something that you've

13    characterized as an unintended consequence in the

14    version of SB 1 that was going to be heard in committee

15    the following day; is that right?

16        A.    Yes, ma'am?

17        Q.    And then Representative Jetton responds

18    "thank you for sharing and good catch, we will work

19    with chairman Murrell on an amendment", closed quote?

20        A.    Uh-huh.

21        Q.    Okay.  Now, I know earlier you had suggested

22    that maybe this exchange was -- as part of

23    representative Jetton asking for your feedback; is that

24    right?

25        A.    Yes.

1    Q.   Okay.  Do you -- where is the email below

2 that, where he asks for your feedback?

3    A.   Well, there's no -- I don't think's an email

4 below that, I think it was a phone call from Ms. Tori

5 asking me -- saying State Rep Jetton would like you to

6 comment on that aspect SB 1.

7    Q.   And the aspect being that vote harvesting was

8 defined as an in person interaction?

9    A.   Yes.

10   Q.   And then you provided your feedback in this

11 email; is that right?

12   A.   That's correct.

13   Q.   And then Representative Jetton responds to

14 you?

15   A.   Uh-huh.

16   Q.   And then, it sort of cut off at the top, but

17 it looks like you may have taken that exchange and then

18 forwarded it to Chair Siegel and some others?

19   A.   It looks like that.

20   Q.   Okay.

21   A.   Just keeping her posted.

22   Q.   Okay.  All right.

23   A.   Yeah, looks like those are all HCRP employees

24 or officers.

25   Q.   I wanted to ask, did anybody besides you with

1  **Harris County Republican Party talk to legislators or**

2  **legislative staff about issues or provisions that ended**

3  **up in SB 1?**

4       A.    It's certainly possible.  I don't know -- I

5  can't name people who did nor can I say they didn't.

6  The Ballot Security Committee -- let me back up.

7                    During the Harris County Republican

8  Party Executive Committee Meeting at the beginning of

9  each legislative session, the Executive Committee

10  passes a resolution that gives guidance to Ballot

11  Security Committee on which changes in general to the

12  election code to support and which changes to oppose as

13  we interact with the state legislators.

14                    So we all receive those same marching

15  orders, and so I'm up there a lot, but others can be up

16  there as well as long as they stay in line with the

17  Executive Committee directed at us, we're all right.

18       Q.    Okay.  And do you know if -- so you say --

19  **let me ask you this.  Did -- did Chair Siegel have**

20  **interactions with members of the legislature or staff**

21  **on some of these issues or provisions that end up in SB**

22  **1?**

23       A.    I am not aware.  I know that Chair Siegel and

24  Senator Bettencourt communicate regularly, okay?  But I

25  cannot tell you whether or not they discussed Senate

Alan Vera - 2/27/2023

133

1   Bill 1.

2                   The court reporter is not catching

3   that.  Ask them to speak louder, and more slowly.

4                   (Discussions in hallway, laughter.)

5       Q.   (BY MS. PERALES:) The court reporter has

6   handed you what has been marked Deposition Exhibit No.

7   6. Do you recognize this as an email from May 19th,

8   2021, from you?

9                   (Exhibit No. 6 marked.)

10      A.   Uh-huh.

11      Q.   (BY MS. PERALES) To --

12      A.   Senate or Bryan Hughes.

13      Q.   Senator Hughes and it looks like some more

14  senators --

15      A.   Don Buckingham, Paul Bettencourt, Louis Culp,

16  these are members of the Senate Committee on State

17  Affairs that hears election bills.

18      Q.   And then you CC some staffers, would that be

19  right, as well as some folks with the Harris County

20  Republican Party?

21      A.   That's correct.

22      Q.   Okay.  And I see Sonya Aston is there?

23      A.   Yes.

24      Q.   And she was staffing with?

25      A.   Senator Bettencourt.

Alan Vera - 2/27/2023

134

1        Q.    And then can you sort of generally help me
2   understand what is it that you are sending to these
3   legislators and staff?

4        A.    On this date, May 19th, we're coming to the
5   end of the regular session Senator Bettencourt's bill,
6   Senate Bill 1589, had passed the Senate earlier, but
7   had not been heard in the Committee in the House at
8   all, so this note asked him to consider adding that
9   portion of SB 1589 to the Article 4 Provision of Senate
10  Bill 7, which was still in process.

11       Q.    Okay.  And were these Election Marshals under
12  the Bill themselves law enforcement officers?

13       A.    Yes.

14       Q.    And did 1589 position them inside the polling
15  place?

16       A.    No.

17       Q.    And where would it have positioned them?

18       A.    It simply made them available to be called,
19  to respond to reports of criminal election activity.

20       Q.    How would that be different than just calling
21  the regular police?

22       A.    These people will actually respond.

23       Q.    That's what happens when you ask an open
24  ended question in a deposition.

25       A.    Uh-huh.

Alan Vera - 2/27/2023

135

1      Q.   Okay.  Thank you one more question about

2  Exhibit No. 6, sorry?

3                 (Exhibit No. 6 marked.)

4      A.   Uh-huh.

5      Q.   (BY MS. PERALES) You say here, quote, "please

6  see the attached record of our invited testimony to the

7  senate committee on state affairs" closed quote, do you

8  see that line there?

9      A.   Yes.

10     Q.   And would that be an example of a time when

11 you did provide something in writing to the Senate?

12     A.   No, I was just attaching my notes.  The notes

13 I spoke from when I testified in support of SB 1, 1589.

14     Q.   Do you remember if those note are typed or

15 handwritten?

16     A.   They're typed, I can't read my handwritten

17 notes.

18                 (Laughter.)

19     Q.   (BY MS. PERALES) I have three emails and I'm

20 going to mark each of them.  Okay.  Can you identify I

21 believe it's No. 7 for me?

22                 (Exhibit No. 7 marked.)

23     A.   Exhibit No. 7 looks like an automated reply

24 from the office of Senator Bob Hall to the Chair of

25 Harris County Republican Party.

Alan Vera - 2/27/2023

136

1    Q.   (BY MS. PERALES) Okay.  Identify No. 8 for

2  me.

3                    (Exhibit No. 8 marked.)

4    A.   Exhibit No. 8 appears to be automated reply

5  From office of Senator Donna Campbell to the Chair of

6  the Harris County Republican Party.

7    Q.   And can you identify 9 for me?

8                    (Exhibit No. 9 marked.)

9    A.   Exhibit No. 9 appears to be automated reply

10  office of Senator Bettencourt to the Chair of the

11  Harris County Republican Party.

12    Q.   (BY MS. PERALES) And is the date on all three

13  exhibits August 10th of 2021?

14    A.   It is.

15    Q.   And they're all at about 4:30 in the morning,

16  yes?

17    A.   Yeah, between 4:30 and 4:45, yup.

18    Q.   Okay.  Do you know what email these exhibits

19  were responding to?

20    A.   I have no idea.

21    Q.   Okay.  Does the date August 10th, 2021 in

22  anyway refresh your recollection about whether this

23  might have been related to communications on SB 1?

24    A.   It does not.  I -- that was in the end of

25  second special session, but no, I can't tell.

1    Q.   Okay.  Thank you.  Did you have any

2  communications with Senator Hall that related in any

3  way to SB 1?

4    A.   Oh, goodness.  I don't remember.

5    Q.   Okay.  Same question with Senator Donna

6  Campbell, did you have any communications with Donna

7  Campbell about SB 1?

8    A.   I don't remember.  The only reason I -- I

9  hedged on Senator Hall he was very good when I did

10 public testimony before the senate committee on state

11 affairs of have asking me many follow up questions.  So

12 I don't know if I may have sent him an email or not.

13   Q.   SB 1 was heard in Senate State Affairs on

14 August 9th, 2021?

15   A.   Okay.

16   Q.   And since these auto replies are coming from

17 the wee hours of August 10th?

18   A.   Uh-huh.

19   Q.   Is -- is it possible that you remember

20 sending some kind of follow up communication to various

21 senators following your testimony?

22   A.   I don't remember doing that.  And if I'd had

23 it would have come from my email address, not the party

24 chairs.

25   Q.   Okay.  Okay.  Is there any part of SB 1 as it

Alan Vera - 2/27/2023

138

1  **was passed by the legislature that you believe**

2  **responded to your concern about the vote harvesting**

3  **being defined as an in person interaction?**

4      A.   I don't remember for certain because it's a

5  long bill, but I do know that they did not affect the

6  sections of the code already established for dealing

7  with the concerns I had of people stealing others

8  identities to vote by mail, they did -- they left that

9  alone.

10     **Q.   Is there any part of SB 1 as it was passed**

11 **that you think tracks very closely with communications**

12 **that you made with legislators?**

13     A.   Oh, goodness --

14     **Q.   Either something that you initiated or**

15 **something that was the product of the back and forth**

16 **where you're providing feedback?**

17     A.   Well, I've already told you that I was --

18 after the previous election I was very concerned about

19 the way poll watchers were obstructed.  So some of the

20 poll watcher improvements certainly tracked with my

21 concerns, okay?  I told you that I had -- I had after

22 the 2020 November election, I had gone public with many

23 serious concerns about drive-thru voting and so that

24 was reflected.  So I think, you know, at least poll

25 watcher -- poll watchers were better protected, the

Alan Vera - 2/27/2023

139

1  issue of voting as it was with the aberration in

2  drive-thru was addressed.  And they did not mess with

3  the clear language of mail ballot harvesting that was

4  not involving personal interaction.  So those three

5  things for sure.

6      **Q.   Do you recall having conversations with**

7  **legislators around making it a -- an offense to have a**

8  **paid person assist a voter in voting by mail?**

9      A.   I didn't have any such discussion with

10  legislators.

11      **Q.   Do you have an understanding of what need was**

12  **meant to be addressed by that?**

13      A.   I have an understanding from what I've been

14  told, having -- sitting around the committee hearing

15  rooms talking to others, but I did not initiate that.

16      **Q.   Okay.  And you don't have a first hand**

17  **acknowledgment of the reasons for that?**

18      A.   I do not, nope.

19      **Q.   Do you have any first hand knowledge about**

20  **the reasons for prohibiting in person interaction with**

21  **a voter in the presence of the mail ballot with --**

22  **while advocating for a particular candidate or outcome?**

23      A.   No, I was not, I was not privy to those

24  discussions or this original complaints.

25      **Q.   And -- and no staff or legislator said, oh**

1  that's there because so and so really felt?

2      A.   No, no.

3      Q.   Okay.  Okay.  With respect to any or the

4  other provisions of SB 1, do you have any knowledge

5  about what the source or the origin was, whether it was

6  a particular colleague in the Republican Party maybe

7  from another County or a particular legislator who was

8  the reason that that provision is there in the Bill?

9      A.   No, I don't.  Not directly, I -- I do know

10  that -- I'm sorry, I don't know, I understand that

11  prior to that session beginning there were a number of

12  election attorneys that were writing legislative

13  language and submitting it.

14      Q.   Uh-huh.

15      A.   But I can't track any one item to any one

16  attorney.

17      Q.   Can you tell me the names of those attorneys?

18      A.   I can't tell you the names of all -- I know

19  Eric Opiela was one of them, and he's the only one I

20  can remember.

21      Q.   Okay.

22      A.   Because he's kind of up front about it.

23              (Laughter).

24      Q.   (BY MS. PERALES) Did you have -- you know, we

25  talked about Senator Bettencourt, he's your local

1 senator.  We haven't talked that much about Brian

2 Hughes who was this author/main sponsor.

3                 Did you ever have any exchange of

4 communication with either Brian Hughes or his staff

5 from let's say the beginning of the regular session

6 through the end of the second special?

7     A.   No, I did not.  But let me just double check.

8 No, the only communication was in committee with --

9 either it was with the Senator or his staff.

10     Q.   Do you have any interaction with republican

11 candidates running for office and advising them about

12 what's in SB 1?

13     A.   No, I don't get involved with candidates much

14 at all.  I answer questions, but I don't interact with

15 them, I don't take part in their campaigns.

16     Q.   And do you recall, for example in 2022, since

17 SB 1 is a fairly new piece of legislation, do you

18 recall answering any questioning of any candidate or

19 their campaign staffers about the meaning of SB 1?

20     A.   The only questions I remember answering from

21 candidates at that time was about whether the candidate

22 could still appoint a poll watcher, and secondly are

23 there any new requirements of poll watchers in which I

24 have to -- had to reply about the SOS training now

25 being mandatory.  Because of course the candidate can

1  appoint poll watchers, but Harris County -- our Party

2  would only appoint poll watchers that I trained, so.

3      **Q.   So aside from poll watchers can you think of**

4  **any other --**

5      A.   I can't think of anything else, hang on.  No.

6           However, because of SB 1 I was asked

7  to take a look at the mail ballot application mailers

8  that Harris County Republican Party was going to send

9  out to the republicans over 65 and I had to completely

10 rewrite them.

11     **Q.   I was just going to ask about outreach by the**

12 **Party to potential mail voters?**

13     A.   Uh-huh.

14     **Q.   So did you work on revising the outreach**

15 **materials for the Harris County Republican Party --**

16     A.   I did.

17     **Q.   To the voters over 65?**

18     A.   Correct.  I had to redo it completely.

19     **Q.   All right.  And so you made those changes to**

20 **the, what are they like, mailers?**

21     A.   Yes, they were -- they were mailers into the

22 layout stage, not quite what was called the mechanical

23 stage, but I had to change those.

24     **Q.   Okay.  Around the time of the 2022 primary**

25 **election?**

Alan Vera - 2/27/2023

143

1      A.    Uh-huh.

2      **Q.    Were you offering any guidance or advice to**

3  **deal with any requests from voters coming in about how**

4  **to apply for their mail ballots?**

5      A.    I was giving -- I was the Party staff, the --

6  the paid staff advice on how to answer questions about

7  the new mail ballot requirements.

8      **Q.    Do you recall the nature of the questions**

9  **that you were getting in the 2022 primary period from**

10  **voters about either applying for ballot by mail or**

11  **returning that mail ballot related to SB 1 --**

12     A.    The questions weren't coming to me, they were

13  coming to staff, but they were calling me to get the

14  information; but it was just the general stuff, now

15  which number do I have to put?  Can I just put my whole

16  driver's license number, et cetera?  Basic fundamental

17  questions.

18     **Q.    What would your advice -- what was your**

19  **advice during the primary period about which number the**

20  **voters should put?**

21     A.    Well, I had the staff tell the voters, put

22  both numbers, okay?  Because the issue was the number

23  the voter put on the ABBM or the carrier envelope had

24  to match a number in the voters registration record.

25  And many of these -- the voters were not old enough to

1  vote by mail, they don't remember which -- which number

2  they used when they first registered, put them both.

3      Q.   Were there also voters who hadn't put a

4  number when they registered?

5      A.   It's possible.  I -- I don't know that -- I

6  don't know that, it could be possible.  I don't know

7  that.

8      Q.   If a voter had lived at the same address for

9  example since pre-HAVA, Help America Vote Act?

10      A.   Uh-huh.

11      Q.   It's possible that their registration, which

12  would have occurred pre-200 wasn't accompanied by an ID

13  number at all; isn't that right?

14      A.   It's possible.

15      Q.   And they would be over 65, and just have

16  stayed put the whole time?

17      A.   Uh-huh.

18      Q.   Do you recall hearing from paid staff of the

19  Party that there were voters in that situation that

20  they hadn't provide any number -- had not provided any

21  number at all with their original registration because

22  it had been a long time ago?

23      A.   I had not heard that specifically.

24      Q.   Okay.  But you did hear about voters putting

25  one number and Harris County having a different number,

Alan Vera - 2/27/2023

145

1  and so the -- the Harris County couldn't match it?

2      A.   I heard that from the people on our signature

3  verification committee.

4      Q.   **Did you hear that from any of the Party staff**

5  **that were getting questions from voters?**

6      A.   Yes, yes.

7               MS. PERALES:  Can we have a five

8  minute break?

9               THE REPORTER:  Okay.  Going off the

10  record at 2:49 p.m.

11               (Off the record.)

12               THE REPORTER:  Back on the record at

13  3:01 p.m.

14      Q.   **(BY MS. PERALES:) Mr. Vera, are there any**

15  **topics or is there any information that you know about**

16  **relevant to SB 1 that you discussed with Mr. Gore that**

17  **you haven't talked about today in the deposition,**

18  **either because I didn't ask you or for any other**

19  **reason?**

20      A.   I can't think of anything, give me a second.

21  Nope, nope.

22      Q.   **Okay.**

23               MS. PERALES:  So I'm going to pass the

24  witness, but I'm not going to conclude the deposition

25  or conclude my questioning of the witness.  We're going

Alan Vera - 2/27/2023

146

1  to leave the deposition open at the end in order to

2  allow for us to be able to resolve some of the issues

3  that have come up with respect to invocation of either

4  First Amendment Privilege or Legislative Privilege that

5  are not resolved, so with that caveat I'm going to pass

6  the witness.

7              MR. GORE:  If I can just say on the

8  record, we appreciate where you're coming from.  We

9  obviously object to holding the deposition open.  We

10  think all the privilege assertions have been

11  appropriate.  We understand that you are reserving the

12  right to keep the deposition only -- open only with

13  respect to those privilege issues, is that -- is that

14  correct?

15              MS. PERALES:  Yes.  That's right, and

16  when you say those privilege issues then we can go back

17  and forth all day.  When you say those privilege issues

18  it's specifically the -- the places today where the

19  witness has declined to testify because of either

20  Legislative Privilege or because of First Amendment

21  Privilege.

22              MR. GORE:  Thank you for

23  clarification.  We stand on our objection, but we

24  appreciate the clarification.

25              MS. PERALES:  Okay.  Would you like to

1  switch seats?

2              MS. HOLMES:  Sure.

3                   EXAMINATION

4  BY MS. HOLMES:

5      **Q.   Good afternoon, Mr. Vera, we met earlier, but**

6  **my name's Jennifer Holmes, I represent the Haul**

7  **plaintiffs.  And I have just a handful of kind of**

8  **clarifying questions for you.  It shouldn't take too**

9  **long.  You testified that you're the chair of the**

10 **Ballot Security Committee for the Harris County**

11 **Republican Party, correct?**

12     A.   Correct.

13     **Q.   And who else is on the Ballot Security**

14 **Committee?**

15     A.   The Ballot Security Committee is made up of

16 members that are appointed by the Senate District

17 Chairs of each Senate District in Harris County.  And

18 based on the bylaws of the Party, senate districts can

19 appoint one or two members to ballot security,

20 depending upon the size of the district.  There are

21 three appointees by the Party Chair and I am one and

22 she's allowed to appointment two others.

23     **Q.   And so that was Cindy Siegel who appointed**

24 **you and two others to the committee?**

25     A.   Yes, for this current term, uh-huh.

1    **Q.    And what are the names of the two other**

2  **members?**

3      A.   Dan Alan, and Steve Carlton -- or Carlin,

4  C-A-R-L-I-N. Steve Carlin.

5    **Q.    And what are Mr. Alan and Mr. Carlin's**

6  **duties -- actually, sorry, let me ask you a question**

7  **before that.  What are Mr. Alan and Mr. Carlin's**

8  **titles?**

9      A.   They're just members, but they're also

10  precinct chairs.

11    **Q.    And what are their duties with the Ballot**

12  **Security Committee?**

13      A.   We recently organized into work group, and

14  Mr. Alan has responsibility for digital poll watching

15  and Mr. Carlin is taking charge of mail ballot

16  observation or BBM observation.

17    **Q.    And were Mr. Alan and Mr. Carlin on the**

18  **Ballot Security Committee during the 2020 election**

19  **cycle?**

20      A.   They were not.

21    **Q.    Who was on the committee during that cycle?**

22      A.   I don't have all the names memorized, there

23  13 members -- voting members, and about eight or nine

24  nonvoting members, and they change every two years.  So

25  neither one of them were on at the 2020 cycle, other

Alan Vera - 2/27/2023

149

1  people appointed by their Senate district chairs of

2  course in those seat.

3       Q.   And how about the 2022 primary, who was on

4  the committee?

5       A.   Those people were on the committee.

6       Q.   Sorry, these people meaning the 13?

7       A.   Steve -- Steve Carlin and -- and Dan Alan

8  were on the committee along the 11 others.  I don't

9  have all the names memorized.

10      Q.   Did Mr. Alan, Mr. Carlin, or any of the other

11 current or former members of the Ballot Security

12 Committee join you in your conversations or emails to

13 legislators about the legislative bills that eventually

14 became SB 1?

15      A.   I'm not aware that they did, and they are

16 done independently.  They're allowed to do so as long

17 as they're following the guidelines of the Executive

18 Committee resolution, okay?  So they could

19 independently communicate.

20                Former members of the committee have

21 traveled with me to Austin to testify on the days that

22 I go to testify.

23      Q.   And can you tell me the names of the member

24 of the committee who testified during the 2021

25 legislative session on -- on SB 1 or any of the

1   predecessors --

2      A.   Yes.  Ken Moore M-O-O-R-E was the most

3   frequent person to accompany to me to testify.

4      Q.   **Anyone else?**

5      A.   Nope, it's a lonely road.

6      Q.   **Did Mr. Moore submit written testimony?**

7      A.   I don't believe he did, I believe I was only

8   verbal testimony.

9      Q.   **Do you know if he used written notes when he**

10  **testified?**

11     A.   Handwritten about half hour before he

12  testified.

13     Q.   **I'd like to ask you about the training you**

14  **provide to poll watchers?**

15     A.   Uh-huh.

16     Q.   **We -- you testified earlier about the**

17  **training materials and that include -- included a**

18  **PowerPoint and a guidebook, correct?**

19     A.   Uh-huh.

20     Q.   **When you give the guidebook to the poll**

21  **watchers do you instruct them to keep it confidential?**

22     A.   I tell them to keep it with them at all times

23  and that they should hang onto it for 22 months after

24  the election.

25     Q.   **Do you tell them to not share it with anyone**

Alan Vera - 2/27/2023

151

1  else?

2      A.   I don't know if I tell them not to share, I

3  just tell them to keep it in their possession.

4      Q.   **Do poll watchers sign anything saying they**

5  **will keep the guidebook confidential?**

6      A.   They do not.

7      Q.   **Concerning the poll watcher PowerPoint**

8  **training that you create?**

9      A.   Uh-huh.

10     Q.   **Does anyone review that PowerPoint to offer**

11 **suggestions or edits?**

12     A.   The general council for the Party reviews it.

13     Q.   **And is that the general council for Harris**

14 **County Republican Party?**

15     A.   Harris County Republican Party.

16     Q.   **And what is that persons name?**

17     A.   Ed Hubbard.

18     Q.   **Does anyone else review the PowerPoint**

19 **training?**

20     A.   The power -- the County Chair does.

21     Q.   **Anyone else?**

22     A.   Nope.

23     Q.   **And when the County Chair has reviewed your**

24 **PowerPoint training, has she made any edits,**

25 **corrections, or suggestions.**

1    A.    Not this year.

2    **Q.    And are you referring to the 2022 training?**

3    A.    Uh-huh.

4    **Q.    How about for the 2020 training?**

5    A.    We didn't have a party chair to speak of in

6    2020, so it was cursory review.  The party chair at the

7    time was Keith Nielsen and he did not review the

8    presentation.

9    **Q.    Can you explain what you mean that you did**

10   **not have a Party Chair, but the Party Chair was Keith**

11   **Nielsen?**

12   A.    We did, there was -- that was the COVID year

13   and it was kind of a mess.  The state convention was

14   delayed months, okay?  And so everything was behind

15   schedule, the organizing of the Party, so the chair --

16   the County Party Chair who should have stepped down in

17   May of 2020 was still in office in August of 2020, they

18   hadn't elected a new chair yet.  And when the new chair

19   came in, I know the bills hadn't been paid for a while,

20   and we just had a lot of catching up to do.  COVID had

21   a significant impact on that.

22   **Q.    It was a chaotic time.**

23   A.    It was.  It was.

24   **Q.    Okay.  How about the guidebook poll watchers,**

25   **does anyone review that to offer suggestions or edits?**

1    A.   Same two people, the Party Chair and the

2 general council.

3    Q.   **And have you received corrections, edits, or**

4 **comments?**

5    A.   No.

6    Q.   **Is that true for both the 2022 guidebook?**

7    A.   And the?

8    Q.   **And the 2020 guidebook?**

9    A.   That's correct.

10   Q.   **Do you have Exhibit 3 before you or can you**

11 **pull it out of that stack, please?  Do I have it?  And**

12 **do you recall that Exhibit 3 is an email that you sent**

13 **to Keith Ingram and Christina Adkins --**

14   A.   Correct.

15   Q.   **On September 2, 2021?**

16   A.   Correct.

17   Q.   **And it attached the 2020 poll watcher**

18 **PowerPoint training?**

19   A.   Correct.

20   Q.   **Okay.  In the email at the bottom you write**

21 **in the second paragraph, you're talking about the --**

22 **the PowerPoint deck.  You said there's -- I think it**

23 **should say there's a version, but it says "there's**

24 **aversion with the audio available, but it's hosted on**

25 **the TrueTheVote website and requires checking in and**

1  creating an account, free;" did I read that correctly?

2      A.   Correct.

3      Q.   Was the 2020 poll watcher PowerPoint training

4  accessible on the TrueTheVote website?

5      A.   The 2021 was.

6      Q.   The 2021 --

7      A.   Uh-huh.

8      Q.   Okay.  Oh, sorry.  I misheard you, the 2020

9  version was?

10     A.   Was.

11     Q.   Okay.  And how would someone -- first, can

12 you explain, what is true to vote?

13     A.   True the vote is a nonprofit nonpartisan

14 organization started in 2010 to promote election

15 integrity nationally.

16     Q.   Is it part of the Harris County Republican

17 Party?

18     A.   It is not.

19     Q.   And during what time period was the poll

20 watcher training available on the true to vote website?

21     A.   From approximately the first of August until

22 the end of October.

23     Q.   Of 2020?

24     A.   Of 2020, yeah.

25     Q.   And if anyone wanted to go to the true to

1  **vote website and see the -- the PowerPoint, what would**

2  **they have to do?**

3     A.   They'd have to sign in, create an account,

4  okay?  And be passed by the truth, the vote gate keeper

5  who was kind of helping me get the training out there.

6     **Q.   Were there any restrictions on who could sign**

7  **in and create an account?**

8     A.   They would have to -- yes, but it was --

9  remember this was COVID, also, so I couldn't have in

10 person training because groups of 50 or more were

11 forbidden.  And so they would submit their names,

12 TrueTheVote would send names to me, I would vet their

13 voting history, and give a thumbs up or thumbs down as

14 far as access to the back to the class.

15    **Q.   And what did you base the thumbs up or thumbs**

16 **down on?**

17    A.   On, primary voting history.

18    **Q.   What about the primary voting history?**

19    A.   Republican voting primary voting in at least

20 three primary elections.

21    **Q.   Any other requirements for someone to access**

22 **the training?**

23    A.   They had -- no, they had to be a registered

24 voter three and have three successive republican

25 primary votes, elections.

1    Q.   Would that have to be in Harris County or

2    anywhere within Texas?

3    A.   No, it was all within Harris County.

4    Q.   Is the 2022 poll watcher training available

5    anywhere online?

6    A.   No, it's not available online.  You have --

7    now that we're out of COVID you have to take the course

8    in person.  We do have a video because we had poll

9    watchers who took the class in May and now it's October

10   and they'd like a refresher.  The party had a private

11   YouTube channel, password protected, that the poll

12   watchers who had already completed the in person class

13   could request to see again, and that access was managed

14   by the paid party staff.

15   Q.   Okay.  And in terms of the 2020 poll watcher

16   training?

17   A.   Uh-huh.

18   Q.   The PowerPoint, did you ever share it outside

19   of the Harris County Republican Party other than

20   sending it to Keith Ingram, and Christina Adkins, and

21   putting it on the TrueTheVote website?

22   A.   That was it.

23   Q.   So you've testified about your duties to

24   recruit and train poll watchers?

25   A.   Uh-huh.

Alan Vera - 2/27/2023

157

1    **Q.   Is it also part of your responsibilities to**
2    **assign poll watchers to particular polling locations?**

3        A.   I don't make the assignments, the Party in
4    the 2022 general election, the executive director of
5    the Party made the assignments.

6        **Q.   How about in the 2022 primary?**

7        A.   Those were all made by the executive director
8    of the Party.

9        **Q.   And who is the executive director?**

10       A.   Well, he was Casey Voeks, V-O-E-K-S he
11   certainly resigned.

12       **Q.   And how about the 2020 election cycle, who**
13   **made the decision to assign poll watchers to various**
14   **polling locations?**

15       A.   In 2020 I made those decisions because there
16   was no party staff.

17       **Q.   And in 2020 when you were deciding the**
18   **assignments, did you place a poll watcher in every**
19   **polling location in the county?**

20       A.   All right.  The poll watchers first of all, I
21   never place a poll watcher alone there's always two.
22   Next is, I make sure we have poll watchers at the
23   critical ballot handling areas of early voting ballot
24   board, signature verification committee, and central
25   count.  Then the rest of the polling locations for poll

Alan Vera - 2/27/2023

158

1  watchers are selected based on history of data

2  discrepancies with the election judges.  The judges

3  that need the most help get the poll watchers.

4      **Q.   And what kind of data discrepancies would you**

5  **consider --**

6      A.   Data discrepancies number one would be more

7  ballots than votes.  Precincts or polling places that

8  had more ballots turned in than voters who signed in.

9  Discrepancy number 2 would be provisional ballot

10  affidavits without ballots.  And those are the two

11  major issues that we measure by.

12      **Q.   Did you -- in considering these -- these two**

13  **categories of data discrepancies?**

14      A.   Uh-huh.

15      **Q.   Did you review any information or data to**

16  **figure out where these discrepancies were happening?**

17      A.   We get -- we download the -- that data after

18  every election.  And so we know at what polling

19  location the discrepancy happened and we know who the

20  election judge was at that polling location.  And so

21  the next election we look to see where's that judge

22  been appointed and they get the poll watcher help.

23      **Q.   So the decision is made more based on where a**

24  **particular judge posted rather than the polling place**

25  **location that had the -- the data discrepancies?**

1    A.    That's generally to -- true.  It's the

2    association of data discrepancies with an election

3    judge, and the poll watchers are sent to support that

4    election judge and to help them out.

5    **Q.    So during the 2020 general election, what**

6    **were your, I guess, priority polling locations based on**

7    **your review of data discrepancies?**

8    A.    I don't remember the exact locations because

9    the judges move, but I had 80 polling locations on

10   election day that receive poll watchers.  I had

11   probably 10 during early voting that receive poll

12   watchers.

13   **Q.    Earlier today you mentioned Moody Gardens was**

14   **that --**

15   A.    Yeah, I met --

16   **Q.    -- okay.  Let me finish my question though.**

17   **Earlier today you mentioned -- now you've corrected you**

18   **-- you were talking about Moody Park, was that a -- a**

19   **location, a polling location where you prioritize**

20   **sending poll watchers during the 2020 election?**

21   A.    Moody Park was not a priority for the 2020

22   election for poll watchers.

23   **Q.    Had it -- was it a priority for the 2022**

24   **primary election?**

25   A.    It was not.

Alan Vera - 2/27/2023

160

1     **Q.   Okay.  Can you recall any of the polling**

2  **place that were priorities during the 2020 general**

3  **election for sending poll watchers?**

4     A.   The 2020 general election?

5    Of the West Gray Multi Service Center, I think

6  Hiram Clark, and I'm not -- I'm not remembering we've

7  changed polling places so many times now, I don't

8  remember.

9     **Q.   How about during the 2022 primary election,**

10  **do you recall any polling locations that were**

11  **priorities in your opinion to send poll watchers?**

12     A.   During the 2022 primary election republican

13  poll watchers could only watch in republican polls.  So

14  that was a practice section for the poll watcher

15  candidates for the fall.  And they were simply sent

16  based on convenience to them to get experience with the

17  election process.

18     **Q.   When you're deciding where to assign poll**

19  **watchers, do you consider anything about partisan**

20  **affiliation of voters in that certain area?**

21     A.   No, because Harris County has county wide

22  polling.  So any voter of any party can vote anywhere,

23  our main concern is the judges and their track record.

24     **Q.   Do you consider anything about population**

25  **density in a certain area?  This area, more people live**

1 **here, more people are voting here, we should send a**

2 **poll watcher here, is that part of the consideration?**

3     A.   It is not part of our consideration.  That

4 should be part of the consideration for the county's

5 placement of polls based on voter density, but that's

6 not part of our consideration.

7     **Q.   If you give me one minute I may be done here?**

8     A.   Yes, ma'am.

9     **Q.   Okay.**

10         MS. HOLMES:  I am likewise going to

11 pass the witness, but I will reiterate what Ms. Perales

12 said on the record about holding the deposition open

13 for resolution of disputes over the invocation of

14 legislative purpose and First Amendment Privilege.

15         MR. GORE:  Subject to that statement

16 I'll just reiterate our prior objection.

17         MR. BIRRING:  We don't have any

18 questions today.  We will reserve the questions for

19 trial if you're a witness there.

20         MS. PERALES:  Shall we ask the people

21 on the Zoom call?

22         (Getting situated for Zoom

23 examination.)

24         MR. TAYLOR:  Look a poll watcher.

25         (Laughter.)

1          MS. PERALES:  Does anybody have any

2  questions?  Zoom people, speak now or forever hold your

3  piece or at least until -- unless we reopen?  Anything

4  folk?  No.  Okay.  I don't hear anything from Zoom.

5          MR. GORE:  MR. GORE:  Okay.  I have a

6  few questions for you Mr. Vera, thank you for your

7  patience today.

8          THE WITNESS:  Yes, sir.

9          CROSS-EXAMINATION

10 BY MR. GORE:

11     **Q.   I want to pick up on where Ms. Holmes ended**

12 **and -- and where you deploy poll watchers.  Do you**

13 **consider anything about voter demographics in where you**

14 **would send poll watchers or assign as priority**

15 **locations for poll watchers?**

16     A.   We do not.

17     **Q.   Mr. Vera, do you have to Exhibit 5 handy?**

18     A.   I have it.

19     **Q.   And Mr. Vera, you see that this is an email**

20 **chain that includes emails between you and**

21 **representative Jetton, and then a forward from you to**

22 **members of the Harris County Republican Party; is that**

23 **right?**

24     A.   Correct.

25     **Q.   So I want to focus on this top email here**

1  where there's box that says "redacted for First

2  Amendment Privilege," and that's an email you sent

3  internally to the Harris County Republican Party; is

4  that right?

5      A.   Correct.

6      Q.   So is it fair to say that you sometimes send

7  internal emails regarding your legislative advocacy --

8  activities?

9      A.   Correct.

10     Q.   Do you also send emails regarding -- internal

11 email regarding poll watcher activities?

12     A.   Correct.

13     Q.   Do you also send internal emails regarding

14 election integrity issues?

15     A.   Correct.

16     Q.   When you send those emails, do you expect

17 them to remain confidential within the Harris County

18 Republican Party?

19     A.   I do.

20     Q.   Does that expectation of confidentiality

21 allow you to be full and frank in those internal

22 communications when you have them?

23     A.   It does.

24     Q.   If -- if you believe that those

25 communications might become public, would you be less

1  likely to engage them?

2       A.   I'd be less likely.

3       Q.   Would you be less likely to be full and frank

4  in those conversations if you believed they might

5  become public?

6       A.   I'd be less likely.

7                 MS. PERALES:  I just want to object to

8  the leading nature of the questions?

9                 MR. GORE:  Well, I -- I'm not sure how

10 they're leading, I think they're yes or no questions,

11 aren't they?

12                MS. PERALES:  Yes, but they're also

13 leading.  I don't mean to stop your roll, so if you

14 have more.

15                MR. GORE:  Okay.  Thank you.

16      Q.   (BY MR. GORE) Okay.  I just have one more

17 question.  So Mr. Vera, if you believe that these

18 communications might become public, would that chill

19 your expression in these emails?

20      A.   It would.

21      Q.   And if these emails became public in this

22 litigation or otherwise turned over to plaintiffs,

23 would you be less likely to engage in that full and

24 frank communication in the future?

25      A.   In that format, yes.

Alan Vera - 2/27/2023

1    Q.   And if you were subject to questioning about

2   internal conversations you had about the Harris County

3   Republican Party, would that also make you less likely

4   to engage in those kinds of conversations in the

5   future?

6    A.   It would.

7    Q.   Would that be true for communications that

8   are not reduced to email or writing?

9    A.   Yes.

10    Q.   Thank you, Mr. Vera.

11                    MR. GORE:  I have no further

12   questions.

13                    MS. PERALES:  Before we go off the

14   record I have just one more thing, which is to ask

15   counsel for Mr. Vera or for the defendant interveners

16   if you plan to conduct a search for responsive

17   documents of Mr. Vera's email and his computer, because

18   I believe he's testified that he does have relevant and

19   responsive documents, but hasn't searched and hasn't

20   given over his computer to be searched.  And I'd just

21   like to know if you're -- if you -- if counsel would

22   agree to do that prior to the deadline, or how we

23   should proceed?

24                    MR. GORE:  Well, I -- I can speak only

25   for the intervener defendants and Harris Country

Alan Vera - 2/27/2023

1   Republican party, and I'll Mr. Taylor speak for

2   Mr. Vera.  I think we've been really up front

3   throughout our in discovery correspondence that we only

4   have custody and control over Harris County Republican

5   Party email addresses and documents, those were the

6   email addresses and documents we searched to respond to

7   the discovery requests that were propounded on the

8   Harris County Republican Party, and we have made

9   productions and created a privilege log off of that

10  production and that collection.

11              We didn't receive any objection to

12  that scope of collection or production.  So that's --

13  that's how we've proceeded in the case, and we think

14  that that's a fulsome and -- and complete collection

15  and production consistent with the Harris County

16  Republican Party's obligations under the rules.

17              MS. PERALES:  I believe that Mr. Vera

18  was designated as a custodian though for records for

19  Harris County in this case, and so after having

20  designated him as a custodian, it -- it would be

21  plaintiff's position that it is incumbent then on GOP

22  Defendant Interveners to search what he has, and it

23  appears that it hasn't extended to what he has.

24              It's not even clear Mr. Vera has a

25  Harris County GOP email address since his -- most of

1  his emails were coming from his business address that

2  -- that we have today.  So if we have to kind of leave

3  the dispute where it is, then we'll -- we'll follow up

4  more on that, but I just wanted to know if -- if there

5  was anything more to our positions to -- to present

6  today.

7              MR. GORE:  I'll just put one more

8  thing on the record, we certainly did identify Mr. Vera

9  as a document custodian.  In the same correspondence we

10  said we would look -- search official files of the

11  Committee and the Official committee email addresses.

12  We do have within the files at least some documents

13  related to the Ballot Security Committee and others, so

14  we did search through those, but we've never

15  represented that we would search through Mr. Vera's

16  personal email, and that's outside of the custody and

17  control of the committee.  I just put that on there to

18  complete the record and I think probably wanted to

19  engage on this separately unless Mr. Taylor has

20  something he'd like to add.

21              MR. TAYLOR:  I mean, like I've said

22  before I -- I don't represent a party, I just represent

23  a non-party witness.  Correct me if I'm wrong, but I

24  was not aware and don't believe currently that there's

25  any subpoena that's been issued on Mr. Vera in his

1  individual capacity to produce any documents.  So I

2  have not searched documents that Mr. Vera might have

3  access to individually.

4              Obviously, if there's a subpoena and

5  it's appropriate and, you know, we'll -- we'll comply

6  with our obligations, but you're catching me flat

7  footed because this is the -- the first I've heard

8  about it.

9              MS. PERALES:  Okay.  Thank you.  All

10  right.  We're going to hold the deposition open, but I

11  believe the questioning for today and the conversation

12  for today has concluded.

13              THE REPORTER:  I just need to get on

14  the record, if there's any further stipulations you

15  want to put on the record, which I believe we passed

16  that, maybe, and if there's any copies anybody would

17  like to order?

18              MS. PERALES:  I need to order, and

19  I'll talk with you off the record about the need for

20  expedite and transcript.

21              THE REPORTER:  Okay.

22              MS. HOLMES:  I'd also like a rough.

23              THE REPORTER:  Okay.  With that we're

24  going off the record at 3:37 p.m.

25              (Proceedings concluded.)

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                     SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO ENTERO,    )
    et al.,                        )
4                                  )
          Plaintiffs,              )  Civil Action
5                                  )  No. SA-21-CV-00844-XR
    vs.                            )
6                                  )
    GREGORY W. ABBOTT, et al.,     )
7                                  )
          Defendants.              )
8                                  )
```

9                    REPORTER'S CERTIFICATE
                  DEPOSITION OF ALAN VERA
10                   FEBRUARY 27, 2023

11          I, Nilda Codina, Notary in and for the State

12   of Texas, hereby certify to the following:

13          That the witness, ALAN VERA, was duly sworn

14   by the officer and that the transcript of the oral

15   deposition is a true record of the testimony given by

16   the witness;

17          I further certify that pursuant to FRCP Rule

18   30(f)(1) that the signature of the deponent:

19          _____ was requested by the deponent or a

20   party before the completion of the deposition and

21   returned within 30 days from date of receipt of the

22   transcript.  If returned, the attached Changes and

23   Signature Page contains any changes and the reasons

24   therefor;

25          __X___ was not requested by the deponent or a

1  party before the completion of the deposition.

2         I further certify that I am neither attorney

3  nor counsel for, related to, nor employed by any of the

4  parties to the action in which this testimony was

5  taken.

6         Further, I am not a relative or employee of

7  any attorney of record in this cause, nor do I have a

8  financial interest in the action.

9         Subscribed and sworn to on this the 8th day

10  of March, 2023.

11                          _____

12                          NILDA CODINA
                            Notary Public in and
                             For the State of Texas
13                          My Commission No. 12878135-3
                            Expires:  10/24/2023

14
                            INTEGRITY LEGAL SUPPORT
15                          Firm Registration No. 528
                            9901 Brodie Lane
16                          Suite 160-400
                            Austin, TX 78748
17                          Phone:(512)320-8690

18

19

20

21

22

23

24

25



# APPENDIX C

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | |
| | § | |
| STATE OF TEXAS, *et al.*, | § | Case No. 5:21-cv-00844-XR |
| | § | [Lead Case] |
| *Defendants.* | § | |
| | § | |
| HARRIS COUNTY REPUBLICAN PARTY, *et al.*, | § | |
| | § | |
| | § | |
| *Intervenor-Defendants.* | | |

## LUPE PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TO COMPEL TESTIMONY OF DEFENDANT INTERVENOR HARRIS COUNTY REPUBLICAN PARTY

Plaintiffs La Union del Pueblo Entero, *et al.* ("Plaintiffs")[1] file this motion to compel and request that the Court order Defendant Intervenor Harris County Republican Party to (1) respond to Plaintiffs' Requests for Production of Documents 1 and 3 and (2) provide deposition testimony related to the Party's communications regarding Senate Bill 1 ("SB1") with Texas legislators, legislative staff and certain executive branch agencies. Plaintiffs' counsel hereby certify that they have conferred in a good faith attempt to resolve the matter by agreement and have been unable to secure compliance by Defendant Intervenor.

## I.    INTRODUCTION

This case involves a challenge by Plaintiff organizations and voters to SB1, a 2021 law that

---

[1] Plaintiffs are La Union del Pueblo Entero, Friendship-West Baptist Church, Southwest Voter Registration Education Project, Texas Impact, Mexican American Bar Association of Texas, Anti-Defamation League Austin, Southwest, and Texoma, Texas Hispanics Organized for Political Education, Jolt Action, William C. Velasquez Institute, FIEL Houston Inc., and James Lewin.

makes significant changes to how Texas voters cast ballots in elections. Defendant Intervenor Harris County Republican Party, as well as other local and national Republican Party entities, intervened on May 13, 2022.[2]

Although Defendant Intervenor promised the Court in November 2022 that it would produce documents reflecting its communications about SB1 with Texas legislators and certain executive branch agencies, Defendant Intervenor did not conduct a search for responsive documents in the custody of Mr. Alan Vera, the Chair of the Harris County Republican Party Ballot Security Committee and the person who conducted most of Defendant Intervenor's lobbying activities on SB1. Earlier this week, Mr. Vera testified in deposition that although he exchanged emails and gave documents to Texas legislators and executive branch officials related to SB1, he was never asked to search for or turn over emails or other documents in this case.

Furthermore, in his deposition, Mr. Vera followed the instructions of counsel for State Defendants not to answer questions regarding certain communications with Texas legislators and legislative staff on the grounds of legislative immunity.

Plaintiffs asked Defendant Intervenor on January 12, 2023 to search for responsive documents beyond those contained in Harris County Republican Party email accounts. On February 27, following Mr. Vera's testimony that he used his personal email account to communicate with legislators and executive branch staff, Plaintiffs asked Defendant Intervenor to conduct a search for responsive documents in Mr. Vera's email and his computer. Defendant Intervenor maintained that it only has custody or control over Harris County Republican Party

---

[2] Text Order of 5/13/2022.

email addresses and documents.

Defendant Intervenor also maintained that the legislative privilege objections are appropriate.  This motion follows.

## II.    BACKGROUND

Private Plaintiffs served Defendant Intervenors with their First Set of Requests for Production on July 7, 2022.  On October 24, 2022, following several meet and confer exchanges, Plaintiffs filed an Opposed Motion to Compel Production of Documents.[3]  In the November 14, 2022 hearing on that discovery motion, Defendant Intervenors advised the Court that they would produce all documents responsive to Plaintiffs' requests for production ("RFPs") 1[4] and 3[5] without objection and without any assertion of privileges, by December 1, 2022.[6]

 In their December 1, 2022 production in response to RFPs 1 and  3, Defendant Intervenors produced 61 documents, only seven of which were responsive to RFP 1.   Ex. K.   Many of the remaining documents, which purported to be responsive to RFPs 1 and 3, were simply notices sent by the Texas Secretary of State to local election officials, as opposed to direct communication with executive branch agencies or officials.

---

[3] *See* ECF 469.

[4] REQUEST FOR PRODUCTION NO. 1. All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Texas Legislature regarding SB 1, SB 7, HB 3, or HB 6.

[5] REQUEST FOR PRODUCTION NO. 3. All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Office of the Texas Governor, the Office of the Texas Attorney General, the Office of the Texas Lieutenant Governor, or the Office of the Texas Secretary of State regarding SB 1, SB 7, HB 3, or HB 6.

[6] *See* ECF 490 at 5; Hr'g Tr. at 13:17–22, 35:3–4.

On January 12, 2023, Plaintiffs sent a deficiency letter to Defendant Intervenors.  Ex. H. In that letter, Plaintiffs requested that Defendant Intervenors include in their search individuals associated with Defendant Intervenors whose email accounts may contain documents "sent to or exchanged with the Texas Legislature [and several other state agencies] regarding SB 1, SB 7, HB 3, or HB 6"  and expand their search beyond official committee email addresses if necessary to include "[a]ll documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Texas Legislature [and several other state agencies] regarding SB 1, SB 7, HB 3, or HB 6." *Id.* at 2.

On February 23, 2023 and February 24, 2023, according to the agreement of the parties, Plaintiffs served Defendant Intervenors with notices to depose:  (1) Mr. Alan Vera, a named document custodian of Defendant Intervenor and Chairman of the Harris County Republican Party Ballot Security Committee, pursuant to Fed. R. C. P. 30(b)(1); (2) the Harris County Republican Party pursuant to Fed. R. C. P. 30(b)(6); and (3) Ms. Cindy Siegel, Harris County Republican Party Chairman, pursuant to Fed. R. C. P. 30(b)(1).  Exs. B, C, D, E and J.

On February 27, 2023, Defendant Intervenor Harris County Republican Party produced Mr. Alan Vera for deposition.  Mr. Vera testified that in his role as the Chairman of the Harris County Republican Party Ballot Security Committee, he communicated extensively with legislators and legislative staff regarding SB1, beginning in June of 2020 and through final passage of SB1 by the Texas Legislature in September 2021.  Ex. L. at 19:22-20:10, 25:3-21, 27:20-29:20; 71:15-72:6.  Mr. Vera testified that he met in person with legislators and legislative staff, gave them "exhibits" to his public testimony, and also communicated with them by email and phone calls.   Ex. L. at 70:7-19; 77:4-13; 76:11-17; 91:5-92:18; 94:14-95:1.

Mr. Vera testified that he both initiated communications with legislators about SB1 and responded to legislator requests for information about SB1. Ex. L. at 76:21-77:3. When he responded to inquiries from legislators, he gave them factual information and told them from his perspective that either certain holes needed to be plugged in the statute or certain issues needed to be addressed by the statute. Ex. L. at 78:9-16; 91:5-92:18; 108:24-109:23. Mr. Vera further testified that on at least one occasion, he provided legislators with proposed bill language that was included in the enacted SB1. Ex. L. at 30:3-14. Mr. Vera testified that he usually responded to legislator inquiries by email or phone. Ex. L. at 95:2-96:1.

During the two special legislative sessions immediately preceding SB1's passage, Mr. Vera provided feedback on SB1 to legislators once or twice a week. Ex. L. at 107:12-20. Mr. Vera testified that he provided feedback on SB1 to Texas Senator Paul Bettencourt, State Representative Jacey Jetton, State Representative Valoree Swanson and State Representative Briscoe Cain. Ex. L. at 107:21-108:8; 108:24-109:23. Senator Bettencourt served on the Senate State Affairs Committee and the SB1 conference committee in the Second Special Session[7], Representative Cain was the Chair of the House Elections Committee in 2021[8], and Representatives Swanson[9] and Jetton[10] served on the House Elections Committee in 2021.

Mr. Vera testified that he communicated with legislators about including language in SB1 related to mail ballot "harvesting," free movement of poll watchers, penalties for poll workers who

---

[7] https://capitol.texas.gov/Members/MemberInfo.aspx?Leg=87&Chamber=S&Code=A1055

[8] https://capitol.texas.gov/Members/MemberInfo.aspx?Leg=87&Chamber=H&Code=A3265

[9] https://capitol.texas.gov/Members/MemberInfo.aspx?Leg=87&Chamber=H&Code=A3425

[10] https://capitol.texas.gov/Members/MemberInfo.aspx?Leg=87&Chamber=H&Code=A3980

obstruct poll watchers, perceived problems with drive-thru voting, and voters registered at illegal addresses--provisions of SB1 challenged by Plaintiffs in this case. Ex. L. at 78:23-80:9; 81:19-82:2; 82:25-83:8; 83:13-20; 84:2-19; 105:8-106:3; 110:7-13. Mr. Vera further testified that in his opinion, SB1's language on poll watcher interference, drive-thru voting and mail ballot "harvesting" tracked closely to his communications with legislators. Ex. L. at 132:11-133:6.

Mr. Vera used his personal email address to send communications to, and receive communications from, legislators and their staff regarding SB1, including sending proposed bill language. Ex. L. at 30:3-14; 30:15-22; 131:20-25. Also, when testifying in the Legislature on SB1, Mr. Vera would write out what he would say and retain those notes after testifying. Ex. L. at 31:3-32:3. Mr. Vera also used his personal email address to communicate with executive branch agencies about SB1. Ex. L. at 116:25-118:15; 119:10-18.

Despite the fact that Mr. Vera was deeply involved in lobbying on SB1 on behalf of the Harris County Republican Party, Mr. Vera testified that he did not search for emails in which he was providing feedback to legislators or initiating conversations with legislators relevant to SB1. Ex. L. at 122:17-123:3. Mr. Vera further testified that he did not turn over his computer to anybody to have them search his emails as part of his involvement in the case, although his emails would be there if Microsoft Outlook saved emails that are older than one year. Ex. L. at 123:9-18.

Without documents from Mr. Vera's files, Plaintiffs were unable to question Mr. Vera adequately about his communications with legislators and legislator staff. The similar lack of document production related to Mr. Vera's communications with various executive branch agencies made it impossible for Plaintiffs to obtain information regarding Defendant Intervenor's communications with those agencies. For example, Mr. Vera testified that he "clearly

remember[ed] not communicating with anyone in the SOS office about SB1 during the regular session or the two special sessions" until counsel showed him an email from the Party Chairman's account and then he recalled that he communicated with staff in the office of the Secretary of State regarding poll watcher training and SB1.  Ex. L. at 116:25-118:15; 119:10-18.

Mr. Vera further refused to answer specific questions about his responses to legislator inquiries for feedback on SB1 because counsel for State Defendants objected and instructed him not to answer on the grounds of legislative privilege.  Ex. L. at 72:20-75:5. Based on those instructions from counsel for State Defendants, Mr. Vera refused to answer questions such as what feedback he provided to legislators related to SB1's provisions on poll watchers, vote "harvesting," and drive-thru voting, and the requirement that voters provide identification numbers on their applications for ballot by mail and their mail ballots.  Ex. L. at 111:16-113:4

Counsel for State Defendants stated that they asserted legislative privilege as to Defendant Intervenor's "communications to the legislators or legislative staff in response to a legislative inquiry" Ex. L. at 74:14-75:5.  Mr. Vera testified that it was difficult to separate responsive communications from communications he initiated with legislators or legislative staff because "the interaction and the dynamics of the exchanges and discussions, those things overlap continually." Ex. L. at 75:6-76:10.  Mr. Vera further testified that when he communicated with legislators and their staff about SB1, it was frequently a combination of him offering information on his own initiative, receiving inquiries from legislators and their staff, and responding to the inquiries from legislators and their staff.  Ex. L. at 76:21-77:3.

In addition to following the instructions of counsel for State Defendants not to answer certain questions because of legislative privilege, Mr. Vera censored his answers to other questions

calling for communications with legislators regarding SB1, even when counsel for State Defendants did not object. Ex. L. at 28:25-29:12; 87:6-9 ("Q. Okay. So what were you advocating for with protect [sic] to the vote harvesting? A. Okay. So we got to be careful about stepping on the objections, okay?"); 88:2-12. Mr. Vera also omitted from his answers information related to his responding to legislator inquiries, and then admitted to these communications when asked directly. Ex. L. at 106:13-107:11.

At the end of Mr. Vera's questioning, counsel for Plaintiffs stated that they would hold open the deposition in order to resolve the issues that had arisen with respect to assertion of the legislative privilege. Ex. L. at 139:22. Counsel for Defendant Intervenor responded that "We think all the privilege assertions have been appropriate." *Id.* Counsel for Plaintiffs also requested that Defendant Intervenor agree to conduct a search for responsive documents in Mr. Vera's email and his computer because he had been designated by Defendant Intervenor as a document custodian, had testified that he had relevant and responsive documents, and testified that he had not searched and had not given over his computer to be searched. Ex. L. at 159:2-161:23. Counsel for Defendant Intervenor responded that although they had designated Mr. Vera as a document custodian, "we only have custody and control over Harris county republican party email addresses and document[s.]" *Id.*

On February 28, 2023, Ms. Cynthia Siegel testified on behalf of the Harris County Republican Party. Ms. Siegel confirmed that Mr. Vera represented the Harris County Republican Party in communicating with the Texas Legislature with respect to SB1 and its predecessor bills. Ex. M (Forthcoming Excerpts of Transcript of Cindy Siegel (February 28, 2023) Rough Transcript.) Ms. Siegel also testified that Mr. Vera conducted Harris County Republican Party

business through his personal email account because Mr. Vera did not have a Harris County Republican Party email address. *Id.*

## I.    LEGAL STANDARD

### A.   Motion to Compel

"A party seeking discovery may move for an order compelling an answer, designation, production, or inspection" if the other party "fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv). Rule 34 permits parties to serve upon each other "a request within the scope of Rule 26(b)" to produce certain items "in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1). "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

Rule 26 requires a party that asserts a privilege to "describe the nature of the documents, communications, or tangible things not produced or disclosed—and to do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii). "It is well settled that the party asserting the privilege has the burden of establishing its applicability." *Perez v. Perry*, No. SA-11-CV-360-OLG-JES-XR, 2014 WL 3495414, at *2 (W.D. Tex. July 11, 2014) (citing *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985)). Conclusory assertions are "insufficient to carry out the proponent's burden of establishing" privilege. *E.E.O.C. v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017).

Under the Federal Rules of Civil Procedure, "[a] party seeking discovery may move for an order compelling an answer . . . if a deponent fails to answer a question." Fed. R. Civ. P.

37(a)(3)(B)(i).  Where counsel instructs a deponent not to answer a question on privilege grounds, the Court may "more accurately assess the privilege dispute on an appropriate [later] motion." *League of United Latin Am. Citizens v. Abbott*, 3:21-cv-00259-DCG-JES-JVB, 2022 WL 3656395, at \*3 (W.D. Tex. Aug. 23, 2022).  Of note, "[i]n a deposition, whether a query implicates privileged communications depends on the question being asked." *Id.* at \*2 (internal quotation omitted).

When a motion to compel "is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  Fed. R. Civ. P. 37(a)(5)(A).

### B. Legislative Privilege

"Legislative privilege is an evidentiary privilege, 'governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence.'" *La Union Del Pueblo Entero v. Abbott ("LUPE I")*, No. SA-21-CV-00844-XR, 2022 WL 1667687, at \*2 (W.D. Tex. May 25, 2022), *appeal docketed sub nom. LULAC v. Hughes*, No. 22-50435 (5th Cir. May 27, 2022) (quoting *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 624 (5th Cir. 2017)).  "The privilege 'is, at best, one which is qualified.'" *League of United Latin Am. Citizens v. Guillen*, No. 22-50407, 2022 WL 2713263, at \*1 (5th Cir. May 20, 2022) (quoting *Jefferson Cmty.*, 849 F.3d at 624).   To that end, "[t]he privilege 'must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *LUPE I*, 2022 WL 1667687, at \*2 (quoting *Jefferson*

*Cmty.*, 849 F.3d at 624); *see also League of United Latin Am. Citizens v. Abbott (LULAC I)*, No. 3:21-cv-00259-DCG-JES-JVB, 2022 WL 1570858, at *1 (W.D. Tex. May 18, 2022).

## II. ARGUMENT

### A. Defendant Intervenor has control of documents related to Mr. Vera's communications with Texas legislators and legislative staff, and executive branch agencies, and must produce any responsive documents from Mr. Vera's email account and computer.

Mr. Vera was Defendant Intervenor Harris County Republican Party's primary agent for purposes of communicating with the Legislature regarding SB1. He used his personal computer and personal email address to conduct business for the Harris County Republican Party. Defendant Intervenor does not dispute that Mr. Vera's communications with the Legislature regarding SB1 are relevant and responsive to Plaintiffs' discovery requests. Yet it argues that it is under no obligation to produce relevant documents from Mr. Vera's personal computer and personal email address because it claims that those documents are not within its possession, custody, or control. On the contrary, case law from this Circuit makes clear that those documents and communications made on behalf of Defendant Intervenor are plainly within its possession, custody, and control.

Courts in this Circuit have emphasized that "[p]ossession, custody, or control are broad terms." *League of United Latin Am. Citizens v. Abbott ("LULAC II")*, No. 3:21-cv-00259-DCG-JES-JVB, 2022 WL 3233406, at *7 (W.D. Tex. Aug. 10, 2022). Indeed, those terms "include more than actual possession or control of the materials; the terms also contemplate a party's legal right or *practical ability to obtain* the materials from a nonparty to the action." *Id.* (cleaned up); *see also Perez v. Perry*, No. SA-11-CV-360-OLG-JES, 2014 WL 1796661, at *1 (W.D. Tex. May 6, 2014). As such "a party can 'control' documents that are within the possession or custody of a non-party," and "[d]ocuments are considered to be within a party's control when that party has the

right, authority, or practical ability to obtain the documents from a nonparty." *Perez*, 2014 WL 1796661, at *1 (quoting Fed. R. Civ. P. 34(a)(1)(A)).

Because Mr. Vera used his personal computer and personal email address to conduct official business of the Harris County Republican Party, documents in both are under the "control" of Defendant Intervenor. *Ultravision Technologies, LLC v. Govision*, *LLC* is instructive. No. 2:18-cv-00100-JRG-RSP, 2020 WL 10692709 (E.D. Tex. Aug. 28, 2020). In that case, the requesting party sought documents from individuals identified as custodians and who had conducted business for the responding party on their personal email accounts. *Id.* at *2. Despite the responding party's objections, the court in *Ultravision* concluded that the personal email accounts of those individuals were "under [the responding party's] control" and compelled production from those email accounts. *Id.*

As in *Ultravision*, the challenged documents here are under the control of Defendant Intervenor. Mr. Vera is the Chairman of the Harris County Republican Party Ballot Security Committee. Ex. L. at 14:2-7. In that role, his duties include advocating on election legislation in the Texas Legislature, including providing members of the Legislature with the Party's priority items, proposing bill language, and testifying in Senate and House committees in support of election legislation. Ex. L. at 19:22-20:10, 25:3-21, 27:20-29:20. Mr. Vera and the designated representative of the Harris County Republican Party both testified that Mr. Vera conducted Harris County Republican Party business through his personal email account and his personal computer. Ex. L. at 30:3-14; 30:15-22; 131:20-25 (Vera) and Ex. <u>M</u> (Forthcoming Excerpts of Transcript of Cindy Siegel (February 28, 2023) Rough Transcript.). Defendant Intervenor also identified Mr. Vera as a document custodian for the Harris County Republican Party. Ex. F.

Thus, Defendant Intervenor plainly has "the right, authority, or practical ability to obtain the documents from" Mr. Vera—but failed to search for or produce any such document. *See Perez*, 2014 WL 1796661, at *1; *see also LULAC II*, 2022 WL 3233406, at *7. Accordingly, any responsive documents in Mr. Vera's personal email address and on his personal computer are under the "control" of Defendant Intervenor—and must be produced. *Ultravision*, 2020 WL 10692709, at *2.

### B. Defendant Intervenor, Mr. Vera, and State Defendants Improperly Invoke the Legislative Privilege.

#### 1. Neither Defendant Intervenor, Mr. Vera, nor State Defendants Can Assert the Legislative Privilege.

As an initial matter, Defendant Intervenor and Mr. Vera cannot assert the legislative privilege because they are not *legislators*.

Courts in this Circuit—including this Court—have consistently held that the legislative "privilege is personal, and it may be waived or asserted" only "by the individual legislator." *La Union Del Pueblo Entero v. Abbott ("LUPE I")*, No. SA-21-CV-00844-XR, 2022 WL 1667687, at *2 (W.D. Tex. May 25, 2022), *appeal docketed sub nom. LULAC v. Hughes*, No. 22-50435 (5th Cir. May 27, 2022); *see also Perez v. Perry*, No. SA-11-cv-360, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014); *LULAC II*, 2022 WL 3233406, at *1; *Gilby v. Hughes*, 471 F. Supp. 3d 763, 768 (W.D. Tex. 2020); *TitleMax of Tex., Inc. v. City of Dallas*, No. 3:21-cv-1040, 2022 WL326566, at *6 (N.D. Tex. Feb. 3, 2022). Neither Mr. Vera nor Defendant Intervenor is a state legislator. Accordingly, they may not assert the legislative privilege here over the challenged testimony.

And because State Defendants are also not legislators, the legislative privilege may not be invoked by, or on behalf of, State Defendants. During Mr. Vera's deposition, counsel for State

Defendants—from the Office of the Attorney General—invoked the legislative privilege to object to several of Plaintiffs' questions, (Ex. L. at 72:20-75:5; 74:14-75:5) and even instructed Mr. Vera to invoke the privilege and refuse to testify (Ex. L. at 111:16-113:4). Following State Defendants' instructions, Mr. Vera declined to answer based on the legislative privilege. *Id.*

As already discussed, neither Defendant Intervenor nor Mr. Vera could invoke the legislative privilege. And as other courts in this Circuit have uniformly held, "neither the Governor, nor the Secretary of State or the State of Texas has standing to assert the legislative privilege on behalf of any legislator or staff member." *Perez*, 2014 WL 106927, at *1; *see also LULAC II*, 2022 WL 3233406, at *1; *Gilby*, 471 F. Supp. 3d at 768; *TitleMax*, 2022 WL 326566, at *6. Counsel from the Office of the Attorney General made clear during the deposition that he represented only State Defendants, (Ex. L. at 2:15-17) and thus could "not invoke the privilege on behalf of [a] legislator, legislative aide, or staff member," *LUPE I*, 2022 WL 1667687, at *2 (quoting *Gilby*, 471 F. Supp. 2d at 767). Accordingly, State Defendants' assertions of the legislative privilege—as well as any assertion by Defendant Intervenor or Mr. Vera on behalf of State Defendants (or anyone else)—were improper, and Defendant Intervenor should be compelled to provide the deposition testimony regarding any communications between Mr. Vera and legislators or legislative staff.[11]

> ### 2. Legislators Waived the Legislative Privilege for any Communication with Defendant Intervenor.

Even if Defendant Intervenor, Mr. Vera, or State Defendants could invoke the legislative privilege on behalf of a legislator or legislative staff, the privilege has been waived as to any communications with Mr. Vera. As the Court previously emphasized, "the legislative privilege

---

[11] For the same reasons, State Defendants lack standing to assert the legislative privilege over any documents in Mr. Vera's computer or from Mr. Vera's personal email address.

[is] waived when [] State Legislators communicate[] with parties outside the legislature, such as party leaders and lobbyists." *LUPE I*, 2022 WL 1667687, at *2; *see also Perez*, 2014 WL 106927, at *2 ("To the extent that legislators or legislative staff communicated with any outsider (*e.g.* party representatives, non-legislators, or non-legislative staff), any privilege is waived as to the contents of those specific communications."); *LULAC II*, 2022 WL 3233406, at *1 n.3; *Gilby*, 471 F. Supp. 3d at 767; *Favors v. Cuomo*, 285 F.R.D. 187, 212 (S.D.N.Y. 2012) (noting that "communications with 'knowledgeable outsiders' . . . fall outside the privilege"). That is so even where communications with third parties are purportedly "made as part of the legislative process of gathering facts for and considering . . . legislation." *See LUPE I*, 2022 WL 1667687, at *3.[12] So, for example, "lobbying communications between the Defendant Intervenors and members of the Texas legislature" "must be produced." *La Union Del Pueblo Entero v. Abbott (LUPE II)*, No. SA-21-CV-00844-XR, 2022 WL 17574079, at *7 (W.D. Tex. Dec. 9, 2022).

Because Mr. Vera is a third party to the Texas Legislature, legislators with whom he communicated have waived the legislative privilege as to any information about which Mr. Vera may testify. Similarly, any documents in the possession, custody, or control of Defendant Intervenor—including those in Mr. Vera's personal computer and email account—necessarily have been shared with outsiders of the Legislature. Accordingly, Mr. Vera's testimony should be compelled, as should the production of any documents in the possession, custody, or control of Defendant Intervenor over which the legislative privilege is asserted.

---

[12] During Mr. Vera's deposition, counsel for State Defendants invoked the legislative privilege specifically over the "content of any communications that [Mr. Vera] made in response to an inquiry from a legislator of legislative staff," Ex. L. at 74:14-75:5, and instructed Mr. Vera not to testify as to any such information. Ex. L. at 111:16-113:4. Mr. Vera in turn declined to answer some of Plaintiffs' questions based on those instructions. *Id.* The Court has already rejected that overly broad view of the legislative privilege—an understanding based on inapposite case law regarding legislative *immunity*, not the legislative *privilege*— and the Court should do the same here. *LUPE I*, 2022 WL 1667687, at *3; *LULAC I*, 2022 WL 1570858, at *1.

### 3. Defendant Intervenor, Mr. Vera, and State Defendants Cannot Assert the Legislative Privilege over Fact-based Information.

Mr. Vera improperly declined to testify about fact-based information not subject to the legislative privilege. The Court has previously emphasized that the legislative privilege "does not apply . . . to 'documents containing factually based information used in the decision-making process or disseminated to legislators or committees, such as committee reports and minutes of meetings,' or 'the materials and information available [to lawmakers] at the time a decision was made.'" *LUPE I*, 2022 WL 1667687, at *2 (quoting *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *9 (N.D. Ill. Oct. 11, 2011)); *see also League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-00259-DCG-JES-JVB, 2022 WL 2921793, at *2 (W.D. Tex. July 25, 2022), *appeal docketed sub nom. LULAC v. Patrick*, No. 22-50435 (5th Cir. July 26, 2022).

Plaintiffs sought testimony from Mr. Vera regarding communications in which he provided information to legislators or legislative staff at those individuals' request, Ex. L at 78:9-16. Based on the legislative privilege, State Defendants objected to—and at times Mr. Vera declined to answer—Plaintiffs' questions seeking such testimony. Ex. L. at 72:20-75:5; 74:14-75:5; 111:16-113:4. However, that testimony constitutes merely "materials and information available [to lawmakers] at the time a decision was made," and is therefore distinct from documents or testimony that could fall within the scope of the privilege—that is, it is not evidence "that contains or involves opinions, motives, recommendations or advice about legislative decisions." *LUPE I*, 2022 WL 1667687, at *2 (quotation omitted). Likewise, documents on Mr. Vera's personal computer and in his personal email account contain fact-based information not subject to the privilege. Accordingly, that evidence must be disclosed.

### 4. Even if Applicable, the Legislative Privilege Should Yield.

Even if applicable, the legislative privilege should yield to the need for discovery here. To determine whether the privilege should yield, courts in this Circuit and elsewhere have consistently considered the following five factors: "(1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *See Perez*, 2014 WL 106927, at *2; *see also LUPE I*, 2022 WL 1667687, at *6. Further, as the Court previously emphasized, the legislative "privilege 'must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'" *LUPE I*, 2022 WL 1667687, at *2 (quoting *Jefferson Cmty.*, 849 F.3d at 624); *LULAC I*, 2022 WL 1570858, at *1; *Perez*, 2014 WL 106927, at *2.

All five factors weigh in favor of disclosure. First, the evidence sought is both relevant and vital to Plaintiffs' claims under the Voting Rights Act and the U.S. Constitution, as "[t]he evidence that [Plaintiffs] seek to compel is highly relevant in proving" those claims, as communications between Mr. Vera and legislators may "reflect the [legislators'] contemporaneous thoughts and motivations in drafting and enacting S.B. 1." *LUPE I*, 2022 WL 1667687, at *6. The second factor—the availability of other evidence—also weighs in favor of disclosure. Of note, this factor "weighs in favor of disclosure 'given the practical reality that officials "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."'" *LUPE I*, 2022 WL 1667687, at *6 (quoting *Veasey*, 2014 WL 1340077, at *3). Plaintiffs have alleged that the Legislature enacted SB1 with an intent

to discriminate against racial minorities and that those plans had a discriminatory effect, and Plaintiffs are therefore entitled to examine the most probative evidence regarding that legislation.

The third and fourth factors—the seriousness of the litigation and issues involved, and the role of the government in the litigation—also weigh in favor of disclosure. Plaintiffs "raise serious questions whether S.B. 1 complies with the Voting Rights Act and the First and Fourteenth Amendments." *LUPE I*, 2022 WL 1667687, at *6; *see also Harding v. Cnty. of Dallas*, No. 3:15-CV-1031-D, 2016 WL 7426127, at *6 (N.D. Tex. Dec. 23, 2016); *Veasey v. Perry*, No. 2:13-CV-193, 2014 WL 1340077, at *2 (S.D. Tex. Apr. 3, 2014) ("[T]he importance of eliminating racial discrimination in voting—the bedrock of this country's democratic system of government—cannot be overstated."). "As [Plaintiffs] have alleged that the Texas legislature intentionally discriminated against minority voters, the decisionmaking process . . . *is* the case[.]" *LUPE I*, 2022 WL 1667687, at *6 (quotation omitted).

Finally, there is no possible chilling effect on governmental employees. Texas legislators and executive officials have participated in the discovery process—including through document production, depositions, and trial appearances—associated with litigation challenging discriminatory voting laws in Texas. *See, e.g., Perez* 2014 WL 106927, at *1; *Texas v. Holder*, 888 F. Supp. 2d 113, 120-21 (D.D.C. 2012). And yet, even after courts have previously concluded that the legislative privilege should yield, no chilling effect has occurred. *See Veasey v. Perry*, No. 2:13-CV-193, 2014 WL 1340077, at *3 (S.D. Tex. Apr. 3, 2014). In any event, even if this factor weighed against disclosure, courts have repeatedly found—particularly in the voting rights context—"that the need for accurate fact finding outweighs any chill to the legislature's deliberations." *LUPE I*, 2022 WL 1667687, at *7; *see also Veasey*, 2014 WL 1340077, at *3; *Baldus v. Brennan*, No. 11-CV-562, 11-CV-1011, 2011 WL 6122542, at *2 (E.D. Wis. Dec. 8,

2011) (concluding that the potential "chilling effect" on the state legislature "is outweighed by the highly relevant and potentially unique nature of the evidence").

Accordingly, the *Perez* factors strongly weigh in favor of disclosure of testimony and production of documents Plaintiffs seek to compel.

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the instant motion, direct Defendant Intervenor to conduct a search for and produce all relevant documents in response to Plaintiffs' Requests for Production 1 and 3, including documents in Mr. Vera's personal email address and personal computer, and compel Defendant Intervenor to provide deposition testimony in response to Plaintiffs' questions regarding Defendant Intervenor's communications with legislators and legislative staff.


Dated: March 3, 2023

Respectfully submitted,


/s/ Nina Perales

Nina Perales (TX Bar No. 24005046)
Julia R. Longoria (TX Bar No. 24070166)
Fatima L. Menendez (TX Bar No. 24090260)
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Telephone: (210) 224-5476
Facsimile: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
Kevin Zhen*

/s/ Sean Morales-Doyle

Sean Morales-Doyle (NY Bar No. 5646641)
Patrick A. Berry (NY Bar No. 5723135)
Jasleen K. Singh (CA. Bar No. 316596)
Eliza Sweren-Becker (NY Bar No. 5424403)
Andrew B. Garber (NY Bar No. 5684147)
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Telephone: (646) 292-8310
Facsimile: (212) 463-7308
sean.morales-doyle@nyu.edu
patrick.berry@nyu.edu
jasleen.singh@nyu.edu
eliza.sweren-becker@nyu.edu
andrew.garber@nyu.edu

Paul R. Genender (TX Bar No. 00790758)

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza

New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

*Attorneys for Plaintiffs*
**LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER
REGISTRATION EDUCATION
PROJECT, MEXICAN AMERICAN
BAR ASSOCIATION OF TEXAS,
TEXAS HISPANICS ORGANIZED FOR
POLITICAL EDUCATION, JOLT
ACTION, WILLIAM C. VELASQUEZ
INSTITUTE, FIEL HOUSTON INC**

*Admitted pro hac vice*

Elizabeth Y. Ryan (TX Bar No. 24067758)
Matthew Berde (TX Bar No. 24094379)
Megan Cloud (TX Bar No. 24116207_
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
paul.genender@weil.com
liz.ryan@weil.com
matt.berde@weil.com
megan.cloud@weil.com

**COUNSEL FOR
FRIENDSHIP-WEST BAPTIST
CHURCH, ANTI-DEFAMATION
LEAGUE AUSTIN, SOUTHWEST, AND
TEXOMA, TEXAS IMPACT, JAMES
LEWIN**

*Admitted pro hac vice*

## CERTIFICATE OF CONFERENCE

I hereby certify that, on January 12, 2023 and February 27, 2023, counsel for LUPE Plaintiffs conferred with counsel for Harris County Republican Party Defendant Intervenor concerning the relief requested in the instant motion. As described in the body of this motion, Harris County Republican Party Defendant Intervenor did not agree to produce the requested testimony and documents. I hereby further certify that, on March 3, 2023, counsel for LUPE Plaintiffs conferred with counsel for all parties concerning the subject of the instant motion. Counsel for State Defendants and Defendant Intervenor stated that they oppose the motion. Counsel for the United States stated that they took no position on the motion.

/s/ Nina Perales
Nina Perales

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 3rd day of March 2023.

/s/ Nina Perales
Nina Perales



# APPENDIX D

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | Case No. 5:21-cv-844-XR |
| v. | § | [Consolidated Cases] |
| | § | |
| GREGORY W. ABBOTT, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

### STATE DEFENDANTS' RESPONSE TO LUPE PLAINTIFFS' MOTION TO COMPEL

Plaintiffs' Motion to Compel seeks privileged information and imposes burdens that are disproportionate to the needs of the case. Despite deposing three members of the Texas Legislature, receiving thousands of pages of documents from individual legislators, and obtaining over 100,000 documents from State Defendants, Plaintiffs seek to impose more costs, burdens, and inefficiencies by compelling agents of individual legislators to release privileged information. This, despite a pending appeal involving the very same legal issue. Deciding legislative privilege absent further guidance from the Fifth Circuit is premature, and Mr. Vera should not be compelled to discuss information that is protected by a privilege that he cannot waive. Plaintiffs' motion should thus be denied.

### BACKGROUND

Throughout the discovery in this case, individual legislators and State Defendants have diligently invoked legislative privilege. On May 3, 2022, Plaintiffs filed a motion to compel the production of nearly 300 privileged documents on multiple grounds. *See* ECF 391. This Court determined that the legislative privilege did not apply and granted Plaintiffs' initial motion, *see* ECF 425, which State Defendants then appealed. *See* Appellants' Brief, *LULAC v. Hughes*, No. 22-50435 (5th Cir. May 26, 2022). The parties and the Court still await guidance from the Fifth Circuit.

1

## ARGUMENT

I.    **Legislative Privilege Protects the Information Plaintiffs Seek.**

For centuries, the legislative privilege has "protect[ed] 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts'" and "preclude[d] any showing of how [a legislator] acted, voted, or decided." *United States v. Helstoski*, 442 U.S. 477, 489 (1979). In addition, "[t]he privilege protects the legislative process itself, and therefore covers . . . legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015). This legislative process not only includes "words spoken in debate," but also "[c]ommittee reports, resolutions, and the act of voting," as well as the "things generally done" during a Legislature's session "by one of its members in relation to the business before it." *Gravel v. United States*, 408 U.S. 606, 617 (1972). This privilege necessarily includes "[m]eeting[s] with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation . . . [and] assist legislators in the discharge of their legislative duty." *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007).

Here, the information Plaintiffs seek falls within the scope of legislative privilege. Plaintiffs attempt to obtain evidence of legislators' "contemporaneous thoughts and motivations in drafting and enacting S.B. 1." *See* ECF 547 at 17. Plaintiffs concede that Mr. Vera communicated with legislators extensively and "responded to legislator requests for information about SB1." *See* ECF 547 at 4–5. When responding to such legislative inquiries, Mr. Vera was necessarily engaged in the "proposal, formulation, and passage of legislation." *See Hubbard*, 803 F.3d at 1308. Indeed, Plaintiffs concede that Mr. Vera provided "proposed bill language" and gave legislators information relating to "certain holes [that] needed to be plugged in the statute or certain issues [that] needed to be addressed by the statute." ECF 547 at 5. For example, "Mr. Vera communicated with legislators about including language related to mail ballot 'harvesting,' free movement of poll watchers, penalties for poll workers who obstruct

2

poll watchers, perceived problems with drive-thru voting, and voters registered at illegal addresses," all of which implicate provisions of SB1 being challenged in this litigation. *See* ECF 547 at 5–6. These are but a few examples of the types of privileged information that Plaintiffs seek. For purposes of analyzing legislative privilege, Mr. Vera was thus acting as an "agent" of these legislators by fulfilling their requests "to discuss issues that bear on potential legislation" and to "assist legislators in the discharge of their legislative duty." *See Almonte*, 478 F.3d at 107.

All of these communications—and the other substantively similarly communications at issue—fall within the definition and scope of legislative privilege. Plaintiffs should not be allowed to obtain from Mr. Vera what they would not be allowed to obtain directly from the legislators themselves. Accordingly, such communications should not be compelled.

## II. Legislative Privilege was Properly Asserted Here.

Plaintiffs argue that legislative privilege has not been properly invoked. That argument is wrong for several reasons. First, any objection lodged by counsel representing those acting as legislative agents is proper. Second, the Office of the Texas Attorney General represents not only State Defendants, but individual legislators, and thus objections made on behalf of those legislators are also proper. Third, absent a specific waiver of legislative privilege by the legislator that holds the privilege, the State of Texas is entitled to lodge the objection.

Given the "complexities of the modern legislative process," the Supreme Court has reasoned that "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants." *Gravel*, 408 U.S. at 616. In line with this reasoning, circuit courts have likewise determined that the legislative privilege extends to non-legislators. *See, e.g.*, *Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995) (finding that "the prophylaxis of the [Speech and Debate] Clause also extends to legislative acts performed by non-legislators"). Rather than adopt an "unacceptably narrow view" that legislative privilege is confined to legislators themselves, the Supreme

Court has instead described the privilege as having the "fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." *Id.* at 618. Thus, the privilege still applies here to the extent that it was invoked on behalf of non-legislators that were fulfilling a legislative role at the behest of members of the legislature.

Additionally, as Plaintiffs are aware, the Office of the Texas Attorney General represents specific legislators in this case. Those legislators have scrupulously invoked legislative privilege during their own depositions as well as in response to Rule 45 subpoenas for documents. Attempts to force their attendance at any deposition that might conceivably reveal legislatively privileged information would be both impractical and disproportionate to the needs of the case. Legislators have instead requested that counsel use its best legal judgment to vigorously defend the privileges to which they are entitled.

Finally, State Defendants themselves have a sufficient interest in preserving legislative privilege on behalf of legislators unless a waiver of that privilege has been effectuated. Legislative privilege applies "whether or not the legislators themselves have been sued." *E.E.O.C. v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011); *see also Hubbard*, 803 F.3d at 1308; *S.C. State Conference of NAACP v. McMaster*, 584 F. Supp. 3d 152, 160 (D.S.C. 2022); *Benisek v. Lamone*, 241 F. Supp. 3d 566, 573 (D. Md. 2017). This is because "state and local officials undoubtedly share an interest in minimizing the 'distraction' of 'divert[ing] their time, energy, and attention from their legislative tasks to defend the litigation.'" *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018) (quoting *Eastland*, 421 U.S. at 503). Because members of the Texas Legislature presumably wish to keep their privileged documents and communications private absent any indication to the contrary, State Defendants' invocation of the privilege was also proper.

For this reason, Plaintiffs' argument for waiver also fails. *See* ECF 547 at 14–15. As the Supreme Court has observed, "waiver can be found only after explicit and unequivocal renunciation

of the protection." *Helstoski*, 442 U.S. at 490. But Plaintiffs have not established even one instance where a legislator explicitly and unequivocally renounced legislative privilege in relation to SB1. Plaintiffs' argument also conflicts with the Supreme Court's central justifications for extending the legislative privilege beyond just the legislators themselves. If legislators are not able to have free and open conversations with their agents about the problems in the relevant communities, a legislator's actions would be uninformed and unsuccessful—a demise that would effectively divide the voice of the people from the ears of the representatives. Accordingly, legislative privilege has not been waived.

### III. Any Marginal Benefit of the Requested Discovery is Insufficient to Overcome Legislative Privilege.

Plaintiffs use a five-factor balancing test to assert that the "legislative privilege should yield to the need for discovery here." *See* ECF 547 at 16–17. But the legitimacy and applicability of that argument is the subject of a currently pending appeal and awaiting decision from the Fifth Circuit. In addition, other circuit courts have rejected such a factor-based test. *See, e.g.*, *Hubbard*, 803 F.3d at 1308. Reliance on that test here would thus be premature.

Plaintiffs would not be entitled to the requested information even if that balancing test were applied. Proving discriminatory intent using the kind of information Plaintiffs hope to find is subject to "the inherent challenges of using evidence of individual lawmakers' motives to establish that the legislature as a whole enacted [the challenged legislation] with any particular purpose." *Am. Trucking Associations, Inc. v. Alviti*, 14 F.4th 76, 90 (1st Cir. 2021) (citing *United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."). While such "evidence of individual legislators' motives is [not] always irrelevant per se," it is undoubtedly "often less reliable and therefore less probative than other forms of evidence bearing on legislative purpose." *Id.* Balanced against this negligible benefit, imposing any discovery burden on

non-parties would be improper and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

Allowing plaintiffs to bootstrap greater access to discovery by bringing particular claims is also bad policy. Indeed, "[w]ere [this Court] to find the mere assertion of a federal claim sufficient, even one that addresses a central concern of the Framers, the privilege would be pretty much unavailable largely whenever it is needed." *Id.* at 88. Plaintiffs' efforts should not be rewarded, and the privileged information should remain protected.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motion to Compel.

Date: March 7, 2023

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil
Litigation

Respectfully submitted.

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Tex. State Bar No. 24087727

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

J. AARON BARNES
Special Counsel
Tex. State Bar No. 24099014

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
christopher.hilton@oag.texas.gov
kathleen.hunker@oag.texas.gov
aaron.barnes@oag.texas.gov

**COUNSEL FOR STATE DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on March 7, 2023, and that all counsel of record were served by CM/ECF.

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER



# APPENDIX E

```
1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
2                      SAN ANTONIO DIVISION

3
   LA UNION DEL PUEBLO ENTERO,     .
4  ET AL,                          .
                                   .
5              PLAINTIFFS,          .
          vs.                      . DOCKET NO. 5:21-CV-844-XR
6                                  .
   GREGORY W. ABBOTT, ET AL,       .
7                                  .
               DEFENDANTS.         .
8

9

10              TRANSCRIPT OF MOTION PROCEEDINGS
             BEFORE THE HONORABLE XAVIER RODRIGUEZ
11                UNITED STATES DISTRICT JUDGE
                       MARCH 7, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:     NINA PERALES, ESQUIRE
17                         FATIMA L. MENENDEZ, ESQUIRE
                           JULIA RENEE LONGORIA, ESQUIRE
18                         KENNETH PARRENO, ESQUIRE
                           MALDEF
19                         100 BROADWAY STREET, #300
                           SAN ANTONIO TX 78205
20

21                         JENNIFER JAESEON YUN, ESQUIRE
                           UNITED STATES DEPARTMENT OF JUSTICE
22                         150 M STREET NE, 8TH FLOOR
                           WASHINGTON DC 20002
23

24

25
```

```
 1
 2                        ZACHARY DOLLING, ESQUIRE
                         TEXAS CIVIL RIGHTS PROJECT
 3                       1405 MONTOPOLIS DRIVE
                         AUSTIN TX 78741
 4
 5    FOR THE DEFENDANTS:   CHRISTOPHER HILTON, ESQUIRE
                           OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 6                         P.O. BOX 12548
                           CAPITAL STATION
 7                         AUSTIN TX 78701
 8
 9                        JOHN M. GORE, ESQUIRE
                          JONES DAY
10                        51 LOUISIANA AVENUE NW
                          WASHINGTON DC 20001
11
12                        MARINA EISNER, ESQUIRE
                          STATES UNITED DEMOCRACY CENTER
13                        1101 17TH STREET NW
                          WASHINGTON DC 20036
14
15                        DAVID LOUK, ESQUIRE
                          COOLEY LLP
16                        3 EMBARCADERO CENTER, 20TH FLOOR
                          SAN FRANCISCO CA 94000
17
18                        BEN L. STOOL, ESQUIRE
                          CRIMINAL DISTRICT ATTORNEY'S OFFICE
19                        OF DALLAS COUNTY, TX
                          500 ELM STREET, SUITE 6300
20                        DALLAS TX 75202
21
22                        ANTHONY J. NELSON, ESQUIRE
                          TRAVIS COUNTY ATTORNEY'S OFFICE
23                        314 WEST 11TH STREET, ROOM 590
                          AUSTIN TX 78701
24
25
```

```
 1

 2                          LEIGH ANN TOGNETTI, ESQUIRE
                            HIDALGO COUNTY CRIMINAL DISTRICT ATTY
 3                          100 E. CANO
                            EDINBURG TX 78539
 4

 5                          LISA V. CUBRIEL, ESQUIRE
                            BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
 6                          CIVIL DIVISION
                            101 W. NUEVA STREET, 7TH FLOOR
 7                          SAN ANTONIO TX 78205

 8

 9                          ERIC J.R. NICHOLS, ESQUIRE
                            BUTLER SNOW LLP
10                          1400 LAVACA STREET, SUITE 1000
                            AUSTIN TX 78701
11

12                          JONATHAN GABRIEL CHAIM FOMBONNE, ESQ
                            SAMEER SINGH BIRRING, ESQUIRE
13                          HARRIS COUNTY ATTORNEY'S OFFICE
                            1019 CONGRESS, 15TH FLOOR
14                          HOUSTON TX 77002

15

16

17

18

19

20  REPORTED BY:            GIGI SIMCOX, RMR, CRR
                            OFFICIAL COURT REPORTER
21                          UNITED STATES DISTRICT COURT
                            SAN ANTONIO, TEXAS
22

23

24

25
```

1      *(San Antonio, Texas; March 7, 2023, at 4:00 p.m., in open*
2  *court and Zoom videoconference.)*
3          THE COURT:  Let's call La Union del Pueblo Entero
4  versus Gregg Abbott, 21 civil 844.
5          Who do we have for the plaintiffs?
6          MISS PERALES:  For LUPE plaintiffs, Your Honor, Nina
7  Perales.  And with me today in the courtroom, Samantha Selma
8  [phonetic], Julia Longoria, Fatima Menendez, and Kenneth
9  Parreno.
10          THE COURT:  Thank you.
11          Anyone else, appearances?
12          MISS YUN:  Jennifer Yun for the United States.
13          THE COURT:  Anyone else?
14          MR. DOLLING:  Zachary Dolling on behalf of the OCA
15  plaintiffs.
16          THE COURT:  And for the State?
17          MR. HILTON:  Good afternoon, Your Honor, Chris Hilton
18  from the Attorney General's Office for the State defendants.
19  There may be some other AG folks on Zoom, but I'll be the only
20  one speaking today.
21          THE COURT:  Who is representing the Harris County
22  Republican Party?
23          MR. HILTON:  That's John Gore.
24          MR. GORE:  Good afternoon, Your Honor.
25          THE COURT:  Mr. Gore, okay.

1          And do we have anyone else on the line representing

2     any of the other defendants?

3          MISS EISNER:  Good afternoon, Your Honor, Marina

4     Eisner representing El Paso County Elections Administrator

5     Lisa Wise from State's United Democracy Center.

6          THE COURT:  Thank you.

7          MR. LOUK:  David Louk from Cooley LLP also

8     representing defendant Wise from El Paso County.

9          THE COURT:  Thank you.

10          MR. STOOL:  Your Honor, this is Ben Stool from Dallas

11     County representing the Dallas County Elections Administrator

12     and the Dallas County District Attorney.

13          THE COURT:  Thank you.

14          So we are here on —

15          MR. NELSON:  Your Honor —

16          THE COURT:  Yes.

17          MR. NELSON:  I'm sorry.

18          Tony Nelson, Assistant Travis County Attorney for the

19     Travis County District Attorney and Travis County Clerk.

20          THE COURT:  Thank you.  Sorry, so the way it is being

21     displayed, I can't see that there's more people on the Zoom.

22          MISS TOGNETTI:  Also, Leigh Ann Tognetti from the

23     Hidalgo County District Attorney's Office representing the

24     Hidalgo County Election Administrator Hilda Salinas.

25          THE COURT:  Thank you.

1          Anybody else out there?  No one else.

2          MISS CUBRIEL:  Your Honor, Lisa Cubriel.

3          THE COURT:  Thank you; for Bexar County.

4          MISS CUBRIEL:  I'm here on — yes, Your Honor.  I

5    injured my ankle or I would have been there in person.

6          THE COURT:  Thank you.  You didn't have much of a

7    walk to go.

8          MR. NICHOLS:  Your Honor, Eric Nichols.  We're not

9    involved in the dispute today, but I represent the Harris

10   County District Attorney's Office.

11         THE COURT:  Thank you.  Okay.

12         MR. BIRRING:  Your Honor, Sameer Birring is here for

13   the Harris County Attorney's Office for the Harris County

14   Elections Administrator.  I believe Jonathan Fombonne is also

15   online from the Harris County Attorney's Office.

16         MR. FOMBONNE:  Yes, Your Honor, I'm here.

17         THE COURT:  Okay.  So we have two matters here, a

18   motion to compel regarding documents that Mr. Vera may or may

19   not have, and a deposition that took place, and then a motion

20   to clarify the scheduling order.

21         So first thing, let's take up the Vera deposition.

22         Who served as Mr. Vera's attorney during that

23   deposition?

24         MISS PERALES:  Your Honor, that counsel is named

25   Mr. Andy Taylor.

1    THE COURT:  Mr. Gore, is Mr. Taylor co-counsel with

2  you, or how does that work?

3    MR. GORE:  Mr. Taylor is not co-counsel with us.  I

4  represent the Harris County Republican Party and the other

5  intervenor defendant and Mr. Taylor represents Mr. Vera.

6    THE COURT:  So which attorney from either the

7  intervenor, the State defendants, or Mr. Taylor asserted the

8  legislative privilege?

9    MR. GORE:  The legislative privilege was asserted by

10  the State defendants during Mr. Vera's deposition.

11    THE COURT:  Mr. Hilton, were you the lawyer asserting

12  those privileges?

13    MR. HILTON:  Your Honor, I was not the attorney

14  asserting those privileges.  That was Mr. Will Wassdorf.

15    But just a point of clarification, the — we also

16  represent these legislators for many other purposes and

17  include some of them in this case, so the assertion of this

18  privilege, really more by the attorney than the State

19  defendant themselves.

20    We filed a brief shortly before the hearing today,

21  just to get something on file with —

22    THE COURT:  No, sir.  Wait a minute.  Let's wait

23  here.

24    So at the time of Mr. Vera's deposition, did any of

25  the individual legislators assert the privilege?

1    MR. HILTON:  I don't understand the question.  They

2 weren't at the deposition.

3    THE COURT:  No, sir.  So the question is real simple.

4    The legislative privilege is only to be asserted by a

5 legislator.  The question is which, if any, legislators

6 asserted that privilege during the time that Mr. Vera was

7 being deposed.

8    MR. HILTON:  If I understand your question, which of

9 those legislators had one of their attorneys there, you know,

10 asserting privilege exclusively on their behalf, then the

11 answer would be they did not have an attorney at the

12 deposition.

13    THE COURT:  So the answer is neither the legislator

14 nor any attorney representing a legislator invoked the

15 legislative privilege, is that correct?

16    MR. HILTON:  With the caveat that I provided earlier

17 that we do represent these legislators both in this and other

18 litigation for many purposes, but, yes, Mr. Wassdorf was there

19 as the attorney for the State defendants.

20    THE COURT:  For the State defendants, not the

21 legislators?

22    MR. HILTON:  Yes, Your Honor.

23    THE COURT:  So there was no meritorious invocation of

24 the legislative privilege for a variety of reasons.

25    I've already ruled on any number of occasions that

1  the privilege is only applicable to a legislator and that the

2  legislative privilege can be waived by third parties entering

3  into that relationship that only belongs between a legislator

4  and their staff member.

5       So Mr. Wassdorf, by invoking the legislative

6  privilege, was in violation of my previous orders asserting

7  groundless objections.  So the remedy for all of that is that

8  Mr. Vera will be redeposed.

9       He will be redeposed at the expense -- so now, I was

10  going to impose that upon the Harris Republican Party, but

11  since from what I understand the Harris Republican Party is

12  not responsible for these meritless objections, it was the

13  State defendants.  Cost of the second deposition of Mr. Vera

14  will be borne by the State of Texas Attorney General's Office.

15       In addition, any costs associated by the plaintiffs

16  in filing this motion to compel will be assessed against the

17  State defendants, as well as any cost of reasonable attorneys

18  fees for attendance of today's hearing.

19       Now let's talk about the documents that Mr. Vera or

20  the Harris County Republican Party should have tendered.

21       So, Mr. Gore, did you ever instruct Mr. Vera to

22  search for any documents that were responsive in Requests for

23  Productions 1 or 3?

24       MR. GORE:  Your Honor, we searched our files at the

25  Harris County Republican Party for documents responsive to

1  Request Numbers 1 and 3, including documents that would have

2  come from Mr. Vera.  That included emails that were sent by

3  Mr. Vera to legislators, many of which were produced.

4          On those emails when he reached out to legislators at

5  the initiative of the Harris County Republican Party or on his

6  own initiative, he copied or otherwise included members of the

7  Harris County Republican Party at their official email

8  accounts on those communications.

9          I just want to sharpen what the dispute is about here

10  in this particular motion.  There are two categories of

11  communications involving Mr. Vera, those that Mr. Vera

12  initiated with the legislature on behalf of the Harris County

13  Republican Party, and those that he sent to individual

14  legislators in response to their requests.

15          So we searched and located those emails that he had

16  sent on behalf of the Harris County Republican Party.  We

17  produced those and those were at issue and subject to his

18  testimony in the deposition.  He was asked about them.  He

19  gave answers about them.  We didn't object to him discussing

20  those.

21          And to the extent that those were emails that he

22  initiated and were not initiated by legislators, there was no

23  objection and he went ahead and he testified about those

24  particular documents.  So we've already produced those

25  documents.  We've allowed him to testify about those

1  documents.

2          So we did conduct a search for responsive documents,

3  not only emails but also hard copy documents.  There were no

4  responsive hard copy documents but we did search for those,

5  including those over which Mr. Vera would have been the

6  custodian.

7          THE COURT:  Okay.

8          MR. GORE:  So the dispute here ––

9          THE COURT:  So what I was going to say is –– so that

10 was helpful background.

11         Now, my understanding of the allegations in the

12 motion to compel are that Mr. Vera was acting as the agent for

13 the Harris County Republican Party in this SB 1 drafting

14 process and fielding questions on behalf of the Harris County

15 Republican Party to the legislators.  So he was acting as your

16 agent, is that true?

17         MR. GORE:  It's true in part.

18         THE COURT:  Okay.  Thank you.

19          (Crosstalk)

20         THE COURT:  This will go a lot faster if we just

21 answers questions that I have.

22         So he's acting as your agent and it's my

23 understanding that he's using his personal email address and

24 his personal computer because he doesn't have or hasn't been

25 given by the Harris County Republican Party one of its

1  computers or a Harris County Republican Party email address,

2  is that correct?

3          MR. GORE:  That is correct in part, yes.

4          THE COURT:  Okay.  "In part."  How can that be in

5  part?

6          MR. GORE:  Well, it is correct to the extent that he

7  is actually acting on behalf of the Harris County Republican

8  Party.  And when he sends emails on behalf of the Harris

9  County Republican Party, he copies the chair or other

10  individuals at their committee email addresses, and those are

11  the emails we searched for, collected, reviewed, and produced

12  to the plaintiffs.

13          THE COURT:  Now —

14          MR. GORE:  When the legislators are reaching out to

15  him separately from that, the Harris County Republican Party

16  is not involved in that.  Those legislators were reaching out

17  to him directly.  Harris County Republican Party was not an

18  intermediary for that, and so in those instances he's not

19  acting on behalf of the Harris County Republican Party when he

20  is fielding those questions and responding to questions to him

21  specifically.

22          THE COURT:  So how can you say, though — so you put

23  him up as your agent, and so there's an agency when he sends

24  material, but you are claiming that there's no agency when the

25  legislators send him questions back?  How do you make this

1  artificial distinction about his role?

2       MR. GORE:  Because the questions back to him were not

3  tied to anything he had said on behalf of the Harris County

4  Republican Party.

5       THE COURT:  But the only reason that they are

6  approaching him is because you-all put him up in the first

7  instance.

8       MR. GORE:  I disagree, Your Honor.

9       Mr. Vera is a known activist and involved in voting

10 issues.  He's involved with other organizations such as the

11 Texas Election Network, which have no connection to the

12 Republican Party, and he advocates on their behalf.  He serves

13 on their board, all of which I understand he does from his

14 personal email.

15      I have to say, I don't represent Mr. Vera, but that's

16 my understanding as well, and so he has other functions and

17 other hats that he wears in this space that aren't necessarily

18 tied to — or are not tied to the Harris County Republican

19 Party and aren't exclusively tied to the Harris County

20 Republican Party.

21      THE COURT:  So when you (inaudible) —

22      *(Crosstalk)*

23      — the custodian of records, did you make clear that

24 he was a custodian of records only sometimes and otherwise he

25 was not a custodian of records?

1          MR. GORE:  We made clear that we were searching
2    official committee email addresses —
3          THE COURT:  No.  No.  No.  No.  No.  We're talking
4    apples and oranges now, Mr. Gore.
5          What I'm saying is — or what I'm asking is, you
6    represented to the parties in this case in initial disclosures
7    or otherwise that Mr. Vera was an individual with knowledge of
8    relevant facts and that he was a custodian of records on
9    behalf of the Harris County Republican Party, did you not?
10          MR. GORE:  Yes, and all of those records —
11          THE COURT:  And so stop.  Again, it will go a whole
12   lot easier if you just answer the questions that I have.
13          So in that representation, did you say he was only
14   acting in that capacity sometimes?
15          MR. GORE:  No, but we didn't have to say that because
16   when he does other things that aren't tied to the Harris
17   County Republican Party he's not a custodian of records for
18   the Harris County Republican Party.
19          (Crosstalk)
20          THE COURT:  If you insist on playing this game, I'll
21   play it too.
22          So with regard to the official agency capacity that
23   he's doing, my question to you is very direct.  Did you or
24   someone on behalf of the Harris County Republican Party search
25   his personal computer and personal email addresses for any

1 responsive documents to Requests for Production Numbers 1 or

2 3?

3          MR. GORE:  No, we searched official files and

4 committee email addresses, disclosed the scope of that search

5 to the plaintiffs —

6          THE COURT:  So without asking —

7          *(Crosstalk)*

8          THE COURT:  So without asking him to do that, you

9 made potentially an incomplete production, and so my question

10 to you is, you can't sit here as we talk and verify to the

11 parties and to the Court, pursuant to Rule 26(g), that you

12 made a complete and adequate review for responsive documents

13 because there could be documents that he was in his agency

14 capacity sending to these legislators that he didn't CC some

15 Harris County Republican Party official, and so there could be

16 potentially other documents, isn't that correct?

17          MR. GORE:  No, I don't believe that is correct

18 because we —

19          THE COURT:  How can you say that?

20          *(Crosstalk)*

21          MR. GORE:  — (inaudible) on behalf of the party.

22          Because when he did send anything on behalf of the

23 party, he copied officials at the Harris County Republican

24 Party and those documents have all been collected, searched,

25 reviewed, and produced and were discussed in his deposition.

1    THE COURT:  So but without a review of his computer

2  and email, you can't represent a full production was made

3  because there could be communications that he did without a CC

4  to somebody at the Harris County Office.  That is a

5  possibility that exists out there, is it not?

6    MR. GORE:  I don't see how that could be.  We have no

7  evidence that that ever happened.  What we have is him copying

8  people and we don't represent him in his personal capacity.

9    He has other associations, including attorney-client

10  relationships with his attorneys in other cases.  He's got an

11  association with an organization, at least one organization

12  that's not affiliated with the Harris County Republican Party.

13    So his personal email account is not within our

14  custody and control, particularly when he's acting as an agent

15  of the legislature and responding to legislative inquiries

16  that are directed at him.

17    Those inquiries were not directed at the Harris

18  County Republican Party.  They weren't directed at the chair.

19  They weren't directed at the party as an organization.  They

20  were directed as to Vera.  And when he acts in that capacity,

21  he's not acting in the capacity of the Harris County

22  Republican Party.  He's acting —

23    THE COURT:  In the 30(b)(6) deposition that was taken

24  of the Harris County Republican Party, your 30(b)(6)

25  representative stated that he was acting as your agent.

1        MR. GORE:  And he did act as our agent in —

2        THE COURT:  So if he was acting as your agent, why

3   didn't you have an obligation under Rule 26(g) to look at his

4   computer to ensure for yourself that all responsive documents,

5   even if you want to parse it the way you do, didn't you have a

6   responsibility to go through his computer to search for

7   responsive emails and other documents because he was your

8   agent?  Why didn't you — even the way you are parsing it, why

9   didn't you do that?

10        MR. GORE:  Because such a search would not have been

11   reasonably calculated to discover discoverable information and

12   would have been unduly burdensome on the parties and on

13   Mr. Vera, because this is Mr. Vera's personal email that he

14   uses for a variety of functions that have nothing to do with

15   the Harris County Republican Party, and it is his practice to

16   share those official communications with members of the Harris

17   County Republican Party.  And in light of those facts, there

18   was no reason to go to Mr. Vera's personal email account and

19   try to find additional communications —

20        THE COURT:  Did you even ask him, can we do this, to

21   even get him to say that this would be intrusive on me?

22        MR. GORE:  We discussed it with Mr. Vera and he did

23   not want us to do it.

24        THE COURT:  And then why didn't you just, even if you

25   weren't going to make the inspection, why didn't you ask him

1  to self-collect?

2          MR. GORE:  Because the facts as we knew them showed

3  that that would be unreasonable and unduly burdensome in the

4  circumstances —

5          THE COURT:  So you produced 61 documents.  How would

6  that be unduly burdensome for him to self-collect whatever he

7  had?  If indeed you're correct and it's only 61 documents, how

8  is that unduly burdensome?

9          MR. GORE:  I don't know how many documents Mr. Vera

10  would have to search.  We produced 61 documents from our

11  files, but in terms of whether and what the search would

12  burden Mr. Vera to do and how he would disentangle email

13  communications that he initiated from those that he sent in

14  response to a legislative initiative, or initiation, which is

15  what the legislative privilege assertion was all about, that

16  was not possible for him necessarily to decouple.

17          Moreover, as I said, he's got mounds of personal

18  email on things that don't have anything to do with the Harris

19  County Republican Party, but that maybe on search terms that

20  are related to the plaintiffs' requests.

21          THE COURT:  The bottom line is no one even tried to

22  do so.  No one tried to do search terms.  No one did any kind

23  of attempt to see how burdensome, if any.  That's the bottom

24  line, isn't that true, Mr. Gore?

25          MR. GORE:  I think the bottom line is that we

1 | conducted a reasonable search of our files, produced
2 | documents, but didn't hear anything about Mr. Vera's personal
3 | email account until February 27th, which was four days before
4 | the close of discovery.
5 |     THE COURT:  But you had an obligation.  You've had an
6 | obligation under Rule 26(g) to produce responsive documents
7 | and search for those, and if he was acting as your agent, as
8 | your 30(b)(6) representative states, then you failed in that
9 | obligation.
10 |     MR. GORE:  Our obligation, Your Honor, was to conduct
11 | a reasonable search for responsive documents that was
12 | proportionate to the needs of the case and not unduly
13 | burdensome.
14 |     THE COURT:  And the Court finds that you failed under
15 | Rule 26(g) to do that reasonable search.
16 |     Now, with that, we are going to redepose Mr. Vera.
17 | He's not going to be able to assert any legislative privilege
18 | assertion.  The Court's already ruled I don't know how many
19 | times on that.  I'm not going to allow any further meritless
20 | objections to be lodged.
21 |     He's to fully, and frankly, and honestly answer all
22 | questions posed to him in that regard between communications
23 | between him and the legislators.  Any lawyer and Mr. Vera who
24 | does assert that privilege, despite now my clear directions,
25 | will be held in contempt of court.

1          Now --

2          MR. HILTON:  Your Honor, may I address one more issue

3    related to that motion before we move on to the other matters?

4          THE COURT:  Yes.

5          MR. HILTON:  Thank you, Your Honor.

6          We'd be happy to do this in writing, if that would be

7    more convenient for the Court, but I thought I would at least

8    say now that we respectfully request that the Court move to

9    stay its ruling that it just made on this motion to compel.

10         THE COURT:  Denied.

11         MR. HILTON:  Thank you, Your Honor.

12         THE COURT:  So now, with that, I want to focus now on

13   what to do with Mr. Vera, in light of this hybrid role that

14   Mr. Gore is alleging he engages in.

15         Now, I will agree with Mr. Gore.  So I don't know who

16   Mr. Vera is, but if he's working for other clients on other

17   matters, then he shouldn't be required to produce something

18   like that, and so what's the plaintiffs' position on that?

19         Are you going to send him a subpoena, pursuant to a

20   third-party subpoena, or are you going to still demand a

21   ruling from this Court on whether or not the Harris County

22   Republican Party has possession, custody, or control regarding

23   his devices?

24         MISS PERALES:  Your Honor, we are happy to double up

25   with a subpoena, but what Mr. Gore is saying is not borne out

1   by Mr. Vera's testimony.  First of all, Mr. Vera doesn't have

2   any other clients; he's not an attorney.  Every time he

3   testified —

4          THE COURT:  Is he a lobbyist?

5          MISS PERALES:  He's a lobbyist for the Harris County

6   Republican Party.

7          THE COURT:  But does he have any other clients that

8   he's a lobbyist for?

9          MISS PERALES:  He did not testify that he did, or

10  given that the questioning was limited as to SB 1, he never

11  testified that he had any other person on whose behalf he was

12  interacting with the legislator.

13         This is a whole new thing that we are hearing today

14  and so I would ask the Court to make clear in its order that

15  unless there's a communication in which Mr. Vera made clear in

16  writing that he was interacting on behalf of somebody other

17  than the Harris County Republican Party that he should have to

18  produce it.

19         Every testimony — every time he testified — and

20  Mr. Gore is right, Mr. Vera testified many times and

21  interacted with the legislature many times on SB 1.  Every

22  time he signed up to register and testify, he did so on behalf

23  of the Harris County Republican Party Ballot Security

24  Committee, whether it was HB 6, SB 1, HB 3, or SB 7.  It was

25  always on behalf of the Harris County Republican Party.

1        Furthermore, Your Honor, I would ask the Court to

2   clarify its order that Mr. Gore and his counsel are not to

3   limit their documents.

4        THE COURT:  You are talking about Mr. Vera?

5        MISS PERALES:  I'm sorry.  That Mr. Vera should not

6   limit his document search to emails with the legislator in

7   which he CC'd party officials.  It is not the case that

8   Mr. Vera testified that he CC'd party officials when he

9   interacted with legislators.

10        In fact, he testified he interacted with legislators

11   many times and all we've received from Mr. Gore and his team

12   were less than seven documents.  That 61 mostly was

13   interaction with the Secretary of State.  With respect to

14   legislators, less than seven documents in the total production

15   in response to Request for Production Number 1, which

16   purported to represent their communications with legislators

17   on SB 1.

18        That's because they only produced what they found in

19   party, official party email addresses, so when the party chair

20   was CC'd.  But given Mr. Vera's testimony that he interacted

21   many times and used his personal email, with the very small

22   handful of documents that we received, we would not want the

23   Court's order to be understood that the search for documents

24   should only be those which Mr. Vera CC'd a party official

25   because we understand from his testimony he had a considerable

1  number of interactions which he did not CC party officials.

2          THE COURT:  Yeah.  No, the Request for Productions 1

3  and 3 doesn't say and limit the email communications or

4  documents were CC'd to anybody.  So the Requests for

5  Productions 1 and 3 are very clear.

6          And so Mr. Vera is ordered, upon penalty of contempt,

7  to produce any documents that he has — and so we can fight

8  about possession, custody, and control, and whether or not

9  this is a legal right jurisdiction, or this is a practical

10  ability jurisdiction, or whether or not this has to be done by

11  a third-party subpoena.

12          When you redepose him, the easiest way to tackle this

13  is just depose him in his individual capacity and require a

14  duces tecum for Requests of Productions 1 and 3.

15          And I expect Mr. Vera to search for documents

16  responsive to 1 and 3, regardless of whether they were CC'd to

17  party officials.  And if there's not a reasonable compliance,

18  pursuant to Rule 26(g) on that subpoena, I will issue sanction

19  orders against anybody and everybody responsible for the

20  failure to responsibly produce those documents.

21          This is my last warning to you-all.  I am tired of

22  this case coming up with these meritless objections, delays,

23  obfuscation.  This is just nonsense.  That's going to stop and

24  it's going to stop today.

25          And from here on out, lawyers and individuals will be

1  held in contempt of court for failure to abide by my orders.

2  I don't know how to make it any more direct than that.  And it

3  will go up the food chain, so you can tell that to your office

4  as well.

5          So that takes care of Vera.

6          The scheduling order.

7          So what I see is still much discovery left to do in

8  this case, and so how do we conduct the remaining discovery

9  and how do we do so in a manner that's as nonintrusive as

10 possible on the poor election officials that have been drug

11 into this thing?

12         Miss Perales.

13         MISS PERALES:  Your Honor, I believe Miss Yun is here

14 to speak on the parties' joint submission regarding the

15 schedule, if it's okay with the court.

16         THE COURT:  So you know, I'm not going to go into

17 this detail again about — because my observations about the

18 scheduling order; you-all agreed to that language.  That was

19 your language in the scheduling order.  And now both of

20 you-all, all of you-all, don't understand what you-all wrote

21 and you want me to rewrite it or clarify it.  I'm having none

22 of it.  I'm having none of it anymore.

23         This is going to be opened up for discovery for the

24 full gamut of relevant proportional discovery, whether it's

25 for primary information, for general election information.

1  I'm not going to play your games anymore.  I'm not going to

2  get drug into these fights anymore.

3         Now, I want to do this, though, in a way that's as

4  nonintrusive as possible on the election offices.

5         So how are we going forward?

6         MISS YUN:  Your Honor, Jennifer Yun, on behalf of the

7  United States.

8         So there are two live issues here, and, one, whether

9  relevant materials that were created or published or disclosed

10 after the primary election discovery period are discoverable

11 during this discovery period.

12        THE COURT:  So I'm telling you it is.  So what I'm

13 asking of you-all is how much more time do you need?  Where do

14 you need this stuff from?  And how are we going to make this

15 as unobtrusive upon the election officials?

16        MISS YUN:  Yes, Your Honor.

17        The parties have been engaging in good faith

18 negotiations to make sure that we are able to complete

19 discovery as expeditiously as possible.

20        And in terms of the county depositions, we have met

21 with the El Paso County counsel as well as the Harris County

22 counsel in order to obviate any need for this Court's

23 intervention.

24        I'm happy to let the counties speak for themselves,

25 but that part of the motion for clarification I believe does

1  not require the Court's intervention.

2      And we have also engaged in extensive meet and

3  confers with the State defendants in order to complete

4  depositions of newly disclosed witnesses into April.  That

5  agreement, I do not believe, is fully agreed upon but we are

6  negotiating that in order to not involve the Court's — in

7  order to not ask for the Court's intervention.

8      THE COURT:  So all these depositions, especially of

9  the election officials, I want to focus on them because they

10  are getting drug into this.

11      So how many times have they already been deposed?

12  What kind of new questions do you have for them that you need

13  and do they have to take?

14      And you-all seem to be fighting over hours and

15  minutes that people need to be deposed.  Again, I'm here to

16  tell you-all, I'm sick and tired of this.  I am not going to

17  be intervening in all this little minutia that good lawyers —

18  and there are good lawyers in this case — should resolve.

19      And so let's backtrack a little bit.  Why do you need

20  these election officials to be deposed yet again?

21      MISS YUN:  Your Honor, just to clarify, are you

22  asking about the Secretary of State's officials?

23      THE COURT:  No, I don't care about them.  I'm worried

24  about Bexar County, Harris County, El Paso, everybody else on

25  the Zoom, why are we —

1          MISS EISNER:  Apologies, Your Honor.  I can speak for
2  the El Paso Elections Administrator and the deposition issue.
3          We have reached agreement on that issue, and so we're
4  prepared to file a stipulation.  We were just making sure
5  everybody was going to sign on, but we had a meet and confer
6  and we have agreed to both the breadth and scope of the
7  deposition.  So I think we can take that off the table.
8          THE COURT:  Who else from an elections office thinks
9  they need relief here?
10         MR. FOMBONNE:  Judge, Jonathan Fombonne from the
11  Harris County Attorney's Office for the Harris County
12  Elections Administrator.
13         I don't think we need relief.  I sent an email
14  yesterday to all the counsel in this case asking for
15  confirmation of what I think is our understanding about the
16  Harris County Elections Administrator's 30(b)(6) deposition.
17         I have only received confirmation from one of the
18  plaintiffs' counsel and nobody else.  If folks would be
19  willing to respond to that email, I think we have an agreement
20  and we don't need the Court's intervention.
21         THE COURT:  Is everybody on board now with Harris
22  County or not?  So instead of nods, I want a yes or a no.
23         MISS YUN:  The United States is okay with Harris
24  County, our negotiation with Harris County and agreement with
25  Harris County.

 1          MR. DOLLING:  OCA plaintiffs agree with the agreement
 2   that Harris County sent out in the email a few days ago.
 3          MISS PERALES:  Same for the LUPE plaintiffs, Your
 4   Honor.
 5          THE COURT:  I think you have relief, Harris County.
 6          MR. FOMBONNE:  Thank you.
 7          THE COURT:  Anybody else?
 8          MR. NELSON:  Yes, Your Honor.
 9          With respect to Travis County — and again this is
10   Tony Nelson, Assistant Travis County Attorney — we spoke with
11   counsel for the consolidated plaintiffs who had issued a
12   subpoena for a second 30(b)(6) deposition of the Travis County
13   Clerk's Office and counsel agreed that we would revisit those
14   issues following the outcome of this hearing, that it would
15   make more sense to do so.
16          We have not spoken again on that today but I would
17   presume that we should be able to work something out that
18   would be along the same lines as what has been agreed to with
19   respect to El Paso and Harris County.
20          THE COURT:  Thank you.
21          Any other counties?
22          So with regard to the depositions of any county
23   officials, you know, I expect it just to be relevant,
24   nonredundant, and as unobtrusive as possible.
25          Now, once we get all those depositions finished, how

1  much more do we have?  Who else is left?

2          MISS YUN:  We have two depositions scheduled with the

3  Secretary of State's Office for next week, and then there are

4  also various newly disclosed witnesses that will be deposed

5  but we are in the middle of negotiating those out-of-time

6  depositions with the State, but we do not —

7          THE COURT:  Well, now that I'm vacating the

8  scheduling order they are not out of time.  So then what I'm

9  hearing is there's a lot of work left to do, is what I'm

10  hearing.

11          MISS YUN:  Your Honor, we believe the agreement is

12  not — we have not fully agreed yet but we believe that we can

13  finish all depositions by April 7th.  That is the date that we

14  have been discussing with all the parties thus far.  It is not

15  yet finalized.

16          THE COURT:  And let me stop there.

17          The State, do you have anymore discovery to do, or

18  are you done?

19          MR. HILTON:  We do have some discovery to do.  I

20  think, as Miss Yun mentioned, we are going to work out the

21  issues we have with respect to newly disclosed witnesses and

22  I'm certain that whatever issue arises with anything we need

23  from the counties, we will be able to work that out as well.

24          You know, with the Court's ruling with respect to the

25  scope of the discovery, which was one of the two issues teed

1  up in the joint motion, that's what gives me pause about

2  questioning whether we can actually deal with it in the time

3  frame that we've been discussing.

4       THE COURT:  I'm going to vacate the current

5  scheduling order.

6       So what I'm hearing is I'm going to turn over to you

7  to come up with a new scheduling order, but again, I'm not

8  going to go into the trap of the tiering and the phasing that

9  you-all did that fell apart.  We are just going to have a

10  deadline for completion of discovery.

11       And then we are going to have a deadline for — I'm

12  assuming there's going to be — what we are all aiming for is

13  either cross-motions for summary judgment or trial, are we

14  not?

15       And so I don't know how, with the current scheduling

16  order, which is why I'm vacating it, we are ever going to get

17  to timely cross-motions for summary judgment being filed,

18  responded to, replied, and being ruled upon.  The time lines

19  now are completely untenable, in light of all the discovery

20  fights.

21       So I'm going to put the onus on you.  I'm going to

22  have my clerk, law clerk, send to you-all what I want down as

23  a new scheduling order.  And you-all are going to meet and

24  confer and fill in the blanks for the deadlines.

25       If you can't submit to me an agreed new scheduling

1  order, then you're going to submit to me on a party basis what
2  you think the scheduling order should be, and then I will just
3  be forced to fill in the blanks for you-all if you can't reach
4  resolution on that.

5       Now, where are we headed with this case?  Is it going
6  to be resolved one way or the other on cross-motions for
7  summary judgment?  Does it make sense to even have
8  cross-motions for summary judgment, or do we just, in lieu of
9  the tedium and expense and everything else of cross-motions
10  for summary judgment, have a bench trial?

11       What's the plaintiffs' position on that?
12       MISS YUN:  Your Honor, the United States does not
13  believe any summary judgment deadlines or the trial, pretrial
14  deadlines need to be moved at this time.

15       And we believe that —
16       THE COURT:  Well, I've already said otherwise, so
17  move on to what I was asking.

18       MISS YUN:  We believe that dispositive motions will
19  be helpful and that we hope to resolve at least some of the
20  claims before trial through dispositive motions.

21       MR. HILTON:  I would generally agree with that, Your
22  Honor.  I can't imagine that the entire case will be disposed
23  of before trial, just given the scope of it, but I think that
24  certainly some of the issues could be narrowed on dispositive
25  motion briefing.

1      THE COURT:  So we have cross-motions for summary

2  judgment, one way or the other the issues get disposed of

3  maybe in part and so the remainder is a bench trial?

4      MR. HILTON:  I think that's right, Your Honor, from

5  the State's perspective.

6      MISS YUN:  We agree, Your Honor.

7      THE COURT:  And then in light of some parties have

8  been dropping like flies here, and so I'm assuming does that

9  mean some of the issues have been narrowed, or not, or are we

10  just losing parties?

11      MISS PERALES:  I don't speak for all consolidated

12  plaintiffs but I will say, Your Honor, that from time to time

13  a party finds itself unable to proceed because of the burdens

14  of litigation.  The changes in the parties that are

15  participating have not narrowed the issues before the Court.

16      THE COURT:  And so as I'm thinking out loud on all of

17  this, one thing that will not be included in the new

18  scheduling order is a new amendment of pleadings.  We are

19  staying put on what's been pled to date.  We are not opening

20  up this file anymore.

21      Okay.  With all that said then, what else do we need

22  to talk about today, Miss Perales, or from the U.S.

23  Government?  I don't care who goes first.

24      MISS YUN:  Your Honor, there is one issue in the

25  motion for clarification regarding the two depositions that we

1  noticed with regards to the Secretary of State's Office.

2         We believe that the default federal rule of seven

3  hours per deposition should apply to those two depositions.

4  The State defendants do not agree, so we were hoping to raise

5  that.

6         THE COURT:  And so why should there be preemptive

7  limits?

8         MR. HILTON:  It's two depositions of the same witness

9  who has already been deposed twice before.  They are unwilling

10  to concede that it can be limited to anything less than the

11  full 14 hours for both his individual and 30(b)(6) capacity.

12  We've proposed nine hours spread over those two depositions.

13         I understand the Court's position on relative burdens

14  on the State versus the county defendants, but the fact of the

15  matter is this witness, Mr. Ingram, is incredibly busy helping

16  those counties try to run their elections, and so -- and we

17  think we have proposed a reasonable alternative, but, you

18  know, that's for the Court to decide whether you want to weigh

19  into that or not.

20         THE COURT:  So these other depositions that he's

21  given, has it been in this case or other cases?

22         MR. HILTON:  In this case, Your Honor, in addition to

23  many depositions in many other cases.  He sometimes feels like

24  he gets deposed more than he actually works his job, but

25  that's obviously not the Court's problem, but these would be

 1  his third and fourth depositions in this case.

 2       THE COURT:  So how is it that nine hours is not

 3  enough?

 4       MISS YUN:  Your Honor, while Mr. Ingram may be the

 5  State's only 30(b)(6) witness, we actually do not know that

 6  that is to be the case so we do not want to preemptively limit

 7  the amount of time that we have across those two depositions.

 8       Of course, we are going to be very respectful of

 9  Mr. Ingram's time and want to be as efficient as possible.  We

10  were not saying that we have to take 14 hours.  It is just

11  that we do not know how long it will take and that a

12  preemptive limit is not warranted here.

13       THE COURT:  So with regard to Mr. Ingram, it's

14  limited to nine hours of Mr. Ingram.

15       However, in the event in his 30(b)(6) capacity

16  Mr. Ingram is unable to answer some question, that nine-hour

17  limit will not apply to any additional 30(b)(6) representative

18  that the State may need to proffer to answer questions that

19  Mr. Ingram is unable to answer.

20       MISS YUN:  Thank you.

21       THE COURT:  What else do we need to take up?

22       So you win one today.

23       MR. HILTON:  Thank you, Your Honor.

24       MR. STOOL:  Judge, this is Ben Stool from Dallas

25  County, Texas.

1    THE COURT:  Yes, sir.

2    MR. STOOL:  If I may ask as a point of clarification,

3  in the Court's vacating the current scheduling order, which I

4  take it to be ECF 437, is the Court opening up the county

5  defendants to newly served written discovery from the other

6  parties?  Because it's essentially closed at this point.

7    THE COURT:  So, yeah, thank you for that very good

8  question.

9    When I was talking out loud I was thinking about,

10  with the exception of Mr. Vera, that we have document

11  problems, and I guess we still have document problems from the

12  State that the Fifth Circuit — is the Fifth Circuit ever

13  going to rule?  Have they had a hearing?  They have had a

14  hearing.

15    MR. HILTON:  On the legislative privilege issue, Your

16  Honor, they have had argument.  It's been fully submitted for

17  months, as I understand it.

18    MISS PERALES:  Since August, Your Honor.

19    MR. HILTON:  So we are all waiting eagerly.

20    THE COURT:  They had oral argument in August?

21    MISS PERALES:  Yes, Your Honor.  They held oral

22  argument in August.

23    THE COURT:  Wow.

24    MISS PERALES:  August 2nd.

25    MR. HILTON:  And just to clarify, because they

1   haven't ruled, that's why we have — you know, I previously
2   moved the Court to stay its ruling with respect to the motion
3   to compel.  So we are waiting for the Fifth Circuit.
4           THE COURT:  Again, now the reason I'm cutting it this
5   way is the State has a different argument on the legislative
6   privilege.
7           Their argument, and unless you've argued it
8   differently upstairs, which you have done, and so somehow or
9   another arguments not presented to me get to go to the Fifth
10  Circuit somehow and get ruled on, despite me never having the
11  opportunity in the first instance, but your argument before me
12  was the fact that a document is actually seen, smelled,
13  whiffed by, opened by a legislator, made it subject to the
14  legislative privilege.
15          The reason the legislative privilege does not apply
16  to Mr. Vera is, one, it hasn't been asserted to by any
17  legislator; two, these are broken by waiver because Mr. Vera
18  is not a staffer employed by that legislator and the
19  legislative privilege applies only to the legislator staff
20  relationship.  And so just like any other attorney-client
21  document, once you start showing documents to third parties
22  that's been waived.
23          So the arguments here are completely different than
24  the arguments advanced to me on the legislative privilege.
25          And again, if Mr. Vera does not produce and not talk

1  about all of this, heads will roll.

2        MR. HILTON:  I certainly understand the Court's

3  ruling in that regard, you know, and we'll take whatever

4  appropriate action we think we need to take with respect to

5  that.

6        THE COURT:  It's called more delay in discovery of

7  this case.

8        MR. HILTON:  Well, I would just add that on appeal my

9  understanding is that there are also individual legislators

10 who have consolidated appeals who have, you know, slightly

11 different arguments.  So with respect to legislative

12 privilege, there's a lot that we are waiting on, but

13 regardless, we understand the Court's ruling.

14       THE COURT:  So let's go back to Mr. Stool's excellent

15 question.

16       I was thinking that there was going to be depositions

17 of these individuals but no longer anymore — now, apart from

18 the State, I'm talking about burdens on the county election

19 officials.  I was under the impression that this was just

20 depositions, not placing additional discovery production

21 burdens on any county election officials, or are you thinking

22 otherwise?

23       MISS PERALES:  Your Honor, there is current discovery

24 outstanding.  Because of the Court's current scheduling order,

25 there is discovery that has been served on counties.

1          And in fact, Mr. Stool and I are setting up a meet

2   and confer about document production from Dallas County before

3   the deadline, which is 30 days out from when we served it, and

4   within the Court's now vacated scheduling order.

5          So I would only want to make clear that if Mr. Stool

6   is asking as to newly propounded discovery versus that

7   discovery that we are still waiting to come in from the

8   counties.

9          THE COURT:  So, Mr. Stool, with regard to the request

10  for production that has been currently propounded upon your

11  office or other offices, are you objecting to producing the

12  current request?

13         MR. STOOL:  Not all of it, Your Honor.

14         There's — we — Miss Perales and I do have — we are

15  going to set up a meet and confer about the specifics of it

16  because Dallas County had been relying on the Court's previous

17  amended scheduling order and its limitation on the scope of

18  the discovery to the November 2022 general election that

19  was — your previous order had been very clear that —

20         THE COURT:  Yeah.  Well, that part, Mr. Stool, I'm

21  vacating.

22         MR. STOOL:  I understand that, so I will certainly,

23  we will take that into account when Miss Perales and I meet

24  and confer about that.  So, no, we just — I mostly wanted to

25  make sure we are not going to being subject to anymore written

1   discovery requests from the parties.

2          THE COURT:  I got you.

3          So with regard to the county election officials, any

4   request for production that have been currently propounded and

5   outstanding, the parties are to — well, the plaintiffs and

6   the county officials are to meet and confer about any

7   objections, burdensome, oppressive kind of arguments and try

8   to reach resolution.

9          But in an effort to protect the county election

10  officials from any further discovery, the new scheduling order

11  that will be entered will not permit the additional

12  propounding of discovery on the county election officials

13  unless it's acquiesced to and agreed to by that county office.

14         Does that make sense?

15  MISS YUN:  Yes, Your Honor.

16  MR. STOOL:  Yes, sir.

17  MR. HILTON:  Apologies for being the slowest one in

18  the room.  I just want to clarify, you know, your ruling with

19  respect to the scope of discovery.

20         I understand it with respect to the private-party

21  plaintiffs, the United States, and with the State.  You are

22  removing any scope limitations for the new discovery period?

23         THE COURT:  Well, it still has to be relevant.  It

24  still has to be proportional.  And it's got to be

25  nonprivileged.

1          MR. HILTON:  Of course.  Does that ruling not apply

2     to the county defendants, or does that ruling also apply to

3     the county defendants?

4          And the reason I ask is that the currently, you know,

5     currently propounded discovery we all issued under the

6     assumption that the scope of discovery — you know, the old

7     scope of discovery applied.  I could foresee a situation where

8     the Court has incomplete information if the scope is not the

9     same and we don't have the ability to address that.

10         Maybe I'm getting too hypothetical with it but that

11    was my question.

12         THE COURT:  Well, my understanding of what's been

13    going on with that scope is that there's arguments that — and

14    I'm not saying that they are correct — but the arguments are

15    that the State has not fully complied or it's delayed

16    production, and so it's all still hanging out there.

17         And so I don't want to be dealing with what was in

18    scope, what was out of scope.  Scope is 26(b)(1), relevant,

19    proportional, and nonprivileged.  And so I don't want to deal

20    with your fights.

21         MR. HILTON:  Understood.

22         THE COURT:  Anything else we need to take up today?

23         MISS YUN:  Your Honor, will the Court set a deadline

24    for the joint scheduling proposal that we are supposed to

25    submit?

1          THE COURT:  You will have 14 days.  My law clerk will

2     get it out to you today or tomorrow and you have 14 days from

3     receipt of that email to either get me an agreed to or

4     individual submissions.

5          MISS YUN:  Thank you, Your Honor.

6          THE COURT:  Anything else we need to do today?

7          MISS PERALES:  Not for plaintiffs, Your Honor.

8          MR. HILTON:  Nothing from the State, Your Honor.

9          THE COURT:  So I sure hope we don't have anymore

10    discovery fights because I'll be mad.

11          You know, the last time we were here regarding the

12    Harris County Republican Party, Mr. Vera -- I don't remember

13    who the lawyer was here.  I guess it was Mr. Gore.  My

14    question or comment, "Okay.  So then I'm hearing from you" --

15    this is all back in what?  November '22?  Yeah.  November

16    14th.

17          "Okay.  So then I'm hearing from you that you are

18    going to produce all documents responsive to Request for

19    Production Number 1 without objection and without any

20    assertion of privileges by December 1, is that what I'm

21    hearing?"  "Yes, Your Honor."

22          And then after we had discussions about the

23    similarity between Number 1 and Number 3, I said, "So I expect

24    Number 3 is going to be fully complied with by December 1,"

25    and we didn't get any of this slicing and dicing legislative

1  privilege.

2          And so after 20 years on the bench, I guess you just

3  get a smell test about who is not playing well in the sandbox,

4  and so whoever doesn't play well in the sandbox next time will

5  find themselves in deeper trouble than being deprived recess.

6          We're adjourned.

7      *(Concludes proceedings)*

8                          -o0o-

9      I certify that the foregoing is a correct transcript from

10  the record of proceedings in the above-entitled matter.  I

11  further certify that the transcript fees and format comply

12  with those prescribed by the Court and the Judicial Conference

13  of the United States.

14

15  Date:  03/10/23          /s/  *Gigi Simcox*
                                United States Court Reporter
16                              262 West Nueve Street
                                San Antonio TX 78207
17                              Telephone:  (210)244-5037

18

19

20

21

22

23

24

25



# APPENDIX F

No. 16-11534

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS, ET AL.,

*Plaintiffs-Appellees*,

*v.*

UNITED STATES OF AMERICA, ET AL.,

*Defendants-Appellants.*

On Appeal from the Northern District of Texas, Wichita Falls Division

## PLAINTIFFS-APPELLEES' MOTION TO DISMISS APPEAL OF DR. RACHEL TUDOR

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

SCOTT A. KELLER
Solicitor General
scott.keller@oag.texas.gov

JOSEPH D. HUGHES
Assistant Solicitor General
jody.hughes@oag.texas.gov

Counsel for Plaintiffs-Appellees

# Certificate of Interested Persons

Pursuant to 5th Circuit Rules 27.4 and 28.1, I hereby certify as follows:

(1) This case is State of Texas, et al. v. United States of America, et al.,
No. 16-11534 (5th Cir.).

(2) The following persons and entities, including those described in the fourth
sentence of Rule 28.2.1, have an interest in the outcome of this case:

Defendants-Appellants:

United States of America
U.S. Department of Education
John B. King, in his official capacity as U.S. Secretary of Education
U.S. Department of Justice
Loretta Lynch, in her official capacity as Attorney General
Vanita Gupta, in her official capacity as Principal Deputy Attorney
General
U.S. Equal Employment Opportunity Commission
Jenny R. Yang, in her official capacity as Chair of the U.S. Equal
Employment Opportunity Commission
U.S. Department of Labor
Thomas E. Perez, in his official capacity as U.S. Secretary of Labor
David Michaels, in his official capacity as U.S. Assistant Secretary of
Labor for Occupational Safety and Health Administration

Plaintiffs-Appellees:

State of Texas
Harrold Independent School District (TX)
State of Alabama
State of Wisconsin
State of Tennessee
Arizona Department of Education
Heber-Overgaard Unified School District (AZ)

i

Paul LePage, Governor of the State of Maine
State of Oklahoma
State of Louisiana
State of Utah
State of Georgia
State of West Virginia
State of Mississippi, by and through Governor Phil Bryant

<u>Movant-Appellant:</u>

Dr. Rachel Jona Tudor

<u>Amici Curiae:</u>

American Civil Liberties Union Foundation
American Civil Liberties Union of Texas
C.L. "Butch" Otter, Governor of the State of Idaho
Eagle Forum Education & Legal Defense Fund
GLBTQ Legal Advocates & Defenders
Lambda Legal Defense & Education Fund, Inc.
Letitia James, Public Advocate for the City of New York
National Center for Lesbian Rights
States in Opposition to Plaintiff's Application for Preliminary
Injunction
 (Washington, New York, California, Connecticut, Delaware,
 Illinois, Maryland, Massachusetts, New Hampshire, New
 Mexico, Oregon, Vermont, the District of Columbia)
Transgender Law Center

<u>Counsel:</u>

For Defendants-Appellants:
 Spencer Amdur, U.S. Department of Justice
 Benjamin L. Berwick, U.S. Department of Justice
 James Bickford, U.S. Department of Justice
 Beth C. Brinkmann, U.S. Department of Justice
 Megan A. Crowley, U.S. Department of Justice

Marleigh D. Dover, U.S. Department of Justice
August C. Flentje, U.S. Department of Justice
Sheila M. Lieber, U.S. Department of Justice
Benjamin C. Mizer, U.S. Department of Justice
Jennifer D. Ricketts, U.S. Department of Justice
Jeffrey E. Sandberg, U.S. Department of Justice
Mark B. Stern, U.S. Department of Justice
Thais-Lyn Trayer, U.S. Department of Justice

For Plaintiffs-Appellees:

Mark Brnovich, Attorney General of Arizona
Joseph David Hughes, Assistant Solicitor General of Texas
Scott A. Keller, Solicitor General of Texas
Jeff Landry, Attorney General of Louisiana
Andrew D. Leonie, Office of the Attorney General of Texas
Jeffrey C. Mateer, First Assistant Attorney General of Texas
Patrick Morrisey, Attorney General of West Virginia
David Austin R. Nimocks, Office of the Attorney General of Texas
Sam Olens, Attorney General of Georgia
Ken Paxton, Attorney General of Texas
Scott Pruitt, Attorney General of Oklahoma
Sean Reyes, Attorney General of Utah
Brad D. Schimel, Attorney General of Wisconsin
Prerak Shah, Office of the Attorney General of Texas
Herbert Slatery III, Attorney General of Tennessee
Brantley D. Starr, Office of the Attorney General of Texas
Joel Stonedale, Office of the Attorney General of Texas
Luther Strange, Attorney General of Alabama
Michael C. Toth, Office of the Attorney General of Texas

For Movant-Appellant:

Marie Eisela Galindo, Law Office of Marie Galindo
Ezra Ishmael Young, Transgender Legal Defense and Education
Fund, Inc.

iii

For Amicus Curiae American Civil Liberties Union Foundation, American Civil Liberties Union of Texas, GLBTQ Legal Advocates & Defenders, Lambda Legal Defense & Education Fund, Inc., National Center for Lesbian Rights, and Transgender Law Center:

>    Paul David Castillo, Lambda Legal Defense & Education Fund
>    Kenneth D. Upton Jr., Lambda Legal Defense & Education Fund

For Amicus Curiae C.L. "Butch" Otter, Governor of the State of Idaho

>    Cally Younger, Office of Governor C.L. "Butch" Otter

For Amicus Curiae Eagle Forum Education & Legal Defense Fund:

>    Karen Bryant Tripp

For Amicus Curiae Letitia James, Public Advocate for the City of New York:  Molly Thomas-Jensen, Office of the Public Advocate

For Amicus Curiae States in Opposition to Plaintiff's Application for Preliminary Injunction (Washington, New York, California, Connecticut, Delaware, Illinois, Maryland, Massachusetts, New Hampshire, New Mexico, Oregon, Vermont, the District of Columbia):

>    Alan D. Copsey, Deputy Solicitor General of Washington
>    Anisha S. Dasgupta, Deputy Solicitor General of New York
>    Robert W. Ferguson, Attorney General of Washington
>    Colleen M. Melody, Assistant Attorney General of Washington
>    Clause S. Platton, Office of the Solicitor General of New York
>    Noah G. Purcell, Solicitor General of Washington
>    Eric T. Schneiderman, Attorney General of New York
>    Barbara D. Underwood, Solicitor General of New York

>    /s/ Scott A. Keller
>    Scott A. Keller
>    Counsel for Plaintiffs-Appellees

Under Federal Rule of Appellate Procedure 27 and Fifth Circuit Rule 27.4, Plaintiffs-Appellees the State of Texas et al. ("Plaintiffs") hereby move to dismiss the appeal of Dr. Rachel Tudor. Defendants-Appellants the United States of America et al. ("Defendants") do not oppose this motion. Dr. Tudor opposes it.

Plaintiffs ask that the Court consider this motion in conjunction with Plaintiffs' pending motion for an extension of time to file their Appellees' brief, which is currently due February 6. Defendants are unopposed to that motion; only Dr. Tudor opposes Plaintiffs' request for an extension. But Dr. Tudor is not a proper party to this appeal. Accordingly, the Court should discount Dr. Tudor's opposition to Plaintiffs' extension motion and dismiss her appeal of the preliminary injunction. In any event, Plaintiffs ask the Court to determine whether Dr. Tudor is a proper party so that Plaintiffs will know whether they need to devote time and words to briefing issues that Dr. Tudor has raised but Defendants have not. *See, e.g.*, Tudor Br. 31-45. Plaintiffs further ask that the motions panel considering Plaintiffs' extension motion consider the issues raised in this motion, because the potential necessity of responding to issues raised only by a non-party further supports Plaintiffs' request for an extension of time.

## Background

In a separate lawsuit, in March 2015, the U.S. Department of Justice sued Southeastern Oklahoma State University and its governing board, alleging discrimination and retaliation against Dr. Rachel Tudor, a transgender professor, under Title VII. Tudor Br. 1; ROA.1167-68. In May 2015, Dr. Tudor intervened in

that suit and claimed, *inter alia*, that she had been subjected to a hostile work environment. Tudor Br. 1; ROA.1193. Shortly thereafter, the Oklahoma defendants moved to dismiss Dr. Tudor's hostile-work-environment claims on the ground that she was not a member of a protected class for Title VII purposes. ROA.1183. In July 2015, the district court denied the Oklahoma defendants' motion to dismiss, holding that Tenth Circuit precedent allowed Dr. Tudor to claim that the Oklahoma defendants discriminated against her because "the actions Dr. Tudor alleges Defendants took against her were based upon their dislike of her presented gender." ROA.1183 (quoting *United States v. Se. Okla. State Univ.*, No. Civ-15-324-C, 2015 WL 4606079 at *2 (W.D. Okla. July 10, 2015)). That separate lawsuit has since been stayed in light of the preliminary injunction in the instant case, ROA.1066, and the clarifying order issued October 18. Order, ECF No. 86 at 6 n.2 (Oct. 18, 2016); ROA.1367.

The district court granted the preliminary injunction at issue in this appeal on August 21, 2016. ROA.1030. Dr. Tudor moved for permissive intervention under Rule 24(b) three weeks later, on September 12, 2016. ROA.1167. Dr. Tudor sought to intervene "for the limited purpose of seeking a declaratory judgment recognizing that" the order denying Oklahoma's motion to dismiss in Dr. Tudor's lawsuit "finally decided the question of whether Dr. Tudor is a member of a protected class under Title VII." ROA.1168 (citing *Se. Okla. State Univ.*, 2015 WL 4606079 at *2).

Plaintiffs and Defendants opposed Dr. Tudor's motion to intervene on several grounds. ROA.1312; ROA.1322. First, it was untimely, having been filed more than

2

three months after this suit was initiated and more than 15 months after Dr. Tudor intervened in the Oklahoma litigation. ROA.1323-1328. Second, it did not identify a "claim or defense that shares with the main action a common question of law or fact," as required by Fed. R. Civ. P. 24(b). ROA.1315-1316. Fatally, Dr. Tudor's stated reason for intervening—to assert that the denial of Oklahoma's motion to dismiss in Dr. Tudor's case collaterally estops Oklahoma from litigating the protected-class question here—is invalid as a matter of law because collateral estoppel requires a final judgment, which has not yet been rendered in either case. ROA.1316-1319.

On October 27, Dr. Tudor asked the district court to rule on her motion to intervene. ROA.1428. One week later, on November 3, 2016, Dr. Tudor filed a protective notice of appeal of the preliminary injunction and the October 18 clarifying order. ROA.1455. Dr. Tudor filed an appellant's brief in this Court on January 3, 2017.

## Argument

### A.  Dr. Tudor Cannot Appeal the Preliminary Injunction Because She Is Not a Party to This Suit.

The district court has not ruled on Dr. Tudor's intervention motion, so she remains a non-party. *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009) ("[I]ntervention is the requisite method for a nonparty to become a party to a lawsuit."). "[A] prospective intervenor does not become a party to the suit unless and until he is allowed to intervene." *Robert Ito Farm, Inc. v. County of Maui*, 842

F.3d 681, 687 (9th Cir. 2016). As a would-be intervenor, Dr. Tudor cannot appeal the district court's preliminary injunction.

"The rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well settled." *Marino v. Ortiz*, 484 U.S. 301, 304 (1988) (per curiam); *see* Fed. R. App. P. 3(c)(1)(A) (requiring notice of appeal to "specify the *party or parties* taking the appeal" (emphasis added)). Specifically, this Court has recognized that "would-be intervenors" who "never obtained the status of party litigants" cannot appeal orders unrelated to their intervention efforts. *Edwards v. City of Houston*, 78 F.3d 983, 993 (5th Cir. 1996) (en banc); *see Toronto-Dominion Bank v. Cent. Nat'l Bank & Trust Co.*, 753 F.2d 66, 68 (8th Cir. 1985) ("Because the motion to intervene has not yet been granted or denied, BNB's status remains uncertain and it has no standing to take an appeal or appear as a party.").[1]

Dr. Tudor could have petitioned for a writ of mandamus directing the district court to rule on her intervention motion before Defendants perfected appeal. *See, e.g.*, *Pfizer, Inc. v. Kelly (In re Sch. Asbestos Litig.)*, 977 F.2d 764, 792 (3d Cir. 1992) (mandamus is available to remedy a court's refusal to rule on a pending motion). In

---

[1] An order denying a motion for permissive intervention is appealable only if the district court abused its discretion in denying permission to intervene. *See, e.g.*, *Woolen v. Surtran Taxicabs, Inc.*, 684 F.2d 324, 330-31 (5th Cir. 1982). Plaintiffs and Defendants both explained below why it would not have been an abuse of discretion to deny her intervention. ROA.1312-1328; *see also* Defs.' Br. 17 n.3. However, because the district court has not yet ruled, and Dr. Tudor has not challenged the failure to rule as an implicit denial of intervention, this Court need not reach the question of whether the district court would have abused its discretion in denying permissive intervention.

the alternative, Dr. Tudor could have argued that the district court implicitly denied her intervention motion and abused its discretion in denying permissive intervention. *See Toronto–Dominion Bank*, 753 F.2d at 68 (recognizing that a court's "failure to rule on a motion to intervene can be interpreted as an implicit denial" of the motion); *Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 420 (5th Cir. 2002) (reviewing the "effective denial of the FDIC's motion to intervene" under the collateral-order doctrine). But Dr. Tudor did not pursue either of those options, and this Court should not put her in the same position as a successful intervenor by allowing her to appeal an order in a case to which she is not a party.

## B. Dr. Tudor Cannot Appeal the Preliminary Injunction as a Non-Party.

Nor can Dr. Tudor invoke the rare exception allowing appeals by non-parties who participate without objection in the district court and are functionally treated as parties. *See Doe v. Pub. Citizen*, 749 F.3d 246, 256-265 (4th Cir. 2014). In *Public Citizen*, the Fourth Circuit allowed a non-party's appeal of peripheral issues under unique circumstances. That case is distinguishable in several respects.

First, in *Public Citizen*, the movant's intervention motion was unopposed, and the district court ultimately granted it in post-judgment proceedings.[2] *Id.* at 256. Second, the movant had "participated in the case" before judgment with the acquiescence of the parties and the district court. *Id.* at 260. Specifically, the movant

---

[2] The district court later attempted to revoke the movant's intervention in *Public Citizen*, but it lacked jurisdiction to do so because appeal had already been perfected. 749 F.3d at 259.

had objected to motions filed by the plaintiffs (which objections the district court considered and overruled), and also filed its own motion (apart from its intervention motion). *Id.* Third, the movant affirmatively challenged the district court's delay in ruling as a "'constructive denial' of the motion to intervene." *Id.* at 253. Finally, the movant did not challenge the merits judgment awarding the plaintiff injunctive relief; instead, it appealed only the court's peripheral orders sealing the record and allowing the plaintiff to proceed under a pseudonym. *Id.*

Here, by contrast, Plaintiffs and Defendants both objected to Dr. Tudor's belated motion to intervene. Dr. Tudor did not participate in the proceedings that led to the preliminary injunction; she did not even move to intervene until three weeks after the preliminary injunction issued.  Unlike the putative intervenor in *Public Citizen*, Dr. Tudor has not challenged on appeal the district court's failure to rule on her motion to intervene or treated it as a constructive denial of her motion. And far from challenging peripheral matters, Dr. Tudor seeks to challenge the preliminary injunction itself. This case is thus very different from both *Public Citizen* and other rare cases in which non-parties who timely participated in the district-court proceedings were allowed to appeal. *Id.* at 260 (discussing *Kaplan v. Rand*, 192 F.3d 60 , 66-67 (2d Cir. 1999); *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1113-14 (9th Cir. 1999); *Binker v. Pennsylvania*, 977 F.2d 738, 745 (3d Cir. 1992)).

## II. Dr. Tudor's Attempt to Appeal Is Untimely.

Dr. Tudor filed her notice of appeal on November 3, 2016. ROA.1455. She seeks to appeal both the August 21 preliminary injunction, ROA.1030, and the October 18 order clarifying the injunction, ROA.1362. Dr. Tudor had 60 days (until October 20, 2016) to appeal the preliminary injunction. Fed. R. App. P. 4(a)(1)(B). Her appeal, filed 74 days after August 21, is untimely.

Dr. Tudor invokes Federal Rule of Appellate Procedure 4(a)(3), which provides that "[i]f one party timely files a notice of appeal, any other *party* may file a notice of appeal within 14 days after the date when the first notice was filed." Fed. R. App. P. 4(a)(3) (emphasis added); Tudor Br. 5. But "a prospective intervenor does not become a party to the suit unless and until he is allowed to intervene." *Robert Ito Farm,* 842 F.3d at 687 (holding that putative intervenors are not "parties" for purposes of the Federal Magistrate Act's consent requirement). To date, Dr. Tudor has not been allowed to intervene. Accordingly, her reliance on Rule 4(a)(3) is misplaced because she is not an "other party" under that Rule. *See Eisenstein*, 556 U.S. at 933.

In *Eisenstein*, the Supreme Court held that the Federal Government is not a "party" to a *qui tam* suit for purposes of Federal Rule of Appellate Procedure 4(a)(1), which extends the appeal deadline to 60 days when the United States is "one of the parties," unless the Government "intervenes in accordance with the procedures established by federal law." 556 U.S. at 933. Similarly, Dr. Tudor will not "become a 'party' to [this] lawsuit" unless and until she is allowed to "intervene

in the action." *Id.* (defining a "'party' to litigation [a]s '[o]ne by or against whom a lawsuit is brought'" (quoting Black's Law Dictionary 1154 (8th ed. 2004))). And Dr. Tudor has not explained why a potential intervenor would be deemed a "party" for purposes of Rule 4(a)(3) when she is not one for purposes of Rule 4(a)(1).

Nor is there jurisdiction over Dr. Tudor's attempted appeal of the October 18 clarifying order. Interlocutory orders clarifying injunctions are unappealable. *See, e.g.*, *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 832 (11th Cir. 2010); *Mikel v. Gourley*, 951 F.2d 166, 169 (8th Cir. 1991). Dr. Tudor argues that the Court has pendent jurisdiction over her appeal of the clarifying order because that order is "inextricably intertwined with" the preliminary injunction. Tudor Br. 5. But that argument assumes Dr. Tudor properly and timely appealed the injunction itself.

In any event, the exercise of pendent appellate jurisdiction is wholly discretionary. *See, e.g.*, *Wallace v. County of Comal*, 400 F.3d 284, 291-92 (5th Cir. 2005). And "[n]one of the few cases in which this court has exercised pendent appellate jurisdiction is substantially similar or fairly analogous to th[is] case." *Byrum v. Landreth*, 566 F.3d 442, 450 & n.9 (5th Cir. 2009) (citing cases).

\* \* \* \*

In sum, Dr. Tudor is not a party to this lawsuit and cannot properly appeal the preliminary injunction or the order clarifying it. Accordingly, the Court should discount her opposition to Plaintiffs' pending motion for extension of time and dismiss her appeal. However, if the Court deemed it appropriate to treat Dr. Tudor's appellant's brief as an amicus curiae brief, Plaintiffs would have no objection. In any

event, Plaintiffs ask the Court to determine whether Dr. Tudor is a proper party so that Plaintiffs will know whether they need to devote time and words to briefing issues that Dr. Tudor has raised but Defendants have not. *See, e.g.*, Tudor Br. 31-45.

## Conclusion

The Court should dismiss Dr. Tudor's appeal.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

/s/ Scott A. Keller
SCOTT A. KELLER
Solicitor General

JOSEPH D. HUGHES
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for Plaintiffs-Appellees*

January 30, 2017

## CERTIFICATE OF CONFERENCE

On January 30, 2017, Plaintiffs' counsel conferred via email with Jeffrey Sandberg, counsel for Defendants-Appellants; and with Ezra Young, counsel for Movant-Appellant Dr. Rachel Tudor. Mr. Sandberg stated that Defendants-Appellants do not oppose the dismissal of Dr. Tudor's appeal and will not file an opposition. Mr. Young stated that Dr. Tudor opposes dismissal of her appeal and will file an opposition.

/s/ Scott A. Keller
SCOTT A. KELLER

January 30, 2017

## CERTIFICATE OF SERVICE

I certify that on January 30, 2017, this motion was (1) served via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov, upon all registered CM/ECF users; and (2) transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov. I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Scott A. Keller
SCOTT A. KELLER

January 30, 2017

## CERTIFICATE OF COMPLIANCE

This motion complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 2,240 words. This motion complies with the requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (Equity Text A and Equity Caps A) using Microsoft Word 2010.

/s/ Scott A. Keller
SCOTT A. KELLER

January 30, 2017

# APPENDIX G

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No:  23-1597

_____

Turtle Mountain Band of Chippewa Indians; Spirit Lake Tribe; Wesley Davis; Zachery S. King; Collette Brown

Plaintiffs - Appellees

v.

Michael Howe

Defendant

North Dakota Legislative Assembly; William R. Devlin, Representative also known as Bill Devlin; Senator Ray Holmberg, Representative; Senator Richard Wardner, Representative; Senator Nicole Poolman, Representative; Michael Nathe, Representative; Terry Jones, Representative; Claire Ness, Senior Counsel at the North Dakota Legislative Council

Movants - Appellants

_____

Appeal from U.S. District Court for the District of North Dakota - Eastern
(3:22-cv-00022-PDW)

_____

## JUDGMENT

Before COLLOTON, BENTON, and KELLY, Circuit Judges.

The court has carefully reviewed the original file of the United States District Court and

orders that this appeal be dismissed for lack of jurisdiction.

April 03, 2023

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.
_____
       /s/ Michael E. Gans



# APPENDIX H

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO *et al.*,  §
　　　　*Plaintiffs*,  §
　　　　　　　　　　　　　§
v.  §  Civil Action No. SA-21-CV-00844-XR
　　　　　　　　　　　　　§
GREGORY W. ABBOTT, IN HIS  §
OFFICIAL CAPACITY AS GOVENOR  §
OF TEXAS *et al*.;  §
　　　　*Defendants*.  §

## ORDER

On this day came on to be considered: (1) Plaintiffs' Motion to Compel Production of Documents and to Compel Testimony of Defendant Intervenor Harris County Republican Party (ECF No. 547) and the responses thereto (ECF Nos. 555, 560), and (2) the parties' Joint Motion for Clarification of the Scheduling Order (ECF No. 542). After careful consideration, the Court issues the following order.

## BACKGROUND

In August 2021, the Texas Legislature passed Senate Bill 1 ("SB 1"), which amended various provisions of the Texas Election Code pertaining to voter registration, voting by mail, poll watchers, and more. In the days and weeks after the law was enacted, numerous parties began filing complaints against various Texas state officials (the "State Defendants") and local elections administrators in this district, challenging certain provisions of SB 1 under the United States Constitution and various federal civil rights statutes. In the interest of judicial economy, these were consolidated under the above-captioned case, as it was first filed.[1]

---

[1] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021)

In October 2021, several local and national Republican committees (the "Committees"), including The Harris County Republican Party ("HCRP" or "Defendant-Intervenor"), sought to intervene in this case. ECF No. 57. The Court denied their motion, concluding that the Committees had not established a legally protectable interest at stake in this litigation or that the State Defendants' representation of their purported interests would be inadequate. *See* ECF No. 122 at 2–7. The Fifth Circuit reversed the Court's order denying intervention, concluding that the Committees' interest in SB 1's provisions concerning party-appointed poll watchers—an interest raised for the first time on appeal—warranted intervention. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022).

In May 2022, the Court granted the Committees' renewed motion to intervene and, after giving the parties an opportunity to confer, the parties submitted a proposed Amended Scheduling Order on June 7, 2022, to accommodate the Committees' participation in the case and various delays caused by discovery disputes. *See* Text Orders dated May 13, 2022 and May 18, 2022; ECF No. 436. The next day, the Court entered the Amended Scheduling Order tracking the parties' proposal. ECF No. 437.

The HCRP now seeks to avoid producing certain discovery to the Plaintiffs. *See* ECF No. 560. Specifically, Plaintiffs seek to compel Defendant-Intervenor to comply with Requests for Production Numbers 1[2] and 3[3], which it previously agreed to produce at a hearing on November 14, 2022. The relevant exchange between counsel for the HCRP and the Court was as follows:

---

and *Mi Familia Vota v. Abbott*, No. 5: 21-cv-920 (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex. 2021); *United States v. Texas*, No. 5:21-cv-1085 (W.D. Tex. 2021), ECF No. 13.

[2] REQUEST FOR PRODUCTION NO. 1. All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Texas Legislature regarding SB 1, SB 7, HB 3, or HB 6.

[3] REQUEST FOR PRODUCTION NO. 3. All documents, including but not limited to communications, talking points, and memoranda, sent to or exchanged with the Office of the Texas Governor, the Office of the Texas Attorney General, the Office of the Texas Lieutenant Governor, or the Office of the Texas Secretary of State regarding SB 1, SB 7, HB 3, or HB 6.

> THE COURT: Okay. So then I'm hearing from you that you're going to produce all documents responsive to Request for Production Number 1 without objection and without any assertion of privileges by December 1. Is that what I'm hearing?
>
> MR. GORE: Yes, Your Honor.
>
> \*\*\*
>
> [After further discussion regarding the similarities between RFP 1 and 3, the Court stated:]
>
> THE COURT: So I expect Number 3 is going to be fully complied with by December 1.

ECF No. 487, Hr'g Tr. at 13:17–22, 35:3–4. The Court warned counsel that, to the extent that the production was deficient, it would entertain sanctions. *Id.* at 18:2–7. In its written order memorializing its rulings on the parties' discovery disputes, the Court further cautioned that a party found to have "improperly assert[ed] a privilege [during a deposition] may be required to bear the costs of any re-deposition." ECF No. 490 at 20.

On December 1, 2022, Defendant-Intervenor served 61 documents responsive to Plaintiffs' requests. On February 27, 2023, Alan Vera, who served as Chair of the Harris County Republican Party Ballot Security Committee was deposed. Defendant-Intervenor identified Mr. Vera as a relevant custodian and person with knowledge of relevant facts. In his deposition, Mr. Vera testified that he communicated extensively with legislators and legislative staff regarding SB1 from June of 2020 through September 2021. He also met with several of these legislators and staff members in person and gave them documents. He further testified that he had email and phone calls with these individuals, providing legislators with proposed language for SB1 and giving "feedback" to Texas State Senator Paul Bettencourt and State Representatives Jacey Jetton, Valoree Swanson, and Briscoe Cain. He wrote many notes throughout this process. His communications included discussions of mail ballot harvesting, poll watchers, penalties that

should be assessed against election officials, drive-through voting, and other matters relevant to this litigation.

On February 28, Defendant-Intervenor produced Cynthia Siegel as its Rule 30(b)(6) representative. Ms. Siegel testified that Mr. Vera represented the HCRP in communicating with the Texas Legislature. She also testified that Mr. Vera used his personal email address when communicating because he did not possess an official HCRP email address.

When Mr. Vera was questioned about whether anyone associated with the HCRP instructed him to search for any responsive documents, he testified that he made no such search of his personal computer or email accounts.

The Court held a hearing on both pending motions on March 7, 2023. As stated in open court and set out more fully below, both motions are **GRANTED**.

## DISCUSSION

### A.    Possession, Custody or Control

Defendant-Intervenor argues that it was under no obligation to produce any of Mr. Vera's documents because the material was not in the possession, custody, or control ("PCC") of the Harris County Republican Party. Defendant-Intervenor otherwise asserts the legislative privilege, an argument this Court has already rejected in this litigation.[4]

PCC is not defined in Federal Rule of Civil Procedure 34 explicitly. Some jurisdictions have stated that a party must produce documents if the party has actual possession, custody or control or has the legal right to obtain the documents on demand. Other jurisdictions have stated that "control" can be found where a party has the practical ability, to acquire the documents. *See*

---

[4] The Court has already noted that the legislative privilege belongs solely to a legislator, and he/she is the only person able to assert that privilege. Neither Mr. Vera nor Defendant-Intervenor can assert the privilege. *See* ECF No. 425 at 4–13. The Court has further concluded that the privilege can be waived if data or documents are shared with anyone outside the legislator/staff relationship. *Id.* That is exactly what occurred here.

*e.g.*, *In re Application of Potanina*, No. 14 MISC. 31 LAP, 2015 WL 4476612, at *1 (S.D.N.Y. June 30, 2015). Despite the fact that many perceive courts in the Fifth Circuit bound to the "legal right" test,[5] many district courts in the Circuit apply a hybrid test—Rule 34 contemplates a party's legal right or practical ability to obtain documents from a non-party to the action. *See, e.g.*, *Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, No. 4:19-CV-1118, 2020 WL 10759435, at *1 (S.D. Tex. Mar. 2, 2020) (citing cases).

This case presents a situation that falls outside the norm of most of these disputes. Here, Mr. Vera acted as the agent for the HCRP but used only using his personal computer and personal email address because the HCRP did not provide him with any equipment. Nonetheless, the Court is satisfied that, under either test, the HCRP is required to search for and produce documents responsive to the requests for production at issue located on Mr. Vera's personal computer and email account. *See id.* at *2 (concluding that the defendant organization had *both* the legal right *and* practical ability to obtain any items responsive to the plaintiffs' discovery requests in the possession of one of its agents).

Defendant-Intervenor failed to conduct a search of Mr. Vera's computer or email account or even to request that he do so personally. Instead, Defendant-Intervenor merely searched its own email servers. At the hearing on March 7, 2023, counsel for Defendant-Intervenor argued that there was no need to search Mr. Vera's personal computer because he would have copied someone with an HCRP email address whenever he was acting as its agent. But counsel failed to conduct any meaningful inquiry into whether Mr. Vera's computer or email account contained relevant communications made on Intervenor-Defendant's behalf in which Mr. Vera failed to copy an

---

[5] *See* The Sedona Conference, *The Sedona Conference Commentary on Rule 34 and Rule 45 "Possession, Custody, or Control"*, 17 SEDONA CONF. J. 467 (2016) (stating the Fifth Circuit is a legal right test jurisdiction, but then citing cases that apply the hybrid approach).

HCRP email address.  Indeed, the legislators could have responded to Mr. Vera's emails without responding to all.  Accordingly, all messages may not be located solely in HCRP's emails.  Without a review of Mr. Vera's computer and email account, counsel for Defendant-Intervenor was unable to accurately represent that Defendant-Intervenor's production was complete under Rule 26(g).  Further, any objection now being lodged at the hearing that a review of Mr. Vera's emails would be unduly burdensome lacks merit.  No such objection was noted at the November 14, 2022 hearing, and no evidence has been put forward supporting any objection.  Counsel's argument is not evidence.  Likewise, any argument now being raised that Mr. Vera represents other individuals in some form of lobbying capacity and a review of his email would be improper is also rejected as untimely.  In addition, the Court is not authorizing any wholesale intrusion into Mr. Vera's computer by the Plaintiffs.  All that is being required is that HCRP and Mr. Vera make a reasonable inquiry into his emails and produce responsive documents.

On a separate note, the Court observes that  the State Defendants were previously required to produce to the Court for an in-camera inspection documents that the State Defendants claimed were privileged. The State Defendants' production to the Court contained fewer than 20 communications between Mr. Vera and various legislators (*see* ECF No. 425 at 48–49, 51–53, 55) while Mr. Vera's own (potentially deficient) production contained 61 documents suggests that the State Defendants' earlier production to the Court may have been incomplete.

**B.     Inappropriate Objections Asserted and Non-Responsive Answers made during the deposition of Mr. Vera**

During Mr. Vera's deposition, counsel for the State Defendants instructed Mr. Vera not to answer various questions based upon the legislative privilege. At other times, Mr. Vera limited his

responses independently citing the privilege. As stated above, and as previously ordered, these objections were meritless.[6]

It is **ORDERED** that Mr. Vera submit to another deposition, with costs assessed against the Office of the Attorney General of Texas. Counsel in the Attorney General's Office was the individual responsible for asserting the meritless objections. Further, that counsel knew at the time he made such objections that he did not represent any of the legislators and that no legislator instructed him to make the objection on their behalf. Further, that counsel knew or should have known of this Court's prior rulings on this matter and that any legislative privilege had been waived because the material was shared outside the legislator/staffer relationship. Plaintiffs are further awarded their reasonable attorneys' fees associated with the filing of their motion to compel and their appearance at the hearing held on March 7, 2023.

Plaintiffs are **DIRECTED** to issue a serve a third-party subpoena under Rule 45 on Mr. Vera in connection with his re-deposition directing him to produce the documents identified in Requests for Production Numbers 1 and 3. This does not relieve HCRP from supplementing its production and producing responsive documents.

It is further **ORDERED** that Mr. Vera and the HCRP produce all documents responsive to the two requests for production at least **fourteen calendar days** prior to the second deposition.

## C.     Motion to Clarify Scheduling Order

The current scheduling order, a proposal submitted and largely agreed to by both parties, was signed on June 8, 2022. ECF No. 437. The parties now dispute the meaning of their own proposal and ask the Court to clarify the scope of discovery. At the hearing, the parties announced

---

[6] At the hearing, counsel for the State Defendants made an oral motion to stay this ruling pending the resolution of the appeal of the Court's previous order on the legislative privilege currently pending before the Fifth Circuit. See ECF No. 426. The Court denied the motion to stay in light of counsel's acknowledgment at the hearing that no legislator actually asserted the privilege during the deposition of Mr. Vera, who is neither a legislator nor a legislative staffer.

that additional discovery is still required to prepare this case for either cross-motions for summary judgment or trial.

The First Amended Scheduling Order is **VACATED**. The parties are **ORDERED** to submit a proposed scheduling order to govern the remainder of this case **no later than March 21, 2023**.

The State Defendants also seek to limit the remaining depositions of Keith Ingram, Director of the Elections Division of the Texas Secretary of State, under Rules 30(b)(1) and 30(b)(6), to a total of nine hours of combined record time. Mr. Ingram has already been deposed for nearly twelve hours—first, as a witness in his individual capacity for over four hours, and then as the sole designee during the first 30(b)(6) deposition of the Texas Secretary of State, which lasted for almost eight hours over the course of two days.

As agreed to by the State Defendants, the additional deposition of Mr. Ingram, whether he is testifying as a fact witness or a 30(b)(6) witness, will be limited to a total of nine hours of combined record time. If Mr. Ingram is unable to answer any questions in his capacity as a 30(b)(6) witness, however, the nine-hour limit will not apply to any additional 30(b)(6) representative that the State Defendants may need to designate in order to answer the questions that Mr. Ingram cannot answer.

## CONCLUSION

The Joint Motion for Clarification of the Scheduling Order (ECF No. 542) is **GRANTED**, and a second amended scheduling order will issue separately. The parties are **ORDERED** to submit a proposed scheduling order to govern the remainder of this case **no later than March 21, 2023**.

Any additional deposition of Mr. Ingram, whether he is testifying as a fact witness or a 30(b)(6) witness, will be limited to a total of nine hours of combined record time.

Plaintiffs' Motion to Compel Production of Documents and to Compel Testimony of Defendant-Intervenor Harris County Republican Party (ECF No. 547) is **GRANTED**.

Plaintiffs are **DIRECTED** to issue a serve a third-party subpoena under Rule 45 on Mr. Vera in connection with his re-deposition directing him to produce the documents identified in Requests for Production Numbers 1 and 3. Mr. Vera must be re-deposed and counsel for Defendant-Intervenor must search Mr. Vera's computer and email for responsive documents. It is further **ORDERED** that Mr. Vera and the HCRP produce all documents responsive to the two requests for production at least **fourteen calendar days** prior to the second deposition.

The Office of the Attorney General of Texas is sanctioned for failing to comply with this Court's previous rulings on the legislative privilege and shall bear the costs of the re-deposition of Mr. Vera. Plaintiffs are further awarded their reasonable attorneys' fees associated with the filing of their motion to compel and their appearance at the hearing held on March 7, 2023.

In failing to search Mr. Vera's computer and email account for responsive documents, the Harris County Republican Party failed to comply with FED. R. CIV. P. 26(g), failed to comply with the Court's Order set forth at the November 14, 2022 hearing, and failed to promptly produce documents in violation of Federal Rule of Civil Procedure 37(c).

The parties have been warned previously in this case about discovery abuse and obfuscation practices that seek to hinder the truth-finding function that should take place in the resolution of this matter. If additional discovery misconduct occurs, the level of sanctions will be increased accordingly and those responsible for the misconduct will be held in contempt of court.

It is so **ORDERED**.

**SIGNED** March 9, 2023.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al. | § | |
| *Plaintiffs* | § | |
| | § | |
| vs. | § | Case No.  SA-21-CV-00844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants* | § | |

## PROPOSED SECOND AMENDED SCHEDULING ORDER

The disposition of this case will be controlled by the following amended order.  If a deadline set in this order falls on a weekend or a holiday, the effective day will be the next business day.

### EXPERTS

All parties shall file all designations of rebuttal experts and serve on all parties the material required by Fed. R. of Civ. P. 26(a)(2)(B) for such rebuttal experts, to the extent not already served, within fifteen (15) days of receipt of the report of the opposing expert.

An objection to the reliability of an expert's proposed testimony under Federal Rule of Evidence 702 shall be made by motion, specifically stating the basis for the objection and identifying the objectionable testimony, within eleven (11) days from the receipt of the written report of the expert's proposed testimony, or within eleven (11) days from obtaining a copy of the expert's deposition, if a deposition is taken, whichever is later.

The deadline for filing supplemental reports required under Fed. R. Civ. P. 26(e) is **May 5, 2023**.

### COMPLETION OF DISCOVERY

The deadline for the completion of all discovery is **April 28, 2023**.

**PRETRIAL MOTIONS**

No motion (other than a motion *in limine*) may be filed after this date except for good cause. The deadline to file motions (including dispositive motions and Daubert motions) is **May 12, 2023**. This deadline is also applicable to the filing of any summary judgment motion under Fed. R. Civ. P. 56 and any defense of qualified immunity. Leave of court is automatically given to file motions, responses, and replies not to exceed 30 pages in length. Fed. R. Civ. P. 6(d) does not apply to the time limits set forth in Local Rule CV-7 for responses and replies to motions.

**WITNESS LIST, EXHIBIT LIST, AND PRETRIAL DISCLOSURES**

The deadline for filing Rule 26(a)(3) disclosures is **July 25, 2023**.

The deadline for filing objections under Rule 26(a)(3) is **August 8, 2023**. Any objections not made will be deemed waived.

**JOINT PRETRIAL ORDER AND MOTION IN LIMINE**

The deadline to file a Final Joint Pretrial Order and any motion *in limine* is **August 22, 2023**.

All attorneys are responsible for preparing the Final Joint Pretrial Order, which must contain the following:

(1) a short statement identifying the Court's jurisdiction. If there is an unresolved jurisdictional question, state it;

(2) a brief statement of the case, one that the judge could read to the jury panel for an introduction to the facts and parties;

(3) a summary of the remaining claims and defenses of each party;

(4) a list of facts all parties have reached agreement upon;

(5) a list of contested issues of fact;

(6) a list of the legal propositions that are not in dispute;

(7) a list of contested issues of law;

(8) a list of all exhibits expected to be offered. Counsel will make all exhibits available for examination by opposing counsel. All documentary exhibits must be exchanged before the final pre-trial conference. The exhibit list should clearly reflect whether a particular exhibit is objected to or whether there are no objections to the exhibit;

(9) a list of the names and addresses of witnesses who may be called with a brief statement of the nature of their testimony;

(10) an estimate of the length of trial;

(11) for a jury trial, include (a) proposed questions for the voir dire examination, and (b) a proposed charge, including instructions, definitions, and special interrogatories, with authority;

(12) for a nonjury trial, include (a) proposed findings of fact and (b) proposed conclusions of law, with authority;

(13) the signatures of all attorneys; and

(14) a place for the date and the signature of the presiding judge.

**FINAL PRETRIAL CONFERENCE**

The Final Pretrial Conference shall be held on **Thursday, August 31, 2023** at **10:30 a.m.**

Motions *in limine*, if any, will be heard on this date. Counsel should confer prior to this hearing on any issues raised in a motion *in limine* or the Joint Pretrial Order. Any party intending to use a demonstrative exhibit should provide the same to opposing counsel at least 3 days prior to the Final Pretrial conference so that if any objections or issues are raised about the demonstrative exhibit, they can be addressed at the final pretrial conference.

**TRIAL**

The Bench Trial Date is **Monday, September 11, 2023** at **9:00 a.m.**

Due to several fall holidays and a preexisting scheduling conflict, trial will recess for the following dates: September 15, 18, and 25–29.

It is so **ORDERED.**|

**SIGNED** this 30th day of March, 2023.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE